**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| AMERICAN COMMERCIAL LINES INC., | § | Case No. 20-30982 (MI) |
| *et al.*, | § |  |
|  | § | (Joint Administration Requested) |
| Debtors.[1] | § | (Emergency Hearing Requested) |
|  | § |  |

**EMERGENCY MOTION OF DEBTORS FOR ORDER
(I) AUTHORIZING DEBTORS TO (A) CONTINUE PAYING OBLIGATIONS
WITH RESPECT TO INSURANCE POLICIES ENTERED INTO PREPETITION
(B) CONTINUE TO PAY BROKERAGE FEES, (C) RENEW, SUPPLEMENT,
MODIFY, OR PURCHASE INSURANCE COVERAGE, (D) CONTINUE
TO PAY WORKER'S COMPENSATION, LHWCA AND JONES ACT COVERAGE
FEES, (E) MAINTAIN SURETY BONDS; AND (II) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED.  A HEARING WILL BE
> CONDUCTED ON THIS MATTER ON FEBRUARY 10, 2020 AT 3:30 PM CT
> IN COURTROOM 404, 4th FLOOR, 515 RUSK STREET, HOUSTON, TX
> 77002.  IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE
> THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU
> MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN
> RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY
> TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF
> REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN FEBRUARY 10, 2020.**

American Commercial Lines Inc. and its affiliated debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), respectfully represent as follows in

support of this motion (this "Motion"):

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

## Relief Requested

1.       Pursuant to sections 363(b) and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), the Debtors seek entry of an order (the "Proposed Order"), substantially in the form attached hereto: (a) authorizing, but not directing, the Debtors to (i) continue honoring their insurance obligations under the prepetition Insurance Policies (as defined herein) and satisfy prepetition obligations related thereto, including the payment of related brokerage fees; (ii) renew, supplement, modify, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; (iii) pay fees on account of the Workers' Compensation Coverage; (iv) continue to renew their Surety Bonds (as defined herein) on an uninterrupted basis postpetition; and (b) granting related relief.

## Background

2.       On February 7, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these cases. Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of these cases for procedural purposes only.

3.       The Debtors are one of the largest and most diversified inland marine transportation and services companies in the United States.  The Debtors' barge fleet transports a variety of liquid and dry cargoes on the Mississippi River, its tributaries, and on the Gulf Intracoastal Waterway, including chemicals, crude oil and petrochemicals, agricultural products, metals, and other bulk and construction materials.

2

4.     On January 31, 2020, the Debtors executed a restructuring support agreement (the "RSA") with the Consenting Lenders and Sponsor.  Pursuant to the RSA, the Consenting Lenders agreed to vote in favor of and support confirmation of the *Joint Prepackaged Chapter 11 Plan of American Commercial Lines Inc. and its Affiliated Debtors and Debtors in Possession* (the "Prepackaged Plan").

5.     Additional information in support of this Motion and regarding the Debtors' businesses, assets, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of David J. Huls in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] which is being filed contemporaneously herewith and is incorporated herein by reference.

## Jurisdiction

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Debtors' Insurance Policies

7.     The Debtors maintain approximately 30 insurance policies (collectively, the "Insurance Policies") administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers").  The insurance policies provide coverage for, among other things, the Debtors' directors and officers, general marine liability, equipment, flood, environmental pollution, automobiles, vessel pollution, and commercial property.  A schedule of the Insurance Policies is attached hereto as **Exhibit A**.  During the twelve months preceding the Petition Date, the Debtors paid approximately $9.7 million in the aggregate on account of premiums in relation to Insurance Policies.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

8.     Some, but not all, of the Insurance Policies are financed through four premium financing agreements (the "Financing Agreements") with AFCO Premium Credit LLC ("AFCO"). Pursuant to the Financing Agreements, the Debtors are required to make monthly premium payments on account of insurance coverage for the period ranging from June 2019 to July 2020. As of the Petition Date, there is approximately $5.2 million outstanding on account of the Financing Agreements, some or all of which will come due during the pendency of these chapter 11 cases.  The Debtors seek the authority to honor any prepetition amounts outstanding under the terms of the Financing Agreements and to pay premiums thereunder in the ordinary course of business during the pendency of these cases.

9.     With respect to the Insurance Policies not covered by the Financing Agreements, the Debtors pay applicable premiums on a monthly or annual basis, as applicable.  The Debtors estimate that, as of the Petition Date, there is approximately $360,000 outstanding on account of prepetition premiums for the non-financed Insurance Policies.

10.     Additionally, certain of the Insurance Policies not covered by the Financing Agreements are subject to regular audits (the "Insurance Policy Audits"), which may result in an adjustment of the premiums owed on account thereof.  Insurance Policy Audits for prepetition premium payments will not conclude until after the Petition Date.  As a result, the aggregate amount of the Debtors' obligations arising from the Insurance Policy Audits is not known at this time.  Accordingly, the Debtors seek the authority, but not the direction, to honor any amounts owed on account of any Insurance Policy Audits in the ordinary course of business.

11.     Pursuant to this Motion, the Debtors are seeking the authority to honor prepetition obligations related to their Insurance Policies, to extend or reduce those Insurance Policies, or to enter into new insurance policies and premium financing agreements, as applicable, in the

ordinary course of business.  The ability to maintain the Insurance Policies and the Financing Agreements, to extend or reduce those Insurance Policies, and to enter into new insurance policies, as needed in the ordinary course of business, is essential to the preservation of the value of the Debtors' business, operations, and assets.  Moreover, in many instances, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' business operations, including, the Longshore and Harbor Workers' Compensation Act, as discussed in more detail below, as well as the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), which requires that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Additionally, failure to pay and maintain certain insurance policies, may result in serious disruption, if not outright cessation, to the Debtors' business operations.  For example, failure to pay and maintain vessel pollution insurance will result in the Debtors having to tie up their liquid barges and boats.[3]

12.     Accordingly, the Debtors request the authority to maintain their existing Insurance Policies to the extent appropriate with respect to the Debtors' go-forward operations, to pay prepetition obligations related thereto, to extend or reduce those Insurance Policies, or to enter into new insurance policies and premium financing agreements, as applicable, in the ordinary course of business.

## Workers' Compensation, LHWCA, and Jones Act Coverage

13.     In the ordinary course of the Debtors' business, the Debtors maintain workers' compensation coverage through Great American Insurance Group for the benefit of their shore-side employees (i.e. land-based employees who do not work on the water) (the "Workers

---

[3]     See 46 U.S.C. § 44015 (requiring the U.S. Secretary of Homeland Security to refuse clearance of a vessel at a port or place of departure from the United States that does not have the requisite certificates evidencing that the vessel has obtained the required insurance coverage).

Compensation Coverage"). The Debtors also maintain coverage through American Equity Underwriters for employees that are subject to the Longshore and Harbor Workers' Compensation Act ("LHWCA," and such insurance, the "LHWCA Coverage").[4] Workers Compensation Coverage and LHWCA Coverage are both paid on a monthly basis, although LHWCA Coverage is directly tied to the employees' payroll.

14. The Debtors' ordinary expenses for Workers Compensation and LHWCA Coverage include insurance premiums and certain administrative and processing costs. Specifically, the Debtors are responsible for paying, in the ordinary course of business, third-party administrators to process claims that arise under the Workers Compensation and LHWCA Coverage. If the Debtors were not able to pay such administrators, the administrators would stop paying claims.[5] Coverage for claims under the Workers' Compensation Coverage and the LHWCA Coverage begins with the first dollar incurred by an injured employee.

15. The Debtors are statutorily obligated to maintain each of the Workers' Compensation and the LHWCA Coverage. If the Debtors were to fail to pay certain obligations on account thereof, the applicable governmental agency or body may intervene, pay such obligations, and assert a priority claim against the Debtors for reimbursement of the same, or may

---

[4]     The LHWCA is a federal law that provides for the payment of compensation, medical care, and vocational rehabilitation services to employees disabled on the job, provided such employees are employed to work on the navigable waters of the United States or in adjoining areas customarily used in the loading, unloading, repairing or building of a vessel. Non-maritime employees also may be covered if they perform their work on navigable water and their injuries occur there. LHWCA Coverage is not required for employees covered by the Jones Act.

[5]     As more fully described in the *Debtors' Emergency Motion for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee and Pension Benefits, and Other Compensation, and (B) Maintain Employee Benefit Programs; and (II) Granting Related Relief* (the "Employee Wages Motion"), the Debtors negotiate and settle Workers Compensation Claims. Pursuant to the Employee Wages Motion, the Debtors are seeking the authority to continue to administer the Workers' Compensation Coverage (as defined therein) and modify the automatic stay of Bankruptcy Code section 362 to allow for the continued administration of the Workers' Compensation Claims.

10442293v1

challenge the Debtors' authority to continue to do business for failure to maintain and remain current with respect to claims arising on account thereof.

16.     The Debtors' average cost per month on account of the Workers' Compensation and LHWCA Coverage is approximately $32,000.  As of the Petition Date, the Debtors estimate that the owe approximately $208,000 on account of prepetition obligations related to the same, which includes amounts owed to third-party administrators.  Accordingly, the Debtors request the authority to pay such prepetition amounts and to continue paying all amounts on account of the Workers Compensation, LHWCA, and Jones Act Coverage as such becomes due in the ordinary course during these chapter 11 cases.

17.     The Debtors also maintain a marine package policy through Starr Insurance Companies for employees subject to the Jones Act[6] (the "Jones Act Coverage"), which provides a cause of action for "any seaman" injured "in the course of his employment."  46 U.S.C. § 688(a). Coverage for claims related to Jones Act Coverage begins in excess of $250,000 incurred by each affected employee.

**Insurance Broker Services**

18.     The Debtors retain both Marsh and Willis Group to serve as their insurance brokers for the Insurance Policies (the "Insurance Brokers").  The Insurance Brokers provide access to specific insurance markets and expertise in certain lines and types of coverage, and assists the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations by aiding with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.  In addition, the Insurance Brokers often act

---

[6]     The Jones Act is a federal maritime law that provides compensation rights to those who have been injured or developed an illness while working aboard, or in connection to, a U.S. vessel.

as the intermediary between the Debtors and the Insurance Carriers, as the Insurance Brokers will often transfer insurance premiums and claims asserted for various Insurance Policies to the various Insurance Carriers.  In connection with these services, the Debtors pay the Insurance Brokers an aggregate amount of approximately $302,500 per year in brokerage fees related to all Insurance Policies (the "Broker Fees").[7]  In the twelve months immediately preceding the Petition Date, the Debtors paid an aggregate amount of approximately $302,500 in Broker Fees to the Insurance Brokers.

19.    The Debtors believe that continuation of the Insurance Brokers' services are necessary to assure the Debtors' ability to secure Insurance Policies on advantageous terms at competitive rates, facilitate the proper maintenance of the Debtors' Insurance Policies postpetition, and ensure adequate protection of the Debtors' property for all parties in interest.  Accordingly, the Debtors request authority to continue paying the Broker Fees.

20.    As of the Petition Date, the Debtors are not aware of any Broker Fees owed to the Insurance Brokers.  For the avoidance of doubt, however, the Debtors request the authority to pay any such amounts that may be owed and to continue making payments to the Insurance Brokers on account of the obligations related to the Insurance Policies, all in the ordinary course of business throughout the pendency of these cases.

**Debtors' Surety Bond Program**

21.    In the ordinary course of business, the Debtors are required to provide surety bonds ("Surety Bonds") to certain third parties to secure the Debtors' performance of certain obligations (the "Surety Bond Program" and each surety thereunder, a "Surety").  The Surety Bond Program covers obligations related to federal, state and local governmental units.  The obligations secured

---

[7]    The Debtors pay $295,000 per year to Marsh and $7,500 per year to Willis Group.

10442293v1

by the Surety Bond Program and a list of the Debtors' Surety Bonds is set forth in **Exhibit B** attached hereto.

22.     The issuance of a Surety Bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to a Surety.  Unlike an insurance policy, if a Surety incurs a loss on a Surety Bond due to such nonperformance or nonpayment, the Surety is entitled to recover the full amount of that loss from the principal (the Debtors).  Here, the Debtors either (i) are party to an indemnity agreement that sets forth the Surety's rights to recover from the Debtors (collectively, the "Surety Indemnity Agreements") or (ii) fully cash collateralized the Surety.  Under each Surety Indemnity Agreement, the Debtors agree to indemnify the Surety from any loss, cost, or expense that the Surety may incur on account of the issuance of any Surety Bonds on behalf of the Debtors (the "Indemnity Obligations").  Each Surety Indemnity Agreement also permits the Surety to request collateral security from the Debtors from time to time in connection with the Indemnity Obligations.

23.     The premiums for the Surety Bonds (the "Surety Premiums" and, together with the Indemnity Obligations, the "Surety Bond Obligations") are generally determined on an annual basis.  Payment is remitted by the Debtors when the Surety Bonds are issued and annually upon each renewal.  In the twelve months preceding the Petition Date, the Surety Premiums totaled approximately $12,250.  As of the Petition Date, the Debtors have approximately $606,000 in outstanding Surety Bonds, and the Debtors estimate they owe approximately $12,250 on account of unpaid prepetition Surety Premiums, all of which will become due and payable during the first 21 days of these chapter 11 cases.  Although this amount could vary, the Debtors request authority to pay all amounts relating to the Surety Premiums in full, and also request authority to continue the Surety Bond Program in the Debtors' discretion, each in the ordinary course of business.

**Basis For Relief**

A.      **Continuance of the Insurance Policies, Workers Compensation, LHWCA and Jones Act Coverage, and Surety Bonds is Required by Law, the Bankruptcy Code, and U.S. Trustee Operating Guidelines**

24.      Under section 1112(b)(4)(C) of the Bankruptcy Code, "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  In addition, in many instances, the coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, as well as the operating guidelines issued by the U.S. Trustee (the "U.S. Trustee Operating Guidelines").  Given this backdrop, it is essential to the Debtors' estates and consistent with the Bankruptcy Code and the U.S. Trustee Operating Guidelines that the Debtors be permitted to maintain and continue making all payments required on account of their Insurance Policies.  It is similarly critical that the Debtors have the authority to supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their business judgment, without further order of the Court.

25.      Likewise, certain of the jurisdictions in which the Debtors operate their businesses require the Debtors to maintain the Workers' Compensation Coverage in accordance with applicable law.  If the Debtors fail to maintain the Workers' Compensation Coverage, applicable law may prohibit the Debtors from operating in those states.   Maintaining the Workers' Compensation Coverage is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

26.      Finally, certain governmental entities require the Debtors to maintain the Surety Bond Program.  Failure to maintain the Surety Bond Program thus could cause legal action and increased claims by certain governmental agencies against the Debtors.  Accordingly, it is critical that the Debtors have the authority to pay all amounts relating to the Surety Premiums and to

10

supplement, amend, extend, renew, or replace their Surety Bonds under the Surety Bond Program as needed, in their discretion, without further order of the Court.

**B.      Payment Obligations on account of the Insurance Policies, Workers Compensation, LHWCA and Jones Act Coverage, and Surety Bond Program are Warranted**

27.      As an initial matter, the Debtors believe that payments made to maintain the Insurance Policies, Workers Compensation, LHWCA and Jones Act Coverage, and the Surety Bond Program fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.  Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997); Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.), 207 B.R. 406, 409 (S.D.N.Y. 1997).

28.      Should the Court determine that payment obligations on account of the Insurance Policies, Workers Compensation, LHWCA and Jones Act Coverage, and Surety Bond Program are not within the Debtors' ordinary course of business, section 363(b) of the Bankruptcy Code provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363(b), courts in this jurisdiction require only that the debtor show that a sound business purpose justifies the proposed use of property.  See, e.g., In re BNP Petro. Corp., 642 F. App'x 429, 435 (5th Cir. 2016); In re Cont'l. Air Lines, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the

11

ordinary course of business."); see also In re Crutcher Res. Corp., 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); In re Terrace Gardens Park P'ship, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

29.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b) of the Bankruptcy Code.  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  See In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."); In re First Wellington Canyon Assocs., No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) (stating that "the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

30.     Section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code pursuant to the "doctrine of necessity."  11 U.S.C. § 105(a).  The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  See In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (holding that section 105 of Bankruptcy Code provides authority for a debtor-in-possession to pay prepetition claims); see also In re Tusa-Expo Holdings, Inc., Ch. 11 Case No. 08-45057-DML-11, 2008 WL 4857954, at *1

12

(Bankr. N.D. Tex. Nov. 7, 2008); <u>CEI Roofing</u>, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004); <u>In re</u>

<u>Mirant Corp.</u>, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 implies

that the payment of prepetition obligations may be permissible within the first 21 days of a case

where doing so is "necessary to avoid immediate and irreparable harm."  Accordingly, the

Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such

payments are critical to preserving the going-concern value of the debtor's estates.

31.     Paying obligations on account of the Insurance Policies, Workers Compensation,

LHWCA and Jones Act Coverage, and Surety Bond Programs is warranted under 363(b) and the

doctrine of necessity.  As described above, maintaining the foregoing is necessary to preserve the

value of the Debtors' assets for the benefit of all parties in interest and to minimize the threat to

the Debtors' ongoing business operations.  In addition, applicable law mandates that the Debtors

pay their obligations on account of their Workers Compensation and LHWCA Coverage.  Failure

to do so could jeopardize their coverage and expose the Debtors to significant liabilities imposed

by the applicable governmental authority.

32.     Importantly, the requested relief would benefit the Debtors' estates with little or no

downside risk.  The Debtors' Prepackaged Plan already contemplates payment in full to all holders

of General Unsecured Claims.  Thus, the relief sought by the Motion, assuming the Prepackaged

Plan is ultimately confirmed by the Court, alters only the timing of payments and not whether any

prepetition obligations will be paid and will not prejudice other parties in interest.

33.     Courts in this district routinely grant relief similar to the relief requested herein.

<u>See, e.g.</u>, <u>In re Weatherford Int'l plc</u>, No. 19-33694 (DRJ) (Bankr. S.D. Tex. July 2, 2019), ECF

No. 83 (authorizing debtors to maintain insurance and surety bond programs and to pay prepetition

obligations in connection with such programs); <u>In re Fieldwood Energy LLC</u>, No. 18-30648 (DRJ)

13

(Bankr. S.D. Tex. Feb. 15, 2018), ECF No. 198 (same); <u>In re Mem'l Production Partners LP</u>, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 17, 2017), ECF No. 56 (same); <u>In re Emerge Energy Servs.</u>, No. 19-11563 (KBO) (Bankr. D. Del. Aug. 13, 2019), ECF No. 192 (same).

34.     Accordingly, based on the foregoing, continuance of, and payment of the obligations on account of, the Insurance Policies, including payment of the Broker Fees, Workers Compensation, LHWCA and Jones Act Coverage, and the Surety Bond Program, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties-in-interest in these chapter 11 cases.

## C.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers

35.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, the proposed debtor-in-possession financing, and anticipated access to cash collateral.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to an authorized payment in respect of the Insurance Policies, Brokerage Fees, or the Surety Bonds, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## <u>Bankruptcy Rule 6003 Has Been Satisfied</u>

36.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which provides that, to the extent such relief is necessary to avoid immediate and irreparable harm, a bankruptcy court

may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition.  As described herein and in the First Day Declaration, the relief requested is essential to avoid immediate and irreparable harm to the Debtors' estates.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

37.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a), under the circumstances, and that the Court waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent applicable.  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify a finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

### Reservation of Rights

38.    Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, or (iv) an approval, adoption, assumption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

15

order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party-in-interest's rights to dispute such claim subsequently.

## **No Previous Request**

39.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## **Notice**

40.     The Debtors will provide notice of this Motion to the following parties: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to Wells Fargo Capital Finance, LLC, as administrative agent under the Debtors' prepetition ABL Facility; (d) counsel to Bank of America, N.A., as administrative agent under the Debtors' prepetition Term Loan Facility; (e) counsel to that certain ad hoc group of lenders under the Debtors' prepetition Term Loan Facility; (f) counsel to the agents for the Debtors' proposed postpetition lenders; (g) the United States Attorney's Office for the Southern District of Texas; (h) the state attorney general's office for all states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

10442293v1

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 7, 2020
Houston, Texas

/s/ John F. Higgins
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com
          eenglish@porterhedges.com

-        and        -

Dennis F. Dunne (*pro hac vice* pending)
Samuel A. Khalil (*pro hac vice* pending)
Parker J. Milender (*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
skhalil@milbank.com
pmilender@milbank.com

*Proposed Counsel for Debtors and Debtors in
Possession*

17

## Exhibit A

### List of Insurance Policies

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| **Operations Coverage lines** | | | |
| Vessel Pollution | Safe Harbor | V-14566-18 | 11/12/2019 - 11/12/2020 |
| Site Pollution Liability Insurance | AXA XL | PEC0053723 | 3/05/2019- 3/05/2022 |
| Commercial Auto - All States | National Union | 4257166 | 06/30/2019 - 06/30/2020 |
| Workman's Compensation | Great American | WC099201205 | 07/15/2018 - 07/15/2020 |
| LHWCA Coverage | ALMA | ALMA00422-09 | 07/15/2017 - 07/15/2020 |

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| **Property Coverage Lines** | | | |
| Primary Property incl Boiler & Machinery | Starr Surplus Lines Insurance Company | SLSTPTY11202019 | 6/30/2019 - 6/30/2020 |
| Primary Property incl Boiler & Machinery | Hallmark Specialty Insurance Company | 73PRP19A2FB | 10/1/2019 - 6/30/2020 |
| Primary Property incl Boiler & Machinery | Evanston Insurance Company | MKLV14XP013055 | 6/30/2019 - 6/30/2020 |
| Primary Property incl Boiler & Machinery | Starr Surplus Lines Insurance Company | 19SLCFM11066401 | 6/30/2019 - 6/30/2020 |
| Primary Property incl Boiler & Machinery | Travelers Property Casualty Company of America | BME1-0P981735 | 6/30/2019 - 6/30/2020 |

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| **Primary Marine Package** | | | |
| Primary Marine Package - Hull & Machinery | Starr Indemnity & Liability | MASIHNY000212-17 (Yr 1) MASIHNY000212-18 (Yr 2) MASIHNY000212-19 (Yr 3) | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss Review Clause |
| Primary Marine Package - Hull Extra Expense | Starr Indemnity & Liability | MASIHNY000212-17 (Yr 1) MASIHNY000212-18 (Yr 2) MASIHNY000212-19 (Yr 3) | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss Review Clause |
| Primary Marine Package - Protection and Indemnity Claims Made Coverage Retro-Active to Oct. 1, 2014 for | Starr Indemnity & Liability | MASIHNY000212-17 (Yr 1) MASIHNY000212-18 (Yr 2) MASIHNY000212-19 (Yr 3) | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 |

2

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| Crew Injuries applicable to AEP entities acquired. | | | * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss |
| Primary Marine Package - Comprehensive Marine General Liability, including SRLL, MTO Liability | Starr Indemnity & Liability | MASIHNY000212-17 (Yr 1) MASIHNY000212-18 (Yr 2) MASIHNY000212-19 (Yr 3) | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss |
| Primary Marine Package - Open Cargo | Starr Indemnity & Liability | MASIHNY000212-17 (Yr 1) MASIHNY000212-18 (Yr 2) MASIHNY000212-19 (Yr 3) | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss |
| 1st Layer Bumbershoot | Starr Indemnity & Liability, through Starr Marine Agency, Inc. 100% | MASILNY000450-19 | 11/12/2017 - 11/12/2018 - Yr 1 |

3

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| | | | 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss Review Clause |
| 2nd Layer Bumbershoot | Starr Indemnity 75% U.S. Specialty Insurance Co 25% | MASILNY000451-19 CXS10868.119 | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss Review Clause |
| 3rd  Layer Bumbershoot | Underwriters at Lloyd's, London through Blades Marine 100% | BMXS-300438 | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 |

4

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| | | | * Subject to Annual Loss Review Clause |
| 4th Layer Bumbershoot | Underwriters at Lloyd's, London through Blades Marine 100% | BMXL-4000082 | 11/12/2017 - 11/12/2018 - Yr 1 11/12/2018 - 11/12/2019 - Yr 2 * Subject to Annual Loss Review Clause 11/12/2019 - 11/12/2020 - Yr 3 * Subject to Annual Loss Review Clause |
| Marine War Risks (Hull and Protection & Indemnity) | Lloyds of London | B0509MARHW1600623 | 11/12/2019 - 11/12/2020 |

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
| **FINPRO Coverage Lines** | | | |
| Directors & Officers | Westchester Fire | DON G25581623 004 | 06/01/2019 - 07/01/2021 |
| Employment Practices | Westchester Fire | DON G25581623 004 | 06/01/2019 - 07/01/2020 |
| Fiduciary | Westchester Fire | DON G25581623 004 | 06/01/2019 - 07/01/2020 |
| Cyber Policy | Beazley | W292FF190101 | 10/30/2019 - |

5

| Insurance Coverage | Carriers | Policy Numbers | Policy Period |
|---|---|---|---|
|  |  |  | 10/30/2020 |
| Fidelity Bond (Crime) | Westchester Fire | DON G25581623 004 | 06/01/2019 - 07/01/2020 |
| Special Risk | U.S. SPECIALTY | U715-89059 | 05/01/2018 - 05/01/2021 |
| D&O Run Off Liability | AIG-National Union | 02-477-41-35 | 11/12/2015 - 11/12/2021 |
| EPL Run Off Liability | AIG-National Union | 02-477-41-35 | 11/12/2015 - 11/12/2021 |
| Fiduciary Run Off Liability | AIG-National Union | 02-477-41-35 | 11/12/2015 - 11/12/2021 |

10442293v1

**<u>Exhibit B</u>**

**List of Surety Bonds**

| Bond No. | Issuer | Debtor Obligee | Amount | Beneficiary | Nature of Bond |
|---|---|---|---|---|---|
| SU39726 | Aspen American Insurance Co. | ACBL Transportation Services LLC | $5,000.00 | Metropolitan Water Reclamation District of Greater Chicago | Required by easement for a property in Lemont, IL |
| SU39726 | Aspen American Insurance Co. | American Commercial Barge Line LLC | $600,000.00 | U.S. Environmental Protection Agency | Required by administrative settlement agreement and consent order entered into by American Commercial Barge Line LLC, certain third-parties, and the U.S. Environmental Protection Agency in November of 2016 |
| SU39725 | Aspen American Insurance Co. | American Commercial Barge Line LLC | $1,000.00 | Tennessee Department of Revenue | Required by the State of Tennessee for taxes, penalty and interest related to petroleum products or alternative fuels |

10442293v1