**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN COMMERCIAL LINES INC., | § | Case No. 20-30982 (MI) |
| *et al.*, | § | |
| | § | Jointly Administered |
| Debtors.[1] | § | (Emergency Hearing Requested) |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR INTERIM
AND FINAL ORDERS (I) AUTHORIZING PAYMENT OF PREPETITION
OBLIGATIONS OWED TO TRADE CREDITORS IN THE ORDINARY COURSE OF
BUSINESS, AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR
AND PROCESS RELATED CHECKS AND TRANSFERS**

> **EMERGENCY RELIEF HAS BEEN REQUESTED.  A HEARING WILL BE
> CONDUCTED ON THIS MATTER ON FEBRUARY 10, 2020 AT 3:30 PM CT
> IN COURTROOM 404, 4th FLOOR, 515 RUSK STREET, HOUSTON, TX
> 77002.  IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE
> THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU
> MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN
> RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY
> TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF
> REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN FEBRUARY 10, 2020.**

American Commercial Lines Inc. and its affiliated debtors in possession in the above-

captioned chapter 11 cases (collectively, the "Debtors"), respectfully represent as follows in

support of this motion (this "Motion"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

**Relief Requested**

1.      By this Motion, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and rule 9013-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas (as amended, the "Bankruptcy Local Rules"), and consistent with the unimpaired treatment of General Unsecured Claims[2] under the Prepackaged Plan (defined below), the Debtors seek entry of interim order (the "Interim Order") and final order (the "Final Order"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, authorizing, but not directing, the Debtors to pay in the ordinary course the allowed prepetition claims of general unsecured creditors that provide goods or services, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise (the "Trade Creditors," and their prepetition claims, the "Trade Claims"), in each case, subject to the procedures and conditions described herein.  The Debtors seek the authority to pay in the ordinary course the Trade Creditors an aggregate interim amount not to exceed $41 million and all amounts upon entry of the Final Order.

2.      The Debtors further request that this Court (a) confirm the administrative priority status of all undisputed obligations of the Debtors owing to third-party vendors and suppliers arising from the postpetition delivery of goods and provision of services that were ordered prior to the Petition Date, (b) authorize the Debtors to pay such obligations in the ordinary course of

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Prepackaged Plan or the First Day Declaration (defined below).

business, and (c) approve the Notice to Counterparties (as defined below) to facilitate and protect the ongoing operation of their businesses.

3.      Finally, the Debtors request that the Court authorize all applicable banks and other financial institutions (collectively, the "Banks") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent directed by the Debtors in accordance with this Motion, whether such checks were presented, or electronic requests were submitted, before or after the Petition Date, and that all such Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request, as appropriate, pursuant to this Motion, without any duty of further inquiry, and without liability for following the Debtors' instructions.

## **Background**

4.      On February 7, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these cases.  These cases are being jointly administered for procedural purposes only.

6.      The Debtors are one of the largest and most diversified inland marine transportation and services companies in the United States.  The Debtors' barge fleet transports a variety of liquid and dry cargoes on the Mississippi River, its tributaries, and on the Gulf Intracoastal Waterway (together, the "Inland Waterways"), including chemicals, crude oil and petrochemicals, agricultural products, metals, and other bulk and construction materials.

7.     On January 31, 2020, the Debtors executed a restructuring support agreement (the "RSA") with the Consenting Lenders and Sponsor.  Pursuant to the RSA, the Consenting Lenders agreed to vote in favor of and support confirmation of the *Joint Prepackaged Chapter 11 Plan of American Commercial Lines Inc. and its Affiliated Debtors and Debtors in Possession* (the "Prepackaged Plan").

8.     Additional information in support of this Motion and regarding the Debtors' businesses, assets, capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of David J. Huls in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated herein by reference.

## Jurisdiction

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Trade Creditors

10.     As compared to other chapter 11 debtors, the Debtors operate a truly unique and specialized business that relies heavily upon continued support and performance from their Trade Creditors in order to meet obligations to their valuable customers.  In the Debtors' industry, competition is fierce and timing is everything.  The Trade Creditors provide a variety of essential goods and services that cannot be replaced without risking the continued viability of the Debtors' business enterprise and impairing their going concern value.

11.     Specifically, the Debtors have extremely limited alternatives to the Trade Creditors when going to the market for the requisite goods and services.  Replacing these vendors is not an option if the Debtors intend to timely honor their customer obligations and avoid substantially

higher costs in doing so.  Furthermore, the failure to make payments to the Trade Creditors would likely result in assertion of maritime liens against the Debtors' estates, which would undermine the continued operation of the Debtors' businesses.[3]

12.     The following chart summarizes the different categories of Trade Creditors referenced herein.  Each category of Trade Creditors is discussed in greater detail below.

| Trade Creditor | Description | Estimated Claim (USD) |
|---|---|---|
| Harbor Services Companies | Provide fleeting and shifting services, as well as the maintenance, repair, and cleaning of barges in areas of the Inland Waterways where the Debtors do not maintain facilities at which to perform these activities themselves, or at locations where the customer requires the use of the specific vendor. | $17.2 million |
| Fuel Vendors | Specialized providers of fuel for vessels that traverse the Inland Waterways.  These vendors are highly specialized, using dedicated equipment to deliver fuel to tow boats while they are underway, given that fueling at fixed, land-based locations would not be practical or efficient. Additionally, the Fuel Vendors often deliver groceries and other supplies to the Debtors' crews, remove waste from the Debtors' vessels, and provide other services to permit the Debtors' to conduct their operations efficiently. | $12.8 million |
| Towing Companies | Utilized by the Debtors to transport small numbers of barges to various ports of origin and destination on the Inland | $14.4 million |

---

[3]     The Debtors do not concede that any potential liens described in this Motion, including contractual liens, mechanics' liens, maritime liens, artisan liens, statutory liens, and liens asserted by Trade Creditors, are valid and enforceable, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens to the extent any are asserted.

10442796v1

| Trade Creditor | Description | Estimated Claim (USD) |
|---|---|---|
|  | Waterways where the Debtors are not currently operating their own towing vessels, either due to lack of business volume or due to timing considerations.  In addition, the Debtors periodically enter into charters with third-parties who provide a fully crewed tow boat that provides exclusive towing services at the Debtors at their direction. |  |
| Miscellaneous Services Companies | Provide rigging, communication services, repairs, deck stores, equipment, parts, goods, and other related services to the Debtors' vessels. | $9.8 million |

*Service Companies*

13.     The barging industry uses two primary types of equipment to move freight: (i) towboats, providing the power source, and; (ii) barges, providing the freight capacity.  Loaded barges are typically transported from their port of origin to their port of destination by towboats operated by the Debtors' employees or by towboats operated by third-parties that are contracted by the Debtors.  With approximately 188 towboats, the Debtors maintain one of the largest towboat fleets on the Inland Waterways, which allows them to deploy towboats to strategic portions of the Inland Waterways.

14.     To maintain a low overall cost structure and enhance their efficiency, quality of service and equipment availability, the Debtors also utilize independent service providers, such as third party towing companies ("Towing Companies").  The Debtors typically utilize Towing Companies to efficiently transport small numbers of barges to various ports of origin and destination on the Inland Waterways where they are not currently operating their own towing

vessels, either due to lack of business volume or timing considerations. The Debtors have strategically utilized such Towing Companies to move barges on an as-needed basis, creating an economic benefit by allowing them to maximize the efficiency, use, and operation of their own towboat and barge fleets. In addition, the Debtors periodically enter into charters with third-parties who provide a fully crewed tow boat that provides exclusive towing services to the Debtors at their direction. The Debtors currently utilize the services of over one-hundred Towing Companies operating on all segments of the Inland Waterways.

15.     The Debtors also utilize third party harbor and fleeting service companies ("Harbor Services Companies") in various geographic regions along the Inland Waterways for fleeting and shifting services, as well as the maintenance, repair, and cleaning of the barges. "Fleeting" is the provision of a mooring location for a barge when that barge is not in transit, and is needed when a barge is (i) waiting to be delivered to a customer facility for loading or unloading, or (ii) at one of the Debtors' interchange facilities where numerous barges are assembled and ultimately aggregated into larger tows for transport to other locations along the Inland Waterways.

16.     The Harbor Services Companies also perform "shifting" services, which refers to the act of moving a barge within a harbor services facility or its general vicinity (i.e., between a mainline towing vessel and the fleet at a particular location, or the movement of a barge between the fleet and a nearby dock). In performing these services, the Harbor Services Companies operate towboats and typically do not move vessels to other geographic regions.

17.     The Debtors currently utilize the services of hundreds of Harbor Service Companies in geographic regions throughout the Inland Waterways, each of which may hold certain of the Debtors' barges in its care, custody, and control at any given time.

18.     In addition, the Debtors use a number of vendors that provide rigging, communication services, repairs, deck stores, and other related services to the Debtors' vessels (the "Miscellaneous Service Companies," and collectively with the Towing Companies and the Harbor Services Companies, the "Service Companies").  These services enable the Debtors to effectively navigate the Inland Waterways and thereby deliver services to their customers.  The Debtors utilize the services of over one-thousand Miscellaneous Service Companies.

19.     Due to the significant number of ports they serve along the 7,000 miles of Inland Waterways, the Debtors determined it prudent to supplement their own operations with the above-referenced services provided by the Service Companies.  The Debtors thus have expended considerable time and resources identifying and maintaining strong relationships with the Service Companies who enable the Debtors to traverse the Inland Waterways efficiently, effectively, and expeditiously.  Given that the Debtors compete on the basis of price, quality of service, and availability of equipment, the use of the Service Companies provides the Debtors with a substantial competitive advantage by lowering their overall cost structure, enhancing the quality of services provided to their customers, and maximizing the efficiency of the use and operation of their towboat and barge fleet.  The continued use and availability of the Service Companies is thus critical to the Debtors' ongoing business operations and ability to successfully reorganize.

*Fuel Vendors*

20.     The Debtors require fuel in order to operate their towboats.  Unlike in the trucking industry, however, fuel is not readily available at innumerable points along the 7,000 miles of the Inland Waterways.  The Debtors thus utilize specialized fuel providers (the "Fuel Vendors") who, in many cases, provide vessel-to-vessel refueling that enables the Debtors' towboats to continue on their routes while simultaneously being refueled.  Additionally, the Fuel Vendors often deliver

groceries to the Debtors' crews, remove waste from the Debtors' vessels, and provide other valuable services to permit the Debtors' towboats to traverse the Inland Waterways as expeditiously as possible without unnecessary stops.

21.     The Fuel Vendors are essential to the Debtors' ability to operate their businesses. Put simply, without the specialized services provided by the Fuel Vendors, the Debtors would not be able to continue their barging operations.  Any unwillingness by the Fuel Vendors to extend trade credit to the Debtors could result in a total standstill of the Debtors' barging operations and have a catastrophic impact on the Debtors' revenues and cash flow.  Additionally, the Debtors could be subject to unfavorable increases in fuel prices by the Fuel Vendors, which could have a materially negative effect on the Debtors' operating expenses and profitability.

22.     Similar to the Service Companies, the Debtors have expended considerable time and resources identifying and maintaining strong relationships with the Fuel Vendors, who enable the Debtors to traverse the Inland Waterways effectively and expeditiously.  Price is one of several key competitive factors that impact the Debtors market position.  Moreover, in many cases, the Debtors have negotiated special rates and discounts with certain Fuel Vendors, which further contribute to the efficiency of the Debtors' operations and their overall cost structure.  Thus, the availability of Fuel Vendors throughout the Inland Waterways and the maintenance of the Debtors' current fuel purchasing terms permits the Debtors to maintain the efficiency of their operations and their overall cost structure.  As a result, the continued use of the Fuel Vendors is critical to the Debtors' ongoing business operations and their ability to reorganize.

*Consequences of Interruption in Service from Service Companies or Fuel Vendors*

23.     The Debtors believe that the failure to honor their prepetition and ordinary course obligations to the Service Companies or Fuel Vendors identified as Trade Creditors could result

in such entities' refusal to continue to provide services or to change the terms of such services in ways that would be detrimental to the Debtors operating capabilities, operating profitability and working capital requirements after the Petition Date.  Any interruption to the goods or services provided by the Service Companies or Fuel Vendors would have a ripple-effect impact throughout the Debtors' business cycle and drastically impair their ability to timely deliver cargo and generate revenue.

24.     As depicted in Exhibit A to the First Day Declaration, the Debtors' barges operate through a series of interdependent stages in order to bring cargo to its destination, including loading and unloading, fleeting, towing, maintenance, and cleaning.  Without the provision of these specialized goods or services at each of these stages, the Debtors' barging cycle could drastically slow or be halted entirely, directly affecting earnings capacity and threatening their relationship with customers.  By way of example, the Debtors' lease many of their towboats on "fully found charters," in which the lessor not only provides the towboat but also provides the required crew. If the Debtors are unable to make payments required under these contracts, the Debtors risk being rendered completely unable to complete the contractually required delivery of its barges which require the services of these fully-found charter towboats, resulting in an adverse impact on the Debtors' customer relationships, revenue generation and cash flows.

*Certain Trade Claims Potentially Entitled to Liens*

25.     As a result of the commencement of these chapter 11 cases, certain Trade Creditors who hold goods for delivery to or from the Debtors may refuse to release the goods pending receipt of payment for their prepetition services.  Under certain non-bankruptcy laws, Trade Creditors that provide shipping, warehousing, and logistics services and supplies may have a lien on goods in its

10

possession to secure the charges or expenses incurred for the transportation or storage of goods.[4] Additionally, pursuant to section 363(e) of the Bankruptcy Code, certain Trade Creditors, as bailees, may be entitled to adequate protection as holders of possessory liens.

26.     The refusal of these Trade Creditors to deliver or return the Debtors' goods and raw materials as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.  Additionally, the Debtors do not operate under long-term contracts with certain of their shippers.   Instead, the Debtors pay spot prices for their shipping needs.   This practice allows the Debtors to take advantage of the best rates available to ship goods; however, it also means that the shippers may not have a long-term interest in doing business with the Debtors and may therefore look to exercise their liens for short-term benefit.

27.     Certain Trade Creditors may also be able to assert maritime liens on the Debtors' vessels in the event the Debtors fail to satisfy outstanding obligations owed thereto (such Service Companies and Fuel Vendors, the "Maritime Vendors").   Specifically, the Maritime Vendors may be entitled to assert maritime liens under United States federal law, which grants maritime liens on vessels to "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner."  See 46 U.S.C. § 31342(a).[5]  Accordingly, to the extent that authorized

---

[4]     For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  See U.C.C. § 7-307(a) (2003).

[5]     "Necessaries" include repairs, supplies, towage, and the use of a dry dock or marine railway."  46 U.S.C. § 31301(4).  Moreover, courts have defined "necessaries" broadly as reaching any good or service that a prudent owner would deem reasonably necessary for her vessel's successful operation.  See Ventura Packers, Inc. v. F/V Jeanine Kathleen, 305 F.3d 913, 923 (9th Cir. 2002) (noting that "modern admiralty jurisprudence interprets 'necessaries' broadly, as anything that facilitates or enables a vessel to perform its mission or occupation") (citing Equilease Corp. v. M/V Sampson, 793 F.2d 598, 603 (5th Cir. 1986)).

payments for necessaries remain unpaid as of the Petition Date, the relevant Maritime Vendors may attempt to assert liens against the Debtors' vessels and hinder the Debtors' use of property that is necessary to operate the Debtors' businesses.[6]

28.     Further, the U.S. maritime laws recognize the rights of maritime lien claimants to enforce their liens <u>in rem</u> by arresting a vessel.  <u>See, e.g.</u>, <u>World Fuel Servs. Sing. PTE v. M/V AS Varesia</u>, 727 F. App'x 811, 814 (5th Cir. 2018) ("When a party has a maritime lien, the mechanism of enforcement is an <u>in rem</u> action commenced by the arrest of the vessel."); <u>Bay Casino, LLC v. M/V Royal Empress</u>, 20 F. Supp. 2d 440, 448 (E.D.N.Y. 1998) ("It is well-settled that although arrest of maritime property is a remedy available within the maritime jurisdiction, it requires an underlying maritime cause of action supporting a maritime lien in the property arrested.").  Holders of maritime liens can take action to arrest a vessel notwithstanding their security rank or the existence of other liens on the vessel.  <u>See</u> Fed. R. Civ. P. Supp. Adm. Rule C; <u>see also</u> <u>RSDC Holdings, LLC v. M.G. Mayer Yacht Servs.</u>, No. 16-3573, 2019 U.S. Dist. LEXIS 16991, at *27-28 (E.D. La. Feb. 1, 2019) (noting that "maritime liens are secret liens that are perfected when they arise" and because the filing of a notice of lien is permissive and not mandatory, "the lien's status and rank are in no way affected by failure to file" such a notice) (citing Grant Gilmore & Charles L. Blank, Jr., <u>The Law of Admiralty</u> § 9-72 (2d ed. 1975)).  Thus, the exercise of remedies related to maritime liens could allow the lienholder to arrest a vessel and hold it as security until a court can enforce a judgment on the merits or until alternative security is posted from which the maritime claim may be satisfied.  <u>See</u> Fed. R. Civ. P. Supp. Adm. Rule E(5).  It is therefore essential that

---

[6]   <u>See, e.g.</u>, <u>La. Int'l Marine, L.L.C. v. Drilling Rig Atlas Century</u>, No. C-11-186, 2012 U.S. Dist. LEXIS 147699, at *18 (S.D. Tex. Aug. 21, 2012) (noting that 46 U.S.C. § 31301(4) "expressly includes 'towage' services"); <u>USL Capital v. New York 30</u>, 975 F. Supp. 382 (D. Mass. 1996) (finding that towing company was entitled to a maritime lien on barge for payment of its towing fees).

the Debtors be permitted to pay their Maritime Vendors in the ordinary course so as to avoid potential disruption to their business operations.

29. The Debtors are not seeking to pay these amounts immediately or in one lump sum. Rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business. The Debtors' cash on hand, availability under the DIP Term Loan and ABL DIP and the cash generated by the Debtors' business will provide ample liquidity for payment of the Trade Claims and continued operation in the ordinary course during the administration of these chapter 11 cases.

30. On an aggregate basis, the Debtors estimate that the amount owed to Trade Creditors (i.e., the identified Service Providers and Fuel Vendors) for goods delivered or services provided prior to the petition date should not exceed $54.2 million. Of this amount, the Debtors are requesting the authority to pay up to $41 million of Trade Claims on an interim basis, prior to a final hearing. Of these amounts, the Debtors believe that approximately $10.7 million and $12.5 million are attributable to claims under section 503(b)(9) of the Bankruptcy Code on an interim and final basis, respectively.

31. Under the Prepackaged Plan, the Trade Claims are unimpaired, and the holders of such claims will receive payment in full. Accordingly, if the relief requested herein is granted, it will affect only the timing of the payment of the Trade Claims and will not prejudice other parties in interest. As such, and because the Debtors believe, in their reasonable business judgment, that the payment of the Trade Claims is necessary and in the best interest of the Debtors, their estates, and their creditors, the Debtors request authority to pay Trade Creditors, in the ordinary course of business, without further notice to or order of the Court.

**Proposed Conditions to Receiving Payment in Ordinary Course**

32.     The Debtors request authority to pay the Trade Creditors' Trade Claims, on the condition that, by accepting payment, the applicable Trade Creditor agrees to continue supplying goods or services to the Debtors for the duration of these Chapter 11 Cases in accordance with trade terms that are (i) at least as favorable to the Debtors as those practices and programs in place prior to the Petition Date or (ii) on terms satisfactory to the Debtors in their business judgment (collectively, the "Customary Trade Terms").  The Debtors also propose that if a Trade Creditor, after receiving a payment on account of its Trade Claim, does not maintain or reinstate Customary Trade Terms during the pendency of these Chapter 11 Cases, then any payments made on account of the Trade Claim to such Trade Creditor after the Petition Date may, in the Debtors' sole discretion, either be deemed applied to postpetition amounts payable to such Trade Creditor or treated as an unauthorized postpetition transfer recoverable by the Debtors.

33.     The Debtors also propose that if a Trade Creditor fails to comply with Customary Trade Terms, the Debtors may, in their discretion and without further order of the Court, declare that the Trade Creditor shall immediately return the Debtors' payment of the Trade Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Trade Claim shall be reinstated in an amount that will restore the Debtors and the Trade Creditor to their original positions as if the payment of the Trade Claim had not been made.

**Treatment of Trade Claims Under Prepackaged Plan**

34.     The goal of these prepackaged Chapter 11 Cases is to deleverage the Debtors' balance sheet without interruption to its business operations.  Disruption to the Debtors' timely receipt of necessary goods and services could negatively impact the Debtors' operations, which

14

would harm its business, damage market reputation, and possibly lead to loss of customers. Accordingly, it is imperative that the Debtors maintain positive relationships with the suppliers of the goods and services essential to their business operations throughout the course of these Chapter 11 Cases and honor their publicly expressed commitment to pay Trade Claims in the ordinary course.  The Consenting Lenders share the Debtors' view and have agreed to the Unimpaired treatment of the General Unsecured Claims, and all other Classes—not including the Term Loan Claims, and Interests in Finn Holding, which are the only Impaired Classes—under the Prepackaged Plan.  The relief requested in this Motion furthers the Debtors' restructuring goals to maximize the value of their estates in accordance with the Prepackaged Plan.

35.      Importantly, the requested relief would benefit the Debtors' estates with little or no downside risk.  The Debtors' Prepackaged Plan already contemplates payment in full to all holders of General Unsecured Claims.  Thus, the relief sought by the Motion, assuming the Prepackaged Plan is ultimately confirmed by the Court, alters only the timing of payments and not whether the Trade Claims will be paid and will not prejudice other parties in interest.

**Basis for Requested Relief**

**A.   Payment of the Trade Claims Is Warranted Under Sections 363 and 105 of the Bankruptcy Code**

36.      The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit hold that section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.  See, e.g., In re BNP Petroleum Corp., 642 F. App'x 429, 435 (5th Cir. 2016); In re Cont'l Air Lines, 780 F.2d 1223,

1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); see also In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor-in-possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  See, e.g., In re CEI Roofing, Inc., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).

37.    Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code."  11 U.S.C. § 105(a); see Ionosphere Clubs, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain pre-petition wages, salaries, medical benefits, and business expense claims to debtor's employees); In re CoServ, L.L.C., 273 B.R. at 497 (holding that the "Court has inherent authority, through section 105(a) of the Bankruptcy Code to grant this [Trade Creditor] Motion, in the interest of preservation of Debtors' bankruptcy estate."); In re Just for Feet, Inc., 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).  Courts have also noted that there are instances in which debtors-in-possession can fulfill their fiduciary duties "only . . . by the pre-plan satisfaction of a prepetition claim."  In re CoServ, L.L.C., 273 B.R. at 497 (noting that the pre-plan satisfaction of prepetition claims would be a valid exercise of

16

a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product.").

38.     Allowing the Debtors to pay the Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value for the Debtors' business and maximizing the value of property available to satisfy creditors.  See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434, 453 (1999).  Indeed, reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery, courts regularly grant relief consistent with that being sought by this Motion under section 105(a) of the Bankruptcy Code. See, e.g., In re CoServ, L.L.C., 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate").  Such is often referred to as the "doctrine of necessity," which functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not otherwise explicitly authorized by the Bankruptcy Code.  See In re Lehigh and New England Railway Co., 657 F.2d 570, 581 (3d Cir. 1981) (a court may authorize payment of prepetition claims if such payment was essential to the continued operation of the debtor, citing "the possibility that the creditor will employ an immediate economic sanction, failing such payment"); In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims . . . [for] goods or services indispensably necessary" to debtors' continued operation); In re Columbia Gas Sys., Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a prepetition claim is essential to the continued operation

17

of [the debtor], payment may be authorized"); <u>In re Structurlite Plastics Corp.</u>, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) ("[A] *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."). The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11— "facilitating the continued operation and rehabilitation of the debtor." <u>Ionosphere Clubs</u>, 98 B.R. at 176.

39.     Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." <u>See</u> <u>In re CoServ, L.L.C.</u>, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); <u>see also</u> <u>In re Tusa-Expo</u> <u>Holdings, Inc.</u>, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); <u>In re CEI Roofing, Inc.</u>, 315 B.R. at 56; <u>In re Mirant Corp.</u>, 296 B.R. 427 (Bankr. N.D. Tex. 2003). Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm." Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

40.     Payment of the Trade Claims as they become due in the ordinary course of business is a sound exercise of the Debtors' business judgment because doing so will avoid a value-destructive business interruption, while not prejudicing the Debtors' other stakeholders. The goal of these prepackaged Chapter 11 Cases is to deleverage the Debtors' balance sheet with minimal interruption to the Debtors' business operations. Failure to pay the Trade Claims could disrupt the Debtors' timely receipt of necessary goods and services, which would negatively impact the

Debtors' operations.  This would harm the Debtors' business, damage their market reputation, and lead to a loss of revenue.  Accordingly, it is imperative that the Debtors maintain positive relationships with their suppliers and service providers, which are essential to the Debtors' business operations, throughout the course of these Chapter 11 Cases.

41.     Additionally, the Prepackaged Plan provides for payment in full General Unsecured Claims.  The relief requested in this Motion, therefore, merely alters the timing of payment to Trade Creditors and not the amount or priority of such payment and does not prejudice other parties in interest.

**B.     Payment of Trade Claims Is Necessary to Ensure Continuation of the Debtors' Operations**

42.     As noted herein and in the First Day Declaration, payment of the Trade Creditors is necessary for the Debtors to maintain operations and consequently preserve the value of their business and ensure safety.  Accordingly, maintaining favorable trade terms and credit is in the best interests of all creditors and other parties in interest.

43.     The Trade Creditors provide goods and services that are necessary to preserve the value of the Debtors' numerous business lines.  Many of the Trade Creditors are providers of specialized goods and services that cannot be replaced in a feasible manner, if at all, due to their specialized qualifications or commitments pursuant to the Debtors' customer contracts.  Failure to pay these vendors' prepetition claims would result in a loss of value to the Debtors' different business lines, which would be unable to continue operating without such vendors.  As stated in the First Day Declaration, the Debtors have concluded that if they do not make Trade Creditor payments, their value will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay.  Not only could failing to make payments to the Debtors' Trade Creditors jeopardize the Debtors' supply of goods and services, but it could also jeopardize the Debtors'

relationships with their customers.  Indeed, for customers with which the Debtors do not have long-term contracts (e.g., in the spot market for grain barging), such customers could elect to use other means of transportation if they believe the Debtors will be unable to perform their contractual obligations to the customer due to the potential service disruptions that could result from the Debtors' inability to depend on continued relationships with third-party service providers.

44.     Due to the consequences that could arise for failing to pay their trade vendors, courts in this district and others have granted debtors similar relief for payments to trade creditors in the ordinary course.  See, e.g., In re Halcón Resources Corp., No. 19-34446 (DRJ) (Bankr. S.D. Tex. Sept. 4, 2019) (authorizing, pursuant to Bankruptcy Code section 363, the payment of prepetition trade claims in the ordinary course); In re Monitronics International, Inc., No. 19-33650 (DRJ) (Bankr. S.D. Tex. July 1, 2019) (same); In re Basic Energy Services, Inc., No. 16-12320 (KJC) Bankr. D. Del. Nov. 17, 2016) (authorized payment of prepetition general unsecured claims in the ordinary course of business where a debtor's proposed prepackaged plan of reorganization provides for a 100% recovery on general unsecured claims.); In re Seventy Seven Fin. Inc., No. 16-11409 (LSS) (Bankr. D. Del. June 28, 2016) (same); In re Offshore Grp. Inv. Ltd., No. 15-12422 (BLS) (Bankr. D. Del. Jan. 5, 2016) (same); In re Hercules Offshore, Inc., No. 15-11685 (KJC) (Bankr. D. Del. Sept. 15, 2015) (same); In re Everyware Global, Inc., No. 15-10743 (LSS) (Bankr. D. Del. Apr. 22, 2015) (same); In re Dolan Co., No. 14-10614 (BLS) (Bankr. D. Del. Mar. 25, 2014) (same); In re Sorenson Commc'ns, Inc., No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (same).

45.     Further, due to the nature of the Debtors' businesses, certain of the Trade Creditors that the Debtors seek authority to pay for delivered fuel, raw materials, equipment, supplies, components, and other goods in the ordinary course to the Debtors within the 20 days prior to the

Petition Date.  The Debtors estimate that approximately $12.5 million owed to Trade Creditors, representing approximately 23% of the total amount of Trade Claims, is on account of goods that were received during the 20 day period before the Petition Date, and therefore, would be afforded administrative priority under section 503(b)(9) of the Bankruptcy Code.  Payment to any Trade Creditor on account of such deliveries at the onset of these Chapter 11 Cases merely accelerates the timing of payment and not the ultimate treatment of such claims.  Accordingly, the Debtors would have to pay the Trade Claims in full, to the extent they fall within the scope of section 503(b)(9) of the Bankruptcy Code, regardless of the timing of such payment.

46.     The Bankruptcy Code does not prohibit a debtor from paying such administrative claims prior to confirmation of a chapter 11 plan and the Debtors believe that they may pay administrative claims incurred in the ordinary course of business in accordance with their business judgment, under Bankruptcy Code section 363(c)(1).  See, e.g., In re Dura Auto. Sys. Inc., No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006), Hr'g Tr. 49:21-23 (noting that the debtor could arguably pay 503(b)(9) claimants without court approval).  Moreover, courts in this district and others have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.  See, e.g., In re Bristow Grp., Inc., No. 19-32713 (Bankr. S.D. Tex. May 14, 2019), ECF No. 97 (authorizing debtors to pay claims arising under section 503(b)(9)); In re Westmoreland Coal Co., No. 18-35672 (Bankr. S.D. Tex. Nov. 15, 2018), ECF No. 512 (same); In re Gastar Expl., Inc., No. 18-36057 (Bankr. S.D. Tex. Nov. 2, 2018), ECF No. 79 (same); In re EXCO Res., Inc., No. 18-30155 (Bankr. S.D. Tex. Jan. 18, 2018), ECF No. 286 (same); In re Linn Energy, LLC, No. 16-60040 (Bankr. S.D. Tex. June 27, 2016), ECF No. 401 (same).

47.     In addition, the Prepackaged Plan provides for payment in full of administrative expenses in the ordinary course of business or, otherwise, on the Effective Date of the Prepackaged Plan, or as soon as practicable thereafter.  Accordingly, payment of the Trade Claims entitled administrative expense priority under section 503(b)(9) of the Bankruptcy Code will only change the timing of the payment of such Prepetition Trade Claims, not the amounts.  See, e.g., In re CEI Roofing, Inc., 315 B.R. at 60 ("[T]he payment of prepetition . . . claims . . . that qualify as priority . . . claims . . . does not trigger the same concerns (i.e., upsetting priorities under the Code and unfair discrimination among general unsecured claims)").  Thus, allowing the relief requested herein with respect to the prepetition Trade Claims will not materially prejudice any parties in interest.  Accordingly, the Debtors seek authority to pay such claims in the ordinary course of business so as to minimize disruptions to their operations and preserve the value of their estates.

**C.     Payment of Claims Potentially Entitled to Liens Is Necessary to Ensure Continuation of the Debtors' Operations**

48.     The critical need for the continued receipt and distribution of goods that Trade Creditors may hold on the Petition Date, or assert liens against, amply justifies the relief sought herein.  Certain Trade Claims are held by Trade Creditors that (i) provide shipping, warehousing, and logistics services and supplies; (ii) repair and maintain the Debtors' equipment and facilities; or (iii) lease facilities or equipment to the Debtors.  Such Trade Creditors may be entitled to assert liens against certain of the Debtors' assets under various state and federal laws.  Under section 363(e) of the Bankruptcy Code, Trade Creditors with liens may be entitled to adequate protection of their liens, which may impose additional costs on the Debtors' estates.  The prompt payment to the Trade Creditors, and satisfaction of any liens asserted against the Debtors' property or the customers' property is thus in the Debtors' sound business judgment and crucial for the orderly and efficient operation of the Debtors' businesses.

22

49.    With respect to the Maritime Vendors, the failure to make timely payment of these claims could subject the Debtors' assets to the assertion of liens and/or result in the arrest of their vessels, as described above.  It is therefore crucial that the Debtors be allowed to pay their Maritime Vendors in the ordinary course as to avoid the potential disruption to their operations.  For this reason, numerous courts, including in this district, have readily granted, in the critical vendor context, relief to debtors with shipping operations.  See, e.g., In re EMAS Chiyoda Subsea Ltd., No. 17-31146 (MI) (Bankr. S.D. Tex. Feb. 28, 2017), ECF No. 271; In re Overseas Shipholding Group, Inc., Case No. 12-20000 (Bankr. D. Del. Dec. 7, 2012), ECF No. 147; In re TBS Shipping Service Inc., Case No. 12-22224 (Bankr. S.D.N.Y. Feb. 29, 2012), ECF No. 87; In re General Maritime Corp., Case No. 11-15285 (Bankr. S.D.N.Y. Dec. 15, 2011), ECF No. 138.

50.    In addition, under the Prepackaged Plan, Trade Claims supported by liens are "Other Secured Claims" that are unimpaired and will be paid in full on the Effective Date of the Prepackaged Plan.  The relief requested in this Motion, therefore, merely alters the timing of payment to Trade Creditors and not the amount or priority of such payment and does not prejudice other parties in interest.

**D.    The Notice to Counterparties Should Be Approved**

51.    In the ordinary course of business, the Debtors engage with a variety of different customers and trade counterparties.  Many of these parties are not familiar with the chapter 11 process, have not retained bankruptcy counsel, and/or may not be comfortable doing business with a company that has filed for bankruptcy in the absence of a notice that the Debtors are authorized and able to continue with their business operations in the ordinary course (subject to the limitations of the Bankruptcy Code).  Therefore, the Debtors seek authorization to provide a notice substantially in the form attached hereto as **Exhibit C** (the "Notice to Counterparties") to certain

23

of its customers and other business counterparties regarding (a) the entry of the Interim Order and/or Final Order, and (b) the Debtors' ability to enter into transactions and use property of the estate in the ordinary course of business pursuant to section 363(c) of the Bankruptcy Code.

52.     For the foregoing reasons, payment of the Trade Claims in the ordinary course is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize the Debtors to pay such claims.

**E.     Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

53.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor-in-possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the obligations discussed herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.   Therefore, the Debtors respectfully request that the Court authorize and direct all applicable banks and financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Satisfaction of Bankruptcy Rule 6003**

54.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."   As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting

the relief requested herein could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

55.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

56.     Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any prepetition claim on any grounds; a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

### No Prior Request

57.     No prior request for the relief sought in this Motion has been made to this or any other court.

10442796v1

**Notice**

58.     The Debtors will provide notice of this Motion to the following parties: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to Wells Fargo Capital Finance, LLC, as administrative agent under the Debtors' prepetition ABL Facility; (d) counsel to Bank of America, N.A., as administrative agent under the Debtors' prepetition Term Loan Facility; (e) counsel to that certain ad hoc group of lenders under the Debtors' prepetition Term Loan Facility; (f) counsel to the agents for the Debtors' proposed postpetition lenders; (g) the United States Attorney's Office for the Southern District of Texas; (h) the state attorney general's office for all states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*Remainder of Page Intentionally Left Blank*

10442796v1

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein, and granting the Debtors such other and further relief as is just.

Dated: February 7, 2020
Houston, Texas

/s/ *John F. Higgins*
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com
        eenglish@porterhedges.com

-        and        -

Dennis F. Dunne (*pro hac vice* pending)
Samuel A. Khalil (*pro hac vice* pending)
Parker J. Milender (*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
        skhalil@milbank.com
        pmilender@milbank.com

*Proposed Counsel for Debtors and Debtors in Possession*

10442796v1

## Exhibit A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| AMERICAN COMMERCIAL LINES INC., | § | Case No. 20-30982 (MI) |
| *et al.*, | § |  |
|  | § | Jointly Administered |
| Debtors.[1] | § | (Emergency Hearing Requested) |
|  | § |  |

**INTERIM ORDER (I) AUTHORIZING PAYMENT OF PREPETITION
OBLIGATIONS OWED TO TRADE CREDITORS IN THE ORDINARY
COURSE OF BUSINESS AND (II) AUTHORIZING FINANCIAL INSTITUTIONS
TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

Upon the motion (the "Motion")[2] of the above-captioned Debtors for entry of an interim order (this "Interim Order") (i) authorizing payment, in the ordinary course of business, of undisputed prepetition claims of Trade Creditors; (ii) authorizing financial institutions to pay, honor, and process related checks and transfers; and (iii) granting related relief; all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**

1.      The final hearing (the "Final Hearing") on the Motion shall be held on [_____], 2020, at _:_ _.m., prevailing Central Time.  Any objections or responses to the entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Central Time, on [_____], 2020.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without the need for a final hearing.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, in the reasonable exercise of their business judgment, to pay, in the ordinary course of business, some or all of the prepetition Trade Claims upon such terms and in the manner provided for in this Interim Order and the Motion; provided that prior to the Final Hearing the amount paid with respect to Trade Claims shall not exceed the aggregate amount of $41 million.  In the event Debtors will exceed the aggregate amounts in any category as detailed in the Motion during the interim period, Debtors shall file a notice with the Court describing the category and overage amount.

3.      The Debtors are further authorized to seek Customary Trade Terms during the pendency of and after these chapter 11 cases; provided that the Debtors' inability to enter into a Customary Trade Terms shall not preclude them from paying a Trade Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' reorganization.

10442796v1

4.      If a Trade Creditor has received payment of its Trade Claim, but later fails to comply with the Customary Trade Terms between the Trade Creditor and the Debtors, or such other terms as were individually agreed to between the Debtors and such Trade Creditor, the Debtors may, in their discretion, declare that (i) if a Trade Creditor, after receiving a payment on account of its Trade Claim, does not maintain or reinstate Customary Trade Terms during the pendency of these chapter 11 cases, then any payments made on account of the Trade Claim to such Trade Creditor after the Petition Date may, in the Debtors' sole discretion, either be deemed applied to postpetition amounts payable to such Trade Creditor or treat the payment as a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Trade Creditor (including by setoff against postpetition obligations); or (ii) the Trade Creditor shall immediately return the payment of its claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Trade Creditor shall be reinstated in such an amount so as to restore the Debtors and the Trade Creditor to their original positions as if the Trade Agreement had never been entered into and no payment of the claim had been made.

5.      The Debtors shall maintain a matrix summarizing payments made pursuant to this Order including (i) the name of each Trade Creditor paid; (ii) the amount paid to each Trade Creditor on account of its Trade Claim; and (iii) the type of goods or services provided by that Trade Creditor.  This matrix will be provided every 30 days following the entry of this order to the U.S. Trustee, counsel to the lenders under any debtor-in-possession financing facility, and the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases; provided that the professionals for any such committee shall keep the matrix confidential

and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any such committee, without the prior written consent of the Debtors.

6.      Notwithstanding the relief granted in this Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any interim or final orders entered by the Court approving the Debtors' entry into any post-petition debtor in possession financing facility and any budget or cash flow forecasts in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget or cash flow forecasts in connection therewith (in either case, the "DIP Order").  To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.  For the avoidance of doubt, the Debtors are not authorized to make any payments pursuant to this Order to, or on behalf of, a non-debtor affiliate except as permitted by the Budget (as defined in the DIP Order).

7.      In accordance with this Interim Order (or other order of the Court), each of the banks and financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in the Motion is authorized to (i) receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto and (ii) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of the Court, whether such checks, drafts, wires, or transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise.

8.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds transfers, on account of prepetition obligations and claims as set forth

herein, and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

9.       Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity or priority of any claim or lien against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity or priority of any claim against the Debtors, (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

10.      Nothing herein shall impair or prejudice the rights of the U.S. Trustee and the statutory committee appointed in these chapter 11 cases, if any, which are expressly reserved, to object to any payment made pursuant to this order to an insider (as such term is defined in section 101(31) of the Bankruptcy Code), or an affiliate of an insider, of the Debtors. To the extent the Debtors intend to make a payment to an insider or an affiliate of an insider of the Debtors, the Debtors shall, to the extent reasonably practicable, provide three (3) business days' advance notice to, and opportunity to object by the U.S. Trustee and any statutory committee appointed in these chapter 11 cases; provided, that if any party objects to the payment, the Debtors shall not make such payment without further order of the Court

11.      Prior to the entry of a Final Order, the Debtor shall not pay any obligations under this Interim Order unless they are due or are deemed necessary to be paid in the Debtor's business

10442796v1

judgment to ensure ongoing provision of goods or services or otherwise to avoid an adverse effect on operations.

12.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

14.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16.     The Notice to Counterparties is hereby approved, and the Debtors shall be authorized to provide such notice to their customers, trade counterparties, and other interested parties in their discretion.

17.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: _____, 2020
Houston, Texas

_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

10442796v1

**<u>Exhibit B</u>**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN COMMERCIAL LINES INC., | § | Case No. 20-30982 (MI) |
| *et al.*, | § | |
| | § | Jointly Administered |
| Debtors.[1] | § | (Emergency Hearing Requested) |
| | § | |

**FINAL ORDER (I) AUTHORIZING PAYMENT OF PREPETITION
OBLIGATIONS OWED TO TRADE CREDITORS IN THE ORDINARY COURSE
OF BUSINESS, AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO
HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

Upon the motion (the "Motion")[2] of the above-captioned Debtors for entry of a final order

(this "Final Order") (i) authorizing payment, in the ordinary course of business, of undisputed

prepetition claims of Trade Creditors; (ii) authorizing financial institutions to pay, honor, and

process related checks and transfers; and (iii) granting related relief; all as more fully set forth in

the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. § 1334; and this Court having found that venue of this proceeding and the

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having

found that the relief requested in the Motion is in the best interests of the Debtors' estates, their

creditors, and other parties in interest; and this Court having found that the Debtors' notice of the

Motion and opportunity for a hearing on the Motion were appropriate under the circumstances

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

10442796v1

and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein; and the Court having entered an order granting the relief requested in the Motion on an interim basis (ECF No. [_]) (the "Interim Order") and having scheduled a final hearing on the Motion for [_____], 2020 (the "Final Hearing"); and the Final Hearing having been held, if necessary, to consider the relief requested in the Motion on a final basis; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**

1.     The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, in the reasonable exercise of their business judgment, to pay, in the ordinary course of business, some or all of the prepetition Trade Claims in full upon such terms and in the manner provided in this Final Order and the Motion.

2.     The Debtors are further authorized to seek Customary Trade Terms during the pendency of and after these chapter 11 cases; provided that the Debtors' inability to enter into a Customary Trade Terms shall not preclude them from paying a Trade Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' reorganization.

3.     If a Trade Creditor has received payment of its Trade Claim, but later fails to comply with the Customary Trade Terms between the Trade Creditor and the Debtors, or such other terms as were individually agreed to between the Debtors and such Trade Creditor, the Debtors may, in their discretion, declare that (i) if a Trade Creditor, after receiving a payment on account of its Trade Claim, does not maintain or reinstate Customary Trade Terms during the pendency of these chapter 11 cases, then any payments made on account of the Trade Claim to

2

such Trade Creditor after the Petition Date may, in the Debtors' sole discretion, either be deemed applied to postpetition amounts payable to such Trade Creditor or treat the payment as a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Trade Creditor (including by setoff against postpetition obligations); or (ii) the Trade Creditor shall immediately return the payment of its claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Trade Creditor shall be reinstated in such an amount so as to restore the Debtors and the Trade Creditor to their original positions as if the Trade Agreement had never been entered into and no payment of the claim had been made.

4.     The Debtors shall maintain a matrix summarizing payments made pursuant to this Order including (i) the name of each Trade Creditor paid; (ii) the amount paid to each Trade Creditor on account of its Trade Claim; and (iii) the type of goods or services provided by that Trade Creditor.  This matrix will be provided every 30 days following the entry of this order to the U.S. Trustee, counsel to the lenders under any debtor-in-possession financing facility, and the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases; provided that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including, but not limited to, any member of any such committee, without the prior written consent of the Debtors.

5.     Notwithstanding the relief granted in this Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any interim or final orders entered by the Court approving the Debtors' entry into any post-petition debtor in possession financing facility and any budget or cash flow forecasts in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget or cash flow

3

forecasts in connection therewith (in either case, the "DIP Order").  To the extent there is any inconsistency between the terms of the DIP Order and any action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.  For the avoidance of doubt, the Debtors are not authorized to make any payments pursuant to this Order to, or on behalf of, a non-debtor affiliate except as permitted by the Budget (as defined in the DIP Order).

6.      In accordance with this Final Order (or other order of the Court), each of the banks and financial institutions at which the Debtors maintain their accounts relating to the payment of the obligations described in the Motion is authorized to (i) receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto and (ii) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of the Court, whether such checks, drafts, wires, or transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise.

7.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds transfers, on account of prepetition obligations and claims as set forth herein, and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

8.      Nothing contained in the Motion or this Final Order, nor any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity or priority of any claim or lien against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity or priority of any claim against the Debtors, (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (iv) an approval,  assumption, adoption, or

4

rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code. Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

9.      Nothing herein shall impair or prejudice the rights of the U.S. Trustee and the statutory committee appointed in these chapter 11 cases, if any, which are expressly reserved, to object to any payment made pursuant to this order to an insider (as such term is defined in section 101(31) of the Bankruptcy Code), or an affiliate of an insider, of the Debtors. To the extent the Debtors intend to make a payment to an insider or an affiliate of an insider of the Debtors, the Debtors shall, to the extent reasonably practicable, provide three (3) business days' advance notice to, and opportunity to object by the U.S. Trustee and any statutory committee appointed in these chapter 11 cases; provided, that if any party objects to the payment, the Debtors shall not make such payment without further order of the Court

10.      The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

11.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

12.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

13.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

10442796v1

14.     The Notice to Counterparties is hereby approved, and the Debtors shall be authorized to provide such notice to their customers, trade counterparties, and other interested parties in their discretion.

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: _____, 2020
Houston, Texas

                              _____
                              THE HONORABLE MARVIN ISGUR
                              UNITED STATES BANKRUPTCY JUDGE

## **<u>Exhibit C</u>**

### **Form of Notice to Counterparties**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|                          |   |                              |
|--------------------------|---|------------------------------|
| In re:                   | § | Chapter 11                   |
|                          | § |                              |
| AMERICAN COMMERCIAL LINES INC., | § | Case No. 20-30982 (MI) |
| *et al.*,                | § |                              |
|                          | § | Jointly Administered         |
| Debtors.[1]              | § | (Emergency Hearing Requested)|
|                          | § |                              |

## NOTICE TO BUSINESS COUNTERPARTIES

This notice is authorized by the United States Bankruptcy Court for the Southern District

of Texas, Houston Division (the "Court") to inform you that:

1.      On February 7, 2020 American Commercial Lines Inc. and its affiliated companies

listed in footnote 1 below (collectively, the "Company") commenced cases under chapter 11 of the

Bankruptcy Code seeking to reorganize its business.  Notwithstanding its filing for chapter 11, the

Company continues to operate its business as permitted by the Bankruptcy Code (see 11 U.S.C. §

1108).  Prior to filing for bankruptcy, the Company was able to reach an agreement with the holders

of its long-term debt obligations to successfully restructure the Company and ensure the long term

viability of the business enterprise.  The Company expects to expeditiously pursue confirmation

of a chapter 11 plan of reorganization that implements this consensual restructuring framework,

and also expects to continue operating in the ordinary course of business.

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

2.       On [_____], 2020, the Court issued an order authorizing the Company to pay its trade creditors on account of amounts owed by the Company for claims that arose prior to the Company's chapter 11 filing.

3.       The Company is permitted to continue (i) entering into transactions in the ordinary course of business, and (ii) using estate property in the ordinary course of business, in each case under the full authority of the Court and the Bankruptcy Code.

Dated: [_____, 2020]
Houston, Texas

10442796v1