**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| AMERICAN COMMERCIAL LINES INC., | § | Case No. 20-30982 (MI) |
| *et al.* | § | |
| | § | Jointly Administered |
| Debtors.[1] | § | |
| | § | |

**DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11
PLAN OF AMERICAN COMMERCIAL LINES INC. AND ITS
AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**MILBANK LLP**

Dennis F. Dunne (*pro hac vice* pending)
Samuel A. Khalil (*pro hac vice* pending)
Parker J. Milender (*pro hac vice* pending)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

**PORTER HEDGES LLP**

John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331

*Counsel to Debtors and
Debtors in Possession*

Dated: February 7, 2020
     Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

**THIS SOLICITATION IS BEING CONDUCTED BY FINN HOLDING CORPORATION, ACL I CORPORATION, AMERICAN COMMERCIAL LINES INC., COMMERCIAL BARGE LINE COMPANY, AMERICAN COMMERCIAL BARGE LINE LLC, AMERICAN COMMERCIAL LINES INTERNATIONAL LLC, ACBL OLDCO, LLC, ACBL TRANSPORTATION SERVICES LLC, ACBL RIVER OPERATIONS LLC, OLD JB LLC, AND ACL PROFESSIONAL SERVICES INC. (COLLECTIVELY, "ACL") TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT PREPACKAGED CHAPTER 11 PLAN *PRIOR TO* THE FILING OF VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.[2] BECAUSE NO CHAPTER 11 CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS BEEN NEITHER FILED WITH ANY UNITED STATES BANKRUPTCY COURT NOR APPROVED BY ANY UNITED STATES BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF CHAPTER 11 CASES, ACL EXPECTS TO PROMPTLY SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (II) APPROVING THE SOLICITATION OF VOTES ON THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.**

**DISCLOSURE STATEMENT FOR JOINT PREPACKAGED**
**CHAPTER 11 PLAN OF AMERICAN COMMERCIAL LINES INC.**
**AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**February 7, 2020**

**Solicitation of votes from the holders of outstanding**

**TERM LOAN CLAIMS**
**INTERESTS IN FINN HOLDING**

**EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY ACL, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLASS 4 CLAIMS AND CLASS 8 INTERESTS IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), INCLUDING SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS, AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(1), (2), (3), OR (7) OF THE SECURITIES ACT**

---

[2] The anticipated debtors in these chapter 11 cases, along with the last four digits of each anticipated debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614). ACL's principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

**("ACCREDITED INVESTORS")  OR A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB").**

---

**DELIVERY OF BALLOTS**

For your vote to be counted, Ballots (as defined herein) reflecting your vote must be actually received by the Voting Agent (as defined herein) before **4:00 p.m. (prevailing Central Time), on February 17, 2020** (the "Voting Deadline") unless extended by ACL. You should refer to the enclosed Ballot(s) for instructions on how to vote on the Plan.

---

**PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES. IN THE CASE OF ANY INCONSISTENCY BETWEEN THE SUMMARY IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, THE PLAN WILL GOVERN.**

**A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS EXHIBIT A.**

10442820v1

## IMPORTANT INFORMATION FOR YOU TO READ

**ACL HAS NOT YET COMMENCED ANY CASES UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE, AND NO UNITED STATES BANKRUPTCY COURT HAS (A) APPROVED THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT OR (B) CONFIRMED THE PLAN.**

**UNDER THE PLAN, HOLDERS OF "GENERAL UNSECURED CLAIMS" (EACH AS DEFINED IN THE PLAN) ARE ANTICIPATED TO BE PAID IN FULL, SUBJECT TO BANKRUPTCY COURT APPROVAL, IN THE ORDINARY COURSE OF BUSINESS DURING THE PENDENCY OF THE CHAPTER 11 CASES OR THEREAFTER IN ACCORDANCE WITH THEIR TERMS, OR TO RECEIVE SUCH OTHER TREATMENT TO RENDER HOLDERS OF SUCH CLAIMS UNIMPAIRED UNDER THE BANKRUPTCY CODE.**

ACL has prepared this disclosure statement (this "Disclosure Statement") for use in connection with the solicitation of votes on, and confirmation of, the *Joint Prepackaged Chapter 11 Plan of American Commercial Lines Inc. and Its Affiliated Debtors and Debtors in Possession*, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"),[3] and the information set forth herein may not be relied upon for any other purpose. ACL has not authorized any entity to provide any information about, or concerning, the Plan, other than the information contained in this Disclosure Statement. In addition, ACL has not authorized any entity to make any representations concerning ACL or the value of its property, other than as set forth in this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding ACL's operations, its financial history and forecasts, the need to seek chapter 11 protection, significant events that are expected to occur during its chapter 11 cases, and the anticipated organization, operations, and liquidity of ACL upon its successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims or interests entitled to vote under the Plan must follow in order for their votes to be counted.

ACL does not presently have the resources to pay all of its existing long-term debt obligations in full and in cash. However, ACL has entered into a Restructuring Support Agreement (attached hereto as **Exhibit B**) with the Consenting Term Lenders and the Sponsor in order to effectuate a balance sheet recapitalization of ACL pursuant to the terms of the Plan. The proposed restructuring will eliminate approximately $949 million in debt from ACL's balance sheet and thereby improve ACL's financial condition and overall creditworthiness and help ensure ACL's continued operations. ACL is commencing solicitation of the Plan *prior* to the commencement of "prepackaged" chapter 11 cases, which ACL believes will minimize disruption to its day-to-day

---

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

10442820v1

operations, reduce the cost of the proposed restructuring, and ultimately be in the best interests of all of its stakeholders.

**ACL therefore recommends, with the support of the Consenting Term Lenders and the Sponsor, that all holders of Claims or Interests who are entitled to vote on the Plan, after having reviewed all of the information contained in this Disclosure Statement, Plan, and other documents incorporated by reference thereto, vote to accept the Plan.**

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND ACL URGES ANY HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS FOR ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN IS ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

UNLESS OTHERWISE STATED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT OR ACCURATE AT ANY TIME AFTER THAT DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE, REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COMPLETE COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED HEREIN, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ACL'S MANAGEMENT PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. WHILE ACL HAS PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, IT HAS NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY

SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. ACL CAUTIONS THAT IT CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED AND, THUS, MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO DESCRIPTIONS OF LITIGATION OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER ACL OR THE REORGANIZED DEBTORS.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any comparable state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act, or any securities regulatory authority of any state under the applicable state securities law. ACL intends to rely on (i) section 1145(a) of the Bankruptcy Code or, to the extent not available, (ii) as to securities issued (A) in connection with (x) the Rights Offering (including any Unsubscribed Shares (as defined in the Backstop Commitment Agreement) purchased pursuant to the Backstop Commitment Agreement), (y) the conversion of the Term Loan DIP Facility to New Money Preferred Equity or New Money Preferred Warrants, as applicable or (z) the New Sponsor Warrants, or (B) as payment of (x) the Backstop Commitment Premium, (y) the DIP Conversion Discount (as defined in the Term Loan DIP Credit Agreement) or (z) the DIP Backstop Premium (as defined in the Term Loan DIP Credit Agreement), to holders that are "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) promulgated under the Securities Act or a "qualified

institutional buyer" as defined in Rule 144A under the Securities Act, on section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder (and in each case, on equivalent state law registration exemptions) to exempt the issuance of new securities of ACL in connection with the Plan from registration under the Securities Act.  The prepetition solicitation of votes on the Plan is being made in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) thereof.  Neither the solicitation of votes on the Plan nor this Disclosure Statement constitutes an offer to sell securities (or a solicitation of an offer to acquire securities) in any state or jurisdiction in which such offer or solicitation is not authorized.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE EXEMPTION FROM SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology, such as "may," "expect," "anticipate," "estimate," "continue," or the negatives thereof, as well as any similar or comparable language. You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to holders of Allowed Claims and Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

Each recipient of this Disclosure Statement, by its acceptance hereof, acknowledges that (i) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) it is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use, or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential or material information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

Subject to the terms hereof, this Disclosure Statement is submitted by ACL on a confidential basis to the holders of Class 4 Claims and Class 8 Interests for informational use solely in connection with the consideration of the proposed restructuring and the Plan.  Its use for any other purpose is not authorized.  Distribution of this Disclosure Statement by the recipient thereof to any person other than a holder of Class 4 Claims and Class 8 Interests and any person retained to advise such person with respect to its participation in the restructuring is unauthorized and, until such time, if any, as the Plan is publicly filed with the Bankruptcy Court, any disclosure of its contents without ACL's prior written consent is prohibited.  Each holder of Class 4 Claims and Class 8 Interests,

- vii -

by accepting delivery of this Disclosure Statement, agrees to the foregoing and agrees to make no copies or reproductions of this Disclosure Statement or any documents referred to in this Disclosure Statement in whole or in part (other than publicly available documents).

- viii -

# TABLE OF CONTENTS

SECTION I. INTRODUCTION AND OVERVIEW ...................................................... 6

    A.    Overview of Proposed Restructuring ................................................ 7
    B.    Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan ............................................................................................ 9
    C.    Plan Solicitation ............................................................................ 10
           1.    Parties Entitled to Vote on Plan ............................................ 10
           2.    Voting Procedures, Ballots, and Voting Deadline ................ 10
    D.    Anticipated Restructuring Timetable ............................................ 11

SECTION II. HISTORICAL INFORMATION ........................................................ 11

    A.    ACL's Businesses and Operations ................................................ 11
    B.    Selected Financial Information ...................................................... 12
    C.    Organizational Structure ............................................................... 12
           1.    ACL I Corporation ("ACLI") ................................................ 13
           2.    ACBL Oldco, LLC ("ACBL Oldco") .................................... 13
           3.    ACL Professional Services Inc. ("ACL Professional") ........... 13
           4.    ACBL Transportation Services LLC ("ACBL Transport") ..... 13
           5.    ACBL River Operations LLC ("ACBL River Ops") .............. 14
           6.    American Commercial Barge Line LLC ("ACBL") ............... 14
           7.    American Commercial Lines Inc. ("ACL Inc.") .................... 14
           8.    American Commercial Lines International LLC ("ACL International") ..................................................................... 14
           9.    Commercial Barge Line Company ("CBLC") ...................... 14
           10.   Old JB LLC ("Old JB") ........................................................ 14
           11.   Finn Holding Corporation ..................................................... 15
           12.   Description of Equity Holders ............................................... 15
    D.    Prepetition Indebtedness and Capital Structure ............................ 15
           1.    Existing ABL Facility ............................................................ 15
           2.    Term Loan Facility ............................................................... 17
           3.    Intercreditor Agreement ........................................................ 17
    E.    Events Leading up to Chapter 11 .................................................. 18
           1.    Recent Weather Events .......................................................... 18
           2.    Trade War with China ........................................................... 19
           3.    Industry Headwinds and Overcapacity .................................. 19
           4.    Over-Leveraged Balance Sheet & Liquidity Shortfall ............ 20
           5.    Negotiation and Entry into Restructuring Support Agreement ................ 20

SECTION III. ANTICIPATED EVENTS DURING CHAPTER 11 CASES ........................... 26

    A.    Overview of Chapter 11 ................................................................ 26
    B.    First-Day Relief ............................................................................ 27
    C.    Disclosure Statement Approval and Confirmation ........................ 30

10442820v1

SECTION IV. SUMMARY OF JOINT PREPACKAGED CHAPTER 11 PLAN...................... 30

A.     Administrative Expenses and Other Unclassified Claims ...................... 30
    1.    General Administrative Expenses................................................ 31
    2.    Restructuring Expenses............................................................. 31
    3.    Professional Fees ...................................................................... 31
    4.    ABL DIP Facility Claims.......................................................... 33
    5.    Term Loan DIP Facility Claims................................................ 33
    6.    Priority Tax Claims .................................................................. 33
B.     Classification and Treatment of Claims and Interests .......................... 33
    1.    Classification of Claims and Interests....................................... 33
    2.    Treatment of Claims and Interests ............................................ 34
    3.    Special Provision Governing Unimpaired Claims..................... 38
C.     Acceptance or Rejection of Plan.......................................................... 39
    1.    Voting Classes .......................................................................... 39
    2.    Presumed Acceptance of the Plan.............................................. 39
    3.    Subordinated Claims ................................................................. 39
D.     Means for Implementation of Plan ...................................................... 39
    1.    General Settlement of Claims and Interests............................... 39
    2.    Restructuring Transactions ....................................................... 40
    3.    Sources of Consideration for Plan Distributions ...................... 41
    4.    Corporate Existence .................................................................. 43
    5.    Vesting of Assets in the Reorganized Debtors .......................... 43
    6.    Cancellation of Loans, Securities, and Agreements ................. 43
    7.    Corporate and Other Entity Action ........................................... 44
    8.    New Organizational Documents ................................................ 44
    9.    Directors and Officers of Reorganized Debtors........................ 45
    10.  Effectuating Documents; Further Transactions ........................ 46
    11.  Section 1146 Exemption ........................................................... 46
    12.  Management Incentive Plan....................................................... 46
    13.  Procedures for Treating Disputed Claims and Interests Under the Plan .. 47
    14.  Authorization and Issuance of New Common Equity, New Preferred
        Equity and New Warrants ........................................................ 48
E.     Treatment of Executory Contracts and Unexpired Leases ................... 49
    1.    Assumption of Executory Contracts and Unexpired Leases.................... 49
    2.    Cure of Defaults for Executory Contracts and Unexpired Leases
        Assumed........................................................................... 50
    3.    Insurance Policies & Indemnification Obligations ................... 50
    4.    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ...................................................................... 51
    5.    Reservation of Rights................................................................ 52
    6.    Contracts and Leases Entered into after Petition Date.............. 52
    7.    Rejection Damages Claims ....................................................... 52
    8.    Compensation and Benefits Plans............................................. 52
F.     Provisions Governing Distributions..................................................... 52
    1.    Timing and Calculation of Amounts to Be Distributed ............ 52
    2.    Disbursing Agent ..................................................................... 52

10442820v1

       3.      Rights and Powers of Disbursing Agent ................................................ 53

       4.      Delivery of Distributions and Undeliverable or Unclaimed
              Distributions ........................................................................................ 53

       5.      Exemption from Securities Laws .......................................................... 54

       6.      Compliance with Tax Requirements ..................................................... 55

       7.      No Postpetition Interest on Claims and Interests ................................. 56

       8.      Setoffs and Recoupment ...................................................................... 56

       9.      Claims Paid or Payable by Third Parties .............................................. 56

       10.     Allocation Between Principal and Accrued Interest ............................. 57

G.     Settlement, Release, Injunction, and Related Provisions ................................ 57

       1.      Compromise and Settlement ................................................................ 57

       2.      Discharge of Claims and Termination of Interests .............................. 58

       3.      Release of Liens ................................................................................... 58

       4.      Releases of Released Parties ................................................................ 58

       5.      Exculpation .......................................................................................... 60

       6.      Injunction ............................................................................................ 61

H.     Conditions to Confirmation and Effective Date ............................................ 61

       1.      Conditions to Effective Date ............................................................... 61

       2.      Waiver of Conditions .......................................................................... 62

I.      Modification, Revocation or Withdrawal of Plan .......................................... 63

       1.      Modification and Amendments ............................................................ 63

       2.      Effect of Confirmation on Modifications ............................................ 63

       3.      Revocation or Withdrawal of Plan ...................................................... 63

J.      Retention of Jurisdiction ............................................................................... 64

K.     Miscellaneous Provisions .............................................................................. 67

       1.      Immediate Binding Effect ................................................................... 67

       2.      Additional Documents ......................................................................... 67

       3.      Payment of Statutory Fees ................................................................... 67

       4.      Reservation of Rights .......................................................................... 68

       5.      Successors and Assigns ....................................................................... 68

       6.      Term of Injunctions or Stays ............................................................... 68

       7.      Entire Agreement ................................................................................ 68

       8.      Exhibits ............................................................................................... 68

       9.      Consent Rights of Required Consenting Term Lenders ........................ 69

       10.     Nonseverability of Plan Provisions ..................................................... 69

       11.     Votes Solicited in Good Faith ............................................................. 69

       12.     Closing of Chapter 11 Cases ............................................................... 70

       13.     Document Retention ........................................................................... 70

       14.     Conflicts .............................................................................................. 70

       15.     Dissolution of Creditors' Committee ................................................... 70

SECTION V. VOTING PROCEDURES AND REQUIREMENTS ........................................... 70

A.     Voting Deadline ............................................................................................ 71

B.     Voting Record Date ....................................................................................... 71

C.     Parties Entitled to Vote .................................................................................. 71

D.     Ballots .......................................................................................................... 72

3

E.      Agreements upon Furnishing Ballots.................................................... 73
F.      Withdrawal or Change of Votes on Plan ............................................. 73
G.      Fiduciaries and Other Representatives.................................................. 73
H.      Waivers of Defects, Irregularities, etc. ............................................... 73
I.      Further Information, Additional Copies ............................................... 74
J.      Requirements for Acceptance by Impaired Class of Claims ................ 74

SECTION VI. CONFIRMATION OF PLAN ........................................................... 74

A.      Combined Hearing ............................................................................... 74
B.      Requirements for Confirmation of Plan – Consensual Confirmation.................. 75
       1.      Feasibility................................................................................ 75
       2.      Best Interests Test ................................................................... 75
C.      Requirements for Confirmation of Plan – Non-Consensual Confirmation .......... 77
       1.      Unfair Discrimination ............................................................. 77
       2.      Fair and Equitable Test ........................................................... 77

SECTION VII. PROJECTED FINANCIAL INFORMATION AND VALUATION
       ANALYSIS........................................................................................... 78

A.      Introduction:......................................................................................... 79
B.      Valuation Methodologies:.................................................................... 80
C.      Discounted Cash Flow Methodology.................................................... 80
D.      Comparable Company Trading Multiples Methodology....................... 80
E.      Precedent Transactions Methodology ................................................... 81
F.      Valuation Considerations:.................................................................... 81

SECTION VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN... 82

A.      Certain U.S. Federal Income Tax Consequences to the Debtors .......................... 83
       1.      Cancellation of Debt and Reduction of Tax Attributes ........................... 84
       2.      Limitation of NOL Carry Forwards and Other Tax Attributes................ 85
B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed
       Term Loan Claims and Allowed Interests in Finn Holding................................ 86
       1.      Consequences to U.S. Holders of Allowed Term Loan Claims .............. 86
       2.      Tax Treatment of Subscription Rights...................................... 91
       3.      Consequences to U.S. Holders of Allowed Interests in Finn Holding...... 92
       4.      Tax Consequences of Owning New Common Securities......................... 93
       5.      Tax Consequences of Owning New Take Back Preferred Securities
               and New Money Preferred Securities ................................... 94
       6.      Limitation on Use of Capital Losses........................................ 98
C.      Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of
       Allowed Term Loan Claims and Allowed Interests in Finn Holding.................. 98
       1.      Gain Recognition ..................................................................... 98
       2.      Accrued Interest ....................................................................... 99
       3.      Tax Consequences of Owning New Common Securities, New Take
               Back Preferred Securities and New Money Preferred Securities .......... 100

4

D.       FATCA .................................................................................................... 103
E.       Information Reporting and Backup Withholding ............................... 104

SECTION IX. CERTAIN FEDERAL AND STATE SECURITIES LAW
CONSIDERATIONS ................................................................................... 105

A.       1145 Securities ..................................................................................... 105
B.       Private Placement ................................................................................ 106

SECTION X. RISK FACTORS ............................................................................... 108

A.       Certain Bankruptcy Law Considerations ........................................... 109
B.       Business-Related Risks ........................................................................ 111
C.       Regulatory Risks .................................................................................. 117
D.       Risks Related to New Preferred Equity, New Common Equity, and New
Warrants ............................................................................................... 120
E.       Factors Relating to Rights Offering ................................................... 123
F.       Risks Relating to Financing Facilities ............................................... 123
G.       Other Risks ........................................................................................... 125

SECTION XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
PLAN .......................................................................................................... 127

A.       Liquidation Under Chapter 7 or Chapter 11 ..................................... 127
B.       Alternative Plans of Reorganization .................................................. 128

SECTION XII. CONCLUSION AND RECOMMENDATION ................................ 128

EXHIBIT A            Joint Prepackaged Chapter 11 Plan

EXHIBIT B            Restructuring Support Agreement

EXHIBIT C            Projections

EXHIBIT D            Liquidation Analysis

## SECTION I.
## INTRODUCTION AND OVERVIEW

Finn Holding Corporation ("Finn Holding"), ACL I Corporation, American Commercial Lines Inc., Commercial Barge Line Company ("CBLC"), American Commercial Barge Line LLC, American Commercial Lines International LLC, ACBL Oldco, LLC, ACBL Transportation Services LLC, ACBL River Operations LLC, Old JB LLC, and ACL Professional Services Inc., as anticipated debtors and debtors in possession (collectively, "ACL") submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") for use in the solicitation of votes on the *Joint Prepackaged Chapter 11 Plan of American Commercial Lines Inc. and Its Affiliated Debtors and Debtors in Possession*, dated as of February 7, 2020, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan").[4]  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference. In the event of any inconsistency between the terms of the Plan and the description of such terms in this Disclosure Statement, the terms of the Plan shall control.

This Disclosure Statement is part of the "Solicitation Package" distributed to all holders of Claims and Interests in the voting Classes, and contains the following:

- the transmittal letter

- this Disclosure Statement,

- the Plan (as Exhibit A to this Disclosure Statement),

- the Restructuring Support Agreement (as Exhibit B to this Disclosure Statement),[5]

- the Projections (as Exhibit C to this Disclosure Statement),

- the Liquidation Analysis (as Exhibit D to this Disclosure Statement), and

- if you are entitled to vote to accept or reject the Plan, one or more Ballots, as applicable, which shall include instructions describing the two acceptable methods to submit your Ballot (via Prime Clerk LLC's online "E-Ballot" portal or via first class mail, overnight courier, or hand delivery) along with a postage-paid, pre-addressed return envelope to be used by voters who opt to submit their Ballot to Prime Clerk LLC by mail.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact Prime Clerk LLC ("Prime Clerk" or the "Voting Agent") by e-mail at ACLballots@primeclerk.com or by phone at (877) 425-3088 (toll free) or (917) 944-8379 (international).

---

[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[5] The signature pages to the Restructuring Support Agreement have been redacted in accordance with the terms and conditions thereof.

For your vote to be counted, your Ballot(s) reflecting your vote must be **actually received** by the Voting Agent no later than 4:00 p.m., prevailing Central Time, on February 17, 2020 (the "Voting Deadline").  To be counted as votes to accept or reject the Plan, each Ballot (each, a "Ballot") must be properly executed, completed, and delivered to the Voting Agent in accordance with the instructions set forth on the applicable Ballot such that it is actually received by the Voting Agent before the Voting Deadline.

Copies, faxes, and e-mails will not be accepted or counted as votes.  Each Ballot has been coded to reflect the Class of the Claim(s) or Interest(s) it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot(s) sent to you with this Disclosure Statement.

ACL anticipates commencing a case under chapter 11 of the Bankruptcy Code for each ACL entity to be jointly administered under the Bankruptcy Code (collectively, the "Chapter 11 Cases") and seeking confirmation of the Plan by the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

A.     *Overview of Proposed Restructuring*

ACL is pleased to announce that the Plan provides for a restructuring of ACL (the "Restructuring") that will eliminate approximately $949 million in debt (plus unpaid interest) from its balance sheet.  As a result, ACL will emerge from the Chapter 11 Cases (as the "Reorganized Debtors") a stronger company, with a sustainable capital structure that is better aligned with ACL's present and future operating prospects.

ACL is commencing this solicitation on the Plan following extensive discussions with certain of its key stakeholders.  The discussions have resulted in majorities of its stakeholders agreeing to (a) support the Restructuring and (b) to vote to accept the Plan pursuant to a Restructuring Support Agreement, dated as of January 31, 2020 (as it may be amended from time to time, the "Restructuring Support Agreement"), among ACL and:

- Holders of, investment advisors or investment managers to a holder or holders of, a majority of the Term Loan Claims (the "Consenting Term Lenders"); and

- Holders of, investment advisors or investment managers to a holder or holders of, all of the Interests in Finn Holding.

**For additional information regarding the Restructuring Support Agreement, please refer to the discussion in Section II.E.5 herein entitled, "Negotiation and Entry into Restructuring Support Agreement."**  A redacted copy of the Restructuring Support Agreement is attached hereto as Exhibit B and incorporated herein by reference.  In the event of any inconsistency between the terms of the Restructuring Support Agreement and the description of such terms in this Disclosure Statement, the terms of the Restructuring Support Agreement shall control.

As a result of the Restructuring provided in the Plan:

7

- the Allowed Existing ABL Facility Claims, will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) on a dollar-for-dollar basis, first lien, first-out revolving loans or commitments under the ABL DIP Facility, (ii) Payment in Full in cash, or (iii) such other less favorable treatment as to which ACL and the holder of such Allowed Existing ABL Facility Claim will have agreed upon in writing;

- the Allowed Term Loan Claims, in the aggregate principal amount of approximately $949 million, will be exchanged for (i) the right to participate in the Rights Offering in accordance with the Rights Offerings Procedures, (ii) a Pro Rata share of the New Take Back Preferred Equity or New Take Back Preferred Warrants, subject to dilution from the Management Incentive Plan, and (iii) a Pro Rata share of the New Common Equity or the New Term Lender Warrants, subject to dilution from the New Sponsor Warrants and conversion of the New Money Preferred Equity;

- the Interests in Finn Holding will be exchanged for 5% of the New Common Equity; and

- all other Claims, including all General Unsecured Claims and all Other Secured Claims, will be paid in full or otherwise rendered Unimpaired.

In order to fund the above-described distributions, in connection with consummation of the Plan, (1) ACL anticipates entering into a new asset based loan facility comprising a revolving credit facility (the "New ABL Facility") and a last-out term facility, and (2) the Reorganized Company will issue the New Common Equity, the New Preferred Equity, and the New Warrants. Pursuant to the Restructuring Support Agreement, ACL must obtain a commitment letter for the New ABL Facility with parties and on terms acceptable to ACL, the Required Consenting Term Lenders and the Required DIP Commitment Parties (each as defined in the Restructuring Support Agreement) by not later than fourteen (14) days after the Petition Date (i.e., by February 21, 2020).

ACL, with the support of the Consenting Term Lenders and the Sponsor, believes that consummation of the proposed Restructuring under the Plan will provide ACL with the capital structure and liquidity to continue operating as a going concern. ACL currently is significantly overleveraged and facing severe liquidity constraints. The proposed Restructuring solves these problems by eliminating approximately $949 million of the ACL's funded debt obligations, thereby reducing debt service expenses, and through the contribution of an additional $200 million of new equity capital, providing necessary working capital to support ACL's operations upon from the Chapter 11 Cases. Not only will these events help stabilize ACL's business in the near-term, but they will also position ACL to operate successfully for years to come and be competitively positioned within the inland barging industry.

In connection with developing the Plan, ACL conducted a careful review of its current business operations and compared its projected value as an ongoing business enterprise with its potential value in a liquidation scenario, as well as the estimated recoveries to holders of Allowed Claims and Interests thereunder. ACL concluded that the potential recoveries to holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern.

ACL believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  **For additional information on estimated recoveries under the Plan as compared to estimated recoveries in liquidation, please refer to the discussion in Section VI.B.2 herein entitled, "Best Interests Test."**  Moreover, ACL believes that any alternative to the Restructuring contemplated by the Plan, such as an out-of-court restructuring, an asset sale or liquidation, or attempts by another party-in-interest to file an alternative plan of reorganization, could result in significant delay, litigation, execution risk, and/or additional costs and, ultimately, lower the recoveries to holders of Allowed Claims and Interests. Accordingly, ACL, with the support of the Consenting Term Lenders and the Sponsor, strongly recommends that you vote to **<u>accept</u>** the Plan, if you are entitled to vote.

B.      *Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan*

The following table summarizes the classification and estimated recoveries to holders of Allowed Claims and Interests under the Plan.  Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates.  The final amounts of Claims or Interests allowed by the Bankruptcy Court may vary from the estimates in this Disclosure Statement.  As a result of the foregoing and other uncertainties inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries realized.  In addition, the ability to receive distributions under the Plan depends upon, among other things, the ability of ACL to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement.  **For additional explanation regarding the terms of the Plan and treatment of Allowed Claims and Interests thereunder, please refer to the discussion in Section IV herein entitled, "**Error! Reference source not found.**," as well as the Plan itself, attached hereto as <u>Exhibit A</u>.**

| <u>Class</u> | <u>Claims or Interests</u> | <u>Status</u> | <u>Voting Rights</u> | <u>Estimated Recovery</u> |
|:---:|:---:|:---:|:---:|:---:|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept | 100% |
| 3 | Existing ABL Facility Claims | Unimpaired | Deemed to accept | 100% |
| 4 | Term Loan Claims | Impaired | Entitled to vote | 38% |
| 5 | General Unsecured Claims | Unimpaired | Deemed to accept | 100% |
| 6 | Intercompany Claims | Unimpaired | Deemed to accept | 100% |
| 7 | Intercompany Interests | Unimpaired | Deemed to accept | 100% |
| 8 | Interests in Finn Holding | Impaired | Entitled to vote | N/A |

9

C.     *Plan Solicitation*

As indicated above, ACL intends to implement the Restructuring through the Chapter 11 Cases and confirmation of the Plan by the Bankruptcy Court.  The solicitation is being conducted at this time in order to obtain sufficient votes accepting the Plan to permit the Plan to be confirmed by the Bankruptcy Court.  **For further information and instructions on voting on the Plan, please refer to Section V herein entitled, "Voting Procedures and Requirements."**

1.     Parties Entitled to Vote on Plan

Under the Bankruptcy Code, only holders of Claims or Interests that are "Impaired" under the Plan are entitled to vote to accept or reject the Plan.  Holders of Claims or Interests that are not Impaired under the Plan (i.e., "Unimpaired") are, in accordance with section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan, and the solicitation with respect to such holders is not required.  ACL is therefore soliciting votes only from holders of Impaired Claims or Interests (to the extent eligible to vote, as described below) and not from any holders of Unimpaired Claims or Interests.

Holders of Claims in Class 4 (Term Loan Claims) and Interests in Class 8 (Interests in Finn Holding) are Impaired under the Plan; therefore, holders of such Claims and Interests are entitled to vote to accept or reject the Plan.

Holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (Existing ABL Facility Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), and Class 7 (Intercompany Interests), are Unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

2.     Voting Procedures, Ballots, and Voting Deadline

If you have received a Ballot and are entitled to vote on the Plan, you should read the materials supplied to you in the Solicitation Package in their entirety, including the instructions set forth in the Ballot(s).  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.  After carefully reviewing the Solicitation Package, please indicate your acceptance or rejection of the Plan on the Ballot by voting for or against the Plan.  ACL will not count any executed Ballot that (a) does not indicate either acceptance or rejection of the Plan, or (b) indicates both acceptance and rejection of the Plan.  The Ballots being sent to the Classes entitled to vote explicitly provide holders who vote to reject the Plan or who do not cast a vote to accept or reject the Plan with the ability to opt-out of the third-party releases set forth in the Plan.

For your vote to be counted, your Ballot(s) must be **actually received** by the Voting Agent no later than the Voting Deadline.  Any Ballot received after the Voting Deadline will be counted only in the discretion of ACL.  To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered in accordance with the instructions set forth on the applicable Ballot, along with a postage-paid, pre-addressed return envelope to be used by voters who opt to submit their Ballot to Prime Clerk by mail, such that it is actually received before the Voting Deadline by the Voting Agent.  Copies, faxes, and e-mails will not be accepted or counted as votes.  Each Ballot has been coded to reflect the Class of the Claim(s) it represents.

Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot(s) sent to you with this Disclosure Statement and follow the instructions included on the applicable Ballot. Do not return any debt instruments or equity securities with your Ballot(s).

If you have any questions about the procedure for voting your Claim(s), the packet of materials that you have received, or the amount of your Claim(s), or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its exhibits, please contact the Voting Agent, by e-mail at ACLballots@primeclerk.com or by phone at (877) 425-3088 (toll free) or (917) 944-8379 (international).

D.    *Anticipated Restructuring Timetable*

ACL anticipates commencing the Chapter 11 Cases (such commencement date, the "Petition Date") on or before February 7, 2020 and, as soon as practicable thereafter, seeking entry of an order of the Bankruptcy Court scheduling a combined hearing to consider (1) the adequacy of information contained in Disclosure Statement and solicitation of votes in connection therewith and (2) confirmation of the Plan (the "Combined Hearing"). ACL expects that notice of the Combined Hearing will be published in *USA Today National Edition* or another nationally-circulated newspaper and will be mailed to all known holders of Claims and Interests approximately twenty-eight (28) days before the date by which objections to confirmation must be filed with the Bankruptcy Court. **For additional information regarding the Combined Hearing, please refer to Section VI.A herein entitled, "Combined Hearing."**

Assuming the Bankruptcy Court approves ACL's scheduling request, ACL anticipates that the Combined Hearing will be held within approximately forty-five (45) days after the Petition Date. However, if any such objections are raised, the expected timing for confirmation may be significantly delayed. To the extent the Plan is confirmed within the expected timeframe, ACL currently intends to consummate the Plan as soon as practicable thereafter. **For additional information regarding the anticipated Chapter 11 Cases, please refer to Section III herein entitled, "Anticipated Events During Chapter 11 Cases."**

## SECTION II.
## HISTORICAL INFORMATION

A.    *ACL's Businesses and Operations*

ACL is one of the largest providers of liquid and dry cargo barge transportation services in the United States, operating a modern fleet of approximately 3,500 cargo barges on the Mississippi River, its tributaries, and on the Gulf Intracoastal Waterway (collectively, the "Inland Waterways"). In addition, ACL operates a series of strategically-placed harbor services facilities throughout the region, providing fleeting, shifting, cleaning, and repair services to their fleet of barges and 188 towboats, as well as to third-parties. With approximately 2,100 employees as of the Petition Date, and customers that include many of the country's major energy, petrochemical, industrial, and agricultural companies, ACL comprises one of the largest and most diversified marine transportation and service companies of its kind.

Founded in 1915 and headquartered in Jeffersonville, Indiana, ACL is one of the only marine companies that offers barge transportation of both liquid and dry cargoes and terminal and

fleeting services throughout the Inland Waterways.  ACL's barges transport a variety of dry cargoes, such as agricultural products (including grains and fertilizers), metals (including steel and aluminum finished and raw materials), and other bulk and construction materials (including salt, cement and aggregate).  ACL's barges also transport liquid cargoes, such as petrochemicals and chemicals, refined products, and crude oil and agricultural products (including renewable fuels and edible oils).

ACL has one of the most modern and high-quality barge fleets in the industry; its fleet of owned and leased barges has an estimated replacement value in excess of $4 billion.  ACL operates an active fleet of approximately 3,500 barges, comprised of approximately 3,094 dry cargo barges and 406 liquid cargo barges.  Groups of up to 40 barges are combined using cables and winches to form a "tow" to be pushed up or downriver by powerful, purpose-built "towboats," of which ACL operates a fleet of approximately 188.  ACL also derives a small portion of its revenue from "tramp towing" (i.e., towing third-party barges not owned or leased by ACL).

ACL's transportation operations are supported by its harbor services business, which is comprised of nine fleeting facilities and two terminals strategically located throughout the Inland Waterways.  ACL operates these facilities throughout the Inland Waterways to provide fleeting, shifting, cleaning, and repair services for both barges and towboats.  ACL also provides harbor services to third-party customers for a fee, which helps to offset the cost of operating the facilities. ACL's harbor services facilities are located at strategic points along the Inland Waterways that allow ACL to assemble and disassemble large barge tows and hold barges for later transit to customer locations, allowing for quicker turnaround times and higher utilization of towboats. These operations are critical to ACL's strategy of using larger tow sizes to drive higher operating efficiency.  Further, scarcity of available river frontage that is suitable for these activities within certain strategic geographic areas provides ACL with a competitive advantage over other barge operators that do not control suitable harbor services locations.  These facilities also provide ACL with the opportunity to perform routine maintenance on its barge fleet, remove residual cargo from its barges in preparation for their next loading, and serve as convenient locations where its crews can embark/disembark from its mainline towing vessels as necessary.  ACL has active harbor services facilities in the following locations: Lemont, Illinois; Channahon, Illinois; Cairo, Illinois; Baton Rouge, Louisiana; Convent, Louisiana; Vacherie, Louisiana; Harahan, Louisiana; Belmont, Louisiana; and Houston, Texas.  ACL also owns and operates terminals that are used to receive, store and transfer dry and liquid cargoes for its customers.

B.      *Selected Financial Information*

As of December 31, 2019, ACL generated approximately $974 million in operating revenues for the prior 12-month period and incurred a net loss of approximately $140 million.  Its unaudited balance sheet reflected assets of approximately $1.441 billion and liabilities of approximately $1.977 billion as of December 31, 2019.

C.      *Organizational Structure*

Collectively, ACL consists of eleven (11) entities organized under the laws of the State of Delaware, as well as two part-owned joint venture entities organized under the laws of the States of Missouri and Texas, which are not anticipated to be debtors in the Chapter 11 Cases.  A chart

illustrating ACL's organizational structure as of the date hereof, as well as descriptions of each ACL entity, is set forth below.



1.    ACL I Corporation ("ACLI")

ACLI is a holding company with no business operations, revenue, or expenses.  ACLI owns 100% of the capital stock of ACL Inc., the parent of CBLC.

2.    ACBL Oldco, LLC ("ACBL Oldco")

ACBL Oldco is a limited liability company with no business operations.

3.    ACL Professional Services Inc. ("ACL Professional")

ACL Professional was a subsidiary that was previously engaged in an environmental contracting business that was sold in 2009.  ACL Professional currently has no business operations.

4.    ACBL Transportation Services LLC ("ACBL Transport")

In addition to owning and operating many of the business assets and operations described above, ACBL Transport also owns and operates two terminal facilities that are used to receive, store and transfer dry and liquid cargoes for ACL's customers: a coal storage and transfer terminal in St. Louis, Missouri and a barge-to-truck transfer facility in Memphis, Tennessee.

ACBL Transport also owns a 50% interest in Bolivar Terminal Co., Inc. ("Bolivar") and a 33% interest in MarineNet LLC ("MarineNet"), each of which are joint venture entities incorporated in Texas and Missouri, respectively.  Bolivar Terminal Co., Inc. is co-owned with Kirby Inland Marine, L.P. and owns a barge fleet facility near Houston, Texas.  MarineNet is co-

13

owned with ACBL River Ops (33%) and Ingram Barge Company (33%) and owns certain intellectual property for electronic information transfers used in the inland barge industry. Neither Bolivar nor MarineNet are expected to be debtors in the Chapter 11 Cases.

ACBL Transport is the second largest employer among the ACL companies with approximately 600 employees as of the date hereof.

5.    ACBL River Operations LLC ("ACBL River Ops")

On November 12, 2015, ACL completed the acquisition (the "River Ops Acquisition") of all the outstanding shares of AEP Resources, Inc. ("AEPR") from American Electric Power Company, Inc. On November 12, 2015, after the closing of the River Ops Acquisition, AEPR was merged into CBLC and ACBL River Ops became a direct subsidiary of CBLC. ACBL River Ops owns a 33% interest in MarineNet LLC.

6.    American Commercial Barge Line LLC ("ACBL")

ACBL is ACL's primary barging subsidiary, accounting for over 80% of ACL's total revenues. ACBL provides most of the administrative services for the ACL subsidiaries including its financial, legal, and management functions. In terms of tonnage and revenue, grain is ACBL's largest transport commodity with inputs used in the steel industry/other bulk commodities and liquids second and third, respectively.

ACBL is the largest employer among the ACL companies with approximately 1,500 employees as of the Petition Date. ACBL also owns 100% of the capital stock of ACL International and ACBL Oldco.

7.    American Commercial Lines Inc. ("ACL Inc.")

ACL Inc. is a holding company with no business operations, revenue, expenses, material assets or liabilities other than its ownership of 100% of the capital stock of CBLC.

8.    American Commercial Lines International LLC ("ACL International")

ACL International is an inactive company with no business operations, revenue, expenses, or material assets.

9.    Commercial Barge Line Company ("CBLC")

CBLC is a holding company with no business operations, material assets, or liabilities other than its ownership of 100% of the capital stock of each of ACBL, ACBL Transport, ACBL River Ops, Old JB, and ACL Professional.

10.    Old JB LLC ("Old JB")

Old JB (formerly known as Jeffboat LLC) is CBLC's subsidiary that was previously engaged in the barge construction business. On March 23, 2018, Old JB entered into an agreement to sell certain of its assets, excluding real estate and selected working capital. Concurrent with

14

this transaction, Old JB announced that it would be exiting the marine equipment construction market upon the completion of the barges that were under construction at that time.  As part of this transaction, Old JB agreed to no longer participate directly or indirectly in the design, construction, manufacture or production of inland barges for a period of ten years.  In addition, ACL gave the buyer the exclusive right to supply its new barge construction needs for a period of ten years, subject to certain conditions.  Old JB retained ownership of its real estate following this transaction.

   11. Finn Holding Corporation

   Finn is a holding company with no business operations, revenue, or expenses.  Finn owns 100% of the capital stock of ACL I Corporation, the parent of ACL Inc.

   12. Description of Equity Holders

   The principal stockholders of Finn Holding Corporation are private equity investment funds advised by Platinum Equity, LLC.  Founded in 1995, Platinum Equity is a global investment firm with approximately $13 billion of assets under management and a portfolio of approximately 40 operating companies.

D. *Prepetition Indebtedness and Capital Structure*[6]

   ACL has incurred debt through two primary debt vehicles, consisting of (i) an asset-based lending ("ABL") facility, and (ii) a term loan facility.  A summary of these debt facilities, as well as the issued and outstanding common stock of Finn Holding and certain other ownership details, is provided below.

   1. Existing ABL Facility

   ACL, CBLC, ACBL, ACBL Transport, Old JB, and ACBL River Ops (collectively referred to herein as the "Credit Parties") are party to an amended and restated revolving credit agreement, dated as of November 12, 2015 (the "Existing ABL Facility Credit Agreement"), by and among the lenders from time to time party thereto and Wells Fargo Capital Finance, LLC, as administrative agent and collateral agent (as amended, modified, supplemented or restated from time to time, the "Existing ABL Facility").  The original credit agreement for the Existing ABL Facility provided for a $550 million asset-based revolving credit facility.  On February 18, 2016, the Credit Parties amended the Existing ABL Facility Credit Agreement to, among other things, increase the $550 million asset-based revolving credit facility to $640 million.  The loans and commitments under the Existing ABL Facility have a maturity date of November 12, 2020, subject to a springing maturity date of August 13, 2020 to the extent the Term Loan Facility (discussed below) remains outstanding as of that date.

   Borrowings under the Existing ABL Facility are limited to the lower of the total amount of the facility and a borrowing base, which is determined based upon eligible accounts receivable and fuel inventories and the value of ACL's fleet of boats and barges.  Up to $35 million of the Existing

---

[6] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

10442820v1

ABL Facility is available for issuances of letters of credit and up to $55 million of the Existing ABL Facility is available for swing line loans, and any such issuance of letters of credit or swing line loans, as applicable, reduces the amount available under the Existing ABL Facility on a dollar-for-dollar basis. All borrowings under the Existing ABL Facility are subject to the satisfaction of customary conditions, including absence of a default and accuracy of representations and warranties.

Borrowings under the Existing ABL Facility bear interest at a floating rate, which can be either LIBOR rate plus an applicable margin or, at the applicable borrower's option, base rate plus an applicable margin. Such floating rates are determined by reference to a pricing grid based on average availability. At the applicable borrower's option, the LIBOR rate can be selected for one-, two-, three-, or six-month interest periods, or, if agreed to by all lenders, a 12-month interest period or less than one-month interest period. The base rate is a fluctuating rate per annum equal to the highest of (i) the prime commercial lending rate publicly announced by the administrative agent as its "prime rate" as in effect on such day, (ii) the Federal Funds Effective Rate plus 1/2 of 1.0%, and (iii) one-month LIBOR plus 1.0% per annum.

The Credit Parties are required to pay a commitment fee to the lenders on the average daily unused portion of the Existing ABL Facility at a rate of 0.375% per annum when average usage of the revolving commitments falls below 50% or 0.250% per annum when average usage of the revolving commitments is equal to or exceeds 50%, in each case, for the immediately preceding fiscal quarter. The Credit Parties also are required to pay a letter of credit fee with respect to any amount available to be drawn under outstanding letters of credit equal to the applicable spread over the base rate under the Existing ABL Facility. In addition, the Credit Parties are required to pay to the issuing bank customary issuance and administration fees as well as a fronting fee equal to 0.125% per annum upon the aggregate face amount of outstanding letters of credit, payable in arrears at the end of each quarter and upon the termination of the Existing ABL Facility, calculated based upon the actual number of days elapsed over a 360-day year.

CBLC, ACBL, ACBL Transport, ACBL River Ops, and Old JB are co-borrowers under the Existing ABL Facility, and ACL Inc. is a guarantor thereunder. The Credit Parties' obligations under the Existing ABL Facility are secured by a first-priority lien on substantially all of the Credit Parties' assets (subject to certain exceptions as set forth in the credit agreement).

As of the date of this Disclosure Statement, the aggregate outstanding principal balance under the Existing ABL Facility was approximately $536 million, plus any accrued and unpaid fees, expenses, letters of credit, and other amounts due and owing pursuant to the terms of the Existing ABL Facility Credit Agreement and related loan documents.

As discussed below, the ABL Lenders have agreed to provide ACL with post-petition financing during the Chapter 11 Cases in the form of a debtor-in-possession superpriority senior secured asset-based revolving credit facility of up to $640 million in the aggregate, which ACL intends to use to fund its working capital needs and satisfy certain prepetition obligations under the Existing ABL Facility during the Chapter 11 Cases. **For additional information regarding the debtor-in-possession asset-based revolving credit facility, please refer to Section III.C herein entitled, "DIP Facility."**

2.      Term Loan Facility

The Credit Parties are also party to a term loan credit agreement, dated as of November 12, 2015, by and among the lenders from time to time party thereto and Bank of America, N.A., as administrative agent and collateral agent.  The term loan credit agreement provides for a $1,150 million term loan credit facility (as amended, modified, supplemented or restated from time to time, the "Term Loan Facility," and together with the Existing ABL Facility, the "Secured Debt Facilities"), of which $948,750,000 million in principal amount is currently outstanding as of the date of this Disclosure Statement.  The loans and commitments under the Term Loan Facility are scheduled to mature on November 12, 2020.  The Credit Parties are required to repay an aggregate principal amount of $14.375 million of term loans each fiscal quarter.  On December 30, 2019, the Credit Parties and certain of the Term Loan Facility lenders executed that certain First Amendment to Term Loan Credit Agreement which, among other things, extended the date of the December 31, 2019 principal payment to February 7, 2020.

The Term Loan Facility bears interest at a benchmark-based rate, which can be either LIBOR rate plus 8.75% or, at the borrower's option, base rate plus 7.75%.  At the borrower's option, the LIBOR rate can be selected for one-, two-, three-, or six-month interest periods, or, if agreed to by all lenders, less than one-month.  The base rate is a fluctuating rate per annum equal to the highest of (i) the prime commercial lending rate publicly announced by the administrative agent as its "prime rate" as in effect on such day, (ii) the Federal Funds Effective Rate plus 1/2 of 1.0% and (iii) one-month LIBOR plus 1.0% per annum.  Interest rates under the Term Loan are subject to a minimum LIBOR rate of 1% and a minimum base rate of 2%.

CBLC is the borrower under the Term Loan Facility, which is guaranteed by the other Credit Parties.  The Credit Parties' obligations under the Term Loan Facility are secured by a first-priority lien in certain real estate and equipment and a second-priority lien on substantially all of the Credit Parties' other assets (subject to certain exceptions as set forth in the credit agreement).

As discussed below, certain of the Term Loan Facility lenders have agreed to provide ACL with post-petition financing during the Chapter 11 Cases in the form of a junior debtor-in-possession term loan of $50 million in the aggregate, which ACL intends to use to fund its costs during the Chapter 11 Cases and for working capital needs.

3.      Intercreditor Agreement

The relative rights, positions and priorities of the secured parties under the Secured Debt Facilities with respect to the assets and properties of the applicable Credit Parties and the liens held by (i) Wells Fargo Capital Finance, LLC, in its capacity as ABL Collateral Agent and Security Trustee (the "Existing ABL Facility Agent") on behalf of the Existing ABL Facility lenders (collectively, the "ABL Secured Parties"), and (ii) Bank of America, N.A., in its capacity as Term Loan Collateral Agent and Security Trustee (the "Term Loan Agent") on behalf of the Term Loan Lenders (collectively, the "Term Loan Secured Parties," and together with the ABL Secured Parties, the "Secured Parties") are set forth in that certain Intercreditor Agreement, by and among the Existing ABL Facility Agent, the Term Loan Agent and certain of the Credit Parties, dated as of November 12, 2015 (as may be amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement").  Pursuant to the Intercreditor Agreement, each

of the Secured Parties holds the relative priorities in the collateral as described above.  In addition, the Intercreditor Agreement limits the rights and remedies each of the Secured Parties in any bankruptcy proceeding of ACL, including in connection with any proposed DIP financing.

E.    *Events Leading up to Chapter 11*

ACL has faced a confluence of environmental, macroeconomic, and industry-specific factors that has rendered it unable to service their funded debt obligations and meet their liquidity needs.  These factors have created a "perfect storm" that has negatively affected ACL's businesses.  Such factors include: (i) unusually high levels of rainfall and flooding in the Inland Waterways, resulting in increased operating costs and reduced revenues; (ii) decreased demand for soybeans and other goods that ACL transports as a result of recent tariffs and trade tensions between the United States and China; and (iii) an oversupply of dry and liquid cargo barge capacity as a result of declines in domestic coal shipments and a shift in distribution patterns to new crude oil pipeline capacity.

Taken together, these factors—discussed further below—have undermined ACL's ability to service its prepetition indebtedness, which includes approximately $1.48 billion of secured debt obligations as of the date of this Disclosure Statement, consisting of approximately $536 million under the Existing ABL Facility and approximately $949 million under the Term Loan Facility.  Both facilities include a maturity date of November 12, 2020, with the Existing ABL Facility subject to a springing maturity date of August 13, 2020 to the extent the Term Loan Facility remains outstanding as of that date.

1.    Recent Weather Events

ACL's barging operations are highly sensitive to weather and river conditions.  Adverse weather conditions such as high or low water, fog, ice, tropical storms and hurricanes can adversely affect the operating conditions on the Inland Waterways.  When ACL is forced to operate in such conditions, its operating costs typically increase as a result of reduced operating productivity linked to lock closures, as well as negative impacts to towboat speed, tow size, loading drafts, and fleet efficiency.  In addition, operating costs can be impacted by limitations imposed on operating practices and horsepower requirements by governmental agencies such as the U.S. Coast Guard.  Terminals may also experience property damage and operational interruptions as a result of weather or river conditions.

In flooding and high-water conditions, river currents tend to be much faster and forceful, reducing a towboat's ability to control its tow of barges.  As a result, the U.S. Coast Guard will generally mandate that the industry reduce the number of barges in each tow to reduce the total weight that each towboat is required to control and increase its effectiveness.  Unfavorable operating conditions can also reduce operational effectiveness by reducing the number of miles per day that a towboat can travel as it encounters delays in traversing specific river areas where a particularly hazardous condition exists, in which case the U.S. Coast Guard may again impose additional restrictions such as "daylight only" operations.

ACL's harbor services business incurs additional costs as swifter currents reduce the speed with which the harbor towboats can move barges and generally make for a more hazardous

environment, requiring ACL's crews to perform their duties in a more deliberate fashion to ensure safety. Third-party harbor service providers institute surcharges for any services they provide during high water, increasing ACL's costs.  ACL also experiences increased repair costs as increased runoff results in more debris in the rivers, increasing damage to towboats.

Late in the fourth quarter of 2018, the Inland Waterways began to experience extremely high runoff from a number of precipitation events that resulted in high river levels over a duration of time that had not been experienced in many areas for decades.  The resulting flooding of the Mississippi River and other Inland Waterways, which continued well into 2019, resulted in higher operating costs and reduced revenue generating capacity for ACL's barge fleet.  For the quarter ended September 30, 2019, ACL estimates that it lost approximately $18 million in revenue as a result of the high water conditions and periodic river closures.  ACL's operating costs increased by an estimated $86 million during the nine months ended September 30, 2019 as a result of this flooding.

The historic level of rainfall in late 2018 through 2019 also adversely affected the grain harvest, which constitutes a significant portion of the cargo carried by ACL's barges; revenue from grain shipments was 23% of ACL's total barging revenue for the years ended December 31, 2017 and 2018.  Due to these adverse weather conditions and their effect on the volume of grain produced and harvested, as well as harvest timing and pricing, ACL has experienced a significant decrease in revenues derived from the transportation of grain.

2.      Trade War with China

Geopolitical events play a prominent role in ACL's business affairs.  The pricing and volume of goods imported through the Port of New Orleans and other Gulf-coast ports are affected by subsidies, tariffs, and embargoes imposed by U.S. or foreign governments.  Demand for U.S. exports as well as goods imported into the United States may be affected by the actions of U.S. or foreign governments, global or regional economic developments, and U.S. and foreign trade agreements and negotiations.  Additionally, the strength or weakness of the U.S. dollar against foreign currencies can impact import and export demand.

China has historically been the largest consumer of U.S. soybeans, importing approximately 23% of the world's soybean production in 2018/19 and projected to import approximately 25.2% of the world's soybean production in 2019/20.  The imposition of tariffs by China on U.S. soybean imports and continuing trade tensions between the United States and China has resulted in a decrease in demand for U.S.-produced soybeans, resulting in a direct decrease in the demand for ACL's services.

3.      Industry Headwinds and Overcapacity

The inland barge transportation industry is highly competitive.  The Debtors' primary competitors are other inland barge transportation companies. Other forms of transportation, such as pipelines, rail and truck transportation can also impact demand for the Debtors' services.  The Debtors compete with other inland barge companies  on the basis of shipping rates, ancillary charges, customer service, quality and type of equipment, safety record, history of protecting the quality and integrity of customer goods transported, available routes, value-added services

19

(including scheduling convenience and flexibility), information timeliness, accessorial terms, and freight payment terms.

Over the last 20 years, the competitive landscape of the inland barge industry has changed due to the significant industry consolidation.  As of December 31, 2018, the top five largest operators of liquid cargo barges in the United States operated 61% of the liquid cargo barges in operation, and the top five largest dry cargo barge operators in the United States operated 63% of the dry cargo barges in operation.  ACL accounted for 11% and 17% of the liquid and dry cargo barge fleet, respectively, as of December 31, 2018.

Additionally, since 2015 the barge industry has been experiencing significant oversupply of dry cargo and liquid cargo barges, resulting from the redeployment of barge capacity displaced by declines in domestic utility coal shipments, liquid cargo barges idled by a shift in distribution patterns to new pipeline capacity, and excess new barge production driven by low steel prices and favorable tax policies.  These oversupply conditions contributed to a decline in the freight rates that ACL was able to charge.

4.    Over-Leveraged Balance Sheet & Liquidity Shortfall

Perhaps the most significant factor leading to the commencement of the Chapter 11 Cases is the liquidity shortfall resulting from the market and industry pressure on ACL's ability to generate operating cash flows as just described, combined with the interest and principal payments due under the significant debt obligations on ACL's balance sheet.  As noted above, ACL has experienced reduced revenues and increased operating costs due to: (i) the historic level of rainfall in certain key farming states, which has caused massive flooding, reduced grain yields, and impeded ship loading and navigation; (ii) the ongoing U.S.-China trade war, in which grain exports have been one of the biggest casualties; and (iii) continued industry competition and an oversupply of barging capacity.  The resulting decrease in ACL's cash flows and cash on hand was exacerbated by the significant ongoing interest and principal payment requirements under ACL's outstanding debt obligations.

As noted above, ACL currently has approximately $1.48 billion of prepetition funded indebtedness on their balance sheet and is facing potential defaults resulting from the breach of certain liquidity covenants under its Existing ABL Facility.  ACL also faces maturities on certain of their debt obligations in the next twelve months.

5.    Negotiation and Entry into Restructuring Support Agreement

Faced with the operational and financial challenges described above, ACL engaged Milbank LLP as legal counsel, Greenhill & Co., LLC ("Greenhill") as investment banker, and Alvarez & Marsal North America, LLC ("A&M") as financial advisor in an effort to explore potential long-term solutions to these issues and engage with ACL's creditors.

In the Spring of 2019, an ad hoc group of lenders under the Term Loan Facility (the "Ad Hoc Group") engaged Davis Polk & Wardwell LLP ("Davis Polk") as legal counsel.  On June 5, 2019, Davis Polk, on behalf of the Ad Hoc Group, sent a letter to ACL notifying the company of the Ad Hoc Group's existence and its willingness to constructively discuss potential solutions to ACL's capital structure.  After preliminary discussions among advisors, ACL hosted an initial

20

in-person meeting with certain members of the Ad Hoc Group on July 23, 2019 to discuss the high-level terms of potential restructuring alternatives.  On November 3, 2019, Davis Polk requested diligence access for itself and Evercore Group L.L.C. ("Evercore"), the Ad Hoc Group's financial advisor, which also attached illustrative restructuring proposals.  ACL subsequently executed a confidentiality agreement with Davis Polk and Evercore on November 20, 2019 and began populating a data room with various diligence documents for review.  On November 20, 2019, shortly after execution of the advisor confidentiality agreements, counsel to ACL sent counsel to the Ad Hoc Group a counter-proposal for a comprehensive restructuring transaction.

By December 2019, the agent to ACL's Existing ABL Facility retained legal counsel and financial advisors.  During December 2019, the Debtors: (i) exchanged numerous proposals with the Existing ABL Facility Agent regarding senior secured DIP financing to be provided by the Existing ABL Facility Lenders; and (ii) continued exchanging proposals with the Ad Hoc Group regarding a comprehensive restructuring, as well as a proposal for standalone junior debtor-in-possession financing. ACL and the Ad Hoc Group also began negotiating an amendment to extend the due date of the December 31, 2019 amortization payment of $14,375,000 under the Term Loan Facility.  ACL and the Ad Hoc Group continued to exchange proposals and clarifications thereof through December 24, 2019.

After extensive good faith and arms' length negotiations, on December 30, 2019 the Ad Hoc Group, the agent under the Term Loan Facility and ACL entered into the First Amendment to Term Loan Credit Agreement (the "Term Loan Amendment"), which extended the payment due date for the December 31 amortization payment to February 7, 2020.  The Term Loan Amendment also included, among other things, (i) additional events of default under the Term Loan Facility that restricted ACL from entering into certain asset sales, making certain investments, and engaging in other transactions without the consent of the Ad Hoc Group members, and (ii) milestones related to ACL's renegotiation efforts with its lease and charter counterparties.

In the weeks leading up to the Petition Date, the Debtors and their advisors held numerous meetings and/or conference calls with the principals of and/or advisors to the Ad Hoc Group and the Existing ABL Facility Agent to continue to negotiate the terms of a potential restructuring transaction.  Based on extensive, good faith efforts of ACL, the Ad Hoc Group and the Existing ABL Facility Agent (on behalf of the Existing ABL Facility Lenders), the parties ultimately were able to negotiate a consensual, comprehensive Restructuring that not only provides expeditious, substantial deleveraging of ACL but also (a) leaves General Unsecured Claims Unimpaired and (b) provides a path to the short-term and long-term financing that will allow ACL to operate its business successfully.  The terms and conditions of the Restructuring were set forth in the Restructuring Support Agreement, as described further below.

On January 30, 2020, ACL, the Existing ABL Facility Agent, and the Existing ABL Facility Lenders entered into an amendment to the Existing ABL Facility (the "ABL Facility Amendment") which provided additional access to funds under the Existing ABL Facility to support ACL's ongoing business operations during the immediate prepetition period.  Also on January 30, 2020, in connection with the ABL Facility Amendment, ACL, the Existing ABL Facility Agent, the lenders under the Existing ABL Facility, and certain members of the Ad Hoc

10442820v1

Group also executed a letter agreement regarding the bridge funding provided under the Existing ABL Facility Amendment (the "Bridge Funding Letter Agreement").  Under the Bridge Funding Letter Agreement, ACL and the Consenting Term Lenders agreed to support a full roll up of the Existing ABL Facility into a DIP facility, and also agreed that the Existing ABL Facility Lenders shall be third-party beneficiaries of the Restructuring Support Agreement with respect to the provisions of the Restructuring Support Agreement that pertain to the ABL Exit Financing, the ABL DIP Financing and the rights of the Existing ABL Facility Lenders and Existing ABL Facility Agent as set forth under the Restructuring Support Agreement and as contemplated under the Plan.

On January 31, 2020, each of ACL, the Consenting Term Lenders and the Sponsor entered into the Restructuring Support Agreement, pursuant to which the Consenting Term Lenders agreed, subject to the terms and conditions set forth therein, to support the Restructuring and vote to accept the Plan.  **A copy of the Restructuring Support Agreement is attached hereto as Exhibit B.**

Pursuant to the Restructuring Support Agreement, each Consenting Term Lender agreed, among other things, to comply with the following obligations during the Effective Period (as defined in the Restructuring Support Agreement):

- use commercially reasonable efforts to support the Restructuring, act in good faith, and take any action necessary or reasonably requested by ACL in a timely matter, including to obtain the requisite regulatory and/or third-party approval, so as to effectuate and implement the Restructuring as soon as possible;

- vote its Claims against ACL to accept the Plan;

- not change or withdraw its vote to accept the Plan or object to, impede or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan;

- not propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization for ACL other than the Plan

- Support the DIP Motion (as defined in the Restructuring Support Agreement) and entry of the DIP Orders;

- not take any action, including, without limitation, initiating or joining in any legal proceeding, that is materially inconsistent with its obligations under the Restructuring Support Agreement; and

- forbear from exercising, directly or indirectly, its rights or remedies or from asserting or bringing any claims under or with respect to the Term Loan Credit Agreement against ACL or any guarantor thereof or any of their respective assets.

Pursuant to the Restructuring Support Agreement, ACL agreed, among other things, to comply with the following obligations during the Effective Period:

- use commercially reasonable efforts to pursue the Restructuring and cooperate with the Consenting Term Lenders in an effort to obtain necessary Bankruptcy Court approval of the Definitive Documents (as defined in the Restructuring Support Agreement) to consummate the Restructuring;

- use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approval for the Restructuring;

- use commercially reasonable efforts to seek additional support for the Restructuring from its other material stakeholders to the extent necessary, including lease counterparties and employees;

- timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, (iv) seeking the entry of an order modifying or terminating ACL's exclusive right to file and/or solicit acceptances of a plan of reorganization, or (v) sustaining a challenge to the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, any portion of the Term Loans or the liens securing such instruments, or asserting any other cause of action against or with respect or relating to the Term Loans or any prepetition liens securing the Term Loans; and

- Meet the following milestones:

  - commence solicitation of the Plan in accordance with section 1126(b) of the Bankruptcy Code not later than February 6, 2020;

  - obtain a commitment letter for the New ABL Facility with parties and on terms acceptable to ACL, the Required Consenting Term Lenders, and the Required DIP Commitment Parties by not later than fourteen (14) days after the Petition Date;

  - commence the Chapter 11 Cases by not later than February 7, 2020;

  - file, on, or within one (1) Business Day of the Petition Date, the Plan, Disclosure Statement, DIP Motion, a motion to approve the Backstop Commitment Agreement and a motion scheduling a combined hearing on the Plan and Disclosure Statement;

  - obtain entry of an order approving the Backstop Commitment Agreement not later than thirty (30) days after the Petition Date, subject to court availability;

23

- obtain entry of (i) an interim DIP Order not later than three (3) Business Days after the hearing on the "first-day" motions, subject to court availability, and (ii) a final DIP Order not later than forty (40) days after the Petition Date, subject to court availability;

- obtain and close the ABL DIP Facility no later than (3) Business Days after the entry of the interim DIP Order;

- obtain entry of an order approving the Disclosure Statement and confirming the Plan not later than forty-five (45) days after the Petition Date, subject to court availability; and

- reach the Effective Date not later than 21 days after entry of the Confirmation Order (the "Outside Consummation Date"); *provided* that if, prior to the Outside Consummation Date, all conditions precedent to effectiveness of the Plan (as provided therein) have been satisfied or waived, as applicable, or, for conditions that by their nature are to be satisfied on the Effective Date, shall then be capable of being satisfied, except the requisite regulatory approvals have not been obtained (including, without limitation, approval by the U.S. Coast Guard), the Outside Consummation Date shall be automatically extended by 14 calendar days, or to such other time as agreed between the Parties (as defined in the Restructuring Support Agreement).

Pursuant to the Restructuring Support Agreement, the Sponsor agreed to, among other things, comply with the following obligations during the Effective Period:

- use commercially reasonably efforts to support the Restructuring, act in good faith, and take any action necessary or reasonably requested by ACL to effectuate the Restructuring in a timely manner;

- support the Plan and vote any Claims or Interests to accept the Plan;

- waive all Claims against ACL or its affiliates, other than Claims that arise under the Existing ABL Facility Credit Agreement or Term Loan Credit Agreement or held by the Sponsor or an affiliate in the ordinary course of business and unrelated to the Sponsor's equity ownership of ACL;

- not change or withdraw (or cause to be changed or withdrawn) its vote to accept the Plan, object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan, or propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization for ACL other than the Plan;

- not (i) pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Effective Date, offer, or contract to pledge, encumber, assign,

sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in ACL or any subsidiary thereof, (ii) acquire any outstanding indebtedness of ACL or any subsidiary thereof, or (iii) make any worthless stock deduction for any tax year ending on or prior to the Effective Date, in each case of (i), (ii) and (iii), to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of ACL or any of its subsidiaries; and

- negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions to address any legal, financial, or structural impediment that may arise that would prevent, hinder, or delay the consummation of the Restructuring.

The Restructuring Support Agreement also contemplates that, upon the commencement of the ACL's Chapter 11 Cases, a subset of the Consenting Term Lenders would provide an additional $50 million in post-petition financing to ACL in order to fund the administration of the Chapter 11 Cases and other working capital needs (the "Term Loan DIP Facility"). The Term Loan DIP Facility is described in greater detail below. Collectively, the total post-petition financing will be $690 million consisting of the $640 million under a senior secured superpriority debtor-in-possession asset-based revolving credit facility with the Existing ABL Facility Agent (the "ABL DIP Facility") and the $50 million Term Loan DIP Facility (together with the ABL DIP Facility, the "DIP Facilities").

In addition to contemplated post-petition financing, the Restructuring Support Agreement sets forth the terms and conditions for the comprehensive Restructuring of ACL's balance sheet and the path to resolve certain prepetition intercompany and third-party claims, all of which would be implemented through the Plan. The principal terms of the Restructuring, which are set forth in greater detail in the Restructuring Support Agreement and the Plan, are summarized below:

- On the Effective Date, the Allowed Claims under the Existing ABL Facility shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, or (ii) be otherwise rendered Unimpaired;

- On the Effective Date, all of the Allowed Term Loan Claims will be fully equitized into 100% of the Take Back Preferred Equity and 95% of the New Common Equity (or, in each case, New Warrants therefor);

- On the Effective Date, certain holders of Allowed Term Loan Claims will contribute $200 million of new money in exchange for a like-amount of mandatorily convertible New Money Preferred Equity in Reorganized ACL, junior in priority to the Take Back Preferred Equity and senior in priority to the New Common Equity (or, in each case, New Warrants therefor), of which (x) $150 million will be contributed pursuant to the

Rights Offering which will be backstopped by the Backstop Commitment Parties, and (y) $50 million will be deemed contributed in exchange for the Term Loan DIP Facility Claims; and

▪ Substantially all other Claims against ACL, including all General Unsecured Claims, will either be paid in full in cash in the ordinary course after the Effective Date or otherwise be Unimpaired.

In light of the foregoing, the Plan contemplates that only two Impaired Classes of Claims and Interests would be entitled to vote on the Plan: the Class 4 Term Loan Claims and the Class 8 Interests in Finn Holding.

In connection with the Plan, ACL also anticipates entering into an exit credit facility that will provide ACL with the necessary liquidity to operate its business into the future.

ACL believes that the Restructuring as set forth in the Plan represents the best outcome for ACL and all of its stakeholders. The Plan limits the impairment of third-party claims only to the Term Loan Class. Importantly, the Plan provides that all General Unsecured Claims against ACL will be paid in full in Cash in the normal course or otherwise be rendered Unimpaired. Additionally, ACL's plans and funding obligations in respect thereof will remain in place under, and left Unimpaired by, the Plan. Accordingly, as a result of the de-levered capital structure and decreased interest expense contemplated by the Restructuring, the Plan will better position ACL to satisfy such creditors' Claims as they come due. The Debtors therefore believe that the Restructuring is in the best interests of their estates and economic stakeholders.

## SECTION III.
## ANTICIPATED EVENTS DURING CHAPTER 11 CASES

A.   *Overview of Chapter 11*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and estates. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets. In furtherance of these two goals, section 362 of the Bankruptcy Code generally provides for, upon the filing of a petition for relief under chapter 11, an automatic stay of substantially all acts and proceedings against a debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's chapter 11 case.

The commencement of a case under chapter 11 creates an estate comprising all of the debtor's legal and equitable interests as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding, subject to the occurrence of an effective

date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions and the terms of the plan, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

The Bankruptcy Code expressly authorizes a debtor to solicit votes for the acceptance of a plan prior to the filing by the debtor of a chapter 11 case. Certain holders of claims against, or interests in, a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require a plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.

Because no chapter 11 cases have yet been commenced, this Disclosure Statement has not yet been approved by any bankruptcy court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code. If the Chapter 11 Cases are subsequently commenced as currently contemplated, ACL expects to promptly seek entry of an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and determining that the solicitation of votes on the Plan by means of this Disclosure Statement was in compliance with section 1125 of the Bankruptcy Code.

B.      *First-Day Relief*

ACL intends to continue to operate its businesses throughout the Chapter 11 Cases in the ordinary course, as it had prior to the commencement thereof, and expects to seek certain "first-day" relief from the Bankruptcy Court for authority to do so. The following are descriptions of the "first-day" motions that ACL currently expects to file upon commencement of the Chapter 11 Cases. As a result of further consideration, however, ACL may, subject to its obligations under the Restructuring Support Agreement, determine to file other motions, omit certain motions, or file motions at a time other than the first day of the Chapter 11 Cases. The following list should therefore not be considered final or exhaustive.

***Motion for Entry of an Order Authorizing Joint Administration of the Chapter 11 Cases***

Upon commencement of the Chapter 11 Cases, ACL expects to seek entry of an order authorizing joint administration of the Chapter 11 Cases for procedural purposes only. Joint administration will provide significant administrative convenience without harming the rights of any party in interest.

***Motion for Entry of Order Authorizing ACL to File Consolidated List of Creditors in Lieu of Submitting Separate Mailing Matrix***

ACL expects to seek entry of an order granting authority to maintain a single consolidated list of creditors, instead of filing a separate matrix for each ACL entity. ACL believes that preparing separate lists of creditors in an entity-specific matrix format would be unnecessarily burdensome and result in duplicate mailings.

*Application to Appoint Prime Clerk LLC as Claims and Noticing Agent*

ACL expects to seek entry of an order authorizing it to appoint and retain Prime Clerk LLC as the Claims and Noticing Agent in its Chapter 11 Cases.  ACL also expects to seek to retain Prime Clerk as the Voting Agent for the solicitation of the Plan, as further described herein.

*Motion for Entry of Order Authorizing ACL's Continued Use of Its Existing Cash Management Systems*

ACL expects to seek entry of an order authorizing it, subject to the requirements of the DIP Order, to continue using its existing cash management system, bank accounts, business forms, and to continue conducting intercompany transactions in the ordinary course.  Absent the Bankruptcy Court's authorization of the continued use of its prepetition cash management system, ACL would face unnecessary difficulty in managing its cash flow and operations during the course of the Chapter 11 Cases, potentially to the detriment of its estates.

*Motion for Entry of an Order Authorizing ACL to Pay Wages and Benefits to Employees and Continue Existing Employee Benefit Plans*

ACL employs approximately 2,100 employees.  In the ordinary course of business, ACL compensates its employees by, among other things, wages and salaries, vacation, business expense allowances and reimbursements, bonuses, retention awards, supplemental retirement, severance, pension plan contributions, medical and dental plans, worker's compensation, and life insurance. Without continuing these wages and benefits, ACL believes that its employees may seek alternative employment opportunities. Accordingly, ACL expects to seek entry of an order authorizing it to continue to pay wages, salaries, and benefits to its employees.[7]

*Motion for Entry of Order Authorizing ACL to Continue Insurance Policies and Pay Certain Obligations in Respect Thereof*

ACL maintains various insurance policies, essential to its ability to conduct its operations and to preserve the value of its business, properties, and assets.  Maintenance of insurance is also required under the laws of the various states in which ACL operates and pursuant to the terms of material agreements to which the ACL entities are parties.  Accordingly, ACL expects to seek entry of an order authorizing it to continue to honor obligations under and related to its insurance policies, and to renew, replace, extend, supplement, modify, or obtain its insurance coverage.

*Motion for Entry of Order Authorizing Payment and Adequate Assurance to Utilities and Prohibit Alterations or Discontinuance of Utility Services to ACL*

In connection with the operation of their business and management of its properties, ACL obtains electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services.   Accordingly, ACL expects to seek entry of an order (i) approving, as adequate assurance of payment for the utility companies, a cash

---

[7] To the extent that ACL does not seek first day relief to honor or pay any prepetition benefits, ACL expects to honor those obligations in the normal course upon the Effective Date of the Plan.

deposit equal to approximately half of ACL's average aggregate monthly cost for utility services, and (ii) prohibiting utility companies from altering, refusing, or discontinuing services to ACL.

### Motion for Entry of Order Authorizing Payment of Taxes and Regulatory Expenses in Ordinary Course of Business

Although ACL expects to pay all taxes and regulatory obligations in full pursuant to the Plan, in order to minimize the potential disruption to its businesses during the Chapter 11 Cases, ACL expects to seek entry of an order authorizing it to pay prepetition sales taxes, use taxes, and property taxes, regardless of when incurred, to the appropriate taxing, licensing, and other governmental authorities and to continue to honor related obligations (including the posting of additional collateral, if necessary) in the ordinary course of ACL's businesses and consistent with its past practices.

### Motion for Entry of an Order Authorizing ACL to Pay Prepetition Obligations Owed to Trade Creditors in the Ordinary Course of Business

In the ordinary course of its business, ACL incurs numerous obligations to various creditors that provide ACL with a variety of resources and services that are necessary for the continued operation of ACL's barge transportation and harbor services businesses.  These payable claims are owed to third-party creditors who will be treated as unimpaired for purposes of the Plan, including, without limitation, trade vendors, suppliers, and service providers.  Given the highly competitive industry in which ACL operates its business, it is essential that ACL maintains and develops relationships with certain of these creditors that supply unique or essential resources and services to ACL.  Accordingly, ACL expects to seek entry of an order authorizing it to pay obligations of third-party trade creditors in the ordinary course of business.

### Motion for Entry of an Order Authorizing the Debtors to Obtain Post-Petition Financing

To address their working capital needs and fund their reorganization efforts, ACL expects to seek Bankruptcy Court approval of agreements (i) with the Existing ABL Facility Agent and lenders under the Existing ABL Facility to receive funding under the ABL DIP Facility, consisting of a senior secured superpriority debtor-in-possession asset-based revolving credit facility with an aggregate principal amount of $640 million, and (ii) with certain lenders under the Term Loan Facility to receive funding under the Term Loan DIP Facility, consisting of a senior secured superpriority debtor-in-possession term loan credit facility with an aggregate principal amount of $50 million.  Pursuant to the terms of the ABL DIP Facility credit agreement, all prepetition obligations under the Existing ABL Facility ABL will be "rolled-up" and refinanced into the ABL DIP Facility.  Lending under the Term Loan DIP Facility will be open to holders of Term Loan Claims and will be fully backstopped by the members of the Ad Hoc Group.

The DIP Facilities are each for a term of six (6) months.  The ABL DIP Facility will bear intertest at the Base Rate plus 3.50% or LIBO Rate plus 4.5%.  The Term Loan DIP Facility will bear interest at LIBOR (with a 2% LIBOR floor) plus 7.00% or Adjusted Base Rate plus 6.00%.

The proposed order seeking approval of the DIP Facilities also reflects an agreement between and among the Debtors and the lenders thereunder regarding the consensual use of cash collateral and the terms of adequate protection to be provided to such parties. Specifically,

adequate protection provided to the lenders under the ABL DIP Facility will include: (i) liens on the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code) (the "Avoidance Action Proceeds"); (ii) an allowed superpriority administrative expense claim; (iii) payment in cash of, solely to the extent that any obligations under the Existing ABL Facility remain outstanding after entry of the Interim DIP Order, interest (at the default rate) due under the Existing ABL Facility; (iv) payment of the reasonable and documented fees, out-of-pocket expenses, and disbursements incurred by the Existing ABL Agent arising prior to the Petition Date; and (v) certain information rights.

Adequate protection provided to the lenders under the Term Loan DIP Facility will include: (i) a continuing, binding, enforceable, valid, perfected replacement security interest in and lien upon the DIP Collateral (including liens on Avoidance Action Proceeds junior to the liens of the lenders under the ABL DIP Facility); (ii) an allowed superpriority administrative expense claim; (iii) current cash payments of the reasonable and documented prepetition and post-petition fees and expenses payable to the Term Loan Facility Agent and the Ad Hoc Group's advisors; and (iv) certain information rights.

C.      *Disclosure Statement Approval and Confirmation*

As discussed above, ACL intends to effectuate the Restructuring through the Plan. Furthermore, pursuant to the Restructuring Support Agreement, ACL is bound by certain milestones, including but not limited to deadlines to commence solicitation of the Plan, obtain entry of a confirmation order, and to consummate the Restructuring. In light of those milestones and the prepackaged nature of the Chapter 11 Cases, ACL expects to file, on or about the Petition Date, a motion for entry of an order approving: (i) the scheduling of a combined hearing to address the approval of this Disclosure Statement and the confirmation of ACL's Plan of reorganization; (ii) objection deadlines in respect of both the Plan and Disclosure Statement; (iii) procedures to solicit votes on the Plan; (iv) notice(s) of the combined hearing, objection deadlines, and the right of certain creditors to "opt out" of the releases set forth in the Plan, and (v) procedures for the assumption of ACL's executory contracts and unexpired leases.  ACL believes the relief requested in the scheduling motion is appropriate in that it will best position it to satisfy the Restructuring Support Agreement milestones, thereby maximizing ACL's ability to consummate the Restructuring for the benefit of all stakeholders.  **For additional information regarding the confirmation process and requirements, please refer to the discussion in Section VI herein entitled, "Confirmation of Plan."**

### SECTION IV.
### SUMMARY OF JOINT PREPACKAGED CHAPTER 11
### PLAN

A.      *Administrative Expenses and Other Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, ABL DIP Facility Claims, Term Loan DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in B of the Plan.

10442820v1

1.      General Administrative Expenses

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, when such payment otherwise becomes due in the applicable Debtor's ordinary course of business without further notice to or order of the Bankruptcy Court), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Debtor.  For the avoidance of doubt, holders of a General Administrative Expense shall not be required to file a request for payment of a claim with the Bankruptcy Court.

2.      Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.   In addition, the Debtors and Reorganized Debtors (as applicable) shall continue to pay Restructuring Expenses after the Effective Date when due in payable in the ordinary course related to implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date.

3.      Professional Fees

a.      Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the Office of the United States Trustee, counsel to the Committee (if any), and all other parties that have requested notice in these Chapter 11 Cases by no later than forty-five (45) days after the Effective Date, unless the Reorganized Debtors agrees otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the applicable Professional Fees.   After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fees Escrow Account; *provided*, *however*, that if the funds in the Professional Fees Escrow Account are insufficient to pay the full Allowed amounts of the Professional Fees, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from its Cash on hand.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation and the Effective Date.  Upon the Effective Date, the Term Loan DIP Facility Agent, Term Loan DIP Facility Lenders, ABL DIP Facility Agent and ABL DIP Facility Lenders shall have no further obligations with respect to the Carve Out under and as defined in the DIP Orders.

b.      Professional Fees Escrow Account

On the Effective Date, the Debtors shall fund the Professional Fees Escrow Account in an amount equal to all asserted Claims for Professional Fees outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts provided prior to or as of the Effective Date payable by the Debtors or the Reorganized Debtors).  Amounts held in the Professional Fees Escrow Account shall not constitute property of the Reorganized Debtors. The Professional Fees Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all holders of Claims for Professional Fees under the Plan, any such amounts shall be returned to, and constitute property of, the Reorganized Debtors.

Professionals shall estimate their unpaid Claims for Professional Fees incurred in rendering services to the Debtors, their Estates or the Committee (if any), as applicable, before and as of the Effective Date and shall deliver such estimate to counsel for the Debtors no later than ten (10) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Claims for Professional Fees. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fees Escrow Account. The total amount proposed to be allocated to the Professional Fees Escrow Account and pursuant to this Section shall be provided to the attorneys for the Debtors and the Consenting Term Lenders no later than three (3) Business Days before the Effective Date.

c.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Reorganized Debtors on and after the Effective Date.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

4.      ABL DIP Facility Claims

On the Effective Date and subject to the terms of the Payoff Letter, except to the extent such holder has agreed to an alternative treatment, each holder of any Allowed ABL DIP Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim (i) on a dollar-for-dollar basis, first-lien, first-out loans or commitments (as applicable) under the New ABL Facility; (ii) Payment in Full in Cash; or (iii) such other less favorable treatment as to which the Debtors and the holder of such Allowed ABL DIP Facility Claims will have agreed upon in writing.

5.      Term Loan DIP Facility Claims

Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Term Loan DIP Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, subject to the U.S. Citizen Determination Procedures (i) its Pro Rata share of the $50 million of the New Money Preferred Equity, and/or (ii) New Money Preferred Warrants.  Each holder of an Allowed Term Loan DIP Facility Claim shall be entitled to receive a distribution in the form of New Money Preferred Equity to the extent permitted under the Jones Act Restriction, and/or to the extent that New Money Preferred Equity cannot be issued to such holder because it is a Non-U.S. Citizen and the amount of New Money Preferred Equity to be delivered to it under all sections of the Plan, when added to the New Money Preferred Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date would exceed the Jones Act Restriction, New Money Preferred Warrants. The percentage ratio of the number of shares of New Money Preferred Equity to the number of New Money Preferred Warrants to be issued to each holder of an Allowed Term Loan DIP Facility Claim that is a Non-U.S. Citizen is subject to the priorities set forth in the New Money Preferred Warrant Agreement.

6.      Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Allowed Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

B.      *Classification and Treatment of Claims and Interests*

1.      Classification of Claims and Interests

Claims and Interests, except for Administrative Expenses, ABL DIP Facility Claims, Term Loan DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in B of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions

33

pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | Existing ABL Facility Claims | Unimpaired | Deemed to accept |
| 4 | Term Loan Claims | Impaired | Entitled to vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 6 | Intercompany Claims | Unimpaired | Deemed to accept |
| 7 | Intercompany Interests | Unimpaired | Deemed to accept |
| 8 | Interests in Finn Holding | Impaired | Entitled to vote |

    2.    Treatment of Claims and Interests

    a.    Class 1 – Priority Non-Tax Claims

*(i)* *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims.  Although all Priority Non-Tax Claims have been placed in one Class for the purposes of nomenclature, the Priority Non-Tax Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*(ii)* *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 1 Claim shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the later of the Effective Date and the date such Claim becomes due and payable in the ordinary course of business or (ii) be otherwise rendered Unimpaired.

*(iii)* *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the

34

Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

b.  Class 2 – Other Secured Claims

(i)  *Classification*: Class 2 consists of all Allowed Other Secured Claims.  Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, the Other Secured Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

(ii)  *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 2 Claim (i) have its Claim be reinstated or receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the Effective Date or (ii) be otherwise rendered Unimpaired.

(iii)  *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

c.  Class 3 – Existing ABL Facility Claims

(i)  *Classification*: Class 3 consists of all Allowed Existing ABL Facility Claims. Although all Existing ABL Facility Claims have been placed in one Class for the purposes of nomenclature, the Existing ABL Facility Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

(ii)  *Treatment*:  On the Effective Date, each holder of an Allowed Class 3 Claim shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Class 3 Claim, receive (i) Payment in Full in Cash; (ii) at the option of such holder of Allowed Class 3 Claims, on a dollar-for-dollar basis, first lien, first-out loans or commitments under the New ABL Facility, or (iii) such other less favorable treatment as to which the Debtors and the holder of such Allowed Class 3 Claim will have agreed upon in writing.

(iii)  *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the

Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

d.     Class 4 – Term Loan Claims

*(i)     Classification*: Class 4 consists of all Allowed Term Loan Claims. Although all Allowed Term Loan Claims have been placed in one Class for the purposes of nomenclature, the Allowed Term Loan Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*(ii)     Allowance*:  Class 4 Claims are deemed Allowed in the aggregate principal amount of $948,750,000.00, plus any unpaid interest, fees, expenses and other amounts due and owing pursuant to the terms of the Term Loan Agreement as of the Petition Date.

*(iii)     Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, in each case subject to the U.S. Citizen Determination Procedures (i) the right to participate in the Rights Offering in accordance with the Rights Offerings Procedures, (ii) its Pro Rata share of the New Take Back Preferred Equity or New Take Back Preferred Warrants, and (iii) its Pro Rata share of the New Common Equity or the New Term Lender Warrants, subject to dilution from the New Sponsor Warrants and conversion of the New Money Preferred Equity and the Management Incentive Plan.

*(iv)*     With respect to (ii) above, each holder of an Allowed Class 4 Claim shall be entitled to receive a distribution in the form of New Take Back Preferred Equity to the extent permitted under the Jones Act Restriction, and New Take Back Preferred Warrants to the extent that New Take Back Preferred Equity cannot be issued to such holder because it is a Non-U.S. Citizen and the amount of New Take Back Preferred Equity to be delivered to it under all sections of the Plan, when added to the New Take Back Preferred Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction. The percentage ratio of the number of shares of New Take Back Preferred Equity to the number of New Take Back Preferred Warrants to be issued to each holder of an Allowed Class 4 Claim that is a Non-U.S. Citizen is subject to the priorities set forth in the New Take Back Preferred Warrant Agreement.

*(v)*     With respect to (iii) above, each holder of an Allowed Class 4 Claim shall be entitled to receive a distribution in the form of New Common Equity to the extent permitted under the Jones Act Restriction and New Term Lender Warrants to the extent that New Common Equity

36

cannot be issued to such holder because it is a Non-U.S. Citizen and the Pro Rata share of New Common Equity to be delivered to it under all sections of the Plan, when added to the New Common Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction.  The percentage ratio of the number of shares of New Common Equity to the number of New Term Lender Warrants to be issued to each holder of an Allowed Class 4 Claim that is a Non-U.S. Citizen is subject to the priorities set forth in the New Term Lender Warrant Agreement.

(vi)    *Voting*:  Class 4 is Impaired under the Plan.  Therefore, holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

e.    Class 5 – General Unsecured Claims

(i)    *Classification*:  Class 5 consists of all Allowed General Unsecured Claims.  Although all General Unsecured Claims have been placed in one Class for the purposes of nomenclature, the General Unsecured Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

(ii)    *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Debtor's business or in accordance with applicable court order (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by the Debtors or ordered by the Bankruptcy Court), or (ii) such other treatment that renders such holder Unimpaired.

(iii)    *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

f.    Class 6 – Intercompany Claims

(i)    *Classification*: Class 6 consists of all Allowed Intercompany Claims.  Although all Allowed Intercompany Claims have been placed in one Class for the purposes of nomenclature, the Intercompany Claims

against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*(ii)    Treatment*:  Each holder of an Allowed Class 6 Claim shall (i) have its Claim be paid, reinstated, or cancelled, to the extent determined appropriate by the Debtors with the reasonable consent of the Required Consenting Term Lenders, or (ii) receive such other treatment that renders such holder Unimpaired.

*(iii)    Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

g.    Class 7 – Intercompany Interests

*(i)    Classification*:  Class 7 consists of all Allowed Interests in the Debtors other than in ACL, separately classified by Debtor.

*(ii)    Treatment*:  Each holder of an Allowed Interest in Class 7 shall (i) have its Interest be reinstated or (ii) receive such other treatment that renders such holder Unimpaired.

*(iii)    Voting*:  Class 7 is Unimpaired under the Plan.  Holders of Allowed Interests in Class 7 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

h.    Class 8 – Interests in Finn Holding

*(i)    Classification*: Class 8 consists of all Interests in Finn Holding.

*(ii)    Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 8 Interest (or its designee which, if Finn Holdings is not the Reorganized Company, may include Reorganized Finn Holdings or a subsidiary) shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Interest (or an interest in a lower tier subsidiary if Finn Holdings is not the Reorganized Company), its Pro Rata share of the New Sponsor Warrants.

*(iii)    Voting*:  Class 8 is Impaired under the Plan.  Therefore, holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Debtors' or Reorganized Debtors' rights and defenses in respect of any Unimpaired Claims,

38

including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims.

C.     *Acceptance or Rejection of Plan*

    1.     Voting Classes

Holders of Class 4 Claims and Class 8 Interests as of the Voting Record Date are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

    2.     Presumed Acceptance of the Plan

Classes 1, 2, 3, 5, 6, and 7 are Unimpaired under the Plan.  Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

    3.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

D.     *Means for Implementation of Plan*

    1.     General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be, and shall be, final.  Among other things, the Plan provides for a global settlement between the Sponsor, the Consenting Term Lenders, and the Debtors (the "Global Settlement") that provides substantial value to the Debtors' estates and allows for all Allowed General Unsecured Claims to be paid in full.  In accordance with the terms of the Restructuring Support Agreement, the Sponsor has agreed to waive any Sponsor Claims and such

Sponsor Claims are deemed waived upon occurrence of the Effective Date. As consideration for the Sponsor (i) agreeing to participate in and help effectuate certain Restructuring Transactions to the benefit of the Debtors' estates and their creditors, (ii) taking, or refraining from taking, certain actions that could jeopardize the Debtors' tax attributes, (iii) waiving any Sponsor Claims, as set forth herein and in the Restructuring Support Agreement, and (iv) taking other necessary actions to facilitate the Debtors' transition into, and emergence from, these chapter 11 cases, the Sponsor shall be included as a "Released Party" in the Plan. The Debtors and the Consenting Term Lenders believe the Global Settlement is fair and reasonable, and represents a sound exercise of the Debtors' business judgment in accordance with Bankruptcy Rule 9019.

Although the Plan does not provide for substantive consolidation of the Estates, it also does not contemplate individual recoveries on a debtor-by-debtor basis. Rather, it represents a global and integrated series of compromises and settlements of all Allowed Claims and Interests against the Debtors, including, but not limited to, the settlement of all Allowed Claims held by the Consenting Term Lenders. The treatment of the Consenting Term Lenders' Claims and the set forth in the Plan supports maximum recoveries for all other creditors, including the unimpairment of holders of Claims in Class 5 (General Unsecured Claims).

 2. Restructuring Transactions

Prior to, on, or after the Effective Date, subject to and consistent with the terms of its obligations under the Plan and the Restructuring Support Agreement, and subject to the rights of the Consenting Term Lenders under the Restructuring Support Agreement, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Debtors, and/or to reincorporate or reorganize certain of the Debtors under the laws of jurisdictions other than the laws under which such Debtors currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, contributions, liquidations or dissolutions, as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Debtors vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions"). Subject to the terms of the Plan, in each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring Entity will perform the obligations of such Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another Debtor will perform such obligations.

In effecting the Restructuring Transactions, the Debtors shall be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (2) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (3) file appropriate certificates or articles

of merger, consolidation or dissolution pursuant to applicable state law; and (4) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  To the extent known, any such Restructuring Transactions will be summarized in the Description of Restructuring Transactions, and in all cases, such transactions shall be subject to the terms and conditions of the Plan and any consents or approvals required under the Plan. The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Debtors and result in a tax efficient structure and emergence for the Debtors.

     3.     Sources of Consideration for Plan Distributions

     a.     Rights Offering.

     *(i)*     *Rights Offering Procedures*. The Debtors will commence and consummate the Rights Offering in accordance with the Rights Offering Procedures.  The Rights Offering will be fully backstopped by the Backstop Commitment Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement.  Unless otherwise expressly allowed pursuant to the Backstop Commitment Agreement or the Rights Offering Procedures, the Subscription Rights may not be sold, transferred, or assigned.

     *(ii)*     *Use of Proceeds*: On the Effective Date, the proceeds of the Rights Offering shall be used: (i) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (ii) to fund Allowed Administrative Expense Claims payable on or after the Effective Date; and (iii)  to fund distributions under the Plan.

     *(iii)*     *Backstop Commitment*: In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Commitment Parties will purchase, on or prior to the Effective Date, its respective Backstop Commitment Percentage of the Unsubscribed Shares (each as defined in the Backstop Commitment Agreement).

     *(iv)*     *Treatment*: Subject to the U.S. Citizen Determination Procedures and the terms of the Rights Offering Procedures, each Rights Offering Participant shall be entitled to receive its Pro Rata share of (i) New Money Preferred Equity to the extent permitted under the Jones Act Restriction and (ii) New Money Preferred Warrants to the extent that New Money Preferred Equity cannot be issued to such Rights Offering Participant because it is a Non-U.S. Citizen and the Pro Rata share of New Money Preferred Equity to be delivered to it under all sections of the Plan, when added to the New Money Preferred Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction. The percentage ratio of the number of shares of New Money Preferred Equity to the number of New Money Preferred Warrants to be issued to each Rights Offering Participant that is a Non-U.S. Citizen is subject to the priorities set forth in the New Money Preferred Warrant Agreement.

     b.     Cash

     The Reorganized Debtors shall fund distributions under the Plan required to be paid in Cash, if any, with Cash on hand, including Cash from operations and any Cash received on the Effective Date, borrowings under the DIP Facilities, and borrowings from the New ABL Facility.

c.      New ABL Facility

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility. The New ABL Facility is expected to contain affirmative and negative covenants that are customary for similar facilities, and will be secured by the same assets as the ABL DIP Facility and, at the election of the New ABL Facility Lenders, the "Specified Real Property" (as defined in the DIP Orders).

Confirmation shall be deemed approval of the New ABL Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith) and the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New ABL Facility, including the New ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Debtors, the Required Consenting Term Lenders, and the New ABL Facility Agent may mutually agree to be necessary to consummate the New ABL Facility.

On the Effective Date, (a) all letters of credit issued under the ABL DIP Credit Agreement, shall be deemed issued or reissued, as applicable, under the New ABL Facility Credit Agreement in accordance with the terms and conditions of the New ABL Facility Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the ABL DIP Facility Agreement or New ABL Facility Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the New ABL Facility Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the New ABL Facility Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Existing ABL Facility Credit Agreement or the New ABL Facility Credit Agreement, as applicable, (including any Liens and security interests granted on the Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the New ABL Facility Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law and any applicable intercreditor agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the persons granted liens and security interests under the New ABL Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

4.      Corporate Existence

Except as otherwise provided in the Plan or as otherwise may be agreed to between the Debtors and the Required Consenting Term Lenders, each of the Reorganized Debtors and their direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

5.      Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or causes of action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

The Plan shall be conclusively deemed to be adequate notice that Liens, Claims, charges or other encumbrances are being extinguished.  Any Person having a Lien, Claim, charge or other encumbrance against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

6.      Cancellation of Loans, Securities, and Agreements

Except as otherwise provided in the Plan (including with respect to Unimpaired Claims), on the Effective Date: (1) the Existing ABL Facility Claims, the Term Loan Claims, the ABL DIP Facility Claims, the Term Loan DIP Facility Claims, the Interests in Finn Holding, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Debtors that are reinstated pursuant to the Plan or the Payoff Letter), shall be deemed cancelled, surrendered, and discharged as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Reorganized Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any

43

agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan or the Payoff Letter) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

7.     Corporate and Other Entity Action

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) appointment of the New Boards pursuant to D.I of the Plan and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (2) the issuance and distribution of the New Common Equity and New Preferred Equity by the Reorganized Company; (3) entry into the New Organizational Documents; (4) entry into the New ABL Facility Documents; (4) entry into the Warrant Agreements and the issuance and distribution of the warrants thereunder by the Reorganized Company pursuant thereto; (5) implementation of the Restructuring Transactions; (6) implementation of the Management Incentive Plan; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure of the Debtors or the Reorganized Debtors, and any corporate or other Entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Debtors or the Reorganized Debtors.  On or before the Effective Date, the appropriate officers of the Debtors or Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of the Reorganized Debtors, including any and all agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by D.7 of the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

8.     New Organizational Documents

On or prior to the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall, if so required under applicable state law, file their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states,

provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

9.      Directors and Officers of Reorganized Debtors

As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of the Debtors shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Debtor entity shall be appointed in accordance with the respective New Organizational Documents.  The members of the New Boards will be identified in the Plan Supplement, to the extent known.  Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

a.      Reorganized Company Board

Subject to compliance with the Jones Act (such that the Reorganized Company shall at all times be a U.S. Citizen eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade), the initial Reorganized Company Board shall consist of 7 initial Directors on the Effective Date, including the CEO Director and 6 directors appointed by the Ad Hoc Group in accordance with the Restructuring Support Agreement and Shareholders Agreement.  The initial Reorganized Company Board shall be disclosed in the Plan Supplement, to the extent known, and in any event will be disclosed prior to the Combined Hearing.

b.      Officers of Reorganized Company

Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable

45

organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

> c.      New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

> 10.      Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

> 11.      Section 1146 Exemption

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the New ABL Facility Credit Agreement and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

> 12.      Management Incentive Plan

On the Effective Date, the Management Incentive Plan shall become effective and shall be implemented in accordance with the terms set forth in the MIP Term Sheet annexed as Exhibit C to the Restructuring Support Agreement. All awards issued under the Management Incentive Plan, once converted, will be dilutive of all other New Common Equity issued pursuant to the Plan.

46

13.     Procedures for Treating Disputed Claims and Interests Under the Plan

a.      Disputed Claims and Interests Process

On and after the Effective Date, except as otherwise provided herein, all Claims and Interests will be paid in the ordinary course of business of the Reorganized Debtors. To the extent a proof of claim is filed, if the Debtors dispute any Claim or Interest, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the Unimpaired treatment of all holders of General Unsecured Claims under the Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under this section of the Plan to assert their claims in any forum as though the Debtors' cases had not been commenced.

Notwithstanding the foregoing, except insofar as a Claim or Interest is Allowed under the Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to Claims and Interests. Any objections to Claims or Interests shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim or proof of Interest is filed or amended or a Claim or Interest is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or Interest, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtors.

b.      No Distributions Pending Allowance

Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

c.      Distributions after Allowance

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest (except to the extent payment of interest on such Allowed Claim is required by Article III.B.5 of the Plan).

d.      Estimation of Claims and Interests

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim or Disputed Interest pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or Interest

47

or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim or Interest at any time during litigation concerning any objection to any Claim or Interest, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim or Disputed Interest, the amount so estimated shall constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Interest, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim or Interest. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

14.    Authorization and Issuance of New Common Equity, New Preferred Equity and New Warrants

a.    On the Effective Date, the Reorganized Debtors shall issue the New Common Equity, New Preferred Equity, and the New Warrants in accordance with the terms of the Plan.  All of the New Common Equity, New Preferred Equity, and the New Warrants, when so issued, shall be duly authorized, validly issued, and, in the case of the New Common Equity and New Preferred Equity, fully paid, and non-assessable.  In no event shall Non-U.S. Citizens hold, in the aggregate, more than twenty-four percent (24%) of the total number of issued and outstanding shares in any class or series of the capital stock of the Reorganized Debtors, including in each of the Take Back Preferred Equity, New Money Preferred Equity, and New Common Equity as of the Effective Date (the "Jones Act Restriction").  All of the New Common Equity underlying the New Money Preferred Equity (upon conversion to New Common Equity) and the New Warrants (upon payment of the exercise price in accordance with the terms of such New Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

b.    If a holder of an Allowed Term Loan DIP Facility Claim, Allowed Class 4 Claim, Allowed Class 8 Interest, or Subscription Rights furnishes a U.S. Citizenship Affidavit to the Debtors on or before the Distribution Record Date and, after review, the Debtors, in the exercise of their reasonable judgment with the advice of counsel and in consultation with the Required Consenting Term Lenders, do not reject such U.S. Citizenship Affidavit as reasonable proof in establishing that such holder is a U.S. Citizen, such holder shall receive its share of New Common Equity, New Take Back Preferred Equity, or New Money Preferred Equity, as applicable, as of the Effective Date; provided, however, that if such holder is a Non-U.S. Citizen, or if the holder does not furnish a U.S. Citizenship Affidavit to the Debtors on or before the Distribution Record Date, or if the U.S. Citizenship Affidavit of such holder has been rejected by the Debtors, in their reasonable judgment with the advice of counsel and in consultation with the Required Consenting Term Lenders, on or before the date that is five (5) Business Days after the Distribution Record Date after review by the Debtors pursuant to Article V.N.b of the Plan (the "U.S. Citizen Determination Procedures"), such holder shall be treated as a Non-U.S. Citizen for purposes of its treatment under Articles II.E, III.B.4, III.B.8 and V.C.1 of the Plan, as applicable. In connection with the Debtors' review of any U.S. Citizenship Affidavit under these U.S. Citizen Determination Procedures, the Debtors shall have the right to require the holder furnishing the

48

U.S. Citizenship Affidavit to provide the Debtors with such documents and other information as it may reasonably request as reasonable proof confirming that the holder is a U.S. Citizen.  The Debtors shall treat all such documents and information provided by any holder as confidential and shall limit the distribution of such documents and information to the Debtors' personnel and counsel that have a "need-to-know" the contents thereof and to the U.S. Coast Guard as may be necessary.  The Debtors shall (i) claim confidential treatment and exemption from Freedom of Information Act requests (a "FOIA Request") for any such documents and information submitted to the U.S. Coast Guard, and (ii) notify the relevant holder (x) if any such holder's documents and information are submitted to the U.S. Coast Guard, and (y) if the Debtors subsequently receives notice from the U.S. Coast Guard that it has received a FOIA Request and that any such document that has been identified by the U.S. Coast Guard as responsive to such a FOIA Request, in which case the Debtors shall allow such holder an opportunity to redact any confidential commercial, financial and proprietary business information exempt from Freedom of Information Act disclosure pursuant to 5 U.S.C. § 552(b)(4) that is in any such document.

c.      The New Term Lender Warrants will be issued pursuant to the terms of the New Term Lender Warrant Agreement.  Each New Term Lender Warrant will, subject to the terms of the New Term Lender Warrant Agreement, be exercisable for one (1) share of New Common Equity.

d.      The New Sponsor Warrants will be issued pursuant to the terms of the New Sponsor Warrant Agreement.  Each New Sponsor Warrant will, subject to the terms of the New Sponsor Warrant Agreement, be exercisable for one (1) share of New Common Equity.

e.      The New Take Back Preferred Warrants will be issued pursuant to the terms of the New Take Back Preferred Warrant Agreement.  Each New Take Back Preferred Warrant will, subject to the terms of the Take Back Preferred Warrant Agreement, be exercisable for one (1) share of New Take Back Preferred Equity.

f.      The New Money Preferred Warrants will be issued pursuant to the terms of the New Money Preferred Warrant Agreement.  Each New Money Preferred Warrant will, subject to the terms of the New Money Preferred Warrant Agreement, be exercisable for one (1) share of New Money Preferred Equity.

E.      *Treatment of Executory Contracts and Unexpired Leases*

1.      Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise ordered by the Bankruptcy Court or provided herein, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed (or amended and assumed, as applicable) by the applicable Debtor counterparty in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, and assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract and Unexpired Lease assumed pursuant to E.1 of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, the Reorganized Company

in accordance with its terms (including any amendments to any Executory Contracts and Unexpired Leases that were entered into after the Petition Date), except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified or stricken such that the transactions contemplated by the Plan shall not entitle the non-Debtor that is party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

     2.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree without further order of the Bankruptcy Court. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Company or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made within seven (7) business days following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of the applicable cure amount, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

     3.     Insurance Policies & Indemnification Obligations

Each of the insurance policies of the Debtors, including all director and officer insurance policies in place as of the Petition Date, are deemed to be and treated as Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies, including all director and officer insurance policies in place as of the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, equityholders, agents, or employees, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

In addition, after the Effective Date, all current and former officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date.

Notwithstanding anything in the Plan, any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, sponsors, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, provided, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, any indemnification and reimbursement provisions under the ABL DIP Facility Agreement or Term DIP Loan Facility Agreement which are expressly stated to survive any repayment or conversion under, or termination of, the ABL DIP Facility Agreement or Term DIP Loan Facility Agreement, as applicable, shall survive any cancellation, conversion or discharge under the Plan in accordance with its terms, and any rights that the ABL DIP Facility Agent or Term Loan DIP Facility Agent may have under the agency provisions of the ABL DIP Facility Agreement or Term DIP Loan Facility Agreement, as applicable, shall survive any such cancellation or discharge.

4.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to the Reorganized Company, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.      Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors has any liability thereunder.

6.      Contracts and Leases Entered into after Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, will be performed by the applicable Debtor or Reorganized Debtor, as the case may be, liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

7.      Rejection Damages Claims

If the rejection of an executory contract or unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).

8.      Compensation and Benefits Plans

All compensation and benefit plans, policies, programs, agreements and arrangements of the Debtors applicable to their respective employees, officers, retirees, consultants, contractors, and non-employee directors, including all plans, policies, programs, agreements and arrangements relating to employment, severance, incentive, bonus, retention, savings, retirement, vacation and sick leave benefits, relocation benefits, fringe benefits, paid time off, healthcare, disability, deferred compensation, pension, and life and accidental death and dismemberment insurance are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

F.      *Provisions Governing Distributions*

1.      Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

2.      Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  If the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent

shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

    3.    Rights and Powers of Disbursing Agent

    a.    Powers of the Disbursing Agent

Without further order of the Bankruptcy Court, the Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    b.    Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable compensation and documented expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

    4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

    a.    Delivery of Distributions to Term Loan Agent

No later than two (2) Business Days after the Distribution Record Date, or as soon thereafter as is reasonably practicable, the Term Loan Agent shall provide to counsel to the Debtors a list of all holders of Term Loan Claims as of such date and such additional information as requested by counsel to the Debtors or the Disbursing Agent in order to make distributions under the Plan.  The Term Loan Agent may, in its sole discretion, limit the further assignment of Term Loan Claims to allow for the accurate recording of the holders of Term Loan Claims as of the Distribution Record Date with respect to the Term Loan Claims. All distributions on account of Term Loan Claims shall be made by the Disbursing Agent directly to holders of Term Loan Claims or such holder's authorized designee in accordance with terms of the Plan and the Term Loan Agreement.  All reasonable and documented fees and expenses of the Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the Chapter 11 Cases or the implementation of the Plan, including but not limited to as part of Article VII.D.1 of the Plan, shall be paid by the Reorganized Company.

    b.    Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at

the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized Debtors.

c.      Minimum Distributions

No fractional New Common Equity, New Warrants, or New Preferred Equity shall be distributed, and no Cash shall be distributed with respect to such fractional amounts.  When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Equity, New Warrants, or, if applicable, New Preferred Equity that is not a whole number, the actual distribution of New Common Equity, New Warrants, or New Preferred Equity, as applicable, shall be rounded as follows:  (a) fractions of greater than one-half (½) shall be rounded to the next higher whole number, and (b) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Equity, New Warrants, or New Preferred Equity, as applicable, to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

d.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such distribution was attempted to be made; provided further, that the Debtors or Reorganized Debtors, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable.  After such date, all unclaimed property or interests in property shall revert to Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred; provided, that all distributions of (i) the New Common Equity, (ii) the New Preferred Equity, (iii) the New Warrants, and (iv) Cash, that are unclaimed by a holders within a Class of Claims, as applicable, shall be distributed on a Pro Rata basis to the holders of Class of Claims, as applicable, whose distributions of the preceding items (i)-(iv) on the Effective Date were not returned as undeliverable.

5.      Exemption from Securities Laws

a.      The offer, issuance, and distribution under the Plan of (i) the New Common Equity, (ii) the New Term Lender Warrants, (iii) New Take Back Preferred Equity, and (iv) the New Take Back Preferred Warrants shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an

54

"underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, the New Organizational Documents and the applicable Warrant Agreements, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

        b.      The offer, issuance and sale of (1) the New Sponsor Warrants and (2) the New Money Preferred Equity and New Money Preferred Equity Warrants (and, in the case of clause (i) only, the Subscription Rights) to: (i) Rights Offering Participants pursuant to the Rights Offering, (ii) the Backstop Commitment Parties under the Backstop Commitment Agreement (including the New Money Preferred Equity and/or any New Money Preferred Equity comprising the Backstop Commitment Premium and the Unsubscribed Securities), and (iii) the Term Loan DIP Facility Lenders in connection with the exchange for Term Loan DIP Facility Claims, the DIP Conversion Discount (as defined in the Term Loan DIP Facility Agreement) and the DIP Backstop Premium (as defined in the Term Loan DIP Facility Agreement), in each case, who are "accredited investors" as defined in Rule 501(a) promulgated under the Securities Act, is being made in reliance on the exemption from registration set forth in section 4(a)(2) thereof and/or Regulation D thereunder and on equivalent state law registration exemptions or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, another available exemption from registration under the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act. Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, the New Organization Documents, and the applicable Warrant Agreements.

        c.      Each holder of New Common Equity, New Preferred Equity and New Warrants shall be deemed to be a party to and bound to the terms of the Shareholders Agreement from and after the Effective Date, even if not a signatory thereto.

    6.      Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.  Notwithstanding the above, each holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by

any governmental unit, including income, withholding and other tax obligations, on account of such distribution. The Debtors have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations. The Debtors may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder.

       7.      No Postpetition Interest on Claims and Interests

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, the ABL DIP Facility, the Term Loan DIP Facility, the DIP Orders, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

       8.      Setoffs and Recoupment

Except for Claims that are expressly Allowed hereunder, the Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest; provided, that neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest.

       9.      Claims Paid or Payable by Third Parties

       a.      Claims Paid by Third Parties

The Debtors or Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor or Reorganized Debtors; provided, however, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the party that is not a Debtor or Reorganized Debtor, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.  To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or Reorganized Debtors entity on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtors entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtors entity annualized

interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

        b.        Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.

        c.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the *provisions* of any applicable insurance policy.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including any holders of Claims, may hold against any other Entity under any insurance policies, including against insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

        10.        Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

G.        *Settlement, Release, Injunction, and Related Provisions*

        1.        Compromise and Settlement

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to applicable bankruptcy law.  In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan.  The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto.  Nothing in the Plan shall compromise or settle, in any way whatsoever, (i) any Causes of Action that the Debtors or Reorganized Debtors,

57

as applicable, may have against any Entity that is not a Released Party or (ii) any Claims or Interests in Classes 1, 2, 3, 5, 6, or 7.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Debtors not previously Allowed (if any), and (2) claims (including Causes of Action) against other Entities.

      2.      Discharge of Claims and Termination of Interests

Except as otherwise provided in the Plan and the Payoff Letter, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Debtors, the Debtors' estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

      3.      Release of Liens

**Except as otherwise expressly provided in the Plan or the Payoff Letter, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New ABL Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New ABL Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and each of their successors and assigns, and the New ABL Facility Agent, the Term Loan DIP Facility Agent and the Term Loan Agent shall be authorized to release any such mortgages, deeds of trust, Liens, pledges or other security interests held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges or other security interests, including the execution, delivery and filing or recording of any related releases or discharges as may be requested by the Reorganized Debtors or may be required in order to effectuate the foregoing.**

      4.      Releases of Released Parties

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to applicable bankruptcy law, of the releases described in G.4 of the Plan and shall**

constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by G.4 of the Plan; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity (including the Debtors) asserting any claim or Cause of Action released pursuant to G.4 of the Plan.

       a.      Releases by the Debtors

Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, the Debtors and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that the Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Debtor), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the ABL DIP Facility Claims, the Term Loan DIP Facility Claims, the Existing ABL Facility Claims, the Term Loan Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New ABL Facility, (iii) the Disclosure Statement, (iv) the Restructuring Support Agreement, (v) the First Amendment to the Term Loan Agreement, (vi) the Bridge Funding Letter Agreement, (vii) the Backstop Commitment Agreement, or (viii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.

       b.      Releases by Holders of Claims or Interests

Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Debtors and Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Restructuring Support

Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Debtor), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the ABL DIP Facility Claims, the Term Loan DIP Facility Claims, the Existing ABL Facility Claims, the Term Loan Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New ABL Facility, (iii) the Disclosure Statement, (iv) the Restructuring Support Agreement, (v) the First Amendment to Term Loan Agreement, (vi) the Bridge Funding Letter Agreement, (vii) the Backstop Commitment Agreement, or (viii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence. For the avoidance of doubt, the releases described in Article VIII.D.2 of the Plan do not release any Claims or Interests under Classes 1, 2, 3, 5, 6, or 7. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan or the Exit ABL Facility Loan Documents.

5.  Exculpation

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the ABL DIP Facility, the Term DIP Facility, the New ABL Facility, the Rights Offering, the Management Incentive Plan, the Disclosure Statement, the Restructuring Supporting Agreement, the Restructuring Transactions, the Bridge Funding Letter Agreement, and the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or

60

**willful misconduct as determined by a Final Order, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

6.    Injunction

**The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.**

H.    *Conditions to Confirmation and Effective Date*

1.    Conditions to Effective Date

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with H.2 of the Plan:

a.    the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

b.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

c.    the Bankruptcy Court shall have entered the DIP Orders and the Final DIP Order shall have become a Final Order;

d.    Final DIP Order in such form and substance as is (i) consented to by each of the Debtors and to the Required Consenting Lenders, (ii) reasonably acceptable to the ABL DIP

Agent  and Term Loan DIP Agent, and (iii) and otherwise consistent with the Restructuring Support Agreement;

> e.     the Bankruptcy Court shall have entered the Confirmation Order and such order shall have become a Final Order;

> f.     all authorizations, consents, regulatory approvals (including from the U.S. Coast Guard), rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of the Debtors' permits and licenses, shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

> g.     except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been (i) executed, delivered, assumed, or performed, as the case may be, (ii) to the extent required, filed with the applicable Governmental Units in accordance with applicable law, (iii) any conditions contained in such documents (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, and (iv) in each case shall be consistent with the Restructuring Support Agreement;

> h.     there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

> i.     the conditions to the effectiveness of the New ABL Facility shall have been satisfied or waived in accordance with the terms of the New ABL Facility Documents on or prior to the Effective Date and Payment in Full of the ABL DIP Facility Claims shall occur concurrently with the occurrence of the Effective Date;

> j.     the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date; and

> k.     the Professional Fees Escrow Account shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan.

> 2.     Waiver of Conditions

The conditions to Confirmation and the Effective Date set forth in H of the Plan may be waived only by the Debtors and the Required Consenting Term Lenders, without notice, leave, or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is

confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

I.    *Modification, Revocation or Withdrawal of Plan*

      1.    Modification and Amendments

Except as otherwise specifically provided in the Plan or the Payoff Letter, and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, but subject to the consent rights set forth in the Restructuring Support Agreement, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, and subject to the consent of the Required Consenting Term Lenders, each Debtor expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring Transactions in a manner that preserves favorable tax attributes; *provided*, *however*, that any such amendment or modification shall not cause Class 5 General Unsecured Claims to be Impaired. Each Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with I of the Plan.

      2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

      3.    Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization, subject in each instance to the Restructuring Support Agreement. If the Debtors revoke or withdraw the Plan, Confirmation does not occur, or the Effective Date does not occur within twenty-one (21) days of the Confirmation Date (the "Outside Consummation Date")[8] (which period may be extended by the Debtors with the consent of the Required Consenting Term Lenders), then: (1) the

---

[8]    If, prior to the Outside Consummation Date, all conditions precedent to effectiveness of the Plan have been satisfied or waived, as applicable, or, for conditions that by their nature are to be satisfied on the Effective Date, shall then be capable of being satisfied, except the requisite regulatory approvals have not been obtained (including, without limitation, approval by the U.S. Coast Guard), the Outside Consummation Date shall be automatically extended by 14 calendar days, or to such other time as agreed between the parties to the Restructuring Support Agreement.

Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a)  constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.  For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Term Lenders under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

J.      *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

b.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

c.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any

Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

        d.    ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

        e.    adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

        f.    adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

        g.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

        h.    enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

        i.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

        j.    issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

        k.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in G of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

        l.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to F.9.a of the Plan;

        m.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

        n.    determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release,

indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

        o.      enter an order or final decree concluding or closing the Chapter 11 Cases;

        p.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

        q.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

        r.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

        s.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

        t.      hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

        u.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under G of the Plan, regardless of whether such termination occurred before or after the Effective Date;

        v.      determine whether and in what amount a Claim is Allowed;

        w.      hear and determine all disputes arising from, or related to, any determination by the Debtors in their reasonable discretion with respect to the acceptance, non-acceptance or rejection of any U.S. Citizenship Affidavit as reasonable proof in establishing that any person otherwise entitled to shares of New Common Equity of New Preferred Equity under the Plan is a U.S. Citizen under the Jones Act;

        x.      recover all assets of the Debtors and property of the Estates, wherever located;

        y.      resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding

or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

z.      hear and determine any rights, claims, or Causes of Action held by, or accruing to, the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

aa.     adjudicate any maritime claims or liens, to the extent permitted by law;

bb.     enforce all orders previously entered by the Bankruptcy Court; and

cc.     hear any other matter as to which the Bankruptcy Court has jurisdiction.

*provided*, however, that documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection or dispute resolution clauses in such documents.

K.     *Miscellaneous Provisions*

1.     Immediate Binding Effect

Subject to H.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

2.     Additional Documents

On or before the Effective Date, the Debtors may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.     Payment of Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors in these cases on the Effective Date. After the Effective Date, the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  Each and

67

every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding the foregoing, nothing herein shall prohibit the Reorganized Company (or the Disbursing Agent on behalf of the Reorganized Company) from paying any Quarterly Fees that become due and payable.

4.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before Consummation.

5.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

6.      Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  For the avoidance of doubt, (i) upon the Effective Date, the automatic stay pursuant to Bankruptcy Code section 362 of any litigation proceedings against or involving the Debtors shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

7.      Entire Agreement

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

8.      Exhibits

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

9.      Consent Rights of Required Consenting Term Lenders

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Required Consenting Term Lenders set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan and the Plan Supplement are fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.  In case of a conflict between the consent rights of the Required Consenting Term Lenders set forth in the Restructuring Support Agreement with the consent rights of the Required Consenting Term Lenders set forth in the Plan or Plan Supplement, the consent rights in the Restructuring Support Agreement shall control.

10.      Nonseverability of Plan Provisions

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without consent of the Debtors and the Required Consenting Term Lenders and, regarding the rights, obligations and releases in respect of the Existing ABL Facility or ABL DIP Facility, the written consent of Existing ABL Facility Agent and ABL DIP Facility Agent; and (3) nonseverable and mutually dependent.

11.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

10442820v1

12.      Closing of Chapter 11 Cases

Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any applicable Local Rules of the Bankruptcy Court, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

13.      Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

14.      Conflicts

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.   In the event of a conflict between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); *provided*, *that*, in the event any such conflict is a material conflict of the type that would require the Debtors to re-solicit the votes of Holders of Claims against the Debtors under section 1127 of the Bankruptcy Code, the Plan shall control solely with respect to such provision giving rise to such material conflict. In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

15.      Dissolution of Creditors' Committee

On the Effective Date, the Committee (if one is appointed) shall be deemed to have been dissolved, and the members thereof, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of prosecuting  requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date.

## SECTION V.
## VOTING PROCEDURES AND REQUIREMENTS

This Section describes in summary fashion the procedures and requirements that have been established for voting on the Plan.  If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan.  If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims or Interests.  If you are entitled to vote and did not receive a Ballot, received a damaged Ballot, or lost your Ballot please contact the Voting Agent by e-mail at ACLballots@primeclerk.com or by phone at (877) 425-3088 (toll free) or (917) 944-8379 (international).

10442820v1

**Before voting to accept or reject the Plan, each eligible holder of a Claim or Interest should carefully review the Plan attached hereto as <u>Exhibit A</u> and described in Section IV herein entitled, "Summary of Joint Prepackaged Chapter 11 Plan."**

A.      *Voting Deadline*

To be considered for purposes of accepting or rejecting the Plan, all Ballots must be **actually received** by the Voting Agent no later than the Voting Deadline of **4:00 p.m., prevailing Central Time, on February 17, 2020**, unless ACL extends the Voting Deadline with the consent of the Required Consenting Term Lenders.  **ACL expressly reserves the absolute right to extend, by oral or written notice to the Voting Agent, the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, until the necessary Ballots have been received.  ACL will not have any obligation to publish, advertise, or otherwise communicate any such extension, other than by filing a notice of such extension with the Bankruptcy Court docket and posting a notice on the website of ACL's notice and voting agent at http://cases.primeclerk.com/ACL.  There can be no assurance that ACL will exercise any right to extend the solicitation period and deadline for the receipt of Ballots.**

Except to the extent requested by ACL, in its sole discretion, or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, Ballots received by the Voting Agent after the Voting Deadline will not be counted or otherwise used in connection with ACL's request for confirmation of the Plan (or any permitted modification thereof).

You must complete and return your Ballot(s) in accordance with the instructions set forth on your applicable Ballot(s).  Votes may not be transmitted orally, by facsimile, or by electronic mail.  Accordingly, you are urged to return your signed and completed Ballot(s) promptly.

B.      *Voting Record Date*

Consistent with the provisions of Bankruptcy Rule 3018(b), ACL has fixed February 3, 2020 as the "<u>Voting Record Date</u>" for the determination of holders of record of Claims or Interests entitled to vote to accept or reject the Plan.  Only holders of record are entitled to vote to accept or reject the Plan.

C.      *Parties Entitled to Vote*

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not Impaired by a plan are deemed to accept the plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "Impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

71

Creditors and equity interest holders whose Claims or Interests are Impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.

As mentioned above, this Disclosure Statement and other Solicitation Package materials are being furnished prior to the commencement of the Chapter 11 Cases, and ACL is soliciting votes on the Plan from the holders of Allowed Claims in Class 4 (Term Loan Claims) and Allowed Interests in Class 8 (Interests in Finn Holding), which Classes are deemed to be Impaired, as follows:

- Holders of Class 4 Term Loan Claims whose names appear as of the Voting Record Date in the list of lenders maintained by the Term Loan Agent; and

- Holders of Class 8 Interests in Finn Holding.

Holders of Claims and Interests that are entitled to vote should receive Ballots with their Solicitation Package, which Ballots should be used to submit their vote.

D.      *Ballots*

Each Ballot enclosed with this Disclosure Statement is marked with the Class into which the Claim or Interest has been placed under the Plan.  All votes to accept or reject the Plan with respect to any Class of Claims or Interests must be cast by properly submitting the duly completed and executed Ballot designated for such Class in accordance with the instructions set forth on the applicable Ballot.  Holders of Claims or Interests voting on the Plan should complete and sign their Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "ACCEPT (VOTE FOR) THE PLAN" or "REJECT (VOTE AGAINST) THE PLAN."   Any executed Ballot that does not indicate either acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted.

To the extent a holder of Claims or Interests holds multiple Claims or Interests within a particular Class, ACL may, in its discretion, instruct the Voting Agent to aggregate, to the extent possible, such holder's Claims or Interests (as applicable) for purposes of counting votes.

Ballots must be delivered to the Voting Agent in accordance with the instructions set forth on the applicable Ballot and **actually received** by the Voting Deadline.

THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Voting Agent by e-mail at ACLballots@primeclerk.com or by phone at (877) 425-3088 (toll free) or (917) 944-8379 (international).

E.      *Agreements upon Furnishing Ballots*

The delivery of a Ballot to the Voting Agent by a holder of a Claim or an Interest voting to accept the Plan will constitute the agreement of such holder to accept (1) all of the terms of, and conditions to, the solicitation and (2) the terms of the Plan; provided, however, that all parties-in-interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code in accordance with any applicable order of the Bankruptcy Court.

In addition, a vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

F.      *Withdrawal or Change of Votes on Plan*

Except as may be provided in the Restructuring Support Agreement with respect to the votes of the Consenting Term Lenders, after the Voting Deadline, no vote may be withdrawn without the prior consent of ACL and the Required Consenting Term Lenders.

Any holder who has submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly-completed Ballot for acceptance or rejection of the Plan.  If more than one timely, properly-completed Ballot is received with respect to the same Claim or Interest, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines in its sole discretion was the last to be received.

G.      *Fiduciaries and Other Representatives*

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Entity acting in a fiduciary or representative capacity, such Entity should indicate such capacity when signing and, if requested by ACL, will be required to submit proper evidence satisfactory to ACL of authority to so act.  Authorized signatories should submit the separate Ballot of each holder for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS **ACTUALLY RECEIVED** BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT ACL RESERVES THE RIGHT, WITH THE CONSENT OF THE REQUIRED CONSENTING TERM LENDERS, TO ACCEPT AND COUNT ANY SUCH LATE BALLOT.   IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE VOTING AGENT.

H.      *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by ACL in its sole discretion, which determination will be final and binding.  As indicated above, effective withdrawals of Ballots must be delivered to the Voting Agent prior to

the Voting Deadline. ACL reserves the absolute right to contest the validity of any such withdrawal. ACL also reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of ACL or its counsel, be unlawful. ACL further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the applicable instructions thereto) by ACL and the Required Consenting Term Lenders, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as ACL (or the Bankruptcy Court) determines. Neither ACL nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

I.      *Further Information, Additional Copies*

If you have any questions or require further information about the voting procedure for voting your Claim or Interest or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by of Bankruptcy Rule 3017(d)), please contact the Voting Agent by e-mail at ACLballots@primeclerk.com or by phone at (877) 425-3088 (toll free) or (917) 944-8379 (international).

J.      *Requirements for Acceptance by Impaired Class of Claims*

An Impaired Class of Claims or Interests shall have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims or Interests in such Class that have voted on the Plan.

## SECTION VI.
## CONFIRMATION OF PLAN

A.      *Combined Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Combined Hearing. On, or as promptly as practicable after commencement of the Chapter 11 Cases, ACL will request that the Bankruptcy Court schedule the Combined Hearing. Notice of the Combined Hearing will be provided to all known creditors and equity interest holders or their representatives. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Combined Hearing or any subsequent adjourned Combined Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules, (3) set forth the name of the objecting party, the nature of Claims or Interests held or asserted by the objecting party, and (4) state with particularity the legal and factual basis for the objection, and (5) be filed with the Bankruptcy Court, together with proof

10442820v1

of service thereof, and served so as to be received no later than the date and time designated in the notice of the Combined Hearing.

The procedures for filing objections to confirmation of the Plan shall be determined by the Bankruptcy Court after the Chapter 11 Cases are commenced.

B.    *Requirements for Confirmation of Plan – Consensual Confirmation*

At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) feasible and (2) in the "best interests" of holders of Claims and Interests Impaired under the Plan.

1.    Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of ACL or any successors to ACL under the Plan. This condition is often referred to as the "feasibility" of the Plan.  ACL believes that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, ACL, in consultation with its financial advisors, has analyzed its ability to meet its obligations incurred under the Plan. As part of that analysis, ACL has prepared consolidated projected financial results (the "Projections") for each of the fiscal years through 2024.  These Projections, and the assumptions on which they are based, are attached hereto as Exhibit C.

ACL prepared the Projections based upon certain assumptions and upon the assessments of certain market experts that it believes to be reasonable at the time of preparation.  Those assumptions ACL considered to be significant are described in the Projections.  The Projections have not been examined or compiled by independent accountants.  Many of the assumptions on which the Projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material.  All holders of Claims and Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the feasibility of the Plan.

2.    Best Interests Test

Unless each Impaired Class of Claims or Interests under the Plan unanimously accepts the Plan, section 1129 of the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all holders of Claims and Interests in such Classes.  This "best interests" test must show that each holder of Impaired Claims or Interests receive property with a value not less than the amount such holder would receive if ACL were liquidated under chapter 7 of the Bankruptcy Code.  ACL believes that under the Plan, holders of Impaired Claims or Interests

will receive property with a value equal to or in excess of the value such holders would receive in a chapter 7 liquidation.

To estimate the potential recoveries to holders of Claims and Interests in a Chapter 7 liquidation, ACL determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code.

The amount of liquidation value available to holders of unsecured Claims against ACL would be reduced by, first, the Claims of secured creditors to the extent of the value of their collateral and, second, the administrative expenses and priority claims allowed in chapter 7, including the costs and expenses of liquidation. Costs and other administrative expenses of a chapter 7 liquidation would include the compensation of a trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, applicable taxes, litigation costs, all unpaid administrative expenses incurred by ACL in the Chapter 11 Cases that are allowed in the chapter 7 cases, such as compensation of counsel and other professionals retained by ACL and Claims arising from ACL's operations during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the original course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of General Unsecured Claims.

In a chapter 7 liquidation, no junior Class of Claims or Interests may be paid unless all Classes of Claims or Interests senior to such junior Class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no Class of Claims or Interests that is contractually subordinated to another Class would receive any payment on account of its Claims or Interests, unless and until such senior Class was paid in full.

Once the Bankruptcy Court ascertains the liquidation recoveries to ACL's secured and priority creditors in chapter 7, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. ACL believes that the Liquidation Analysis attached hereto as Exhibit D demonstrates that each holder in a Class of Impaired Claims or Interests will receive at least as much, if not more, under the Plan as such holder would receive if ACL were liquidated pursuant to chapter 7. Therefore, ACL believes that the Plan satisfies the requirements of the "best interests" test.

C.      *Requirements for Confirmation of Plan – Non-Consensual Confirmation*

To the extent there is any Impaired Class of Claims that votes to reject the Plan, ACL will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to that Class.  The Bankruptcy Code permits the Bankruptcy Court to confirm the Plan over the dissent of any Impaired Class of Claims or Interests as long as the remaining standards in section 1129(a) and section 1129(b) are met.  This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the chapter 11 process.  It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection by any Impaired Class of Claims or Interests if, among other requirements, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class.

1.      Unfair Discrimination

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, the Plan could treat two Classes of unsecured creditors differently without unfairly discriminating against either Class. This test only applies to Classes that reject or are deemed to reject the Plan.

2.      Fair and Equitable Test

A chapter 11 plan is only fair and equitable with respect to a dissenting class if no class senior to such dissenting class receives more than it is entitled to on account of such senior claims or interests.  The "fair and equitable" test also imposes certain requirements that depend on the type of claims or interests in the dissenting class.

To be fair and equitable with respect to a dissenting class of Impaired secured creditors, a chapter 11 plan must provide that each holder in such class either (a) retains its liens on the property subject to such liens (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of consummation of the chapter 11 plan, of at least such allowed amount or (b) receives the "indubitable equivalent" of its secured claim.

To be fair and equitable with respect to a dissenting class of Impaired unsecured creditors, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the allowed amount of its unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the chapter 11 plan.

77

To be fair and equitable with respect to a dissenting class of Impaired equity interest holders, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the chapter 11 plan.

In light of the Restructuring Support Agreement, ACL anticipates that the Plan will be fully consensual. The only Impaired Classes under the Plan are Class 4 (Term Loan Claims) and Class 8 (Interests in Finn Holding). The requisite number of holders of such Claims and Interests have signed the Restructuring Support Agreement and agreed to vote in favor of the Plan. Accordingly, ACL believes that, under the Bankruptcy Code, it will not be necessary to satisfy the cramdown standards with respect to such classes.

## SECTION VII.
## PROJECTED FINANCIAL INFORMATION AND
## VALUATION ANALYSIS

THE FOLLOWING VALUATION WAS CONDUCTED SOLELY FOR THE PURPOSES OF CALCULATING THE TOTAL ENTERPRISE VALUE OF THE COMPANY IN A CONSENSUAL PRE-PACKAGED BANKRUPTCY SCENARIO. THE COMPANY HAS NOT PROVIDED PROJECTIONS, AND NO VALUATION ANALYSIS WAS CONDUCTED, CONTEMPLATING A NON-CONSENSUAL, CONTESTED BANKRUPTCY OUTCOME. IN SUCH A CONTESTED SCENARIO, IT IS POSSIBLE THAT THE PROJECTIONS PROVIDED HEREIN COULD BE MATERIALLY NEGATIVELY IMPACTED, RESULTING IN A MATERIALLY DIFFERENT VALUATION RANGE THAN IS PRESENTED. THE NATURE OF THE COMPANY'S BUSINESS IS RELIANT ON THE CONFIDENCE OF ITS CUSTOMERS, WHICH COULD BE MATERIALLY NEGATIVELY IMPACTED IN THE CONTEXT OF A CONTESTED BANKRUPTCY SCENARIO. THE VALUATION HEREIN SHOULD ONLY BE UTILIZED AND EVALUATED IN THE CONTEXT OF THE CONSENSUAL PLAN CONTEMPLATED.

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR THE DEBTORS IN CONNECTION WITH THE CURRENTLY-PROPOSED PLAN, AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS.

THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST ACL OR ANY OF THEIR AFFILIATES.

GREENHILL IS ACTING AS INVESTMENT BANKER TO ACL, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

A.    *Introduction:*

In connection with developing the Plan, the Debtors directed Greenhill to estimate the going-concern value of the Reorganized Debtors.  This analysis has been prepared for the Debtors' sole use and is based on information provided to Greenhill by the Debtors and other publicly available information.

Based on the Financial Projections set forth in <u>Exhibit C</u>, and subject to the disclaimers and the descriptions of Greenhill's methodology set forth herein, and solely for purposes of the Plan, Greenhill estimates the total enterprise value of the Reorganized Debtors to be between approximately $987 million and $1,216 million with a midpoint of $1,101 million.  The range of total equity value, including Take Back Preferred Equity and New Money Preferred Equity, is determined by taking the total enterprise value less the estimated net debt outstanding as of an assumed Effective Date of March 31, 2020, was estimated by Greenhill to be between approximately $478 million and $707 million with a midpoint of $593 million. The range of common equity value as of an assumed Effective Date of March 31, 2020 was estimated by Greenhill to be between approximately $61 million and $290 million with a midpoint of $176 million. The implied total enterprise value should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated total enterprise value range for the Reorganized Debtors, Greenhill: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (4) considered certain economic and industry information relevant to the Debtors' operating businesses; (5) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; (6) and considered the value assigned to certain precedent change-of-control transactions for businesses similar to those of the Debtors.

Although Greenhill conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and financial projections, Greenhill relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and on certain publicly available information as to which Greenhill does not have independent knowledge.

The projections provided by the Debtors to Greenhill are for fiscal years 2020-2024. Greenhill has relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith judgments

of the Debtors.  Greenhill does not offer an opinion as to the attainability of the Financial Projections.  The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of the Debtors' assets were sought or obtained in connection with Greenhill's valuation.  Greenhill did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Debtors, and therefore makes no representations as to their impact on the Debtors' financial statements.

B.     *Valuation Methodologies:*

The following is a brief summary of certain financial analyses performed by Greenhill to arrive at a range of estimated total enterprise values.  The following summary does not attempt to be a complete description of all of the analyses undertaken to support Greenhill's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances.  As a result, the process involved in preparing a valuation is not readily summarized.

In performing its analysis, Greenhill applied the following valuation methodologies as applicable to the operations of the Debtors:  (1) the discounted cash flow methodology; (2) the comparable company trading multiples methodology; and (3) the precedent transactions methodology.

C.     *Discounted Cash Flow Methodology*

Greenhill's application of the discounted cash flow methodology involved deriving the unlevered free cash flows that the Debtors' operations would generate assuming their Financial Projections are realized. To determine the total enterprise value range, these cash flows and an estimated terminal value at the end of the projection period were discounted to derive their present value as of an assumed emergence date of March 31, 2020, using the estimated weighted average cost of capital of the Reorganized Debtors as a discount rate.

D.     *Comparable Company Trading Multiples Methodology*

Greenhill's application of the comparable company trading multiples methodology involved identifying a group of publicly-traded companies whose businesses and operating characteristics are generally similar to the Reorganized Debtors' operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' operations because no such company exists, to Greenhill's knowledge.  Under the comparable company methodology, the total enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt, capitalized leases when using the EBITDAR approach and minority interests in unconsolidated subsidiaries. Such total enterprise

values are expressed as multiples of EBITDAR and EBITDA, and then the total enterprise value of the Reorganized Debtors is calculated by applying these multiples to the Reorganized Debtors' projected financials.

E.    *Precedent Transactions Methodology*

Greenhill's application of the precedent transactions methodology involved identifying and examining merger and acquisition transactions that involved companies whose business and operating characteristics are generally similar to the Reorganized Debtors' operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' operations because no such company exists, to Greenhill's knowledge.  From a review of the transaction-derived valuation multiples for this group, Greenhill then developed a range of valuation multiples to apply to the Financial Projections to derive a range of implied enterprise values for the Reorganized Debtors' operations.

In arriving at its valuation estimate, Greenhill did not consider any one analysis or factor to the exclusion of any other analyses or factors, but instead used reasonable judgment as to the relative relevance of each methodology.  Accordingly, Greenhill believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation.  Greenhill's analysis includes multiple valuation methodologies.  Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to total enterprise value.

F.    *Valuation Considerations:*

This valuation is based upon information available to, and analyses undertaken by, Greenhill as of February 5, 2020, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections.  The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.  For purposes of this valuation, Greenhill has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date.  Events and conditions subsequent to this date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' total enterprise value.  Neither Greenhill nor the Debtors has any obligation to update, revise or reaffirm the valuation.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner consistent with the Plan and the RSA Term Sheet, achieving the forecasts reflected in the Financial Projections, the Company maintaining sufficient cash required to operate the Debtors' businesses, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.  Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the total enterprise value of the Reorganized Debtors.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the total enterprise value ranges associated with Greenhill's valuation analysis. As further described in the Disclosure Statement, the Reorganized Debtors are anticipated to be a private Company that will not be obligated to file public reports or disclosures. There can be no assurance that any trading market will develop for the New Equity Interests. The estimates of value for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets. Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors

## SECTION VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
## THE PLAN

The following is a general discussion based upon present law of certain U.S. federal income tax considerations relevant to the implementation of the Plan to the Debtors, the Reorganized Debtors, holders of Allowed Term Loan Claims and holders of Allowed Interests in Finn Holding. This summary is limited to holders of the Allowed Term Loan Claims and Allowed Interests in Finn Holding who hold their Claims and Interests, respectively, as capital assets for purposes of the Internal Revenue Code of 1986, as amended (the "Code"). This discussion does not address rules relating to Allowed Term Loan Claims or Allowed Interests in Finn Holding held by special categories of holders, including financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker dealers, tax exempt organizations, traders in securities that elect to mark to market, investors liable for the alternative minimum tax, persons subject to special accounting rules under Section 451(b) of the Code, U.S. expatriates, investors that hold such Claims or Interests as part of a straddle, hedging, constructive sale or conversion transaction, and U.S. Holders (as defined below) whose functional currency is not the U.S. dollar. The discussion does not address any state, local or foreign taxes, the Medicare tax on net investment income, the federal alternative minimum tax, or any other federal tax other than the federal income tax. The discussion of U.S. federal income tax consequences below is based on the Code, Treasury Regulations, judicial authorities, published positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. Holders should note that no rulings from the IRS have been sought, and the Debtors do not know whether they will request a ruling, with respect to any of the U.S. federal income tax consequences discussed below, and no

assurance can be given that the IRS or a court will not take contrary positions. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are Unimpaired, or holders who are not entitled to vote because they are deemed to accept or reject the Plan. Additionally, this discussion does not address the U.S. federal income tax consequences to the Commitment Parties in their capacities as such.

This summary is not a comprehensive description of all of the U.S. federal tax consequences that may be relevant with respect to the Plan. We urge you to consult your own tax advisor regarding your particular circumstances and the U.S. federal tax consequences to you with respect to the Plan, as well as any tax consequences arising under the laws of any state, local or foreign tax jurisdiction and the possible effects of changes in U.S. federal or other tax laws.

As used herein, the term "U.S. Holder" means a beneficial owner of Allowed Term Loan Claims or Allowed Interests in Finn Holding, as applicable, that for U.S. federal income tax purposes is any of the following:

- an individual citizen or resident of the United States;

- a corporation or any other entity treated as a corporation for U.S. federal income tax purposes created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

A "Non-U.S. Holder" means a beneficial owner of Allowed Term Loan Claims or Allowed Interests in Finn Holding, as applicable, other than a U.S. Holder or an entity or arrangement treated as a partnership for U.S. federal income tax purposes.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Allowed Term Loan Claims or Allowed Interests in Finn Holding being exchanged in the Plan, the U.S. federal income tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership and accordingly, this summary does not apply to partnerships. A partner of a partnership exchanging Allowed Term Loan Claims or Allowed Interests in Finn Holding should consult its own tax advisor regarding the U.S. federal income tax consequences to the partner of exchanging Allowed Term Loan Claims or Allowed Interests in Finn Holding pursuant to the Plan.

A.     *Certain U.S. Federal Income Tax Consequences to the Debtors*

Finn Holding is the parent of a consolidated U.S. federal income tax group that includes those Debtors that are treated as corporations for U.S. federal income tax purposes (the "Tax Group"). The Tax Group has significant net operating loss ("NOL") carryforwards as of December

31, 2019, and certain other favorable tax attributes, including substantial interest expense carryforwards.  As discussed below, the amount of the Tax Group's NOLs (including certain NOLs incurred after the Effective Date) and other tax attributes may be significantly reduced or otherwise subject to limitation in connection with the implementation of the Plan.

      1.     Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the amount of Cash paid, (y) the adjusted issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any stock or other consideration given in satisfaction of such indebtedness at the time of the exchange. The amount of CODI, if any, arising in connection with the implementation of the Plan and, accordingly, the amount of tax attributes subject to reduction, will generally depend on the fair market value (or, in the case of debt instruments, the adjusted issue price) of various forms of consideration to be received by holders of Claims under the Plan, and may also be impacted by the manner in which the Plan is implemented. These factors are not known at this time and may not be known with certainty until after the Effective Date and, as a result, the total amount of CODI arising as a result of the implementation of the Plan cannot be determined until after the Effective Date.

A debtor generally will not, however, be required to include any amount of CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding, as would be the case if the Plan were approved. Instead, as a consequence of such exclusion, a debtor must reduce certain of its tax attributes by the amount of CODI that it excluded from gross income pursuant to Section 108 of the Code. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the reorganized company remains subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the Code. Carryover of disallowed interest expense would not be a tax attribute subject to such reduction unless future Treasury Regulations provide to the contrary. Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact unless there is a so-called "excess loss account" ("ELA") in the stock of a debtor.  In that case, the debtor may be required to recognize taxable income equal to the lesser of the amount of such ELA and any CODI in excess of reduced tax attributes.

The Debtors are expected to generate a significant amount of CODI as a result of the implementation of the Plan.  As noted above, the amount of CODI will not be determinable until after the Effective Date, however, such amount is expected to substantially reduce and possibly eliminate the Debtors' NOLs and may reduce certain other tax attributes.  Depending on the amount of CODI, it is possible that the Debtors will have CODI in excess of tax attributes required to be reduced.  In that case, if there is an ELA in the stock of the entity with such excluded CODI, the Tax Group would recognize taxable income in the amount of such excess CODI, but not to

exceed the amount of such ELA, and the Reorganized Debtors would be required to pay tax on any such taxable income.  It is not yet known whether there would be a relevant ELA in the stock of an applicable Debtor.

> 2.      Limitation of NOL Carry Forwards and Other Tax Attributes

Under sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the amount of any NOLs, interest expense carryforwards, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the corporation allocable to periods prior to the ownership change (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. The implementation of the Plan will result in an "ownership change" of the Tax Group for these purposes.  As a result, the Reorganized Debtors' use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the IRS recently amended the proposed effective date provision of those regulations to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. Thus, if the proposed regulations are finalized in their current form, the proposed regulations are not expected to apply to the Reorganized Debtors and the remainder of this discussion assumes they will not apply.

> a.      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (1.63% for ownership changes occurring in February 2020). The section 382 limitation may be increased to the extent that the company recognizes certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

   b.  Special Bankruptcy Exception

  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the ownership change, and during the part of the taxable year prior to and including the ownership change, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the company undergoes another "ownership change" within two years after the first change, then the company's Pre-Change Losses thereafter would be effectively eliminated in their entirety. Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

  The Debtors have not yet determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

B. *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Term Loan Claims and Allowed Interests in Finn Holding*

  1.  Consequences to U.S. Holders of Allowed Term Loan Claims

  Pursuant to the Plan, in full and final satisfaction, settlement, release and discharge of, and in exchange for the Allowed Term Loan Claims, each holder thereof will receive, in each case subject to the U.S. Citizen Determination Procedures, its Pro Rata share, relative to all Allowed Term Loan Claims, of (i) the Subscription Rights to acquire New Money Preferred Equity or New Money Preferred Warrants (together, the "New Money Preferred Securities"), (ii) the New Take Back Preferred Equity or the New Take Back Preferred Warrants (together, the "New Take Back Preferred Securities") and (iii) the New Common Equity or the New Term Lender Warrants (together, the "New Term Lender Common Securities").

  The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Term Loan Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a taxable transaction or a tax-deferred transaction, such as an exchange governed by

86

Section 351 of the Code (a "Section 351 Exchange") or a "reorganization" within the meaning of Section 368 of the Code (a "Reorganization" and together with a Section 351 Exchange, a "Tax-Deferred Transaction"). Whether the transactions undertaken pursuant to the Plan constitute a taxable transaction or a Tax-Deferred Transaction will depend on the manner in which the Plan is implemented, the identity of the issuer of the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities and, in certain instances, whether the Allowed Term Loan Claims are "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. The Allowed Term Loan Claims had a term to maturity of five (5) years when issued. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor at the time of issuance, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. A U.S. Holder of Allowed Term Loan Claims should consult their own tax advisor to determine whether the Allowed Term Loan Claims should be treated as securities for U.S. federal income tax purposes.

While not free from doubt, the Debtors believe, and the following discussion assumes, that the New Term Lender Warrants, the New Take Back Preferred Warrants and the New Money Preferred Warrants should all be treated as "stock" for U.S. federal income tax purposes. In addition, as discussed below under "—Tax Treatment of Subscription Rights", the following discussion assumes unless otherwise indicated that the Subscription Rights are respected for U.S. federal income tax purposes as options to acquire the New Money Preferred Securities. Furthermore, for the reasons discussed below under "—Tax Treatment of New Take Back Preferred Securities and New Money Preferred Securities," the Reorganized Company intends to take the position that the New Take Back Preferred Securities will be treated as preferred stock, and that the New Money Preferred Securities will not be treated as preferred stock, for purposes of Section 351 of the Code. In addition, because of the redemption rights on the New Take Back Preferred Equity, the Reorganized Company believes that the New Take Back Preferred Securities should be treated as "nonqualified preferred stock."

      a.      Tax-Deferred Transaction

Whether the transactions contemplated by the Plan constitute a Tax-Deferred Transaction will depend on the manner in which the Plan is implemented, including the identity of the issuer of the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities and, in certain instances, whether the Allowed Term Loan Claims are treated as "securities" for U.S. federal income tax purposes. The classification of an exchange as a Tax-Deferred Transaction generally serves to defer the recognition of any gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain (but not loss) to

the extent the holder receives "boot" in the Tax-Deferred Transaction, i.e., consideration other than an instrument treated as stock of the exchanging company (in the case of a Section 351 Exchange) or consideration other than stock or securities of the exchanging company (in the case of a Reorganization). For this purpose, options such as the Subscription Rights are treated as securities. In addition, nonqualified preferred stock such as the New Take Back Preferred Securities are not treated as stock under the Section 351 Exchange rules, but are treated as stock or securities (when received in exchange for securities or other nonqualified preferred stock) for purposes of the Reorganization rules.  Accordingly, if the transactions undertaken pursuant to the Plan qualify as a Reorganization with respect to Allowed Term Loan Claims, because each such holder is expected to receive solely stock and securities permitted to be received and not boot, a U.S. Holder of Allowed Term Loan Claims generally will not recognize any gain or loss upon the exchange.  If the transactions undertaken pursuant to the Plan do not qualify as a Reorganization but do qualify as a Section 351 Exchange with respect to the Allowed Term Loan Claims, a U.S. Holder generally will recognize gain, but not loss, to the extent of the fair market value of the New Take Back Preferred Securities and the Subscription Rights.

If the exchange of Allowed Term Loan Claims for the consideration provided for in the Plan is a Reorganization and the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities are all treated as stock or securities and not boot, a U.S. Holder's aggregate tax basis in the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities received in respect of its Allowed Term Loan Claims (except to the extent received in respect of accrued but unpaid interest, which shall be treated as described below) should be equal to the U.S. Holder's tax basis in their Allowed Term Loan Claims.  Such aggregate tax basis should be allocated among the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities received in accordance with their relative fair market values. In that case, a U.S. Holder's holding period in the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities received will include its holding period in the Allowed Term Loan Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest (which shall be treated as described below).

If the exchange of Allowed Term Loan Claims for the consideration provided for in the Plan is not a Reorganization but qualifies as a Section 351 Exchange, a U.S. Holder's aggregate tax basis in the New Term Lender Common Securities received in respect of its Allowed Term Loan Claims (except to the extent received in respect of accrued but unpaid interest, which shall be treated as described below) should be equal to the U.S. Holder's tax basis in their Allowed Term Loan Claims, decreased by the fair market value of the New Take Back Preferred Securities and the Subscription Rights and increased by any gain recognized in the Section 351 Exchange. A U.S. Holder's tax basis in the New Take Back Preferred Securities and the Subscription Rights should be equal to the fair market value of such New Take Back Preferred Securities and Subscription Rights.  A U.S. Holder's holding period in the New Term Lender Common Securities received will include the applicable portion of such U.S. Holder's holding period in the Allowed Term Loan Claim exchanged therefor, except to the extent received in respect of accrued but unpaid interest (which shall be treated as described below).  A U.S. Holder's holding period in the New Take Back Preferred Securities should begin on the day following the Effective Date.

Regardless of whether the exchange is treated as a Tax-Deferred Transaction, a U.S. Holder will have taxable interest income to the extent of any consideration allocable to accrued but unpaid interest or original issue discount not previously included in income as more fully described below under "—Accrued Interest," which amounts will not be included in the amount realized with respect to a U.S. Holder's Claim.

For a discussion of the tax treatment of the exercise or lapse of the Subscription Rights, see "—Tax Treatment of Subscription Rights" below.

### b.      Taxable Transaction

If the transactions undertaken pursuant to the Plan do not constitute a Tax-Deferred Transaction with respect to a U.S. Holder of an Allowed Term Loan Claim, a U.S. Holder of an Allowed Term Loan Claim would be treated as exchanging such Claims for the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities in a fully taxable transaction.  A U.S. Holder of an Allowed Term Loan Claim who is subject to this treatment should recognize gain or loss equal to the difference between the fair market value of the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities received (other than any consideration received in respect of accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Claim immediately prior to the exchange. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Term Loan Claim  in such U.S. Holder's hands, whether the Allowed Term Loan Claim  was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Term Loan Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Term Loan Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for its Allowed Term Loan Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See "—Accrued Interest" and "—Market Discount", below.

If the exchange is a taxable transaction, a U.S. Holder's tax basis in the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities received in respect of its Allowed Term Loan Claims should be equal to the fair market value of the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities.  A U.S. Holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

For a discussion of the tax treatment of the exercise or lapse of the Subscription Rights, see "—Tax Treatment of Subscription Rights" below.

### c.      Accrued Interest

Regardless of whether the exchange constitutes a Tax-Deferred Transaction or a taxable transaction, to the extent that any amount received by a U.S. Holder of a surrendered Allowed Term Loan Claim is attributable to accrued but unpaid interest on the debt instruments constituting

the surrendered Allowed Term Loan Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed Term Loan Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Term Loan Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration received in respect of Allowed Term Loan Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Term Loan Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

d.      Market Discount

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of an Allowed Term Loan Claim who receives consideration pursuant to the Plan in satisfaction of their Allowed Term Loan Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the Allowed Term Loan Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Term Loan Claim acquired with market discount should generally be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Term Loan Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Term Loan Claims that were acquired with market discount are exchanged in a Reorganization, any market discount that accrued on the Allowed Term Loan Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the Subscription Rights, the New Take Back Preferred Securities and the New Term Lender Common Securities is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the Allowed Term

90

Loan Claims. If, however, the Allowed Term Loan Claims that were acquired with market discount are exchanged in a Section 351 Exchange, it is unclear whether the U.S. Holder will be required to recognize any market discount that accrued on the Allowed Term Loans Claims (i.e., up to the time of the exchange) to the extent of any deemed gain.

U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the exchange of Allowed Term Loan Claims that were acquired with market discount pursuant to the Plan.

      2.      Tax Treatment of Subscription Rights

The characterization of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes – as simply the exercise of options to acquire the underlying New Money Preferred Securities (i.e., new stock) or, alternatively, as an integrated transaction pursuant to which a portion of the underlying new stock acquired in connection with the exercise of the Subscription Rights is treated as acquired directly in partial satisfaction of a holder's Allowed Term Loan Claim – is uncertain.

Regardless of the characterization of the Subscription Rights, a U.S. Holder of Subscription Rights generally would not recognize any gain or loss upon the exercise of such Subscription Rights. A U.S. Holder's aggregate tax basis in the New Money Preferred Securities received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the New Money Preferred Securities and (ii) the holder's tax basis, if any, in either (a) the Subscription Rights, or (b) under an integrated transaction analysis, any New Money Preferred Securities received pursuant to the exercise of a Subscription Right to the extent that they are treated as directly acquired in partial satisfaction of the holder's Allowed Term Loan Claim. A U.S. Holder's holding period in the New Money Preferred Securities received upon exercise of a Subscription Right generally should commence the day following the exercise of the Subscription Right, unless the Subscription Right is disregarded and the holder is instead treated as receiving for its Allowed Term Loan Claim a portion of the New Money Preferred Securities acquired equal in value to the value of the Subscription Rights. In the latter event, if the receipt of the New Money Preferred Securities was part of a Tax-Deferred Transaction, the U.S. Holder could have a holding period in the portion of New Money Preferred Securities having a value equal to the Subscription Rights that includes its holding period in the Allowed Term Loan Claims deemed exchanged directly for such New Money Preferred Securities (and the period up to the date of exercise of the Subscription Rights). In addition, if either the Subscription Rights or, under an integrated transaction analysis, a portion of the New Money Preferred Securities acquired in connection with the exercise of Subscription Rights are treated as received as part of a Reorganization or possibly a Section 351 Exchange, any gain recognized upon a subsequent disposition of the New Money Preferred Securities treated as received in exchange for the Allowed Term Loan Claim may be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income (see "—Market Discount" above).

It is uncertain whether a U.S. Holder that does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Allowed Term Loan Claim. If the U.S. Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the U.S. Holder generally would recognize a loss

91

to the extent of the U.S. Holder's tax basis in the Subscription Right. In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which in the case of a Reorganization, even if the right goes unexercised, should include the holding period of the Allowed Term Loan Claim exchanged therefor).

       3.      Consequences to U.S. Holders of Allowed Interests in Finn Holding

Pursuant to the Plan, in full and final satisfaction, settlement, release and discharge of, and in exchange for the Allowed Interests in Finn Holding, each holder thereof will receive, or a subsidiary of such holder will receive, its Pro Rata share of the New Sponsor Warrants (together with the New Term Loan Common Securities, the "New Common Securities"). The U.S. federal income tax treatment for Finn Holdings and the holders of an Interest in Finn Holdings will depend on the manner in which the Plan is implemented, the identity of the issuer of the New Sponsor Warrants, the tax characterization of the New Sponsor Warrants, and whether the New Sponsor Warrants are treated as received for an existing equity interest in the issuer of the New Sponsor Warrants, other property or for some other purpose. The manner in which the Plan will be implemented has not yet been determined. In addition, while not free from doubt, the Debtors believe, and the following discussion assumes, that the New Sponsor Warrants should be treated as "stock" for U.S. federal income tax purposes.

The U.S. federal income tax consequences of the Plan to Finn Holding and U.S. Holders of Allowed Interests in Finn Holding will depend, in part, on whether the receipt of the New Sponsor Warrants constitutes a taxable transaction or a tax-deferred transaction for the U.S. Holder(s) receiving New Sponsor Warrants. If the transaction is a tax-deferred transaction for the recipient of the New Sponsor Warrants, neither Finn Holding nor a U.S. Holder of Allowed Interests in Finn Holding generally will recognize any gain or loss upon the exchange. In such case, the tax basis in the New Sponsor Warrants received should be equal to the tax basis in property exchanged therefor, and the holding period in the New Sponsor Warrants will include the holder's holding period in the property exchanged therefor. If the transaction is a taxable transaction, the receipt of the New Sponsor Warrants should be a taxable event for a recipient of such warrants, in which case a U.S. Holder receiving the New Sponsor Warrants should recognize gain or loss equal to the difference between the fair market value of the New Sponsor Warrants and such U.S. Holder's adjusted tax basis in the surrendered property immediately prior to the exchange. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder and the nature of the exchanged property in such U.S. Holder's hands. If recognized gain is capital gain, it generally would be long-term capital gain if the property treated as sold was held for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. If the exchange is a taxable transaction, a holder's tax basis in the New Sponsor Warrants received should be equal to the fair market value of the New Sponsor Warrants, and a holder's holding period for the New Sponsor Warrants should begin on the day following the Effective Date. If all or portion of the New Sponsor Warrants are treated as transferred in exchange for something other than property, the recipient may have ordinary income equal to the fair market value of the New Sponsor Warrants at issuance.

4.    Tax Consequences of Owning New Common Securities

a.    Distributions on New Common Securities

Any distributions (including distributions of New Common Equity Anti-Dilution Warrants (as defined in the Plan Term Sheet)) made on account of New Common Securities will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Company, as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain which will be treated as long-term capital gain if such U.S. Holder's holding period in its New Common Securities exceeds one year as of the date of the distribution.  A U.S. Holder's basis in any New Common Equity Anti-Dilution Warrant received will be equal to its fair market value.

Amounts treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

b.    Potential Constructive Dividends on New Common Securities

Under Section 305 of the Code, a repurchase, redemption or other transaction with respect to New Preferred Equity that is treated as a distribution on the New Preferred Equity that is taxable as a dividend (as discussed below under "—Sale, Redemption or Repurchase of New Take Back Preferred Securities and New Money Preferred Securities") may have the effect of increasing a New Common Security holder's interest in the Reorganized Company's assets or earnings and profits, which may, in some circumstances, result in a deemed distribution to such holder of a New Common Security. U.S. Holders should consult their tax advisors as to the tax consequences of receiving constructive dividends.

c.    Sale, Redemption or Repurchase of New Common Securities

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Securities. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period in the New Common Securities is more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. In certain circumstances, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Term Lender Common Securities as ordinary income if such U.S. Holder

93

took a bad debt deduction with respect to its Allowed Term Loan Claims or recognized an ordinary loss on the exchange of its Allowed Term Loan Claims for New Term Lender Common Securities.

As discussed above under "—Market Discount", in the case of any loan underlying an Allowed Term Loan Claim that was acquired at a "market discount" and subject to Tax-Deferred Transaction treatment, the Code indicates that any accrued market discount in respect of such portion of the Allowed Term Loan Claim that is not currently includible in income should carry over to any nonrecognition property received in exchange therefor (e.g., the New Term Lender Common Securities and other instruments issued pursuant to the Plan). Accordingly, any gain recognized by a holder upon a subsequent disposition of such New Term Lender Common Securities would be treated as ordinary income to the extent of such New Term Lender Common Securities' allocable portion of any accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

      d.      Conversion of New Term Lender Warrants and New Sponsor Warrants to New Common Equity and Conversion of Common Equity Anti-Dilution Warrants to Demand Notes

The conversion of New Term Lender Warrants or New Sponsor Warrants to New Common Equity should generally be a tax-free exchange, with the result that the basis and holding period of the New Term Lender Warrants or New Sponsor Warrants, as applicable, in the hands of the converting U.S. Holder transfer to the New Common Equity, other than any portion of the New Common Equity purchased for cash.

The conversion of a Common Equity Anti-Dilution Warrant to a non-interest bearing demand note should generally be a tax-free exchange, with the result that the basis and holding period of the Common Equity Anti-Dilution Warrant in the hands of the converting U.S. Holder transfer to the non-interest bearing demand note.

    5.      Tax Consequences of Owning New Take Back Preferred Securities and New Money Preferred Securities

      a.      Tax Treatment of New Take Back Preferred Securities and New Money Preferred Securities

Section 305 of the Code provides special rules for the tax treatment of preferred stock. According to the Treasury Regulations promulgated under that section, the term preferred stock generally refers to stock that, in relation to other classes of stock outstanding, enjoys certain limited rights and privileges that are generally associated with specified dividend and liquidation priorities, but does not participate in corporate growth to any significant extent. The determination of whether stock constitutes preferred stock for purposes of Section 305 of the Code depends in large part upon whether the stock participates significantly in corporate growth (such stock colloquially being referred to as "participating preferred stock"). Participating preferred stock is generally not treated as preferred stock for purposes of Section 305 of the Code and, accordingly, certain of the deemed distribution provisions of Section 305 of the Code are generally inapplicable to such stock.

The treatment of the New Take Back Preferred Securities and the New Money Preferred Securities under Section 305 of the Code is subject to uncertainty. The Reorganized Company intends to take the position that the New Take Back Preferred Securities will be treated as preferred stock for purposes of Section 305 of the Code and that the New Money Preferred Securities will not be treated as preferred stock for purposes of Section 305 of the Code.  That treatment is uncertain and the tax consequences described herein could be materially different if such tax treatment is challenged. The remainder of this discussion assumes the correctness of such treatment.

b.      Distributions on New Take Back Preferred Securities and New Money Preferred Securities

Any distributions (including distributions of Take Back Preferred Anti-Dilution Warrants or New Money Preferred Anti-Dilution Warrants (each, as defined in the Plan Term Sheet and, together with the New Common Equity Anti-Dilution Warrants, the "Anti-Dilution Warrants")) made on account of New Take Back Preferred Securities or New Money Preferred Securities will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Company, as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed the Reorganized Company's current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain which will be treated as long-term capital gain if such U.S. Holder's holding period in its New Take Back Preferred Securities or New Money Preferred Securities, as applicable, exceeds one year as of the date of the distribution.  A U.S. Holder's basis in any Take Back Preferred Anti-Dilution Warrant or New Money Preferred Anti-Dilution Warrant received will be equal to its fair market value.

Amounts treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

c.      Potential Constructive Dividends on New Take Back Preferred Equity

Because the New Take Back Preferred Equity is expected to be treated as preferred stock under Section 305 of the Code, there may be deemed distributions that result under Section 305, including with respect to accruing yield and on account of any preferred OID (i.e., the excess, if any, of the redemption price of the New Take Back Preferred Equity over the issue price of the New Take Back Preferred Equity, which is expected to be its fair market value at issuance) on the New Take Back Preferred Equity that is more than *de minimis*.  Any preferred OID on the New Take Back Preferred Equity will generally be required to be recognized as a dividend over the term

95

of the New Take Back Preferred Equity on a constant-yield-to-maturity basis to the extent of the Reorganized Company's earnings and profits. The Reorganized Company intends to take the position that stated yield on the New Take Back Preferred Equity is not a dividend unless and until such yield is declared, however, that treatment is uncertain and, if challenged, could result in different tax consequences than described herein.

           d.        Conversion of New Money Preferred Equity to New Common Equity

Subject to the discussion immediately below, the conversion of New Money Preferred Equity to New Common Equity should generally be a tax-free exchange, with the result that the basis and holding period of the New Money Preferred Equity in the hands of the converting U.S. Holder transfer to the New Common Equity.

If, however, there are dividends in arrears on the New Money Preferred Equity and the fair market value of the New Common Equity received (determined immediately following the recapitalization) exceeds the issue price of the New Money Preferred Equity surrendered, then conversion may result in a deemed distribution if (i) the conversion is "pursuant to a plan to periodically increase a shareholder's proportionate interest in the assets or earnings and profits of the corporation" or (ii) the New Money Preferred Equity constitutes preferred stock for purposes of Section 305 of the Code. There is significant uncertainty with respect to whether clause (i) would apply to a conversion of the New Money Preferred Equity. In the event clause (ii) applied to such conversion, a converting holder would be treated as receiving a deemed distribution in an amount equal to the lesser of (x) the amount of the dividends in arrears and (y) the excess of (1) the fair market value of the New Common Equity (determined immediately following the recapitalization) over (2) the issue price of the New Money Preferred Equity surrendered, in each case, to the extent of the current or accumulated earnings and profits of the Reorganized Company as determined under U.S. federal income tax principles. Receipt of cash in connection with accrued dividends in arrears with respect to New Money Preferred Equity at the time New Money Preferred Equity is converted into New Common Equity will also generally be treated as a distribution with respect to such stock, which distribution may be taxable at such time, as described above.

   U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of converting the New Money Preferred Equity.

           e.        Sale, Redemption or Repurchase of New Take Back Preferred Securities and New Money Preferred Securities

Subject to the discussion below regarding redemptions of the New Preferred Equity, unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale or other taxable disposition of the New Take Back Preferred Securities or New Money Preferred Securities. Such capital gain will be long-term capital gain if at the time of the sale or other taxable disposition, the U.S. Holder's holding period in the New Take Back Preferred Securities or New Money Preferred Securities, as applicable, is more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. In certain circumstances, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Take

Back Preferred Securities or New Money Preferred Securities, as applicable, as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Term Loan Claims or recognized an ordinary loss on the exchange of its Allowed Term Loan Claims for the New Take Back Preferred Securities or New Money Preferred Securities, as applicable.

As discussed above under "—Market Discount", in the case of any loan underlying an Allowed Term Loan Claim that was acquired at a "market discount" and subject to Tax-Deferred Transaction treatment, the Code indicates that any accrued market discount in respect of such portion of the Allowed Term Loan Claim that is not currently includible in income should carry over to any nonrecognition property received in exchange therefor (e.g., the New Take Back Preferred Securities, the New Money Preferred Securities and other instruments issued pursuant to the Plan). Accordingly, any gain recognized by a holder upon a subsequent disposition of such New Take Back Preferred Securities or New Money Preferred Securities, as applicable, would be treated as ordinary income to the extent of such New Take Back Preferred Securities' or New Money Preferred Securities' allocable portion of any accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

A full or partial redemption of or other payment on the New Preferred Equity will be treated as a distribution taxable as a dividend to holders of the New Preferred Equity to the extent of the Reorganized Company's current or accumulated earnings and profits, unless it can be satisfactorily established that, for U.S. federal income tax purposes, (i) the redemption is "not essentially equivalent to a dividend," (ii) the redemption results in a "complete termination" of the holder's interest in all of the instruments treated as stock of the Reorganized Company (both preferred and common) or (iii) the redemption is "substantially disproportionate" with respect to the holder, all within the meaning of Section 302(b) of the Code. In any such case where one of these requirements are met, the redemption will be subject to U.S. federal income tax in the manner described above with respect to sales and other taxable dispositions generally. A redemption of the New Preferred Equity that is treated as a distribution taxable as a dividend will be subject to U.S. federal income tax in the manner described above under "—Distributions on New Preferred Equity."

In addition, under Section 305 of the Code, a redemption of New Preferred Equity that is treated as a distribution taxable as a dividend to a holder of New Preferred Equity may have the effect of increasing a New Money Preferred Security holder's interest in the Reorganized Company's assets or earnings and profits, which may, in some circumstances, result in a deemed distribution to such holder. U.S. Holders should consult their tax advisors as to the tax consequences of receiving constructive dividends.

       f.      Conversion of New Take Back Preferred Warrants and New Money Preferred Warrants to New Preferred Equity and Conversion of Take Back Preferred Anti-Dilution Warrants and New Money Preferred Anti-Dilution Warrants to Demand Notes

The conversion of New Take Back Preferred Warrants and New Money Preferred Warrants to New Preferred Equity should generally be a tax-free exchange, with the result that the basis and holding period of the New Take Back Preferred Warrants or New Money Preferred Warrants, as

applicable, in the hands of the converting U.S. Holder transfer to the New Preferred Equity, other than any portion of the New Preferred Equity purchased for cash. However, if there are any dividends in arrears on the New Take Back Preferred Warrants at the time of conversion, a U.S. Holder may be deemed to receive a constructive distribution under Section 305 of the Code in the amount of such dividends in arrears, which will be taxable as a dividend to the extent of the current or accumulated earnings and profits of the Reorganized Company as determined under U.S. federal income tax principles.

The conversion of a Take Back Preferred Anti-Dilution Warrant or a New Money Preferred Anti-Dilution Warrant, as applicable, to a non-interest bearing demand note should generally be a tax-free exchange, with the result that the basis and holding period of the New Take Back Preferred Anti-Dilution Warrant or a New Money Preferred Anti-Dilution Warrant, as applicable, in the hands of the converting U.S. Holder transfer to the non-interest bearing demand note.

6. Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses will be subject to limits on their use of capital losses. For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year. Noncorporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

C. *Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Term Loan Claims and Allowed Interests in Finn Holding*

1. Gain Recognition

Whether the satisfaction of an Allowed Term Loan Claim or an Allowed Interest in Finn Holding is a taxable event or not will be determined as noted above under the discussion relevant to U.S. Holders. To the extent that the Restructuring is treated as a taxable exchange or otherwise results in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a Non-U.S. Holder on the exchange of its Allowed Term Loan Claims or Allowed Interests in Finn Holding, as applicable, generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or applicable successor form). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

    2.      Accrued Interest

Subject to the discussion below under "—FATCA" and "—Information Reporting and Backup Withholding," payments to a Non-U.S. Holder that are attributable to accrued but unpaid interest on the loans constituting the surrendered Allowed Term Loan Claim generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Debtor stock entitled to vote;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the Code);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Code; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but unpaid interest on the Allowed Term Loan Claims that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but unpaid interest. For purposes of providing a properly

executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail, the Plan provides that the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Allowed Claims, if any.  The IRS could take the position that the consideration received by a Non-U.S. Holder should be allocated in some way other than as provided in the Plan. Non-U.S. Holders of Allowed Term Loan Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

    3.       Tax Consequences of Owning New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities

        a.       Distributions on New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities

Any distributions (including constructive distributions as described above under "—Potential Constructive Dividends on New Common Equity," "—Potential Constructive Dividends on New Take Back Preferred Equity" and "—Conversion of New Money Preferred Equity to New Common Equity" and any Anti-Dilution Warrants) made on account of New Common Securities, New Take Back Preferred Securities or New Money Preferred Securities will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Company, as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of the Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; see "—Sale, Redemption or Repurchase of New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities" below).

Subject to the discussion below under "—FATCA" and "—Information Reporting and Backup Withholding" and except as described below, dividends paid with respect to New Common Securities, New Take Back Preferred Securities or New Money Preferred Securities held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). In the case of any constructive dividend to a Non-U.S. Holder, any such tax may be withheld from other amounts payable to a Non-U.S. Holder, including, but not limited to, distributions of cash or stock or sales proceeds subsequently paid or credited to, or other funds or assets of, such Non-U.S. Holder. A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a Non-U.S. person and its entitlement to the lower

treaty rate or exemption from tax with respect to such payments. If the Reorganized Company is required to pay any withholding taxes in connection with any dividends (including constructive or deemed dividends) allocable to a Non-U.S. Holder, including in connection with the distribution of an Anti-Dilution Warrant, the Reorganized Company may reduce other payments or amounts owing to the Non-U.S. Holder, including reducing the principal amount of any non-interest bearing demand note for which an Anti-Dilution Warrant is exercisable, on account of such payment.

Dividends paid (including constructive or deemed dividends) with respect to New Common Securities, New Take Back Preferred Securities or New Money Preferred Securities held by a Non-U.S. Holder that are effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

b.     Conversion of New Money Preferred Equity to New Common Equity

The characterization of the conversion of New Money Preferred Equity to New Common Equity for a Non-U.S. Holder will generally be the same as for a U.S. Holder, as described above, and any dividend income that a Non-U.S. Holder is treated as realizing as a result of the conversion of New Money Preferred Equity to New Common Equity will be subject to the same withholding and information reporting regimes described above with respect to distributions to a Non-U.S. Holder on the New Common Equity and New Preferred Equity. As a condition to a conversion elected by the holders, the Reorganized Company may require Non-U.S. Holders to fund any required withholdings with respect to any amounts treated as dividends in connection with such conversion.

c.     Sale, Redemption or Repurchase of New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities

Subject to the discussion below regarding redemptions of the New Preferred Equity and under "—Information Reporting and Backup Withholding," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of New Common Securities, New Take Back Preferred Securities or New Money Preferred Securities unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the Reorganized Company is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Securities, New Take Back Preferred Securities or New Money Preferred Securities, as applicable. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). The Debtors consider it unlikely, based on the current business plans and operations, that the Reorganized Company will become a "U.S. real property holding corporation" in the future.

As discussed above under "—Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Term Loan Claims and Allowed Interests in Finn Holding," a full or partial redemption of or other payment on the New Preferred Equity will generally be treated as a distribution taxable as a dividend to the extent of the Reorganized Company's current or accumulated earnings and profits unless it can be satisfactorily established that, for U.S. federal income tax purposes, (i) the redemption is "not essentially equivalent to a dividend," (ii) the redemption results in a "complete termination" of the holder's interest in the stock (both preferred and common) of the Reorganized Company or (iii) the redemption is "substantially disproportionate" with respect to the holder, all within the meaning of section 302(b) of the Code. In such event, any amount constituting a dividend for U.S. federal income tax purposes generally would be subject to U.S. federal withholding tax at a rate of 30%, or such lower rate as may be specified by an applicable income tax treaty, unless such dividend is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). A withholding agent (which may include the Reorganized Company) might not make a determination as to whether the cash received upon redemption or other payment is subject to such withholding, including because the application of Section 302 of the Code will depend on a Non-U.S. Holder's particular circumstances. Accordingly, withholding agents may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the entire amount of the redemption amount or other payment made to such Non-U.S. Holder, unless (1) the withholding agent has established special procedures allowing Non-U.S. Holders to certify that they are exempt from such withholding tax and (2) such Non-U.S. Holders are able to certify that they meet the requirements of such exemption (e.g., because such Non-U.S. Holders are not treated as receiving a dividend under the Section 302 tests described above). However, there can be no assurance that a withholding agent will establish such special certification procedures. If a withholding agent withholds excess amounts from the cash consideration so payable to a Non-U.S. Holder, such Non-U.S. Holder may obtain a refund of any such excess amounts by timely filing an appropriate claim with the IRS. Non-U.S. Holders should consult their own tax advisors regarding the application of the foregoing rules in light of their particular facts and circumstances, the

procedures for claiming treaty benefits or otherwise establishing an exemption from U.S. withholding tax with respect to payments received in redemption of their New Preferred Equity.

In addition, under Section 305 of the Code, a redemption of New Preferred Equity that is treated as a distribution taxable as a dividend may have the effect of increasing a New Money Preferred Security holder's or New Common Security holder's interest in the Reorganized Company's assets or earnings and profits, which may, in some circumstances, result in a deemed distribution to such holder. Such a deemed distribution would be treated as described above under "—Distributions on New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities" for Non-U.S. Holders.  Non-U.S. Holders should consult their tax advisors as to the tax consequences of receiving constructive dividends.  If the Reorganized Company is required to pay any withholding taxes in connection with any constructive dividends allocable to a Non-U.S. Holder, the Reorganized Company may reduce other payments or amounts owing to the Non-U.S. Holder on account of such payment.

> d.    Conversion of New Term Lender Warrants to New Common Equity, Conversion of New Take Back Preferred Warrants and New Money Preferred Warrants to New Preferred Equity and Conversion of Anti-Dilution Warrants for Demand Notes

The characterization of the conversion of New Money Preferred Equity to New Common Equity, and of the conversion of New Take Back Preferred Warrants and New Money Preferred Warrants to New Preferred Equity, for a Non-U.S. Holder will generally be the same as for a U.S. Holder, as described above, and any dividend income that a Non-U.S. Holder realizes as a result of such conversion will be subject to the same withholding and information reporting regimes described above with respect to distributions on the New Common Equity and New Preferred Equity.  The Reorganized Company may require a Non-U.S. Holder to fund any required withholdings with respect to any amounts treated as dividends in connection with a conversion as a condition to the conversion.

The conversion of an Anti-Dilution Warrant for a non-interest bearing demand note should generally be a tax-free exchange, with the result that the basis and holding period of the Anti-Dilution Warrant in the hands of the converting Non-U.S. Holder transfer to the non-interest bearing demand note.

D.    *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including any dividends (including constructive dividends) on the New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of the FATCA withholding rules on such Non-U.S. Holder's ownership of New Common Securities, New Take Back Preferred Securities and New Money Preferred Securities.

E.      *Information Reporting and Backup Withholding*

The Debtors and the Reorganized Company will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Code. In general, information reporting requirements may apply to distributions or payments made to a holder under the Plan or with respect to their New Common Securities, New Take Back Preferred Securities or New Money Preferred Securities. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Restructuring would be subject to these regulations and require disclosure on the holders' tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE RESTRUCTURING TRANSACTIONS ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**SECTION IX.**
**CERTAIN FEDERAL AND STATE SECURITIES LAW**
**CONSIDERATIONS**

The issuance of, and the distribution under, the Plan of the New Take Back Preferred Equity, New Take Back Preferred Warrants, the New Common Equity and the New Term Lender Warrants on account of Allowed Term Loan Claims pursuant to Article III.B.4 of the Plan (the "1145 Securities") will be exempt from registration under section 5 of the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code (to the extent available). Subscription Rights, New Money Preferred Equity and New Money Preferred Warrants issued pursuant to the Rights Offering (including and any Unsubscribed Shares purchased pursuant to the Backstop Commitment Agreement), as payment of the Backstop Commitment Premium, the DIP Conversion Discount (as defined in the Term Loan DIP Credit Agreement), or the DIP Backstop Premium (as defined in the Term Loan DIP Credit Agreement), in connection with the conversion of the Term Loan DIP Facility to New Money Preferred Equity or New Money Preferred Warrants, as applicable, and the New Sponsor Warrants (collectively, the "4(a)(2) Securities") will be exempt under Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, another available exemption, from registration under the Securities Act. Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

A.      *1145 Securities*

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim against, or interest in, a debtor with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution and under an agreement in

105

connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

B.      *Private Placement*

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.

ACL believes that the 4(a)(2) Securities to be issued pursuant to the Plan and as described in the first paragraph in this Section are issuable without registration under the Securities Act in reliance the exemption from registration provided under Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Only 4(a)(2) Eligible Holders that are institutional "accredited investors" (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act) or "qualified institutional buyers" (within the meaning of Rule 144A of the Securities Act) and complete and return the Investor Questionnaire to the Rights Offering Subscription Agent will be eligible to participate in the Rights Offering. The 4(a)(2) Securities will be "restricted securities" (within the meaning of Rule 144), subject to the transfer restrictions applicable thereto. Such securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act and who has not been an affiliate of the issuer during the

90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a brokers' transaction (within the meaning of section 4(a)(4) of the securities act), directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

ACL believes that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. It is currently contemplated that the Reorganized Debtors will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act.

In addition to the foregoing, all transfers of New Common Equity, New Warrants, and New Preferred Equity will be subject to the transfer provisions and other applicable provisions set forth in the New Organizational Documents, the Shareholder Agreement and the Warrants Agreement, as applicable.

\* \* \* \* \*

*Legends*. To the extent certificated or issued by way of direct registration on the records of the Reorganized Debtors' transfer agent, certificates evidencing the New Common Equity held by holders of 10% or more of the outstanding New Common Equity, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all 4(a)(2) Securities will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED

107

STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree, pursuant to and to the extent set forth in the applicable Rights Offering subscription form, that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under or in connection with the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## SECTION X.
## RISK FACTORS

The implementation of the Plan and the issuance and distribution of the New Preferred Equity, New Common Equity, and New Warrants are subject to a number of material risks, including those summarized below. However, this summary of risks and considerations is not exhaustive. Prior to deciding whether and how to vote on the Plan, holders of Claims or Interests entitled to vote should read and consider carefully all of the information in the Plan and this Disclosure Statement, as well as all other information referenced or incorporated by reference into this Disclosure Statement.

These risk factors contain certain statements that are "forward-looking statements." These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of ACL, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, the effect of the reorganization on customers, suppliers, and vendors, adverse weather conditions, fluctuations in raw material prices and other costs, barge oversupply conditions, aging infrastructure, the American political climate, the consumption of durable and nondurable goods, the degree and nature of competition, increases in insurance costs, changes in government regulations, changes in the application or interpretation of those regulations, changes in the systems, personnel, technologies, or other resources ACL devotes to compliance with regulations, ACL's ability to complete acquisitions and successfully integrate the operations of acquired businesses, terrorist actions or acts of war, operating efficiencies, property tax assessments, and other market and competitive conditions. Holders of Claims and Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements. No party, including, without limitation, ACL or the Reorganized Debtors, undertakes an obligation to update any such statements.

A.    *Certain Bankruptcy Law Considerations*

**ACL cannot predict the amount of time needed in chapter 11 to implement the Plan, and lengthy chapter 11 cases could disrupt its businesses, as well as impair prospects for reorganization on terms contained in the Plan and possibly provide an opportunity for other plans to be proposed**

ACL cannot be certain that the Chapter 11 Cases, commenced solely for the purpose of implementing the Plan, would be of relatively short duration (e.g., 45 to 65 days) and would not unduly disrupt its businesses. It is impossible to predict with certainty the amount of time needed in bankruptcy, and ACL cannot be certain that the Plan will be confirmed. Moreover, the Bankruptcy Code limits the time during which a debtor has an exclusive right to file a plan before other proponents can propose and file their own plan.

Lengthy chapter 11 cases would also involve additional expenses and divert the attention of management from operation of the businesses, as well as create concerns for personnel, vendors, suppliers, service providers, and customers. The disruption that lengthy chapter 11 cases would inflict upon ACL's businesses would increase with the length of time needed to complete the Restructuring, and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including suppliers, service providers, vendors, personnel, and customers. Significant delay may result in the termination of the Restructuring Support Agreement or the DIP Facilities due to missed milestones, other termination events, or other applicable events of default, to the extent ACL is unable to obtain waivers or amendments from the relevant Consenting Term Lenders, ABL DIP Facility Lenders, or Term Loan DIP Facility Lenders, as applicable.

If ACL is unable to obtain confirmation of the Plan on a timely basis for any reason, ACL may be forced to operate in chapter 11 for an extended period while trying to develop a different chapter 11 plan that can be confirmed. Protracted chapter 11 cases would increase both the probability and the magnitude of the adverse effects described above.

***ACL may be unable to obtain confirmation of the Plan***

Although ACL believes that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the re-solicitation of votes on the Plan.

If the Plan is not confirmed, there can be no assurance the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan.  If a liquidation or protracted reorganization of ACL's bankruptcy estates were to occur, there is a substantial risk that ACL's going-concern value would be substantially eroded to the detriment of all stakeholders.

***The Effective Date may not occur***

Although ACL believes the Effective Date may occur shortly after the Confirmation Date, there can be no assurance as to such timing.  The occurrence of the Effective Date is also subject to certain conditions precedent as set forth in Article IX of the Plan.  Failure to meet any of these conditions could result in the Plan not being consummated.

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement shall:  (a) constitute a waiver or release of any claims by ACL, any holders of Claims or Interests (including the Consenting Term Lenders), or any other Entity; (b) prejudice in any manner the rights of ACL, any holders of Claims or Interests (including the Consenting Term Lenders), or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by ACL, any holders of Claims or Interests (including the Consenting Term Lenders), or any other Entity, in any respect.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan.  If a liquidation or protracted reorganization of ACL's Estates were to occur, there is a substantial risk that ACL's going-concern value would be eroded to the detriment of all stakeholders.

***ACL may be unsuccessful in obtaining first-day orders to authorize certain requested relief***

There can be no guaranty that ACL will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize certain requested "first day" relief, including but not limited to, payment of accounts payable to certain creditors in the ordinary course of business, payment of employees and employee benefits, and authorization to use existing cash management systems.  As a result, ACL may be unable to make certain prepetition payments to customers, vendors, suppliers, service providers, other creditors, and various employees, in which case ACL's businesses may suffer.

10442820v1

*Risk of Termination of the Restructuring Support Agreement*

The Restructuring Support Agreement contains certain provisions that give the Consenting Term Lenders the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact ACL's relationships with, among others, vendors, suppliers, employees, and major customers.

*Risks Related to Possible Objections to the Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although ACL believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

*Projections, Estimates, and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained in this Disclosure Statement contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, including but not limited to (i) the aggregate amounts of Claims in the various Classes, and (ii) the estimated recoveries by holders of Allowed or Unimpaired Claims or Interests, and such projections and estimates should not be considered assurances or guarantees of the amount of assets that will ultimately be available for distribution on the Effective Date or the amount of Claims in the various Classes that might be Allowed or Unimpaired.  In addition, if the actual amount of Allowed Claims or Interests are greater than ACL's estimates, ACL may be unable to pay or otherwise satisfy those Claims and other Claims in accordance with the terms of the Plan.

B.      *Business-Related Risks*

**The announcement of the Restructuring could adversely affect the value of ACL's businesses**

It is possible that announcement of the Restructuring or the filing of the Chapter 11 Cases could adversely affect ACL's operations and relationships with third-parties.  Due to uncertainties, many risks exist, including the following:

- customers could switch to competitors;

- personnel may be distracted from performance of their duties or more easily attracted to other employment opportunities, including with ACL's competitors;

- customers may delay making payments;

- although the Plan provides for payment in full of General Unsecured Claims, general unsecured creditors may suspend or terminate their relationship with ACL,

exercise rights of set-off or similar remedies, further restrict ordinary credit terms, or require guarantee of payment;

- vendors and customers could terminate their relationship or require financial assurances or enhanced performance;

- trade creditors could require payment in advance or cash on delivery;

- the ability to renew existing contracts and compete for new business may be adversely affected;

- competitors may take business away from ACL; and

- insurance policies may be more difficult or expensive to obtain.

A delay in completing the Restructuring may result in the same adverse consequences.  The occurrence of one or more of these events could have a material and adverse effect on the financial condition, operations, and prospects of ACL and the value of its existing interests and debt.

***ACL is subject to adverse weather and river conditions, including droughts, floods and marine incidents.***

ACL's barging operations are affected by weather and river conditions. Adverse weather conditions such as high or low water, fog, ice, tropical storms and hurricanes can adversely affect the operating conditions on the Inland Waterways. For example, the Upper Mississippi River is closed annually from approximately mid-December to mid-March as that section of river is generally ice-covered during that period, and ice conditions can hamper navigation on the upper reaches of the Illinois River during the winter months. When ACL is forced to operate in such conditions, its repair and other operating costs typically increase. During hurricane season in the summer and early fall ACL may be subject to revenue loss, business interruptions, and equipment and facilities damage, particularly in the Gulf of Mexico region. In addition, adverse river conditions can result in lock closures as well as affect towboat speed, tow size, loading drafts, and fleet efficiency, place limitations on night passages and dictate horsepower requirements. Terminals may also experience property damage and operational interruptions as a result of weather or river conditions. Extended periods of adverse weather conditions, such as the historic flooding the Mississippi River experienced during 2019, can result in higher operating costs and reduced revenue generating capacity within ACL's barge fleet.  Marine incidents involving others' vessels or terminals may impact ACL's ability to efficiently operate on the Inland Waterways. Such accidents, particularly those involving hazardous materials, spills or vessel sinkings, can effectively close sections of the Inland Waterways to marine traffic.

***Significant risks are inherent in the day-to-day operations in ACL's business***

The day-to-day activities of ACL's business involve the operation of boats, barges, machinery, and other operating equipment.  Due to the nature of ACL's operations, personal injury or loss of life or severe damage to and destruction of property and equipment may occur, which may interrupt ACL's business. ACL could be named as a defendant in a lawsuit asserting

112

substantial claims upon the occurrence of any of these events. Although ACL maintains insurance protection in amounts ACL considers to be adequate, this insurance could be insufficient in coverage and may not be effective under all circumstances or against all hazards to which ACL may be subject. If ACL is not fully insured against a successful claim, any such claim could have a material adverse effect on ACL's financial condition and results of operations.

### *A North American or global recession or other economic crises may have a detrimental impact on ACL's business*

Although ACL cannot predict the extent, timing or ramifications, ACL believes that economic factors, such as a recession in the United States or globally, heighten the following risks.

*Demand and pricing for ACL's services* — Demand for ACL's services is directly related to the overall demand for the cargoes which it transports. An economic downturn could lessen the demand for such cargoes and could, in turn, reduce the demand for ACL's services. This reduction could likely result in a less favorable supply/demand mix of barges, which could result in reduced rates for ACL's services, particularly in the spot markets. Such lower rates could negatively impact ACL's revenue and financial condition. This loss of demand could also result in tow-size and barge positioning inefficiencies.

*Credit availability to ACL's customers and suppliers* — Many of ACL's customers and suppliers rely on liquidity from operative global credit markets. If credit availability is restricted for these customers, demand for ACL's services may be constricted resulting in lower revenue, and ACL may not be able to enforce contracts or collect on outstanding invoices.

### *Global trade agreements, tariffs and subsidies, and embargoes could decrease the demand for imported and exported goods, adversely affecting the flow of import and export tonnage through the Port of New Orleans and the demand for barging services*

The pricing of, demand for and volume of goods imported through the Port of New Orleans and other Gulf-coast ports are affected by subsidies, tariffs and embargoes imposed by U.S. or foreign governments. Demand for U.S. exports as well as goods imported into the United States may be affected by the actions of U.S. or foreign governments, global or regional economic developments and U.S. and foreign trade agreements and negotiations. Additionally, the strength or weakness of the U.S. dollar against foreign currencies can impact import and export demand. For example, the recent establishment of Chinese tariffs and continuing trade tensions between the United States and China has resulted in a decrease in demand for soybeans, a commodity that China has traditionally purchased from the United States in significant quantities. In the future, these events could reduce the volume of goods shipped and the resulting demand for ACL's services.

### *Freight transportation rates for the Inland Waterways fluctuate from time to time and may decrease*

Freight transportation rates fluctuate from season-to-season and year-to-year. Levels of dry and liquid cargo transported on the Inland Waterways vary based on several factors, including global economic conditions and business cycles, domestic and international agricultural production and demand, domestic and international crude oil production and demand, domestic

113

and international coal demand and foreign exchange rates. Grain, particularly corn and soybeans for export, has been a significant part of ACL's business that is typically booked under spot market contracts. Spot grain contracts are normally priced at, or near, the quoted tariff rates in effect for the river segment of the move at the time they are contracted, which ranges from immediately prior to the transportation services to 90 days or more in advance. Spot rates can vary widely from quarter-to-quarter and year-to-year. The revenue generated under spot market contracts ultimately may not cover inflation, particularly for wages and fuel, in any given period.

Demand for transportation of other cargoes fluctuates periodically and results in increases and decreases in demand in certain river segments and for particular types of vessels. The number of barges and towboats available to transport dry and liquid cargo on the Inland Waterways also varies from year-to-year as older vessels are retired and new vessels are placed into service. The resulting relationship between levels of cargoes and vessels available for transport affects the freight transportation rates that ACL is able to charge.

### An oversupply of barging capacity may lead to reductions in freight rates

Barge oversupply conditions may occur due to a variety of factors, including fluctuations in demand for particular types of barges, overbuilding of new barges, delays in retirement of barges and refurbishment of barges to extend their useful lives. Since 2015, the barge industry has been experiencing oversupply conditions. When such supply/demand imbalances occur, it could take several years before balance returns due to the variable nature of the barging industry, and the freight transportation industry in general, and the relatively long useful life of marine equipment.

### Yields and timing of North American and worldwide grain harvests could materially affect demand for ACL's barging services

Demand for dry cargo barging in North America is significantly affected by the volume of grain exports flowing through ports on the Gulf of Mexico. The volume of grain exports through the Gulf of Mexico can vary due to, among other things, crop harvest yield levels in the United States and abroad, and ocean going freight spreads between the Gulf of Mexico and the Pacific Northwest. Adverse weather conditions may affect the volume of grain produced and harvested, as well as impact harvest timing and pricing. In the event of a diminished or delayed harvest, the demand for barging services will likely decrease. Overseas grain shortages increase demand for U.S. grain, while worldwide over-production decreases demand for U.S. grain. Other factors, such as domestic ethanol demand, overseas markets' acceptance of genetically altered products and currency exchange rates, may also affect demand for U.S. grain. Fluctuations in demand for U.S. grain exports can lead to temporary barge oversupply, which in turn can lead to reduced freight rates. ACL cannot assure that historical levels of U.S. grain exports will continue in the future.

### Prevailing natural gas and crude oil prices, as well as the volatility of their prices, could have an adverse effect on ACL's business

Fuel expenses represent a significant portion of ACL's total annual expenses, and fuel prices are subject to fluctuation as a result of domestic and international events.  Additionally, demand for liquid barge transportation services is driven by the production volumes of the bulk liquid cargoes that ACL transports, such as petrochemicals, chemicals, refined petroleum products

114

and crude oil.  This production can depend on prevailing natural gas and crude oil prices, as well as the volatility of their prices.  Volatility in the price of natural gas and crude oil can also result in heightened uncertainty, which may lead to decreased production and delays in new petrochemical and refinery plant construction.  Oversupply of tank barges caused by reduced crude oil and natural gas condensate production and increased competition for petrochemical and chemical business could have an adverse impact on ACL's business.

***Seasonal fluctuations in industry demand could adversely affect ACL's operating results, cash flow, and working capital requirements***

Segments of the inland barging business are seasonal. Historically, ACL's revenue and profits have been lower during the first six months of the year and higher during the last six months of the year. This seasonality is due primarily to the timing of the North American grain harvest and seasonal weather patterns. ACL's working capital requirements typically track the rise and fall of ACL's revenue and profits throughout the year. As a result, adverse market or operating conditions during the last six months of a calendar year could disproportionately adversely affect ACL's operating results and cash flow, while significant increases in ACL's revenue could increase the amount of cash required to fund working capital requirements.

***The aging infrastructure on the Inland Waterways may lead to increased costs and disruptions in ACL's operations***

Many of the dams and locks on the Inland Waterways were built early in the last century, and their age makes them costly to maintain and susceptible to unscheduled maintenance and repair outages. The delays caused by malfunctioning dams and locks or by closures due to repairs or construction may increase ACL's operating costs, delay the delivery of ACL's cargoes and create other operational inefficiencies. This could result in interruption of ACL's service, resulting in lower revenue and higher operating costs. Federal government funding available to repair and maintain this infrastructure has historically been constrained, and funding has been supplemented by diesel fuel user taxes paid by ACL's industry. There can be no guarantee that government funding levels will be sufficient to sustain infrastructure maintenance and repair costs or that a greater portion of the costs will not be imposed on operators. Higher diesel fuel user taxes could be imposed, which would increase ACL's costs if ACL is unable to recover the increase through surcharges or pricing increases.

***The inland barge transportation industry is highly competitive and increased competition could adversely affect ACL***

The inland barge transportation industry is highly competitive. ACL's primary competitors are other inland barge transportation companies; however ACL also competes with companies who operate pipelines as well as railroad and truck transportation. Increased competition in the future could result in a significant increase in available shipping capacity on the Inland Waterways, which could decrease rates or result in loss of business.

***ACL is named as a defendant in litigation matters and is in receipt of other claims and ACL cannot predict the outcome of such litigation and claims, which may result in the imposition of significant liability***

ACL faces risks arising from various litigation matters that have been asserted against it or that may be asserted against it in the future. The nature of ACL's business exposes it to the potential for disputes or legal or other proceedings from time to time relating to, but not limited to, personal injury and property damage, environmental matters, labor and employment matters, contract disputes and other matters. These matters, individually or collectively, could affect ACL's business by distracting its management from the operation of its business and could involve significant expenditures and/or imposition of significant liability.

***Adequate access to capital could impact ACL's ability to maintain its fleet***

The life expectancy for dry cargo barges and liquid cargo barges in ACL's fleet is approximately 30 and 40 years, respectively, with the age of retirement depending on the physical condition of a barge and amount of reinvestment and repair necessary for continued operation. As a barge approaches its life expectancy, absent significant reinvestment and repair, the cost to maintain and operate these barges may increase such that it is no longer profitable to operate them. ACL expects to continue its maintenance program to ensure fleet integrity and optimize utilization, however such reinvestment requires capital investment. If access to capital is unavailable or the cost of capital is too high, it could impact ACL's ability to maintain its fleet.

***ACL's insurance may not be adequate to cover its operational risks***

While ACL believes that it has satisfactory insurance coverage for pollution, property, marine and general liability, in the event that costs exceed available insurance or additional liability is imposed on ACL for which it is unable to seek reimbursement, ACL's business and operations could be materially and adversely affected. ACL may not be able to continue to procure adequate insurance coverage at commercially reasonable rates in the future.

***A major incident or casualty loss at any of ACL's facilities could significantly reduce production***

One or more of ACL's facilities or its equipment may experience a major incident and may be subject to unplanned events such as explosions, fires, inclement weather, acts of God and other transportation interruptions. Any shutdown or interruption of a facility could reduce the production from that facility and could prevent ACL from conducting its business for an indefinite period of time at that facility, which could substantially impair ACL's business.

***Interruption or failure of ACL's information technology and communications systems, or compliance with requirements related to controls over ACL's information technology protocols, could impair ACL's ability to effectively provide ACL's services or the integrity of its information***

ACL's services rely heavily on the continuing operation of its information technology and communications systems. In addition, because ACL's systems sometimes contain information about individuals and businesses, ACL's failure to appropriately safeguard the security of the data it holds, whether as a result of its own error or the malfeasance or errors of others, could harm ACL's reputation or give rise to legal liabilities, leading to lower revenues, increased costs and other material adverse effects on ACL's results of operations. Further, ACL relies on third-party software and systems infrastructure providers for ACL's information technology systems. Information technology outages could occur from these providers due to fire, floods, loss of power,

116

telecommunication failures and cyber-attacks. Failure of this software or systems infrastructure could have an adverse effect on ACL's operations.

***The loss of key personnel, including highly skilled and licensed vessel personnel, could adversely affect ACL's business***

ACL believes that its ability to successfully implement ACL's business strategy and to operate profitably depends on the continued employment of its senior management team and other key personnel, including highly skilled and licensed vessel personnel. Specifically, experienced vessel operators, including captains, are not quickly replaceable and the loss of high-level vessel employees over a short period of time could impair ACL's ability to operate all of ACL's vessels. If key employees depart, ACL may have to incur significant costs to replace them. ACL's ability to execute its business strategy could be impaired if ACL cannot replace them in a timely manner. Therefore, any loss or reduction in the number of such key personnel could adversely affect ACL's future operating results.

C.      *Regulatory Risks*

***Government regulations affecting the barging industry, or changes in these regulations, could result in increased expenses or may have a negative impact on the barging industry***

The barging industry is subject to various laws and regulations, including national, state and local laws and regulations, all of which are subject to amendment or changes in interpretation. In addition, various governmental and quasi-governmental agencies and certain of ACL's customers require barge operators to obtain and maintain permits, licenses and certificates and require routine inspections, monitoring, recordkeeping and reporting of their vessels and operations. The majority of ACL's towboats and liquid cargo barges are subject to inspection or certification by the U.S. Coast Guard and the crews ACL employs aboard vessels are licensed or certified by the U.S. Coast Guard. Any significant changes in laws or regulations affecting the inland barge industry, or in the interpretation thereof, could cause ACL to incur significant expenses. Although ACL works actively with regulators at all levels to avoid inordinate impairment of its operations, regulations and their interpretations may ultimately have a negative impact on the barging industry.

ACL's industry relies on towboats that are powered by diesel fuel. Regulations imposed on emission levels produced by the engines required to power ACL's towboats have become increasingly restrictive. As a result, new technologies have been introduced to meet these more restrictive requirements which are more costly than those previously used, increasing the construction cost of new towboats. In addition, these new technologies are more expensive to operate and may not produce the same overall operating performance when compared to engines previously used in towboats, which can increase ACL's cost to operate. Further, there can be no assurance that, should these limitations on emissions continue to become more restrictive, the producers of these engines will be successful in developing new technologies that will comply with these more stringent restrictions or that such technologies will be available without significant increased costs.

In addition, changes in environmental laws impacting the shipping business, including the passage of climate change legislation or other regulatory initiatives that restrict emissions of greenhouse gases, may require costly vessel modifications, the use of higher-priced fuel and changes in operating practices that ACL may not be able to recover through increased pricing to customers.

***The Jones Act restricts foreign ownership of ACL's stock, and the failure to comply with the Jones Act could have a material adverse effect on ACL's business or the repeal, suspension or substantial amendment of the Jones Act could increase competition on the Inland Waterways and have a material adverse effect on ACL's business***

The Jones Act requires that, to be eligible to operate a vessel transporting non-proprietary cargo on the Inland Waterways and engage in the coastwise trade, the company that owns the vessel must be at least 75% owned and controlled by U.S. citizens under applicable U.S. maritime laws at each tier of its ownership. The Jones Act therefore restricts, directly or indirectly, foreign ownership interests in the entities that directly or indirectly own the vessels which ACL operates on the Inland Waterways.  ACL will be responsible for monitoring the direct and indirect ownership of Non-U.S. citizens of its capital stock and the ownership interests in its affiliates that own vessels operating on the Inland Waterways in the coastwise trade to ensure compliance with the citizenship requirements of the Jones Act.  After the Effective Date, if the Reorganized Debtor or its affiliates owning vessels operating on the Inland Waterways in the coastwise trade at any point cease to be 75% owned and controlled by U.S. citizens, they may become subject to severe penalties and fines, including, under certain circumstances, being deemed to have made an unapproved foreign transfer of their vessels resulting in the permanent loss of such vessels' U.S. coastwise trading privileges and the forfeiture of the Reorganized Debtor's Inland Waterways operations.

In order to ensure compliance with the Jones Act citizenship requirements that at least 75% of the New Common Equity and each class of New Preferred Equity in Reorganized Debtor will be owned and controlled by U.S. citizens, at least 76% of the shares of New Common Equity and each class of New Preferred Equity issued on the Effective Date will be issued to U.S. citizens. The remaining 24% of the shares of New Common Equity and each class of New Preferred Equity issued on the Effective Date will be issued to Non-U.S. citizens.  Non-U.S. citizens who would have otherwise received additional shares of New Common Equity or New Preferred Equity will receive New Warrants.

New Warrants may only be exercised by (i) U.S. citizens, and (ii) Non-U.S. citizens to the extent permitted under the New Organizational Documents.  The forms of the New Warrants will not grant the holder of a New Warrant any voting or control rights, dividend rights, or contain any negative covenants restricting the operation of the Reorganized Debtor's business.  In certain cases, the holders of New Warrants may receive additional warrants which are exercisable for non-interest bearing demand notes.  These additional warrants are only exercisable by U.S. citizens. To our knowledge this feature, warrants exercisable for non-interest bearing notes, has not been used by a company engaged in the coastwise trade.  ACL will request the National Vessel Documentation Center, an agency within the United States Coast Guard, to confirm that warrants exercisable for non-interest bearings notes will not affect ACL's status as a U.S. Citizen, but there is no guarantee that they will approve this feature.  If the National Vessel Documentation Center

118

concludes that this feature, or any other feature in the New Warrants will affect our status as a U.S. Citizen, the New Warrants may be revised to remove that feature.

The New Organizational Documents will restrict ownership of the shares of New Common Equity and New Preferred Equity by Non-U.S. citizens in the aggregate to not more than 24% and will contain certain other provisions to enable the Reorganized Debtor to comply with the citizenship requirements of the Jones Act, including, without limitation, provisions that provide for the automatic redemption of shares through the issuance of warrants in the event that the applicable permitted percentage of ownership by Non-U.S. citizens is exceeded.  Such warrants will have the same risks and restrictions as the New Warrants, which risks and restrictions are discussed herein.

The Jones Act continues to be in effect, but has from time to time come under scrutiny.  If the Jones Act were to be repealed, suspended, or substantially amended and, as a consequence, competitors with lower operating costs were to enter the Inland Waterways market, ACL's advantages as a U.S. citizen operator of Jones Act vessels could be eroded over time.

### ACL is subject to risks associated with possible climate change legislation, regulation, and international accords

Greenhouse gas emissions have increasingly become the subject of a large amount of international, national, regional, state, and local attention. The U.S. Congress has considered in the past legislation that would create an economy-wide "cap-and-trade" system that would establish a limit (or cap) on overall greenhouse gas emissions and create a market for the purchase and sale of emissions permits or "allowances." Any proposed cap-and-trade legislation would likely affect the marine transportation industry due to anticipated increases in energy costs as fuel providers pass on the cost of the emissions allowances, which they would be required to obtain under cap-and-trade to cover the emissions from fuel production and the eventual use of fuel by ACL or its energy suppliers. In addition, cap-and-trade proposals would likely increase the cost of energy, including purchases of diesel fuel, steam and electricity, and certain raw materials used or transported by ACL. Proposed domestic and international cap-and-trade systems could materially increase ACL's customer's raw material and operating costs. Future environmental regulatory developments related to climate change in the United States that restrict emissions of greenhouse gases could result in financial impacts on ACL's operations that cannot be predicted with certainty at this time.

### Failure to comply with environmental, health, inspection, and safety regulations could result in substantial penalties and changes to ACL's operations

ACL's operations, facilities, properties, and vessels are subject to extensive and evolving laws and regulations. These laws pertain to air emissions; water discharges; the handling and disposal of solid and hazardous materials and oil and oil-related products, hazardous substances and wastes; the investigation and remediation of contamination; vessel inspection; and health, safety; and the protection of the environment and natural resources. Failure to comply with these laws and regulations may trigger a variety of administrative, civil, and criminal enforcement measures, including the assessment of civil and criminal penalties, the imposition of remedial obligations, assessment of monetary penalties and the issuance of injunctions limiting or

preventing some or all of ACL's operations. As a result, ACL is involved from time to time in administrative and legal proceedings related to environmental, health and safety matters and have in the past and will continue to incur costs and other expenditures relating to such matters. In addition to environmental laws that regulate ACL's ongoing operations, ACL is also subject to environmental remediation liability. Under federal and state laws, ACL may be liable as a result of the release or threatened release of hazardous substances or wastes or other pollutants into the environment at or by ACL's facilities, properties or vessels, or as a result of ACL's current or past operations, including facilities to which ACL has shipped wastes. These laws, such as the federal Clean Water Act, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or "CERCLA," the Resource Conservation and Recovery Act and the Oil Pollution Act of 1990, or "OPA 90," typically impose liability and cleanup responsibility without regard to whether the owner or operator knew of or caused the release or threatened release. Even if more than one person may be liable for the release or threatened release, each person covered by the environmental laws may, under certain circumstances, be held wholly responsible for all of the cleanup costs and damages. In addition, third-parties may sue the owner or operator of a site or vessel for damage based on personal injury, property damage, or other costs and cleanup costs, resulting from environmental contamination. Under OPA 90, owners, operators, and bareboat charterers are jointly and severally strictly liable for the discharge of oil within the internal and territorial waters of the United States, and the 200-mile exclusive economic zone around the United States. Additionally, an oil spill could result in significant liability, including fines, penalties, criminal liability and costs for natural resource damages. Most states bordering on a navigable waterway have enacted legislation providing for potentially unlimited liability for the discharge of pollutants within their waters. The discovery of environmental issues at ACL's sites, the modification of existing laws or regulations or the promulgation of new laws or regulations, more vigorous enforcement by regulators, the imposition of joint and several liability under CERCLA or analogous state laws or OPA 90, and other unanticipated events could result in a material adverse effect on ACL's financial condition and results of operations.

D.    *Risks Related to New Preferred Equity, New Common Equity, and New Warrants*

The ultimate recoveries under the Plan to holders of Claims in Classes 4 and 8 that receive New Preferred Equity, New Common Equity, and/or New Warrants pursuant to the Plan will depend on the realizable value of such securities.  The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below.  Prior to voting on the Plan, each holder of Claims in Classes 4 and 8 should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan and this Disclosure Statement.  By virtue of the New Warrants being exercisable into New Preferred Equity and/or New Common Equity, risks that relate to the New Preferred Equity and New Common Equity will necessarily also affect the New Warrants.

**The acquisition of New Common Equity, New Preferred Equity, and New Warrants, including through the Plan, may be subject to regulatory restrictions**

The acquisition of New Common Equity, New Preferred Equity, and New Warrants, including through the Plan, and the ability to vote such New Common Equity, New Preferred Equity, and New Warrants, may be subject to compliance with regulatory requirements (including the Jones Act) and/or prior regulatory approvals by the holder or acquirer of New Common Equity,

New Preferred Equity, or New Warrants. Such regulatory approvals may include, without limitation, approvals from any other regulatory body or bodies, or the satisfaction of any notification and waiting period requirements, such as those of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules promulgated thereunder (the "HSR Act") and the approval of the terms of the New Warrants by the U.S. Coast Guard. The applicability of regulatory approvals may depend on the amount of New Common Equity, New Preferred Equity, and New Warrants to be acquired or to be voted, as applicable, or, in the case of the HSR Act, if certain size of parties and size of transaction thresholds are satisfied and no exemption is applicable. The ability to obtain regulatory approvals may depend upon the business activities of the proposed acquirers of New Common Equity, New Preferred Equity, and New Warrants, and the affiliates of such proposed acquirers. Regulatory approvals may be denied, conditioned, or delayed and may not be available. Denial, condition or delay could prevent a proposed holder from acquiring New Common Equity, New Preferred Equity, and New Warrants, and could prevent a holder from voting its securities.

A holder or acquirer of New Common Equity, New Preferred Equity, or New Warrants should consult with its own legal counsel with regard to compliance with and/or obtaining appropriate regulatory approvals. The acquisition of New Common Equity, New Preferred Equity, and/or New Warrants, or voting of the same prior to obtaining and/or complying with any necessary regulatory approvals, may result in liability including potentially substantial civil penalties.

### *Lack of established markets for the New Preferred Equity, New Common Equity and New Warrants may adversely affect liquidity*

The New Preferred Equity, New Common Equity, and New Warrants may be illiquid securities without an active trading market. There can be no assurance that an active trading market for the New Preferred Equity, New Common Equity, or New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded, should an active trading market develop. ACL does not anticipate that the New Common Equity, New Preferred Equity or the New Warrants to be issued under the Plan will be listed on or traded on any nationally recognized market or exchange.

### *The New Preferred Equity, New Common Equity, and New Warrants may be subject to restrictions on transferability*

The terms of the New Organizational Documents, the Shareholder Agreement and the Warrant Agreements are expected to contain prohibitions on the transfer of the New Preferred Equity, New Common Equity, or New Warrants, respectively, to the extent such transfer would subject the Reorganized Debtors to the registration and reporting requirements of the Securities Act and the Securities Exchange Act. Furthermore, the terms of the New Organizational Documents, the Shareholder Agreement and the Warrant Agreements may contain additional transferability restrictions, including with respect to the Jones Act.

***Certain holders of New Preferred Equity, New Common Equity, and New Warrants may hold substantial interests in the Reorganized Company***

Certain holders of Term Loan Claims are expected to acquire a significant ownership interest in the Reorganized Debtors pursuant to the Plan, the Backstop Commitment Agreement, and the Rights Offering. Such holders, if their decisions are aligned, would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Preferred Equity, New Common Equity, and New Warrants. Further, the possibility that one or more holders of significant numbers of shares of New Preferred Equity, New Common Equity, or New Warrants may determine to sell all or a large portion of their New Preferred Equity, New Common Equity, or New Warrants in a short period of time may adversely affect the market price of the New Preferred Equity, New Common Equity, and New Warrants.

***Potential for Dilution***

The ownership percentage represented by the New Preferred Equity, New Common Equity, and New Warrants distributed on the Effective Date under the Plan, distributed pursuant to the Rights Offering, and distributed as the Backstop Commitment Premium, will be subject to dilution from the equity issued in connection with the Management Incentive Program, any other shares that may be issued in connection with the Plan or post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

***Equity Interests Subordinated to Reorganized Debtors' Indebtedness***

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Preferred Equity, New Common Equity, and New Warrants would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Preferred Equity, New Common Equity, and New Warrants will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

***Implied Valuation of New Preferred Equity, New Common Equity, and New Warrants Not Intended to Represent Trading Value of New Common Shares***

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Preferred Equity, New Common Equity, and New Warrants in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Preferred Equity, New Common Equity, and New Warrants is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual

operating performance and other factors not possible to predict, could cause the market price of the New Preferred Equity, New Common Equity, and New Warrants to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Preferred Equity, New Common Equity, and New Warrants in the public or private markets.

### The Reorganized Debtors will be a Private Company

The Reorganized Debtors do not expect to be subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act. As a result, holders of the New Preferred Equity, New Common Equity, and New Warrants may receive less information with respect to the ACL's business than they would have received if the Reorganized Debtors were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

E.      *Factors Relating to Rights Offering*

### ACL Could Modify Rights Offering Procedures

ACL may modify the Rights Offering Procedures in a manner that is reasonably acceptable to the Required Backstop Commitment Parties (as defined in the Backstop Commitment Agreement), and among other things, adopt additional detailed procedures if necessary in ACL's business judgment. Such modifications may adversely affect the rights of those participating in the Rights Offering.

### Backstop Commitment Agreement Could Be Terminated

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement if various conditions are not satisfied. Termination of the Backstop Commitment Agreement could result in termination of the Restructuring Support Agreement and prevent ACL from consummating the Plan.

F.      *Risks Relating to Financing Facilities*

### The Term Loan DIP Facility, the ABL DIP Facility, and/or the New ABL Facility may not become available to the Reorganized Debtors.

On or shortly after the Petition Date, ACL intends to ask the Bankruptcy Court to authorize the Term Loan DIP Facility and the ABL DIP Facility to provide for funding during the Chapter 11 Cases. The Term Loan DIP Facility and the ABL DIP Facility are intended to provide liquidity to ACL during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the Term Loan DIP Facility or the ABL DIP Facility on the terms requested by ACL. Moreover, if the Chapter 11 Cases take longer than expected to conclude, ACL may exhaust its financing. There is no assurance that ACL will be able to obtain additional financing from its existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of ACL's businesses may be materially impaired.

Additionally, pursuant to the Restructuring Support Agreement, ACL must obtain a commitment letter for the New ABL Facility with parties and on terms acceptable to ACL, the

Required Consenting Term Lenders and the Required DIP Commitment Parties (each as defined in the Restructuring Support Agreement) by not later than fourteen (14) days after the Petition Date (i.e., by February 21, 2020). As of the date of this Disclosure Statement, there can be no assurance that ACL will successfully obtain this commitment letter.

In addition, the Term Loan DIP Facility Agreement, the ABL DIP Facility Agreement, and the anticipated New ABL Facility Documents include (or will include) various conditions to closing. Accordingly, ACL cannot give assurances that the ABL DIP Facility, the Term Loan DIP Facility, or the New ABL Facility will be consummated. In the event any of these facilities are not consummated, and ACL is unable to promptly obtain replacement facilities, the ability of ACL to confirm the Plan will be materially and adversely affected.

Even if the Term Loan DIP Facility Agreement, the ABL DIP Facility Agreement, and the New ABL Facility Documents are entered into, any inability of the Reorganized Debtors to remain in compliance with its covenants thereunder could restrict the ability of the Reorganized Debtors to fully access the maximum amount that may be borrowed under the foregoing. While ACL believes these risks are mitigated in part by the fact that the ABL DIP Facility is expected to be provided by certain of the Existing ABL Facility Lenders, the Term Loan DIP Facility is expected to be provided by certain of the Term Loan Lenders, and the New ABL Facility is expected to be provided by certain of the Existing ABL Facility Lenders, these uncertainties with respect to the ABL DIP Facility, the Term Loan DIP Facility, and the New ABL Facility may nonetheless adversely affect the success of the Reorganized Debtors.

### *The extent of leverage may limit the Reorganized Debtors' ability to obtain additional financing.*

Although the Plan will result in the elimination of debt, the Reorganized Debtors will continue to have a significant amount of indebtedness after the Effective Date.

Such levels of indebtedness may limit the ability of the Reorganized Debtors to obtain additional financing for working capital, capital expenditures, debt service requirements, and general corporate or other purposes. Such levels of indebtedness may also limit the ability of the Reorganized Debtors to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Debtors vulnerable in a downturn in general economic conditions or in its business, or unable to carry out necessary maintenance or capital spending.

### *Defects in Collateral Securing the New ABL Facility*

The indebtedness under the New ABL Facility is expected to be secured, subject to certain exceptions and permitted liens, by security interests in substantially all assets of the Reorganized Debtors (henceforth, the "Collateral"). The Collateral securing the New ABL Facility may be subject to exceptions, defects, encumbrances, liens, and other imperfections. Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the obligations under the New ABL Facility all amounts owed in accordance therewith. The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors. The amount received upon a sale of Collateral would be dependent

on numerous factors, including the actual fair market value of the Collateral at such time, and the timing and manner of the sale. By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Exit Facility, in full or at all. There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain. Accordingly, there may not be sufficient collateral to pay all of the amounts due on the New ABL Facility, if entered into.

G.      *Other Risks*

***ACL's Projections and other financial information are based on assumptions that may prove incorrect.***

The Projections and other financial information contained herein reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize.

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, ACL has relied on financial data derived from its books and records that was available at the time of such preparation. Although ACL has exercised its reasonable business judgment to ensure the accuracy of the financial information provided herein, and while ACL believes that such financial information fairly reflects its financial results, ACL is unable to warrant or represent that the financial information contained herein is without inaccuracies.

The Projections are, by their nature, forward-looking, and necessarily based on certain assumptions or estimates that are beyond ACL's control and may ultimately prove to be incorrect. The actual future financial results of the Reorganized Debtors may turn out to be materially different from the Projections. As discussed above, the barging industry is volatile and ACL's operations are subject to inherent uncertainties and risks, all of which make accurate forecasting very difficult. There can be no assurances that such prospective assessments will ultimately prove to be accurate.

It was assumed in the preparation of the Projections and other financial information contained herein that the historical book value of ACL's assets as of December 31, 2019 approximates those assets' fair value, except for specific adjustments.

***The Restructuring is expected to give rise to cancellation of debt income, which may adversely impact the Reorganized Debtors.***

The Restructuring is expected to give rise to cancellation of debt income ("CODI") for U.S. federal income tax purposes. A debtor in bankruptcy is generally able to exclude CODI from taxable income, but is required to reduce its tax attributes, including NOLs, by the amount of the CODI. Any reduction in NOLs and other tax attributes as a result of CODI may result in the Reorganized Company paying more cash income taxes in the future than it otherwise would. In addition, if CODI exceeds the amount of tax attributes available for reduction, the Reorganized Company may be required to pay cash taxes on all or some of such excess if there is a so-called

125

excess loss account in the stock of the Debtors.  See the discussion under the heading "Certain Federal Income Tax Consequences of the Plan" regarding the material U.S. federal income tax consequences of the Restructuring.

***Holders may, in certain circumstances, be deemed to have received constructive distributions subject to U.S. federal income tax on the New Take Back Preferred Securities, the New Money Preferred Securities and the New Common Securities.***

A holder may, in certain circumstances, be deemed to have received constructive distributions subject to U.S. federal income tax on the New Take Back Preferred Securities, the New Money Preferred Securities and the New Common Securities. Applicable withholding taxes (including backup withholding) may apply to any such constructive distributions and the withholding liability may be satisfied by withholding on future cash payments made on the New Take Back Preferred Securities, the New Money Preferred Securities or the New Common Securities, as applicable, or other assets of the holder. In addition, if any withholding taxes (including backup withholding) are paid on behalf of a holder, then those withholding taxes may be set off against payments of cash or stock or sales proceeds received by, or other funds or assets of, that holder. For a discussion of the U.S. federal income tax treatment of constructive distributions on the New Take Back Preferred Securities, the New Money Preferred Securities and the New Common Securities, see "Certain Federal Income Tax Consequences of the Plan."

***Historical financial information may not be comparable.***

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in ACL's historical financial statements.

***ACL could withdraw Plan***

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by ACL.

***ACL has no duty to update***

The statements contained in the Disclosure Statement are made by ACL as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  ACL has no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

***No representations outside the disclosure statement are authorized***

No representations concerning or related to ACL, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the

126

Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  The Disclosure Statement is not legal advice to you.  The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on ACL or holders of Claims or Interests.

**SECTION XI.**
**ALTERNATIVES TO CONFIRMATION AND**
**CONSUMMATION OF PLAN**

If the Plan is not confirmed, the alternatives include (a) liquidation of ACL under chapter 7 or chapter 11 of the Bankruptcy Code and (b) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization.  Each of these possibilities is discussed in turn below.

A.      *Liquidation Under Chapter 7 or Chapter 11*

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of ACL.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims or Interests, ACL believes that in a chapter 7 liquidation, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and equity interest holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of ACL's operations and the failure to realize the greater going concern value of ACL's assets.

ACL could also be liquidated pursuant to the provisions of a chapter 11 plan.  In a liquidation under chapter 11, ACL's assets could be sold in a more orderly fashion over a longer period of time than in a chapter 7 liquidation.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs.  Because a trustee is not required in a

127

chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation, in which a trustee must be appointed.  However, the drafting and pursuit of a liquidation plan and its balloting and tabulation would result in additional administrative costs.  Any distributions to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

It is highly unlikely that Interest holders would receive any distribution in a liquidation under either chapter 7 or chapter 11.

Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, ACL believes that any liquidation is a much less attractive alternative for creditors and equity interest holders than the Plan because of the greater recoveries ACL anticipates will be provided by the Plan.  ACL BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND INTERESTS THAN WOULD LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by ACL with its financial advisors, is premised upon a chapter 7 liquidation and is attached hereto as Exhibit D.  In the Liquidation Analysis, ACL has taken into account the nature, status, and underlying value of the assets of ACL, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.  Based on this analysis, it is likely that a liquidation of ACL's assets would produce less value for distribution to creditors and equity interest holders than that recoverable in each instance under the Plan.

B.    *Alternative Plans of Reorganization*

If ACL remained in chapter 11, ACL could continue to operate its businesses and manage its properties as debtors-in-possession, but it would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether ACL could continue as a viable going-concern in protracted Chapter 11 Cases.  ACL could have difficulty operating with the high operating and financing costs and the eroding confidence of its customers and trade vendors, if ACL remained in chapter 11 for a prolonged period.  It likely would be very difficult for ACL to find alternative bank financing or financing from other sources if the DIP Facilities were terminated.  If ACL were unable to obtain financing and continue as a viable going-concern, ACL (or other parties in interest) could ultimately propose another plan or attempt to liquidate ACL under chapter 7 or chapter 11.  Such alternative plans might involve either a reorganization or continuation of ACL's businesses or an orderly liquidation of its assets, or a combination of both.

## SECTION XII.
## CONCLUSION AND RECOMMENDATION

ACL, with the support of the Consenting Term Lenders and the Sponsor, believes that confirmation and implementation of the Plan is in the best interests of the holders of Claims and Interests because it provides the greatest distributions and opportunity for distributions to such

holders.  In addition, any alternative to confirmation of the Plan could result in extensive delays and substantially increased administrative expenses.

Accordingly, ACL, with the support of the Consenting Term Lenders and the Sponsor, urges all holders of Claims and Interests who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be **actually received** by the Voting Agent no later than 4:00 p.m., prevailing Central Time, on February 17, 2020.

[*Remainder of page intentionally left blank*]

Dated:  February 7, 2020

Respectfully submitted,

ACBL OLDCO, LLC
ACBL RIVER OPERATIONS LLC
ACBL TRANSPORTATION SERVICES LLC
ACL I CORPORATION
ACL PROFESSIONAL SERVICES INC.
AMERICAN COMMERCIAL BARGE LINE LLC
AMERICAN COMMERCIAL LINES INC.
AMERICAN COMMERCIAL LINES INTERNATIONAL LLC
COMMERCIAL BARGE LINE COMPANY
OLD JB LLC

By:   /s/ David J. Huls
          Name: David J. Huls
          Title: SVP & CFO


FINN HOLDING CORPORATION


By:   /s/ Justin Maroldi
          Name: Justin Maroldi
          Title: Assistant Secretary

**Exhibit A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| AMERICAN COMMERCIAL LINES INC., *et al.* | § § § | Case No. 20-30982 (MI) |
| Debtors.[1] | § § § § | Jointly Administered |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF AMERICAN COMMERCIAL
LINES INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**MILBANK LLP**

Dennis F. Dunne (*pro hac vice* pending)
Samuel A. Khalil (*pro hac vice* pending)
Parker J. Milender (*pro hac vice* pending)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

**PORTER HEDGES LLP**

John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331

*Counsel to American Commercial Lines Inc.
and Its Affiliated Debtors and Debtors in Possession*

**Dated: February 7, 2020**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company (2365), American Commercial Barge Line LLC (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC (6589), ACBL River Operations LLC (6762), Old JB LLC (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ................................................................. 1

    A.    Defined Terms ...................................................................................... 1
    B.    Rules of Interpretation ........................................................................ 16
    C.    Computation of Time .......................................................................... 17
    D.    Governing Law ................................................................................... 17
    E.    Reference to Monetary Figures ........................................................... 17

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS ................................................................................................. 18

    A.    General Administrative Expenses ........................................................ 18
    B.    Restructuring Expenses ....................................................................... 18
    C.    Professional Fees ................................................................................ 18
           1.    Final Fee Applications ............................................................ 18
           2.    Professional Fees Escrow Account .......................................... 19
           3.    Post-Effective Date Fees and Expenses ................................... 20
    D.    ABL DIP Facility Claims .................................................................... 20
    E.    Term Loan DIP Facility Claims .......................................................... 20
    F.    Priority Tax Claims ............................................................................. 20

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................................................................................... 21

    A.    Classification of Claims and Interests .................................................. 21
    B.    Treatment of Claims and Interests ....................................................... 21
           1.    Class 1 – Priority Non-Tax Claims .......................................... 21
           2.    Class 2 – Other Secured Claims .............................................. 22
           3.    Class 3 – Existing ABL Facility Claims ................................... 22
           4.    Class 4 – Term Loan Claims ................................................... 23
           5.    Class 5 – General Unsecured Claims ....................................... 24
           6.    Class 6 – Intercompany Claims ............................................... 25
           7.    Class 7 – Intercompany Interests ............................................ 25
           8.    Class 8 – Interests in Finn Holding .......................................... 25
    C.    Special Provision Governing Unimpaired Claims ................................. 26

ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN .......................................... 26

    A.    Voting Classes ................................................................................... 26
    B.    Presumed Acceptance of the Plan ....................................................... 26
    C.    Subordinated Claims .......................................................................... 26

ARTICLE V MEANS FOR IMPLEMENTATION OF PLAN ................................................... 26

    A.    General Settlement of Claims and Interests ................................................ 26
    B.    Restructuring Transactions ......................................................................... 27
    C.    Sources of Consideration for Plan Distributions ....................................... 28
        1.    Rights Offering. ............................................................................ 28
        2.    Cash. ............................................................................................. 29
        3.    New ABL Facility ........................................................................ 29
    D.    Corporate Existence .................................................................................... 30
    E.    Vesting of Assets in the Reorganized Debtors ........................................... 30
    F.    Cancellation of Loans, Securities, and Agreements ................................... 31
    G.    Corporate and Other Entity Action ............................................................ 31
    H.    New Organizational Documents .................................................................. 32
    I.    Directors and Officers of Reorganized Debtors .......................................... 32
        1.    Reorganized Company Board ....................................................... 32
        2.    Officers of Reorganized Company ............................................... 33
        3.    New Subsidiary Boards ................................................................ 33
    J.    Effectuating Documents; Further Transactions .......................................... 33
    K.    Section 1146 Exemption ............................................................................. 33
    L.    Management Incentive Plan ......................................................................... 34
    M.    Procedures for Treating Disputed Claims and Interests Under the Plan ............. 34
        1.    Disputed Claims and Interests Process ........................................ 34
        2.    No Distributions Pending Allowance ........................................... 35
        3.    Distributions after Allowance ...................................................... 35
        4.    Estimation of Claims and Interests .............................................. 35
    N.    Authorization and Issuance of New Common Equity, New Preferred
        Equity and New Warrants ........................................................................... 35

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ....................................................................................................... 37

    A.    Assumption of Executory Contracts and Unexpired Leases ....................... 37
    B.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........ 37
    C.    Insurance Policies & Indemnification Obligations ..................................... 38
    D.    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ................................................................................................. 39
    E.    Reservation of Rights .................................................................................. 39
    F.    Contracts and Leases Entered into after Petition Date ............................... 39
    G.    Rejection Damages Claims .......................................................................... 39
    H.    Compensation and Benefits Plans ............................................................... 40

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 40

    A.    Timing and Calculation of Amounts to Be Distributed ............................. 40
    B.    Disbursing Agent ........................................................................................ 40
    C.    Rights and Powers of Disbursing Agent ..................................................... 40
        1.    Powers of the Disbursing Agent .................................................. 40

        2.     Incurred Expenses ................................................................ 41
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 41
        1.     Delivery of Distributions to Term Loan Agent ........................................ 41
        2.     Delivery of Distributions in General ................................................... 41
        3.     Minimum Distributions ................................................................. 41
        4.     Undeliverable Distributions and Unclaimed Property ........................... 42
    E.    Exemption from Securities Laws ............................................................. 42
    F.    Compliance with Tax Requirements ......................................................... 43
    G.    No Postpetition Interest on Claims and Interests .................................... 43
    H.    Setoffs and Recoupment ...................................................................... 44
    I.    Claims Paid or Payable by Third Parties ................................................ 44
        1.     Claims Paid by Third Parties .......................................................... 44
        2.     Claims Payable by Third Parties ..................................................... 44
        3.     Applicability of Insurance Policies ................................................. 45
    J.    Allocation Between Principal and Accrued Interest .................................. 45

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
               PROVISIONS ................................................................. 45

    A.    Compromise and Settlement .................................................................. 45
    B.    Discharge of Claims and Termination of Interests .................................. 46
    C.    Release of Liens ............................................................................... 46
    D.    Releases of Released Parties ................................................................ 46
        1.     Releases by the Debtors ................................................................. 47
        2.     Releases by Holders of Claims or Interests ...................................... 47
    E.    Exculpation .................................................................................... 48
    F.    Injunction ...................................................................................... 49

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ................... 49

    A.    Conditions to Effective Date ................................................................ 49
    B.    Waiver of Conditions ......................................................................... 50

ARTICLE X MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ................. 51

    A.    Modification and Amendments ............................................................. 51
    B.    Effect of Confirmation on Modifications .............................................. 51
    C.    Revocation or Withdrawal of Plan ....................................................... 51

ARTICLE XI RETENTION OF JURISDICTION ........................................................ 52

ARTICLE XII MISCELLANEOUS PROVISIONS ....................................................... 55

    A.    Immediate Binding Effect ................................................................... 55
    B.    Additional Documents ........................................................................ 55
    C.    Payment of Statutory Fees .................................................................. 55
    D.    Reservation of Rights ........................................................................ 55
    E.    Successors and Assigns ...................................................................... 56

F.      Notices ................................................................................................ 56
G.      Term of Injunctions or Stays.............................................................. 57
H.      Entire Agreement ............................................................................... 58
I.      Exhibits .............................................................................................. 58
J.      Consent Rights of Required Consenting Term Lenders ..................... 58
K.      Nonseverability of Plan Provisions.................................................... 58
L.      Votes Solicited in Good Faith............................................................ 58
M.      Closing of Chapter 11 Cases ............................................................. 59
N.      Document Retention ........................................................................... 59
O.      Conflicts............................................................................................. 59
P.      Dissolution of Creditors' Committee................................................. 59

## Introduction

American Commercial Lines Inc. ("ACL Inc."); ACL I Corporation; Commercial Barge Line Company ("CBLC"); American Commercial Barge Line LLC ("ABCL"); American Commercial Lines International LLC; ACBL Oldco, LLC; ACBL Transportation Services LLC ("ACBL Transportation"); ACBL River Operations LLC ("ACBL River Ops"); Finn Holding Corporation ("Finn Holding"); Old JB LLC; and ACL Professional Services Inc. (each a "Debtor" and, collectively, the "Debtors" or "ACL"), jointly propose this prepackaged plan of reorganization, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"), for the resolution of certain outstanding Claims against, and Interests in, the Debtors, pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended and as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Cases, the "Bankruptcy Code"). Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each Debtor. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below:

1.    "*ABL DIP Facility*" means the secured asset-based revolving credit facility made available by the ABL DIP Facility Lenders to the Debtors to provide financing and otherwise extend credit and other financial accommodations during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the ABL DIP Facility Agreement and the DIP Orders.

2.    "*ABL DIP Facility Agent*" means Wells Fargo Capital Finance, LLC, as Administrative Agent under the ABL DIP Facility Agreement.

3.    *ABL DIP Facility Agreement*" means that certain Senior Secured Debtor-in-Possession Credit Agreement by and among ACL Inc., as "Holdings," CBLC, ACBL, ACBL Transportation, and ACBL River Ops, as Borrowers, the guarantors, lenders, issuing banks and bank product providers from time to time party thereto, and the ABL DIP Facility Agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

4.    "*ABL DIP Facility Claims*" means all Claims against any Debtor arising on account of the ABL DIP Facility or pursuant to or secured by the ABL DIP Facility Agreement, and which constitute "Obligations," as such term is defined in the ABL DIP Facility Agreement.

5.    "*ABL DIP Facility Lenders*" means the financial institutions party from time to time to the ABL DIP Facility Agreement as lenders, issuing banks or bank product providers, in their respective capacities as such.

6.    "*ACL*" has the meaning specified in the Introduction hereto.

7.    "*Ad Hoc Group*" means the ad hoc group of Consenting Term Lenders represented by, *inter alia*, Davis Polk & Wardwell LLP and Evercore Group L.L.C.

8.    "*Administrative Expense*" means any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees; (c) an administrative expense of the type described in section 503(b)(9) of the Bankruptcy Code; and (d) any and all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code; provided, however, that "Administrative Expense" shall not include any Term Loan DIP Facility Claim or ABL DIP Facility Claim.

9.    "*Agents*" means the Existing ABL Facility Agent, the ABL DIP Facility Agent, the New ABL Facility Agent, the Term Loan Agent, and the Term Loan DIP Facility Agent.

10.    "*Allowed*" means, with respect to any Claim or Interest, the extent to which such Claim or Interest is not Disputed.  An Allowed Claim: (a) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed; and (b) shall be net of any setoff amount that may be asserted by any Debtor against the holder of such Claim, which shall be deemed to have been setoff in accordance with the provisions of the Plan.  Notwithstanding anything to the contrary herein, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan.

11.    "*Article*" refers to an article of the Plan.

12.    "*Avoidance Actions*" means any and all actual or potential claims and Causes of Action to avoid a transfer of property from, or an obligation incurred by, one or more of the Debtors, that arise under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or similar state law.

13.    "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of February 7, 2020, made by and between (i) the Debtors, on the one hand, and (ii) each of the Backstop Commitment Parties, on the other hand.

14.    "*Backstop Commitment Parties*" means, at any time or from time to time, the Term Loan Lenders that have committed to fund the Rights Offering and are signatories to the

2

Backstop Commitment Agreement, solely in their capacities as such, including their respective permitted transferees, successors and assigns, all in accordance with the Backstop Commitment Agreement.

15. "*Bankruptcy Code*" has the meaning specified in the Introduction hereto.

16. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Cases.

17. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075 and the general, local, and chamber rules of the Bankruptcy Court.

18. "*Bridge Funding Letter Agreement*" means that certain Bridge Funding Letter Agreement, dated as of January 30, 2020, by and among the Debtors party thereto, the Existing ABL Facility Agent, the Existing ABL Facility Lenders, the Consenting Term Lenders and Term Loan Agent.

19. "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York are required or authorized by law to remain closed.

20. "*Cash*" means cash and cash equivalents in U.S. dollars.

21. "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including, but not limited to, Avoidance Actions; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

22. "*CEO Director*" means the chief executive officer of the Reorganized Debtors, as a Director on the Reorganized Company Board as set forth in Article V.I.

23. "*Chapter 11 Case*" means, with respect to a particular Debtor, the case under chapter 11 of the Bankruptcy Code pending for such Debtor in the Bankruptcy Court, jointly administered with each other Debtors' Chapter 11 Case, and the "*Chapter 11 Cases*" means every Debtors' Chapter 11 Case, collectively.

24.     "*claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, and "*Claim*" means a claim as such term is defined in section 101(5) of the Bankruptcy Code against a Debtor.

25.     "*Class*" means a class of Claims or Interests designated in Article III of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code.

26.     "*Combined Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation and approval of the Disclosure Statement, as such hearing may be continued from time to time.

27.     "*Committee*" means the statutory committee of unsecured creditors appointed by the Office of the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, if any.

28.     "*Confirmation Date*" means the date upon which Confirmation occurs.

29.     "*Confirmation Order*" means the Bankruptcy Court order confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement, with such order being consistent with the Restructuring Support Agreement and otherwise satisfactory to the Debtors and the Required Consenting Term Lenders and, with respect to the rights and benefits of the ABL DIP Facility Lenders, ABL DIP Facility Agent, Existing ABL Facility Lenders and Existing ABL Facility Agent, or to the extent relating to the ABL DIP Facility Claims or Existing ABL Facility Claims, otherwise satisfactory to the ABL DIP Facility Agent.

30.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

31.     "*Consenting Term Lenders*" means each Term Loan Lender that is party to the Restructuring Support Agreement that is a holder of, or an investment advisor or an investment manager to a holder or holders of, Term Loan Claims.

32.     "*Consummation*" means the occurrence of the Effective Date.

33.     "*D&O Policy*" means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

34.     "*Debtor*" or "*Debtors*" have the meaning specified in the Introduction hereto.

35.     "*Description of Restructuring Transactions*" means a summary description of certain Restructuring Transactions, including any changes to the corporate and/or capital structure of the Debtors (to the extent known), to be made on the Effective Date as determined by the Debtors, the Required Consenting Term Lenders and the Required DIP Commitment Parties.

36.     "*DIP Facilities*" means the ABL DIP Facility and the Term Loan DIP Facility.

4

37.　　"*DIP Orders*" means the Interim Period DIP Order and Final DIP Order.

38.　　"*Director*" means a member of the board of directors or board of managers, as applicable, of Reorganized Company.

39.　　"*Disbursing Agent*" means one or more of the Reorganized Debtors and/or any other Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

40.　　"*Disclosure Statement*" means that certain *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of American Commercial Lines Inc. and its Affiliated Debtors and Debtors in Possession*, dated February 7, 2020, as it may be amended, supplemented, restated, or modified from time to time, including all exhibits and schedules thereto and references therein, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and as approved by the Bankruptcy Court.

41.　　"*Disputed*" means, with respect to a Claim, (i) any Claim, which Claim is disputed under Article V of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

42.　　"*Distribution Record Date*" means the Confirmation Date or such later date as agreed to by the Reorganized Debtors, the Required Consenting Term Lenders and the Required DIP Commitment Parties in writing.

43.　　"*Effective Date*" means the date selected by the Debtors and the Required Consenting Term Lenders, in accordance with the Restructuring Support Agreement, that is the first Business Day after the Confirmation Date, on which date all conditions to the Effective Date specified in Article IX.A have been satisfied or waived in accordance with Article IX.B.

44.　　"*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

45.　　"*Estate*" means, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Debtors' Estate, collectively.

46.　　"*Exculpated Parties*" means, collectively, and in each case in their capacities as such during the Chapter 11 Cases, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, (iv) the parties to the Restructuring Support Agreement, (v) each of the Agents in their capacities as such, (vi) the Existing ABL

5

Facility Lenders and any lead arrangers, bookrunners and syndication agents under the Existing ABL Facility Credit Agreement, (vii) the ABL DIP Facility Lenders and any lead arrangers, bookrunners and syndication agents under the ABL DIP Facility Agreement, (viii) the New ABL Facility Agent, New ABL Facility Lenders and any lead arrangers, bookrunners and syndication agents under the New ABL Facility Credit Agreement, (ix) the Consenting Term Lenders, (x) the Term Loan DIP Facility Lenders, (xi) the Backstop Commitment Parties, and (xii) with respect to each of the foregoing Persons in clauses (i) through (xi), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

47. "*Executory Contract*" means a contract to which one or more of the Debtors are party, other than an Unexpired Lease, which contract is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

48. "*Existing ABL Facility*" means the senior secured asset-based revolving credit facility made available by the Existing ABL Facility Lenders to the Debtors to provide financing and otherwise extend credit and other financial accommodations prior to the filing of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Existing ABL Facility Credit Agreement.

49. "*Existing ABL Facility Agent*" means Wells Fargo Capital Finance, LLC, as Administrative Agent and Collateral Agent under the Existing ABL Facility Credit Agreement.

50. "*Existing ABL Facility Claims*" means all Claims against any Debtor arising on account of the Existing ABL Facility or pursuant to or secured by the Existing ABL Credit Agreement or the other Existing ABL Facility Loan Documents, and which constitute "Obligations," as such term is defined in the Existing ABL Credit Agreement, solely to the extent not Paid in Full as contemplated by the DIP Orders.

51. "*Existing ABL Facility Credit Agreement*" means that certain Amended and Restated Revolving Credit Agreement by and among American Commercial Lines Inc. and certain of its subsidiaries, as Borrowers, lenders, and issuing banks from time to time party thereto, and the Existing ABL Facility Agent, dated as of November 12, 2015 as amended, modified, or supplemented from time to time.

52. "*Existing ABL Facility Lenders*" means the financial institutions party from time to time to the Existing ABL Credit Agreement as lenders, issuing banks or bank product providers, in their respective capacities as such.

53. "*Existing ABL Facility Loan Documents*" means the documents that govern the Existing ABL Facility, including the Existing ABL Credit Agreement.

54.    "*Final DIP Order*" means the Bankruptcy Court order authorizing use of cash collateral, the ABL DIP Facility and the Term Loan DIP Facility on a final basis.

55.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

56.    "*First Amendment to Term Loan Agreement*" means that certain First Amendment to Term Loan Credit Agreement, dated as of December 30, 2019, by and among the Debtors party thereto, the Term Loan Agent and the other Term Loan Lenders party thereto.

57.    "*Finn Holding*" has the meaning specified in the Introduction hereto.

58.    "*General Administrative Expense*" means any Administrative Expense other than Professional Fees.

59.    "*General Unsecured Claim*" means any Unsecured Claim, other than a Sponsor Claim or an Intercompany Claim, against any Debtor.

60.    "*Global Settlement*" has the meaning specified in Article V.A of the Plan.

61.    "*Governmental Unit*" means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

62.    "*Impaired*" means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

63.    "*Indemnification Obligation*" means (i) any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, sponsors, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date; and (ii) all indemnification obligations that are surviving obligations pursuant to the terms of the Payoff Letter

64.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

65.    "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to

7

purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or not transferable, issued or unissued, authorized, or outstanding.

66. "*Interim Period DIP Order*" means the Bankruptcy Court order authorizing use of cash collateral, the ABL DIP Facility and the Term Loan DIP Facility for the period pending entry of the Final DIP Order.

67. "*Jones Act*" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. coastwise trade.

68. "*Jones Act Restriction*" has the meaning set forth in Article V.N of the Plan.

69. "*Lien*" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

70. "*Management Incentive Plan*" means the management incentive plan that shall become effective and be implemented as of the Effective Date, in accordance with the terms set forth in the MIP Term Sheet annexed as Exhibit C to the Restructuring Support Agreement.

71. "*New ABL Facility*" means the new senior secured asset-based revolving credit facility and first-in last-out term loan, in the anticipated aggregate amount of $650 million, to be made available to the Reorganized Debtors pursuant to and subject to the terms and conditions of the New ABL Facility Credit Agreement and the other New ABL Facility Documents.

72. "*New ABL Facility Agent*" means Wells Fargo Capital Finance, LLC, in its capacity as administrative agent under the New ABL Facility Credit Agreement and the other New ABL Facility Documents.

73. "*New ABL Facility Credit Agreement*" means the credit agreement, to be dated as of the Effective Date, that will govern the New ABL Facility, in such form filed with the Plan Supplement.

74. "*New ABL Facility Documents*" means the following documents that will govern the New ABL Facility: (a) the New ABL Facility Credit Agreement, and (b) such other financing documents related to the New ABL Facility, including intercreditor agreements, each in form and substance reasonably acceptable to (i) the Reorganized Debtors, and (ii) the Required Consenting Term Lenders, the New ABL Facility Lenders, and the New ABL Facility Agent.

75. "*New ABL Facility Lenders*" means the financial institutions party from time to time to the New ABL Facility Credit Agreement as lenders, issuing banks, or bank product providers, in their respective capacities as such.

76. "*New Boards*" means the Reorganized Company Board and New Subsidiary Boards.

77. "*New Common Equity*" means the common equity in the Reorganized Company to be authorized, issued, and outstanding on and after the Effective Date.

78. "*New Organizational Documents*" means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, the Shareholder Agreement, or such other organizational documents of the Reorganized Debtors, the forms of which shall be acceptable to the Debtors and the Required Consenting Term Lenders and included in the Plan Supplement.

79. "*New Money Preferred Equity*" means, subject to the Jones Act Restriction, the up to $217 million convertible preferred equity in the Reorganized Company, of which pursuant to the Plan (i) $50 million will be issued to the Term Loan DIP Facility Lenders in exchange for Term Loan DIP Facility Claims, (ii) up to $150 million will be issued through the Rights Offering in accordance with the Rights Offering Procedures, and (iii) additional amounts will be issued to reflect (x) the DIP Backstop Premium (as defined in the Term Loan DIP Facility Agreement), (y) the DIP Conversion Discount (as defined in the Term Loan DIP Facility Agreement) upon the conversion of Term Loan DIP Facility Claims, and (z) the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement).

80. "*New Money Preferred Warrants*" means 25-year warrants for New Money Preferred Equity issued pursuant to the New Money Preferred Warrant Agreement.

81. "*New Money Preferred Warrant Agreement*" means that certain warrant agreement that shall govern the terms of the New Money Preferred Warrants, the form of which shall be included in the Plan Supplement.

82. "*New Preferred Equity*" means the New Take Back Preferred Equity and the New Money Preferred Equity.

83. "*New Take Back Preferred Equity*" means, subject to the Jones Act Restriction, the $200 million preferred equity in the Reorganized Company to be authorized, issued, or outstanding on and after the Effective Date.

84. "*New Take Back Preferred Warrants*" means 25-year warrants for Take Back Preferred Equity issued pursuant to the New Take Back Preferred Warrant Agreement.

85. "*New Take Back Preferred Warrant Agreement*" means that certain warrant agreement that shall govern the terms of the New Take Back Preferred Warrants, the form of which shall be included in the Plan Supplement.

86. "*New Sponsor Warrants*" means 25-year warrants for 5% of New Common Equity exercisable at a strike price of $0.01 and issued pursuant to the New Sponsor Warrant Agreement.

9

87.    "*New Sponsor Warrant Agreement*" means that certain warrant agreement that shall govern the terms of the New Sponsor Warrants, the form of which shall be included in the Plan Supplement.

88.    "*New Subsidiary Boards*" means the initial board of directors or managers (as applicable) for the Reorganized Debtors (other than the Reorganized Company), as appointed pursuant to Article V.I.

89.    "*New Term Lender Warrant Agreement*" means that certain warrant agreement that shall govern the terms of the New Term Lender Warrants, the form of which shall be included in the Plan Supplement.

90.    "*New Term Lender Warrants*" means 25-year warrants for of New Common Equity issued pursuant to the New Term Lender Warrant Agreement.

91.    "*New Warrants*" means the New Sponsor Warrants, the New Take Back Preferred Warrants, the New Money Preferred Warrants, and the New Term Lender Warrants.

92.    "*Non-U.S. Citizen*" means an Entity other than a U.S. Citizen.

93.    "*Notice of Entry of Confirmation Order*" means a notice to be sent by the Reorganized Debtors following the entry of the Confirmation Order stating that the Bankruptcy Court has confirmed the Plan and providing such other information as required by the Confirmation Order.

94.    "*Other Secured Claim*" means any Secured Claim against any Debtor other than an Administrative Expense, ABL DIP Facility Claim, Term Loan DIP Facility Claim, Priority Claim, Existing ABL Facility Claim, or Term Loan Claim.

95.    "*Payment in Full*" or "*Paid in Full*" means: (a) with respect to the Existing ABL Facility Claims and ABL DIP Facility Claims, (i) the payment in full in Cash or immediately available funds of all such obligations, (ii) the termination or expiration of all commitments to extend credit to the Debtors, (iii) the termination of, or providing Cash collateral in respect of, or providing other security or treatment as agreed between the Debtors and the applicable Existing ABL Facility Lender or ABL DIP Facility Lender all outstanding letters of credit and "Secured Bank Product Obligations" (as such term is defined in the ABL DIP Facility Agreement and Existing ABL Facility Credit Agreement) that compose a portion of the Existing ABL Facility Claims or ABL DIP Facility Claims, as set forth in the Existing ABL Facility Credit Agreement or ABL DIP Facility Agreement, respectively, (iv) the Cash collateralization in respect of any asserted or threatened claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages for which any Existing ABL Facility Lender, any ABL DIP Facility Lender, Existing ABL Facility Agent or ABL DIP Facility Agent may be entitled to indemnification by any Debtor pursuant to the indemnification provisions in the Existing ABL Facility Credit Agreement and related loan documents and ABL DIP Facility Agreement and related loan documents, as applicable, (v) a general release (in form and substance satisfactory to ABL DIP Facility Agent) of any and all claims and causes of action that could have been asserted or raised under or in connection with the Existing ABL Facility or ABL DIP Facility, or

10

both, and (vi) customary survival of indemnification obligations under the ABL DIP Facility and related loan documents.

96.     "*Payoff Letter*" means the payoff letter in respect of Payment in Full of the ABL DIP Facility Claims and Existing ABL Facility Claims, in form and substance acceptable to the Debtors and the ABL DIP Facility Agent.

97.     "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

98.     "*Plan Supplement*" means the compilation of documents (or forms thereof), schedules, and exhibits to the Plan, as each may be amended, supplemented, or modified from time to time in accordance with the Plan, Restructuring Support Agreement, Bankruptcy Code, and Bankruptcy Rules, to be filed with the Bankruptcy Court which may include, as applicable: (a) the New Organizational Documents; (b) a list of the members of the New Boards (to the extent known); (c) the New ABL Facility Credit Agreement; (d) the Warrant Agreements, (e) the Management Incentive Plan; (f) the Description of Restructuring Transactions, (g) the Payoff Letter, and (h) such other documents as are necessary or advisable to implement the Restructuring contemplated by the Restructuring Support Agreement and the Plan, each of which shall be consistent with the Restructuring Support Agreement and, except as otherwise provided herein, acceptable in form and substance to the Required Consenting Term Lenders and, solely with respect to the Payoff Letter and New ABL Credit Facility Agreement, ABL DIP Facility Agent and New ABL Facility Agent.  For the avoidance of doubt, the Debtors shall have the right to amend, supplement, or modify the Plan Supplement through the Effective Date in accordance with the Plan, Restructuring Support Agreement, Bankruptcy Code, and Bankruptcy Rules; *provided that* any such amendment or modification shall be acceptable in form and substance to the Required Consenting Term Lenders, the Required DIP Commitment Parties, and solely with respect to any Plan Supplement document that materially affects the rights or obligations of the ABL DIP Facility Agent, ABL DIP Facility Lenders, New ABL Facility Agent or New ABL Facility Lenders (including the Payoff Letter and New ABL Facility Credit Agreement), in form and substance reasonably acceptable to the ABL DIP Facility Agent and New ABL Facility Agent.

99.     "*Plan*" has the meaning specified in the Introduction hereto.

100.    "*Plan Term Sheet*" means the American Commercial Lines Inc. restructuring term sheet that shall be implemented as of the Effective Date in accordance with the terms set forth in the restructuring term sheet annexed as <u>Exhibit A</u> to the Restructuring Support Agreement

101.    "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

102.    "*Priority Non-Tax Claim*" means any Claim against any Debtor entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense, Term Loan DIP Facility Claim, ABL DIP Facility Claim, or Priority Tax Claim.

103.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against any Debtor entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

104.    "*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Allowed Interests (as applicable) in the same Class.

105.    "*Professional*" means any Entity that is, by Bankruptcy Court order: (a) employed for legal, financial advisory, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, and/or 1103 of the Bankruptcy Code; or (b) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code upon a motion on notice; provided, however, that "Professional" shall not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse in the ordinary course of its businesses.  For the avoidance of doubt, "Professional" does not include any professional-service Entity retained by the Existing ABL Facility Agent, the Term Loan Agent, or the Consenting Term Lenders.

106.    "*Professional Fees Escrow Account*" means the account established on the Effective Date pursuant to Article II.C.2.

107.    "*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that:  (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional.  To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

108.    "*Released Parties*" means to the extent such party has not opted out of being a Releasing Party (as set forth in the definition thereof), all of the following, each in their respective capacities as such: (a) the Debtors; (b) the Reorganized Debtors, (c) the Agents, (d) the Existing ABL Facility Lenders and any lead arrangers, bookrunners and syndication agents under the Existing ABL Facility Credit Agreement, (e) the Term Loan Lenders; (f) the Backstop Commitment Parties, (g) the ABL DIP Facility Lenders and any lead arrangers, bookrunners and syndication agents under the ABL DIP Facility Agreement; (h) the Term Loan DIP Facility Lenders; (i) the Consenting Term Lenders; (j) New ABL Facility Agent, New ABL Facility Lenders and any lead arrangers, bookrunners and syndication agents under the New ABL Facility Credit Agreement; (k) the Sponsor; (l) to the extent that the applicable foregoing Entity has not opted out of being a Releasing Party, each of the foregoing Entities' respective successors, assigns, current and former shareholders, subsidiaries, directors, officers, funds, affiliates, members, employees, partners, limited partners, general partners, members, management companies, investment managers, investment advisors, investment bankers, financial advisors, restructuring advisors, accountants, managers, agents, representatives, principals, consultants, attorneys, and professional advisors (each in their capacity as such); and (m) to the extent that the applicable foregoing Entity has not opted out of being a Releasing Party (or, in the case of any Entity identified in clause (l), if the party in clause (a) through (k) to which

12

such Entity relates has not opted out of being a Releasing Party), each such Entity's predecessors.

109.    "*Releasing Parties*" means all of the following, each in their respective capacities as such: (a) the Debtors; (b) Released Parties (each in their capacity as such); (c) the holders of all Claims or Interests who vote to accept the Plan, (d) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and who fail to opt out of the releases in Article VIII.D of the Plan by checking the opt-out election box in the applicable ballot or notice, (e) the holders of all Claims or Interests who vote, or are deemed, to accept the Plan but do not opt out of granting the releases set forth herein, (f) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (g) all other holders of Claims and Interests to the maximum extent permitted by law.

110.    "*Reorganized Company*" means Finn Holding, ACL, CBL or any successor to any such entity, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

111.    "*Reorganized Company Board*" means the initial board of Directors of the Reorganized Company, as appointed pursuant to Article V.I.

112.    "*Reorganized Debtors*" means, collectively, the Reorganized Company and its direct and indirect subsidiaries, or any successors thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

113.    "*Required Consenting ABL DIP Facility Lenders*" means, as of any time of determination, the ABL DIP Facility Lenders holding a majority of the aggregate amount of all ABL DIP Facility Claims held at such time by all of the ABL DIP Facility Lenders.

114.    "*Required Consenting Lenders*" means, as of any time of determination, the Required DIP Commitment Parties, the Required Consenting Term Lenders, and the Required Consenting ABL DIP Facility Lenders.

115.    "*Required Consenting Term Lenders*" means, as of any time of determination, the Consenting Term Lenders holding a majority of the aggregate amount of all Term Loan Claims held at such time by all of the Consenting Term Lenders.

116.    "*Required DIP Commitment Parties*" shall have the meaning set forth in the Restructuring Support Agreement.

117.    "*Restructuring*" means the comprehensive restructuring of the existing debt and other obligations of the Debtors on the terms and conditions set forth in the Plan and the Restructuring Support Agreement.

118.    "*Restructuring Expenses*" means the reasonable and documented fees and out-of-pocket expenses when due of (i) Goldberg Kohn Ltd., as counsel to the Existing ABL Facility Agent and the ABL DIP Facility Agent, (ii) FTI Consulting, Inc., as financial advisor to the Existing ABL Facility Agent and the ABL DIP Facility Agent, (iii) McGlinchey Stafford PLLC, as maritime legal counsel to the Existing ABL Facility Agent and the ABL DIP Facility Agent,

13

(iv) Bracewell LLP, as local legal counsel to the Existing ABL Facility Agent and the ABL DIP Facility Agent, (v) Davis Polk & Wardwell LLP as counsel to the Consenting Term Lenders and DIP Term Loan Lenders, (vi) Evercore Group L.L.C., as financial advisor to the Consenting Term Lenders, (vii) Winston & Strawn LLP, as maritime legal counsel to the Consenting Term Lenders, and (viii) Rapp & Krock, PC as local legal counsel to the Consenting Term Lenders and DIP Term Loan Lenders.

119.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of January 31, 2020, by and among the Debtors, the Consenting Term Lenders, and the Sponsor, together with all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

120.    "*Restructuring Transactions*" has the meaning set forth in Article V.B.

121.    "*Rights Offering*" means the offering of Subscription Rights in accordance with the Rights Offering Procedures.

122.    "*Rights Offering Participant*" means any holder of an Allowed Term Loan Claim that subscribes for Rights Offering Securities in the Rights Offering in accordance with the Rights Offering Procedures.

123.    "*Rights Offering Procedures*" means the procedures for conducting the Rights Offering attached to Backstop Commitment Agreement.

124.    "*Rights Offering Securities*" means the New Money Preferred Equity and New Money Preferred Warrants offered in the Rights Offering. Pursuant to the Restructuring Support Agreement and the Backstop Commitment Agreement, 22.5% of the Rights Offering Securities shall be reserved for the Consenting Term Lenders, and 77.5% of the Rights Offering Securities shall be offered pro rata to all holders of Allowed Term Loan Claims.

125.    "*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

126.     "*Secured Claim*" means any Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

127.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

128.    "*Shareholder Agreement*" means the shareholder agreement to be entered into (or as may be deemed entered into, as applicable) by the Reorganized Debtors and the holders of New Common Equity, New Preferred Equity and New Warrants on the Effective Date that will

14

govern certain matters related to the governance of the Reorganized Debtors, in form and substance consistent with the Plan Term Sheet.

129.    "*Sponsor*" means certain affiliates and investment funds managed by Platinum Equity, LLC that are party to the Restructuring Support Agreement.

130.    "*Sponsor Claim*" means any Claim against any of the Debtors that is held by the Sponsor.

131.    "*Subscription Rights*" means the rights to acquire up to $150 million of Rights Offering Securities pursuant to the Rights Offering Procedures and the Backstop Commitment Agreement.

132.    "*Term Loan Agent*" means Bank of America, N.A., as administrative agent and collateral agent under the Term Loan Agreement.

133.    "*Term Loan Agreement*" means that certain Term Loan Credit Agreement, dated as of November 12, 2015, among Commercial Barge Line Company, as borrower, American Commercial Lines Inc., as holdings, and various lenders thereto, as amended by the First Amendment to Term Loan Agreement, and as otherwise amended,, modified, or supplemented from time to time.

134.    "*Term Loan Claims*" means all Claims against any Debtor arising on account of the term loan made available to the Debtors pursuant to the Term Loan Agreement, and which constitute "Obligations," as such term is defined in the Term Loan Agreement. The Term Loan Claims shall be Allowed in an aggregate principal amount of approximately $948,750,000 plus any accrued and unpaid interest at the non-default rate as of the Petition Date plus all other unpaid and outstanding Obligations as of the Petition Date, as applicable, and which Term Loan Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code.

135.    "*Term Loan DIP Facility*" means the secured term loan facility made available by the Term Loan DIP Facility Lenders to the Debtors to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term Loan DIP Facility Agreement and the DIP Orders.

136.    "*Term Loan DIP Facility Agent*" means Cortland Capital Market Services, LLC, as Administrative Agent under the Term Loan DIP Facility Agreement.

137.    "*Term Loan DIP Facility Agreement*" means that certain Senior Secured Debtor-in-Possession Term Loan Agreement by and among American Commercial Lines Inc., as Holdings, Commercial Barge Line Company and certain of its subsidiaries, as Borrowers, the other guarantors, lenders, and issuing banks from time to time party thereto, and the Term Loan DIP Facility Agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

138.    "*Term Loan DIP Facility Claims*" means all Claims against any Debtor arising on account of the Term Loan DIP Facility or pursuant to or secured by the Term Loan DIP

15

Facility Loan Agreement, and which constitute "Obligations," as such term is defined in the Term Loan DIP Facility Agreement.

139.    "*Term Loan DIP Facility Lenders*" means the financial institutions party from time to time to the Term Loan DIP Facility Agreement as lenders.

140.    "*Term Loan Lenders*" means the financial institutions party from time to time to the Term Loan Agreement as lenders, solely in their respective capacities as such.

141.    "*Termination Event*" means a termination event as set forth in Section 7 of the Restructuring Support Agreement.

142.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are party, which lease is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

143.    "*Unimpaired*" means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not Impaired.

144.    "*Unsecured Claim*" means any Claim, other than an Administrative Expense, Term Loan DIP Facility Claim, ABL DIP Facility Claim, Priority Claim, Intercompany Claim, Existing ABL Facility Claim, Term Loan Claim, or Other Secured Claim.

145.    "*U.S. Citizen*" means an Entity that is a citizen of the United States within the meaning of the Jones Act, eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade.

146.    "*U.S. Citizenship Affidavit*" means an Affidavit of United States Citizenship by a holder of a Term Loan Claim certifying that such holder is a U.S. Citizen.

147.    "*U.S. Citizen Determination Procedures*" has the meaning set forth in Article V.N.B.

148.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

149.    "*Voting Record Date*" means February 3, 2020.

150.    "*Warrant Agreements*" means, collectively, the New Take Back Preferred Warrant Agreement, the New Money Preferred Warrant Agreement, the New Sponsor Warrant Agreement, and the New Term Lender Warrant Agreement.

B.    *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein,"

16

"hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (4) all references to articles or Articles are references to the Articles hereof; (5) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, the Plan; (6) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (7) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, modified, or supplemented; (8) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (9) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (10) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (11) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (12) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (13) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or entity governance matters relating to the Debtors or the Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

17

# ARTICLE II
# ADMINISTRATIVE EXPENSES AND
# OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, ABL DIP Facility Claims, Term Loan DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.   *General Administrative Expenses*

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, when such payment otherwise becomes due in the applicable Debtor's ordinary course of business without further notice to or order of the Bankruptcy Court), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Debtor.  For the avoidance of doubt, holders of a General Administrative Expense shall not be required to file a request for payment of a claim with the Bankruptcy Court.

B.   *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.   In addition, the Debtors and Reorganized Debtors (as applicable) shall continue to pay Restructuring Expenses after the Effective Date when due in payable in the ordinary course related to implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date.

C.   *Professional Fees*

1.   Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the Office of the United States Trustee, counsel to the Committee (if any), and all other parties that have requested notice in these Chapter 11 Cases by no later than forty-five (45) days after the Effective Date, unless the Reorganized Debtors agrees otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Reorganized

10442818v1

Debtors and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the applicable Professional Fees. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fees Escrow Account; *provided*, *however*, that if the funds in the Professional Fees Escrow Account are insufficient to pay the full Allowed amounts of the Professional Fees, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from its Cash on hand.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation and the Effective Date. Upon the Effective Date, the Term Loan DIP Facility Agent, Term Loan DIP Facility Lenders, ABL DIP Facility Agent and ABL DIP Facility Lenders shall have no further obligations with respect to the Carve Out under and as defined in the DIP Orders.

2.      Professional Fees Escrow Account

On the Effective Date, the Debtors shall fund the Professional Fees Escrow Account in an amount equal to all asserted Claims for Professional Fees outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts provided prior to or as of the Effective Date payable by the Debtors or the Reorganized Debtors). Amounts held in the Professional Fees Escrow Account shall not constitute property of the Reorganized Debtors. The Professional Fees Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all holders of Claims for Professional Fees under the Plan, any such amounts shall be returned to, and constitute property of, the Reorganized Debtors.

Professionals shall estimate their unpaid Claims for Professional Fees incurred in rendering services to the Debtors, their Estates or the Committee (if any), as applicable, before and as of the Effective Date and shall deliver such estimate to counsel for the Debtors no later than ten (10) Business Days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Claims for Professional Fees. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fees Escrow Account. The total amount proposed to be allocated to the Professional Fees Escrow Account and pursuant to this Section shall be provided to the attorneys for the Debtors and the Consenting Term Lenders no later than three (3) Business Days before the Effective Date.

19

3.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Reorganized Debtors on and after the Effective Date.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

D.      *ABL DIP Facility Claims*

On the Effective Date and subject to the terms of the Payoff Letter, except to the extent such holder has agreed to an alternative treatment, each holder of any Allowed ABL DIP Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) at the option of such holder of such Allowed ABL DIP Facility Claim, on a dollar-for-dollar basis, first-lien, first-out loans or commitments (as applicable) under the New ABL Facility; (ii) Payment in Full in Cash; or (iii) such other less favorable treatment as to which the Debtors and the holder of such Allowed ABL DIP Facility Claims will have agreed upon in writing.

E.      *Term Loan DIP Facility Claims*

Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Term Loan DIP Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, subject to the U.S. Citizen Determination Procedures (i) its Pro Rata share of the $50 million of the New Money Preferred Equity, and/or (ii) New Money Preferred Warrants.  Each holder of an Allowed Term Loan DIP Facility Claim shall be entitled to receive a distribution in the form of New Money Preferred Equity to the extent permitted under the Jones Act Restriction, and/or to the extent that New Money Preferred Equity cannot be issued to such holder because it is a Non-U.S. Citizen and the amount of New Money Preferred Equity to be delivered to it under all sections of the Plan, when added to the New Money Preferred Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date would exceed the Jones Act Restriction, New Money Preferred Warrants. The percentage ratio of the number of shares of New Money Preferred Equity to the number of New Money Preferred Warrants to be issued to each holder of an Allowed Term Loan DIP Facility Claim that is a Non-U.S. Citizen is subject to the priorities set forth in the New Money Preferred Warrant Agreement.

F.      *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim

shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Allowed Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF
## CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses, ABL DIP Facility Claims, Term Loan DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|-------|--------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | Existing ABL Facility Claims | Unimpaired | Deemed to accept |
| 4 | Term Loan Claims | Impaired | Entitled to vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 6 | Intercompany Claims | Unimpaired | Deemed to accept |
| 7 | Intercompany Interests | Unimpaired | Deemed to accept |
| 8 | Interests in Finn Holding | Impaired | Entitled to vote |

B.    *Treatment of Claims and Interests*

    1.    Class 1 – Priority Non-Tax Claims

        a.    *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims. Although all Priority Non-Tax Claims have been placed in one Class for the purposes of nomenclature, the Priority Non-Tax Claims against each

21

applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.   *Treatment*:   Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 1 Claim shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the later of the Effective Date and the date such Claim becomes due and payable in the ordinary course of business or (ii) be otherwise rendered Unimpaired.

c.   *Voting*:   Class 1 is Unimpaired under the Plan.   Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Secured Claims

a.   *Classification*: Class 2 consists of all Allowed Other Secured Claims. Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, the Other Secured Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.   *Treatment*:   Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 2 Claim (i) have its Claim be reinstated or receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the Effective Date or (ii) be otherwise rendered Unimpaired.

c.   *Voting*:   Class 2 is Unimpaired under the Plan.   Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.   Class 3 – Existing ABL Facility Claims

a.   *Classification*: Class 3 consists of all Allowed Existing ABL Facility Claims. Although all Existing ABL Facility Claims have been placed in one Class for the purposes of nomenclature, the Existing ABL Facility Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.   *Treatment*:   On the Effective Date, each holder of an Allowed Class 3 Claim shall, in full and final satisfaction, settlement, release, and discharge

22

of, and in exchange for, its Allowed Class 3 Claim, receive (i) Payment in Full in Cash; (ii) at the option of such holder of Allowed Class 3 Claims, on a dollar-for-dollar basis, first lien, first-out loans or commitments under the New ABL Facility, or (iii) such other less favorable treatment as to which the Debtors and the holder of such Allowed Class 3 Claim will have agreed upon in writing.

c.    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Term Loan Claims

a.    *Classification*: Class 4 consists of all Allowed Term Loan Claims. Although all Allowed Term Loan Claims have been placed in one Class for the purposes of nomenclature, the Allowed Term Loan Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.    *Allowance*:  Class 4 Claims are deemed Allowed in the aggregate principal amount of $948,750,000.00, plus any unpaid interest, fees, expenses and other amounts due and owing pursuant to the terms of the Term Loan Agreement as of the Petition Date.

c.    *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, in each case subject to the U.S. Citizen Determination Procedures (i) the right to participate in the Rights Offering in accordance with the Rights Offerings Procedures, (ii) its Pro Rata share of the New Take Back Preferred Equity or New Take Back Preferred Warrants, and (iii) its Pro Rata share of the New Common Equity or the New Term Lender Warrants, subject to dilution from the New Sponsor Warrants and conversion of the New Money Preferred Equity and the Management Incentive Plan.

With respect to (ii) above, each holder of an Allowed Class 4 Claim shall be entitled to receive a distribution in the form of New Take Back Preferred Equity to the extent permitted under the Jones Act Restriction, and New Take Back Preferred Warrants to the extent that New Take Back Preferred Equity cannot be issued to such holder because it is a Non-U.S. Citizen and the amount of New Take Back Preferred Equity to be delivered to it under all sections of the Plan, when added to the New Take Back Preferred Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction. The percentage ratio of the number of shares of New Take Back Preferred

23

Equity to the number of New Take Back Preferred Warrants to be issued to each holder of an Allowed Class 4 Claim that is a Non-U.S. Citizen is subject to the priorities set forth in the New Take Back Preferred Warrant Agreement.

With respect to (iii) above, each holder of an Allowed Class 4 Claim shall be entitled to receive a distribution in the form of New Common Equity to the extent permitted under the Jones Act Restriction and New Term Lender Warrants to the extent that New Common Equity cannot be issued to such holder because it is a Non-U.S. Citizen and the Pro Rata share of New Common Equity to be delivered to it under all sections of the Plan, when added to the New Common Equity being issued under the Plan to other Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction.  The percentage ratio of the number of shares of New Common Equity to the number of New Term Lender Warrants to be issued to each holder of an Allowed Class 4 Claim that is a Non-U.S. Citizen is subject to the priorities set forth in the New Term Lender Warrant Agreement.

d.   *Voting*:   Class 4 is Impaired under the Plan.   Therefore, holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.   Class 5 – General Unsecured Claims

a.   *Classification*:  Class 5 consists of all Allowed General Unsecured Claims.  Although all General Unsecured Claims have been placed in one Class for the purposes of nomenclature, the General Unsecured Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.   *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Debtor's business or in accordance with applicable court order (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by the Debtors or ordered by the Bankruptcy Court), or (ii) such other treatment that renders such holder Unimpaired.

c.   *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed Class 5 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

24

6.     Class 6 – Intercompany Claims

a.     *Classification*: Class 6 consists of all Allowed Intercompany Claims. Although all Allowed Intercompany Claims have been placed in one Class for the purposes of nomenclature, the Intercompany Claims against each applicable Debtor shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.     *Treatment*:  Each holder of an Allowed Class 6 Claim shall (i) have its Claim be paid, reinstated, or cancelled, to the extent determined appropriate by the Debtors with the reasonable consent of the Required Consenting Term Lenders, or (ii) receive such other treatment that renders such holder Unimpaired.

c.     *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

7.     Class 7 – Intercompany Interests

a.     *Classification*:  Class 7 consists of all Allowed Interests in the Debtors other than in ACL, separately classified by Debtor.

b.     *Treatment*:  Each holder of an Allowed Interest in Class 7 shall (i) have its Interest be reinstated or (ii) receive such other treatment that renders such holder Unimpaired.

c.     *Voting*:  Class 7 is Unimpaired under the Plan.  Holders of Allowed Interests in Class 7 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

8.     Class 8 – Interests in Finn Holding

a.     *Classification*: Class 8 consists of all Interests in Finn Holding.

b.     *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 8 Interest (or its designee which, if Finn Holdings is not the Reorganized Company, may include Reorganized Finn Holdings or a subsidiary) shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Interest (or an interest in a lower tier subsidiary if Finn Holdings is not the Reorganized Company), its Pro Rata share of the New Sponsor Warrants.

c.     *Voting*:  Class 8 is Impaired under the Plan.  Therefore, holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

25

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect (i) the Debtors' or Reorganized Debtors' rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims or (ii) the rights and defenses of any holder of Unimpaired Claims in respect of its Unimpaired Claims.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF PLAN

A.    *Voting Classes*

Holders of Class 4 Claims and Class 8 Interests as of the Voting Record Date are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

B.    *Presumed Acceptance of the Plan*

Classes 1, 2, 3, 5, 6, and 7 are Unimpaired under the Plan. Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant

to the Plan, and all distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be, and shall be, final.  Among other things, the Plan provides for a global settlement between the Sponsor, the Consenting Term Lenders, and the Debtors (the "Global Settlement") that provides substantial value to the Debtors' estates and allows for all Allowed General Unsecured Claims to be paid in full.  In accordance with the terms of the Restructuring Support Agreement, the Sponsor has agreed to waive any Sponsor Claims and such Sponsor Claims are deemed waived upon occurrence of the Effective Date.  As consideration for the Sponsor (i) agreeing to participate in and help effectuate certain Restructuring Transactions to the benefit of the Debtors' estates and their creditors, (ii) taking, or refraining from taking, certain actions that could jeopardize the Debtors' tax attributes, (iii) waiving any Sponsor Claims, as set forth herein and in the Restructuring Support Agreement, and (iv) taking other necessary actions to facilitate the Debtors' transition into, and emergence from, these chapter 11 cases, the Sponsor shall be included as a "Released Party" in the Plan.  The Debtors and the Consenting Term Lenders believe the Global Settlement is fair and reasonable, and represents a sound exercise of the Debtors' business judgment in accordance with Bankruptcy Rule 9019.

Although the Plan does not provide for substantive consolidation of the Estates, it also does not contemplate individual recoveries on a debtor-by-debtor basis. Rather, it represents a global and integrated series of compromises and settlements of all Allowed Claims and Interests against the Debtors, including, but not limited to, the settlement of all Allowed Claims held by the Consenting Term Lenders. The treatment of the Consenting Term Lenders' Claims and the set forth in the Plan supports maximum recoveries for all other creditors, including the unimpairment of holders of Claims in Class 5 (General Unsecured Claims).

B.      *Restructuring Transactions*

Prior to, on, or after the Effective Date, subject to and consistent with the terms of its obligations under the Plan and the Restructuring Support Agreement, and subject to the rights of the Consenting Term Lenders under the Restructuring Support Agreement, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Debtors, and/or to reincorporate or reorganize certain of the Debtors under the laws of jurisdictions other than the laws under which such Debtors currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, contributions, liquidations or dissolutions, as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Debtors vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions").  Subject to the terms of the Plan, in each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring Entity will perform the obligations of such Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another Debtor will perform such obligations.

In effecting the Restructuring Transactions, the Debtors shall be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (2) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (3) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law; and (4) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  To the extent known, any such Restructuring Transactions will be summarized in the Description of Restructuring Transactions, and in all cases, such transactions shall be subject to the terms and conditions of the Plan and any consents or approvals required under the Plan. The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Debtors and result in a tax efficient structure and emergence for the Debtors.

C.      *Sources of Consideration for Plan Distributions*

     1.      Rights Offering.

       (a)      *Rights Offering Procedures*. The Debtors will commence and consummate the Rights Offering in accordance with the Rights Offering Procedures.  The Rights Offering will be fully backstopped by the Backstop Commitment Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement.  Unless otherwise expressly allowed pursuant to the Backstop Commitment Agreement or the Rights Offering Procedures, the Subscription Rights may not be sold, transferred, or assigned.

       (b)      *Use of Proceeds*: On the Effective Date, the proceeds of the Rights Offering shall be used: (i) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; (ii) to fund Allowed Administrative Expense Claims payable on or after the Effective Date; and (iii)  to fund distributions under the Plan.

       (c)      *Backstop Commitment*: In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Commitment Parties will purchase, on or prior to the Effective Date, its respective Backstop Commitment Percentage of the Unsubscribed Shares (each as defined in the Backstop Commitment Agreement).

       (d)      *Treatment*: Subject to the U.S. Citizen Determination Procedures and the terms of the Rights Offering Procedures, each Rights Offering Participant shall be entitled to receive its Pro Rata share of (i) New Money Preferred Equity to the extent permitted under the Jones Act Restriction and (ii) New Money Preferred Warrants to the extent that New Money Preferred Equity cannot be issued to such Rights Offering Participant because it is a Non-U.S. Citizen and the Pro Rata share of New Money Preferred Equity to be delivered to it under all sections of the Plan, when added to the New Money Preferred Equity being issued under the Plan

28

to other Non-U.S. Citizens as of the Effective Date, would exceed the Jones Act Restriction. The percentage ratio of the number of shares of New Money Preferred Equity to the number of New Money Preferred Warrants to be issued to each Rights Offering Participant that is a Non-U.S. Citizen is subject to the priorities set forth in the New Money Preferred Warrant Agreement.

 2. Cash

The Reorganized Debtors shall fund distributions under the Plan required to be paid in Cash, if any, with Cash on hand, including Cash from operations and any Cash received on the Effective Date, borrowings under the DIP Facilities, and borrowings from the New ABL Facility.

 3. New ABL Facility

On the Effective Date, the Reorganized Debtors shall enter into the New ABL Facility. The New ABL Facility is expected to contain affirmative and negative covenants that are customary for similar facilities, and will be secured by the same assets as the ABL DIP Facility and, at the election of the New ABL Facility Lenders, the "Specified Real Property" (as defined in the DIP Orders).

Confirmation shall be deemed approval of the New ABL Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith) and the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New ABL Facility, including the New ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Debtors, the Required Consenting Term Lenders, and the New ABL Facility Agent may mutually agree to be necessary to consummate the New ABL Facility.

On the Effective Date, (a) all letters of credit issued under the ABL DIP Credit Agreement, shall be deemed issued or reissued, as applicable, under the New ABL Facility Credit Agreement in accordance with the terms and conditions of the New ABL Facility Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the ABL DIP Facility Agreement or New ABL Facility Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the New ABL Facility Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the New ABL Facility Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Existing ABL Facility Credit Agreement or the New ABL Facility Credit Agreement, as applicable, (including any Liens and security interests granted on the Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the New ABL Facility Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), with the priorities established in respect thereof under applicable non-bankruptcy law and any applicable intercreditor agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

29

The Reorganized Debtors and the persons granted liens and security interests under the New ABL Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

D.      *Corporate Existence*

Except as otherwise provided in the Plan or as otherwise may be agreed to between the Debtors and the Required Consenting Term Lenders, each of the Reorganized Debtors and their direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

E.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or causes of action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

The Plan shall be conclusively deemed to be adequate notice that Liens, Claims, charges or other encumbrances are being extinguished.  Any Person having a Lien, Claim, charge or other encumbrance against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

30

F.      *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan (including with respect to Unimpaired Claims), on the Effective Date: (1) the Existing ABL Facility Claims, the Term Loan Claims, the ABL DIP Facility Claims, the Term Loan DIP Facility Claims, the Interests in Finn Holding, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Debtors that are reinstated pursuant to the Plan or the Payoff Letter), shall be deemed cancelled, surrendered, and discharged as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and the Reorganized Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan or the Payoff Letter) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

G.      *Corporate and Other Entity Action*

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) appointment of the New Boards pursuant to Article V.I and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (2) the issuance and distribution of the New Common Equity and New Preferred Equity by the Reorganized Company; (3) entry into the New Organizational Documents; (4) entry into the New ABL Facility Documents; (4) entry into the Warrant Agreements and the issuance and distribution of the warrants thereunder by the Reorganized Company pursuant thereto; (5) implementation of the Restructuring Transactions; (6) implementation of the Management Incentive Plan; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure of the Debtors or the Reorganized Debtors, and any corporate or other Entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by

31

the security holders, managers, or officers of the Debtors or the Reorganized Debtors.  On or before the Effective Date, the appropriate officers of the Debtors or Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of the Reorganized Debtors, including any and all agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article V.G shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

H.    *New Organizational Documents*

On or prior to the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall, if so required under applicable state law, file their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

I.    *Directors and Officers of Reorganized Debtors*

As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of the Debtors shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Debtor entity shall be appointed in accordance with the respective New Organizational Documents.  The members of the New Boards will be identified in the Plan Supplement, to the extent known.  Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

1.    Reorganized Company Board

Subject to compliance with the Jones Act (such that the Reorganized Company shall at all times be a U.S. Citizen eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade), the initial Reorganized Company Board shall consist of 7 initial Directors on the Effective Date, including the CEO Director and 6 directors appointed by the Ad Hoc Group in accordance with the Restructuring Support Agreement and Shareholders Agreement.  The initial Reorganized Company Board shall be disclosed in the Plan Supplement, to the extent known, and in any event will be disclosed prior to the Combined Hearing.

2.    Officers of Reorganized Company

Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

3.    New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

J.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

K.    *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the New ABL Facility Credit Agreement and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the

33

making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

L.      *Management Incentive Plan*

On the Effective Date, the Management Incentive Plan shall become effective and shall be implemented in accordance with the terms set forth in the MIP Term Sheet annexed as Exhibit C to the Restructuring Support Agreement. All awards issued under the Management Incentive Plan, once converted, will be dilutive of all other New Common Equity issued pursuant to the Plan.

M.      *Procedures for Treating Disputed Claims and Interests Under the Plan*

1.      Disputed Claims and Interests Process

On and after the Effective Date, except as otherwise provided herein, all Claims and Interests will be paid in the ordinary course of business of the Reorganized Debtors. To the extent a proof of claim is filed, if the Debtors dispute any Claim or Interest, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Notwithstanding section 502(a) of the Bankruptcy Code, and considering the Unimpaired treatment of all holders of General Unsecured Claims under the Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn. The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under this section of the Plan to assert their claims in any forum as though the Debtors' cases had not been commenced.

Notwithstanding the foregoing, except insofar as a Claim or Interest is Allowed under the Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to Claims and Interests. Any objections to Claims or Interests shall be served and filed (a) on or before the ninetieth (90th) day following the later of (i) the Effective Date and (ii) the date that a proof of Claim or proof of Interest is filed or amended or a Claim or Interest is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or Interest, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtors.

2.      No Distributions Pending Allowance

Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

3.      Distributions after Allowance

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest (except to the extent payment of interest on such Allowed Claim is required by Article III.B.5).

4.      Estimation of Claims and Interests

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim or Disputed Interest pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim or Interest at any time during litigation concerning any objection to any Claim or Interest, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim or Disputed Interest, the amount so estimated shall constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Interest, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim or Interest. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

N.      *Authorization and Issuance of New Common Equity, New Preferred Equity and New Warrants*

(a)      On the Effective Date, the Reorganized Debtors shall issue the New Common Equity, New Preferred Equity, and the New Warrants in accordance with the terms of the Plan.  All of the New Common Equity, New Preferred Equity, and the New Warrants, when so issued, shall be duly authorized, validly issued, and, in the case of the New Common Equity and New Preferred Equity, fully paid, and non-assessable.  In no event shall Non-U.S. Citizens hold, in the aggregate, more than twenty-four percent (24%) of the total number of issued and outstanding shares in any class or series of the capital stock of the Reorganized Debtors, including in each of the Take Back Preferred Equity, New Money Preferred Equity, and New

35

Common Equity as of the Effective Date (the "Jones Act Restriction"). All of the New Common Equity underlying the New Money Preferred Equity (upon conversion to New Common Equity) and the New Warrants (upon payment of the exercise price in accordance with the terms of such New Warrants) shall also be duly authorized, validly issued, fully paid, and non-assessable.

(b)     If a holder of an Allowed Term Loan DIP Facility Claim, Allowed Class 4 Claim, Allowed Class 8 Interest, or Subscription Rights furnishes a U.S. Citizenship Affidavit to the Debtors on or before the Distribution Record Date and, after review, the Debtors, in the exercise of their reasonable judgment with the advice of counsel and in consultation with the Required Consenting Term Lenders, do not reject such U.S. Citizenship Affidavit as reasonable proof in establishing that such holder is a U.S. Citizen, such holder shall receive its share of New Common Equity, New Take Back Preferred Equity, or New Money Preferred Equity, as applicable, as of the Effective Date; provided, however, that if such holder is a Non-U.S. Citizen, or if the holder does not furnish a U.S. Citizenship Affidavit to the Debtors on or before the Distribution Record Date, or if the U.S. Citizenship Affidavit of such holder has been rejected by the Debtors, in their reasonable judgment with the advice of counsel and in consultation with the Required Consenting Term Lenders, on or before the date that is five (5) Business Days after the Distribution Record Date after review by the Debtors pursuant to this Article V.N.b (the "U.S. Citizen Determination Procedures"), such holder shall be treated as a Non-U.S. Citizen for purposes of its treatment under Articles II.E, III.B.4, III.B.8 and V.C.1 hereof, as applicable. In connection with the Debtors' review of any U.S. Citizenship Affidavit under these U.S. Citizen Determination Procedures, the Debtors shall have the right to require the holder furnishing the U.S. Citizenship Affidavit to provide the Debtors with such documents and other information as it may reasonably request as reasonable proof confirming that the holder is a U.S. Citizen. The Debtors shall treat all such documents and information provided by any holder as confidential and shall limit the distribution of such documents and information to the Debtors' personnel and counsel that have a "need-to-know" the contents thereof and to the U.S. Coast Guard as may be necessary. The Debtors shall (i) claim confidential treatment and exemption from Freedom of Information Act requests (a "FOIA Request") for any such documents and information submitted to the U.S. Coast Guard, and (ii) notify the relevant holder (x) if any such holder's documents and information are submitted to the U.S. Coast Guard, and (y) if the Debtors subsequently receives notice from the U.S. Coast Guard that it has received a FOIA Request and that any such document that has been identified by the U.S. Coast Guard as responsive to such a FOIA Request, in which case the Debtors shall allow such holder an opportunity to redact any confidential commercial, financial and proprietary business information exempt from Freedom of Information Act disclosure pursuant to 5 U.S.C. § 552(b)(4) that is in any such document.

(c)     The New Term Lender Warrants will be issued pursuant to the terms of the New Term Lender Warrant Agreement. Each New Term Lender Warrant will, subject to the terms of the New Term Lender Warrant Agreement, be exercisable for one (1) share of New Common Equity.

(d)     The New Sponsor Warrants will be issued pursuant to the terms of the New Sponsor Warrant Agreement. Each New Sponsor Warrant will, subject to the terms of the New Sponsor Warrant Agreement, be exercisable for one (1) share of New Common Equity.

(e)      The New Take Back Preferred Warrants will be issued pursuant to the terms of the New Take Back Preferred Warrant Agreement.  Each New Take Back Preferred Warrant will, subject to the terms of the Take Back Preferred Warrant Agreement, be exercisable for one (1) share of New Take Back Preferred Equity.

(f)      The New Money Preferred Warrants will be issued pursuant to the terms of the New Money Preferred Warrant Agreement.  Each New Money Preferred Warrant will, subject to the terms of the New Money Preferred Warrant Agreement, be exercisable for one (1) share of New Money Preferred Equity.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise ordered by the Bankruptcy Court or provided herein, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed (or amended and assumed, as applicable) by the applicable Debtor counterparty in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, and assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article VI.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, the Reorganized Company in accordance with its terms (including any amendments to any Executory Contracts and Unexpired Leases that were entered into after the Petition Date), except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified or stricken such that the transactions contemplated by the Plan shall not entitle the non-Debtor that is party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree without further order of the Bankruptcy Court.  In the event of a dispute regarding (1) the amount of any payments to cure

37

such a default, (2) the ability of the Reorganized Company or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made within seven (7) business days following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of the applicable cure amount, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

C.    *Insurance Policies & Indemnification Obligations*

Each of the insurance policies of the Debtors, including all director and officer insurance policies in place as of the Petition Date, are deemed to be and treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies, including all director and officer insurance policies in place as of the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, equityholders, agents, or employees, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

In addition, after the Effective Date, all current and former officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date.

Notwithstanding anything in the Plan, any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, sponsors, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, provided, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such

38

Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, any indemnification and reimbursement provisions under the ABL DIP Facility Agreement or Term DIP Loan Facility Agreement which are expressly stated to survive any repayment or conversion under, or termination of, the ABL DIP Facility Agreement or Term DIP Loan Facility Agreement, as applicable, shall survive any cancellation, conversion or discharge under the Plan in accordance with its terms, and any rights that the ABL DIP Facility Agent or Term Loan DIP Facility Agent may have under the agency provisions of the ABL DIP Facility Agreement or Term DIP Loan Facility Agreement, as applicable, shall survive any such cancellation or discharge.

D.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to the Reorganized Company, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

E.      *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Debtors that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors has any liability thereunder.

F.      *Contracts and Leases Entered into after Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, will be performed by the applicable Debtor or Reorganized Debtor, as the case may be, liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

G.      *Rejection Damages Claims*

If the rejection of an executory contract or unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 5 (General Unsecured Claims).

H.      *Compensation and Benefits Plans*

All compensation and benefit plans, policies, programs, agreements and arrangements of the Debtors applicable to their respective employees, officers, retirees, consultants, contractors, and non-employee directors, including all plans, policies, programs, agreements and arrangements relating to employment, severance, incentive, bonus, retention, savings, retirement, vacation and sick leave benefits, relocation benefits, fringe benefits, paid time off, healthcare, disability, deferred compensation, pension, and life and accidental death and dismemberment insurance are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

B.      *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  If the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

Without further order of the Bankruptcy Court, the Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.     Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable compensation and documented expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     Delivery of Distributions to Term Loan Agent

No later than two (2) Business Days after the Distribution Record Date, or as soon thereafter as is reasonably practicable, the Term Loan Agent shall provide to counsel to the Debtors a list of all holders of Term Loan Claims as of such date and such additional information as requested by counsel to the Debtors or the Disbursing Agent in order to make distributions under the Plan. The Term Loan Agent may, in its sole discretion, limit the further assignment of Term Loan Claims to allow for the accurate recording of the holders of Term Loan Claims as of the Distribution Record Date with respect to the Term Loan Claims. All distributions on account of Term Loan Claims shall be made by the Disbursing Agent directly to holders of Term Loan Claims or such holder's authorized designee in accordance with terms of the Plan and the Term Loan Agreement.  All reasonable and documented fees and expenses of the Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the Chapter 11 Cases or the implementation of the Plan, including but not limited to as part of this Article VII.D.1, shall be paid by the Reorganized Company.

2.     Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized Debtors.

3.     Minimum Distributions

No fractional New Common Equity, New Warrants, or New Preferred Equity shall be distributed, and no Cash shall be distributed with respect to such fractional amounts.  When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Equity, New Warrants, or, if applicable, New Preferred Equity that is not a whole number, the actual distribution of New Common Equity, New Warrants, or New Preferred Equity, as applicable, shall be rounded as follows:  (a) fractions of greater than one-half (½) shall be rounded to the next higher whole number, and (b) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Equity, New Warrants, or New Preferred Equity, as

41

applicable, to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

        4.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such distribution was attempted to be made; provided further, that the Debtors or Reorganized Debtors, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable.  After such date, all unclaimed property or interests in property shall revert to Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred; provided, that all distributions of (i) the New Common Equity, (ii) the New Preferred Equity, (iii) the New Warrants, and (iv) Cash, that are unclaimed by a holders within a Class of Claims, as applicable, shall be distributed on a Pro Rata basis to the holders of Class of Claims, as applicable, whose distributions of the preceding items (i)-(iv) on the Effective Date were not returned as undeliverable.

E.      *Exemption from Securities Laws*

        (a)        The offer, issuance, and distribution under the Plan of (i) the New Common Equity, (ii) the New Term Lender Warrants, (iii) New Take Back Preferred Equity, and (iv) the New Take Back Preferred Warrants shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, the New Organizational Documents and the applicable Warrant Agreements, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

        (b)        The offer, issuance and sale of (1) the New Sponsor Warrants and (2) the New Money Preferred Equity and New Money Preferred Equity Warrants (and, in the case of clause (i) only, the Subscription Rights) to: (i) Rights Offering Participants pursuant to the Rights Offering, (ii) the Backstop Commitment Parties under the Backstop Commitment Agreement (including the New Money Preferred Equity and/or any New Money Preferred Equity comprising the Backstop Commitment Premium and the Unsubscribed Securities), and (iii) the Term Loan DIP Facility Lenders in connection with the exchange for Term Loan DIP Facility

42

Claims, the DIP Conversion Discount (as defined in the Term Loan DIP Facility Agreement) and the DIP Backstop Premium (as defined in the Term Loan DIP Facility Agreement), in each case, who are "accredited investors" as defined in Rule 501(a) promulgated under the Securities Act, is being made in reliance on the exemption from registration set forth in section 4(a)(2) thereof and/or Regulation D thereunder and on equivalent state law registration exemptions or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, another available exemption from registration under the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act. Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, the New Organization Documents, and the applicable Warrant Agreements.

(c)     Each holder of New Common Equity, New Preferred Equity and New Warrants shall be deemed to be a party to and bound to the terms of the Shareholders Agreement from and after the Effective Date, even if not a signatory thereto.

F.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.  Notwithstanding the above, each holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. The Debtors have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations. The Debtors may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder.

G.     *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, the ABL DIP Facility, the Term Loan DIP Facility, the DIP Orders, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

H.      *Setoffs and Recoupment*

Except for Claims that are expressly Allowed hereunder, the Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest; provided, that neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest.

I.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor or Reorganized Debtors; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the party that is not a Debtor or Reorganized Debtor, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.  To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or Reorganized Debtors entity on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtors entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtors entity annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the

44

respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including any holders of Claims, may hold against any other Entity under any insurance policies, including against insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

J.      *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

### ARTICLE VIII
### SETTLEMENT, RELEASE, INJUNCTION,
### AND RELATED PROVISIONS

A.      *Compromise and Settlement*

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to applicable bankruptcy law.  In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan.  The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto.  Nothing in the Plan shall compromise or settle, in any way whatsoever, (i) any Causes of Action that the Debtors or Reorganized Debtors, as applicable, may have against any Entity that is not a Released Party or (ii) any Claims or Interests in Classes 1, 2, 3, 5, 6, or 7.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Debtors not previously Allowed (if any), and (2) claims (including Causes of Action) against other Entities.

B.      *Discharge of Claims and Termination of Interests*

Except as otherwise provided in the Plan and the Payoff Letter, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Debtors, the Debtors' estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

C.      *Release of Liens*

**Except as otherwise expressly provided in the Plan or the Payoff Letter, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New ABL Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New ABL Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and each of their successors and assigns, and the New ABL Facility Agent, the Term Loan DIP Facility Agent and the Term Loan Agent shall be authorized to release any such mortgages, deeds of trust, Liens, pledges or other security interests held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges or other security interests, including the execution, delivery and filing or recording of any related releases or discharges as may be requested by the Reorganized Debtors or may be required in order to effectuate the foregoing.**

D.      *Releases of Released Parties*

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to applicable bankruptcy law, of the releases described in this Article VIII.D and shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by this Article VIII.D; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity (including the Debtors) asserting any claim or Cause of Action released pursuant to this Article VIII.D.**

10442818v1

1.      Releases by the Debtors

**Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, the Debtors and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that the Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Debtor), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the ABL DIP Facility Claims, the Term Loan DIP Facility Claims, the Existing ABL Facility Claims, the Term Loan Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New ABL Facility, (iii) the Disclosure Statement, (iv) the Restructuring Support Agreement, (v) the First Amendment to the Term Loan Agreement, (vi) the Bridge Funding Letter Agreement, (vii) the Backstop Commitment Agreement, or (viii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.**

2.      Releases by Holders of Claims or Interests

**Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Debtors and Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims**

47

assertable by or on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Debtor), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the ABL DIP Facility Claims, the Term Loan DIP Facility Claims, the Existing ABL Facility Claims, the Term Loan Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New ABL Facility, (iii) the Disclosure Statement, (iv) the Restructuring Support Agreement, (v) the First Amendment to Term Loan Agreement, (vi) the Bridge Funding Letter Agreement, (vii) the Backstop Commitment Agreement, or (viii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.  For the avoidance of doubt, the releases described in this Article VIII.D.2 do not release any Claims or Interests under Classes 1, 2, 3, 5, 6, or 7.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan or the Exit ABL Facility Loan Documents.

E.     *Exculpation*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the ABL DIP Facility, the Term DIP Facility, the New ABL Facility, the Rights Offering, the Management Incentive Plan, the Disclosure Statement, the Restructuring Supporting Agreement, the Restructuring Transactions, the Bridge Funding Letter Agreement, and the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and,

therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

F.    *Injunction*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

## ARTICLE IX
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

A.    *Conditions to Effective Date*

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B:

1.    the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

2.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

3.    the Bankruptcy Court shall have entered the DIP Orders and the Final DIP Order shall have become a Final Order;

4.    Final DIP Order in such form and substance as is (i) consented to by each of the Debtors and to the Required Consenting Lenders, (ii) reasonably acceptable to the ABL DIP Agent  and Term Loan DIP Agent, and (iii) and otherwise consistent with the Restructuring Support Agreement;

5.    the Bankruptcy Court shall have entered the Confirmation Order and such order shall have become a Final Order;

6.    all authorizations, consents, regulatory approvals (including from the U.S. Coast Guard), rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of the Debtors' permits and licenses,

49

shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

7.    except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been (i) executed, delivered, assumed, or performed, as the case may be, (ii) to the extent required, filed with the applicable Governmental Units in accordance with applicable law, (iii) any conditions contained in such documents (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, and (iv) in each case shall be consistent with the Restructuring Support Agreement;

8.    there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

9.    the conditions to the effectiveness of the New ABL Facility shall have been satisfied or waived in accordance with the terms of the New ABL Facility Documents on or prior to the Effective Date and Payment in Full of the ABL DIP Facility Claims shall occur concurrently with the occurrence of the Effective Date;

10.   the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date; and

11.   the Professional Fees Escrow Account shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan.

B.    *Waiver of Conditions*

The conditions to Confirmation and the Effective Date set forth in this Article IX may be waived only by the Debtors and the Required Consenting Term Lenders, without notice, leave, or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

## ARTICLE X
## MODIFICATION, REVOCATION OR
## WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan or the Payoff Letter, and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, but subject to the consent rights set forth in the Restructuring Support Agreement, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, and subject to the consent of the Required Consenting Term Lenders, each Debtor expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring Transactions in a manner that preserves favorable tax attributes; *provided, however*, that any such amendment or modification shall not cause Class 5 General Unsecured Claims to be Impaired.  Each Debtor may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization, subject in each instance to the Restructuring Support Agreement.  If the Debtors revoke or withdraw the Plan, Confirmation does not occur, or the Effective Date does not occur within twenty-one (21) days of the Confirmation Date (the "Outside Consummation Date")[2] (which period may be extended by the Debtors with the consent of the Required Consenting Term Lenders), then:

---

[2]    If, prior to the Outside Consummation Date, all conditions precedent to effectiveness of the Plan have been satisfied or waived, as applicable, or, for conditions that by their nature are to be satisfied on the Effective Date, shall then be capable of being satisfied, except the requisite regulatory approvals have not been obtained (including, without limitation, approval by the U.S. Coast Guard), the Outside Consummation Date shall be automatically extended by 14 calendar days, or to such other time as agreed between the parties to the Restructuring Support Agreement.

(1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a)  constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.  For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Term Lenders under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.  ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.I.1;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.    determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or final decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII, regardless of whether such termination occurred before or after the Effective Date;

22.     determine whether and in what amount a Claim is Allowed;

23.     hear and determine all disputes arising from, or related to, any determination by the Debtors in their reasonable discretion with respect to the acceptance, non-acceptance or rejection of any U.S. Citizenship Affidavit as reasonable proof in establishing that any person otherwise entitled to shares of New Common Equity of New Preferred Equity under the Plan is a U.S. Citizen under the Jones Act;

24.     recover all assets of the Debtors and property of the Estates, wherever located;

25.     resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

26.     hear and determine any rights, claims, or Causes of Action held by, or accruing to, the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

27.     adjudicate any maritime claims or liens, to the extent permitted by law;

28.     enforce all orders previously entered by the Bankruptcy Court; and

29.     hear any other matter as to which the Bankruptcy Court has jurisdiction.

*provided*, however, that documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection or dispute resolution clauses in such documents.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors in these cases on the Effective Date.  After the Effective Date, the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding the foregoing, nothing herein shall prohibit the Reorganized Company (or the Disbursing Agent on behalf of the Reorganized Company) from paying any Quarterly Fees that become due and payable.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

55

admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before Consummation.

E.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.     *Notices*

All notices, requests, and demands to or upon the Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

> American Commercial Lines Inc.
> 1701 E. Market St.
> Jeffersonville, Indiana 47130
> Attention:      Dawn Landry, SVP & General Counsel
> Email:          dawn.landry@bargeacbl.com
>
> with a copy to:
>
> Milbank LLP
> 55 Hudson Yards
> New York, New York 10001
> Attention:      Dennis F. Dunne, Esq.
>                 Samuel A. Khalil, Esq.
>                 Parker Milender, Esq.
> Email:          ddunne@milbank.com
>                 skhalil@milbank.com
>                 pmilender@milbank.com

If to the Existing ABL Facility Agent or the ABL DIP Facility Agent:

> 2450 Colorado Avenue, Suite 3000 West
> Santa Monica, California 90404
> Attn: Business Finance Division Manager
>
> with a copy to:
>
> Goldberg Kohn Ltd.
> 55 East Monroe, Suite 3300

56

Chicago, Illinois 60603
Attention:     Randall Klein, Esq.
               Prisca Kim, Esq.
Email:         randall.klein@goldbergkohn.com
               prisca.kim@goldbergkohn.com

If to the Consenting Term Lenders:

Davis Polk & Wardell LLP
450 Lexington Avenue
New York, NY 10017
Attention:     Damian S. Schaible, Esq.
               Darren S. Klein, Esq.
               Erik Jerrard, Esq.
Email:         damian.schaible@davispolk.com
               darren.klein@davispolk.com
               erik.jerrard@davispolk.com

If to the Sponsor:

Platinum Equity, LLC
360 N. Crescent Dr.
Beverly Hills, CA 90210
Attention:     Michael Fabiano
               Koustubh Patwardhan
Email:         mfabiano@platinumequity.com
               kpatwardhan@platinumequity.com

In the Notice of Entry of Confirmation Order, the Debtors shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the United States Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After service of the Notice of Entry of Confirmation and the occurrence of the Effective Date, the Debtors shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the United States Trustee and those Entities who have filed such renewed requests.

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  For the avoidance of doubt, (i) upon the Effective Date, the automatic stay pursuant to Bankruptcy Code section 362 of any litigation proceedings against or involving the Debtors shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

57

H.  *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.  *Exhibits*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

J.  *Consent Rights of Required Consenting Term Lenders*

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Required Consenting Term Lenders set forth in the Restructuring Support Agreement with respect to the form and substance of the Plan and the Plan Supplement are fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.  In case of a conflict between the consent rights of the Required Consenting Term Lenders set forth in the Restructuring Support Agreement with the consent rights of the Required Consenting Term Lenders set forth in the Plan or Plan Supplement, the consent rights in the Restructuring Support Agreement shall control.

K.  *Nonseverability of Plan Provisions*

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without consent of the Debtors and the Required Consenting Term Lenders and, regarding the rights, obligations and releases in respect of the Existing ABL Facility or ABL DIP Facility, the written consent of Existing ABL Facility Agent and ABL DIP Facility Agent; and (3) nonseverable and mutually dependent.

L.  *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to

58

section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

M.    *Closing of Chapter 11 Cases*

Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, any applicable Local Rules of the Bankruptcy Court, and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.    *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

O.    *Conflicts*

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of a conflict between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); *provided, that*, in the event any such conflict is a material conflict of the type that would require the Debtors to re-solicit the votes of Holders of Claims against the Debtors under section 1127 of the Bankruptcy Code, the Plan shall control solely with respect to such provision giving rise to such material conflict. In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

P.    *Dissolution of Creditors' Committee*

On the Effective Date, the Committee (if one is appointed) shall be deemed to have been dissolved, and the members thereof, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of prosecuting  requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date.

*[Remainder of page intentionally left blank]*

Dated:  February 7, 2020

Respectfully submitted,

ACBL OLDCO, LLC
ACBL RIVER OPERATIONS LLC
ACBL TRANSPORTATION SERVICES LLC
ACL I CORPORATION
ACL PROFESSIONAL SERVICES INC.
AMERICAN COMMERCIAL BARGE LINE LLC
AMERICAN COMMERCIAL LINES INC.
AMERICAN COMMERCIAL LINES INTERNATIONAL LLC
COMMERCIAL BARGE LINE COMPANY
OLD JB LLC

By:    /s/ David J. Huls
   Name: David J. Huls
   Title: SVP & CFO


FINN HOLDING CORPORATION


By:    /s/ Justin Maroldi
   Name: Justin Maroldi
   Title: Assistant Secretary

60

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR A SOLICITATION OF AN OFFER WITH RESPECT TO ANY SECURITIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.  THIS RESTRUCTURING SUPPORT AGREEMENT IS SUBJECT IN ALL RESPECTS TO FEDERAL RULE OF EVIDENCE 408 AND ANY STATE LAW EQUIVALENTS.**

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (together with all exhibits, schedules, and attachments hereto, which includes the Restructuring Term Sheet (as defined herein), each as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of January 31, 2020, is entered into by and among:

(i)    ACL I Corporation, American Commercial Lines Inc. ("ACL"), Commercial Barge Line Company ("CBLC"), American Commercial Barge Line LLC, American Commercial Lines International LLC, ACBL Oldco, LLC, ACBL Transportation Services LLC, ACBL River Operations LLC, Old JB LLC, and ACL Professional Services Inc. (collectively, the "Company");

(ii)    The undersigned lenders (collectively, the "Consenting Term Lenders") under that certain Term Loan Credit Agreement, dated as of November 12, 2015, among Commercial Barge Line Company, as borrower, American Commercial Lines Inc., as holdings, and various lenders thereto (as amended, modified, supplemented, or otherwise restated from time to time, the "Term Loan Credit Agreement", and the term loans made thereunder, the "Term Loans");

(iii)    Certain Consenting Term Lenders identified as "DIP Commitment Party" on the signature pages or applicable Joinder Agreement hereto who commit subject to the terms and conditions herein, to provide, or cause to provide, certain postpetition term loan financing (the "DIP Term Loan Facility") to the Debtors pursuant to the Restructuring (each such party, a "DIP Commitment Party"); and

(iv)    Certain affiliates and investment funds of Platinum Equity, LLC set forth on the attached signature pages (collectively, the "Sponsor") that currently indirectly hold 100% of the existing common stock and any other equity, ownership or profit interests (the "Existing Equity Interests") of the Company.

Each of the Company, the Consenting Term Lenders, the Sponsor and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof is referred to herein as a

"Party" and collectively as the "Parties."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet setting forth the terms of the Restructuring (as defined herein), a copy of which is attached hereto as **Exhibit A** (including any exhibits and schedules thereto, the "Restructuring Term Sheet").

## RECITALS

**WHEREAS**, the Parties have engaged in arm's-length, good faith discussions regarding a restructuring of certain of the Company's indebtedness and other obligations, including the Company's indebtedness and obligations under the Term Loan Credit Agreement;

**WHEREAS**, the Parties have agreed to undertake a recapitalization of the Company (the "Restructuring"), pursuant to a pre-packaged plan of reorganization and as may be amended from time to time (the "Plan" and, any corresponding disclosure statement, the "Disclosure Statement") in connection with the Company's voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") to be filed with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

**WHEREAS**, the Company has requested that each of the Consenting Term Lenders and the Sponsor (each a "Consenting Party" and, collectively, the "Consenting Parties") sign this Agreement to support the Restructuring.

**WHEREAS**, subject to the terms and conditions set forth herein, the Parties have agreed to take certain actions in support of the Restructuring on the terms set forth in the Restructuring Term Sheet, the Plan, and this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each Consenting Party, on a several but not joint basis, agree as follows:

## AGREEMENT

**Section 1.**    **Definitive Documents**.

Definitive documents shall consist of (i) documents implementing and achieving the Restructuring, including any substantive "first-day" or "second-day" motion, the motion seeking approval of the ABL DIP Facility and the DIP Term Loan Facility (the "DIP Motion"), the DIP Documents (as defined in **Exhibit B** (the "DIP Term Loan Facility Term Sheet")), the Plan, Disclosure Statement, the Preferred Backstop Commitment Agreement (as defined, and on the terms set forth in **Exhibit D**), plan supplement, ballots, solicitation procedures, exit financing agreements, and corporate governance documents; (ii) substantive motions or pleadings seeking approval or confirmation of any of the foregoing documents, including the motion to approve the Disclosure Statement and solicitation procedures, and brief in support of confirmation; (iii) any order(s) or proposed forms of orders to approve any of the foregoing, including the DIP Motion (the "DIP Orders"), the Disclosure Statement, solicitation procedures, and the Plan (including, without limitation, the Confirmation Order) (collectively (i)-(iii), the "Definitive Documents").

The Definitive Documents shall (i) contain the Stated Equity Value determined in accordance with the Restructuring Term Sheet, (ii) contain terms, conditions, covenants, representations and warranties consistent with this Agreement, the Restructuring Term Sheet and the Plan in all material respects and, (iii) except as set forth herein, otherwise in form and substance acceptable to the (A) Company, (B) Initial DIP Commitment Parties who hold, in aggregate, at least 50.1% in principal amount of the DIP Commitments as of the date hereof (the "Required DIP Commitment Parties"), and (C) Consenting Term Lenders who hold, in aggregate, at least 50.1% in principal amount under the Term Loan Credit Agreement held by the Consenting Term Lenders (the "Required Consenting Term Lenders"); *provided* that such terms, conditions, covenants, representations and warranties shall be reasonably acceptable to the Sponsor solely with respect to provisions adversely affecting its rights or treatment under this Agreement or the Plan; *provided further*, that the DIP Documents shall also be in form and substance acceptable to each Initial DIP Commitment Party.

Section 2.   **Milestones**

The Company shall comply with each of the following milestones, as applicable, unless otherwise expressly and mutually agreed in writing among the Company and the Required Consenting Term Lenders (in each case, with email from counsel being sufficient) (subparts (a)–(g) below, the "Milestones"):

(a)   commence solicitation of the Plan in accordance with section 1126(b) of the Bankruptcy Code not later than February 6, 2020 (the "Solicitation Commencement Date");

(b)   obtain a commitment letter for the ABL exit financing (the "ABL Exit Financing Commitment") with parties and on terms acceptable to the Company, the Required Consenting Term Lenders and the Required DIP Commitment Parties by not later than fourteen (14) days after the Petition Date;

(c)   commence the Chapter 11 Cases by not later than February 7, 2020 (the "Petition Date");

(d)   file, on, or within one (1) Business Days (as defined herein) of the Petition Date, the Plan, Disclosure Statement, DIP Motion, a motion to approve the Preferred Backstop Commitment Agreement and a motion scheduling a combined hearing on the Plan and Disclosure Statement;

(e)   obtain entry of an order approving the Preferred Backstop Commitment Agreement not later than thirty (30) days after the Petition Date, subject to court availability;

(f)   obtain entry of (i) an interim DIP Order not later than three (3) Business Days after the hearing on the "first-day" motions, subject to court availability, and (ii) a final DIP Order not later than forty (40) days after the Petition Date, subject to court availability;

(g)   obtain and close the ABL DIP Financing no later than (3) Business Days after the entry of the interim DIP Order, which shall roll up the obligations outstanding under

the that certain Amended and Restated Revolving Credit Agreement, dated as of November 12, 2015, among American Commercial Lines Inc. and certain of its affiliates as borrowers and the various lenders thereto (as amended, modified, supplemented, or otherwise restated from time to time, the "ABL Credit Agreement") as of the Petition Date;

(h)     obtain entry of an order approving the Disclosure Statement and confirming the Plan (the "Confirmation Order") not later than forty-five (45) days after the Petition Date, subject to court availability; and

(i)     reach the Plan Effective Date (as defined in the Restructuring Term Sheet) not later than 21 days after entry of the Confirmation Order (the "Outside Consummation Date"); provided that if, prior to the Outside Consummation Date, all conditions precedent to effectiveness of the Plan (as provided therein) have been satisfied or waived, as applicable, or, for conditions that by their nature are to be satisfied on the Effective Date, shall then be capable of being satisfied, except the requisite regulatory approvals have not been obtained (including, without limitation, approval by the Coast Guard), the Outside Consummation Date shall be automatically extended by 14 calendar days, or to such other time as agreed between the Parties.

**Section 3.     Restructuring and Related Support**.

3.01.     The Company's Obligations.     During the Effective Period (as defined herein), the Company covenants and agrees to perform and comply, as applicable, with the following obligations:

(a)     use commercially reasonable efforts to (i) pursue the Restructuring on the terms, and in accordance with this Agreement, including the Milestones, by, among other things, negotiating in good faith and implementing this Agreement, the Definitive Documents, and the transactions contemplated hereby and thereby, and (ii) cooperate with the Consenting Term Lenders in an effort to obtain necessary Bankruptcy Court approval of the Definitive Documents to consummate the Restructuring;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address such impediment in a manner reasonably acceptable to the Required Consenting Term Lenders and the Required DIP Commitment Parties;

(c)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approval for the Restructuring;

(d)     not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Restructuring, this Agreement, or the Plan;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent necessary, including lease counterparties and employees;

(f)      timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases; (iv) seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization; or (v) sustaining a challenge to the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, any portion of the Term Loans or the liens securing such instruments, or asserting any other cause of action against or with respect or relating to the Term Loans or any prepetition liens securing the Term Loans;

(g)      not engage in any material merger, consolidation, disposition, acquisition, investment, dividend, sale-leaseback, or similar transaction outside the ordinary course without Required Consenting Term Lender approval, except as provided in the Definitive Documents;

(h)      subject to the terms of the DIP Orders and any applicable engagement or fee letters, timely pay the reasonable and documented fees and expenses of the Consenting Term Lenders arising prior to and after the Petition Date, consistent with all governing retention agreements;

(i)      not initiate or seek court approval for any employee incentive, retention or severance plan, except for (i) the management incentive plan on the terms set forth in **Exhibit C** hereto, or (ii) the relief requested in the Company's "first day" employee wage motion and order; provided, however, in the case of (ii), the employee wage motion and order shall not provide for any relief associated with any employee incentive plan, retention plan or severance plan not in existence as of December 31, 2019;

(j)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring; and

(k)      not seek, solicit, or support any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership sale of assets, financing (debt or equity), refinancing, or restructuring of the Company other than the Restructuring (an "Alternative Transaction"); provided that, if the Company receives a written or oral proposal or expression of interest regarding any Alternative Transaction, within one (1) Business Day, the Company shall notify (with email being sufficient) counsel to the Sponsor and the Consenting Term Lenders of any such proposal or expression of interest, with such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof.  For the avoidance of doubt, and not

5

withstanding any provisions to the contrary herein, in order to fulfill the Company's fiduciary obligations, the Company may receive proposals or offers for Alternative Transactions from other parties and discuss and/or analyze such Alternative Transactions, without breaching or terminating this Agreement.

3.02.    Nothing in this Agreement shall require any director or officer of any Company entity to take any action or inaction that would be inconsistent with their fiduciary duties to the Company entity.  No action or inaction on the part of any director or officer of the Company entity that such officer or director believes is consistent, their fiduciary duties shall be limited or precluded by this Agreement; *provided*, that if the Company decides, in the exercise of its fiduciary duties, to pursue an Alternative Transaction, the Company shall notify (with email being sufficient) counsel to the Sponsor and the Consenting Term Lenders within one (1) Business Day of such decision.

3.03.    Notwithstanding anything to the contrary herein, nothing in this Agreement shall create or impose any additional fiduciary obligations upon any Company entity or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of any Company entity, that such entities did not have prior to the Agreement Effective Date.

3.04.    <u>Consenting Term Lenders' Obligations</u>.  During the Effective Period, the Consenting Term Lenders covenant and agree to perform and comply, as applicable, with the following obligations; *provided that*, for the avoidance of doubt, the Consenting Term Lenders shall not bear any costs or expenses of complying with any provision contained in this section 3.04 (with the exception of any costs and expenses that may be incurred by the Consenting Term Lenders' professionals):

(a)    use commercially reasonable efforts to (i) support the Restructuring, including, as applicable, by implementing this Agreement, the Plan, applicable Definitive Documents, and the transactions contemplated hereby and thereby, (ii) act in good faith; and (iii) take any action necessary or reasonably requested by the Company in a timely matter, including to obtain the requisite regulatory and/or third-party approval, so as to effectuate and implement the Restructuring as soon as possible;

(b)    subject to receipt of the Disclosure Statement and any other solicitation materials with respect to the Plan by the earlier of (i) the Petition Date and (ii) at least one Business Day before the applicable voting deadline, vote any claims against the Company, including each of its claims under the ABL Credit Agreement, the Term Loan Credit Agreement, the Term Loan DIP Facility, and the ABL DIP Facility, respectively, and any other claims against the Company (such claims, together with any claims the Consenting Term Lenders and the Sponsor may have against the Company, the "<u>Company Claims</u>") and any interests in the Company (such interests, together with any interests the Consenting Term Lenders and the Sponsor may have in the Company, the "<u>Company Interests</u>" and, collectively with the Company Claims, the "<u>Company Claims/Interests</u>"), to accept the Plan by delivering a duly executed and completed ballot accepting

the Plan on a timely basis during the solicitation of votes for the Plan (the "Solicitation") and consenting to and, if applicable, not opting out of, the releases set forth in the Plan;

(c)     support the DIP Motion and entry of the DIP Orders in accordance with this Agreement;

(d)     subject to Section 7.08, not (i) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Plan, (ii) object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan, or (iii) propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization for the Company other than the Plan;

(e)     not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Restructuring, this Agreement, or the Plan;

(f)     negotiate in good faith regarding the terms of any appropriate additional or alternative provisions or agreements, whether requested by the Company or otherwise, to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring;

(g)     in the case of the DIP Commitment Parties, provide the Term Loan DIP Facility on the terms and conditions substantially as set forth herein;

(h)     in the case of the Initial DIP Commitment Parties that become party to the Preferred Backstop Commitment Agreement (the "Backstop Commitment Parties"), backstop the offering of equity interests described on the terms and conditions substantially as set forth in **Exhibit D** hereto;

(i)     not take any action, including, without limitation, initiating or joining in any legal proceeding, that is materially inconsistent with its obligations under this Agreement;

(j)     forbear from exercising, directly or indirectly, its rights or remedies or from asserting or bringing any claims under or with respect to the ABL Credit Agreement or the Term Loan Credit Agreement, as applicable, against the Company or any guarantor thereof or any of their respective assets; and

(k)     if reasonably requested by the Company, use commercially reasonable efforts to support approval of the Disclosure Statement and confirmation of the Plan by filing papers and appearing in the Bankruptcy Court in support thereof.

3.05.    DIP Commitment.

(a)    Subject to the termination rights of each DIP Commitment Party set forth in Section 7.01 (i) each DIP Commitment Party that is a Consenting Term Lender on the Agreement Effective Date (each an "Initial DIP Commitment Party") commits to provide, or cause to provide, its share of the DIP Term Loan Facility as set forth in Schedule 1 hereto on the terms and conditions substantially as set forth in the DIP Term Loan Facility Term Sheet and otherwise subject to relevant Definite Documents, *provided* that any Consenting Term Lender that executes a Joinder Agreement to this Agreement no later than one (1) day prior to the Petition Date (the "DIP Election Date") may by making the appropriate election on such Joinder Agreement, commit to provide, or cause to provide, a share of the DIP Term Loan Facility equal in percentage to the *pro rata* percentage of 77.5% of the aggregate Term Loan Claims held by such Consenting Term Lender as of the Agreement Effective Date (any Consenting Term Lender that elects to make such commitment pursuant to a Joinder Agreement, a "Joining DIP Commitment Party" and, the Initial DIP Commitment Parties and the Joining DIP Commitment Parties, collectively, the "DIP Commitment Parties"); *provided further* that each Initial DIP Commitment Party's commitment to provide, or cause to provide, its share of the DIP Term Loan Facility shall be reduced *pro rata* based on the percentages set forth on Schedule 1 hereto, for the share of the DIP Term Loan Facility to be provided, or caused to be provided, by the Joining DIP Commitment Parties; *provided further* that upon a termination of this Agreement as to the Initial DIP Commitment Parties by the Initial DIP Commitment Parties in accordance with the provisions hereof prior to the funding of the DIP Term Loan Facility, the commitment of any Joining DIP Commitment Party to provide, or cause to provide, its share of the DIP Term Loan Facility as set forth in this paragraph 3.05 shall also terminate.  A copy of this Agreement shall be posted to the lender data site maintained by the agent to the Term Loan Credit Agreement as soon as practicable after the Agreement Effective Date, with signature pages redacted in accordance with Section 8 hereof.

3.06.    Sponsor Commitments. During the Effective Period, the Sponsor covenants and agrees to perform and comply (and cause its non-portfolio company affiliates to perform and comply) with the following obligations:

(a)    use commercially reasonably efforts to (i) support the Restructuring, including, as applicable, by implementing this Agreement, the Plan, the applicable Definitive Documents, and the transactions contemplated hereby and thereby, (ii) act in good faith, and (iii) take any action necessary or reasonably requested by the Company to effectuate the Restructuring in a timely manner;

(b)    support the Plan and, subject to its receipt of the Disclosure Statement and any other Solicitation materials with respect to the Plan, vote any Company Claims/Interests to accept the Plan (if applicable) by delivering a duly executed and completed ballot accepting the Plan on a timely basis during the Solicitation and consenting to and, if applicable, not opting out of, the releases set forth in the Plan;

(c)    waive all Claims (including any claims for accrued and unpaid management fees payable by the Company or its affiliates) against the Company or its affiliates, other than Claims that arise under the ABL Credit Agreement or Term Loan Credit Agreement or

held by the Sponsor or an affiliate in the ordinary course of business and unrelated to the Sponsor's equity ownership of the Company;

    (d) not (i) change or withdraw (or cause to be changed or withdrawn) its vote to accept the Plan, (ii) object to, delay, impede, or take any other action to interfere with, delay, or postpone acceptance, consummation, or implementation of the Plan, or (iii) propose, file, support, or vote for any restructuring, sale of assets, workout, or plan of reorganization for the Company other than the Plan;

    (e) not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Restructuring, this Agreement, or the Plan;

    (f) not (i) pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Company or any subsidiary thereof, (ii) acquire any outstanding indebtedness of the Company or any subsidiary thereof, or (iii) make any worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, in each case of (i), (ii) and (iii), to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of the Company or any of its subsidiaries; and

    (g) negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions to address any legal, financial, or structural impediment that may arise that would prevent, hinder, or delay the consummation of the Restructuring.

   3.07. <u>Specific Performance</u>.  It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain and that any breach by a Party of this Agreement would result in irreparable damage for which monetary damages would not be an adequate remedy.  Each Party accordingly agrees that each other Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach or threatened breach thereof.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

   3.08. <u>Additional Parties</u>.

   Any Holder of Company Claims/Interests may, at any time after the occurrence of the Agreement Effective Date, become a party to this Agreement as a Consenting Party and/or a DIP Commitment Party (an "<u>Additional Consenting Party</u>") by executing a joinder in the form

attached hereto as **Exhibit F** (the "Joinder Agreement"), pursuant to which such Additional Consenting Party shall be bound by the terms of this Agreement as a Consenting Party hereunder. No Additional Consenting Party shall be a "Backstop Commitment Party" or Initial DIP Commitment Party for purposes of this Agreement.

        3.09.    Transfer of Company Claims/Interests.

        (a)    Except as expressly provided herein, during the Effective Period, each Consenting Party shall not sell, assign, pledge, transfer, grant a participation interest in, or otherwise dispose of, directly or indirectly any of the Company Claims/Interests, in whole or in part (any such actions are collectively referred to herein as a "Transfer" and, the Consenting Party making such Transfer is referred to herein as the "Transferor"), and any purported Transfer of any Company Claims/Interests shall be void and without effect; provided, however, that such Transfer may be made if it otherwise complies with the requirements of any of the documentation evidencing such Company Claims/Interests and either (i) the transferee is another Consenting Party or (ii) if the transferee is not another Consenting Party, the transferee agrees in writing to be bound by the terms of this Agreement by executing the Joinder Agreement (a transferee that satisfies such requirements, a "Permitted Transferee" and such Transfer, a "Permitted Transfer"). Upon compliance with the foregoing, (x) the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred Company Claims/Interests, and (y) the transferee shall be deemed to be a Consenting Party under this Agreement with respect to such transferred Company Claims/Interests. Each Consenting Party agrees and acknowledges that any Transfer of Company Claims/Interests that does not comply with the terms and procedures set forth in this Section 3.09(a) shall be deemed null and void *ab initio* and of no force or effect until such a joinder is executed and effective.

        This Agreement shall in no way be construed to preclude the Consenting Parties from acquiring additional Company Claims/Interests; provided, that (i) any Consenting Party that acquires additional Company Claims/Interests after executing this Agreement shall notify the Company of such acquisition within five (5) Business Days after the closing of such trade, and (ii) any such acquired Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Party be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company of such acquisition.

        (b)    Notwithstanding Section 3.0(a): (i) a Consenting Party may Transfer its Company Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker become a Party pursuant to Section 3.09(a); provided, that (A) such Qualified Marketmaker (1) must Transfer such right, title, or interest within ten (10) Business Days after its receipt thereof, (B) the subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Company Claims is to a transferee that is a Permitted Transferee (by, for the avoidance of doubt, executing a Joinder Agreement and delivering an executed copy thereof to the persons set forth in clause (a) of this Section 3.09) and the Transfer is otherwise a Permitted Transfer, and (C) any Transfer that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio* and the Company and each of the Consenting Term Lenders shall have the right to enforce the voiding of such Transfer to the extent permitted by applicable law; and (ii) to the extent that a Consenting

Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interests in such Company Claims that the Qualified Marketmaker acquires from a party who is not a Consenting Party without the requirement that the transferee be or become a Consenting Party.

For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Company Claims (including debt securities or other debt) or enter with customers into long and short positions in Company Claims (including debt securities or other debts), in its capacity as a dealer or market maker in such Company Clams, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities and other debt).

3.10.   Public Disclosure.  The Parties understand and acknowledge that, on or after the Agreement Effective Date (as defined herein), the Company may disclose the existence of, or the terms of, this Agreement or any other term of the transactions contemplated herein without the consent of the other Parties, except that the signature pages shall be redacted in accordance with Section 8 hereof.

**Section 4.        Amendments and Modifications.**

4.01.   This Agreement may not be modified, amended, or supplemented and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 4.

4.02.   This Agreement may be amended or modified from time to time with the prior written approval (with email being sufficient) of each of the Company, the Sponsor, and Required Consenting Term Lenders (in each case, which consent shall not be unreasonably withheld); provided, however, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Term Lenders holding claims Company Claims/Interests within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Company Claims/Interests held by a Consenting Term Lender, the consent of each such affected Consenting Term Lender shall also be required to effectuate such proposed modification, amendment, waiver, or supplement; provided further, that  consent of the Sponsor shall not be required to amend the Milestones or any other term which does not adversely affect the rights and obligations of the Sponsor under this Agreement or the Plan.

4.03.   The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

11

**Section 5.**    **Undertakings and Representations.**

5.01.    Chapter 11 Related Matters.    To the extent reasonably practicable, the Company shall provide counsel for the Consenting Term Lenders a review period of at least two (2) calendar days prior to the date when the Company intends to file any Definitive Document or other pleading with the Bankruptcy Court.

5.02.    Further Assurances.    Each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Restructuring and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or desirable to facilitate the Restructuring in accordance with this Agreement and the Definitive Documents.  Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by another Party to carry out the purpose and intent of this Agreement, including facilitating any necessary regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**Section 6.**    **Representations and Warranties**.

6.01.    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date on which a subsequent Party becomes a party hereto):

(a)    Enforceability.    It is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement, carry out the transactions set forth herein, and perform its obligations set forth hereunder.  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part.  Each Party has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

(b)    No Violation of Law or Breach.    Subject to and other than any registration, filing, consent, notice, or approval required in connection with the Restructuring, the execution, delivery, and performance by such Party of this Agreement does not and will not (x) violate any provision of law, rule, or regulation applicable to it or its charter or bylaws (or other similar governing documents) in any material respect, or (y) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, which conflict, breach, or default would have a material adverse effect on the Restructuring.  In the event of governmental or regulatory authority (other than the Bankruptcy Court) issuing a ruling or an order restricting, preventing or prohibiting the consummation of the transactions contemplated by this Restructuring Support Agreement, the Consenting Term Lenders and Company agree to amend the terms of transactions contemplated by the Restructuring Support Agreement, to reconstruct the intended effect of, and provide substantially consistent economic treatment to, the Parties.

(c)　　No Consent or Approval.  The execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the Securities & Exchange Commission or other securities regulatory authorities under applicable securities laws.  For the avoidance of doubt, the Parties acknowledge that the Restructuring shall be subject to approval by the Bankruptcy Court.

(d)　　Binding Obligation.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

6.02.　　Each Consenting Party individually represents on a several basis, and as to itself only, that, as applicable, as of the date such Consenting Party executes and delivers this Agreement (i) it is the beneficial owner, or has validly executed unsettled trades, of the aggregate principal amount of the Company Claims/Interests set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Additional Consenting Party), or (ii) it is the nominee, investment manager, advisor, or subadvisor for one or more beneficial holders thereof, and has, with respect to the beneficial owners of such Company Claims/Interests, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Company Claims/Interests or to exchange, assign, and transfer such Company Claims/Interests, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.  Each Consenting Party further individually represents on a several basis, and as to itself only, that, other than pursuant to this Agreement, such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, in each case that would prevent in any way such Consenting Party's  performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

The Company further agrees that in any publication or filing of this Agreement, it shall take all necessary efforts to redact any reference to any Consenting Term Lender's beneficial ownership of Company Claims/Interests.

**Section 7.　　Termination**.

7.01.　　Required Consenting Lender Termination Events.  Each of the Required DIP Commitment Parties or the Required Consenting Term Lenders may terminate this Agreement on five (5) Business Days' prior written notice, delivered to the other Parties in accordance with Section 10.08, upon the occurrence and continuance of any of the following events:

(a)　　the breach in any material respect by the Company or the Sponsor of any of the undertakings, representations, warranties, or covenants of the Company or the Sponsor, as applicable, set forth in this Agreement, which remains uncured for a period of five (5)

Business Days after receipt of written notice of such breach (which period shall run concurrently with the notice period set forth in this Section);

(b)      the failure of the Company to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, *provided that*, to the extent such Milestone is not met due to the solely due to the actions of the Required Consenting Term Lenders and/or Required DIP Commitment Parties, as applicable, there shall be no termination right for such Parties under this Section 7.01(d);

(c)      if any Definitive Document, including for the avoidance of doubt, any material amendments or modifications thereto, is inconsistent with this Agreement or the Restructuring Term Sheet, or if any other document or agreement necessary to consummate the Restructuring is not satisfactory or reasonably satisfactory (as applicable) to the Required Consenting Term Lenders and the Required DIP Commitment Parties;

(d)      entry of a final order that grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Restructuring;

(e)      if the Company withdraws the Plan or files any plan of reorganization or liquidation or disclosure statement that is not consistent in any material respect with this Agreement, the Restructuring Term Sheet, or the Plan;

(f)      if the Company, the Sponsor, or any affiliate (i) notifies counsel to the Consenting Term Lenders pursuant to section 3.02 and/or makes a public announcement that it intends to pursue an Alternative Transaction or (ii) enters into a definitive agreement with respect to an Alternative Transaction;

(g)      the Company or any other Debtor in the Chapter 11 Cases files a motion or application seeking to sell any material assets, including but not limited to any sale leaseback transaction, without the prior written consent of the Required Consenting Term Lenders and the Required DIP Commitment Parties;

(h)      the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not substantially in the form of the DIP Orders or otherwise consented to by the Required Consenting Term Lenders and the Required DIP Commitment Parties;

(i)      an Event of Default resulting in an acceleration under the DIP Credit Agreement or, solely with respect to the Required Consenting Term Lenders or Required DIP Commitment Parties, the termination of the Preferred Backstop Commitment Agreement;

(j)      after the ABL Exit Financing Commitment is obtained, if it (i) fails to remain in full force and effect, (ii) is rescinded, repudiated, terminated or purported to be rescinded, repudiated, or terminated, (iii) the parties thereto fail to remain in compliance therewith;

(k)      if the Sponsor terminates this Agreement;

14

(l)      the failure of the Company to pay the fees and expenses as set forth in Section 9 of this Agreement and the DIP Order; and

(m)      if the Company files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Consenting Term Lenders' Company Claims or liens securing such Claims.

7.02.      Company Termination Events.   The Company may terminate this Agreement, with respect to all Parties, on five (5) Business Days' prior written notice, delivered to the other Consenting Parties in accordance with Section 10.08, upon the occurrence and continuance of any of the following events:

(a)      the breach of this Agreement in any material respect by the Sponsor of any of its undertakings, representations, warranties, or covenants set forth in this Agreement which remains uncured for a period of five (5) Business Days after receipt of written notice of such breach (which period shall run concurrently with the notice period set forth in this Section);

(b)      the breach of this Agreement in any material respect by Consenting Term Lenders holding an amount of Term Loan Claims that would result in non-breaching Consenting Term Lenders holding less than two-thirds (2/3) of the aggregate amount of Term Loans (inclusive of validly executed but unsettled trades) which remains uncured for a period of five (5) Business Days after receipt of written notice of such breach (which period shall run concurrently with the notice period set forth in this Section);

(c)      the board of directors, board of managers, or similar governing body of any Company entity determines in good faith (i) that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law, or (ii) in the exercise of its fiduciary duties, pursues an Alternative Transaction;

(d)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring;

(e)      if, as of May 1, 2020, the Plan Effective Date has not occurred;

(f)      if the Preferred Backstop Commitment Agreement (i) is not executed prior to the Petition Date, (ii) fails to remain in full force and effect, (iii) is terminated, or (iv) the parties thereto fail to remain in compliance therewith;

(g)      if any of the DIP Commitment Parties fail to provide their *pro rata* share of the DIP Term Loan Facility and such commitments are not assumed by another DIP Commitment Party; or

(h)      after the ABL Exit Financing Commitment is obtained, if it (i) fails to remain in full force and effect, (ii) is rescinded, repudiated, terminated or purported to be rescinded, repudiated, or terminated, (iii) the parties thereto fail to remain in compliance therewith.

7.03.    Other Termination Events.  Subject to section 7.07, any of the Company, Sponsor, Required DIP Commitment Parties or Required Consenting Term Lenders may terminate this Agreement on five (5) Business Days' prior written notice, delivered to the other Consenting Parties in accordance with Section 10.08, upon the occurrence of any of the following events:

(a)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable injunction, judgment, decree, ruling, or order restraining, enjoining, or otherwise prohibiting the consummation of the Restructuring or the Plan; provided, that the Company shall have six (6) Business Days to obtain relief that would allow consummation of the Restructuring that does not prevent or materially diminish compliance with the terms of this Agreement;

(b)    if an examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), or a trustee or receiver shall have been appointed by final, non-appealable order in one or more of the Chapter 11 Cases;

(c)    the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or such cases shall have been dismissed by final, non-appealable order of a court of competent jurisdiction.

(d)    if the Bankruptcy Court enters a final, non-appealable order in the Chapter 11 Cases terminating the Company's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code; or

(e)    the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code solely to the extent a court order grants the relief sought in such involuntary case.

7.04.    Sponsor Termination Events.  The Sponsor may terminate this Agreement, solely with respect to the Sponsor, on five (5) Business Days' prior written notice, delivered to the other Consenting Parties in accordance with Section 10.08, upon the occurrence and continuance of any of the following events:

(a)    the breach in any material respect by Consenting Term Lenders holding an amount of Term Loan Claims that would result in nonbreaching Consenting Term Lenders holding less than two-thirds (2/3) of the aggregate amount of Term Loans (inclusive of validly executed but unsettled trades), of any of its undertakings, representations, warranties, or covenants set forth in this Agreement which remains uncured for a period of five (5) Business Days after receipt of written notice of such breach (which period shall run concurrently with the notice period set forth in this Section);

(b)     the Company withdraws the Plan or files any plan of reorganization or liquidation or disclosure statement that is not consistent in any material respect with this Agreement;

(c)    entry of a final order that grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to

16

any material asset that, to the extent such relief was granted, would have a material adverse effect on the consummation of the Restructuring; or

           (d)    a Definitive Document materially and adversely modifies, removes, or impairs any of the rights or benefits proposed to be granted to, or received by, the Sponsor as specified in this Agreement and the Sponsor has not consented to such modification.

        7.05.   <u>Mutual Termination</u>.  This Agreement and the obligations of all Parties hereunder may be terminated by mutual agreement among the Company and the Required Consenting Term Lenders.

        7.06.   <u>Automatic Termination.</u>  This Agreement shall terminate automatically upon the Plan Effective Date.

        7.07.   <u>Effect of Termination.</u>  Notwithstanding anything to the contrary in this Agreement, other than as provided in Section 7.05 or Section 7.06, neither the Company, the Sponsor, the Required DIP Commitment Parties nor the Required Consenting Term Lenders may terminate this Agreement, as applicable, if such Party or Parties failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of the applicable termination event giving rise to such termination right.  Subject to Section 10.05, upon termination of this Agreement by the Company, the Required DIP Commitment Parties or the Required Consenting Term Lenders, each other Party shall be automatically released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Further, upon the termination of this Agreement, any and all consents or ballots tendered by the Parties, for all purposes, shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner in connection with the Restructuring, this Agreement, confirmation of the Plan, or otherwise, and such votes or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission).

        7.08.   <u>Automatic Stay</u>.  The Company acknowledges that after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required; <u>provided</u>, that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination was not proper under the terms of this Agreement.

      **Section 8.**   **Effectiveness**.  This Agreement shall become effective and binding on each of the Parties on the date and time on which the following has occurred (such date, the "<u>Agreement Effective Date</u>"):

(a)      counterpart signature pages to this Agreement shall have been executed and delivered by: (i) the Company; (ii) the Sponsor; and (iii) Consenting Term Lenders consisting of at least 50.1% of the holders of Term Loan Claims that collectively hold at least 66 2/3rds% of the principal amount of the Term Loan in the aggregate, inclusive of validly executed but unsettled trades; _provided_, that signature pages executed by Consenting Parties shall be delivered to the Company and the advisors to the Company in an unredacted form; _provided, further_, that the Company and the advisors to the Company shall not disclose the unredacted signature pages and shall keep such unredacted signature pages in strict confidence, except as may be required by law.  The Agreement shall be effective from the Agreement Effective Date until validly terminated pursuant to the terms hereof (such period, the "_Effective Period_").  To the extent that a signatory to this Agreement holds, as of the date hereof or thereafter, multiple Company Claims/Interests, such Party shall be deemed to have executed this Agreement in its capacity as a Holder of all such Company Claims/Interests, and this Agreement shall apply severally to such Party with respect to each such claim held by such Party; and

(b)      the Company shall have paid, or caused to be paid, all undisputed, reasonable, and documented fees, out of pocket expenses, and unpaid professional retainer amounts of the professionals identified in Section 9 hereof, subject to any applicable terms in their respective engagement letters, for which an invoice has been received by the Company on or before the date that is two (2) Business Days prior to the Agreement Effective Date.

Section 9.      **Fees and Expenses**.  Except as set forth in Section 8(b) or the provisos to this sentence, each Party is responsible for its own fees and expenses (including the fees and expenses of counsel, financial consultants, investment bankers, and accountants) in connection with the entry into this Agreement and the transactions contemplated hereby; _provided_, that subject to any applicable terms in their respective engagement letters, the Company shall pay or cause to be paid the reasonable and documented fees and out-of-pocket expenses when due of (i) Davis Polk & Wardwell LLP as counsel to the Consenting Term Lenders, (ii) Evercore Group L.L.C., as financial advisor to the Consenting Term Lenders, (iii) Winston & Strawn LLP, as maritime legal counsel to the Consenting Term Lenders, and (iv) Rapp & Krock, PC as local legal counsel to the Consenting Term Lenders; _provided further_, that the Company shall not be responsible under this Agreement for any fees and expenses incurred after the termination of this Agreement.

Section 10.      **Miscellaneous**.

10.01.      _Complete Agreement_.  This Agreement together with the exhibits, other documents and instruments referenced herein constitute the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties hereto with respect to the subject matter of this Agreement, other than for any confidentiality agreement.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party on the date hereof or thereafter.

10.02.      _Parties_.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.09.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit

or any legal or equitable right, remedy, or claim under this Agreement.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

10.03.   Governing Law; Submission to Jurisdiction; Selection of Forum; WAIVER OF TRIAL BY JURY.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution, termination, performance, or nonperformance of this Agreement (including exhibits), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without giving effect to any applicable conflict of laws principles to the extent that the application of the laws of another jurisdiction would be required thereby.  Each Party agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this Agreement, any provision hereof or the Restructuring described herein, in the United States District Court for the Southern District of New York, any New York State court sitting in the Borough of Manhattan of New York City, or, to the extent the Company commences the Chapter 11 Cases, the Bankruptcy Court (the "Chosen Courts") and, solely in connection with claims arising under this Agreement or the Restructuring that are the subject of this Agreement, (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto; provided, that, upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court.  Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR THE RESTRUCTURING DESCRIBED HEREIN.

10.04.   Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, e-mail, or otherwise) in any number of counterparts, each of which, when executed and delivered in accordance with Section 8, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

10.05.   Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

10.06.   Survival.  Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in Section 7.07, Section 9, Section 10 shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

10.07.   Relationship Among Parties.  It is understood and agreed that no Consenting Party has any duty of trust or confidence in any form with any other Consenting Party, and, except

19

as provided in this Agreement, there are no agreements, commitments, or undertakings between or among them. In this regard, it is understood and agreed that any Consenting Party may trade in the loans and/or commitments under the Term Loan or other debt or equity securities of the Company without the consent of the Company, as the case may be, or any other Consenting Party, subject to applicable securities laws, the terms of any applicable non-disclosure agreement, and the terms of this Agreement; provided, further, that neither any Consenting Party nor the Company shall have any responsibility for any such trading by any other entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Consenting Parties shall in any way affect or negate this understanding and agreement.

10.08.   Notices.   Unless otherwise provided herein, all notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (iii) when sent by electronic mail, in each case at the following addresses (or such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

(a)   If to the Company, to:

American Commercial Lines Inc.
1701 E. Market St.
Jeffersonville, Indiana 47130
Attention:   Dawn Landry, SVP & General Counsel
Email:   dawn.landry@bargeacbl.com

with a copy to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:   Dennis F. Dunne, Esq.
   Samuel A. Khalil, Esq.
   Parker Milender, Esq.
Email:   ddunne@milbank.com
   skhalil@milbank.com
   pmilender@milbank.com

(b)   If to the Consenting Term Lenders or a transferee thereof, to the addresses set forth below following each such lender's signature (or as directed by any transferee thereof), as the case may be, (or at such other addresses as shall be specified by like notice) with a copy to:

Davis Polk & Wardell LLP
450 Lexington Avenue
New York, NY 10017
Attention:    Damian S. Schaible, Esq.
              Darren S. Klein, Esq.
              Erik Jerrard, Esq.
Email:        damian.schaible@davispolk.com
              darren.klein@davispolk.com
              erik.jerrard@davispolk.com

(c)    If to the Sponsor or a transferee thereof, to the addresses set forth below following the Sponsor's signature (or as directed by any transferee thereof), as the case may be, (or at such other addresses as shall be specified by like notice) with a copy to:

Platinum Equity, LLC
360 N. Crescent Dr.
Beverly Hills, CA 90210
Attention:    Michael Fabiano
              Koustubh Patwardhan
Email:        mfabiano@platinumequity.com
              kpatwardhan@platinumequity.com

10.09.    No Solicitation.  This Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.  In addition, this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan.  The votes of the Holders of claims against the Company will not be solicited until such Holders who are entitled to vote on the Plan have received the Plan, the Disclosure Statement, and any other required solicitation materials.

10.10.    Other Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; (vii) all references in this Agreement to any

21

"Section" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

(b)     The Company and Consenting Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**COMPANY**

AMERICAN COMMERCIAL LINES INC.

By: _____
Name: David J. Huls
Title: SVP & CFO

COMMERCIAL BARGE LINES COMPANY

By: _____
Name: David J. Huls
Title: SVP & CFO

AMERICAN COMMERCIAL BARGE LINE LLC

By: _____
Name: David J. Huls
Title: SVP & CFO

ACBL TRANSPORTATION SERVICES LLC

By: _____
Name: David J. Huls
Title: SVP & CFO

*[Signature Page to Restructuring Support Agreement]*

ACBL RIVER OPERATIONS LLC

By:_____
Name: David J. Huls
Title: SVP & CFO


OLD JB LLC

By:_____
Name: David J. Huls
Title: SVP & CFO


ACL I CORPORATION

By:_____
Name: David J. Huls
Title: SVP & CFO


ACL PROFESSIONAL SERVICES INC.

By:_____
Name: David J. Huls
Title: SVP & CFO

AMERICAN COMMERCIAL LINES
INTERNATIONAL LLC

By:_____
Name: David J. Huls
Title: SVP & CFO


ACBL OLDCO, LLC

By:_____
Name: David J. Huls
Title: SVP & CFO


FINN HOLDING CORPORATION


By:_____
Name: Justin Maroldi
Title: Assistant Secretary

AMERICAN COMMERCIAL LINES
INTERNATIONAL LLC


By:_____
Name: David J. Huls
Title: SVP & CFO


ACBL OLDCO, LLC


By:_____
Name: David J. Huls
Title: SVP & CFO


FINN HOLDING CORPORATION


By:_____
Name: Justin Maroldi
Title: Assistant Secretary

*[Signature Page to Restructuring Support Agreement]*

## EXHIBIT A

## RESTRUCTURING TERM SHEET

Execution Version

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION OF AN OFFER WITH RESPECT TO ANY SECURITIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS. EXCEPT AS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES. THIS TERM SHEET IS SUBJECT IN ALL RESPECTS TO FEDERAL RULE OF EVIDENCE 408 AND ANY STATE LAW EQUIVALENTS.**

## American Commercial Lines Inc. Restructuring Term Sheet

This Term Sheet, which is <u>Exhibit A</u> to a Restructuring Support Agreement dated January 31, 2020 (the "<u>Restructuring Support Agreement</u>"), by and among American Commercial Lines Inc. and certain of its affiliates and subsidiaries (collectively, the "<u>Company</u>" or the "<u>Debtors</u>"), the Consenting Term Lenders, and the Sponsor, describes the proposed terms of the Company's restructuring (the "<u>Restructuring</u>").  The Company will implement the Restructuring through a pre-packaged plan of reorganization under chapter 11 of the Bankruptcy Code, which shall be consistent with the terms of this Term Sheet and the Restructuring Support Agreement (as it may be amended or supplemented from time to time in accordance with the terms of the Restructuring Support Agreement, the "<u>Plan</u>"), in voluntary chapter 11 cases (the "<u>Chapter 11 Cases</u>") to be commenced in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"). This Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Restructuring Support Agreement and in **<u>Annex 1</u>** hereto.

| **OVERVIEW OF THE RESTRUCTURING** | |
|---|---|
| **Debtors** | ACL I Corporation; American Commercial Lines Inc.; Commercial Barge Line Company; American Commercial Barge Line LLC; American Commercial Lines International LLC; ACBL Oldco, LLC; ACBL Transportation Services LLC; ACBL River Operations LLC; Old JB LLC; Finn Holding Corporation; and ACL Professional Services Inc. |
| **Summary** | Subject in all respects to and as provided by the other terms of this Term Sheet, the Plan, and to the Restructuring Support Agreement, the Debtors will restructure their funded debt obligations by, among other things: (i) refinancing the ABL Facility into the New ABL Facility with a maturity date no earlier than August 2024; (ii) equitization of the Term Loan Claims into Take Back Preferred Equity and New Common Equity (in each case or New Warrants therefor); and (iii) contribution by the Holders of Allowed Term Loan Claims of $200 million of new money in exchange for a like-amount of mandatorily convertible New Money Preferred Equity in Reorganized ACL, junior in priority to the Take Back Preferred Equity and senior in priority to the New Common Equity (in each case or New Warrants therefor) of which (x) $150 million will be contributed pursuant to the Rights Offering (as defined below), which Rights Offering will be backstopped by the Backstop Commitment Parties, and (y) $50 million will be deemed contributed in exchange for the Term Loan DIP Facility Claims.  The amount of New Money Preferred Equity (or New Warrants therefor) to be offered pursuant to the Rights Offering will be determined by the Debtors and the Required Consenting Term Lenders, and will be based in part on the amount of new capital required in order to achieve *pro forma* liquidity of the Reorganized Debtors of $150 million (of which $25 million will be in cash), taking into account the availability under the New ABL Facility.   The New Money Preferred Equity issued to the Holders of Allowed Term Loan Claims on the Plan Effective Date shall represent a percentage of the total outstanding shares of New Money Preferred Equity and New Common Equity equal to (i) the Initial Liquidation Preference (as defined below) divided by (ii) the Initial Liquidation Preference plus the Stated Equity Value (such ratio, as adjusted pursuant to customary anti-dilution protections applicable to convertible securities, the "Conversion Ratio").  The New Common Equity issued to the Holders of Allowed Term Loan Claims on the Plan Effective Date shall represent a percentage of the total outstanding shares of New Money Preferred Equity and New Common Equity equal to (i) the Stated Equity Value divided by (ii) the Initial Liquidation Preference plus the Stated Equity Value. |

| Implementation | The Debtors will effectuate the Restructuring through the Chapter 11 Cases and confirmation of the prepackaged Plan, which shall be consistent with this Term Sheet and subject to the other terms and conditions set forth in the Restructuring Support Agreement. |
|---|---|
| **ABL DIP Facility** | A debtor-in-possession revolving financing facility in the amount of $640 million to be provided by certain Holders of Allowed ABL Facility Claims, to be on terms acceptable to the Required Consenting Term Lenders. |
| **Term Loan DIP Facility** | The DIP Commitment Parties will provide the Debtors with a secured debtor-in-possession financing, the proceeds of which shall be used for, among other things, general corporate purposes during the pendency of the Chapter 11 Cases on the terms and conditions set forth in the DIP Term Loan Facility term sheet attached as **Exhibit B** to the Restructuring Support Agreement. |
| **New ABL Facility** | The ABL DIP Facility will be refinanced with a New ABL Facility in the principal amount of $650 million, consisting of a $600 million asset-based revolving facility and a $50 million "last out" term facility (the "<u>FILO Facility</u>").  The New ABL Facility shall be on terms substantially consistent with the terms set forth in the ABL Exit Financing Commitment and otherwise to be negotiated among the lenders party thereto, the Company and the Required Consenting Term Lenders. |
| **Take Back Preferred Equity** | On the Plan Effective Date, the Reorganized Debtors shall, subject to the second-to-last bullet in this section below, issue certain series A preferred equity (the "<u>Take Back Preferred Equity</u>") at a liquidation preference of $200 million. |
| | • <u>Priority</u>. The Take Back Preferred Equity shall be senior to the New Money Preferred Equity and New Common Equity. |
| | • <u>Dividend</u>.  The Take Back Preferred Equity shall accrue a 7.50% dividend per annum on the liquidation preference, payable quarterly in cash if declared by the board, starting on the first Quarterly Distribution Date. Such dividend shall be payable only if declared by the board and to the extent the Reorganized Debtors' cumulative last-twelve-months (or annualized, as applicable) Adjusted Net Income exceeds the annualized dividend (including the dividends that would have been payable on any Take Back Preferred Equity for which New Warrants are exercisable).  The excess of Adjusted Net Income for any prior periods over the annualized dividends on the Take Back Preferred Equity and New Money Preferred Equity and excess cash flow |

3

redemptions of the Take Back Preferred Equity and New Money Preferred Equity (including, in each case, the dividend that would have been payable on any Take Back Preferred Equity or New Money Preferred Equity for which New Warrants are exercisable, the excess cash flow redemption payments that would have been payable on any Take Back Preferred Equity for which New Warrants are exercisable and the excess cash flow redemption payments that would have been payable on any New Money Preferred Equity for which New Warrants are exercisable, in each case for which Take Back Preferred Equity Anti-Dilution Warrants or New Money Preferred Equity Anti-Dilution Warrants are issued instead of such payments), in each case, for any prior periods shall be carried forward and added to the Adjusted Net Income for the next twelve-month period for purposes of calculating dividends. Any unpaid dividend (whether or not declared) accrues and is payable in cash when declared upon the Reorganized Debtors' satisfaction of this test, which shall be conducted quarterly.  Upon satisfaction of the tests described in this section, the board shall declare any dividends contemplated by this section out of funds legally available therefor.

- <u>Participation</u>.   The Take Back Preferred Equity shall be issued *pro rata* to all Holders of Allowed Term Loan Claims.

- <u>Redemption</u>. At any time on or after the date that is seven (7) years after the Plan Effective Date, any Holder of outstanding Take Back Preferred Equity shall have the right to require the Reorganized Debtors to redeem all (but not less than all) of such Holder's Take Back Preferred Equity in full in cash for an amount equal to the liquidation preference (which shall include any accrued and unpaid dividends, whether or not declared). In addition, 50.0% of Excess Cash Flow (the "<u>Excess Cash Flow Redemption Amount</u>") shall be used to once-annually mandatorily redeem the Take Back Preferred Equity promptly after the Reorganized Debtors' annual reports and audited results are finalized; provided, that the Excess Cash Flow Redemption Amount shall not include the amount of the redemption payment that the holders of New Warrants for Take Back Preferred Equity would have been entitled to if they had exercised such New Warrants for Take Back Preferred Equity on the record date for such redemption payment. Subject to the prior repayment in full of the FILO Facility, the Take Back Preferred Equity also may be redeemed at any time at the option of the Reorganized Debtors for an amount of cash equal to the aggregate amount

of outstanding liquidation preference (which shall include any accrued and unpaid dividends, whether or not declared).

- <u>Payment Conditions</u>. The dividends and redemptions on account of Take Back Preferred Equity shall be subject to compliance with the Payment Conditions under the New ABL Facility.

- <u>Liquidation</u>. Upon any sale (whether by merger, consolidation, sale of all or substantially all of the assets, sale or exchange of at least a majority of the equity or otherwise) or liquidation, dissolution or winding-up of the Reorganized Debtors (any of the foregoing, a "<u>Liquidation</u>") each then-outstanding share of Take Back Preferred Equity shall be entitled to receive the liquidation preference (which shall include any accrued and unpaid dividends, whether or not declared).

- <u>Warrants</u>. If and to the extent required for compliance with the Jones Act, Holders of Allowed Term Loan Claims shall receive New Warrants for Take Back Preferred Equity in lieu of shares of Take Back Preferred Equity. If any New Warrant for Take Back Preferred Equity is issued to any Holder, it shall be exercisable, subject to the Jones Act Restriction, at any time for the number of shares of Take Back Preferred Equity that such Holder of Allowed Term Loan Claims would have received but for the Jones Act Restriction, and the strike price thereof shall be $0.01 per share of Take Back Preferred Equity. The duration of any such New Warrant shall be 25 years, and the Holder thereof shall not be entitled to any voting rights prior to exercise. Any such New Warrants shall be subject to the Anti-Dilution Protections (as discussed below) and other customary anti-dilution protections, shall be subject to a substantially similar cashless exercise option as the Sponsor Warrants (mutatis mutandis), and upon Liquidation, shall be entitled to receive the amount they would have been entitled to receive as if they had been converted into Take Back Preferred Equity at such time. The liquidation preference of any Take Back Preferred Equity for which New Warrants are exercisable shall be reduced by the amount of any redemption payments that the holders of the New Warrants for Take Back Preferred Equity would have been entitled to if they had exercised such New Warrants for Take Back Preferred Equity on the record date for such redemption payment.

| | |
|---|---|
| | •    <u>Anti-Dilution Protections</u>. If and to the extent a dividend is paid to the Take Back Preferred Equity or a redemption of Take Back Preferred Equity occurs, the holder of New Warrants for Take Back Preferred Equity shall receive an anti-dilution warrant (the "<u>Take Back Preferred Equity Anti-Dilution Warrants</u>"). Take Back Preferred Equity Anti-Dilution Warrants shall be exercisable at any time by a U.S. Citizen (for Jones Act purposes) for a non-interest bearing demand note issued by Reorganized ACL in the principal amount equal to the dividend or redemption payment that the New Warrants for Take Back Preferred Equity would have been entitled to if they had been converted into Take Back Preferred Equity on the record date for such dividend or redemption payment reduced by the amount of any withholding taxes paid or payable by the Reorganized Debtors on behalf of the Holder of New Warrants in connection with the receipt of the Take Back Preferred Equity Anti-Dilution Warrants. Take Back Preferred Equity Anti-Dilution Warrants shall have a strike price of $0.01. Take Back Preferred Equity Anti-Dilution Warrants shall be fully transferable and severable from the New Warrants for Take Back Preferred Equity. Take Back Preferred Equity Anti-Dilution Warrants shall not be exercisable for stock or non-interest-bearing demand notes by Non-U.S. Citizens. |
| **New Money Preferred Equity** | On the Plan Effective Date, subject to the second-to-last bullet in this section below, the Reorganized Debtors shall issue certain series B preferred equity (the "<u>New Money Preferred Equity</u>") in an aggregate amount of $200 million (the "<u>Initial Liquidation Preference</u>")[1], with $50 million to be issued *pro rata* to lenders under the Term Loan DIP Facility in exchange for such lenders' Term Loan DIP Facility Claims and $150 million to be issued through a rights offering to eligible Holders of Allowed Term Loan Claims (the "<u>Rights Offering</u>") in exchange for cash proceeds from the Rights Offering (defined below). The Rights Offering shall be backstopped by members of the Ad Hoc Group (the "<u>Backstop Commitment Parties</u>") pursuant to an agreement governing the terms thereof, with such backstop commitment to be provided prior to the Petition Date |

---

[1] An additional $17 million in liquidation preference of New Money Preferred Equity will be issued in respect of (i) the 6.00% backstop premium for backstopping the $50 million DIP Term Loan Facility payable to the Initial DIP Commitment Parties in the form of New Money Preferred Equity on the Plan Effective Date, (ii) the 7.00% conversion fee payable in New Money Preferred Equity upon the conversion of DIP Facility Claims on the Plan Effective Date, and (iii) the 7.00% backstop premium payable in New Money Preferred Equity to the members of the Ad Hoc Group on account of New Money Preferred Equity issued pursuant to the Rights Offering (as described elsewhere in this Term Sheet).

(the "Preferred Equity Backstop Agreement").

- <u>Priority</u>. The New Money Preferred Equity shall be senior to the New Common Equity and junior to the Take Back Preferred Equity.

- <u>Participation</u>.  Participation in the Rights Offering shall be provided as follows: (i) 22.5% to be reserved for the Backstop Commitment Parties; and (ii) 77.5% to be offered *pro rata* to all Holders of Allowed Term Loan Claims.

- <u>Dividend</u>. The New Money Preferred Equity shall accrue a dividend of 10.00% per annum on the liquidation preference payable quarterly in cash if declared by the board starting on the first Quarterly Distribution Date. Such dividend shall only be payable  if declared by the board and to the extent the Reorganized Debtors' cumulative last-twelve-months (or annualized, as applicable) Adjusted Net Income, less the amount of annualized dividend of the Take Back Preferred Equity (including the dividends that would have been payable on any Take Back Preferred Equity for which New Warrants are exercisable), exceeds the annualized dividend of the New Money Preferred Equity (including the dividends that would have been payable on any New Money Preferred Equity for which New Warrants are exercisable). The excess of Adjusted Net Income for any prior periods over the annualized dividends on the Take Back Preferred Equity and New Money Preferred Equity and excess cash flow redemption payments of the Take Back Preferred Equity and New Money Preferred Equity (including, in each case, the dividend that would have been payable on any Take Back Preferred Equity or New Money Preferred Equity for which New Warrants are exercisable, the excess cash  flow redemption payments that would have been payable on any Take Back Preferred Equity for which New Warrants are exercisable and the excess cash flow redemption payments that would have been payable on any New Money Preferred Equity for which New Warrants are exercisable, in each case for which Take Back Preferred Equity Anti-Dilution Warrants or New Money Preferred Equity Anti-Dilution Warrants are issued instead of such payments), in each case, for any prior periods, less the annualized dividend and excess cash flow payments of the Take Back Preferred Equity for the current period (including, in each case, the dividend or redemption payments that would have been payable on any Take Back Preferred Equity for which New Warrants are exercisable),

shall be carried forward for purposes of calculating dividends for the current period.  Any unpaid dividend (whether or not declared) accrues and is payable in cash when declared upon the Reorganized Debtors' satisfaction of this test, which shall be conducted quarterly.  Upon satisfaction of the tests described in this section, the board shall declare any dividends contemplated by this section out of funds legally available therefor.

- Conversion. All outstanding New Money Preferred Equity shall be mandatorily convertible into New Common Equity on the earlier of: (i) the date that is seven (7) years after the Plan Effective Date (the "Mandatory Conversion Date"); and (ii) the date on which 66.7% of the holders of the liquidation preference elects to convert.  The New Money Preferred Equity also shall be optionally convertible into New Common Equity at any time at the election of the holder thereof at the Conversion Ratio. Upon any conversion pursuant to the preceding two sentences of this bullet, all or the relevant portion of the New Money Preferred Equity, as applicable, shall be converted into (A) an amount in cash, payable upon conversion, equal to any accrued and unpaid dividends (whether or not declared) and (B) New Common Equity, in an amount equal to the liquidation preference of such New Money Preferred Equity, converted at the Conversion Ratio. In addition, the Reorganized Debtors may, at any time, at their option, convert all of the outstanding New Money Preferred Equity into (A) an amount in cash, payable upon conversion, equal to the sum of (1) any accrued and unpaid dividends (whether or not declared) and (2) the present value of all future dividends that would have accrued and been payable (whether or not declared) on the New Money Preferred Equity from the date of conversion through the Mandatory Conversion Date, if the New Money Preferred Equity had remained outstanding through the Mandatory Redemption Date, discounted to present value at a rate equal to the yield to maturity (as of the conversion date) of U.S. Treasury notes with a constant maturity of seven (7) years, plus a margin of 50 basis points, and (B) New Common Equity, in an amount equal to the liquidation preference of the New Money Preferred Equity, converted at the Conversion Ratio.

- Dividend Participation.  Holders of New Money Preferred Equity will participate on an as-converted basis in any cash dividends on New Common Equity paid prior to conversion. No dividends will be paid on the New Money Preferred

Equity or the New Common Equity (nor will repurchases thereof be permitted) unless the Reorganized Debtors have paid all accrued and unpaid dividends (whether or not declared) on the Take Back Preferred Equity.

- <u>Voting</u>. Holders of New Money Preferred Equity will be entitled to vote on an as-converted basis on any matters submitted to a vote of holders of New Common Equity.

- <u>Redemption</u>. Starting on the date the Take Back Preferred Equity is fully paid off, and once-annually thereafter promptly after the Reorganized Debtors' annual reports and audited results are finalized, the Reorganized Debtors shall use 25.00% of Excess Cash Flow to make an offer to (i) holders of New Money Preferred Equity for such holders to, at their election, redeem such shares and (ii) holders of New Warrants for New Money Preferred Equity for such holders to, at their election, receive a New Money Preferred Equity Anti-Dilution Warrant as described below. All redemptions of New Money Preferred Equity and issuances of New Money Preferred Equity Anti-Dilution Warrants in lieu of redemption shall be solely at the option of the respective holders. The Reorganized Debtors shall not have any right to redeem the New Money Preferred Equity or issue New Money Preferred Equity Anti-Dilution Warrants in lieu of redemption without the consent of the respective holders. Any redemptions shall be for an amount in cash equal to the liquidation preference (which shall include any accrued and unpaid dividends, whether or not declared). Any optional redemption of New Money Preferred Equity shall be subject to the prior repayment in full of the FILO Facility.

- <u>Backstop Premium</u>.   The Preferred Equity Backstop Agreement shall include a 7.00% backstop premium payable in New Money Preferred Equity to the Backstop Commitment Parties on account of New Money Preferred Equity offered pursuant to the Rights Offering.

- <u>Payment Conditions</u>. The dividends and redemptions on account of New Money Preferred Equity shall be subject to compliance with the Payment Conditions under the New ABL Facility.

- <u>Liquidation.</u>  Upon any Liquidation, each remaining outstanding share of New Money Preferred Equity shall be entitled to receive the aggregate amount of outstanding liquidation preference (which shall include any accrued and

unpaid dividends, whether or not declared). The New Money Preferred Equity shall be structured in a manner so that such equity will not be considered "preferred stock" within the meaning of Section 305 of the Internal Revenue Code of 1986, as amended.

- Warrants. If and to the extent required for compliance with the Jones Act, Holders of Allowed Term Loan Claims shall receive New Warrants for New Money Preferred Equity in lieu of shares of New Money Preferred Equity. If any New Warrant for New Money Preferred Equity is issued to any Holder, it shall be exercisable, subject to the Jones Act Restriction, at any time for the number of shares of New Money Preferred Equity that such Holder of Allowed Term Loan Claims would have received but for the Jones Act Restriction, and the strike price thereof shall be $0.01 per share of New Money Preferred Equity. The duration of any such New Warrant shall be 25 years, and the Holder thereof shall not be entitled to any voting rights prior to exercise. Any such New Warrants shall be subject to the Anti-Dilution Protections (as discussed below) and other customary anti-dilution protections, shall be subject to a substantially similar cashless exercise option as the Sponsor Warrants (mutatis mutandis), and upon Liquidation, shall be entitled to receive the amount they would have been entitled to receive as if they had been converted into New Money Preferred Equity at such time.

- Anti-Dilution Protections. If and to the extent a dividend is paid to the New Money Preferred Equity (including amounts in respect of accrued dividends paid upon conversion), the holder of New Warrants for New Money Preferred Equity shall receive an anti-dilution warrant (the "New Money Preferred Equity Anti-Dilution Warrants"). In addition, the holder of New Warrants for New Money Preferred Equity shall also receive a New Money Preferred Equity Anti-Dilution Warrant if such holder so elects in lieu of redemption in connection with any excess cash flow redemption offer for the New Money Preferred Equity. New Money Preferred Equity Anti-Dilution Warrants shall be exercisable at any time by a U.S. Citizen (for Jones Act purposes) for a non-interest bearing demand note issued by Reorganized ACL in the principal amount equal to the dividend or redemption payment that the New Warrants for New Money Preferred Equity would have been entitled to if they had been converted into New Money Preferred Equity on the record date for such dividend or redemption payment,

| | |
|---|---|
| | reduced by the amount of any withholding taxes paid or payable by the Reorganized Debtors on behalf of the holder of New Warrants in connection with the receipt of the Take Back Preferred Equity Anti-Dilution Warrants.  New Money Preferred Equity Anti-Dilution Warrants shall have a strike price of $0.01.  New Money Preferred Equity Anti-Dilution Warrants shall be fully transferable and severable from the New Warrants for New Money Preferred Equity. New Money Preferred Equity Anti-Dilution Warrants shall not be exercisable for stock or non-interest-bearing demand notes by Non-U.S. Citizens. The liquidation preference of any New Money Preferred Equity for which New Warrants are exercisable shall be reduced by the amount of any New Money Preferred Equity Anti-Dilution Warrants that such holder elects to receive in connection with any excess cash flow redemption offer for the New Money Preferred Equity. |
| **Sponsor Warrants** | On the Plan Effective Date, the Reorganized Debtors shall issue warrants exercisable at any time for 5.0% of outstanding New Common Equity on the Plan Effective Date, subject to dilution from the Management Incentive Plan (but not from the New Money Preferred Equity, as set forth below) (the "Sponsor Warrants"). <br><br> •    Strike Price: $0.01 per share. <br><br> •    Duration: 25 years. <br><br> •    Dividend and Voting Participation: Subject to the Jones Act Restriction (if applicable), holders of Sponsor Warrants may vote and will participate in any cash dividends on New Common Equity paid prior to exercise on an as-converted basis. <br><br> •    Anti-Dilution: The Sponsor Warrants shall be protected against dilution from the conversion of New Money Preferred Equity and shall otherwise be subject to customary anti-dilution protections, which protections cannot be amended or waived without approval of the Sponsor. <br><br> •    Cashless Exercise Option: Sponsor Warrant holders may, in lieu of paying the Strike Price, elect that the Company withhold a number of shares of New Common Equity then issuable upon exercise of such Sponsor Warrant(s) with an aggregate fair market value as of the exercise date equal to such aggregate Strike Price. |

| | • Liquidation: Upon any Liquidation, the Sponsor Warrants shall be entitled to receive the amount they would have been entitled to receive as if they had been converted into New Common Equity at such time. |
|---|---|

## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

| Type of Claim | Treatment | Impairment / Voting |
|---|---|---|
| **ABL DIP Facility Claims** | Each Holder of an Allowed ABL DIP Facility Claim shall receive, either (i) on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the New ABL Facility, (ii) payment in full in cash, or (iii) such other less favorable treatment as to which the Debtors and the Holder of such Allowed ABL DIP Claims will have agreed upon in writing. | Unimpaired; deemed to accept |
| **Term Loan DIP Facility Claims** | Each Holder of an Allowed Term Loan DIP Facility Claim will receive its *pro rata* share of New Money Preferred Equity at a Liquidation Preference of $50 million. | Unimpaired; deemed to accept |
| **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | Unimpaired; deemed to accept |
| **Priority Tax Claims** | In full satisfaction of the Allowed Priority Tax Claims, each Holder of an Allowed Priority Tax Claim will be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired; deemed to accept |
| **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, such Holder will receive (i) payment in full in cash, payable on the later of the Plan Effective Date and the date that is ten (10) Business Days after the date on which | Unimpaired; deemed to accept |

12

| | | |
|---|---|---|
| | such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such other treatment so as to render such Holder's Allowed Other Secured Claim unimpaired. | |
| **Other Priority Claims** | Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim unimpaired. | Unimpaired; deemed to accept |
| **ABL Facility Claims** | The ABL DIP Facility will roll-up 100% of the obligations under the ABL Facility. | Unimpaired; deemed to accept |
| **Term Loan Claims** | In full satisfaction of each Allowed Term Loan Claim, each Holder thereof will receive its *pro rata* share of: (i) Take Back Preferred Equity; (ii) 100% of New Common Equity, subject to dilution by the MIP, Sponsor Warrants, and New Money Preferred Equity; and (iii) the right to participate in the Rights Offering on the terms set forth therein. | Impaired; entitled to vote |
| **General Unsecured Claims** | Except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtor against which such Allowed General Unsecured Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each Allowed General Unsecured Claim against the Debtors, each Holder thereof shall receive (i) payment in cash in an amount equal to such Allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Claim, or (ii) such other treatment so as to render such Claim unimpaired. | Unimpaired; deemed to accept |

| **Intercompany Claims** | No property will be distributed to the Holders of allowed Intercompany Claims. Each Intercompany Claim will either be Reinstated or canceled and released, in the Company's discretion with the reasonable consent of the Required Consenting Term Lenders. | Unimpaired; deemed to accept |
|---|---|---|
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be Reinstated or otherwise canceled at the Company's option, with the reasonable consent of the Required Consenting Term Lenders. | Unimpaired; deemed to accept |
| **Existing Equity Interests** | In full satisfaction of Existing Equity Interests, the Holders of the Existing Equity Interests shall receive their *pro rata* share of the Sponsor Warrants. | Impaired; entitled to vote |
| **OTHER TERMS OF THE RESTRUCTURING** | | |
| **Lease Restructuring Program** | The Company shall document the proposed lease modifications delivered pursuant to the Amendment in a manner reasonably acceptable to the Ad Hoc Group no later than February 6, 2020. | |
| **Executory Contracts and Unexpired Leases** | As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) is determined to be rejected by the Debtors with the reasonable consent of the Required Consenting Term Lenders, (ii) expires or terminates pursuant to its own terms or, (iii) is terminated by agreement of the parties thereto. | |
| **Corporate Governance** | Board designation rights, protective provisions, transfer rights and restrictions, registration rights, preemptive rights, information rights and other corporate governance for the Reorganized Debtors, including charters, bylaws, a shareholder rights agreement, operating agreements, or other organization or formation documents, as applicable, shall be on the terms set forth in the Corporate Governance Term Sheet attached to the Restructuring Support Agreement as **Exhibit E**, or otherwise as determined by the Required Consenting Term Lenders in consultation with the Debtors, and shall be consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable. | |

| | |
|---|---|
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | The Plan shall provide that, to the maximum extent permitted by applicable law all indemnification provisions and insurance policies currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be Reinstated, assumed, and/or remain intact and irrevocable, as applicable, and shall survive effectiveness of the Restructuring. |
| **Management Incentive Plan** | On the Plan Effective Date, a management incentive plan shall be implemented in accordance with the MIP Term Sheet attached to the Restructuring Support Agreement as **Exhibit C**. |
| **Tax Issues** | To the extent practicable and as determined by the Required Consenting Term Lenders and the Company, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial tax structure for the Reorganized Debtors. The Company and Reorganized Debtors shall withhold all taxes required to be withheld under applicable law.   To the extent of any withholding required that does not have associated cash payments sufficient to satisfy any such withholding, the Company or Reorganized Debtors, as the case may be, shall be entitled to make such other arrangements to satisfy such withholding, including reducing other amounts payable to a holder. |
| **Jones Act** | The Restructuring contemplated by this Term Sheet, including with respect to limitations on ownership and control of Take Back Preferred Equity, New Money Preferred Equity, Sponsor Warrants and New Common Equity, will be structured so as to satisfy the ownership and control requirements of the Jones Act and any other applicable statutory or regulatory requirements, including the Jones Act Restriction. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan** | On the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the |

| | |
|---|---|
| **Restructuring Documents** | Restructuring, including pursuant to section 1145 of the Bankruptcy Code to the extent available, and/or to holders that are "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) promulgated under Regulation D under the Securities Act, or "qualified institutional buyers" within the meaning of Rule 144A of the Securities Act (and in each case, in reliance on equivalent state law registration exemptions), as set forth in greater detail in the Disclosure Statement. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Plan Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, (v) adjudication of maritime liens to the extent permitted by law, and (vi) other purposes. |
| **Releases and Exculpation** | The Plan will provide for releases and exculpations to the fullest extent permitted by law. |
| **Consent Rights** | All consent rights shall be as set forth in the Restructuring Support Agreement (including its Exhibits). |

## ANNEX 1

## DEFINITIONS

| | |
|---|---|
| **ABL Facility** | The revolving credit facility under that certain Amended and Restated Revolving Credit Agreement, dated as of November 12, 2015, among American Commercial Lines Inc. and certain of its affiliates as borrowers and the various lenders thereto, with Wells Fargo Capital Finance, LLC, as administrative agent. |
| **ABL Facility Claim** | Any Claim arising under, derived from, or based on the ABL Facility. |
| **ABL DIP Facility Claim** | Any Claim arising under, derived from, or based on the ABL DIP Facility. |
| **Ad Hoc Group** | That certain ad hoc group of Holders of Term Loan Claims represented by Davis Polk & Wardwell LLP. |
| **Adjusted Net Income** | For any period, EBITDAR (as defined in the New ABL Facility), minus (i) rent expense, (ii) non-discretionary capital expenditures, (iii) working capital changes, (iv) dividends, distributions, and redemptions, (v) tax expense, (vi) interest expense, and (vii) scheduled amortization payments (including amortization payments under the FILO Facility), in each case, of the Reorganized Debtors on a consolidated basis for such period, subject to any additional adjustments as may be reasonably agreed by the Required Consenting Term Lenders.[1]  During the first year after the Plan Effective Date, Adjusted Net Income will be calculated on a *pro forma* basis. |
| **Administrative Claim** | A Claim incurred by the Debtors on or after the Petition Date and before the Plan Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Affiliate** | With respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code. |
| **Allowed** | With reference to any Claim, a Claim arising on or before the Plan Effective Date (a) that has been scheduled on the Debtor's schedules |

---

[1] Unless otherwise defined herein, all terms used in the computation of Adjusted Net Income shall be interpreted based on GAAP.

| | |
|---|---|
| | as undisputed, liquidated and non-contingent, (b) (i) as to which no objection to allowance has been interposed within the time period set forth in the Plan, or (ii) as to which any objection has been determined by a Final Order of the Bankruptcy Court in favor of the Holder, (c) any Claim as to which the Debtor's liability and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (d) any Claim expressly allowed under the Plan; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise unimpaired pursuant to the Plan. |
| **Business Day** | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close. |
| **Claim** | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |
| **Confirmation Order** | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Disclosure Statement** | The disclosure statement in respect of the Plan. |
| **Disclosure Statement Order** | The order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Excess Cash Flow** | The amount, if any, by which the cumulative last-twelve-months Adjusted Net Income exceeds the annualized dividends on the Take Back Preferred Equity and the New Money Preferred Equity.  In each case, the amounts of the "annualized dividends" shall include such dividends that would have been payable on any Take Back Preferred Equity and New Money Preferred Equity for which any New Warrants are exercisable. |
| **Final Order** | An order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as |

18

| | |
|---|---|
| | to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending. |
| **General           Unsecured Claim** | Any Claims as of the Petition Date (other than Intercompany Claims) that are neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any lease rejection damages Claims. |
| **Holder** | An Entity holding a Claim or Interest, as applicable. |
| **Impaired** | With respect to any class of Claims or Interests, a class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Initial      DIP      Funding Date** | The date that the interim DIP Order is entered by the Bankruptcy Court. |
| **Intercompany Claim** | A prepetition Claim held by a Debtor against a Debtor. |
| **Intercompany Interest** | An Interest in any Debtor other than American Commercial Lines Inc. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| **Jones Act** | Collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S.-flag vessels in the U.S. coastwise trade. |
| **Jones Act Restriction** | In no event shall Non-U.S. Citizens hold, in the aggregate, more than 24% of the total number of issued and outstanding shares in any class or series of the capital stock of the Reorganized Debtors, |

| | |
|---|---|
| | including in each of the Take Back Preferred Equity, New Money Preferred Equity, and New Common Equity. |
| **New Common Equity** | The shares of common stock, par value $0.01 per share, of Reorganized ACL to be issued (i) on the Plan Effective Date, (ii), upon exercise of the Sponsor Warrants or New Warrants for New Common Equity, (iii) upon conversion of the New Money Preferred Equity, or (iv) as otherwise permitted pursuant to the new corporate governance documents of Reorganized ACL.  The New Common Equity shall be junior in priority to the Take Back Preferred Equity and the New Money Preferred Equity, and no dividends will be paid on the New Common Equity (nor will repurchases thereof be permitted) unless the Reorganized Debtors have paid all accrued and unpaid dividends (whether or not declared) on the Take Back Preferred Equity and the New Money Preferred Equity. If and to the extent required for compliance with the Jones Act, Holders of Allowed Term Loan Claims shall receive New Warrants for New Common Equity in lieu of shares of New Common Equity.  If any New Warrant for New Common Equity is issued to any Holder, it shall be exercisable at any time for the number of shares of New Common Equity that such Holder of Allowed Term Loan Claims would have received but for the Jones Act Restriction, and the strike price thereof shall be $0.01 per share of New Common Equity. The duration of any such New Warrant shall be 25 years, and the Holder thereof shall not be entitled to any voting rights prior to exercise. Any such New Warrants shall be subject to the Anti-Dilution Protections (as discussed below) and other customary anti-dilution protections, shall be subject to a substantially similar cashless exercise option as the Sponsor Warrants (mutatis mutandis), and upon Liquidation, shall be entitled to receive the amount they would have been entitled to receive as if they had been converted into New Common Equity at such time.

Anti-Dilution Protections.  If and to the extent a dividend is paid to the New Common Equity, the Holder of New Warrants or New Common Equity shall receive an anti-dilution warrant (the "New Common Equity Anti-Dilution Warrants").  New Common Equity Anti-Dilution Warrants shall be exercisable at any time by a U.S. Citizen (for Jones Act purposes) for a non-interest bearing demand note issued by Reorganized ACL in the principal amount equal to the dividend or redemption payment that the New Warrants for New Common Equity would have been entitled to if they had been converted into New Common Equity on the record date for such dividend or redemption payment, reduced by the amount of any withholding taxes paid or payable by the Reorganized Debtors on behalf of the holder of New Warrants in connection with the receipt of the New Common Equity Anti-Dilution Warrants. New Common |

| | |
|---|---|
| | Equity Anti-Dilution Warrants shall have a strike price of $0.01. Warrants shall be fully transferable and severable from the New Warrants for New Common Equity.  New Common Equity Anti-Dilution Warrants shall not be exercisable for stock or non-interest-bearing demand notes by Non-U.S. Citizens. |
| **New Warrants** | Means warrants for New Common Equity, Take Back Preferred Equity, or New Money Preferred Equity, as the case may be, issued pursuant to the Plan on the terms set forth herein. |
| **Non-U.S. Citizen** | Means any Person which is not able eligible and qualified to own and operate U.S.-flag vessels in the U.S. coastwise trade. |
| | If (i) a Person does not furnish an affidavit of citizenship and supporting questionnaire to the Debtors on or before the Plan Effective Date, or (ii) such affidavit or questionnaire has been rejected by the Debtors in the exercise of their reasonable judgment with the advice of counsel and in consultation with the Required Consenting Term Lenders, then such Person shall be considered a Non-U.S. Citizen for the purposes of the Jones Act Restriction. |
| **Other Priority Claim** | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim against any of the Debtors, other than an ABL Facility Claim or a Term Loan Claim. |
| **Person** | An individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other entity. |
| **Petition Date** | The date on which the Debtors commence the Chapter 11 Cases. |
| **Plan Effective Date** | The date selected by the Debtors and the Required Consenting Term Lenders, in accordance with the Restructuring Support Agreement, that is the first Business Day on which date all conditions to the Plan Effective Date have been satisfied or waived in accordance with the Plan. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Quarterly Distribution Date** | Following the Plan Effective Date, reoccurring dates occurring promptly after the Reorganized Debtors' quarterly reports and audited results are finalized. |

| | |
|---|---|
| **Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Reorganized Debtors** | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Reorganized ACL** | American Commercial Lines Inc., as reorganized pursuant to and under the Plan or any successor thereto, or such other entity as determined by the Company and the Required Consenting Term Lenders. |
| **Secured** | When referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Stated Equity Value** | The plan value of the New Common Equity to be agreed by the Company and the Required Consenting Term Lenders on or before plan solicitation. |
| **Term Loan Claim** | Any Claim arising under, derived from, or based on the Term Loan Facility. |
| **Term Loan DIP Facility Claim** | Any Claim arising under, derived from, or based on the Term Loan DIP Facility. |
| **Term Loan Facility** | The facility under that certain Term Loan Credit Agreement, dated as of November 12, 2015, among Commercial Barge Line Company, as borrower, American Commercial Lines Inc., as holdings, and various lenders thereto, as amended, modified, or supplemented from time to time. |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |

22

# **EXHIBIT B**

## **DIP TERM LOAN FACILITY TERM SHEET**

## DIP TERM LOAN FACILITY TERM SHEET

This term sheet (the "**DIP Term Loan Facility Term Sheet**") sets forth the principal terms of a potential superpriority secured debtor-in-possession term loan credit facility (the "**DIP Term Loan Facility**"; the credit agreement evidencing the DIP Term Loan Facility, the "**DIP Term Loan Credit Agreement**" and, together with the DIP Orders (as defined herein) and the other definitive documents governing the DIP Term Loan Facility, the "**DIP Documents**," each of which shall be in form and substance acceptable to the DIP Term Loan Agent and the Required DIP Term Lenders (each as defined herein)), in their capacities as debtors and debtors-in-possession (the "**Debtors**") to be entered into with the Loan Parties (as defined herein) in connection with their respective cases (along with the cases of certain other affiliated debtors, if any, the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The DIP Term Loan Facility will be subject to the approval of, and consummated in the Chapter 11 Cases in, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), in accordance with the DIP Orders and the DIP Documents. Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement to which this DIP Term Facility Term Sheet is attached as **Exhibit B** (the "**Restructuring Support Agreement**").

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **Borrower** | Commercial Barge Line Company, as a debtor and debtor-in-possession (the "**Borrower**"). |
| **Guarantors** | American Commercial Lines Inc. ("**Holdings**") and all other Debtors, which shall in any event include all subsidiaries of the Borrower that are guarantors or borrowers under the DIP ABL Facility (as defined below), each as a debtor and debtor-in-possession (collectively with the Borrower and Holdings, the "**Loan Parties**"). |
| **DIP Term Loan Agent** | Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Term Loan Agent**"), or any other institution to be mutually agreed. |
| **Amount & Type** | A superpriority secured debtor-in-possession credit facility composed of new money loans in an aggregate principal amount not to exceed $50.0 million (the "**DIP Term Loans**", and the commitments with respect to the DIP Term Loans, the "**DIP Term Loan Commitments**"), which shall be available in its entirety upon entry of the Interim DIP Order (as defined herein) and satisfaction of all other applicable conditions precedent described below (the "**Closing Date**"). On the Closing Date, the Borrower shall make a single draw of DIP Term Loans in an amount equal to the DIP Term Loan Commitments.<br><br>The borrowing of DIP Term Loans shall permanently reduce the DIP Term Loan Commitments, and DIP Term Loans repaid or prepaid may not be reborrowed.<br><br>The proceeds of the DIP Term Loans shall be funded into a separate account which shall not be subject to the dominion of the DIP ABL Agent (the "**DIP Term Loan Proceeds Account**"). |

| | |
|---|---|
| **DIP Term Lenders** | Certain Initial DIP Commitment Parties and certain other lenders under the Prepetition Term Loan Credit Agreement (in such capacities and collectively, the "**DIP Term Lenders**").<br><br>The obligation of any DIP Term Lender to fund any loan under the DIP Term Loan Facility may be fulfilled on behalf of such DIP Term Lender by any of such DIP Term Lender's affiliates or related investment vehicles. The DIP Term Lenders may, by notice to the Borrower, modify the funding mechanics of the DIP Term Loan Facility to mitigate or avoid any adverse tax effects on the DIP Term Lenders, so long as any such change does not result in a material cost or expense (other than fronting or similar fees) to the DIP Term Lenders or the Loan Parties. |
| **Maturity Date** | The earliest of (i) the date that is six months after the Closing Date, (ii) the effective date of any plan of reorganization (as defined below) (the "**Effective Date**") and (iii) the consummation of a sale or other disposition of all or substantially all assets of the Loan Parties under Bankruptcy Code section 363, (such earliest date, the "**DIP Termination Date**"). |
| **Conversion into New Money Preferred Equity** | The principal amount of the DIP Term Loans will be converted into New Money Preferred Equity on the Effective Date, if all conditions to the issuance of the New Money Preferred Equity described under "Conditions Precedent" in the Backstop Commitment Agreement Term Sheet attached to the RSA as **Exhibit D** (the "**New Money Conversion Conditions**") are satisfied on the Effective Date, in each case, on the terms and as specified in the Preferred Equity Backstop Agreement; provided that any DIP Term Lender may, by written designation to the Borrower and in accordance with the DIP Term Loan Credit Agreement, cause any New Money Preferred Equity issuable on account of any of its DIP Term Loans to be issued to any of its affiliates or related investment vehicles.<br><br>If the New Money Conversion Conditions are not satisfied on the DIP Termination Date, all DIP Term Loans shall be due and payable in full in cash on the DIP Termination Date. |
| **Interest Rate** | Floating interest rate of, at the option of the Borrower, (i) LIBOR + 7.00% per annum, or (ii) ABR + 6.00, in each case payable monthly in cash.<br><br>At any time while an event of default under the DIP Documents has occurred and is continuing, all amounts owing under the DIP Term Loan Facility, including the DIP Loans, will bear interest at an interest rate equal to the interest rate otherwise applicable thereto plus 2.00%, which shall be payable on demand from time to time. |
| **LIBOR Floor** | 2.00% |
| **Amortization** | None. |
| **DIP ABL Facility** | A superpriority senior secured debtor-in-possession asset based credit facility (the "**DIP ABL Facility**" and, together with the DIP Term Loan Facility, the "**DIP Facilities**") in an aggregate commitment amount not to |

| | |
|---|---|
| | exceed $640,000,000 million (the loans thereunder, the "**DIP ABL Loans**" and, together with the DIP Term Loans, the "**DIP Loans**") on terms acceptable to the Initial DIP Commitment Parties.  For purposes hereof, (i) the administrative agent and collateral agent under the DIP ABL Facility is referred to as the "**DIP ABL Agent**" (together with the DIP Term Loan Agent, the "**DIP Agents**") and (ii) the lenders under the DIP ABL Facility are referred to as the "**DIP ABL Lenders**" (together with the DIP Term Lenders, the "**DIP Lenders**"). |
| **Interim DIP Order** | The interim order approving the DIP Facilities, which shall be in form and substance acceptable to the Required DIP Term Lenders (the "**Interim DIP Order**"), (i) authorizing and approving the DIP Facilities and the transactions contemplated thereby and hereby, including, without limitation, the granting of the super-priority status, security interests and priming liens, and the payment of all fees; (ii) lifting or modifying the automatic stay to permit the Debtors to perform their obligations and  the DIP Agents and the DIP Lenders to exercise their respective rights and remedies with respect to the Facilities, (iii) providing for adequate protection in favor of Prepetition Agents and Prepetition Lenders, (iv) including terms and conditions customary for transactions of this type. In addition, the Interim DIP Order shall provide, among other things, the DIP Agents and the DIP Lenders with customary releases acceptable to the DIP Agents and the DIP Lenders and such other stipulations and findings as the DIP Lenders require in their reasonable discretion, including, without limitation, customary stipulations from the Loan Parties regarding the amount, validity, enforceability and perfection of the Prepetition Secured Obligations and/or the liens granted in favor of the Prepetition Secured Parties. |
| **Final DIP Order** | The final order approving the DIP Facilities, which shall be substantially in the same form as the Interim DIP Order (with modifications as are necessary to convert the Interim DIP Order into a final order or otherwise satisfactory to the Required DIP Term Lenders) (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"). |
| **Prepetition Secured Facilities – Defined Terms** | "**Prepetition Term Loan Credit Agreement**" means that certain Term Loan Credit Agreement dated November 12, 2015, by and among Holdings, the Borrower, Bank of America N.A., as Administrative Agent (the "**Prepetition Term Loan Agent**"), and the lenders party thereto (the "**Prepetition Term Lenders**"), together with any schedules and exhibits thereto (as amended by that certain First Amendment to Term Loan Credit Agreement, dated December 30, 2019, and as may be further amended, supplemented or otherwise modified prior to the Petition Date). "**Prepetition Term Loan Debt Documents**" means collectively, the Prepetition Term Loan Credit Agreement and the other Credit Documents (as defined in the Prepetition Term Loan Credit Agreement). "**Prepetition Term Loan Obligations**" means the "Obligations" as defined in the Prepetition Term Loan Credit Agreement. |

| | |
|---|---|
| | "**Prepetition Term Loan Secured Parties**" means the Prepetition Term Lenders, the Prepetition Term Loan Agent and all other "Secured Creditors" (as defined in the Prepetition Term Loan Debt Documents).

**Prepetition ABL Credit Agreement**" means that certain Amended and Restated Revolving Credit Agreement dated November 12, 2015, by and among the Borrower, certain Loan Parties as additional borrowers party thereto, Wells Fargo Capital Finance, LLC, as Administrative Agent (the "**Prepetition ABL Agent**" and together with the Prepetition Term Loan Agent, the "**Prepetition Agents**"), and the lenders party thereto (the "**Prepetition ABL Lenders**" and together with the Prepetition Term Lenders, the "**Prepetition Lenders**"), together with any schedules and exhibits thereto (as amended, supplemented or otherwise modified prior to the Petition Date).

"**Prepetition ABL Debt Documents**" means collectively, the Prepetition ABL Credit Agreement and the other Credit Documents (as defined in the Prepetition ABL Credit Agreement).

"**Prepetition ABL Obligations**" means collectively, the "Obligations" as defined in the Prepetition ABL Credit Agreement.

"**Prepetition ABL Secured Parties**" means collectively, the Prepetition ABL Lenders, the Prepetition ABL Agent and all other "Secured Creditors" (as defined in the Prepetition ABL Debt Documents).

"**Prepetition Credit Agreements**" means collectively, the Prepetition ABL Credit Agreement and the Prepetition Term Loan Credit Agreement.

"**Prepetition Debt Documents**" means collectively, the Prepetition Term Loan Debt Documents and the Prepetition ABL Debt Documents.

"**Prepetition Secured Obligations**" means collectively, the Prepetition Term Loan Obligations and the Prepetition ABL Obligations.

"**Prepetition Secured Parties**" means collectively, the Prepetition Term Loan Secured Parties and the Prepetition ABL Secured Parties.

"**Prepetition Intercreditor Agreement**" means that certain Intercreditor Agreement dated November 12, 2015, by and among the Prepetition Term Loan Agent, the Prepetition ABL Agent, the Borrower, and the other Loan Parties party thereto (as amended, supplemented or otherwise modified prior to the Petition Date). |
| **Collateral** | Subject to the priorities set forth below, all real and personal property of the Loan Parties, subject to customary exclusions and excluding any causes of action under chapter 5 of the Bankruptcy Code or any other avoidance actions under applicable law but including, effective upon entry of a Final DIP Order, all proceeds of such causes of action (collectively, the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facilities, the "**DIP Liens**"). |

4

| | |
|---|---|
| **Priority of the DIP Facilities** | All obligations of the Borrower and the Guarantors to the DIP Term Lenders and to the DIP Term Facility Agent shall, subject to the Carve-Out (as defined below), at all times: |

      • be entitled to the benefits of Bankruptcy Code section 364(c)(1), having a superpriority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the Prepetition Secured Parties under the Interim DIP Order and the Final DIP Order, and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 726, 1113 or 1114, and any other provision of the Bankruptcy Code ("**DIP Term Loan Claims**"), subject only to the Carve-Out and *pari passu* with the DIP ABL Claims (as defined below);

      • be secured by a junior perfected security interest and lien on all property of the Debtors that was not, on the date of the commencement of the Chapter 11 Cases (the "**Petition Date**"), subject to valid, unavoidable and perfected security interests and liens, excluding avoidance actions and, prior to the entry of the Final DIP Order, proceeds thereof and subject to certain other exceptions;

      • be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral was, as of the Petition Date, subject to valid, perfected and unavoidable liens in favor of third parties (including, with respect to the DIP ABL Priority Collateral (as defined below), the existing liens of the Prepetition ABL Secured Parties) that were in existence immediately prior to the Petition Date and permitted under the Prepetition Debt Documents, or to valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing liens of the Prepetition Term Loan Secured Parties, which existing liens will be primed by the liens described in the next clause); and

      • be secured by a perfected priming security interest and lien on the ABL Excluded Collateral.

All obligations of the borrower and the guarantors under the DIP ABL Facility to the DIP ABL Lenders and DIP ABL Agent shall, subject to the Carve-Out, at all times:

      • be entitled to the benefits of Bankruptcy Code section 364(c)(1), having a superpriority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the Prepetition Secured Parties under the Interim DIP Order and the Final DIP Order, and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections  105, 326,

328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 726, 1113 or 1114, and any other provision of the Bankruptcy Code ("**DIP ABL Claims**"; collectively with the DIP Term Loan Claims, the "**DIP Claims**"), subject only to the Carve-Out and *pari passu* with the DIP Term Loan Claims;

- be secured by a senior perfected security interest and lien on all property of the Debtors that was not, on Petition Date, subject to valid, unavoidable and perfected security interests and liens, excluding avoidance actions and, prior to the entry of the Final DIP Order, proceeds thereof and subject to certain other exceptions;

- be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral was, as of the Petition Date, subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Debt Documents, or to valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing liens of the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties, which existing liens will be primed by the liens described in the next clause), subject as to priority to such liens in favor of such third parties; and

- be secured by a perfected priming security interest and lien on the DIP ABL Priority Collateral of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations.

All liens authorized and granted pursuant to the DIP Orders (including liens granted as Adequate Protection) shall be deemed effective and perfected as of the Petition Date, and no further filing, notice, or act under applicable law or otherwise will be required to effect such perfection.  The DIP Term Lenders, or the DIP Term Loan Agent on behalf of the DIP Term Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be necessary under state law or other applicable law in order to enforce the security, perfection or priority of the DIP Term Lenders' claims described herein.

"**DIP ABL Priority Collateral**" shall mean all DIP Collateral that consists of assets of the type set forth in the definition of "Revolving Facility Collateral" in the Prepetition Intercreditor Agreement.

"**DIP Term Priority Collateral**" shall mean all assets of the type set forth in the definition of "ABL Excluded Collateral" in the Prepetition Intercreditor Agreement.

| | |
|---|---|
| | As between the DIP Term Lenders, the DIP Term Loan Agent, the DIP ABL Lenders and the DIP ABL Agent, the rights and priorities with respect to the DIP Collateral will be governed by a new intercreditor agreement (the "**DIP Intercreditor Agreement**") which shall be substantially consistent with the Prepetition Intercreditor Agreement, subject to any changes thereto acceptable to the DIP Term Loan Agent and the DIP ABL Agent.<br><br>The rights of the DIP Term Loan Agent and the DIP Term Lenders shall not be subject to any rights, claims, charges or liens arising under Section 506(c) or Section 552(b) of the Bankruptcy Code, or the equitable doctrine of marshaling.<br><br>The "**Carve Out**" means (i) all fees required to be paid to (A) the Clerk of the Bankruptcy Court and (B) the to the office of the United States Trustee; (ii) all reasonable fees and expenses up to $20,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and a creditors' committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Person**s") at any time before or on the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (subject to a limitation to be set forth in the DIP Orders); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000 incurred after the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").<br><br>For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP ABL Agent or the DIP Term Loan Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the DIP Term Loan Agent (if notice is delivered by the DIP ABL Agent), counsel to the DIP ABL Agent (if notice is delivered by the DIP Term Loan Agent), and counsel to a creditors' committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in and under the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement) stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **Adequate Protection for Prepetition Term Loan Secured Parties** | Pursuant to Bankruptcy Code sections 361, 363(e) and 364(d)(1), as adequate protection in respect of (x) the incurrence of the DIP Facilities, (y) the imposition of the automatic stay, and (z) the Loan Parties' use of the collateral, the Loan Parties and the DIP Lenders agree, subject to |

|  | Bankruptcy Court approval, to all of the following forms of adequate protection (the "**Adequate Protection**"):

Prepetition Term Loan Secured Parties:

(a) payment of reasonable fees and out-of-pocket expenses for the Prepetition Term Loan Agent and the Ad Hoc Group, including, without limitation, the reasonable and documented out-of-pocket fees and expenses of Davis Polk & Wardwell LLP, Evercore Group L.L.C., local counsel in any relevant jurisdiction and maritime counsel retained by the Ad Hoc Group;

(b) subject to the Carve-Out, superpriority administrative expense claims as provided by section 507(b) of the Bankruptcy Code junior to the DIP Claims;

(c) financial reporting and other reports and notices delivered by the Company to the DIP Agents;

(d) customary stipulations regarding validity, perfect and priority of the liens securing the Prepetition Term Loan Obligations under the Prepetition Term Loan Credit Agreement and regarding validity, priority and absence of defenses or counterclaims to the Prepetition Term Loan Obligations and customary releases;

(e) a perfected security interest in and lien on the DIP Collateral, which shall be (A) with respect to the DIP Term Priority Collateral, junior in priority to the liens in favor of the DIP Term Loan Agent, (B) with respect to the DIP ABL Priority Collateral, junior in priority to the liens in favor of the DIP ABL Agent, the Prepetition ABL Agent and the DIP Term Loan Agent, and (C) junior in priority to the Carve Out; and

(f) performance of the Milestones.

The adequate protection described above shall survive the termination of the DIP Facilities.  In addition, the DIP Orders shall provide for customary prepetition secured lender protections, including, but not limited to, waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code (subject to entry of the Final DIP Order), the equitable doctrine of marshaling, limitations on the use of collateral and stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties. |
| **Events of Default** | Substantially the same as the Prepetition ABL Credit Agreement, with appropriate modifications to reflect this Term Sheet and the debtor-in-possession nature of the DIP Term Loan Facility, including additional events of default consistent with the DIP ABL Facility and acceptable to the Required DIP Term Lenders. |
| **Affirmative Covenants** | Substantially the same as the Prepetition ABL Credit Agreement, with |

| | |
|---|---|
| | appropriate modifications to reflect this Term Sheet and the debtor-in-possession nature of the DIP Term Loan Facility, including additional affirmative covenants consistent with the DIP ABL Facility and acceptable to the Required DIP Term Lenders. |
| **Negative Covenants** | Substantially the same as the Prepetition ABL Credit Agreement, with appropriate modifications to reflect this Term Sheet and the debtor-in-possession nature of the DIP Term Loan Facility, including additional negative covenants consistent with the DIP ABL Facility and acceptable to the Required DIP Term Lenders. |
| **Representations and Warranties** | Representations and warranties which are substantially the same as the Prepetition ABL Credit Agreement, with appropriate modifications to reflect this Term Sheet and the debtor-in-possession nature of the DIP Term Loan Facility. |
| **Financial Covenants** | A Budget Variance Covenant consistent with the DIP ABL Facility and acceptable to the Required DIP Lenders |
| **Financial Reporting Requirements** | • To be consistent with the DIP ABL Facility and in any event to include rolling 13-week cash flow forecasts and variance analyses; and<br>• Additional reporting requirements consistent with the requirements under the DIP ABL Facility to be agreed and acceptable to the Required DIP Term Lenders. |
| **Budget** | Consistent with the DIP ABL Facility to be agreed and acceptable to the Required DIP Term Lenders |
| **Milestones** | The DIP Documents shall require compliance with milestones (the "**Milestones**") consistent with the milestones set forth in the Restructuring Support Agreement unless waived by the Required DIP Term Lenders. |
| **Conditions Precedent** | Consistent with the DIP ABL Facility to be agreed and acceptable to the Required DIP Term Lenders, and to include (i) delivery of DIP Documents, including security agreements, the DIP Intercreditor Agreement, and guarantee agreements, and filing of UCC financing statements, (ii) delivery of customary closing deliverables, including secretary certificates, an officer's certificate, good standing certificates and insurance certificates, (iii) entry of Interim DIP Order and satisfactory first-day orders, (iv) receipt of satisfactory budget, (v) effectiveness and satisfaction of all closing conditions under the DIP ABL Facility, (vi) payment of fees and expenses, (vii) satisfaction of know your customer, Patriot Act and similar requirements and (viii) delivery of a customary borrowing notice. |
| **Voting** | Amendments and waivers of the DIP Term Loan Facility will require the approval of at least two (2) DIP Term Lenders (DIP Term Lenders affiliated with each other or under common management being deemed to be one single DIP Term Lender) collectively holding more than 50% of the aggregate amount of the DIP Term Loan Facility (the "**Required DIP Term Lenders**"); provided that certain amendments, waivers or other modifications of the DIP Term Loan Facility shall require the consent of |

| | |
|---|---|
| | each adversely affected DIP Term Lender or all DIP Term Lenders. |
| **Fees and Expenses Indemnification** | Loan Parties obligated under the DIP Term Loan Facility shall pay all reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Term Loan Agent and/or the DIP Term Lenders in connection with any and all aspects of the DIP Term Loan Facility and the Chapter 11 Cases, including, without limitation, the reasonable fees and expenses of legal counsel or financial advisors, hired by or on behalf of the DIP Term Loan Agent and the DIP Term Lenders (collectively), including Davis Polk & Wardwell LLP, Evercore Group L.L.C., local counsel in any relevant jurisdiction and maritime counsel retained by the DIP Term Lenders (collectively). |
| | The Loan Parties will indemnify the DIP Term Loan Agent and DIP Term Lenders, and hold them harmless from and against all liabilities, claims and disbursements (including reasonable and documented out-of-pocket costs and expenses) arising out of or relating to the transactions contemplated hereby, except solely for gross negligence or willful misconduct of such indemnified party to the extent determined by a final, non-appealable order of a court of competent jurisdiction. |
| **Fees** | *Funding Fee:* Each DIP Term Lender shall receive a non-refundable fee (the "**DIP Funding Fee**") in an amount equal to 3.0% of its pro rata share of the DIP Term Loan Commitments on the Closing Date, fully earned, due and payable by the Loan Parties in cash on the Closing Date.  The DIP Funding Fee will take the form of original issue discount. |
| | *DIP Backstop Premium*: Each DIP Term Backstop Lender shall receive a non-refundable fee (the "**DIP Backstop Premium**") in an amount equal to 6.0% of the aggregate amount of such DIP Term Backstop Lender's backstop obligations as of the date of the Restructuring Support Agreement. The DIP Backstop Premium shall be fully earned on the date on which the Interim DIP Order is entered and shall be due and payable (i) on the DIP Termination Date in cash or (ii) if the New Money Conversion Conditions are satisfied on the Effective Date, in New Money Preferred Equity. |
| | *DIP Conversion Discount:* Each DIP Term Lender shall receive a non-refundable fee (the "**DIP Conversion Discount**") in an amount equal to 7.0% of the aggregate principal amount of its DIP Term Loans under the DIP Term Loan Credit Agreement. The DIP Conversion Discount shall be earned by, and shall be due and payable to, the DIP Term Lenders (i) with respect to any DIP Term Loans that are prepaid or repaid (whether on a voluntary or mandatory basis) prior to the DIP Termination Date, on the date of such prepayment or repayment (in which case the DIP Conversion Discount shall be payable in cash), and (ii) solely if the New Money Conversion Conditions are satisfied on the Effective Date, on the Effective Date (in which case the DIP Conversion Discount shall be payable in New Money Preferred Equity). |
| | Any DIP Term Backstop Lender and any DIP Term Lender may, by timely |

| | |
|---|---|
| | written designation to the Borrower and in accordance with the DIP Term Loan Credit Agreement, cause any New Money Preferred Equity issuable on account of its DIP Backstop Premium or DIP Conversion Discount, as applicable, to be issued to any of its affiliates or related investment vehicles. |
| **Use of Proceeds** | The proceeds of the DIP Term Loans under the DIP Term Loan Facility will be used only for the following payments and, in the cases of payments pursuant to clauses (i) and (ii) below, subject to the terms and conditions herein and the Budget (subject to any permitted variance under the Budget Variance Covenant): (i) working capital and other general corporate purposes of the Borrower and the other Loan Parties and their subsidiaries in accordance with the Budget; (ii) any adequate protection payments in accordance with the DIP Orders; and (iii) the professional fees and expenses of administering the Chapter 11 Cases (including payments benefiting from the Carve-Out), including allowed professional fees subject to the terms and conditions set forth in this DIP Term Loan Facility Term Sheet whether or not in accordance with the Budget (and including fees incurred prior to the Closing Date).<br><br>Notwithstanding the foregoing, proceeds of the DIP Facilities and cash collateral shall not be used (i) to permit the Debtors, or any other party-in-interest, or their representatives to challenge or otherwise contest or institute any proceeding to determine (x) the amount, validity, perfection or priority of security interests in favor of any of the DIP Lenders or the Prepetition Secured Parties or (y) the amount, validity or enforceability of the obligations of the Debtors under the DIP Loans or the Prepetition Debt Documents, (ii) to prevent, hinder or otherwise delay the DIP Agents or the Prepetition Secured Parties' assertion, enforcement or realization on the collateral securing the Prepetition Secured Obligations or the DIP Collateral in accordance with the DIP Documents, the Prepetition Debt Documents or the DIP Orders other than to seek a determination that an event of default under the DIP Documents or the Prepetition Debt Documents has not occurred or is not continuing, (iii) to seek to modify any of the rights granted to the DIP Agents, DIP Lenders or the Prepetition Secured Parties under the DIP Orders, the DIP Documents, the DIP Facilities or the Prepetition Debt Documents, in each of the foregoing cases without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion, (iv) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by an order of the Bankruptcy Court (including, without limitation, under the DIP Orders) and (y) permitted under the DIP Documents or (v) to investigate, commence, prosecute or defend any claim, motion, proceeding, or cause of action, or assert any defense or counterclaim, against any of the DIP Lenders or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives, including, in each case, without limitation, lender liability claims or claims pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise, except for an amount to be agreed and acceptable to the Required DIP Term Lenders permitted for investigation |

| | |
|---|---|
| | costs of any official statutory committee appointed pursuant to Bankruptcy Code § 1102. |
| **Remedies** | Subject to the DIP Intercreditor Agreement, the DIP Term Loan Agent (acting at the direction of the Required DIP Term Lenders) and the DIP Term Lenders shall have customary remedies, including, without limitation, the right (after providing five (5) business days' prior notice to the Loan Parties), to realize on all DIP Collateral, including cash collateral. |
| | The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated on the DIP Termination Date, without further notice or order of the Bankruptcy Court, unless the DIP Term Loan Agent (at the direction of the Required DIP Term Lenders) elects otherwise in a written notice to the Loan Parties, and the DIP Term Loan Agent (at the direction of the Required DIP Term Lenders) shall be permitted to exercise all rights and remedies, including with respect to the DIP Collateral, set forth in the Interim DIP Order or the Final DIP Order, as applicable, and the DIP Documents, and as otherwise available at law without further order or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise. |
| | Unless otherwise ordered by the Bankruptcy Court, in the event any party requests a hearing seeking to prevent the DIP Agents or the DIP Lenders from exercising any of their rights and remedies that arise after an event of default, the sole issue before the Bankruptcy Court at such hearing shall be whether an event of default has occurred and has not been cured or waived.  No other issue or argument shall be relevant to any opposition to enforcement of the DIP Agents' and the DIP Lenders' rights. |
| **Governing Law** | The laws of the State of New York, except as governed by the Bankruptcy Code. |
| **Miscellaneous** | This DIP Term Facility Term Sheet does not purport to summarize all of the conditions, covenants, representations, warranties, events of default and other terms and provisions which would be contained in the DIP Documents, if any, relating to matters covered hereby, all of which shall be acceptable in form and substance to the Required DIP Term Lenders. |

## EXHIBIT C

**MIP TERM SHEET**

Execution Version

**AMERICAN COMMERCIAL**
**BARGE LINE**

**MANAGEMENT EQUITY INCENTIVE PLAN AND RELATED MATTERS**

The following describes the principal terms of the management equity incentive plan to be adopted by American Commercial Barge Line (the "Company") for the benefit of its key executives and employees, and also addresses certain other compensation matters.

| | |
|---|---|
| *MEIP Overview:* | General. The Company will adopt a Management Equity Incentive Plan (the "MEIP") on the terms and conditions set forth herein, or on such terms and conditions as may otherwise be agreed to between the Company's management and the reorganized Company's board of directors, (this "Term Sheet"), to be effective as of the Company's emergence from bankruptcy ("Emergence").<br><br>MEIP Pools. The MEIP consists of two parts:<br><br>*RSU Pool.* There will be reserved, exclusively for management,[1] a pool of Common Shares of the [Company][2] (the "MEIP Shares") representing no less than 5% of the Common Shares of the Company outstanding as of the date of Emergence (on a fully-diluted and fully-distributed basis) that will be granted as restricted stock units ("RSUs" and such pool, the "RSU Pool"). The MEIP Shares will be equivalent in all economic respects to the Common Shares.<br><br>*SAR Pool.* There will be reserved, for management and key employees, a pool of cash-settled Stock Appreciation Rights (each a "SAR") with respect to MEIP Shares representing no less than 5% of the Common Shares of the Company outstanding as of the date of Emergence (on a fully-diluted and fully-distributed basis) (such pool, the "SAR Pool"). Each SAR will provide for the holder to receive a payment in cash equal to the excess, if any, of the fair market value of a MEIP Share on the date of conversion over the fair market value of a MEIP Share on the date of grant[3] (which for the initial grant of SARs will be as soon as practicable following the Emergence Date).<br><br>The RSU Pool and the SAR Pool shall be collectively referred to herein as the "MEIP Pool."<br><br>Initial Grants.<br><br>*Initial RSU Pool.* 50% of the RSU Pool (the "Initial RSU Pool") will be granted to management in the form of performance-vesting and time vesting RSUs as soon as practicable following the date of Emergence (the "Emergence Date") in accordance with this Term Sheet, with the individual allocations to be determined by the board of directors of the Company (the "Board") immediately following the Emergence (the "Initial RSU Grants" and along with any other grant made under the MEIP, an "Award").<br><br>*Initial SAR Pool.* 60% of the SAR Pool will be granted to management as soon as practicable following the Emergence Date (the "Initial Management SAR Pool"), with individual allocations to be determined by the Board following the Emergence Date. The Initial Management SAR Pool shall be divided into two parts, one of which will represent 50% of the overall Initial Management SAR Pool ("Management Part A") and the remainder will represent 50% of the overall Initial Management SAR Pool ("Management Part B"). An additional 20% of the SAR Pool will be granted to key employees (other than management) as soon as practicable following the Emergence Date, with individual allocation to be determined by the Board following the Emergence Date |

---

[1] Note: This pool will be granted to the top-8 members of management ("Top Management").
[2] Note: Issuing entity to be confirmed based on final post-emergence structure.
[3] Note: Fair market value on the date of grant for grants made in connection with the Emergence will be the midpoint of Plan Equity Value (as defined within the Plan of Reorganization).

("Initial Key Employee SAR Pool"). The Initial Key Employee SAR Pool shall be divided into two parts, one of which will represent 50% of the overall Initial Key Employee SAR Pool ("Key Employee Part A") and the remainder will represent 50% of the overall Initial Key Employee SAR Pool ("Key Employee Part B").

Additional Grants. Any portion of the MEIP Pool that is not granted in connection with the Emergence or any Awards that are forfeited, terminated or cancelled, in each case for no value, will be eligible to be allocated at the sole and exclusive discretion of the Board. For the avoidance of doubt, the Board shall have no obligation to grant all Awards available for grant pursuant to the MEIP Pool.

Dividends: Any special dividends paid by the Company in respect of the Common Shares shall (i) accumulate in respect of outstanding unvested RSUs in the form of "dividend equivalent units" and will be set aside and paid out at the time the underlying RSU vests and is settled and (ii) result in the equitable adjustment of the outstanding SARs through the reduction in the base price of each SAR; provided, however, that if the base price cannot be reduced without incurring potential tax liability, the dividends will accumulate in respect of the outstanding SARs in the form of "dividend equivalent units" that will be paid out at the same time as the underlying SAR is paid out (assuming that such underlying SAR vests).

Share Recycling. MEIP Shares in respect of Awards under the MEIP that are terminated, forfeited or cancelled, in each case for no value, shall again become available for issuance under the MEIP.

| | |
|---|---|
| *MEIP Vesting:* | Normal Vesting. |

*RSUs*: 50% of the Initial RSU Grants will vest ratably on each of the first three (3) anniversaries of the Emergence Date, subject to the participant's continued employment with the Company through the applicable vesting date (the "Time-Based Awards"). The remaining 50% of the Initial RSU Grants will vest based on the level of achievement of the performance factors determined by the Board as of the Emergence Date (the "Performance Awards"). Both Time-Based Awards and Performance Awards will be settled within 30 days following the applicable vesting date.

*SARs*:
The SARs granted as part of the Initial Management SAR Pool will vest according to the following schedule: (i) Management Part A will vest ratably on each of the third and fourth anniversary of the Emergence Date and (ii) Management Part B will vest ratably on each of the fifth and sixth anniversary of the Emergence Date; provided that vesting under (i) and (ii) above is subject to the participant's continued employment with the Company through the applicable vesting date (except as otherwise provided below).

The SARs granted as part of the Initial Key Employee SAR Pool will vest according to the following schedule: (i) Key Employee Part A will vest ratably on each of the first four (4) anniversaries of the Emergence Date and (ii) Key Employee Part B will vest ratably on each of the fifth and sixth anniversary of the Emergence Date; provided that vesting under (i) and (ii) above is subject to the participant's continued employment with the Company through the applicable vesting date (except as otherwise provided below).

Termination of Employment without Cause; Resignation for Good Reason.

*RSUs*: If a participant's employment is terminated by the Company without Cause or the participant resigns with Good Reason, his or her unvested RSUs will vest pro rata through the date of termination with the proration of the outstanding unvested RSUs to be determined by multiplying (i) the number of RSUs that are scheduled to vest on the next vesting date by (ii) the quotient of (A) the number of days worked since the last vesting date divided by (B) the total number of days in the then applicable vesting period; provided that the minimum amount of aggregate vesting (taking into account any RSUs that vest prior to the date of the termination of

|  | employment) shall be equivalent to the length of the applicable non-compete period.  For the avoidance of doubt, such pro rata vesting of the RSUs shall apply to both Time-Based Awards and Performance Awards; provided that vesting of Performance Awards will only vest to the extent that the applicable performance conditions are achieved.  For the avoidance of doubt, upon a termination of employment other than by the Company without Cause or by the participant for Good Reason, all unvested RSUs shall be forfeited for no consideration.<br><br>*SARs*:  If a participant's employment is terminated by the Company without Cause or the participant resigns with Good Reason, any SARs that would have vested during the one year period following the qualifying termination of employment shall vest and, to the extent the termination of employment occurs prior to the fourth anniversary of the date of grant, 50% of the portion that vests as a result of such termination of employment shall pay out on the 4th anniversary of the date of grant and 50% of the portion that vests as a result of such termination of employment shall pay out on the 6th anniversary of the date of grant, or, in each case, on a Change in Control (if earlier). For the avoidance of doubt, all of his or her remaining unvested SARs shall be forfeited for no consideration.<br><br>Termination of Employment with Cause.<br>If a participant's employment is terminated for Cause or the participant breaches a restrictive covenant, the participant will forfeit all of his or her vested and unvested Awards and any MEIP Shares acquired through the settlement of Awards shall be cancelled for no consideration.<br><br>Accelerated Vesting Upon a Change in Control.  Upon a Change in Control, (i) 100% of a participant's unvested Time-Based Awards and SARs will accelerate and vest and (ii) the Performance Awards will vest, subject to the achievement of the applicable performance factors, in each case subject to the participant's continued employment until immediately prior to consummation of the Change in Control. |
|---|---|
| *Settlement of SARs:* | The SARs granted as part of the Initial Management SAR Pool will settle according to the following schedule: (i) Management Part A will be settled upon the earlier of (A) the fourth anniversary of the date of grant  or (B) a Change in Control of the Company and (ii) Management Part B will be settled upon the earlier of (A) the sixth anniversary of the date of grant  or (B) a Change in Control of the Company.  Notwithstanding the foregoing, the SARs that vest as a result of a qualifying termination of employment shall settle and payout as set forth in the termination provision described above.<br><br>The SARs granted as part of the Initial Key Employee SAR Pool will settle according to the following schedule: (i) Key Employee Part A will be settled upon the earlier of (A) the fourth anniversary of the date of grant  or (B) a Change in Control of the Company and (ii) Key Employee Part B will be settled upon the earlier of (A) the sixth anniversary of the date of grant or (B) a Change in Control of the Company.  Notwithstanding the foregoing, the SARs that vest as a result of a qualifying termination of employment shall settle and payout as set forth in the termination provision described above.<br><br>For the avoidance of doubt, the date of grant for the SARs granted as part of the Initial Management SAR Pool and the Initial Key Employee SAR Pool shall be the Emergence Date. |
| *Restrictive Covenants*: | In connection with the granting of the Awards under the MEIP, each participant will agree to be subject to perpetual confidentiality and nondisparagement covenants and one year post-termination non-compete and non-solicitation (both customer and employee) covenants. |
| *Definitions:* | Terms used in this Term Sheet that are defined in a participant's existing agreement with the Company shall have the meaning set forth therein, except for the definition of Change in Control, which shall be defined in the MEIP. |

| | |
|---|---|
| | "Good Reason" shall mean the occurrence of any of the following, without the individual's prior written consent: (i) a material reduction in base salary (after giving effect to the 2020 increase contemplated by this Term Sheet) or (ii) a relocation of the individual's principal work location in effect as of the date hereof by more than 50 miles.<br><br>Other terms shall have definitions that are reasonable and customary for similar management arrangements. |
| *Taxes:* | Subject to customary financing related restrictions, each participant in the MEIP may elect to satisfy taxes required to be withheld through net share settlement. |
| *Adjustments to Existing Compensation Levels:* | As soon as practicable after the Emergence Date, the Board shall perform a compensation study with a target of adjusting the annual base salaries of Top Management by January 1, 2022 to the 50th percentile for each member of Top Management based on the results of such compensation study.  For the year 2020, each of the Top Management's annual base salaries will be increased by a minimum of 10%, retroactive to January 1, 2020, with the unpaid half of the 2020 target bonus opportunity increased commensurately with the salary increase provided (such that the target bonus for 2020 is increased by 50% of the increase in annual base salary). |
| *Lease Renegotiation Incentive Program* | Within five (5) days following the Emergence Date (subject to the applicable individual's continued employment through the Emergence Date), the Company shall pay a one-time Lease Incentive Payment (as defined below) to the individuals set forth on Exhibit A, in accordance with the allocations set forth therein.  The Lease Incentive Pool shall be equal to $1,250,000. |

**Exhibit A**

**Participants in Lease
Renegotiation Incentive
Program**

| Name | Title | Allocation (as a percentage of Lease Incentive Pool) |
|---|---|---|
| Mark Knoy | President & CEO | 30% |
| David Huls | Sr Vice President & CFO | 19% |
| Dawn Landry | SVP & General Counsel | 19% |
| Matt Griffiths | Sr Director Vessel Reliability | 16% |
| Neil Collins | Sr Director, Supply Chain | 16% |
| | | 100% |

# EXHIBIT D

**BACKSTOP COMMITMENT AGREEMENT TERM SHEET**

**AMERICAN COMMERCIAL LINES INC. CHAPTER 11 RESTRUCTURING**

**BACKSTOP COMMITMENT AGREEMENT TERM SHEET**

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN (THE "PLAN") WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

This term sheet (this "Term Sheet"), which is **Exhibit D** to a Restructuring Support Agreement dated January 31, 2020 (the "Restructuring Support Agreement"), by and among American Commercial Lines Inc. and certain of its affiliates and subsidiaries, the ABL Agent, the Consenting ABL Lenders, the Consenting Term Lenders, and the Sponsor, describes the material terms relating to the BCA (as defined below) in connection with the restructuring (the "Restructuring") of American Commercial Lines Inc., a Delaware corporation (including, as applicable, Reorganized ACL (or an affiliate or successor), the "Company"), and together with its debtor affiliates (the "Debtors").

Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Restructuring term sheet that is **Exhibit A** to Restructuring Support Agreement, including in Annex 1 hereto (the "Restructuring Term Sheet")

**BACKSTOP COMMITMENT AGREEMENT**

**Rights Offering:** A Rights Offering (as defined in the Restructuring Term Sheet) for shares of the New Money Preferred Equity (the "Rights Offering Shares") of Reorganized ACL (or an affiliate or successor) of which 22.5% shall be reserved for the Backstop Parties (as defined below) and the remaining 77.5% will be offered *pro rata* to all Holders of Allowed Term Loan Claims at an aggregate purchase price (excluding the Backstop Commitment Premium) of up to $150 million (the "Rights Offering Amount") at a price per share ("Per Share Price") to be determined based on the Company's post emergence equity value. For the avoidance of doubt, as contemplated by the Restructuring Term Sheet, the per share liquidation preference of all New Money Preferred Equity issued pursuant hereto (including in respect of the Backstop Commitment Premium) will be equal to the Per Share Price. The Rights Offering shall be implemented in connection with the Rights Offering Procedures (as defined below).

**Rights Offering Procedures:** Customary procedures for a rights offering (the "Rights Offering Procedures").[1] There will be no oversubscription rights for the Rights Offering.

---

[1] The Rights Offering Procedures to include provision for the delivery by each rights offering participant to deliver a certification of citizenship in order for the Reorganized Debtor to establish compliance with the Jones Act (as defined below).

| | |
|---|---|
| **Backstop Parties:** | In their capacities as Backstop Parties under the BCA (as defined below), certain of the Consenting Term Lenders that are also Initial DIP Commitment Parties (each as defined in the Restructuring Support Agreement) (collectively, the "<u>Backstop Parties</u>"). |
| **Definitive Documentation:** | The Backstop Parties and the Debtors shall enter into a backstop commitment agreement (the "<u>BCA</u>"), in form and substance consistent with this Term Sheet and satisfactory to the Debtors and the Backstop Parties. |
| **Commitment to Participate in the Rights Offering** | Subject to the terms described herein, each Backstop Party hereby agrees to fully exercise all subscription rights issued to it, based on the amount of Allowed Term Loan Claims that such party owns as of a record date ("Subscription Record Date" (as defined in the Rights Offering Procedures)), in the Rights Offering to purchase Rights Offering Shares. |
| **Backstop Commitment:** | Subject to the terms described herein, each Backstop Party will commit (such commitment, the "<u>Backstop Commitment</u>") to purchase on a several and not joint basis, and the Company will agree to sell to such Backstop Party, the Rights Offering Shares (based on the Per Share Price) that are not purchased as part of the Rights Offering (the "<u>Backstop Shares</u>") based on the percentages set forth in an exhibit to the BCA (each, a "<u>Backstop Commitment Percentage</u>"). |
| **Backstop Commitment Premium:** | A premium in an amount equal to 7% of the Rights Offering Amount payable in shares of New Money Preferred Equity (issued at the Per Share Price) (the "<u>Backstop Commitment Premium</u>") shall be deemed fully earned by the Backstop Parties upon the Bankruptcy Court's approval of the BCA. The Company shall cause the Backstop Commitment Premium to be paid to the Backstop Parties on the effective date of the Restructuring (the "<u>Effective Date</u>"). If the Restructuring is not consummated, the Backstop Commitment Premium is payable in cash (see "<u>Break Premium</u>" below). Subject to Bankruptcy Court approval, the Backstop Commitment Premium shall constitute an allowed administrative expense of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code. |
| **Transfer of Allowed Term Loan Claims:** | Transfers of Allowed Term Loan Claims shall not impact a Backstop Party's Backstop Commitment Percentage. |
| **Transfer of Backstop Commitment:** | Each Backstop Party's Backstop Commitment shall be transferable in whole or in part to a Permitted Transferee (as defined below); *provided* that the transferring Backstop Party shall give notice of its intent to transfer its Backstop Commitment (other than to a Related Fund), whether in whole or in part, ("<u>Transfer Notice</u>") to the Company and the non-transferring Backstop Parties and each such non-transferring Backstop Parties shall have a right, but not an obligation, for a period of 10 days following receipt of the Transfer Notice to purchase its *pro rata* share thereof based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-transferring Backstop Parties purchasing such transferring Backstop Party's Backstop Commitment, on the terms described in the Transfer Notice. If any non-transferring Backstop Party does not elect |

to purchase its full pro rata share of the Backstop Commitment offered in the Transfer Notice, then each non-transferring Backstop Party that elected to purchase its full *pro rata* share of the Backstop Commitment proposed to be transferred shall have customary oversubscription rights to purchase the unsubscribed portion of the Backstop Commitments proposed to be transferred in such Transfer Notice. In the event that following the elections described above, the non-transferring Backstop Parties do not elect to purchase all of the Backstop Commitment offered in the Transfer Notice, the transferring Backstop Party shall have the right to complete such transfer to any such Permitted Transferee at a price no lower than the price set forth in the Transfer Notice and on other terms and conditions that are at least as favorable in the aggregate to such transferring Backstop Party as such other terms and conditions set forth in the Transfer Notice. Any third party transferee of the Backstop Commitment shall agree in writing to be bound by the obligations of such transferring Backstop Party under the BCA and the Restructuring Support Agreement and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations.

"Permitted Transferee" means (i) a Related Fund (as defined below), (ii) any other Backstop Party and (iii) any other person that is a party to the Restructuring Support Agreement or executes a joinder thereto and the other Backstop Parties determine in good faith is reasonably capable of fulfilling the BCA to be transferred (including making the necessary representations and warranties under the BCA).

Notwithstanding the foregoing, a Backstop Party may assign its Backstop Commitment to any fund, account or investment vehicle that it controlled, managed, advised or sub-advised by such Backstop Party, an affiliate thereof or the same investment manager, advisor or subadvisor as the Backstop Party or an affiliate of such investment manager, advisor or subadvisor (each, a "Related Fund") without submitting a Transfer Notice, in which case, such assigning Backstop Party shall notify the Company and such Related Fund transferee shall agree in writing to be bound by the obligations of such transferring Backstop Party under the BCA and the Restructuring Support Agreement and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations. In the case of transfers to a Related Fund, the assigning Backstop Party shall remain fully obligated for its Backstop Commitment.

| | |
|---|---|
| **Transfer of Subscription Rights:** | Subscription rights in the Rights Offering are not separately transferable or detachable from Allowed Term Loan Claims and may only be transferred together with the applicable Allowed Term Loan Claims. |
| **Funding Procedures:** | No later than ten (10) business days following the subscription deadline for the Rights Offering, the Company shall deliver a written notice to each Backstop Party of: (i) the number of Rights Offerings Shares elected to be purchased and the aggregate purchase price therefor; (ii) the aggregate |

3

number of unsubscribed shares, if any, and the aggregate purchase price; (iii) the aggregate number of unsubscribed shares based upon such Backstop Party's Backstop Commitment Percentage to be issued and sold by the Company to such Backstop Party and the aggregate purchase price therefor (the "Funding Amount"); (iv) wire instructions for a segregated account (the "Account") established with an escrow agent or the rights offering agent reasonably acceptable to the Required Backstop Parties to which such Backstop Party shall deliver the Funding Amount; and (v) the estimated deadline for delivery of the Funding Amount which shall be four (4) business days before the expected Effective Date (the "Funding Deadline"). The Company shall cause an additional notice of the Funding Deadline to be provided after the Confirmation Order has been entered by the Bankruptcy Court; *provided* that the Funding Deadline shall be a minimum of five (5) business days after date of such notice (unless an earlier date is required to ensure the Funding Deadline is no later than four (4) business days before the expected Effective Date).

Each Backstop Party shall deliver and pay its applicable Funding Amount by wire transfer in immediately available funds in U.S. dollars into the Account. If the BCA is terminated in accordance with its terms after such delivery, such funds shall be released to the Backstop Parties, without any interest accrued thereon, promptly following such termination.

**Backstop Party Default:** Any Backstop Party that fails to timely fund its Backstop Commitment or to fully exercise all subscription rights held by it in the Rights Offering after written notice thereof and a 3-day opportunity to cure (a "Defaulting Backstop Party") will be liable for the consequences of its breach and the parties to the BCA can enforce rights of money damages and/or specific performance upon the failure to timely fund by the Defaulting Backstop Party. Each of the non-defaulting Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such Defaulting Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-defaulting Backstop Parties assuming such Defaulting Backstop Party's Backstop Commitment. If any non-defaulting Backstop Party does not elect to assume its full pro rata share of the Backstop Commitment of the Defaulting Backstop Party, then each non-defaulting Backstop Party that assumed its full *pro rata* share of the Defaulting Backstop Party's Backstop Commitment shall have customary oversubscription rights to assume the unsubscribed portion of the Defaulting Backstop Party's Backstop Commitment. Any Defaulting Backstop Party shall not be entitled to the Backstop Commitment Premium and the portion of the Backstop Commitment Premium otherwise payable to any Defaulting Backstop Party shall be paid *pro rata* to any Backstop Parties that assume all or a portion of the Defaulting Backstop Party's Backstop Commitment.

**Required Backstop Parties:** Backstop Parties holding at least 60.0% in aggregate amount of the Backstop Commitments of all Backstop Parties (excluding any Defaulting Backstop Parties and their corresponding Backstop Commitments) (the "Required Backstop Parties") shall have certain consent rights as specified herein.

4

| | |
|---|---|
| **Debtors' Representations and Warranties:** | The BCA shall contain customary representations and warranties on the part of the Debtors, including: |

- corporate organization and good standing;
- requisite corporate power and authority with respect to execution and delivery of transaction documents;
- due execution and delivery and enforceability of transaction documents;
- no knowledge of any proposal with respect to an Alternative Transaction (as defined below);
- due issuance and authorization of New Money Preferred Equity;
- no consents or approvals (other than Bankruptcy Court approval);
- no conflicts; and
- other representations and warranties to be agreed upon by the Company and the Backstop Parties

| | |
|---|---|
| **Backstop Parties' Representations and Warranties:** | The BCA shall contain customary representations and warranties on the part of the Backstop Parties, to be provided severally and not jointly, including: |

- corporate organization and good standing;
- requisite corporate power and authority with respect to execution and delivery of transaction documents;
- due execution and delivery and enforceability of transaction documents;
- acknowledgement of no registration under the Securities Act;
- no consents or approvals;
- no conflicts;
- sufficiency of funds; and
- institutional accredited investor or qualified institutional buyer status and other customary private placement representations and warranties.

| | |
|---|---|
| **Debtors' Covenants:** | Customary covenants of the Debtors, including to: |

- support the Restructuring, consistent with Restructuring Support Agreement;
- comply with securities laws, including filing a Form D, if required, and any blue sky law or similar compliance;
- assist any Backstop Party in complying with 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto (the "Jones Act"); and
- make any filings in connection with the BCA required by HSR and any other applicable antitrust laws or other applicable laws (and assist any Backstop Party in making any such filings).

| | |
|---|---|
| **Backstop Parties' Covenants:** | Customary covenants of the Backstop Parties, including to: |

- support the Restructuring, subject to the terms and conditions of Restructuring Support Agreement; and
- make any filings in connection with the BCA required by HSR and any other applicable antitrust laws.

#92826475v21

| | |
|---|---|
| **Interim Operating Covenants:** | Before and through the Effective Date, except as set forth in the BCA or with the written consent of the Required Backstop Parties (not to be unreasonably withheld), the Company shall, and shall cause its subsidiaries: |

- to operate their business in the ordinary course;
- to use commercially reasonable efforts to implement the Business Plan and, unless inconsistent with the Business Plan, preserve intact their current material business organizations; and
- to use commercially reasonable efforts to keep available the services of their current senior executive officers and key employees and preserve its material relationships with customers, suppliers, lessors, licensors, licensees, distributors and others having material business dealings with the Company or its subsidiaries.

Any of the following transactions require approval by the Required Backstop Parties (not to be unreasonably withheld), except for scheduled exceptions to be set forth in the BCA:

- any acquisition, merger with or other change of control of another business or any assets in excess of a threshold to be agreed;
- dispose of any assets with a value in excess of a threshold to be agreed;
- entry into, material amendment or termination of any Material Contract (to be defined in the BCA) other than as described in the Business Plan (as defined below);
- agree to new employee compensation, new deferred compensation, severance arrangements or termination agreements unless required by contract or for non-executives in the ordinary course of business other than as agreed in connection with the Restructuring Support Agreement;
- material changes in budget or Business Plan;
- significant capital expenditures (in an amount to be agreed) other than as described in the Business Plan; and
- other customary operating covenants to be mutually agreed.

"Business Plan" refers to the Company's business plan for 2020, as approved by the Company's applicable governing bodies, and provided to the Backstop Parties prior to the execution of the BCA.

| | |
|---|---|
| **Conditions Precedent:** | All Backstop Party conditions shall be subject to waiver by Required Backstop Parties. |

Conditions for Company and Backstop Parties:

- Entry of Confirmation Order.
- All conditions to Confirmation Order and Plan satisfied or waived by the Required Backstop Parties, and Plan consistent in all material respects with the Restructuring Support Agreement and Restructuring Term Sheet (it being understood and agreed that any modifications that affect or impact the treatment of or distributions to claims, DIP Backstop Premium, DIP Conversion Discount, Preferred Equity Backstop Premium, Section 3.05 of the Restructuring Support Agreement and Schedule I thereto, the economic terms, including the Backstop Commitment Percentages, under

6

the Backstop Commitment Term Sheet and BCA, the pro-forma capital structure of the Reorganized Debtors, economic terms of the Take Back Preferred Equity and New Money Preferred Equity, or the means of implementation of the Plan, in each case shall be deemed to be material).

- Rights Offering conducted and concluded in all material respects as agreed in Rights Offering Procedures (it being understood and agreed that any modifications that affect or impact the treatment of or distributions to claims, DIP Backstop Premium, DIP Conversion Discount, Preferred Equity Backstop Premium, Section 3.05 of the Restructuring Support Agreement and Schedule I thereto, the economic terms, including the Backstop Commitment Percentages, under the Backstop Commitment Term Sheet and BCA, the pro-forma capital structure of the Reorganized Debtors, economic terms of the Take Back Preferred Equity and New Money Preferred Equity, or the means of implementation of the Plan, in each case shall be deemed to be material).
- All required HSR, antitrust and other specified regulatory approvals and consents obtained (including approval of the U.S. Coast Guard).

Conditions for Backstop Parties only shall include:

- Bringdown of Company's representations and warranties, subject to all material respects standard;
- Performance by Company of all covenants, subject to all material respects standard
- No MAE (as defined in the definitive BCA)
- The Company shall document the proposed lease modifications in a manner reasonably acceptable to the Ad Hoc Group no later than February 6, 2020.

Conditions for Company only:

- Backstop Parties wire all funds; and
- Bringdown of Backstop Parties' representations and warranties.
- Performance by Backstop Parties of all covenants, subject to all material respects standard

| | |
|---|---|
| **No Shop and Superior Proposals:** | Customary no-shop provision for competing proposals to restructure or acquire all or any material portion of the equity or assets of the Company (whether by merger, consolidation, sale of assets, sale of equity or otherwise) (collectively, "<u>Alternative Transactions</u>"), applicable to the Company and its affiliates, including its controlling affiliates, with a customary fiduciary out for a Superior Transaction (defined below). Company must provide (i) notice of all competing proposals (whether oral or written) to Backstop Parties promptly after receiving such proposal and (ii) a copy of each such proposal. |

<u>Fiduciary Out</u>: If the Company's Board of Directors (the "<u>Company Board</u>") determines in good faith and on the advice of its financial and legal advisors that (i) a proposal for an Alternative Transaction is or would reasonably be expected to lead to a Superior Transaction and (ii) that the failure of the board to pursue such proposal would reasonably be expected to result in a breach of the Company Board's fiduciary duties under Delaware law (a "<u>Superior Proposal</u>"), the Company may decide to negotiate with the party making the Superior Proposal and will (a) notify

7

the Backstop Parties of such determination promptly, (b) provide the Backstop Parties with a copy of such Superior Proposal promptly and (c) keep the Backstop Parties apprised of negotiations and material terms thereof on a current basis. In addition, the Backstop Parties shall have customary rights to match the terms of any Superior Proposal.

Window Shop: Company can provide confidential information subject to an NDA and participate in negotiations in connection with a Superior Proposal; *provided* the NDA is no less favorable to the Company than any NDA currently in effect with a Backstop Party, and the Backstop Parties must receive the same confidential information and all copies of all written documents and material oral information exchanged in connection with the Superior Proposal simultaneously with the Company providing such information to the third party (excluding the identity of the counterparty thereto to the extent prohibited by a separate agreement).

A "Superior Transaction" is a transaction that the Company Board determines in good faith, based on the advice of its outside financial and legal advisors: would be in the best interests of the Company and its creditors and equity holders as a whole, including, but not limited to the Backstop Parties.

|  |  |
|---|---|
| **Break Premium:** | If the BCA terminates for any of the reasons set forth below under "Termination" (other than pursuant to clauses (a), (b)(1), (2), or (4) or (c)(2)), the Backstop Commitment Premium (plus any Expense Reimbursement (as defined below)) is payable to the Backstop Parties in cash within 2 business days of such termination. Each Backstop Party shall receive its pro rata portion of the Break Premium, based on its Backstop Commitment Percentage. |
| **Expense Reimbursement:** | If the BCA is terminated for any of the reasons set forth below under "Termination" (other than pursuant to clauses (a), (b)(1), (2) or (4) or (c)(2)), BCA to provide for payment to the Backstop Parties of all reasonable and documented Backstop Party expenses related to the Restructuring, including all expenses of financial, legal and other advisors, whether incurred before, on or after the date hereof (the "Expense Reimbursement"). |
| **Outside Date:** | No later than 66 days after the Petition Date (the "Outside Date"); provided that if, prior to the Outside Date, all conditions precedent to effectiveness of the Plan (as provided therein) have been satisfied or waived, as applicable, or, for conditions that by their nature are to be satisfied on the Effective Date, shall then be capable of being satisfied, except the requisite regulatory approvals have not been obtained (including, without limitation, approval by the Coast Guard), the Outside Date shall be automatically extended by 14 calendar days, or to such other time as agreed between the Parties. |
| **Termination:** | Customary termination events including the following: |
|  | a. Mutual written consent of the Company and Required Backstop Parties |
|  | b. By the Company upon: |

8

1. Material breaches by the Backstop Parties of representations, warranties, covenants and failure to cure;
2. The Bankruptcy Court denies entry of an order to assume the BCA or the Restructuring Support Agreement or any order approving the BCA or the Restructuring Support Agreement is reversed, stayed, dismissed or vacated;
3. Provided that the Company has complied with the "no shop" provisions described above, the Company Board reasonably determining in good faith based upon the advice of outside counsel that failing to enter into a Superior Transaction would be inconsistent with the exercise of its fiduciary duties under Delaware law; or
4. The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring.

c. By the Required Backstop Parties upon:

1. The termination of the Restructuring Support Agreement in accordance with its terms  other than due to a breach thereunder by a Backstop Party;
2. The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, the Rights Offering, or any material aspect of the transactions contemplated by the Restructuring Support Agreement or this Agreement;
3. Material breach of no shop provisions by the Company;
4. Bankruptcy Court approves an Alternative Transaction or the Company or any of its affiliates enters into an agreement to consummate an Alternative Transaction or files a motion to propose or approve any actual or proposed Alternative Transaction (or public announcement of any of the foregoing);
5. Material breaches of representations, warranties, covenants by the Company and failure to cure;
6. a DIP Credit Agreement Event of Default has occurred and is continuing without waiver or not subject to forbearance for more than 3 days; or
7. any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing an examiner or trustee with expanded powers to oversee or operate the Debtors in the Chapter 11 Cases.

d. Automatically if the Effective Date has not occurred by the Outside Date, unless the Outside Date is extended by mutual consent of the Required Backstop Parties and the Company.

| | |
|---|---|
| **Amendment / Waiver:** | The BCA may only be amended by an instrument in writing executed by the Company and the Required Backstop Parties; *provided* that each Backstop |

9

Party's prior written consent shall be required for any amendment that would have the effect of:

- modifying such Backstop Party's Backstop Commitment Percentage;
- increasing the purchase price to be paid in respect of the Backstop Shares;
- changing the terms of or conditions to the payment of the Backstop Commitment Premium;
- changing any of the termination rights; or
- otherwise disproportionately and materially adversely affecting such Backstop Party.

**Securities Law Matters:** The Rights Offering Shares, the Backstop Shares and the Backstop Commitment Premium shall be exempt from the registration requirements of the U.S. federal securities laws pursuant to Section 4(a)(2) of the Securities Act or another exemption promulgated thereunder and will be "restricted securities" subject to certain transfer restrictions under the U.S. federal securities laws unless sold pursuant to an exemption or a registration statement.

**Specific Performance** Each of the Company and the Backstop Parties agree that irreparable damage would occur if any provision of the BCA were not performed in accordance with the terms thereof and that each of the parties thereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of the BCA or to enforce specifically the performance of the terms and provisions thereof and hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in the BCA or herein, no right or remedy described or provided in the BCA or herein is intended to be exclusive or to preclude a party thereto from pursuing other rights and remedies to the extent available under such agreement, herein, at law or in equity.

**Confidentiality:** In order for confidential information to be exchanged pursuant to the BCA, each Backstop Party shall continue to be subject to customary confidentiality agreements.

**Other Provisions:** Such other covenants and agreements as are customary for backstop commitment agreements that the Company and the Backstop Parties shall mutually agree.

**Governing Law / Jurisdiction:** New York law and, to the extent applicable, the Bankruptcy Code; Bankruptcy Court exclusive jurisdiction and jury trial waiver to be included.

**Tax Treatment** The Backstop Commitment Premium and the Break Premium shall be treated as a "put premium" paid to the Backstop Parties, for all U.S. federal income tax purposes (and, to the extent applicable, for state, local and non-U.S. tax purposes )

# EXHIBIT E

## GOVERNANCE TERM SHEET

Execution Version

# AMERICAN COMMERCIAL LINES INC.

## Term Sheet Relating to Corporate Governance Matters

This term sheet (this "Corporate Governance Term Sheet"), which is **Exhibit E** to a Restructuring Support Agreement dated January 31, 2020 (the "Restructuring Support Agreement"), by and among American Commercial Lines Inc. and certain of its affiliates (the "Company" or "ACL")), the Consenting Term Lenders, and the Sponsor, describes the material terms relating to the corporate governance of a reorganized American Commercial Lines Inc. ("Reorganized ACLI") that would be implemented in connection with the consummation of the Restructuring.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Restructuring Term Sheet and the Plan (as defined in the Restructuring Term Sheet).

| | |
|---|---|
| **Structure:** | The Company will be organized as a Delaware corporation. |
| **Capital Structure:** | The Company's issued equity interests ("Equity Interests") will initially consist of the Take Back Preferred Equity, New Money Preferred Equity and New Common Equity, and the New Warrants will also be outstanding, in each case, as described in greater detail in the Restructuring Term Sheet. |
| | Each holder of Take Back Preferred Equity is referred to as a "Take Back Preferred Holder," each holder of New Money Preferred Equity is referred to as a "New Money Preferred Holder" and each holder of New Common Equity is referred to as a "Holder."  The Take Back Preferred Holders, New Money Preferred Holders and Holders, collectively, are referred to as the "Company Stockholders." |
| | "Fully Diluted Common Shares" means the aggregate amount of New Common Equity after giving effect to a hypothetical conversion of all of the outstanding (i) New Money Preferred Equity, (ii) Sponsor Warrants and New Warrants and (iii) any New Money Preferred Equity issuable upon conversion of the New Warrants, in each case into New Common Equity (but not, for the avoidance of doubt, giving effect to the conversion of any equity awards pursuant to the  management incentive plan set forth in **Exhibit C** to the Restructuring Support Agreement). |
| | • "Major Holders" means (i) Contrarian Capital Management, L.L.C. (together with one or more of its designated affiliates or managed investment vehicles, funds or accounts (including separately managed accounts), collectively, "Contrarian"), (ii) Finepoint Capital L.P. (together with one or more of its designated affiliates or managed investment vehicles, funds or accounts (including separately managed accounts), collectively, "Finepoint"), (iii) Invesco Ltd. (together with one or more of its designated affiliates or managed investment vehicles, funds or accounts (including separately managed accounts), collectively, "Invesco") and (iv) from and after the date of emergence (the "Emergence Date"), except as otherwise provided below, with the prior written consent of Contrarian, Finepoint and Invesco (and any Additional Major Holders previously agreed to by Contrarian, Finepoint and Invesco pursuant to this clause (iv)), any additional Company Stockholder who at any time holds more than 12.5% of the |

|  | Fully Diluted Common Shares (each, an "<u>Additional Major Holder</u>"); *provided* that such consent shall automatically be deemed given if such Company Stockholder holds more than 12.5% of the Fully Diluted Common Shares unless such Company Stockholder or any of its affiliates (other than any such affiliates separated by an effective information wall) holds, or later acquires, an aggregate 3% or more of the outstanding equity interests or voting rights in respect of any of the Company's Competitors (or has any appointment or similar rights to such Competitor's board of directors, board of managers or similar governing body, or any veto or similar rights over any of such Competitor's actions) (collectively, any such interests and/or rights referred to in this proviso, a "<u>Disqualifying Interest in a Competitor</u>"). |
|---|---|
| **Board of Directors:** | The Company will be managed by a board of directors (the "<u>Board</u>"), which will be responsible for overseeing the operation of the Company's business. The Board will initially be comprised of eight directors ("<u>Directors</u>").

The Directors on the Board shall be determined as follows:

- <u>Contrarian</u>: Contrarian shall have the right to appoint (i) two Directors for so long as Contrarian holds 17.5% or more of the outstanding Fully Diluted Common Shares, (ii) one Director for so long as Contrarian holds less than 17.5% but at least 7.5% of the outstanding Fully Diluted Common Shares and (iii) no Directors for so long as Contrarian holds less than 7.5% of the outstanding Fully Diluted Common Shares (each Director appointed by Contrarian, a "<u>Contrarian Director</u>");

- <u>Finepoint and Invesco</u>: Each of Finepoint and Invesco shall have the right to appoint (i) one Director for so long as such Major Holder holds at least 7.5% of the outstanding Fully Diluted Common Shares and (ii) no Directors for so long as such Major Holder holds less than 7.5% of the outstanding Fully Diluted Common Shares; *provided* that if Finepoint or Invesco comes to hold 17.5% or more of the outstanding Fully Diluted Common Shares, such Major Holder shall instead have the right to appoint two Directors for so long as it holds 17.5% or more of the outstanding Fully Diluted Common Shares (each Director appointed by Finepoint, a "<u>Finepoint Director</u>", and each Director appointed by Invesco, an "<u>Invesco Director</u>"); *provided, further,* that either Finepoint or Invesco may transfer its right to appoint its Director(s) to Contrarian at any time;

- <u>CEO</u>: The then current Chief Executive Officer (the "<u>CEO</u>") of the Company, which initially shall be Mark Knoy (the "<u>CEO Director</u>"), shall be a Director;

- <u>Additional Major Holders</u>: From and after the Emergence Date, each Additional Major Holder shall have the right to appoint (i) two Directors for so long as such Additional Major Holder holds 22.5% or more of the outstanding Fully Diluted Common Shares, (ii) one |

Director for so long as such Additional Major Holder holds less than 22.5% but at least 12.5% of the outstanding Fully Diluted Common Shares and (iii) no Directors for so long as such Additional Major Holder holds less than 12.5% of the outstanding Fully Diluted Common Shares (each Director appointed by an Additional Major Holder, an "Additional Major Holder Director"); *provided, however*, that (x) the first Board seat filled by an Additional Major Holder, if applicable, shall be a Board seat previously held by a Contrarian Director, Finepoint Director or Invesco Director, to the extent any of Contrarian, Finepoint or Invesco has, as of such time, ceded its right to appoint one or more Directors (i.e., upon falling below the applicable 12.5% or 7.5% thresholds set forth above) and (y) to the extent each of Contrarian, Finepoint and Invesco continues to hold its rights to appoint one or more Directors as set forth above and Additional Major Holders nonetheless have the right to appoint one or more Additional Major Holder Directors, then the size of the Board shall increase, to the extent necessary, to accommodate the Contrarian Directors, Finepoint Director(s), the Invesco Director(s), the CEO Director and the Minority Director, along with the Additional Major Holder Directors;

- Minority Director: One seat will be reserved for a candidate (the "Minority Director") who initially shall be Scott Vogel, and after an initial term of 12 months, the next Minority Director shall be nominated by the then-serving Minority Director (who may, for the avoidance of doubt, nominate him- or herself) and shall be elected by an affirmative vote of at least 66-2/3% of the outstanding Fully Diluted Common Shares owned by Company Stockholders that are not Major Holders (voting together as a single class, on an as-converted basis). In the event that the initial nominee for Minority Director in any election of Directors is not elected to the Board, the Minority Director shall have the right to nominate another candidate to be elected by an affirmative vote of at least 66-2/3% of the outstanding Fully Diluted Common Shares owned by Company Stockholders that are not Major Holders (voting together as a single class, on an as-converted basis), such nomination and voting process shall be repeated to the extent necessary until a Minority Director is elected, and the then-serving Minority Director shall remain in office until his or her successor is elected; and

- Other Directors: To the extent that any seats on the Board remain unfilled after accommodating the Contrarian Directors, Finepoint Director(s), Invesco Director(s), CEO Director, Additional Major Holder Directors and Minority Director, candidates for such seats (each, an "Other Director"), who shall be independent of the Company and the Major Holders and shall have relevant experience in the industry in which the Company operates, shall be selected in good faith by the affirmative vote of at least 66-2/3% of the outstanding Fully Diluted Common Shares owned by Company Stockholders that beneficially own more than 5% of the outstanding Fully Diluted Common Shares as of the Emergence Date (voting

together as a single class, on an as-converted basis) and after an initial term of 12 months, each Other Director shall be nominated by the nominating committee of the Board and elected by an affirmative vote of at least 66-2/3% of the outstanding Fully Diluted Common Shares owned by Company Stockholders that beneficially own more than 5% of the outstanding Fully Diluted Common Shares as of such time (voting together as a single class, on an as-converted basis).

The initial Board shall be designated by the Required Consenting Term Lenders prior to the filing of the Plan Supplement in accordance with the foregoing provisions. All Directors shall serve one-year terms from the Emergence Date, and shall be elected annually. All Company Stockholders shall agree to vote in favor of the election of all Directors that the Major Holders are entitled to appoint as set forth above. If any Major Holder cedes its right to appoint one or more Directors (e.g., upon falling below the applicable thresholds set forth above), any such Director shall be entitled to finish his or her then-current one-year term and terminate his or her Board service upon the expiration thereof, unless such Major Holder has ceased to own at least 1% of the outstanding Fully Diluted Common Shares, in which case all Directors appointed by such Major Holder shall be required to immediately terminate their respective Board service.

If a Contrarian Director, Finepoint Director, Invesco Director or Additional Major Holder Director ceases to serves as a Director as a result of his or her death, disability, retirement, resignation, removal or otherwise, so long as Contrarian, Finepoint, Invesco or the Additional Major Holder, as applicable, would then be entitled to designate a Director to fill such vacancy, Contrarian, Finepoint, Invesco or the Additional Major Holder, as applicable, shall have the exclusive right to designate another individual to fill such vacancy and serve as a Director. If any Other Director ceases to serve as a Director as a result of his or her death, disability, retirement, resignation, removal or otherwise, the remaining Directors shall have the exclusive right to designate another individual to fill such vacancy and serve as a Director until the next annual meeting. If any Minority Director ceases to serve as a Director as a result of his or her death, disability, retirement, resignation, removal or otherwise, such vacancy shall be filled in the same manner as the election of the Minority Director in annual elections.

Subject to the transfer restrictions and other terms described herein (including the limitation of the rights of any person who holds, or later acquires, a Disqualifying Interest in a Competitor), if any Major Holder transfers a sufficient number of Equity Interests for the transferee to exceed the threshold above which such Major Holder has the right to appoint at least one Director to the Board (or, in the case of a transfer in which other Holders exercise their respective tag-along rights as described below, if such transferee acquires such number of Equity Interests from the transferring Major Holder and all other transferring Holders), and the transferring Major Holder elects to designate the transferee an Additional Major Holder, then notwithstanding anything else to the contrary

4

contained herein, such transferee shall be entitled to all Director designation and other governance rights of an Additional Major Holder hereunder (provided that such transferee's right to appoint Directors to the Board shall be subject to the thresholds applicable to the transferring Major Holder).

Each Director shall be entitled to share all information received by such individual in his or her capacity as such with the Major Holder that designated him or her, so long as such Major Holder (i) executes and delivers a customary confidentiality agreement applicable to such information on a form reasonably acceptable to the Company and (ii) does not have a Disqualifying Interest in a Competitor.

Except for Directors who are employees of Reorganized ACLI, Directors shall receive such cash or other compensation (if any) in respect of their service on the Board or any committee thereof as the Board shall approve from time to time, and each Director shall be entitled to customary reimbursement by the Company of expenses incurred by such Director in connection with attending or participating in Board or committee meetings or otherwise carrying out his or her services as a Director, as determined by the Board.

No Company Stockholder or any of its affiliates shall nominate any person for election as a Director or otherwise take any action to affect or influence the election of a nominee, in each case, other than as expressly provided by the terms hereof; *provided* that no Company Stockholder will be restricted from having private discussions with the Board.

The Board shall designate a Director to act as the Chairperson of the Board, provided that the CEO Director may not the Chairperson.

All officers, including the CEO, of Reorganized ACLI shall be U.S. citizens. The Board of Reorganized ACLI shall satisfy Jones Act requirements, including the requirement that (i) the Chairperson of the Board shall be a U.S. citizen, and (ii) no more than a minority of the number of Directors necessary to constitute a quorum of the Board (and any committee thereof) shall be a non-U.S. citizen. U.S. citizenship status shall be determined in accordance with the Jones Act. If Jones Act restrictions do not permit all Major Holders who are non-U.S. citizens to appoint Directors to the Board in accordance with the terms hereof, it is acknowledged and agreed that, for so long as (x) Invesco has the right to appoint an Invesco Director and (y) continues to be a non-U.S. citizen for purposes of the Jones Act, Invesco shall be entitled to appoint a Director before any other Major Holder who is a non-U.S. citizen.

| | |
|---|---|
| **Board Committees:** | Subject to the terms set forth herein, the Board will have the discretion to establish committees. |
| | The nominating committee and compensation committee of the Board shall each initially consist of at least one Contrarian Director. The Company's stockholders' agreement (the "<u>Stockholders' Agreement</u>") shall set forth a list of committees to be created by the Board, including responsibilities to be delegated thereto, and shall additionally provide that |

| | |
|---|---|
| | all major actions in respect of the Company's business shall be reserved for meetings of the full Board. |
| **Take Back Preferred Holder Consent Rights:** | Each of the following actions by the Company or any of its subsidiaries shall require the prior written consent of Take Back Preferred Holders holding more than 50% of the outstanding Take Back Preferred Equity at such time, voting as a separate class:<br><br>• any Liquidation, unless the Take Back Preferred Holders would receive an aggregate amount in connection therewith equal to the liquidation preference of the outstanding Take Back Preferred Equity at such time (including any accrued and unpaid dividends thereon);<br><br>• incurrence of any indebtedness or creation of any lien (other than purchase money liens and customary types of statutory liens) or security interest, or issuance of any Equity Interests ranking senior to, or pari passu with, the Take Back Preferred Equity with respect to the right to receive assets of the Company or any of its affiliates in connection with any dividend or other distribution by the Company or any Liquidation, other than (i) any indebtedness permitted to be incurred under the ABL Exit Financing, (ii) any such transactions among the Company and its wholly owned subsidiaries or (iii) demand notes issued upon exercise of any Take Back Preferred Equity Anti-Dilution Warrants, New Money Preferred Equity Anti-Dilution Warrants or New Common Equity Anti-Dilution Warrants (in each case, as defined in the Restructuring Term Sheet);<br><br>• declaration or payment of any dividend or other distribution on any Equity Interests that are junior to the Take Back Preferred Equity, other than (i) dividends on the New Money Preferred Equity and/or the New Common Equity as and to the extent permitted by the Restructuring Term Sheet (including, for the avoidance of doubt, any payments upon conversion of the New Money Preferred Equity provided for in the Restructuring Term Sheet) or (ii) any such transactions among the Company and its wholly owned subsidiaries;<br><br>• redemption or repurchase of any Equity Interests that are junior to the Take Back Preferred Equity, other than (i) redemptions of the New Money Preferred Equity as and to the extent permitted by the Restructuring Term Sheet (including, for the avoidance of doubt, any payments upon conversion of the New Money Preferred Equity provided for in the Restructuring Term Sheet), (ii) redemptions of the New Common Equity and/or any other Equity Interests held by any director, officer or employee of the Company or any of its subsidiaries in connection with such individual's termination of employment or service for a purchase price equal to the lower of cost and fair market value and otherwise on terms approved by the Board, (iii) any such transactions among the Company and its wholly owned subsidiaries, or (iv) redemptions of the New Common Equity and/or any other Equity Interests in connection with the satisfaction of tax withholding obligations incurred by any director, officer or employee of the |

#92841705v21

|  | Company or any of its subsidiaries in connection with the vesting of equity compensation awards; |
|  | • amendment, waiver or other modification (whether by merger, consolidation or otherwise) of the organizational documents of the Company or any of its subsidiaries or the Stockholders' Agreement (collectively, the "<u>Organizational Documents</u>") in a manner that, by its terms, adversely affects the powers, preferences or rights of the Take Back Preferred Equity; and |
|  | • any agreement or commitment to do any of the foregoing. |
| **New Money Preferred Holder Consent Rights:** | Each of the following actions by the Company or any of its subsidiaries shall require the prior written consent of New Money Preferred Holders holding more than 50% of the outstanding New Money Preferred Equity at such time, voting as a separate class:<br><br>• any Liquidation, unless the New Money Preferred Holders would receive an aggregate amount in connection therewith equal to the liquidation preference of the outstanding New Money Preferred Equity at such time (including any accrued and unpaid dividends thereon) (*provided* that nothing herein shall limit the rights of the New Money Preferred Holders to elect to convert the New Money Preferred Equity in connection with such Liquidation as and to the extent permitted by the Restructuring Term Sheet);<br><br>• incurrence of any indebtedness or creation of any lien (other than purchase money liens and customary types of statutory liens) or security interest, or issuance of any Equity Interests ranking senior to, or pari passu with, the New Money Preferred Equity with respect to the right to receive assets of the Company or any of its affiliates in connection with any dividend or other distribution by the Company or any Liquidation, other than (i) issuance of the Take Back Preferred Equity as and to the extent provided by the Restructuring Term Sheet, (ii) any indebtedness permitted to be incurred under the New ABL Facility, (iii) any such transactions among the Company and its wholly owned subsidiaries or (iv) demand notes issued upon exercise of any Take Back Preferred Equity Anti-Dilution Warrants, New Money Preferred Equity Anti-Dilution Warrants or New Common Equity Anti-Dilution Warrants.;<br><br>• declaration or payment of any dividend or other distribution on any Equity Interests that are junior to the New Money Preferred Equity, other than (i) dividends on the New Common Equity as and to the extent permitted by the Restructuring Term Sheet or (ii) any such transactions among the Company and its wholly owned subsidiaries;<br><br>• redemption or repurchase of any Equity Interests that are junior to the New Money Preferred Equity, other than (i) redemptions of the New Common Equity and/or any other Equity Interests held by any director, officer or employee of the Company or any of its subsidiaries |

7

<table>
<tr>
<td></td>
<td>in connection with such individual's termination of employment or service for a purchase price equal to the lower of cost and fair market value and otherwise on terms approved by the Board, (ii) any such transactions among the Company and its wholly owned subsidiaries or (iii) redemptions of the New Common Equity and/or any other Equity Interests in connection with the satisfaction of tax withholding obligations incurred by any director, officer or employee of the Company or any of its subsidiaries in connection with the vesting of equity compensation awards;

• amendment, waiver or other modification (whether by merger, consolidation or otherwise) of the Organizational Documents in a manner that adversely affects the powers, preferences or rights of the New Money Preferred Equity; and

• any agreement or commitment to do any of the foregoing.</td>
</tr>
<tr>
<td><strong>Board Approval Rights; Major Holder Consent Rights:</strong></td>
<td>Each of the following actions by the Company or any of its subsidiaries shall require the prior approval of the Board:

• subject to the drag-along rights described below, any Liquidation (*);

• incurrence of any indebtedness or creation of any lien (other than purchase money liens and customary types of statutory liens) or security interest, in each case in excess of $25 million in the aggregate, other than demand notes issued upon exercise of any Take Back Preferred Equity Anti-Dilution Warrants, New Money Preferred Equity Anti-Dilution Warrants or New Common Equity Anti-Dilution Warrants; (*);

• declaration or payment of any dividend or other distribution on any Equity Interests, other than dividends on the Take Back Preferred Equity and/or the New Money Preferred Equity as and to the extent permitted by the Restructuring Term Sheet (including, for the avoidance of doubt, any payments upon conversion of the New Money Preferred Equity provided for in the Restructuring Term Sheet) (*);

• redemption or repurchase of any Equity Interests, other than (i) redemptions of the Take Back Preferred Equity and/or the New Money Preferred Equity as and to the extent permitted by the Restructuring Term Sheet (including, for the avoidance of doubt, any payments upon conversion of the New Money Preferred Equity provided for in the Restructuring Term Sheet) or (ii) redemptions of the New Common Equity and/or any other Equity Interests held by any director, officer or employee of the Company or any of its subsidiaries in connection with such individual's termination of employment or service for a purchase price equal to the lower of cost and fair market value and otherwise on terms approved by the Board (*);</td>
</tr>
</table>

8

- any amendment, waiver or other modification (whether by merger, consolidation or otherwise) of the Organizational Documents (*);

- subject to the IPO demand rights described below, consummation of any initial public offering (an "IPO") or other public offering (*);

- (i) any other issuance of Equity Interests or securities convertible into or exchangeable or exercisable for Equity Interests, or (ii) the adoption, amendment or termination of any management incentive plan, other than the adoption of the management incentive plan to be adopted on the Emergence Date on terms to be agreed;

- any increase in the size of the Board (*);

- appointment, compensation or termination of any executive officer;

- approval of the annual operating and capital expenditure budget or any material change or deviation therefrom;

- entry into any new line of business;

- any disposition (in one transaction or a series of related transactions) of any business or assets in excess of $20 million (*);

- any acquisition (in one transaction or a series of related transactions) of any business or assets except for acquisitions of assets made in accordance with the capital expenditure budget approved by the Board;

- entry into, material amendment or waiver of, failure to enforce, or termination or renewal of, any agreement, arrangement or transaction with (i) any affiliate of the Company, (ii) any Company Stockholder or holder of New Warrants (a "Warrant Holder") that beneficially owns 3% or more of any class of Equity Interests, or any affiliate of any such Company Stockholder or Warrant Holder, (iii) any director or officer of any of the persons referred to the foregoing clauses (i) and (ii), or (iv) any member of the "immediate family" (as such term is defined in Rule 16a-1 of the Securities Exchange Act of 1934) of any of the persons referred to the foregoing clauses (i), (ii) and (iii), unless, in each case in this paragraph, such agreement, arrangement or transaction (or such action with respect thereto, as applicable) is on arm's-length terms and has been approved by a majority of the Directors who are disinterested with respect thereto (in each case in this paragraph, for the avoidance of doubt, excluding (A) any employment, compensation or benefits agreements, plans or arrangements with any director, officer or employee of the Company or any of its subsidiaries that is approved by the Board and (B) any agreements, arrangements or transactions among the Company and its wholly owned subsidiaries);

9

- entry into, material amendment or waiver of, or termination of, any agreement or series of related agreements pursuant to which the Company or any of its subsidiaries are expected to receive or make aggregate payments in excess of $25 million;

- entry into, material amendment or waiver of, or termination of, any partnership, joint venture or other similar agreement or arrangement;

- any loan, advance or capital contribution in excess of $5 million in the aggregate, other than advances of business expenses in the ordinary course of business;

- commencement or settlement of any material litigation;

- any change in corporate structure that would result in the Company not being taxable as a corporation or any other material changes to the tax elections of the Company or any of its subsidiaries or other actions that may create a material adverse tax consequence for any Major Holder (*);

- any other matter submitted to a vote of the Holders; and

- agreement or commitment to do any of the foregoing.

A majority of the total number of Directors then in office shall constitute a quorum of the Board, and either (i) the affirmative vote of a majority of the Directors present at a meeting at which a quorum is present or (ii) the unanimous written consent of all Directors then in office (in lieu of a meeting), shall be required for the Board to act, except that each of the actions of the Company or any of its subsidiaries marked with an asterisk (*) in the foregoing list shall require the approval of at least six of the eight Directors.

In addition to Board approval, without limiting the consent rights of the Take Back Preferred Holders or New Money Preferred Holders described above, each of the actions of the Company or any of its subsidiaries marked with an asterisk (*) in the foregoing list shall also require the prior written consent of Major Holders holding more than 50% of the Fully Diluted Common Shares held by the Major Holders.

Company Stockholders may not call special meetings of stockholders or act by written consent.

| | |
|---|---|
| **Transfer Restrictions:** | All Equity Interests and New Warrants shall be freely transferable, subject to compliance with applicable securities laws, except that the following transfers shall be prohibited: |

- any transfer of Equity Interests or New Warrants that would result in the triggering of an SEC reporting obligation; and

- any transfer of Equity Interests or New Warrants to (i) any company whose primary business is operating barge line(s) on inland

|  | waterways or (ii) certain other adverse parties (defined to mean any party who would reasonably be expected to have an adverse impact on the Company or the Company Stockholders, if such party were permitted to be a Company Stockholder), in each case as set forth on a list that is agreed-upon by the Company and the Required Consenting Term Lenders and set forth in the Plan Supplement and periodically updated by the Board in good faith (each such party and their affiliates, a "Competitor"), other than any such transfer (i) made with the prior written consent of the Board or (ii) pursuant to the drag-along rights described below; *provided* that no Company Stockholder or Warrant Holder that is party to the Stockholders' Agreement as of the Emergence Date or any of its affiliates (including affiliated funds) shall be deemed a Competitor unless such Company Stockholder acquires a Disqualifying Interest in a Competitor after the Emergence Date. |
|---|---|
| **Tag-Along Rights:** | Each Company Stockholder or Warrant Holder that beneficially owns 3% or more of any outstanding class of Equity Interests on an as-converted basis shall have the right to sell its Equity Interests of such class (or New Warrants convertible into Equity Interests of such class) on a proportionate basis, or "tag-along" (based on its relative ownership of such class of Equity Interests on an as-converted basis), in any sale (or series of sales) by any one or more Company Stockholders or Warrant Holders of more than 50% of the outstanding Equity Interests of such class on an as-converted basis to an unaffiliated third party. |
| **Drag-Along Rights:** | Any one or more Company Stockholders or Warrant Holders holding more than 60% of the outstanding Fully Diluted Common Shares shall have the right to effect, and to cause the Company and each other Company Stockholder and Warrant Holder to consent to and participate in, a sale of the Company to an unaffiliated third party (whether by merger, consolidation or sale of all or substantially all of the assets or Equity Interests), without the approval of any other Company Stockholders, or Warrant Holders subject to customary protections for such other Company Stockholders and Warrant Holders, including that the purchase price for such sale shall be in cash or publicly traded securities not subject to any contractual or securities law restrictions on transfer from and after the consummation thereof. |
| **IPO Demand Rights:** | Any one or more Company Stockholders or Warrant Holders holding more than 60% of the outstanding Fully Diluted Common Shares shall have the right to effect, and to cause the Company and each other Company Stockholder and Warrant Holder to consent to and participate in, an IPO resulting in gross proceeds to the Company and the Company Stockholders and Warrant Holders of at least $100 million and the New Common Equity being listed on the NYSE or Nasdaq (a "Qualified IPO"), without the approval of any other Company Stockholders or Warrant Holders. |
| **Preemptive Rights:** | Each Company Stockholder or Warrant Holder that beneficially owns 3% or more of the outstanding Fully Diluted Common Shares shall have |

11

| | customary preemptive rights on a pro rata basis in connection with any issuance of Equity Interests or securities convertible into or exchangeable or exercisable for Equity Interests by the Company or any of its subsidiaries so that such Company Stockholder or Warrant Holder has the ability to maintain the same percentage ownership of Fully Diluted Common Shares before and after such issuance, subject to customary exceptions. |
| | However, the Company may sell such Equity Interests or other securities to Major Holder-affiliated purchasers without first offering such Equity Interests or securities to the other Company Stockholders and Warrant Holders so long as the Company takes all steps necessary to enable the other Company Stockholders and Warrant Holders to exercise their respective preemptive rights with respect to such Equity Interests or securities sold to the Major Holder-affiliated purchasers as promptly as reasonably practicable (and in any event with 30 days) following the purchase by the Major Holder-affiliated purchasers on the same terms (including at the same price) as such other Company Stockholders and Warrant Holders would have been entitled to exercise such rights if the Company had offered such Equity Interests or securities to such Company Stockholders and Warrant Holders directly. |
| **Information Rights:** | The Company shall provide each Company Stockholder and Warrant Holder with customary information and access rights ("Information Rights") so long as such Company Stockholder or Warrant Holder (i) executes and delivers a customary confidentiality agreement applicable to such Information Rights on a form reasonably acceptable to the Company and (ii) does not have a Disqualifying Interest in a Competitor. |
| | Information Rights shall consist of the following: |
| | 1) For each Company Stockholder and Warrant Holder, access to a virtual data room, which shall include, in each case prepared in accordance with GAAP: |
| |     a) audited annual financial statements within 120 days of year-end for the first year ended after the Emergence Date and within 90 days of year-end for each year ended thereafter; and |
| |     b) quarterly financial statements within 45 days of quarter-end. |
| | 2) Each Company Stockholder and Warrant Holder shall receive an invitation to a quarterly MD&A conference call with members of the Company's senior management, which will include a customary Q&A. |
| | 3) Each Company Stockholder and Warrant Holder owning at least 2% of the Fully Diluted Common Shares shall have a customary right to receive reasonably requested information and customary inspection rights (not to be exercised more than once in any 12-month period) over the Company's books and records. |
| | 4) Each Company Stockholder and Warrant Holder shall be entitled to notification of key events, including termination or departure of senior management, material adverse changes in the business or material |

|  | litigation, in each case subject to reasonable limitations to be set forth in the Stockholders' Agreement with respect to the materiality of matters so disclosed and the form of notice to be provided. |
|--|--|
|  | The foregoing Information Rights shall be subject to customary exceptions to protect confidential and proprietary Company information from disclosure to the public and Competitors; provided that each Company Stockholder and Warrant Holder shall make a representation and warranty in the Stockholders' Agreement that, as of the Emergence Date, neither it nor any of its affiliates (including affiliated funds) holds a Disqualifying Interest in a Competitor, and no Company Stockholder or Warrant Holder that is party to the Stockholders' Agreement as of the Emergence Date shall be deemed to hold a Disqualifying Interest in a Competitor unless such Company Stockholder or Warrant Holder or any of its affiliates (including affiliated funds) acquires a Disqualifying Interest in a Competitor after the Emergence Date, in which case the Company Stockholder or Warrant Holder shall notify the Board thereof, and the Board may, in good faith, determine that such Company Stockholder or Warrant Holder shall nevertheless be entitled to Information Rights. |
|  | In addition, the Company shall provide prospective purchasers of Equity Interests or New Warrants with customary access to Company information (which shall include the Information Rights set forth in clause (1) above) for the purpose of evaluating such acquisition of Equity Interests or New Warrants so long as such prospective purchaser executes and delivers a confidentiality agreement in form and substance reasonably acceptable to the Company. |
| **Registration Rights Agreement:** | Upon an IPO, the Company and the Company Stockholders and Warrant Holders shall enter into a separate registration rights agreement (the "Registration Rights Agreement") that provides that, following the IPO, (i) any Company Stockholder or Warrant Holder that would not otherwise be allowed to sell all of its Common Shares immediately without volume limitations or other restrictions under the Securities Act of 1933, (ii) any other Company Stockholder or Warrant Holder that beneficially owns more than 3% of the Fully Diluted Common Shares or (iii) the Sponsor shall, in each case, be entitled to customary registration rights with respect to the Common Shares held by it, including customary demand, shelf and piggyback registration rights. |
| **Corporate Opportunities:** | The Organizational Documents shall provide, to the fullest extent permitted by applicable law, for the renunciation of the Company's interest in any business opportunity that is presented to any Company Stockholder, Warrant Holder or any Director who is not also an officer or employee of the Company or any of its subsidiaries, in each case, other than any opportunity expressly presented to any such Director in writing in his or her capacity as such. |
| **Amendments:** | Without limiting the consent rights of the Take Back Preferred Holders, New Money Preferred Holders and Major Holders described above, any amendment, waiver or other modification of the Organizational |

13

| | Documents (whether by merger, consolidation or otherwise) that, by its terms, disproportionately, materially and adversely affects any Company Stockholders or Warrant Holders shall also require the prior written consent of holders of a majority of the outstanding Fully Diluted Common Shares held by the Company Stockholders and Warrant Holders so affected. |
|---|---|
| **Termination:** | The Stockholders' Agreement (but not, for the avoidance of doubt, the Registration Rights Agreement) shall terminate upon a Liquidation or Qualified IPO. |
| **Jones Act:** | The Organizational Documents, including with respect to limitations on ownership of Take Back Preferred Equity, New Money Preferred Equity, New Common Equity and New Warrants, and limitations on the composition of the Board and management, shall be structured so as to satisfy the requirements of the Jones Act and any other applicable statutory or regulatory requirements. |

#92841705v21

**EXHIBIT F**

**JOINDER AGREEMENT**

**Form of Joinder Agreement**

This joinder agreement (this "Joinder Agreement") to the Restructuring Support Agreement (the "Agreement"),[1] dated as of [_____], 2020, by and among:  (i) the Company; (ii) the Consenting Term Lenders; and (iii) the Sponsor, is executed and delivered by [_____] (the "Joining Party") as of [_____].

1.      Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Consenting Term Lenders.

2.      DIP Commitment Election:

☐      By checking this box before the DIP Election Date, the Joining Party hereby represents and warrants that it holds Term Loan Claims in the amount set forth below, and hereby commits to provide a share of the DIP Term Loan Facility up to the Joining Party's *pro rata* percentage of 77.5% of the aggregate Term Loan Claims held by such Consenting Term Lender as of the Agreement Effective Date (such amount specified below), and otherwise on the terms and conditions agreed to by the DIP Commitment Parties in the DIP Facility Term Sheet and/or the DIP Credit Agreement, as applicable.

3.      Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Company Claims/Interests identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 6 of the Agreement to each other Party.

4.      Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

5.      Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:

---

[1]     Capitalized terms used but not otherwise defined herein, shall have the meanings ascribed to them in the Agreement.

Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

Name:

Title:

Address: _____

_____

_____

Attn:

Tel:

Fax:

E-mail:

Holdings: $_____ of Debt
            Under the Term Loan

DIP Commitment Amount: $_____

**<u>Annex 1</u> to the Form of Joinder Agreement**

*Restructuring Support Agreement*

**<u>Exhibit C</u>**

**Projections**

**FINANCIAL INFORMATION AND PROJECTIONS**

The Debtors believe that the Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code, because Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors.  In connection with the preparation and development of the Plan and for purposes of determining whether the Plan will satisfy this feasibility standard, the Debtors have analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared financial projections (the "Financial Projections") for fiscal years 2020 through 2024 (the "Projection Period").  The Financial Projections are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED IN DETAIL IN THIS DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE FINANCIAL PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

IN PARTICULAR, THE PROJECTIONS SET FORTH HEREIN CONTEMPLATE THE REORGANIZATION OF THE DEBTORS IN A CONSENSUAL PRE-PACKAGED BANKRUPTCY SCENARIO, IN WHICH THE DEBTORS WOULD EMERGE FROM CHAPTER 11 IN EARLY APRIL 2020.   THE DEBTORS HAVE NOT PROVIDED PROJECTIONS THAT CONTEMPLATE A NON-CONSENSUAL, CONTESTED BANKRUPTCY OUTCOME, THAT CONTEMPLATE ANY MATERIAL DELAY IN EMERGENCE FROM CHAPTER 11, OR MATERIAL CHANGES IN CUSTOMER BEHAVIOR IN RESPONSE TO OUR CHAPTER 11 FILING. IN EITHER SUCH SCENARIO, IT IS POSSIBLE THAT THE PROJECTIONS PROVIDED HEREIN COULD BE NEGATIVELY IMPACTED TO A MATERIAL EXTENT. THE FINANCIAL PROJECTIONS HEREIN SHOULD ONLY BE UTILIZED AND EVALUATED IN THE CONTEXT OF THE CONSENSUAL PLAN AND THE OVERALL CHAPTER 11 TIMELINE THAT IS CONTEMPLATED BY THIS DISCLOSURE STATEMENT.

A.    **General Assumptions:**

1.    **Methodology**

Management developed the Financial Projections for the Projection Period based on forecasted revenue estimates based on Management's views on customer demand and macroeconomic trends including bookings, river conditions, ongoing market rates and vessel operating metrics. The Financial Projections reflect Management's views regarding estimated demand for the Debtors' services and estimated future operating costs and capital expenditures.

2.    **Presentation**

The Financial Projections are presented on a consolidated basis. Intercompany transactions have been netted out unless otherwise noted.

3.    **Emergence Date**

Emergence from the Chapter 11 Cases for the purposes of the Financial Projections is assumed to occur in early April 2020 (with the emergence date the "**Assumed Effective Date**").

4.    **Operations**

Financial Projections incorporate the Debtors' estimates regarding sales, operating costs, and planned business development and productivity initiatives reflected in their forecasted plan for the Projection Period.  The sales estimates are based on Management's best efforts to forecast the demand of customers for the Debtors' Dry Transportation, Liquid Transportation and Fleeting and Terminals business units during the Projection Period in a normalized weather environment. The actual demand of customers for the Debtors' services could vary from the assumptions used to prepare the forecast contained herein.  The Debtors' ability to adapt to adverse weather and river conditions, including droughts, floods, icing and marine accidents, may also vary.

B.    **Financial Projection Assumptions:**

1.    **Revenue**

Revenues include barge affreightment, day rate plus towing contracts, unit tow equipment day rate contracts and ancillary fleeting and terminal services. The revenue forecast is based on Management's view of sales trends, contracting outlook, strategic planning, the anticipated impact of future competition and forecasted trends in the Debtors' existing lines of business. Revenue is comprised of sales in the following major businesses: Dry Transportation, Liquid Transportation and Fleeting and Terminal Services.

2.    **Operating Cost**

Operating costs include the cost of labor, fuel, outside towing, fully found charters, third-party port and cargo services and other costs incurred in the operation of the Debtors' fleet of boats and barges. The cost of sales projection is based on Management's view of its relationships with vendors, the anticipated impact of future commodity prices, the anticipated impact of future competition, and the anticipated composition of the Debtors' service offerings. The Financial

3

Projections incorporate the Debtors' estimates regarding barge count, boat count, barge turns and other operational metrics.

### 3. Selling General & Administrative ("SG&A")

Selling, general and administrative expenses include all administrative expenses not included in cost of sales which includes payroll, travel, ordinary course professional fees and various other miscellaneous administrative expenses These expenses do not necessarily vary proportionally with revenues. The projections for SG&A are based on Management's view of the costs necessary to support the Debtors' operations once it emerges from Chapter 11.

### 4. Adjusted Earnings Before Interest, Taxes, Depreciation, Amortization and Rent ("Adjusted EBITDAR")

Adjusted EBITDAR is anticipated to steadily increase throughout the Projection Period beginning at ~$260mm in 2020, before ~$2mm in forecasted in-court business degradation in February and March, increasing to ~$360mm in 2022. This increase is based on Management's view of a normalized operating environment and the implementation of an optimized dry vertical strategy with heightened focus on bulk and reduced exposure to the grain market.

### 5. Pension Payments

Pension payments represent amounts payable to meet the minimum funding requirements under the Debtors' defined benefit pension plan.

### 5. Cash Taxes

Cash taxes represent an estimate of federal, state, and local taxes that would be payable based upon the estimated taxable income reflected in the Debtors' projections.

### 7. Working Capital

Management determined projected working capital by evaluating historical accounts receivable, inventory, other current assets, accounts payable, accrued payroll and fringe benefits and other current liabilities balances and the relationship of those items to operating results such as revenues and operating costs. Working capital is forecasted to provide cash from a normalization of working capital in 2020 and 2021, followed by outflows in 2022-2024 driven by growth of the business.

### 8. Operating Leases[1]

Operating leases are payments made for use of boats and barges, operating equipment, building, real estate and data processing hardware under various operating lease and charter agreements. The Financial Projections reflect the Debtors' estimates of reductions in certain lease obligations that were agreed to in connection with the Debtors' reorganization process. The Financial Projections also reflect the impact of anticipated lease equipment buy-out transactions expected to occur post-emergence.

4

### 9.      Capital Expenditures[1]

Capital expenditures include maintenance spending related to the Debtors' boats and barges, investments in IT / software systems, equipment acquired  for used at the Debtors' fleet and terminal facilities and other miscellaneous expenditures. Maintenance capital expenditures are expected to range between ~$30mm and ~$55mm annually during the Projection Period. In addition, boat and barge fleet replacement expenditures, equipment buy-out expenditures and other capital expenditures are forecast to range between ~$45mm and ~$120mm annually during the Projection Period.

### 10.      Capital Lease Payments[1]

Capital lease payments represent amounts paid to various lessors that are classified as capital leases for financial reporting purposes. The payments made under capital leases are reflected in the financial statements of the Debtors' as interest expense and as reductions of the capital lease obligation reflected on the Debtors' balance sheet. The Financial Projections reflect the Debtors' estimates of reductions in certain lease obligations that were agreed to in connection with the Debtors' reorganization process. The Financial Projections also reflect the impact of anticipated lease equipment buy-out transactions expected to occur post-emergence through 2023.

### 11.      Capital Structure and Liquidity

Consistent with the terms of the reorganization, the Financial Projections assume the capital structure of the Debtors' will consist of the following: (a) a $575mm Exit ABL Facility, (b) a $75mm Exit FILO Facility, (c) a ~$200mm Take-Back Preferred Equity instrument with a cash dividend rate of 7.50%, (d) a ~$217mm[2] New-Money Preferred Equity instrument with a cash dividend rate of 10.00%, and (e) Common Equity. While dividend payments on the two classes of Preferred Equity are subject to certain financial performance triggers, the Financial Projections reflect the payment of these dividends throughout the projection period as such financial performance triggers are deemed to be achieved based on the results of operations reflected in the Financial Projections.

The Financial Projections further assume that ~$408mm in borrowings under the Exit ABL Facility will occur on the Assumed Effective Date and will be used to repay the DIP ABL Facility. Proceeds from the New-Money Preferred Equity will be used to repay the $50mm DIP FILO and to reduce borrowing under the Exit ABL, with the remaining proceeds to be available for the Debtors' use for general corporate purposes.

Management expects to have approximately ~$255mm of liquidity (defined as cash on hand plus amounts available under the Exit ABL facility) on the Assumed Effective Date.

---

(1)   Capital lease and operating lease amounts are presented for illustrative purposes. Amendments to lease agreements that are currently in process will require re-testing of operating and capital lease classifications for GAAP purposes. Amounts of capital lease debt and operating leases could change as a result of this re-testing.  In addition, certain lease discussions remain ongoing.

(2)   Consists of $50mm in rolled DIP FILO, $150mm in New Money and ~$17mm in fees payable in New-Money Preferred Equity

5

## Reorganized Debtors' Financial Projections

($ in millions)

**Income Statement**

| | 4/20-12/20 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Dry Transportation Revenue[1] | $578 | $793 | $821 | $850 | $880 |
| Plus: Liquid Transportation Revenue[1] | 196 | 273 | 287 | 300 | 314 |
| Plus: Fleeting & Terminals Revenue[2] | 144 | 192 | 192 | 192 | 192 |
| Total Revenue[2] | $918 | $1,258 | $1,300 | $1,341 | $1,386 |
| Less: Total Barge Costs | (26) | (36) | (36) | (37) | (38) |
| Less: Total Boat Costs | (377) | (511) | (524) | (536) | (547) |
| Less: Port & Cargo Costs | (186) | (250) | (255) | (260) | (265) |
| Less: Fleeting & Terminals Operating Costs | (101) | (134) | (134) | (134) | (134) |
| Less: SG&A | (29) | (39) | (40) | (41) | (42) |
| **Adjusted EBITDAR** | **$199** | **$288** | **$310** | **$334** | **$360** |
| Less: Operating Lease Rents[3] | (71) | (92) | (87) | (78) | (74) |
| Total EBITDA | $128 | $196 | $223 | $255 | $286 |
| Less: D&A | (55) | (82) | (91) | (101) | (109) |
| Total EBIT | $73 | $115 | $131 | $155 | $177 |
| Less: Exit ABL Facility Interest | (14) | (18) | (17) | (17) | (16) |
| Less: Exit FILO Facility Interest | (3) | (4) | (4) | (2) | (2) |
| Less: Capital Lease Interest | (6) | (6) | (5) | (5) | (4) |
| **Pre-Tax Income** | **$50** | **$86** | **$105** | **$131** | **$155** |
| Less: Taxes | (12) | (22) | (26) | (33) | (39) |
| **Net Income** | **$37** | **$65** | **$79** | **$98** | **$116** |

($ in millions)

**Cash Flow Generation**

| | 4/20-12/20 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Adjusted EBITDAR** | **$199** | **$288** | **$310** | **$334** | **$360** |
| Less: Operating Lease Rents[3] | (71) | (92) | (87) | (78) | (74) |
| Less: CapEx[4] | (82) | (131) | (155) | (131) | (116) |
| Less: Capital Lease Payments[3][5] | (11) | (12) | (11) | (11) | (8) |
| Less: Other[6] | 9 | (6) | (19) | (41) | (58) |
| **Cash Flow Before Debt Service** | **$45** | **$47** | **$38** | **$73** | **$104** |
| Less: Exit ABL Facility Interest | (14) | (18) | (17) | (17) | (16) |
| Less: Exit FILO Facility Payments | (3) | (4) | (4) | (2) | (2) |
| Less: Take-Back Preferred Equity Cash Dividend | (8) | (14) | (13) | (13) | (12) |
| Less: New-Money Preferred Equity Cash Dividend | (11) | (22) | (22) | (22) | (22) |
| **Levered Free Cash Flow** | **$9** | **($11)** | **($19)** | **$19** | **$52** |
| Less: Exit ABL Facility Draw / (Paydown) | (52) | 11 | (15) | (11) | (43) |
| Less: Preferred Equity Sweep[7] | - | (26) | - | (8) | (10) |
| **Total Change in Cash** | **($43)** | **($27)** | **($33)** | **-** | **-** |

(1) Transportation revenue inclusive of affreightment revenue, unit tow revenue, demurrage revenue, towing revenue, day rate and charter revenue and other revenue
(2) Includes intercompany fleeting and terminals revenue
(3) Reflects estimated impact of pending lease amendments as of 01/30/2020. Such amounts are subject to negotiation and may change; includes anticipated impact of equipment buy-outs
(4) Includes maintenance CapEx, fleet acquisition CapEx, equipment buy-out CapEx and other CapEx
(5) Payments made under leases classified as capital leases for reporting purposes
(6) Other inclusive of cash pension payments, change in net working capital and cash taxes
(7) Illustratively assumes 50% prior year cash flow sweep (if FCCR above 1.0x and payable in following March) to pay down Take-Back Preferred Equity

**Reorganized Debtors' Financial Projections (Cont'd)**

| ($ in millions) | TXN PF | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Debt and Credit Statistics** | | | | | | |
| ABL Facility (Lesser of Borrowing Base and Commitment) | $575 | $575 | $575 | $575 | $575 | $575 |
| Less: Letters of Credit | (17) | (17) | (15) | (14) | (12) | (11) |
| Less: ABL Draw | (408) | (356) | (367) | (352) | (341) | (298) |
| Plus: EoP Cash | 104 | 61 | 34 | 1 | 1 | 1 |
| **Liquidity** | **$254** | **$263** | **$228** | **$210** | **$223** | **$267** |
| | | | | | | |
| ABL Facility | $408 | $356 | $367 | $352 | $341 | $298 |
| Plus: Exit FILO Facility | 75 | 75 | 75 | 75 | 75 | 75 |
| Less: Cash | (104) | (61) | (34) | (1) | (1) | (1) |
| **Total Net Debt** | **$379** | **$370** | **$407** | **$426** | **$415** | **$372** |
| Plus: Capital and Operating Leases[1][2] | 355 | 334 | 300 | 241 | 270 | 234 |
| **Total Adjusted Net Debt (incl. Leases)** | **$734** | **$704** | **$708** | **$667** | **$684** | **$606** |
| Plus: Take-Back Preferred Equity | 200 | 200 | 174 | 174 | 166 | 156 |
| Plus: New-Money Preferred Equity | 217 | 217 | 217 | 217 | 217 | 217 |
| **Total Adjusted Net Debt Plus Preferred Equity** | **$1,151** | **$1,121** | **$1,098** | **$1,058** | **$1,067** | **$979** |
| | | | | | | |
| **LTM Adjusted EBITDAR** | **$222** | **$199** | **$288** | **$310** | **$334** | **$360** |
| *Total Adjusted Net Debt (incl. Leases) / EBITDAR* | **3.3x** | **3.5x** | **2.5x** | **2.2x** | **2.0x** | **1.7x** |

| ($ in millions) | TXN PF | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Select Balance Sheet Items** | | | | | | |
| Accounts Receivable | 157 | 143 | 149 | 155 | 161 | 166 |
| Inventory | 28 | 28 | 28 | 28 | 28 | 28 |
| Other Current Assets | 34 | 35 | 28 | 28 | 28 | 28 |
| Accounts Payable | 29 | 35 | 36 | 36 | 38 | 39 |
| Accrued Payroll and Fringe Benefits | 14 | 17 | 26 | 27 | 27 | 27 |
| Other Current Liabilities | 52 | 53 | 53 | 53 | 53 | 53 |

(1)  Capital lease and operating lease amounts are presented for illustrative purposes. Amendments to lease agreements that are currently in process will require re-testing of operating and capital lease classifications for GAAP purposes. Amounts of capital lease debt and operating leases could change as a result of this re-testing.  In addition, certain lease discussions remain ongoing.

(2)  Reflects estimated impact of pending lease amendments as of 01/30/2020. Such amounts are subject to negotiation and may change; includes anticipated impact of equipment buy-outs

10442820v1

## <u>Exhibit D</u>

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

> NOTHING CONTAINED IN THE FOLLOWING LIQUIDATION ANALYSIS (THE "ANALYSIS") IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR HYPOTHETICAL ADMISSION OF THE DEBTORS. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN AN ANALYSIS UNDER SECTION 1129(a)(7) OF THE BANKRUPTCY CODE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS AND RECOVERIES THEREON IN THESE CHAPTER 11 CASES COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH IN THE ANALYSIS.

**Introduction**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[9] requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Equity Interest in each impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. To make these findings, the Bankruptcy Court must: (a) estimate the cash proceeds (the "**Net Estimated Liquidation Proceeds**") that a chapter 7 trustee would generate if each Debtor's chapter 11 case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (b) determine the distribution (the "**Estimated Recovery in Liquidation**") that each non-accepting holder of a Claim or Equity Interest would receive from the Net Estimated Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each holder's Estimated Recovery in Liquidation to the distribution that such holder would receive under the Plan (the "**Plan Recovery**") if the Plan were confirmed and consummated.

Based on the Analysis, the Debtors believe the Plan satisfies the best interests test and that each holder of an impaired Claim or Equity Interest will receive value under the Plan on the Effective Date that is not less than the value such holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Analysis and conclusions set forth herein are fair and represent management's best judgment regarding the results of a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, taking into account various factors, including the absence of an established liquid market for the sale of the Debtors' assets, the negative impact on values arising from a distressed sale of a fleet of assets of the size owned by the Debtors relative to the market taken as a whole, and the relatively short amount of time provided to complete the sales under current market conditions. The Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and holders of impaired Claims or Interests in making this determination, and should not be used for any other purpose. Accordingly,

---

[9] Capitalized terms used in this Liquidation Analysis, but not defined herein, have the meanings ascribed to them in the Plan.

asset values and claims amounts included herein may be different than amounts referred to in the Plan. The Analysis is based upon certain assumptions discussed herein.

**Significant Assumptions**

The Analysis assumes that the Debtors' liquidation would commence on or about March 31, 2020 (the "**Conversion Date**"), under the direction of a chapter 7 trustee and would continue for a period of approximately 12 months, during which time all of the Debtors' assets would be sold or otherwise liquidated, and the cash proceeds (net of liquidation-related costs), together with cash on hand, would then be distributed to creditors in accordance with the priority scheme established under the Bankruptcy Code. The Debtors would expect the chapter 7 trustee to retain professionals to assist in the liquidation of their estates. It is assumed all customers would terminate their contracts at the Conversion Date and that there would be no claims resulting from such termination. All operations except for those required to execute the liquidation are assumed to cease to minimize costs associated with the Chapter 7 wind down and liquidation. For the purposes of the Analysis, the Debtors and their advisors have attempted to ascribe value to each of the assets as they would be liquidated by a chapter 7 trustee.

**Summary Notes to the Analysis**

1. *Dependence on assumptions*. The Analysis is based on several estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic, business, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. *Additional claims in a liquidation*. The liquidation itself may trigger certain obligations and priority payments that otherwise would not be due in the ordinary course of business or would otherwise not exist under a chapter 11 plan. The liquidation would likely prompt certain other events to occur, including the rejection of unexpired leases, among others. Such events, if triggered, could create a larger number of creditors and may subject the chapter 7 estates to additional claims. Estimates of such additional claims have been included in the Analysis.

3. *Basis of presentation*. The Analysis was developed on a consolidated basis rather than on a legal entity basis.

4. *Preference transfers.* A comprehensive preference analysis has not been conducted by the Debtors or their advisors. The Debtors are currently generally paying vendors on scheduled terms and are expected to do so through the expected Conversion Date. Therefore, the amount of preference claims is assumed to be zero for the purposes of the Analysis.

5. *Fraudulent transfers.* No recovery or related litigation costs have been attributed to any potential fraudulent transfer actions under the Bankruptcy Code. The Debtors do not

10442820v1

believe that such causes of action would have a material effect on the Analysis for purposes of section 1129(a)(7) of the Bankruptcy Code.

6. *Dependence on an unaudited balance sheet.*  The Analysis is largely dependent on a preliminary unaudited consolidating balance sheet as of December 31, 2019, adjusted to account for expected changes in certain asset and liability classes including the forecasted cash balance at the Conversion Date.

7. *Chapter 7 wind-down costs*.  It is assumed that it will take approximately 12 months to complete the wind down and liquidation of the Debtors' estates.  The fees and operating expenses incurred during the chapter 7 process are included in the estimate of chapter 7 wind down expenses and contemplate employee related expenses including retention and severance, other operational overhead costs associated with winding down the estate, chapter 7 trustee and professional fees, and certain broker fees associated with the sale of property and equipment.

*CONCLUSION:  THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING CHART, THAT CONFIRMATION OF THE PLAN WILL PROVIDE ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS WITH A RECOVERY (IF ANY) THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. ACCORDINGLY, THE DEBTORS SATISFY THE BEST INTEREST TEST.*

The following Liquidation Analysis for the Debtor Entities should be reviewed with the accompanying notes:

| $ in Thousands | FN | 12/31/19 NBV | Adjustments | Liquidation Balance | Low ($) | Low (%) | High ($) | High (%) |
|---|---|---|---|---|---|---|---|---|
| **NET ASSET PROCEEDS** | | | | | | | | |
| Cash and Cash Equivalents | A. | $ 8,846 | $ 22,475 | $ 31,321 | $ 31,321 | 100.0% | $ 31,321 | 100.0% |
| Accounts Receivable, net | B. | 137,616 | (16,896) | 120,719 | 90,305 | 74.8% | 114,331 | 94.7% |
| Inventory | C. | 28,429 | - | 28,429 | 10,684 | 37.6% | 18,744 | 65.9% |
| Other Current Assets | D. | 36,013 | (6,996) | 29,017 | - | 0.0% | 7,377 | 25.4% |
| PP&E – Owned Vessels | E. | 663,843 | 341,229 | 1,005,072 | 556,106 | 55.3% | 625,619 | 62.2% |
| PP&E – Leased Vessels | F. | 72,407 | (26,661) | 45,747 | 11,437 | 25.0% | 22,873 | 50.0% |
| PP&E – Real Property | G. | 52,973 | (14,006) | 38,967 | 27,277 | 70.0% | 31,173 | 80.0% |
| PP&E – Other | H. | 22,776 | 10,000 | 32,776 | 9,345 | 28.5% | 18,691 | 57.0% |
| Other Long Term Assets | I. | 406,310 | (394,055) | 12,255 | 1,793 | 14.6% | 4,203 | 34.3% |
| **Total Net Asset Proceeds** | | $ 1,429,212 | $ (84,910) | $ 1,344,303 | $ 738,268 | 54.9% | $ 874,332 | 65.0% |
| **Less:  Chapter 7 Liquidation / Wind-down Costs** | | | | | | | | |
| Employee Related Expenses | J. | | | | $ (10,327) | | $ (13,972) | |
| Other Operational & Overhead Costs | K. | | | | (5,538) | | (7,493) | |
| Ch. 7 Trustee Fees | L. | | 3.0% | | (22,148) | | (26,230) | |
| Professional Fees | M. | | | | (12,272) | | (16,603) | |
| Broker Fees | N. | | 2.5% | | (15,104) | | (17,459) | |
| **Total Wind Down Costs** | | | | | $ (65,389) | | $ (81,757) | |
| **Net Proceeds Available For Priority / Administrative Claims** | | | | | $ 672,879 | | $ 792,575 | |
| Priority Taxes | | | | $ (10,633) | $ (10,633) | 100.0% | $ (10,633) | 100.0% |
| 503(b)(9) Claims | | | | (12,520) | (12,520) | 100.0% | (12,520) | 100.0% |
| Employee Related | | | | (11,497) | (11,497) | 100.0% | (11,497) | 100.0% |
| Accrued Unpaid Professional Fees | | | | (6,500) | (6,500) | 100.0% | (6,500) | 100.0% |
| **Total Priority / Administrative Claims** | O. | | | $ (41,149) | $ (41,149) | 100.0% | $ (41,149) | 100.0% |
| **Net Proceeds Available For Senior Secured Claims** | | | | | $ 631,729 | | $ 751,426 | |
| Maritime Liens - Preferred | | | | $ (1,542) | $ (1,542) | 100.0% | $ (1,542) | 100.0% |
| ABL Facility - (Principal + Accr. Interest) | | | | (551,581) | (551,581) | 100.0% | (551,581) | 100.0% |
| DIP Term Loan - (Principal + Accr. Interest) | | | | (50,375) | (50,375) | 100.0% | (50,375) | 100.0% |
| **Total Senior Secured Claims** | P. | | | $ (603,498) | $ (603,498) | 100.0% | $ (603,498) | 100.0% |
| **Net Proceeds Available For Term Loan Claims** | | | | | $ 28,231 | | $ 147,928 | |
| Term Loan - (Principal + Accr. Interest) | | | | $ (975,179) | $ (28,231) | 2.9% | $ (147,928) | 15.2% |
| **Total Term Loan Claims** | Q. | | | $ (975,179) | $ (28,231) | 2.9% | $ (147,928) | 15.2% |
| **Net Proceeds Available For Maritime Liens - Necessaries Claims** | | | | | $ - | | $ - | |
| Maritime Liens - Necessaries | | | | $ (35,980) | $ - | 0.0% | $ - | 0.0% |
| **Total Maritime Liens - Necessaries Claims** | R. | | | $ (35,980) | $ - | 0.0% | $ - | 0.0% |
| **Net Proceeds Available For General Unsecured Claims** | | | | | $ - | | $ - | |
| Trade Payables and Accrued Expenses | | | | $ (8,227) | $ - | 0.0% | $ - | 0.0% |
| Vessel Lease Contract Rejection Damages | | | | (351,750) | - | 0.0% | - | 0.0% |
| Real Property Lease Rejection Damages | | | | (12,965) | - | 0.0% | - | 0.0% |
| Litigation Claims and Environmental Liabilities | | | | (5,348) | - | 0.0% | - | 0.0% |
| Pension Liability | | | | (65,395) | - | 0.0% | - | 0.0% |
| **Total General Unsecured Claims** | S. | | | $ (443,684) | $ - | 0.0% | $ - | 0.0% |
| **Net Proceeds Available For Equity** | | | | | $ - | | $ - | |

## Detailed Debtor Assumptions

5

Asset recovery and claims estimates presented in this Liquidation Analysis are generally based on an unaudited consolidating balance sheet as of December 31, 2019, but for adjustments to certain forecasted balances including cash & cash equivalents, accounts receivable and forecasted debt and accrued interest claims, all of which are based on the estimated balance as of the Conversion Date. Management does not believe that the December 31, 2019 balances used for select assets and claims will be materially different as of the Conversion Date.

Asset Recovery Estimates

- **A. – Cash and Equivalents**:  Forecasted balance of Cash and Equivalents on hand as of the Conversion Date (note that corresponding ABL Facility and Accounts Receivable balances have also been adjusted for forecasted change in balance as of the Conversion Date).  The Debtors estimate a 100% recovery on cash and equivalents.

- **B. – Accounts Receivable, net**: Mostly consists of customer trade receivables and accrued unbilled revenue, with downward Adjustments to Net Book Value (the "**NBV**") to arrive at the Liquidation Balance to account for estimated allowances for uncollectible accounts, deferred revenue for vessel deliveries in progress, amounts owed to customers who are also vendors with open Accounts Payable, all forecasted as of the Conversion Date. For vessels contracted prior to the assumed conversion to a chapter 7 proceeding, it is assumed that existing customers will terminate their contracts without any claim against the Debtors.  The Debtors assume that 74.8% to 94.7% of the Adjusted net Accounts Receivable Liquidation Balance will be collected.

- **C. – Inventory**:  The majority of inventory is comprised of fuel, spare parts and general supplies for vessels, offset by downward Adjustments to NBV for the amount of fuel stored in non-owned vessels. Fuel inventory is assumed to have a net recovery value of 50% to 90% due to the relatively commoditized nature of the asset and due to the assumption that fuel located within owned vessels is often times included as a favorable purchase price adjustment when a vessel is sold.  Spare parts and general supplies are assumed to have a relatively lower recovery value of 30% to 50%.

- **D. – Other Current Assets**:  Represents prepaid expenses for certain lease arrangements, insurance, IT software and maintenance, bank fees, medical premiums, membership fees, and insurance receivables related to certain litigation claims. Prepaid expenses are generally assumed to have a relatively low recovery range of between 0% and 25.4% due to the difficulty in recouping payments in the event of a liquidation.  Insurance Claims Receivable related to potential litigation claims are included as a downward Adjustment to the Liquidation Balance in this asset class and instead are assumed to be offset against litigation claims and Maritime Liens – Preferred within the claims recovery calculations.

- **E. – PP&E: Owned Vessels**:  Asset class includes owned barges, boats and vessels.  The Debtors currently own approximately 90 boats and 1,530 barges.  The Liquidation Balance for owned vessels is based on the Fair Market Value (the "**FMV**") per a third-party appraisal.  The Analysis assumes that owned vessels are sold through a sales process over a 6 to 12-month period, with high recovery values based on 90% of the Net Forced Liquidation Value

("**NFLV**") of vessels, or approximately 62% of the FMV, and low recovery values based on 80% of the NFLV, or approximately 55% of the FMV, both of which are net of holding, disposal and broker fees.

- F. – PP&E:  Leased Vessels:  Analysis assumes that capital and operating leases with favorable terms are assumed and assigned to a new counterparty under section 365 of the Bankruptcy Code, with the potential favorable economic lease terms (relative to imputed hypothetical market price) over the duration of the remaining existing lease split evenly between the Debtors and the new counterparties in the high recovery scenario and reduced by an additional 50% in the low scenario.  The Analysis also adjusts the Liquidation Balance in this asset class for approximately $14 million of ABL letters of credit related to two boat leases that are assumed to be drawn by the Conversion Date and then partially recoverable to Debtors in an assignment of such leases after the Conversion Date (the Analysis assumes 25% recovery in low scenario and 50% recovery in high scenario). Vessel leases with unfavorable market terms are assumed to be rejected, the lease rejections claims for which are included separately in the analysis as a General Unsecured Claim.

- G. – PP&E:  Real Property:  Asset class consists of owned land, real estate and leasehold improvements. The Analysis assumes that real property is sold through a sales process over a 6 to 12-month period. The Liquidation Balance for real property is based on the FMV of each property as implied by 2019 tax assessments, with low recovery values based on 70% and high recovery values based on 80% of FMV, both of which represent management's estimate of net recoverable sale proceeds.

- H. – PP&E:  Other:  Asset class includes the net book value of machinery and equipment, office equipment, vehicles, improvements made to the efficiency or useful life thereof, net of accumulated depreciation, and batture leases ACL has entered into with various counterparties which provide for river shoreline control at the Debtors' fleets. The Analysis assumes that valuable batture leases would be assumed and assigned to other industry participants yielding potential incremental value to the Debtors' estates of between $5 million and $10 million.  Remaining leases are assumed to be rejected, the lease rejections claims for which are included separately in the analysis as a General Unsecured Claim. Excluding the batture lease recoveries, the Debtors assume that approximately 19% to 38% of net Other PP&E will be monetized in a liquidation.

- I. – Other Long Term Assets:  Asset class consists largely of Goodwill and other intangible assets that are assumed to have zero recovery value in a liquidation scenario and thus represent a downward Adjustment to the forecast Liquidation Balance. Asset class also includes the joint equity owned investment in Bolivar Terminal located near Houston, TX which is assumed to have an estimated sale or assignment recovery value of between 3x and 5x of the Debtors' share of estimated 2019 EBITDA in a liquidation.

***Chapter 7 Liquidation / Wind Down Costs***

- J. – Employee Related Expenses:  Employee related expenses reflect the cost of a reduced corporate staff required to execute the liquidation, including related severance and retention costs.  Wind down costs include a limited set of support personnel from various functions

10442820v1

including finance and accounting, IT, human resources, legal and a significantly reduced sales and logistics workforce. Headcount is expected to be gradually reduced over 12-month period as wind down plan is executed.

- <u>K. – Other Operational & Overhead Costs</u>:  Operating costs reflect the cost of a reduced run-rate for planned SG&A overhead expenditures, including among others, IT systems costs, property taxes, ordinary course professionals (taxes, reporting), insurance, telecommunications costs and other office related operating costs.

- <u>L. – Chapter 7 Trustee Fees</u>:  Amount represents the estimated chapter 7 trustee expenses, calculated at 3% of the Total Net Asset Proceeds.

- <u>M. – Professional Fees</u>:  Includes an estimate for legal and financial professionals for the trustee, secured lenders and Official Committee of Unsecured Creditors.  Fees are assumed to gradually taper off over 12-month period as wind down plan is executed.

- <u>N. – Broker Fees</u>:  Includes an incremental 2.5% brokerage commission on the PP&E net asset sale proceeds for owned vessels, assigned leases, property, real estate and other machinery and equipment sales not otherwise included in the PP&E net asset proceeds.

*Claims*

- <u>O. – Administrative / Priority Claims</u>: Claims include priority property, use and certain business license tax claims, employer tax claims, estimated 503(b)(9) claims, accrued and unpaid employee related claims and estimated accrued, unpaid professional fees as of the Conversion Date (assuming no payment of success or closing fees).  Analysis indicates that Administrative / Priority Claims will be entitled to receive a full recovery under both the low and high case in a liquidation scenario.

- <u>P. – Senior Secured Claims</u>:  Claims consist of forecasted amounts outstanding under the ABL Facility as of the Conversion Date, including the forecasted outstanding principal balance of $533.4 million, approximately two weeks of accrued and unpaid interest at the Conversion Date of $1.6 million, and $16.6 million in letters of credit which are assumed to be owed and outstanding as of the conversion date. Senior Secured claims also include the forecasted principal and accrued interest amounts under the DIP Term Loan of $50 million and $0.4 million, respectively, which have a lower claims recovery priority than the ABL Facility.  Lastly, these claims include $1.5 million of estimated, asserted preferred maritime liens related to potential litigation, net of insurance claims receivable, all of which are assumed to have a higher claims recovery priority than both the ABL Facility and the DIP Term Loan. Analysis indicates that Senior Secured Claims will be entitled to receive a full recovery under both the low and high case in a liquidation scenario.

- <u>Q. – Term Loan Claims</u>:  Claims include amounts outstanding under the Term Loan facility as of the Conversion Date, which includes the outstanding principal balance of $948.75 million and interest accrued through the Petition Date of $26.4 million. Analysis indicates that Secured Claims will be entitled to receive a recovery between 2.9% to 15.2% in a liquidation scenario.

- R. – Maritime Liens - Necessaries Claims: Claims consist of amounts owed to vendors who provide maritime "necessaries" to a vessel, which under U.S. Federal law is defined as repairs, supplies, towage, and the use of a dry dock railway.  For purposes of this analysis, fuel related costs have also been considered a necessary.  Maritime Liens – Necessaries claims are not forecasted to receive a recovery under the liquidation scenario.

- S. – General Unsecured Claims:  Includes estimates for a combination of the following claims, none of which are forecasted to receive any recovery under the liquidation scenario:

  a. *Trade Payables and Accrued Expenses* – Consists of estimated unsecured trade payables and accrued expenses net of 503(b)(9) and maritime lien claimants.

  b. *Vessel Lease Contract Rejection Damages* – Consists of estimated damage claims related to rejected boat and barge leases that may be asserted against the Debtors. Estimated damage claims include a combination of illustrative maintenance and repair costs and equipment condition return provisions included within certain vessel lease agreements as well as damages equal to the discounted remaining lease payments under the respective lease agreements as of the Conversion Date. Claim amounts exclude vessel lease contract rejection damages for leases that are expected to be assumed and assigned in a liquidation (see footnote F). Damage claims for unfavorable leases do not account for any potential reductions in unsecured claims as a result of mitigation, which could substantially reduce the claim amounts in this recovery class.

  c. *Real Property Lease Rejection Damages* – Consists of rejection damages for leased real property under Section 502(b)(6) of the Bankruptcy Code and are equal to the greater of lease payments for one year, or 15 percent of the remaining lease payments due under the lease, not to exceed three years' payments.  Claim amounts exclude real property lease contract rejection damages for leases that are expected to be assumed and assigned in a liquidation, including the batture leases (see footnote H).

  d. *Litigation Claims* and *Environmental Liabilities* – Based on the mid-point of estimated damages, net of insurance claim proceeds, related to claims asserted against the Debtors for potential environmental damages and remediation costs.  The inclusion of estimates of pending litigation claims and environmental liabilities are provided for the illustrative purposes of this Liquidation Analysis and do not represent an admission of liability or degree of fault by the Debtors.

  e. *Pension Liability* – Estimated pension liability claims owed under the Debtors' postretirement plans, as accrued for on a GAAP accounting basis on the preliminary December 31, 2019 trial balance.  Actual cash liability as of the Conversion Date may be greater and will vary depending on measurement methodology.