# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 20-30982 (MI) |
| AMERICAN COMMERCIAL LINES | ) |
| INC., *et al.*,[1] | ) (Jointly Administered) |
| Debtors. | ) (Emergency Hearing Requested) |
|  | ) |
|  | ) |

## EMERGENCY MOTION OF
## DEBTORS FOR INTERIM PERIOD
## AND FINAL ORDERS (I) AUTHORIZING
## DEBTORS TO (A) OBTAIN POSTPETITION
## FINANCING AND (B) USE CASH COLLATERAL;
## (II) GRANTING (X) LIENS AND SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS AND (Y) ADEQUATE
## PROTECTION TO THE PREPETITION SECURED PARTIES; (III)
## MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING
## A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON FEBRUARY 10, 2020 AT 3:30 PM CT IN COURTROOM 404, 4th FLOOR, 515 RUSK STREET, HOUSTON, TX 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN FEBRUARY 10, 2020.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial Lines Inc. (7794), Commercial Barge Line Company ("CBLC") (2365), American Commercial Barge Line LLC ("ACBLL") (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL Transportation Services LLC ("Transport") (6589), ACBL River Operations LLC ("River Ops") (6762), Old JB LLC ("Old JB") (6590), and ACL Professional Services Inc. (4614). The Debtors' principal offices are located at 1701 E. Market Street, Jeffersonville, Indiana 47130.

American Commercial Lines, Inc. ("Holdings" or "ACL") and its affiliated debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors" or the "Company"), respectfully represent as follows in support of this motion (this "Motion"):

<strong><u>Relief Requested</u></strong>

1.       The Debtors seek entry of an interim period order (the "Interim Period Order")[2] and a final order (the "Final Order," and together with the Interim Period Order, the "DIP Orders"):

    a.    granting authorization for (x) the DIP ABL Borrowers to obtain postpetition financing as set forth in the DIP ABL Documents (as defined herein) (the "DIP ABL Financing"), and for Holdings and the other DIP ABL Guarantors to guaranty the obligations (the "DIP ABL Obligations") of the DIP ABL Borrowers in connection with the DIP ABL Financing (the DIP Term Guarantors together with the DIP ABL Borrowers, the "DIP ABL Loan Parties"); and (y) the DIP Term Borrower to obtain postpetition financing as set forth in the DIP Term Documents (as defined herein) (the "DIP Term Financing," and, together with the DIP ABL Financing, the "DIP Financing"), and for the DIP Term Guarantors to guaranty the obligations (the "DIP Term Loan Obligations," and, together with the DIP ABL Obligations, the "DIP Obligations") of the DIP Term Borrower in connection with the DIP Term Financing (the DIP Term Guarantors together with the DIP Term Borrower, the "DIP Term Loan Parties;" the DIP Term Loan Parties together with the DIP ABL Loan Parties, the "DIP Loan Parties"); the DIP Financing consisting of:

        i.    a senior secured superpriority debtor-in-possession asset-based revolving credit facility (the "DIP ABL Facility") in an aggregate principal amount of up to $640,000,000 (the "DIP ABL Loans"), pursuant to the terms and conditions of that certain Senior Secured Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP ABL Credit Agreement"), by and among Holdings, the DIP ABL Borrowers and Wells Fargo Capital Finance, LLC ("Wells Fargo") as Administrative Agent and Collateral Agent (in such capacities, the "DIP ABL Agent") for and on behalf of itself and the other lenders party thereto (the "DIP ABL Lenders," and, collectively with the DIP ABL Agent, the Issuing Bank (as defined in the DIP ABL Credit Agreement), and the Secured Bank Product Providers (as defined in the DIP ABL Credit Agreement), the "DIP ABL Secured Parties"), substantially in the form of **Exhibit B**, attached hereto; and

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim Period Order, the DIP ABL Credit Agreement, or the DIP Term Credit Agreement, as applicable.

ii.     a senior secured superpriority debtor-in-possession term loan credit facility (the "<u>DIP Term Facility,</u>" and, together with the DIP ABL Facility, the "<u>DIP Facilities</u>"), in an aggregate principal amount of up to $50,000,000 (the loans made thereunder, the "<u>DIP Term Loans</u>" and together with the DIP ABL Loans, the "<u>DIP Loans,</u>") pursuant to the terms and conditions of that certain Secured Superpriority Debtor-in-Possession Term Loan Agreement (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Term Loan Credit Agreement,</u>" and, together with the DIP ABL Credit Agreement, the "<u>DIP Credit Agreements</u>"), by and among the DIP Term Borrower, the DIP Term Guarantors, and Cortland Capital Market Services, LLC, as administrative agent and collateral agent (in such capacities, the "<u>DIP Term Loan Agent,</u>" and, together with the DIP ABL Agent, the "<u>DIP Agents</u>") for and on behalf of the lenders party thereto (the "<u>DIP Term Lenders,</u>" and, together with (x) the DIP ABL Lenders, the "<u>DIP Lenders,</u>" and (y) the DIP Term Loan Agent, the "<u>DIP Term Loan Secured Parties;</u>" the DIP Term Loan Secured Parties together with the DIP ABL Secured Parties, the "<u>DIP Secured Parties</u>"), substantially in the form of **<u>Exhibit C</u>**, attached hereto;

b.     granting authorization for:

i.     the Debtors to execute and deliver the DIP ABL Credit Agreement, and any other agreements, instruments, pledge agreements, guarantees, security agreements, control agreements, notes, and other Credit Documents (as defined in the DIP ABL Credit Agreement) and documents related thereto (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP ABL Credit Agreement, the "<u>DIP ABL Documents</u>") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP ABL Documents;

ii.     the Debtors to execute and deliver the DIP Term Loan Credit Agreement, and any other agreements, documents, instruments and/or amendments executed and delivered in connection therewith, (collectively, the "<u>DIP Term Documents,</u>" and together with the DIP ABL Documents, the "<u>DIP Documents</u>") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Term Documents;

c.     authorizing (x) the DIP Loan Parties to use the DIP ABL Facility (A) to, simultaneously with the initial draw under the DIP ABL Facility, refinance all of the outstanding Prepetition ABL Debt (as defined herein) in full, including interest, fees, costs and other charges payable thereunder through the date of repayment, together with the deemed issuance and deemed incurrence of all letter of credit obligations and bank product obligations extant or otherwise

issued and outstanding through such date of refinancing, which refinancing, deemed issuance and deemed incurrence shall be indefeasible upon the occurrence of the ABL Satisfaction Date, (B) for the DIP Loan Parties' working capital needs and general corporate purposes in accordance with the DIP ABL Documents and as permitted by the Budget (subject to the Permitted Variance, as defined and set forth in the DIP ABL Credit Agreement), and (C) for the Prepetition ABL Secured Parties' Adequate Protection Obligations (as defined below), and (y) the DIP Loan Parties to use proceeds of the DIP Term Financing for working capital and general corporate purposes in accordance with the terms of the DIP Term Documents and as permitted by the Budget (subject to the Permitted Variance) defined and as set forth in the DIP Term Loan Credit Agreement);

d.    subject to the restrictions set forth in the DIP Documents, Interim Period Order, and the Intercreditor Agreements (as defined herein), authorizing the Debtors, during the Interim Period, to use the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein) of the Prepetition ABL Secured Parties under the Prepetition ABL Documents and the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents (each as defined herein), and provide adequate protection to the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Collateral (including Cash Collateral), including by the Carve Out, in each case occurring during the Interim Period;

e.    authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due, and payable to the extent provided in, and in accordance with, the DIP Documents and the Interim Period Order;

f.    authorizing the Debtors to make certain Stipulations with respect to the Prepetition Credit Agreements and the liens and security interests arising therefrom;

g.    subject to the Carve Out and the Prepetition Intercreditor Agreement, granting the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to, all of the DIP Loan Parties' assets;

h.    granting the DIP Secured Parties liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain customarily excluded assets) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), subject to the Carve Out (as defined herein) and the Intercreditor Agreements;

4

i.  authorizing (a) a waiver, to the extent set forth herein, of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined herein) (together, the "Collateral") pursuant to section 506(c) of the Bankruptcy Code, and (b) subject to entry of the Final Order, a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

j.  modifying the automatic stay to the extent set forth herein;

k.  scheduling a final hearing (the "Final Hearing") to be held within 30 days of the Petition Date to consider final approval of the DIP Facilities and use of Cash Collateral (as defined herein) pursuant to a proposed Final Order; and

l.  granting certain related relief.

## **Jurisdiction**

2.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

3.   The bases for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 363(m), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), rules 1075-1, 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (as amended, the "Bankruptcy Local Rules"), and the Procedures for Complex Cases in the Southern District of Texas (as amended, the "Complex Case Procedures").

4.   The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Background**

6.   On February 7, 2020 (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.  No trustee, examiner,  or statutory committee of creditors has been appointed in these cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases for procedural purposes only, pursuant to Bankruptcy Rule 1015(b).

7.     The Debtors are one of the largest and most diversified inland marine transportation and services companies in the United States.  The Debtors' barge fleet transports a variety of liquid and dry cargoes on the Mississippi River, its tributaries, and on the Gulf Intracoastal Waterway, including chemicals, crude oil and petrochemicals, agricultural products, metals, and other bulk and construction materials.

8.     Additional information regarding the circumstances leading to the commencement of these chapter 11 cases, the Debtors' businesses, and capital structure is set forth in the *Declaration of David J. Huls in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated herein by reference.

## Prepetition Capital Structure

**Prepetition ABL Credit Facility**

9.     As of the Petition Date, ACL and each of the DIP Borrowers (collectively the "Prepetition Obligors") were parties to an amended and restated revolving credit agreement, dated as of November 12, 2015 (as amended, the "Prepetition ABL Credit Agreement" and, together with the "Credit Documents" (as defined in the Prepetition ABL Credit Agreement), the "Prepetition ABL Documents"), by and among the Prepetition Obligors, Wells Fargo Capital Finance, LLC, as Administrative Agent and Collateral Agent (in such capacities, the "Prepetition ABL Agent"); and the lenders party from time to time thereto (the "Prepetition ABL Lenders," and, together with the Prepetition ABL Agent and the other Secured Creditors (as defined in the Prepetition ABL Credit

Agreement), the "Prepetition ABL Secured Parties") pursuant to which the Prepetition ABL Lenders provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Prepetition Obligors pursuant to the Prepetition ABL Credit Agreement (the "Prepetition ABL Credit Facility").

10.     The Prepetition ABL Credit Agreement provided for a maximum availability of $640 million, subject to a borrowing base, of which up to $100 million was available for the issuance of letters of credit (and the availability under the Prepetition ABL Credit Agreement was reduced on a dollar for dollar basis with respect to issued and outstanding letters of credit).  As of the Petition Date, approximately $536 million in borrowings and approximately $16.6 million of letters of credit were outstanding under the Prepetition ABL Credit Facility (such outstanding obligations, along with all other "Obligations" as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Debt" and any of the Prepetition ABL Secured Parties' claims arising in connection with the Prepetition ABL Debt, the "Prepetition ABL Claims").

11.     The Prepetition Obligors' obligations under the Prepetition ABL Credit Facility are secured by a first priority lien on substantially all of the Prepetition Obligors' assets (subject to certain exceptions as set forth in the Prepetition ABL Documents) including accounts receivable, inventory, cash and cash equivalents, vessels, equipment, fixtures, owned and leased real property, and proceeds of all of the foregoing (collectively, the "Prepetition ABL Priority Collateral").  The Prepetition ABL Priority Collateral does not include the real property of Old JB commonly known as 1030 East Market Street, Jeffersonville, IN 47130, the real property previously owned by River Ops commonly known as the West Memphis Marine Terminal and located at State Rt. 301, Cooper Sandpit Road, West Memphis, AR 7230, and all equipment (which does not include vessels) located on such real property (collectively the "Exclusive Term Collateral" and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral").

**Prepetition Term Loan Facility**

12.     As of the Petition Date, the Prepetition Obligors were parties to a term loan credit agreement, dated as of November 12, 2015 (as amended, the "Prepetition Term Loan Credit Agreement," and together with the "Credit Documents" (as defined in the Prepetition Term Loan Credit Agreement), the "Prepetition Term Loan Documents"), by and among the Prepetition Obligors, Bank of America, N.A., as Administrative Agent (in such capacity, the "Prepetition Term Loan Agent"), and the lenders party from time to time thereto (the "Prepetition Term Loan Lenders," and together with the Prepetition Term Loan Agent, the "Prepetition Term Secured Parties") pursuant to which the Prepetition Term Loan Lenders provided loans to the Prepetition Obligors pursuant to the Prepetition Term Loan Credit Agreement (the "Prepetition Term Loan Facility").

13.     The Prepetition Term Loan Credit Agreement provided for an original principal balance of $1,150 million.  As of the Petition Date, approximately $949 million was outstanding under the Prepetition Term Loan Facility (such outstanding obligations, along with all other "Obligations" as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loan Debt," and any claims of the Prepetition Term Secured Parties arising in connection with the Prepetition Term Loan Debt, the "Prepetition Term Loan Claims").

14.     The Prepetition Term Loan Documents provide for the Prepetition Obligors' obligations under the Prepetition Term Loan Facility to be secured by a first priority lien on the Exclusive Term Collateral and a second priority lien on the Prepetition ABL Priority Collateral.

15.     The relative lien priorities between the Prepetition Term Secured Parties and the Prepetition ABL Secured Parties is governed by that certain Intercreditor Agreement, dated as of November 12, 2015, by and among the Prepetition ABL Agent, the Prepetition Term Loan Agent, the Prepetition Obligors, and AEP Elmwood LLC (the "Prepetition Intercreditor Agreement").

**Cash Collateral**

16.     All of the Prepetition Obligors cash, other than cash held in the "Excluded Deposit Accounts" (as defined in the Prepetition ABL Credit Agreement), to the extent property of the

Prepetition Obligors, including any cash in deposit accounts (whether subject to control agreements or otherwise), constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code, subject to the terms of the Intercreditor Agreements (the "Cash Collateral").

### Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Complex Case Procedures

17.    The chart below contains a summary of the material terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B).[3]

| Bankruptcy Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The Prepetition ABL Secured Parties and the Prepetition Term Secured Parties. Interim Period Order ¶ F(viii) |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B) | DIP ABL: Base Rate plus 3.50% or LIBO Rate plus 4.5% DIP Term: LIBOR (with a 2% LIBOR floor) plus 7.00% or Adjusted Base Rate plus 6.00% DIP ABL Credit Agreement §§ 1.01, 2.06; DIP Term Credit Agreement §§ 1.01, 2.06 |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The DIP Facility shall not be available unless the Court shall have authorized by the Debtors' use of proceeds of Prepetition Collateral that constitute Cash Collateral. Interim Period Order ¶¶ G(v)-(x), 1, 9(b), 12, 16; DIP ABL Credit Agreement §§ 8.08, 10.12; DIP Term Credit Agreement §§ 8.8, 8.15, 10.12 |
| **Term** Bankruptcy Rule 4001(b)(1)(B)(iii) and 4001 (c)(1)(B) | 6 months DIP ABL Credit Agreement § 1.01; DIP Term Credit Agreement § 1.01 |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | DIP Agents and DIP Lenders Expenses: All reasonable and documented out-of-pocket costs and expenses of the DIP Agents incurred in connection with the preparation and execution and delivery of, and any amendment, waiver, supplement or modification to, the DIP Documents, and the consummation and administration of the transactions contemplated hereby. |

---

[3]    This summary is qualified in its entirety by the provisions of the DIP Documents.  To the extent anything in this Motion is inconsistent with the DIP Documents, the terms of the applicable document shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or elsewhere in the Interim Period Order, as applicable.

| Bankruptcy Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
| | Professional Fees and Expenses: Reasonable and documented fees and expenses of the professionals retained by any of the DIP Agents and the DIP Secured Parties, including, without limitation, the reasonable and documented fees and expenses of the professionals retained by (A) the DIP ABL Agent, including Goldberg Kohn Ltd, as counsel, FTI Consulting, Inc., as financial advisor, McGlinchey Stafford PLLC, as maritime legal counsel and Bracewell LLP, as local legal counsel, (B) the DIP Term Loan Agent, including Stroock & Stroock & Lavan LLP and Haynes and Boone, LLP, as legal counsel, and (C) advisors to the Ad Hoc Group (as defined in that certain Restructuring Support Agreement, dated January 20, 2020 by and among, *inter alia,* the Loan Parties and the DIP Term Lenders (the "Restructuring Support Agreement")), including Davis Polk & Wardwell LLP, as counsel, Evercore Group L.L.C., as financial advisor, Winston & Strawn LLP, as maritime counsel, and Rapp & Krock, PC, as local counsel, and such other advisors as permitted under the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement, as applicable, in each case, as provided for in the DIP Documents (collectively, the "DIP Fees and Expenses"), without the need to file retention motions or fee applications or to provide notice except as required in connection with the Review Period. <br><br> Administrative Agent Fees: Certain fees to the DIP Agents in the amounts and at the times specified in the letter agreements between the Borrower and the DIP Agents (the "DIP Facility Fee Letters"), filed contemporaneously herewith.[4] <br><br> DIP ABL Unused Line Fee: 0.375% on average daily unused Availability <br><br> DIP ABL Fronting Fee: 0.25% of Letter of Credit Usage <br><br> DIP ABL LC Participation Fee: 4.5% of the LC Exposure <br><br> DIP Term Funding Fee: 3% of the DIP Term Loan Commitments <br><br> DIP Term Backstop Premium: 6.0% of backstop commitments, payable in New Money Preferred Equity if the New Money Conversion Conditions are satisfied. <br><br> DIP Term Conversion Discount: 7% of the DIP Term Loans, payable in New Money Preferred Equity if the New Money Conversion Conditions are satisfied. <br><br> Interim Period Order ¶¶ 2(b) and 19; DIP ABL Credit Agreement §§ 2.05 and 2.13k; DIP Term Credit Agreement § 2.05 |
| **Roll-up** <br> Complex Case Procedures rule I, ¶ 21 | Pursuant to the terms of the DIP ABL Credit Agreement, all Prepetition ABL Obligations shall be "rolled-up," which includes contingent indemnification obligations, and refinanced into the DIP ABL Credit Agreement on the Closing Date of the DIP ABL Loan, subject to the reservation of rights in paragraph 23 of the Interim Period Order. <br><br> Interim Period Order ¶¶ G(ix), 14(d); DIP ABL Credit Agreement § 6.04(a) |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | Adequate Protection of Prepetition ABL Secured Parties: The Prepetition ABL Secured Parties are entitled to adequate protection of their interests in all Prepetition ABL Priority Collateral, including the Cash Collateral, including for, without limitation, the aggregate diminution in value (the "ABL |

---

[4]   The Debtors have sought authority to file the DIP Facility Fee Letters under seal pursuant to the Debtors' *Emergency Motion for Entry of an Order Authorizing Debtors to File DIP Facility Fee Letters Under Seal*, filed contemporaneously herewith.

| Bankruptcy<br>Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
|  | Diminution in Value") of the Prepetition ABL Secured Parties' interests in the Prepetition ABL Priority Collateral resulting from the depreciation, sale, lease or use by the DIP Loan Parties (or other decline in value) of the Prepetition ABL Priority Collateral, the priming of the Prepetition ABL Liens by the DIP ABL Liens pursuant to the DIP ABL Documents and the Interim Period Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from the Petition Date through the date of entry of the Final Order. As adequate protection, the Prepetition ABL Secured Parties are granted the following, subject to the Carve Out and the Intercreditor Agreements (but in accordance with paragraph 5 of the Interim Period Order) (collectively, the "Prepetition ABL Secured Parties Adequate Protection Obligations"):<br><br>• the "Prepetition ABL Adequate Protection Liens" upon the DIP Collateral including but not limited to the Term Loan Proceeds Account (it being understood that, subject to and effective upon entry of the Final Order, the Prepetition ABL Adequate Protection Liens (as defined herein) shall attach to Avoidance Proceeds, which shall be senior to the Prepetition Term Loan Adequate Protection Liens on such Avoidance Proceeds) to secure the ABL Diminution in Value, subject and subordinate only to (i) the DIP ABL Liens (and any liens to which the DIP ABL Liens are junior), (ii) in the case of the ABL Excluded Collateral, the DIP Term Liens (and any liens to which the DIP Term Liens are junior), the Prepetition Term Liens and the Prepetition Term Loan Adequate Protection Liens, and (iii) the Carve Out;<br><br>• an allowed superpriority administrative expense claim, as provided for in section 507(b) of the Bankruptcy Code, in an amount equal to the ABL Diminution in Value, if any, with, except as set forth in the Interim Period Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Prepetition ABL 507(b) Claim");<br><br>• payment in cash of, solely to the extent that any Prepetition ABL Debt remains outstanding after entry of the Interim Period Order, interest (at the default rate) due under the Prepetition ABL Documents (the "Prepetition ABL Adequate Protection Payments");<br><br>• payment of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of Goldberg Kohn Ltd., as counsel, FTI Consulting, Inc., as financial advisor, McGlinchey Stafford PLLC, as maritime legal counsel and Bracewell LLP, as local legal counsel, and other advisors as provided in the Prepetition ABL Credit Agreement) incurred by the Prepetition ABL Agent arising prior to the Petition Date and invoiced to the Debtors at least two (2) business days prior to the Closing Date, and (ii) subject to the Review Period, the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of Goldberg Kohn Ltd., as counsel, FTI Consulting, Inc., as financial advisor, McGlinchey Stafford |

| Bankruptcy<br>Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
|  | PLLC, as maritime legal counsel and Bracewell LLP, as local legal counsel, and other advisors as provided in the Prepetition ABL Credit Agreement) incurred by the Prepetition ABL Agent arising subsequent to the Petition Date (collectively, the "<u>ABL Adequate Protection Fees and Expenses</u>"); and<br><br>• information rights to all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Secured Parties under the DIP Documents.<br><br><u>Adequate Protection of Prepetition Term Loan Secured Parties</u>: The Prepetition Term Loan Secured Parties are entitled to adequate protection of their interests in all Prepetition Collateral for the aggregate diminution in value (the "<u>Term Diminution in Value</u>") of the Prepetition Term Secured Parties' interests in the Prepetition Collateral resulting from the depreciation, sale, lease, or use by the DIP Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition Term Liens by the DIP Liens pursuant to the DIP Documents and the Interim Period Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from the Petition Date through the date of entry of the Final Order. As adequate protection, the Prepetition Term Loan Secured Parties are hereby granted the following, in each case, subject to the Carve Out and the Intercreditor Agreements (collectively, the "<u>Prepetition Term Loan Adequate Protection Obligations</u>," and together with the Prepetition ABL Secured Parties Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>"):<br><br>• a continuing, binding, enforceable, valid, and perfected replacement security interest in and lien (the "<u>Prepetition Term Loan Adequate Protection Liens</u>" and together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>") (subject to the limitations set forth in the Interim Period Order) upon the DIP Collateral (it being understood that, subject to and effective upon entry of the Final Order, Prepetition Term Loan Adequate Protection Liens shall attach to Avoidance Proceeds, which shall be junior to the Prepetition ABL Adequate Protection Liens on such Avoidance Proceeds) to secure the Term Diminution in Value, subject and subordinate only to (i) the DIP Term Liens (and any liens to which the DIP Term Liens are junior), (ii) in the case of the DIP ABL Priority Collateral, the DIP ABL Liens (and any liens to which the DIP Term Liens are junior), the Prepetition ABL Liens, and the Prepetition ABL Adequate Protection Liens, and (iii) the Carve Out;<br><br>• an allowed superpriority administrative expense claim, as provided for in section 507(b) of the Bankruptcy Code, in an amount equal to the Term Diminution in Value, if any, with, except as set forth in the Interim Period Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>Prepetition Term Loan 507(b) Claim</u>" and, together with the Prepetition ABL 507(b) Claim, the "<u>507(b) Claims</u>");<br><br>• current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to (i) the |

| Bankruptcy Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
| | Prepetition Term Loan Agent, including Cahill Gordon & Rendel LLP, as counsel, and (ii) reasonable and documented prepetition and postpetition fees and expenses payable to the Ad Hoc Group advisors, including Davis Polk & Wardwell LLP, as counsel, Evercore Group L.L.C., as financial advisor, Winston & Strawn LLP, as maritime counsel, and Rapp & Krock, PC, as local counsel, and such other advisors to the Ad Hoc Group and as may be reasonably consented to by the Debtors, which payments shall be made in the manner provided for in paragraph 19 of the Interim Period Order (together with the ABL Adequate Protection Fees and Expenses, the "Adequate Protection Fees and Expenses"); <br><br> • information rights to all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Secured Parties under the DIP Documents; and <br><br> • performance of the Case Milestones (as defined herein). <br><br> Interim Period Order ¶¶ 14-15 |
| **Priority/Liens under Section 364 of the Bankruptcy Code** <br><br> Bankruptcy Rule 4001(c)(1)(B)(i) <br><br> Complex Case Procedures rule I, ¶ 21(h) | Subject to the Carve Out and the Prepetition Intercreditor Agreement, the granting to the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to, all of the DIP Loan Parties' assets and the granting to the DIP Secured Parties of liens, pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code, on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain customarily excluded assets including Avoidance Actions) and all proceeds thereof, including, subject only to, and effective upon, entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), subject to the Carve Out (as defined herein) and the Intercreditor Agreements. <br><br> Interim Period Order ¶¶ 6-7 |
| **Determination of Prepetition Claims/Liens** <br> **Release or Waiver of any Claim of the Estate** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iii) and 4001(c)(1)(B)(viii) <br><br> Complex Case Procedures rule I, ¶ 21(f) | Debtors' Stipulations.  After consultation with their attorneys and financial advisors, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree, immediately upon entry of the Interim Period Order, to certain stipulations regarding the validity and extent of the Prepetition ABL Secured Parties' and Prepetition Term Loan Secured Parties' claims and liens. <br><br> After consultation with their attorneys and financial advisors, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree, effective upon entry of the Interim Period Order, to a release of claims and causes of action against the Prepetition ABL Secured Parties' and Prepetition Term Loan Secured Parties' claims and liens. <br><br> Interim Period Order ¶ F |

| Bankruptcy Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
| **Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>**Waiver of Non-bankruptcy Law Relating to Perfection**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | Upon a Termination Notice (as defined in the Interim Period Order) or the occurrence of the DIP Termination Date (as defined in the DIP Documents) the DIP Secured Parties shall be entitled to seek an expedited hearing on three business days' notice for an order modifying the automatic stay such that the applicable DIP Secured Parties and applicable Prepetition Secured Parties may exercise rights and remedies.<br><br>The Interim Period Order includes standard and customary language concerning the waiver and modification of automatic stay to permit the DIP Agents to take all actions to perfect liens and security interests granted under the Interim Period Order.<br><br>Interim Period Order ¶¶ 9(e) 21 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Parties shall indemnify and hold harmless the DIP Agents and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreements.<br><br>DIP ABL Credit Agreement § 13.01(a); DIP Term Credit Agreement § 13.01(a) |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | During the Interim Period, no costs or expenses of administration which have been or may be incurred in these chapter 11 cases at any time shall be charged against the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral, whether pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Term Loan Agent or the Prepetition Term Loan Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.<br><br>Interim Period Order ¶ 10 |
| **Granting of Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Complex Case Procedures rule I, ¶ 21(d) | Subject to entry of the Final Order pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agents, for the benefit of the DIP Lenders, shall be granted the DIP Liens, which shall include the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code) (the "Avoidance Action Proceeds"), in order to secure the DIP Obligations.<br><br>Interim Period Order ¶¶ 6-7 |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.<br><br>Interim Period Order ¶¶ 9(f), 24(e) |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | Standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligation of each DIP Lender to make DIP Loans. |

| Bankruptcy<br>Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
| | DIP ABL Credit Agreement Articles 6 and 7; DIP Term Credit Agreement Articles 6 and 7 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Complex Case Procedures rule I, ¶ 21(a) | As a condition to the DIP Facilities and the use of Cash Collateral, the Debtors shall comply with the required milestones (as attached as **Exhibit D** hereto) (collectively, the "<u>Case Milestones</u>").<br><br>Interim Period Order ¶ 18 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Complex Case Procedures rule I, ¶ 21(e) | "<u>Event of Default</u>" shall mean (a) an Event of Default under and as defined in the DIP ABL Documents, (b) an Event of Default under and as defined in the DIP Term Loan Documents, (c) the Debtors' commencing, or participating in furtherance of, any solicitation of any plan of reorganization that is not a "Plan" (as defined in the DIP Documents) or such other plan of reorganization that each of the Required ABL Lenders and the Required Term Loan Lenders shall have expressly consented to in writing, or (d) failure by any Debtor to comply with, perform or observe any term, covenant, agreement, or obligation under the Interim Period Order.<br><br>Events of Default as defined in the DIP ABL Documents includes the usual and customary defaults for financings of this type, including nonpayment of obligations, defaults under covenants, breaches of representations and warranties, cross-defaults, failure to comply with ERISA rules and regulations, invalidity of collateral documents, change of control, invalidity of pre-petition loan documents, and bankruptcy-specific defaults.<br><br>Interim Period Order ¶ 5(c)(iii); DIP ABL Credit Agreement Article 11; DIP Term Credit Agreement Article 11 |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Complex Case Procedures rule I, ¶ 21(g) | As used in the Interim Period Order, the "<u>Carve Out</u>" means: (i) all fees required to be paid to (A) the Clerk of the Court, and (B) the U.S. Trustee; (ii) all reasonable fees and expenses up to $100,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by Interim Period Order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent (acting at the direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)) of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (solely with respect to the Prepetition ABL Priority Collateral and the DIP ABL Collateral), in an aggregate amount in accordance with this paragraph; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000.00 incurred after the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by Interim Period Order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>"). For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP ABL Agent or the DIP Term Loan Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the DIP Term Loan Agent (if notice is delivered by the DIP ABL Agent), counsel to the DIP ABL Agent (if notice is delivered |

| Bankruptcy Code and Bankruptcy Rules | DIP Facilities/Interim Period Order |
|---|---|
| | by the DIP Term Loan Agent), and counsel to a Creditors' Committee (if appointed), which notice may be delivered following the occurrence, and during the continuation of an Event of Default (as defined in and under the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement) stating that the Post-Carve Out Trigger Notice Cap has been invoked. <br><br> Interim Period Order ¶ 5 |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(1)(B) | The Interim Period Order provides for a standard and customary challenge period for the Creditors' Committee (if appointed) or any other party in interest, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in each case, with requisite standing, expiring on the earlier of (x) with respect to any Creditors' Committee, 60 days after entry of the Final Order and (y) for all other parties in interest with standing if a Creditors' Committee is not appointed, 75 days after the entry of the Interim Period Order (the "Challenge Period"). <br><br> Interim Period Order ¶ 23(a) |

### Statement Regarding Significant Provisions

18. The Interim Period Order contains the following provisions (the "Significant Provisions")[5] identified in section I.21 of the Complex Case Procedures: (a) granting certain Case Milestones, as set forth above and attached hereto as **Exhibit D**; (b) subject to the Challenge Period, approving the roll-up and refinancing of all Prepetition ABL Debt into the DIP ABL Credit Agreement upon entry of the Interim Period Order; (c) granting the DIP Lenders certain events of default and remedies; (d) granting a limitation on the use of DIP Loans, Cash Collateral, DIP Collateral, Prepetition Collateral, or proceeds of any of the foregoing or the Carve Out to pay the fees and expenses of an official committee of unsecured creditors (if appointed) in investigating claims against the DIP Lenders or the Prepetition Secured Parties, or challenging the amount, validity, perfection, or priority of their claims and liens; (e) granting certain releases to the Prepetition Secured Parties, subject to the Challenge Period; and (f) granting a lien on the proceeds of avoidance actions,

---

[5] Significant Provisions refer to those provisions that contain the following: (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll-ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claim against lenders or others; (g) limitations on fees for advisors to official committees; (h) priming liens; and (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

16

subject to and effective only upon, the entry of the Final Order.  As stated above and in the *Declaration of Neil A. Augustine* (the "DIP Declaration"), the DIP Facilities are critical to the Debtors' ability to continue to fund their business operations, ensure consensual use of Cash Collateral, and provides comfort and certainty to the Debtors' vendors, customers, and workforce. The terms of the DIP Facilities and the Interim Period Order were heavily negotiated by the Debtors and the DIP Lenders, and the DIP Lenders' agreement to fund the DIP Loans is dependent on approval of such terms.

19.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate and just under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Period Order should be approved.

## I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Under the DIP Documents.

20.     Courts grant considerable deference to a debtor-in-possession's business judgment in determining whether to obtain postpetition credit, the amount of such credit, and the structure of the financing arrangements.  *See*, *e.g.*, *In re Trans World Airlines*, *Inc.*, No. 92-00115 [Docket No. 1419] (Bankr. D. Del. Dec. 12, 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores*, *Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating that courts should defer to debtor's "reasonable business judgment . . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

21.     To determine whether a debtor has properly exercised its business judgment, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on other*

*grounds* 607 F.3d 957 (3d Cir. 2010); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

22.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender. *See, e.g., In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  The court may also appropriately take into consideration non-economic benefits to a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks Inc.*, the bankruptcy court for the Southern District of New York stated that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

23.    The decision to obtain credit from the DIP Lenders on the terms set forth in the DIP Facilities is well within the Debtors' sound business judgment.  The DIP Facilities will afford the Debtors sufficient liquidity to, among other things:  (a) maintain ordinary course operations; (b)

stabilize the Debtors' businesses during the pendency of these chapter 11 cases; (c) fund payroll obligations; and (d) fund the administrative cost of the cases.  Moreover, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe the proposed DIP Facilities represent the best available financing under the current circumstances.  Furthermore, entry into the DIP Facilities with the Debtors' prepetition lenders will avoid a costly adequate protection fight at the outset of these cases that would cause significant uncertainty among the Debtors' employees, lessors, and others.  Accordingly, the Court should authorize the Debtors to enter into, and perform under, the DIP Documents.

**II.     The Debtors Should Be Authorized to Grant DIP Liens and DIP Superpriority Claim.**

24.     Section 364 of the Bankruptcy Code authorizes a debtor-in-possession to obtain financing under certain circumstances.  In the event a debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense (as authorized under sections 364(a) and 364(b)), section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."

25.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1)(A)-(B).

26.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and/or (d) of the Bankruptcy Code.  *In re Snow shoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber*

19

*Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snow shoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

27.     As described above and as set forth in the DIP Declaration, the Debtors are unable to obtain postpetition financing as unsecured credit pursuant to sections 364(a) or (b) of the Bankruptcy Code, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or as secured credit pursuant to section 364(c) of the Bankruptcy Code. Accordingly, as described above, the DIP Liens consists of continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition, security interests in and liens on all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each DIP Obligor pursuant to section 364(d) of the Bankruptcy Code.

28.     The Court should authorize the granting of liens under section 364(d)(1) because the Debtors are not able to obtain credit on any other terms and the Prepetition Secured Parties have consented to priming.  Consent by secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected").  Here, the Prepetition Secured Parties

have consented to the priming of their liens by the DIP Liens, subject to the adequate protection provided under the DIP Orders, and, accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

29.     Likewise, the Debtors would be unable to obtain the DIP Loans without providing the DIP Agents, on behalf of themselves and the DIP Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in each of the DIP Obligors' chapter 11 cases (collectively, the "DIP Superpriority Claims").   Without access to the DIP Superpriority Claims, the DIP Lenders would be unwilling to provide the DIP Loans.

**III.    The Debtors Should Be Authorized to Use Cash Collateral.**

30.     Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use Cash Collateral with the consent of the secured party.   Here, the Prepetition Secured Parties have consented to the Debtors' use of their respective Cash Collateral, subject to the terms and limitations set forth in the Interim Period Order.

31.     The Debtors require the use of Cash Collateral to fund the cases and maximize value of their estates for the benefit of all stakeholders and avail themselves of the "breathing room" afforded by a chapter 11 restructuring.   As the Prepetition Secured Parties have consented to the use of Cash Collateral, on the terms and limitations set forth in the Interim Period Order, and the use of Cash Collateral is required to achieve value maximizing transactions the Debtors seek to consummate, the Court should authorize the Debtors' use of Cash Collateral.

**IV.    The Debtors Should Be Authorized to Provide Adequate Protection to the Prepetition Secured Parties.**

32.     Section 363(e) of the Bankruptcy Code provides that a secured party is entitled to "adequate protection" of its interest in its collateral to the extent the debtor intends to use such collateral, including cash collateral, postpetition.   While section 361 of the Bankruptcy Code provides examples of potential forms of adequate protection, such as granting replacement liens and

21

administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Rocco*, 319 B.R. 411 (Bankr. W.D. Pa. 2005); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection "must be determined based upon equitable considerations arising from the particular facts of each proceeding"). It was the intent of Congress in Section 361 to give courts flexibility to fashion relief under general equitable principals in light of the facts and circumstances of each case. *In re Wilson*, 30 B.R. 371 (Bankr. E D. Pa. 1983).

33.     The Prepetition Secured Parties have agreed that the proposed Adequate Protection is sufficient to protect the Prepetition Secured Parties against any diminution in the value of the Prepetition Collateral, including Cash Collateral. Further, as the Debtors require the use of Cash Collateral maximize value for the Debtors' estates, the Debtors believe that the terms and conditions of the Debtors' use of Cash Collateral are fair and reasonable under the circumstances.

**V.     The Debtors Should Be Authorized to Pay the Fees of the DIP Agents and the DIP Lenders.**

34.     Under the DIP Documents, the Debtors have agreed, subject to the Court's approval, to pay the DIP Agents' reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, execution, and delivery of, and any amendment, waiver, supplement or modification to, the DIP Documents prepared in connection therewith, and the consummation and administration of the transactions contemplated therein.

35.     In particular, the Debtors have agreed to pay the reasonable and documented fees and expenses of the professionals retained by any of the DIP Agents and the DIP Secured Parties, including, without limitation, the reasonable and documented fees and expenses of the professionals retained by (a) the DIP ABL Agent, including Goldberg Kohn Ltd, as counsel, FTI Consulting, Inc.,

22

as financial advisor, McGlinchey Stafford PLLC, as maritime legal counsel and Bracewell LLP, as local legal counsel, (b) the DIP Term Loan Agent, including Stroock & Stroock & Lavan LLP and Haynes and Boone, LLP as legal counsel, and (c) advisors to the Ad Hoc Group (as defined in the Restructuring Support Agreement), including Davis Polk & Wardwell LLP, as counsel, Evercore Group L.L.C., as financial advisor, Winston & Strawn LLP, as maritime counsel, and Rapp & Krock, PC, as local counsel, and such other advisors as permitted under the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement, as applicable, in each case, as provided for in the DIP Documents, without the need to file retention applications or fee applications or to provide notice to any third party.

36.    The Debtors have also agreed to pay fees to the DIP Agents in the amounts, and at the times, specified in the DIP Facility Fee Letters.  Specifically, the Debtors will pay the: (a) DIP ABL Unused Line Fee of 0.375% on average daily unused Availability (as defined in the DIP Documents); (b) DIP ABL Fronting Fee of 0.25% of Letter of Credit Usage (as defined in the DIP Documents); (c) DIP ABL LC Participation Fee of 4.5% of the LC Exposure (as defined in the DIP Documents); (d) DIP Term Funding Fee of 3% of the DIP Term Loan Commitments (as defined in the DIP Documents); (e) DIP Term Backstop Premium of 6.0% of backstop commitments, payable in New Money Preferred Equity if the New Money Conversion Conditions are satisfied (as defined in the DIP Documents); and (f) DIP Term Conversion Discount of 7% of the DIP Term Loans, payable in New Money Preferred Equity if the New Money Conversion Conditions are satisfied.  These fees are an integral component of the overall terms of the DIP Facilities and were required by the DIP Agents and the DIP Lenders as consideration for the extension of postpetition financing following substantial arms'-length and good faith negotiations.

37.    The type of fees the Debtors seek to pay to the DIP Secured Parties have been granted in other large chapter 11 cases.  In *In Defender Drug Stores, Inc.*, 145 B.R. 312 (9th Cir. BAP 1992), the Ninth Circuit Bankruptcy Appellate Panel (the "BAP") acknowledged that courts routinely

authorize protections to debtor-in-possession lenders that are not specifically mentioned in section 364 (such as interest on postpetition loans, cross collateralization and waivers of various Bankruptcy Code requirements).  *Id*. at 316-317.  In that case, the BAP affirmed the bankruptcy court's grant of an "enhancement fee" to the DIP lender as consideration for its agreement to waive a default under the DIP to allow the debtor sufficient time to liquidate.  The fee was equal to 10% of the gross proceeds of the sale in excess of the amount necessary to pay in full the DIP lender's post- and prepetition debt.  The court held that the bankruptcy court had the authority to approve such fee because (i) the debtor was not able to obtain credit on less burdensome terms, (ii) the proposed fee did not prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, and (iii) the interests of the junior lienholder were adequately protected.  Id. at 317.  Here, the Debtors face similar circumstances, and the DIP Facilities do not impinge upon the fundamental rights of the Bankruptcy Code and interests of the Debtors' creditors; in fact, the Debtors believe the DIP Facilities are likely the best and only option to maximize chances that junior creditors can improve their recoveries.

38.     Accordingly, the Debtors submit that the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.  These fees are necessary for the Debtors to obtain the financing required to help avoid immediate liquidation, and are reasonable in the current circumstances.

**VI.     The Proposed Roll-Up of Prepetition ABL Debt is Necessary and Appropriate.**

39.     The DIP Documents provide for a roll-up of the obligations under the Prepetition ABL Documents into the DIP ABL Credit Agreement (the "Roll-Up") upon entry of the Interim Period Order and the Closing Date of the DIP ABL Financing.

40.     The Roll-Up is a critical component of the DIP Facilities.  The DIP ABL Lenders will not continue to lend to the Debtors during the chapter 11 cases without the Roll-Up, which was a prerequisite to the DIP ABL Lenders' agreement to provide credit under the DIP ABL Facility.  The

DIP Term Lenders have agreed to provide the DIP Term Facility on a junior basis to the DIP ABL Facility, including the Roll-Up, in order to induce the DIP ABL Secured Parties to modify the borrowing availability in order to make more liquidity available to the Debtors in the aggregate, as part of a package of DIP Financing for the benefit of the Debtors.  Thus, after careful consideration of available alternatives, the Debtors have determined that the Roll-Up is necessary to obtain access to liquidity and is in the best interests of the Debtors and their estates.

41.     Roll-ups, as well as similar refinancings of prepetition claims with postpetition credit, may be authorized under section 363(b) of the Bankruptcy Code.  *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010) ("Post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business . . . similarly, prepetition secured claims can be paid off through a roll-up."); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D. Del. 2015).  As the United States District Court for the District of Delaware observed:

> [P]repetition secured claims can be paid off through a "roll-up."  Most simply, a [roll-up] is the payment of a pre-petition debt with the proceeds of a post-petition loan.  Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code.  The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor.  As a result, the entirety of the prepetition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order.  In both a refinancing and a rollup, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (*quoting In re Capmark Fin. Grp.*, Inc., 438 B.R. at 511).

42.     Courts consider a number of factors when determining whether to authorize a roll-up of prepetition debt, including whether:  (a) the proposed financing is an exercise of sound and

reasonable business judgment; (b) no alternative financing is available on any other basis; (c) the financing is in the best interests of the estate and its creditors; (d) no better offers, bids, or timely proposals are before the court; (e) the credit transaction is necessary to preserve the assets of the estate; (f) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender(s); (g) the financing is necessary, essential, and appropriate for the continued operating of the Debtors' business and the preservation of their estates; and (h) the financing agreement was negotiated in good faith and at arms'-length between the debtor and the proposed lenders. *See In re Farmland Indus., Inc.*, 294 B.R. at 879-80 (surveying opinions authorizing roll-ups).

43.     Recognizing exigent circumstances like those present here, courts in this circuit have approved roll-ups in recent chapter 11 cases. *See*, *e.g.*, *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2020) [Docket No. 146]; *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) [Docket No. 144] (on interim basis, authorizing $50 million DIP draw of a $350 million DIP that included $175 million roll up of prepetition debt);  *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket No. 255] (authorizing $350 million DIP that included $250 million roll up of prepetition debt); *In re Vanguard Natural Resources, Inc.* (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) [Docket No. 241] (authorizing $130 million DIP that included $65 million roll up of prepetition debt); *In re Gastar Exploration, Inc.*, No. 18-36507 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) [Docket No. 213] (authorizing approximately $383 million DIP that included repayment of approximately $283 million of prepetition debt); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) [Docket No. 520] (authorizing $110 million DIP that included $90 million to refinance prepetition debt); *In re Shoreline*

*Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) [Docket No. 190] (authorizing approximately $50 million DIP that included refinancing of $32 million in prepetition debt).[6]

44.     Furthermore, courts have authorized *interim* borrowings to be applied towards the roll-up of prepetition obligations.  *See, e.g.*, *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket Nos. 86, 255]; *In re Mission Coal Company, LLC*, No. 18-04177 (TOM) (Bankr. N.D. Ala. Oct. 16, 2018) [Docket Nos. 64, 300] (authorizing approximately $201,441,464 DIP and a roll-up of approximately $50 million on an interim basis); *In re Remington Outdoor Co.*, Inc., No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) [Docket Nos. 68, 177] (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to Interim Period Order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) [Docket Nos. 120, 352] (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to Interim Period Order*); In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) [Docket Nos. 59, 348] (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to Interim Period Order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 10, 2015) [Docket Nos. 190, 947] (authorizing approximately $285 million DIP and a roll-up of approximately $250 million prepetition debt, including a full ABL roll-up of $215 million, pursuant to Interim Period Order).

45.     Consistent with this authority, the Debtors respectfully submit that the Court should approve the Roll-Up as a sound exercise of the Debtors' business judgment.

## VII.    The DIP Lenders Are Good-Faith Lenders Under Section 364(e).

46.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its liens securing those loans, even if the debtor's authority to

---

6       Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

47.     As explained herein, and in the DIP Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms for obtaining vital postpetition financing; (b) no other lender offering alternative financing on any other basis; and (c) arms'-length, good-faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VIII.   The Automatic Stay Should Be Modified on a Limited Basis.

48.     The proposed Interim Period Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to: (i) allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the DIP Liens; (ii) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claims to the DIP Lenders and to incur liabilities and obligations to the DIP Lenders in accordance with the DIP Documents; and (iii) following the occurrence of an

Event of Default, permit the DIP Agents to exercise all rights and remedies in accordance with the DIP Documents and applicable law.

49.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See*, *e.g.*, *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) [Docket No. 144]; *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket No. 255]; *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) [Docket No. 183] (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 26, 2014) [Docket No. 13] (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) [Docket No. 21] (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) [Docket No. 264]; *In re Peak Broad.*, *LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 3, 2012) [Docket No. 118] (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg.*, *LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) [Docket No. 169].

## IX.     Failure to Obtain Immediate Access to the Interim Amount and to Cash Collateral Would Cause Immediate and Irreparable Harm.

50.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

51.     For the reasons noted above, the Debtors have an immediate need to be able to access the DIP Facilities and to continue using the Prepetition Secured Parties' Cash Collateral.  Absent such

relief, the Debtors will not be able to, among other things, fund their business operations, including payroll obligations, ensure consensual use of Cash Collateral, provide comfort and certainty to the Debtors' vendors, customers, and workforce, fund the administration of the cases, and will suffer immediate and irreparable harm to the detriment of all parties in interest.

52.     For each of the reasons set forth herein, the Debtors request that the Court enter the Interim Period Order authorizing the Debtors, from and after entry of the Interim Period Order until the Final Hearing, to incur obligations under the DIP Facilities on the terms of, and subject to conditions set forth in, the DIP Documents and the Interim Period Order.  This relief will enable the Debtors to preserve and maximize the value of their assets for the benefit of their estates and creditors, pending the Final Hearing.

### Request for Final Hearing

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

54.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

55.     The Debtors will provide notice of this Motion to the following parties: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to Wells Fargo Capital Finance, LLC, as administrative agent under the Debtors' prepetition ABL Facility; (d) counsel to Bank of America, N.A., as administrative agent under the Debtors' prepetition Term Loan Facility; (e) counsel to that certain ad hoc group of lenders under the Debtors' prepetition Term Loan Facility;

(f) counsel to the agents for the Debtors' proposed postpetition lenders; (g) the United States Attorney's Office for the Southern District of Texas; (h) the state attorney general's office for all states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any party that requests service pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

56.    WHEREFORE the Debtors respectfully request entry of the proposed Interim Period Order, substantially in the forms attached hereto as **Exhibit A**, respectively, granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 9, 2020

/s/ John F. Higgins
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com
          eenglish@porterhedges.com

-        and        -

Dennis F. Dunne (*pro hac vice* pending)
Samuel A. Khalil (*pro hac vice* pending)
Parker J. Milender (*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
          skhalil@milbank.com
          pmilender@milbank.com

*Proposed Counsel for Debtors and Debtors in Possession*

## Exhibit A

**Proposed Interim Period Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 20-30982 (MI) |
| AMERICAN COMMERCIAL LINES | ) | |
| INC., *et al.*,[1] | ) | (Jointly Administered) |
| Debtors. | ) | (Emergency Hearing Requested) |
| | ) | |
| | ) | |

**ORDER (A) AUTHORIZING THE**
**DEBTORS TO OBTAIN POSTPETITION**
**FINANCING, (B) AUTHORIZING THE DEBTORS**
**TO USE CASH COLLATERAL, (C) GRANTING LIENS**
**AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE**
**PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,**
**(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of American Commercial Lines Inc. ("**Holdings**"),

Commercial Barge Line Company (the "**DIP Term Borrower**" or the "**Company**") and their

affiliated debtors (together with Holdings, the "**DIP Term Guarantors**"; the Company, American

Commercial Barge Line LLC, ACBL Transportation Services LLC and ACBL River Operations

LLC, the "**DIP ABL Borrowers**"; and Holdings and the other affiliated debtors (excluding the

DIP ABL Borrowers), the "**DIP ABL Guarantors**"), each as a debtor and debtor-in-possession

(collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable, are: Finn Holding Corporation (1456), ACL I Corporation (1534), American Commercial
Lines Inc.  (7794), Commercial Barge Line Company ("CBLC") (2365), American Commercial Barge Line LLC
("ACBLL") (6600), American Commercial Lines International LLC (6599), ACBL Oldco, LLC (6602), ACBL
Transportation Services LLC ("Transport") (6589), ACBL River Operations LLC ("River Ops") (6762), Old JB
LLC ("Old JB") (6590), and ACL Professional Services Inc. (4614).  The Debtors' principal offices are located
at 1701 E. Market Street, Jeffersonville, Indiana 47130.

[2]     Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the DIP Motion.

to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 363(m), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 1075-1, 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Bankruptcy Rules**") and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**") promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), seeking, among other things:

(i)     authorization for (x) the DIP ABL Borrowers to obtain postpetition financing as set forth in the DIP ABL Documents (as defined herein) (the "**DIP ABL Financing**"), and for Holdings and the other DIP ABL Guarantors to guaranty the obligations (the "**DIP ABL Obligations**") of the DIP ABL Borrowers in connection with the DIP ABL Financing (the DIP Term Guarantors together with the DIP ABL Borrowers, the "**DIP ABL Loan Parties**"); and (y) the DIP Term Borrower to obtain postpetition financing as set forth in the DIP Term Documents (as defined herein) (the "**DIP Term Financing**" and, together with the DIP ABL Financing, the "**DIP Financing**"), and for the DIP Term Guarantors to guaranty the obligations (the "**DIP Term Loan Obligations**," and together with the DIP ABL Obligations, the "**DIP Obligations**") of the DIP Term Borrower in connection with the DIP Term Financing (the DIP Term Guarantors together with the DIP Term Borrower, the "**DIP Term Loan Parties**"; the DIP Term Loan Parties together with the DIP ABL Loan Parties, the "**DIP Loan Parties**"); the DIP Financing consisting of:

(I)     a senior secured superpriority debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Facility**") consisting of a revolving credit facility in an aggregate principal amount of up to $640,000,000 (the "**DIP ABL Loans**"), pursuant to the terms and conditions of that certain *Senior Secured Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "**DIP ABL Credit Agreement**"), by and among the Holdings, the DIP ABL Borrowers and Wells Fargo Capital Finance, LLC ("**Wells Fargo**") as administrative agent and collateral agent (in such capacities, the "**DIP ABL Agent**") for and on behalf of itself and the other lenders party thereto (the "**DIP ABL Lenders**," and collectively with the DIP ABL Agent, the Issuing Bank (as defined in the DIP ABL Credit Agreement) and the Secured Bank Product

Providers (as defined in the DIP ABL Credit Agreement), the "**DIP ABL Secured Parties**"), substantially in the form of **Exhibit B**, attached to the DIP Motion; and

(II)    a senior secured superpriority debtor-in-possession term loan credit facility (the "**DIP Term Facility**" and, together with the DIP ABL Facility, the "**DIP Facilities**"), in an aggregate principal amount of up to $50,000,000 (the loans made thereunder, the "**DIP Term Loans**" and together with the DIP ABL Loans, the "**DIP Loans**") pursuant to the terms and conditions of that certain *Secured Superpriority Debtor-in-Possession Term Loan Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "**DIP Term Loan Credit Agreement**," and together with the DIP ABL Credit Agreement, the "**DIP Credit Agreements**"), by and among the DIP Term Borrower, the DIP Term Guarantors, and Cortland Capital Market Services, LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Term Loan Agent**" and, together with the DIP ABL Agent, the "**DIP Agents**") for and on behalf of the lenders party thereto (the "**DIP Term Lenders**" and, together with (x) the DIP ABL Lenders, the "**DIP Lenders**," and (y) the DIP Term Loan Agent, the "**DIP Term Loan Secured Parties**"; the DIP Term Loan Secured Parties together with the DIP ABL Secured Parties, the "**DIP Secured Parties**"), substantially in the form of **Exhibit C**, attached to the DIP Motion;

(ii)    authorization for:

(I)    the Debtors to execute and deliver the DIP ABL Credit Agreement, and, any other agreements, instruments, pledge agreements, guarantees, security agreements, control agreements, notes, and other Credit Documents (as defined in the DIP ABL Credit Agreement) and documents related thereto (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP ABL Credit Agreement, the "**DIP ABL Documents**") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP ABL Documents;

(II)    the Debtors to execute and deliver the DIP Term Loan Credit Agreement, and any other agreements, documents, instruments and/or amendments executed and delivered in connection therewith, (collectively, the "**DIP Term Documents**," and together with the DIP ABL Documents, the "**DIP Documents**") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Term Documents;

3

(iii)    (x) the DIP Loan Parties to use the DIP ABL Facility to, (A) simultaneously with the initial draw under the DIP ABL Facility, refinance all of the outstanding Prepetition ABL Debt (as defined herein) in full, including interest, fees, cost and other charges payable thereunder through the date of repayment, together the deemed issuance and deemed incurrence of all letter of credit obligations and bank product obligations extant or otherwise issued and outstanding through such date of refinancing, which refinancing, deemed issuance and deemed incurrence shall be indefeasible upon the occurrence of the ABL Satisfaction Date, (B) for working capital and general corporate purposes of the DIP Loan Parties in accordance with the DIP ABL Documents and as permitted by the Budget (subject to the Permitted Variance, as defined and set forth in the DIP ABL Credit Agreement), and (C) for Prepetition ABL Secured Parties Adequate Protection Obligations (as defined below), and (y) the DIP Loan Parties to use proceeds of the DIP Term Financing for working capital and general corporate purposes in accordance with the terms of the DIP Term Documents and as permitted by the Budget (subject to the Permitted Variance) defined and set forth in the DIP Term Loan Credit Agreement);

(iv)    subject to the restrictions set forth in the DIP Documents, this interim period order (the "**Interim Period Order**") and the Intercreditor Agreements (as defined herein), the Debtors to, during the Interim Period, use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition ABL Secured Parties under the Prepetition ABL Documents and the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents (each as defined herein) and provide adequate protection to the Prepetition ABL Secured Parties and Prepetition Term Loan Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral), resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Collateral (including Cash Collateral), including by the Carve Out in each case occurring during the Interim Period;

(v)     the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents and this Interim Period Order;

(vi)    the Debtors to make certain Stipulations with respect to the Prepetition Credit Agreements and the liens and security interests arising therefrom;

(vii)   subject to the Carve Out and the Prepetition Intercreditor Agreement, the granting to the DIP Secured Parties of allowed superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to all assets of the DIP Loan Parties;

4

(viii)    the granting to the DIP Secured Parties of liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates (other than certain customarily excluded assets) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), subject to the Carve Out (as defined herein) and the Intercreditor Agreements;

(ix)    (a) a waiver, to the extent set forth herein, of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined herein) (together, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code, and (b) subject to entry of the Final Order, any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(x)    modification of the automatic stay to the extent set forth herein; and

(xi)    the scheduling of a final hearing (the "**Final Hearing**") to be held within 30 days of the Petition Date to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"; the Interim Period Order together with the Final Order, the "**DIP Orders**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Neil A. Augustine* (the "**DIP Declaration**"), the *Declaration of David J. Huls* (the "**First Day Declaration**"), the DIP Documents, and the evidence submitted and arguments made by the Debtors at the Initial Hearing held on February 10, 2020 (the "**Initial Hearing**"); and notice of the Initial Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Initial Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors'

assets; and it appearing that the Debtors' entry into the DIP Credit Agreements and other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INITIAL HEARING BY THE DEBTORS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:** [3]

A.     *Petition Date*.  On February 7, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court.  On February [●], 2020, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.     *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 363(m) 364(c),

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Bankruptcy Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

       D.    *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

       E.    *Notice*.  The Initial Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the DIP Motion or the entry of this Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

       F.    *Debtors' Stipulations*.  Without prejudice to the rights of the Debtors' estates or any other party in interest (but subject to the limitations thereon contained in paragraph 23 below), and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

           (i)    *Prepetition ABL Credit Facility*.  Pursuant to that certain Amended and Restated Revolving Credit Agreement dated November 12, 2015 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**," and collectively with the other Credit Documents (as defined in the Prepetition ABL Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**Prepetition ABL Documents**"), among (a) the

borrowers party thereto (the "**Prepetition ABL Borrowers**"), (b) the guarantors under the Prepetition ABL Documents (the "**Prepetition ABL Guarantors**"), (c) Wells Fargo, as administrative agent and collateral agent (in such capacities, the "**Prepetition ABL Agent**"), and (d) the lenders party thereto (the "**Prepetition ABL Lenders**," and collectively with the Prepetition ABL Agent, the "Issuing Bank" (as defined under the Prepetition ABL Credit Agreement) and the "Secured Bank Product Providers" (as defined under the Prepetition ABL Credit Agreement), the "**Prepetition ABL Secured Parties**") and the other Prepetition ABL Secured Parties party thereto, the Prepetition ABL Lenders provided revolving credit and other financial accommodations to the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "**Prepetition ABL Credit Facility**").

        (ii)    *Prepetition ABL Debt*.  As of the Petition Date, the Prepetition ABL Borrowers and the Prepetition ABL Guarantors were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $\536,338,410 (collectively, together with accrued and unpaid interest, all other "Obligations" as defined in the Prepetition ABL Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition ABL Debt**"), which Prepetition ABL Debt has been guaranteed on a joint and several basis by all of the Prepetition ABL Guarantors.  For purposes of this Interim Period Order, (x) "**ABL Satisfaction Date**" means the date of indefeasible Payment in Full (as defined herein) of the Prepetition ABL Debt; (y) the ABL Satisfaction Date shall be deemed to have occurred if Payment in Full of the Prepetition ABL Debt has occurred and the Challenge Period (as defined herein) expires without the timely and proper commencement of a Challenge Proceeding in accordance with paragraph 23 of this Interim Period Order with respect to the Prepetition ABL

Debt or against the Prepetition ABL Secured Parties, or if a Challenge Proceeding is timely and properly asserted prior to the expiration of the Challenge Period, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition ABL Secured Parties by order of a court of competent jurisdiction; and (z) "**Payment in Full**" means the occurrence of (i) the payment in full in cash or immediately available funds of all of the obligations, (ii) the termination or expiration of all commitments to extend credit to the DIP Borrowers, (iii) with respect to the Prepetition ABL Debt and DIP ABL Obligations, the termination of, providing cash collateral in respect of, or providing other security or treatment as agreed between the Debtors and the applicable Prepetition Secured Party, all outstanding letters of credit and "Secured Bank Product Obligations" (as such term is defined in the Prepetition ABL Credit Agreement and DIP ABL Credit Agreement) that compose a portion of the Prepetition ABL Debt or DIP ABL Obligations, as set forth in the Prepetition ABL Credit Agreement or DIP ABL Credit Agreement, respectively, (iv) with respect to the Prepetition ABL Debt and DIP ABL Obligations, the cash collateralization in respect of any asserted or threatened claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages for which any Prepetition ABL Secured Party, any DIP ABL Secured Party, Prepetition ABL Agent or DIP ABL Agent may be entitled to indemnification by any Debtor pursuant to the indemnification provisions in the Prepetition ABL Documents and DIP ABL Documents, as applicable, and (v) with respect to the Prepetition ABL Debt and DIP ABL Obligations, the delivery of a payoff letter (in form and substance satisfactory to Prepetition ABL Agent and DIP ABL Agent) and delivery of a general release (in form and substance satisfactory to Prepetition ABL Agent and DIP ABL Agent) of any and all claims and causes of action that could have been asserted or raised under or in connection with the Prepetition ABL Documents and the DIP ABL Documents.

(iii)     *Prepetition ABL Liens and Prepetition ABL Priority Collateral*.  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties, a first priority security interest in and continuing lien on (the "**Prepetition ABL Liens**") the Revolving Facility Collateral (as defined in that certain Prepetition Intercreditor Agreement referred to below) (which, for the avoidance of doubt, includes Cash Collateral) in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition ABL Priority Collateral**"), subject only to Prepetition ABL Permitted Prior Liens (as defined herein).

(iv)     *Prepetition Term Loan Facility*.  Pursuant to that certain Term Loan Credit Agreement dated November 12, 2015 (as amended, restated, amended and restated, supplemented, waived or otherwise modified and as in effect on the Petition Date, the "**Prepetition Term Loan Credit Agreement**" and, together with the Prepetition ABL Credit Agreement, the "**Prepetition Credit Agreements**," and collectively with the Credit Documents (as defined in the Prepetition Term Loan Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time the "**Prepetition Term Loan Documents**," and together with the Prepetition ABL Documents, the "**Prepetition Debt Documents**") among the Company, as borrower (the "**Prepetition Term Borrower**" and, together with the Prepetition ABL Borrowers, the "**Prepetition Borrowers**"), the guarantors party thereto (the "**Prepetition Term Loan Guarantors**"), the lenders party thereto (the "**Prepetition Term Loan Lenders**"), Bank of America, N.A. as administrative agent (in such capacity, the "**Prepetition Term Loan Agent**" and together with the Prepetition Term Loan Lenders, the "**Prepetition Term Loan Secured**

Parties," the Prepetition Term Loan Secured Parties, together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**") the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Borrower pursuant to the Prepetition Term Loan Documents (the "**Prepetition Term Loan Facility**" and together with the Prepetition ABL Credit Facility, the "**Prepetition Facilities**").

(v)     *Prepetition Term Loan Debt.*  The Prepetition Term Loan Facility provided the Prepetition Term Borrower with term loans in the aggregate principal amount of $1,150,000,000.00.  As of the Petition Date, the Prepetition Term Borrower and the Prepetition Term Loan Guarantors were justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of $949,000,000 in respect of loans made by the Prepetition Term Loan Lenders pursuant to, and in accordance with the terms of, the Prepetition Term Loan Documents, (collectively, together with accrued and unpaid interest and all other "Obligations" as defined in the Prepetition Term Loan Credit Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition Term Loan Debt**," and collectively with the Prepetition ABL Debt, the "**Prepetition Secured Debt**"), which Prepetition Term Loan Debt has been guaranteed on a joint and several basis by all of the Prepetition Term Loan Guarantors.

(vi)    *Prepetition Term Liens and ABL Excluded Collateral.*  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, a security interest in and continuing lien on (the "**Prepetition Term Liens**," and together with the Prepetition ABL Liens, the "**Prepetition Liens**") substantially all of their assets and property, including, (a) a first priority

(subject to certain permitted liens) security interest in and continuing lien on the "**ABL Excluded Collateral**" (as defined in the Prepetition Intercreditor Agreement; ABL Excluded Collateral together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**"), and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and the Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii)    *Validity, Perfection and Priority of Prepetition ABL Liens and Prepetition ABL Debt*.  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition ABL Priority Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition ABL Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, not subordinated and senior in priority to the Prepetition ABL Liens as of the Petition Date, the "**Prepetition ABL Permitted Prior Liens**"); (c) the Prepetition ABL Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Debt exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Debt is subject to any challenge or defense including, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no

12

claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees (in their capacities as such) arising out of, based upon or related to the Prepetition ABL Credit Facility; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition ABL Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Debt.

(viii)   *Validity, Perfection and Priority of Prepetition Term Liens and Prepetition Term Loan Debt*.  The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Liens on the Prepetition Collateral were valid, binding, non-avoidable, enforceable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Secured Parties; (b) the Prepetition Term Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral, and (2) certain liens senior by operation of law or otherwise permitted by the Prepetition Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable, and senior in priority to the Prepetition Term Liens as of the Petition Date, the "**Prepetition Term Loan Permitted Prior Liens**" and, together with the Prepetition ABL Permitted Prior Liens, the "**Permitted Prior Liens**"); (c) the Prepetition Term Loan Debt constitutes legal, valid and binding obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; and (d) the Debtors waive, discharge, and release any right to challenge the extent and priority of the liens securing the Prepetition Term Loan Debt.

(ix)     *Value of Prepetition Liens and Prepetition Claims.*  The aggregate value of the Prepetition ABL Priority Collateral exceeds the aggregate amount of the Prepetition ABL Debt and the claims of the Prepetition ABL Secured Parties arising under, or secured by, the Prepetition ABL Documents (together with all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code) constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)     *No Control.*  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Credit Agreements.

(xi)     *No Claims or Causes of Action.*  No claims or causes of action are held by the Debtors or their estates against, or with respect to, the Prepetition Secured Parties or their respective Representative (as defined herein), solely in their respective capacities as such, under the Prepetition Debt Documents.

(xii)     *Release.*  Effective as of the date of entry of this Interim Period Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective Representatives (as defined herein), solely in their respective capacities as such (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**") of any kind, nature or description, whether matured or unmatured, known or unknown, foreseen or unforeseen, liquidated or

unliquidated, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Debt Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Period Order.

(xiii)   *Cash Collateral*.   All of the cash of the Prepetition Borrowers, the Prepetition ABL Guarantors, and the Prepetition Term Loan Guarantors, other than cash held in the "Excluded Deposit Accounts" (as defined in the Prepetition ABL Credit Agreement), to the extent property of such Debtors, including any cash in deposit accounts (whether subject to control agreements or otherwise) constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code, subject to the terms of the Intercreditor Agreements.   All "Deposit Account Control Agreements" (as defined in the Prepetition ABL Credit Agreement) in effect as of the Petition Date shall remain in full force and effect notwithstanding the entry of this Interim Period Order and any subsequent orders amending this Interim Period Order, and all such Deposit Account Control Agreements shall be deemed to also be in favor of the DIP ABL Agent in respect of the DIP ABL Obligations and the DIP Term Loan Agent in respect of the DIP Term Obligations.

G.     *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)     Good and sufficient cause has been shown for the entry of this Interim Period Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Credit Agreements.

(ii)     The DIP Loan Parties have an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in each case on an interim basis, in order to consummate the prepackaged plan filed contemporaneously herewith, to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, employees and customers, to make payroll, to make capital expenditures, to refinance the Prepetition ABL Debt, and to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the DIP Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties and to a successful reorganization of the DIP Loan Parties.

(iii)     The DIP Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The DIP Loan Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties (x) granting to the DIP Secured Parties, subject to the Carve Out, the DIP Liens and the DIP Superiority Claims (as defined herein) and (y), subject to the Carve Out, incurring the

16

Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Period Order, the Intercreditor Agreements and the DIP Documents.

(iv)    Based on the DIP Motion, the DIP Declaration, the First Day Declaration, and the record presented to the Court at the Initial Hearing, the terms of the DIP Financing, the terms of the Adequate Protection Obligations, and the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Period Order and the DIP Documents are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)    To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed to have consented to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Period Order and the DIP Documents.

(vi)    The DIP Financing, the Adequate Protection Obligations, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, and the DIP Secured Parties, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation:  all DIP Loans made to the DIP Loan Parties pursuant to the DIP Documents and any DIP Obligations (including any "**Secured Bank Product Obligations**" as defined in the DIP ABL Credit Agreement) shall be deemed to have been extended by the DIP Agents and the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon

17

the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Period Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vii)    The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the DIP Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (each as defined herein)), in accordance with the terms hereof and the DIP Documents, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Period Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Period Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the DIP Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided* that nothing in this Interim Period Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Period Order and in the context of the DIP Financing authorized by this Interim Period Order, (y) be

construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Prepetition Intercreditor Agreement, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties and the rights of any other party in interest to object to such relief are hereby preserved.

(ix)     Upon entry of the Interim Period Order, the refinancing and replacement of the Prepetition ABL Debt reflects the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties. The Prepetition ABL Lenders and their affiliates that have provided prepetition secured debt to the Debtors would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens (as defined herein), and the DIP Agents and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties thereunder without the roll-up. The roll-up will benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations.

(x)     The Debtors have requested immediate entry of this Interim Period Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the relief set forth in this Interim Period Order, the DIP Loan Parties' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Period Order and the DIP Documents are therefore in the best interests of the DIP Loan Parties' estates and consistent with the DIP Loan Parties' exercise of their fiduciary duties.

19

H.      *Permitted Prior Liens; Continuation of Prepetition Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agents, the DIP Secured Parties, the Prepetition Secured Parties, or a Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests, subject to the Intercreditor Agreements.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly junior and subject to the Prepetition Liens and the DIP Liens. The Prepetition Liens, and the DIP Liens that prime the Prepetition Liens, are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facilities, the DIP Documents, and the Prepetition Debt Documents.

I.      *Intercreditor Agreements*.  Except as otherwise expressly modified herein, in the DIP Intercreditor Agreement or in the other DIP Documents, that certain Intercreditor Agreement dated November 12, 2015 between the Prepetition ABL Agent, the Prepetition Term Loan Agent and the Credit Parties party thereto (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Intercreditor Agreement**") governs the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral and is binding and enforceable in accordance with its terms.  Pursuant to section 510 of the Bankruptcy Code, but subject to the terms of this Interim Period Order and the DIP Intercreditor Agreement, the Prepetition Intercreditor Agreement and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Debt Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights

and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Period Order or otherwise and the modification of the automatic stay) with respect to the Prepetition Collateral. Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Term Secured Parties have agreed to not oppose or object to the terms of the DIP Financing or the terms of this Interim Period Order in respect thereof. The parties to the Prepetition Intercreditor Agreement stipulate, and the Court hereby finds, that the DIP ABL Facility is a "**Refinancing**" of the Prepetition ABL Credit Facility as such term is used in the Prepetition Intercreditor Agreement, the refinancing of the Prepetition ABL Debt pursuant to this Interim Period Order shall not be deemed to constitute the "**Senior Discharge Date**" (as defined in the Prepetition Intercreditor Agreement), the DIP ABL Obligations shall be deemed "Revolving Credit Obligations" (as such term is used in the Prepetition Intercreditor Agreement). The DIP Documents include a [**DIP Intercreditor Agreement**] dated as of the date of the DIP Credit Agreements, between the DIP ABL Agent, the DIP Term Loan Agent and the Debtors party thereto (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Intercreditor Agreement**"; together with the Prepetition Intercreditor Agreement, the "**Intercreditor Agreements**") govern the respective rights, interests, obligations, priority, and positions of the DIP Secured Parties with respect to the Collateral and is binding and enforceable in accordance with its terms.

J.       *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Period Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Interim Financing Approved*.  The relief sought in the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Period Order.  All objections to this Interim Period Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.     *Authorization of the DIP Financing and the DIP Documents*.

(a)     The DIP Loan Parties are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations in accordance with, and subject to the terms of this Interim Period Order and the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The DIP ABL Borrowers are hereby authorized to borrow money and incur other financial accommodations pursuant to the DIP ABL Credit Agreement, and the DIP ABL Guarantors are hereby authorized to guaranty the DIP ABL Obligations, subject in each case to any limitations on borrowing under the DIP ABL Documents, which shall be used for all purposes permitted under the DIP ABL Documents, subject to and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and this Interim Period Order including, without limitation, as set forth in paragraphs 16 and 17 herein, the "**Budget**") [4] including, without limitation, to refinance the Prepetition ABL Debt as provided herein (including the deemed issuance of letters of credit

---

[4]     A copy of the initial Budget is attached hereto as **<u>Schedule 1</u>**.

and deemed incurrence of bank product obligations as therein provided), to provide working capital for the DIP Loan Parties and for general corporate purposes and to pay Prepetition ABL Secured Parties Adequate Protection Obligations, interest, fees and expenses in accordance with this Interim Period Order and the DIP Documents.  The DIP Term Borrower is hereby authorized to borrow money pursuant to the DIP Term Loan Credit Agreement, and deposit such money in the Term Loan Proceeds Account (as defined in the DIP Credit Agreement), and the DIP Term Guarantors are hereby authorized to guaranty the DIP Term Borrower's DIP Term Loan Obligations with respect to such borrowings, in each case up to an aggregate principal amount equal to $50 million, to be fully available upon entry of the Interim Period Order subject to any limitations on borrowing under the DIP Term Documents, which shall be used for all purposes permitted under the DIP Term Documents, subject to and in accordance with the Budget, including, without limitation, to provide working capital for the DIP Loan Parties and for general corporate purposes and to pay Adequate Protection Obligations, interest, fees and expenses in accordance with this Interim Period Order and the DIP Documents,  in each case in accordance with this Interim Period Order and the DIP Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, and agreements and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties, the DIP Agents and the requisite DIP Lenders under the DIP ABL Credit Agreement and DIP Term Loan Credit Agreement, as applicable, may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and payment of amounts owed under the DIP Documents and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), that do not (A) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder, (B) increase existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee), (C) modify the definition of "Borrowing Base" (or the definitions used therein in a manner that materially modifies the terms of the Borrowing Base) in the DIP ABL Credit Agreement (it being understood and agreed that this clause (C) shall not affect the DIP ABL Agent's rights to implement reserves in accordance with the terms set forth in the DIP Documents), or (D) shorten the Case Milestones set forth in the DIP Documents;

(iii)     the non-refundable payment to the DIP Agents or the DIP Secured Parties, as the case may be, of all reasonable and documented fees payable under the DIP Debt Documents including, without limitation, unused facility fees, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's or collateral agent's fees, upfront fees, closing fees, commitment fees, exit fees, backstop fees, agency fees, and/or professional fees (which fees shall be irrevocable once paid in accordance with the terms of such DIP Debt Documents and this Interim Period Order, and shall be deemed to have been, approved upon entry of this Interim Period Order, whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement (and in any separate letter agreements between any or all DIP Loan Parties, on the one hand, and any of the DIP Agents and/or DIP Secured Parties, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time (giving effect to the Review Period), including, without limitation, the reasonable and documented fees and expenses of the

professionals retained by (A) the DIP ABL Agent, including Goldberg Kohn Ltd, as counsel, FTI Consulting, Inc., as financial advisor, McGlinchey Stafford PLLC, as maritime legal counsel and Bracewell LLP, as local legal counsel, (B) the DIP Term Loan Agent, including Stroock & Stroock & Lavan LLP and Haynes and Boone, LLP as legal counsel, and (C) advisors to the Ad Hoc Group (as defined in that certain Restructuring Support Agreement, dated January 20, 2020 by and among, *inter alia,* the Loan Parties and the DIP Term Lenders (the "**Restructuring Support Agreement**")), including Davis Polk & Wardwell LLP, as counsel, Evercore Group L.L.C., as financial advisor, Winston & Strawn LLP, as maritime counsel, and Rapp & Krock, PC, as local counsel, and such other advisors as permitted under the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement, as applicable, in each case, as provided for in the DIP Documents (collectively, the "**DIP Fees and Expenses**"), without the need to file retention motions or fee applications or to provide notice to any party; and

(iv)     the performance of all other acts necessary, appropriate, and/or desirable under or in connection with the DIP Documents.

3.     *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates thereto in accordance with the terms of the DIP Documents and this Interim Period Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy

Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agents or any of the DIP Secured Parties, in each case, under, or secured by, the DIP Documents or this Interim Period Order, including all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents.  Without limiting the foregoing, the DIP ABL Obligations shall also include all Secured Bank Product Obligations to the extent arising under the Prepetition ABL Documents (and deemed incurred under the DIP ABL Document) or the DIP ABL Documents. The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the DIP Termination Date (as defined herein), except as provided in paragraph 5 or 27 herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    *Refinancing of the Prepetition ABL Debt*.  Upon entry of this Interim Period Order, all Prepetition ABL Debt not otherwise repaid, or deemed incurred or deemed issued under the DIP ABL Credit Agreement, including all Prepetition ABL Debt consisting of accrued and unpaid interest, fees, costs, other charges and expenses, shall be repaid, replaced, deemed repaid, deemed issued or deemed incurred, or otherwise replaced, as applicable, as "Obligations" under the DIP ABL Debt Documents subject to the terms herein.  The Prepetition ABL Secured Parties would not consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP ABL Secured Parties would not be willing to provide the DIP ABL Financing or extend credit and other financial accommodations (including letters of credit and bank product obligations) to the DIP Loan Parties thereunder without the refinancing and replacement of the Prepetition ABL Credit Facility by the DIP ABL Facility and the deemed issuance and deemed incurrence of letter of credit obligations and bank product obligations as provided under the DIP ABL Credit Agreement.  All such payment of Prepetition ABL Debt shall be final, subject only to the right of parties in interest to seek a determination in accordance with paragraph 23 below that such applications to other Prepetition ABL Debt resulted in the payment of an unsecured prepetition claim of Prepetition ABL Agent and Prepetition ABL Secured Parties.  Any amounts disgorged in connection with any such objection or determination and actually received by the Debtors in cash shall be first applied to reduce the DIP ABL Obligations, dollar-for-dollar.

5.    *Carve Out*.

(a)    Carve Out.  As used in this Interim Period Order, the "**Carve Out**" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 (and any

interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by Interim Period Order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and a Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (solely with respect to the Prepetition ABL Priority Collateral and the DIP ABL Collateral), in an aggregate amount in accordance with paragraph 5 hereof; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000.00 incurred after the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by Interim Period Order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP ABL Agent or the DIP Term Loan Agent (acting at the direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)) to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the DIP Term Loan Agent (if notice is delivered by the DIP ABL Agent), counsel to the DIP ABL Agent (if notice is delivered by the DIP Term Loan Agent), and counsel to a Creditors' Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event

of Default (as defined in and under the DIP ABL Credit Agreement or the DIP Term Loan Credit Agreement) stating that the Post-Carve Out Trigger Notice Cap has been invoked.

  (b) <u>Fee Estimates</u>.

  (i) Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following entry of the Interim Period Order, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); *provided*, *that* within one business day of the delivery of the Carve Out Trigger Notice (such date of delivery, the "**Termination Declaration Date**"), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.

  (ii) If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such

Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 5(c) below.

(iii)     Solely as it relates to the DIP ABL Agent and DIP ABL Lenders, any deemed draw and borrowing pursuant to paragraph 5(c)(i)(A) for amounts under subclause (iii) of the definition of Carve Out shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date, and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "**ABL Professional Fee Carve Out Cap**").

(iv)     The DIP ABL Agent and DIP ABL Lenders shall be entitled to maintain at all times a reserve (the "**Carve Out Reserve**") in an amount (the "**Carve Out Reserve Amount**") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the following week occurring after the most

recent Calculation Date, *plus* (iv) the amounts contemplated under subclauses (i) and (ii) of the definition of Carve Out.

(v)     Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the date of this Interim Period Order, the DIP Loan Parties shall deliver to the DIP ABL Agent (with a copy to the DIP Term Loan Agent) a report setting forth the Carve Out Reserve Amount as of such time (the "**Fee Report**"), and, in setting the Carve Out Reserve, the DIP Agents and DIP Lenders shall be entitled to rely upon such Fee Reports in accordance with the DIP Documents.  Prior to the delivery of the first report setting forth the Carve Out Reserve Amount, the DIP ABL Agent may calculate the Carve Out Reserve Amount by reference to the Budget for subclause (i) of the Carve Out Reserve Amount. Notwithstanding anything herein to the contrary, the DIP ABL Agent may increase the Carve Out Reserve Amount to include additional amounts with respect to any success, completion, commission-based, or other non-hourly fees (other than fees referenced in paragraph 5(d)(vi)) billed by any Professional Person entitled to the benefit of the Carve Out.

(c)     Carve Out Reserves.

(i)     On the Termination Declaration Date, the Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors for loans under the DIP ABL Credit Agreement in an amount equal to the sum of (x) the amounts set forth in subclauses (a) and (b) of the definition of Carve Out, and (y) the then unpaid amounts of the Allowed Professional Fees in accordance with paragraph 5 hereof (any such amounts actually advanced shall constitute DIP ABL Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (which cash amounts shall

reduce, on a dollar for dollar basis, the draw requests and DIP Loans pursuant to this paragraph 5(c)(i).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees referred to in paragraph 5(c)(i) (the "**Pre-Carve Out Trigger Notice Reserve**").

(ii)   On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the DIP Loan Parties for loans under the DIP ABL Credit Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP ABL Loans) and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable loans under the DIP ABL Credit Agreement pursuant to this paragraph 5(c)(ii)).  The DIP Loan Parties shall deposit and hold such amounts in a segregated account at the DIP ABL Agent in trust exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**").

(iii)   For purposes of this Interim Period Order, "**Event of Default**" shall mean (a) an Event of Default under and as defined in the DIP ABL Documents,  (b) an Event of Default under and as defined in the DIP Term Loan Documents, (c) the Debtors' commencing, or participating in furtherance of, any solicitation of any plan of reorganization that is not the "Plan" (as defined in the DIP Documents) or such other plan of reorganization as each of the Required ABL Lenders and the Required Term Loan Lenders shall have expressly consented to such treatment in writing, or (d) failure by any Debtor to comply with, perform or observe any term,

covenant, agreement or obligation under this Interim Period Order. On the third business day following the Termination Declaration Date and the deemed requests for the making of loans under the DIP ABL Credit Agreement as provided in this paragraph 5(c), notwithstanding anything in the DIP ABL Credit Agreement to the contrary, including with respect to (1) the existence of an Event of Default under this Interim Period Order and/or the DIP ABL Credit Agreement, (2) the failure of the Debtors to satisfy any or all of the conditions precedent for the making of any loans under the DIP ABL Credit Agreement (3) any termination of the Commitments under the DIP ABL Facility following an Event of Default, or (4) the occurrence of the Termination Declaration Date, each DIP ABL Lender with an outstanding Commitment under the DIP ABL Facility shall make available to the DIP ABL Agent such DIP ABL Lender's pro rata share of such Commitment under the DIP ABL Credit Agreement.

(iv)    For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Period Order to secure payment of the Carve Out shall be limited to any shortfall in funding as provided below.

(d)    <u>Application of Carve Out Reserves</u>.

(i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subclauses (i) through (iii) of the definition of Carve Out (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full.  If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP ABL Agent on account of the applicable DIP ABL Obligations until the Payment in Full of the DIP ABL Obligations, *second* to the Prepetition ABL Agent until the Payment in Full of the applicable

Prepetition ABL Debt, *third* to the DIP Term Loan Agent on account of the DIP Term Loan Obligations until the Payment in Full of the DIP Term Loan Obligations, and *fourth* to the Debtors.

(ii)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subclause (iv) of the definition of Carve Out (the "**Post-Carve Out Amounts**").  If the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP ABL Agent on account of the applicable DIP ABL Obligations until the Payment in Full of the DIP ABL Obligations, *second* to the Prepetition ABL Agent on account of the applicable Prepetition ABL Debt, *third* to the DIP Term Loan Agent on account of the DIP Term Loan Obligations until the Payment in Full of the DIP Term Loan Obligations, and *fourth* to the Debtors.

(iii)     Notwithstanding anything to the contrary in the Prepetition Debt Documents, the DIP Documents or this Interim Period Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 5(d), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding prior to making any payments to the DIP ABL Agent or the Prepetition ABL Agent, as applicable.

(iv)     Notwithstanding anything to the contrary in the Prepetition Debt Documents, DIP Debt Documents or this Interim Period Order, following the third business day after delivery of a Carve Out Trigger Notice, the DIP Agents and Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a

35

security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in paragraphs (ii) and (iii) above.

(v)       Notwithstanding anything to the contrary in this Interim Period Order, (A) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (B) subject to the limitations with respect to the DIP ABL Agent, DIP ABL Secured Parties, Prepetition ABL Agent and Prepetition ABL Secured Parties set forth in paragraph 5(b), above, in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(vi)      Notwithstanding anything to the contrary in this Interim Period Order, in no event shall any completion fee or similar restructuring fee for Greenhill & Co., LLC be included in the Pre-Carve Out Amounts or the ABL Professional Fee Carve Out Cap or be entitled to be paid from the Pre-Carve Out Trigger Notice Reserve.  Any such fee that is an Allowed Professional Fee shall be entitled to share *pro rata* in the Post-Carve Out Amounts.

(e)     *Reservation of Rights*.  Nothing herein shall be construed to impair the right or ability of any party to object to the fees, expenses, reimbursement or other compensation of any Professional Person with respect to the Carve Out provisions.

(f)     *No Direct Obligation To Pay Allowed Professional Fees*.  The DIP ABL Agent, the DIP Term Loan Agent, the DIP ABL Secured Parties, and the DIP Term Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Period Order or otherwise

shall be construed to obligate the DIP ABL Agent, the DIP Term Loan Agent, the DIP ABL Secured Parties, and the DIP Term Lender, or the Debtors, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

6.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c) (for any time period prior to entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state-law equivalents ("**Avoidance Actions**") but including, effective upon entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with the DIP Credit

37

Agreements, the Intercreditor Agreements and this Interim Period Order, subject only to the liens on such property and the Carve Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Period Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The DIP Superpriority Claims shall be senior to the 507(b) Claims (as defined herein).

       7.     *DIP ABL Liens and DIP Term Liens*.

       (a)     *DIP ABL Liens*.  As security for the DIP ABL Obligations, effective and automatically and properly perfected upon the date of this Interim Period Order and without the necessity of the execution, recordation or filing by the DIP ABL Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP ABL Agent of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the DIP ABL Agent for its own benefit and the benefit of the DIP ABL Secured Parties (all property identified in clauses (i) through (iii) below (but excluding in each case the Excluded Property (as defined in the DIP Documents), the Excluded Deposit Accounts (as defined in the ABL DIP Credit Agreement),  and any other exclusion from the definition of "Collateral" in the DIP ABL Credit Agreement) (collectively, "**Excluded Assets**")) being collectively referred to as the "**DIP ABL Collateral**"), subject only to the Carve Out (all such liens and security interests granted to the DIP ABL Agent, for its benefit and for the benefit of the DIP ABL Secured Parties, pursuant to this Interim Period Order and the DIP ABL Documents, the "**DIP ABL Liens**"), subject to the Intercreditor Agreements:

       (i)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected,

first priority senior security interest in and lien upon all prepetition and postpetition property of the DIP ABL Loan Parties, including the Term Loan Proceeds Account, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien or is subject to a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the DIP Loan Parties (whether maintained with any of the DIP Agents or otherwise) (the "**Unencumbered Property**"), in each case other than:  (i) the Excluded Assets (as defined in the DIP ABL Credit Agreement), but including the proceeds of Excluded Assets that do not otherwise constitute Excluded Assets and (ii) the Avoidance Actions, but subject to the Carve Out (but in accordance with paragraph 5 hereof) and effective only upon entry of the Final Order, Avoidance Proceeds shall not be excluded, which security interest and lien on such Unencumbered Property securing the DIP ABL Obligations shall be senior to the security interest and lien on such Unencumbered Property securing the DIP Term Loan Obligations;

(ii)     *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all Prepetition ABL Priority Collateral, regardless of where located, regardless of whether or not any liens on such assets are voided,

39

avoided, invalidated, lapsed or unperfected, which shall prime the Prepetition ABL Liens and the Prepetition Term Liens (the "**DIP ABL Priming Liens**").  Notwithstanding anything herein to the contrary, the DIP ABL Priming Liens shall be (i) subject and junior to the Carve Out in all respects (but in accordance with paragraph 5 hereof), (ii) junior to the Prepetition ABL Permitted Prior Liens, (iii) senior in all respects to the Prepetition ABL Liens, (iv) senior to the Adequate Protection Liens and (v) senior to the DIP Term Liens and Prepetition Term Liens on such Prepetition ABL Priority Collateral.  The Prepetition ABL Liens shall be primed by and made subject and subordinate to the Carve Out (but in accordance with paragraph 5 hereof) and the DIP ABL Priming Liens on Prepetition ABL Priority Collateral, but the DIP ABL Priming Liens shall not prime the Prepetition ABL Permitted Prior Liens; and

(iii)     *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject to the Carve Out (but in accordance with paragraph 5 hereof), a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all prepetition and postpetition property of the DIP ABL Loan Parties other than the Prepetition ABL Priority Collateral that, on or as of the Petition Date, is subject to a valid, perfected and non-avoidable lien, which shall be junior to the Prepetition ABL Permitted Prior Liens and, solely with respect to the ABL Excluded Collateral, junior to the DIP Term Liens, Prepetition Term Liens and the Prepetition Term Loan Adequate Protection Liens.

(b)     *DIP Term Liens*.  As security for the DIP Term Loan Obligations, effective and perfected upon the date of this Interim Period Order and without the necessity of the execution, recordation or filing by the DIP Term Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Term Loan Agent of, or over, any Collateral, security interests and liens are hereby granted to the DIP Term Loan Agent for its own benefit and the benefit of the DIP Term Lenders (all property identified in clauses (i) through (iii) below (but excluding in each case Excluded Assets) being collectively referred to as the "**DIP Term Loan Collateral**," and collectively with DIP ABL Collateral, the "**DIP Collateral**"; all DIP Collateral other than the ABL Excluded Collateral is hereinafter referred to as the "**DIP ABL Priority Collateral**"), subject only to the payment of the Carve Out (all such liens and security interests granted to the DIP Term Loan Agent, for its benefit and for the benefit of the DIP Term Lenders, pursuant to this Interim Period Order and the DIP Term Documents, the "**DIP Term Liens**" and, together with the DIP ABL Liens, the "**DIP Liens**"), subject to the Intercreditor Agreements:

> (i)     *Liens On Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all Unencumbered Property, in each case other than:  (i) the Excluded Assets, but including the proceeds of such Excluded Assets that do not otherwise constitute such Excluded Assets; and (ii) the Avoidance Actions, but subject to the Carve Out and effective only upon entry of the Final Order, Avoidance Proceeds shall not be excluded, which security interest and lien on such Unencumbered Property securing

the DIP Term Loan Obligations shall be junior to the security interest and lien on such Unencumbered Property securing the DIP ABL Obligations;

(ii)     *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon the ABL Excluded Collateral, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which shall prime the Prepetition Term Liens (the "**DIP Term Priming Liens**").  Notwithstanding anything herein to the contrary, the DIP Term Priming Liens shall be (i) subject and junior to the Carve Out in all respects, (ii) junior to the Prepetition Term Loan Permitted Prior Liens, (iii) senior in all respects to the Prepetition Term Liens, (iv) senior to Prepetition Term Loan Adequate Protection Liens and (v) senior to the DIP ABL Liens on such ABL Excluded Collateral.  The Prepetition Term Liens shall be primed by and made subject and subordinate to the Carve Out and the DIP Term Priming Liens on ABL Excluded Collateral, but the DIP Term Priming Liens shall not prime the Prepetition Term Loan Permitted Prior Liens; and

(iii)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all prepetition and postpetition property of the DIP ABL Loan Parties other than the ABL Excluded Collateral that, on or as of the Petition Date,

is subject to a valid, perfected and non-avoidable lien, which shall be (i) junior to the Prepetition Term Loan Permitted Prior Liens, (ii) junior to the DIP ABL Liens, Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens and (iii) senior to the Prepetition Term Loan Liens.

(c)     *Liens on Specified Real Property*.  Notwithstanding anything to the contrary contained in this Interim Period Order or the DIP Documents, the DIP ABL Collateral shall not contain any real property other than the "**Specified Real Property**" (as defined in the DIP ABL Credit Agreement) until the DIP ABL Agent and each DIP ABL Lender shall have received (i) all flood insurance documentation and completed all diligence and coverage in accordance with the Flood Disaster Protection Act of 1973, as amended and (ii) in the event that any such real property is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", evidence that the Debtors have maintained flood insurance with respect to such real property (including any personal property which is located thereon) complying with the Flood Disaster Protection Act of 1973, as amended from time to time, in amounts and otherwise satisfactory to all DIP ABL Lenders.  Effective upon the satisfaction of such preceding conditions, the DIP ABL Collateral will include such Specified Real Property in respect of which such conditions have been satisfied.  Subject to the Carve Out, the Debtors shall not permit any person other than the DIP ABL Agent and the DIP Term Loan Agent to obtain directly or indirectly any lien (as adequate protection or otherwise) over the Real Property of any Debtor other than the DIP ABL Agent's and the DIP Term Loan Agent's liens over the Specified Real Property (set forth on Schedule S-1 to the DIP ABL Credit Agreement) and the Debtors shall not sell, dispose or otherwise transfer any such Specified Real Property without the consent of the DIP Agents (with respect to the DIP Term Loan Agent, acting at the

direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)).  Such

Specified Real Property shall remain property of each Debtor's estate (and the value of any

interest in Real Property securing the Prepetition ABL Obligations as of the Petition Date) will

be preserved for the benefit of such Debtor's estate in the same manner that avoided transfers are

preserved for the benefit of the estate under § 551 of the Bankruptcy Code, and any junior liens

in such property shall be and remain junior in all respects to the estate's interest in such real

property; provided that with respect to any parcel of such Real Property, after the DIP ABL Agent

has received confirmation from each DIP ABL Lender that such DIP ABL Lender has completed

its flood insurance diligence, has received copies of all flood insurance documentation and has

confirmed that flood insurance compliance has been completed as required by the Flood Laws (as

defined in the DIP ABL Credit Agreement) or as otherwise satisfactory to such DIP ABL Lender,

then pursuant to this Interim Period Order such parcel of Real Property shall be automatically

become DIP ABL Priority Collateral (defined below) and DIP ABL Collateral, for the benefit of

the DIP ABL Secured Parties, as security for the DIP ABL Obligations, but subject to the Carve

Out.

8.      *Maintenance of Letters of Credit and Secured Bank Product Obligations.*  Upon

entry of this Interim Period Order, all letters of credit issued under and all Secured Bank Product

Obligations incurred under the Prepetition ABL Credit Agreement shall continue in place and all

obligations under or in connection with such letters of credit shall be deemed issued under, and all

obligations under or in connection with such Secured Bank Product Obligations, deemed incurred

under, and otherwise subject to the DIP ABL Credit Agreement and shall constitute DIP ABL

Obligations.  To the extent permitted by the DIP Documents, the DIP ABL Borrowers are

authorized to maintain and renew letters of credit issued or deemed issued under the DIP Credit

Agreements, and incur or deemed to have incurred Secured Bank Product Obligations, on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis.

9.      *Protection of DIP Secured Parties' Rights*.

(a)      So long as there are any DIP Obligations outstanding or any DIP Lenders have any outstanding Commitments (as defined in the DIP Credit Agreements), then with respect to any DIP Collateral, the Prepetition Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Agreements or this Interim Period Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, or the Adequate Protection Liens except to the extent required by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of all DIP Obligations and termination of the Commitments), to the extent such transfer, disposition, sale or release is permitted under the applicable DIP Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such Collateral unless, solely as to this clause (iii), any of the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)) or the DIP Secured Parties file financing statements or other documents to perfect the liens granted pursuant to this Interim Period Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date.

(b)     Unless the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)), the Prepetition ABL Agent and the Prepetition Term Loan Agent (acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement)) shall have provided their prior written consent or all DIP Obligations and all Adequate Protection Obligations have been indefeasibly paid in full in cash and the lending commitments under the DIP Facilities have terminated (including Payment in Full of all Prepetition ABL Debt and DIP ABL Obligations), there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following:  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and/or the 507(b) Claims except as expressly set forth in this Interim Period Order or the DIP Documents; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Period Order; (iii) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; or (iv) any modification of any of the DIP Agents', DIP Secured Parties', or the Prepetition Secured Parties' rights under this Interim Period Order, or the DIP Documents with respect to any DIP Obligations, Adequate Protection Obligations, or other obligations or rights under this Interim Period Order.

(c)     Until the DIP Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been indefeasibly paid in full in cash

(including Payment in Full of all Prepetition ABL Debt and DIP ABL Obligations), the Debtors shall (i) maintain books, records, and accounts to the extent and as required by the DIP Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by such parties) to provide under the DIP Documents or the provisions of this Interim Period Order; (iii) upon reasonable advance notice, permit, the DIP Secured Parties and the Prepetition Secured Parties, and their respective advisors to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents; (iv) permit the DIP Secured Parties and the Prepetition Secured Parties, and their respective advisors to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets; and (v) upon reasonable advance notice, permit the DIP Secured Parties and the Prepetition Secured Parties to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and the Prepetition Collateral in accordance with the DIP Documents and the Prepetition Debt Documents.

(d)     To the extent any Prepetition Secured Party has possession of any Collateral or has control with respect to any Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent

for perfection for the benefit of the applicable DIP Agent and the DIP Secured Parties and shall comply with the instructions of the applicable DIP Agent (with respect to the DIP Term Loan Agent, acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)) with respect to the exercise of such control and the applicable DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties, including with respect to bank accounts.

(e)     Immediately upon the occurrence and during the continuation of an Event of Default under any of the DIP Documents or hereunder, notwithstanding the automatic stay provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before or order from the Court, but subject to the terms of this Interim Period Order (including the Carve Out) and the Intercreditor Agreements, each of the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)) may declare (any such declaration, a "**Termination Notice**") (A) the termination, reduction or restriction of any further Commitment to the extent any such Commitment remains, and, except as otherwise provided below in this paragraph 9(e) below, the termination of authorization to use Cash Collateral, (B) all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, (C) the termination of the applicable DIP Documents as to any future liability or obligation of the applicable DIP Agent or DIP Secured Parties (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations) and (D) demand cash collateral as provided for in the applicable DIP Documents.

48

The Termination Notice shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the DIP ABL Agent (if delivered by the DIP Term Loan Agent), counsel to the DIP Term Loan Agent (if delivered by the DIP ABL Agent), counsel to a Creditors' Committee (if appointed), and the U.S. Trustee.  The DIP Secured Parties shall be entitled to seek an expedited hearing (a "**Remedies Hearing**") on three business days' notice (subject to the Court's availability) for an order modifying the automatic stay in the Chapter 11 Cases such that: (a) the applicable DIP Secured Parties shall be entitled to exercise their rights and remedies, subject to the Intercreditor Agreements and in accordance with the respective DIP Documents and this Interim Period Order, to satisfy the relevant DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve Out, and (b) the applicable Prepetition Secured Parties shall be entitled to exercise their rights and remedies, subject to the Intercreditor Agreements and in accordance with the applicable Prepetition Documents and this Interim Period Order, to satisfy the relevant 507(b) Claims (as defined herein) and Adequate Protection Liens (as defined herein), subject to the Carve Out.  Subject to paragraph 5 hereof) the sole issue that the Debtors may bring before the Court at any such Remedies Hearing is whether an Event of Default has occurred and/or is continuing. Upon the Termination Notice or the occurrence of the DIP Termination Date (as defined in the DIP Documents), without further notice or order of the Court, the Debtors' authorization to use Cash Collateral and incur DIP Financing hereunder will automatically terminate and the DIP Secured Parties will have no obligation to provide any DIP Loans or other financial accommodations; *provided*, until the resolution of the Remedies Hearing, (x) the Debtors may use Cash Collateral to pay accrued and unpaid employee wages and benefits payable in the ordinary course in accordance with the Budget and (y) the Debtors may request DIP Loans or use Cash Collateral to pay the Carve Out to the extent set forth herein.

(f)      In no event shall the DIP Agents, DIP Secured Parties or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral, absent the express written consent of the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)), the Prepetition Term Loan Agent (acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement)), and the Prepetition ABL Agent (as applicable).  Further, subject only to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.

(g)      No rights, protections or remedies of the DIP Agents or the DIP Secured Parties granted by the provisions of this Interim Period Order or any DIP Documents shall be limited, modified or impaired in any way by:  (i) any actual or purported withdrawal of the consent of any party to the DIP Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the DIP Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

(h)      If a DIP Agent takes any enforcement action with respect to the Collateral, the applicable Prepetition Secured Parties and DIP Loan Parties (i) shall cooperate with the applicable DIP Agent (subject to the condition that no Prepetition Secured Party shall have any obligation or duty to take any action, or refrain from taking any action, that could reasonably be expected to result in the incurrence of any liability or damage to any Prepetition Secured Party) in its efforts to enforce its security interest in the Collateral, and (ii) shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Agent

from enforcing their security interests in the Collateral; *provided* that the actions of a DIP Agent with respect to any enforcement action shall at all times be subject to, and in accordance with, the Intercreditor Agreements; *provided*, *further*, the Prepetition Secured Parties shall be indemnified and held harmless to the extent provided in any applicable Prepetition Debt Document for any loss, liability or obligation incurred in connection with any of the foregoing.

10.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Term Loan Agent (acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)) and the DIP ABL Agent, the Prepetition ABL Agent (prior to the ABL Satisfaction Date), or the Prepetition Term Loan Agent, as the case may be, that holds a lien on the relevant asset (for any time period prior to entry of the Final Order), and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Secured Parties, the Prepetition ABL Agent or the Prepetition Term Loan Agent, and nothing contained in this Interim Period Order shall be deemed to be a consent by the DIP Agents, the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

11.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agents (on their own behalf or on behalf of the DIP ABL Secured Parties or the DIP Term Loan Secured Parties) or the Prepetition Secured Parties pursuant to the provisions of the DIP Orders or

any subsequent order of the Court shall, subject to the reservation of rights set out in paragraph 23 of this Interim Period Order, be irrevocably received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors.

12.      *Use of Cash Collateral*.  The DIP Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Period Order and the DIP Documents (including the Budget subject to the Permitted Variance), to use all Cash Collateral, and the Prepetition Secured Parties are directed promptly to turn over to the DIP Loan Parties all Cash Collateral received or held by them (other than any Cash Collateral received or held by such Prepetition Secured Party in connection with any Secured Bank Product Obligations continuing to be provided after the Petition Date and other than as set forth in the Emergency Motion of Debtors for an Order (i) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, and (D) Continue Using Credit Cards; (II) Granting an Extension of Time to Comply With Requirements of 11 U.S.C.§§345(B); and (III) Granting Related Relief; *provided* that (a) the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth, and (b) except on the terms and conditions of this Interim Period Order, the DIP Loan Parties shall be enjoined and prohibited from, at any time, using the Cash Collateral absent further order of the Court.

13.      *Disposition of DIP Collateral*.

(a)      The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP ABL Agent and the Prepetition ABL Agent (and no such consent shall

be implied, from any other action, inaction or acquiescence by the DIP ABL Secured Parties or the Prepetition ABL Secured Parties, or from any order of this Court), except as otherwise provided for in the DIP ABL Documents or otherwise ordered by the Court, and subject to the Intercreditor Agreements.

(b)     The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Term Loan Agent (acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)) (and no such consent shall be implied, from any other action, inaction, or acquiescence by the DIP Term Loan Secured Parties or the Prepetition Term Loan Secured Parties, or from any order of this Court), except as otherwise provided for in the DIP Term Documents or otherwise ordered by the Court, and subject to the Intercreditor Agreements.

14.     *Adequate Protection of Prepetition ABL Secured Parties*.  The Prepetition ABL Secured Parties are entitled pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition ABL Priority Collateral, including the Cash Collateral, for any reason provided for under the Bankruptcy Code, including, without limitation, the aggregate diminution in value (the "**ABL Diminution in Value**") of the Prepetition ABL Secured Parties' interests in the Prepetition ABL Priority Collateral resulting from the depreciation, sale, lease or use by the DIP Loan Parties (or other decline in value) of the Prepetition ABL Priority Collateral, the priming of the Prepetition ABL Liens by the DIP ABL Liens pursuant to the DIP ABL Documents and this Interim Period Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from the Petition Date through the date of entry of the Final Order.  Nothing herein shall impair or modify the

application of section 507(b) in the event that the adequate protection provided to the Prepetition ABL Secured Parties under this Interim Period Order or the Final Order is insufficient to compensate for the ABL Diminution in Value.  Providing the Prepetition ABL Secured Parties Adequate Protection Obligations to the Prepetition ABL Secured Parties shall not be deemed an admission that the respective interests of the Prepetition ABL Secured Parties are adequately protected.  This Interim Period Order and the Final Order shall not prejudice or limit the rights of the Prepetition ABL Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.  As adequate protection, the Prepetition ABL Secured Parties are hereby granted the following, in each case, subject to the Carve Out and the Intercreditor Agreements (but in accordance with paragraph 5 hereof) (collectively, the "**Prepetition ABL Secured Parties Adequate Protection Obligations**"):

(a)    <u>Prepetition ABL Adequate Protection Liens</u>.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Secured Parties) is hereby granted (effective and perfected upon the date of this Interim Period Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) a continuing, binding, enforceable, valid, perfected, replacement security interest in and lien (the "**Prepetition ABL Adequate Protection Liens**") (subject to the limitations set forth above) upon the DIP Collateral including, but not limited to, the Term Loan Proceeds Account (it being understood that, subject to and effective upon entry of the Final Order, the Prepetition ABL Adequate Protection Liens (as defined herein) shall attach to Avoidance Proceeds, which shall be senior to the Prepetition Term Loan Adequate Protection Liens on such Avoidance Proceeds) to secure the ABL Diminution in Value, subject and subordinate only to (i) the DIP ABL Liens (and any liens

to which the DIP ABL Liens are junior) (ii) in the case of the ABL Excluded Collateral, the DIP Term Liens (and any liens to which the DIP Term Liens are junior), the Prepetition Term Liens and the Prepetition Term Loan Adequate Protection Liens, and (iii) the Carve Out (but in accordance with paragraph 5 hereof).

        (b)     <u>Prepetition ABL Section 507(b) Claim.</u>  The Prepetition ABL Secured Parties are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in an amount equal to the ABL Diminution in Value that is not otherwise satisfied pursuant to this paragraph 14, if any, with, except as set forth in this Interim Period Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition ABL 507(b) Claim**").  The Prepetition ABL 507(b) Claim shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, without limitation, subject to upon entry of the Final Order, the Avoidance Proceeds).  The Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims granted in respect of the DIP Obligations and shall be *pari passu* with the Prepetition Term Loan 507(b) Claim (as defined herein).  Except to the extent expressly set forth in this Interim Period Order or the DIP Credit Agreements, the Prepetition ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition ABL 507(b) Claim unless and until the DIP ABL Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims in respect of the DIP ABL

Obligations have indefeasibly been paid in cash in full and all Commitments have been terminated (including the Payment in Full of the DIP ABL Obligations).

(c)      Prepetition ABL Adequate Protection Payments.  Subject to the Carve Out as set forth in this Interim Period Order, as further adequate protection, the Debtors are authorized and directed to provide adequate protection to the Prepetition ABL Secured Parties in the form of payment in cash of solely to the extent that any Prepetition ABL Debt remains outstanding after entry of this Interim Period Order, interest (at the default rate) due under the Prepetition ABL Documents, subject to the rights preserved in paragraph 23 below (the "**Prepetition ABL Adequate Protection Payments**").

(d)      Prepetition ABL Agent's Fees and Expenses.  Subject to the Carve Out as set forth in this Interim Period Order, the Debtors are authorized and directed to provide adequate protection to the Prepetition ABL Secured Parties in the form of payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) of (i) upon the Closing Date, payment of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of Goldberg Kohn Ltd., as counsel, FTI Consulting, Inc., as financial advisor, McGlinchey Stafford PLLC, as maritime legal counsel and Bracewell LLP, as local legal counsel, and other advisors as provided in the Prepetition ABL Credit Agreement) incurred by the Prepetition ABL Agent arising prior to the Petition Date and invoiced to the Debtors at least two (2) business days prior to the Closing Date, and (ii) subject to the Review Period and paragraph 19, the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of Goldberg Kohn Ltd., as counsel, FTI Consulting, Inc., as financial advisor, McGlinchey Stafford PLLC, as maritime legal counsel

and Bracewell LLP, as local legal counsel, and other advisors as provided in the Prepetition ABL Credit Agreement) incurred by the Prepetition ABL Agent arising subsequent to the Petition Date (collectively, the "**ABL Adequate Protection Fees and Expenses**").  Pursuant to the terms of the DIP ABL Credit Agreement, any contingent indemnification obligations under the Prepetition ABL Documents shall be "rolled-up" into the DIP ABL Credit Agreement and, subject to the reservation of rights in paragraph 23 hereof, be obligation of the Debtors.

(e)     Information Rights.  The Debtors shall promptly provide the Prepetition ABL Agent, on its own behalf and on behalf of the Prepetition ABL Secured Parties, respectively, with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Secured Parties under the DIP Debt Documents.

(f)     The Prepetition ABL Secured Parties Adequate Protection Obligations in subparagraph (e) above shall survive the Payment in Full of the DIP ABL Obligations.  Following any such Payment in Full of the DIP ABL Obligations, the Prepetition ABL Secured Parties Adequate Protection Obligations may be waived, amended, modified or extended from time to time solely by Prepetition ABL Agent or the Required Lenders (as defined in the Prepetition ABL Credit Agreement), each in their sole discretion.

15.     *Adequate Protection of Prepetition Term Loan Secured Parties*.  The Prepetition Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, for any reason provided for under the Bankruptcy Code, including, without limitation, , the aggregate diminution in value (the "**Term Diminution in Value**") of the Prepetition Term  Secured Parties' interests in the Prepetition Collateral resulting from the depreciation, sale, lease or use by the DIP Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition

Term Liens by the DIP Liens pursuant to the DIP Documents and this Interim Period Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code from the Petition Date through the date of entry of the Final Order.  Nothing herein shall impair or modify the application of section 507(b) in the event that the adequate protection provided to the Prepetition Term Loan Secured Parties under this Interim Period Order or the Final Order is insufficient to compensate for Term Diminution in Value.  Providing the Prepetition Term Loan Secured Parties Adequate Protection Obligations to the Prepetition Term Loan Secured Parties shall not be deemed an admission that the respective interests of the Prepetition Term Loan Secured Parties are adequately protected.  This Interim Period Order and the Final Order shall not prejudice or limit the rights of the Prepetition Term Loan Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.  As adequate protection of, the Prepetition Term Loan Secured Parties are hereby granted the following, in each case, subject to the Carve Out and the Intercreditor Agreements (collectively, the "**Prepetition Term Loan Adequate Protection Obligations**," and together with the Prepetition ABL Secured Parties Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

(a)     <u>Prepetition Term Loan Adequate Protection Liens</u>.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Prepetition Term Loan Agent (for itself and for the benefit of the Prepetition Term Loan Lenders) is hereby granted (effective and perfected upon the date of this Interim Period Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) a continuing, binding, enforceable, valid, perfected replacement security interest in and lien (the "**Prepetition Term Loan Adequate Protection Liens**" and together with the Prepetition ABL Adequate Protection Liens, the "**Adequate Protection Liens**") (subject to the limitations set forth

above) upon the DIP Collateral (it being understood that, subject to and effective upon entry of the Final Order, Prepetition Term Loan Adequate Protection Liens shall attach to Avoidance Proceeds, which shall be junior to the Prepetition ABL Adequate Protection Liens on such Avoidance Proceeds) to secure the Term Diminution in Value, subject and subordinate only to (i) the DIP Term Liens (and any liens to which the DIP Term Liens are junior), (ii) in the case of the DIP ABL Priority Collateral, the DIP ABL Liens (and any liens to which the DIP Term Liens are junior), the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens and (iii) the Carve Out.

(b)  *Prepetition Term Loan Secured Parties Section 507(b) Claim*.  The Prepetition Term Loan Secured Parties are hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in an amount equal to the Term Diminution in Value that is not otherwise satisfied pursuant to this paragraph 15, if any, with, except as set forth in this Interim Period Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition Term Loan 507(b) Claim**" and, together with the Prepetition ABL 507(b) Claim, the "**507(b) Claims**").  The Prepetition Term Loan 507(b) Claim shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, upon entry of the Final Order, the Avoidance Proceeds).  The Prepetition Term Loan 507(b) Claim shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims granted in respect of the DIP Obligations and shall be *pari passu* with the Prepetition ABL 507(b) Claim. Except to the extent expressly set forth in this Interim Period Order or the DIP Credit Agreements, the Prepetition Term Loan Secured Parties shall not receive or retain any payments, property or

other amounts in respect of the Prepetition Term Loan 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all Commitments have been terminated (and in respect of the DIP ABL Obligations, Payment in Full of the DIP ABL Obligations).

        (c)    <u>Prepetition Term Loan Secured Parties Fees and Expenses</u>.  Subject to the Carve Out as set forth in this Interim Period Order, the Prepetition Term Loan Agent shall receive from the DIP Loan Parties, in each case subject to the Review Period, for the benefit of the Prepetition Term Loan Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to (i) the Prepetition Term Loan Agent, including Cahill Gordon & Rendel LLP, as counsel and (ii) reasonable and documented prepetition and postpetition fees and expenses payable to the Ad Hoc Group advisors, including Davis Polk & Wardwell LLP, as counsel, Evercore Group L.L.C., as financial advisor, Winston & Strawn LLP, as maritime counsel, and Rapp & Krock, PC, as local counsel, and such other advisors to the Ad Hoc Group and as may be reasonably consented to by the Debtors, which payments shall be made in the manner provided for in paragraph 19 below (together with the ABL Adequate Protection Fees and Expenses, the "**Adequate Protection Fees and Expenses**").

        (d)    <u>Information Rights</u>.  The Debtors shall promptly provide the Prepetition Term Loan Agent, on its own behalf and on behalf of the Prepetition Term Lenders, respectively, with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Secured Parties under the DIP Debt Documents.

        (e)    <u>Milestones</u>.  Performance of the Case Milestones, in each case as may be waived, amended, modified or extended from time to time in accordance with the Restructuring

Support Agreement, or, to the extent the Restructuring Support Agreement is no longer in force and effect, by the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement).

(f)     The Prepetition Term Loan Secured Parties Adequate Protection Obligations in subparagraphs (d) above shall survive any termination of the DIP Term Loan Credit Agreement or the Commitments thereunder.  Following any such termination of the DIP Term Loan Credit Agreement or the Commitments thereunder, the Prepetition Secured Term Loan Adequate Protection Obligations may be waived, amended, modified or extended from time to time solely by the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement) in their sole discretion.

16.     *Budget Maintenance*.  The use of borrowings and other extensions of credit by the Debtors under the DIP Documents and the use of Cash Collateral shall be limited in accordance with the Budget (subject in all respects to the Permitted Variance).  The initial Budget shall depict, on a weekly and line item basis, for the first thirteen (13) week period from the Closing Date (as defined in the DIP Credit Agreements) (A) (i) projected operating receipts, (ii) projected disbursements, including ordinary course operating expenses and bankruptcy-related expenses (including professional fees and expenses, asset sales and any other fees and expenses relating to the DIP Documents), (iii) net cash flow, (iv)  projected Availability (each as defined in the DIP ABL Credit Agreement), and (vi) total available liquidity, and (B) the other items set forth therein and such other information requested by the DIP Agents, and such initial Budget shall be approved by, and in form and substance reasonably satisfactory to, each of the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)) in their sole discretion (it being acknowledged and agreed that the Budget attached hereto as **Schedule 1** is approved by and satisfactory to the DIP Agents under

each of the DIP Credit Agreements).  The Budget shall be updated, modified or supplemented by the Debtors not less than one time each month, and each such updated, modified or supplemented budget shall be deemed an approved Budget unless either of the DIP Agents (in acting at the direction of the applicable Required Lenders, in their sole discretion) objects by written notice delivered to the Debtors on or within three (3) business days after the receipt of such updated, modified or supplemented budget; *provided*, that in the event that either of the DIP Agents objects, the current approved Budget shall remain the approved Budget until the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)) and the Debtors agree as to an updated, modified or supplemented Budget.  Each Budget delivered to the DIP Agents shall be accompanied by such supporting documentation as reasonably requested by the DIP Agents.  Each Budget shall be prepared in good faith based upon assumptions that the Debtors believe to be reasonable.  A copy of any Budget (or updated Budget) shall be delivered to counsel for a Creditors' Committee (if appointed) and the U.S. Trustee after it has been approved in accordance with the DIP Documents.

17. *Budget Compliance*.  The Debtors shall at all times comply with the Budget, subject to the variances permitted under the DIP Credit Agreements; *provided*, that in the case of the fees, costs and expenses of the DIP Agents, the DIP Secured Parties, the Ad Hoc Group and the Adequate Protection Fees and Expenses, the Debtors shall pay such fees, costs, and expenses in accordance with the DIP Documents and this Interim Period Order without being limited by the Budget and such payments shall not be calculated in any variance.  The Debtors shall provide all reports and other information as required in the DIP Credit Agreements (subject to the grace periods provided therein). The Debtors' failure to comply with the Budget (including the variances permitted under the DIP Credit Agreements) or to provide the reports and other information

required in the DIP Credit Agreements shall constitute an Event of Default under the DIP Credit Agreements and an Event of Default hereunder, following the expiration of any applicable grace period set forth in the DIP Credit Agreements or hereunder and absent a waiver in accordance with the applicable DIP Credit Agreement or hereunder.

18.     *Milestones*.  As a condition to the DIP Facilities and the use of Cash Collateral, the Debtors shall comply with the required milestones (as attached as **Exhibit D** to the DIP Motion) (collectively, the "**Case Milestones**").  Any Case Milestone that would otherwise fall on a Saturday, Sunday or federal holiday will be treated in accordance with Bankruptcy Rule 9006.  For the avoidance of doubt, the failure of the Debtors to comply with any of the Case Milestones shall (a) constitute an Event of Default under (i) each of the DIP Credit Agreements and (ii) this Interim Period Order; and (b) permit the DIP Agents to exercise the rights and remedies provided for in this Interim Period Order and the DIP Documents, subject to the Intercreditor Agreements and the provisions of this Interim Period Order.

19.     *Payment of Fees and Expenses*.  The Debtors are authorized and directed to pay the DIP Fees and Expenses, as provided in the DIP Documents.  Subject to the review procedures set forth in this paragraph 19, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance by the Court.  Professionals for the DIP Secured Parties and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices

shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the Creditors' Committee (if appointed) and the U.S. Trustee.  Any objections raised by the Debtors, the U.S. Trustee or a Creditors' Committee (if appointed) with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice (the "**Review Period**") if after the Review Period an objection remains unresolved, it will be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need to provide notice to any other party or otherwise comply with the procedures set forth in this paragraph 19 provided that invoices for such fees and expenses were provided to the Debtors at least two (2) business days prior to the Closing Date.  No attorney or advisor to the DIP Secured Parties or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP Secured Parties in connection with or with respect to the DIP Facilities; and (ii) except as provided in paragraph 23, the Prepetition Secured Parties in connection with or with respect to these matters, are hereby approved in full and shall not be subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person.

20.      *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is

reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that any of the Prepetition Secured Parties, upon a change in circumstances, may request further or different adequate protection, and the Debtors or any other party may contest any such request. Subject to the Carve Out as set forth in this Interim Period Order, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any diminution in value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.  Further, this Interim Period Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

21.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 7 hereof and the Adequate Protection Liens granted pursuant to paragraph 7 hereof, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents (on behalf of the DIP ABL Secured Parties and DIP Term Loan Secured Parties) or the Prepetition Secured

Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Period Order.  Upon the reasonable request of a DIP Agent (with respect to the DIP Term Loan Agent, acting at the direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)), each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the applicable DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  The Prepetition ABL Agent shall serve as agent for DIP ABL Agent for purposes of perfection or control in respect of any DIP Collateral, and deposit account control agreements, leases, licenses, landlord agreements, warehouse agreements, bailment agreements, insurance policies, contracts or similar agreements in which Prepetition ABL Agent has an interest will be deemed to be for the benefit of DIP ABL Agent and DIP ABL Secured Parties without further action by any party, and, to the extent set forth in the DIP Intercreditor Agreement, the DIP ABL Agent will be the gratuitous bailee of the DIP Term Loan Agent for the benefit of the DIP Term Loan Secured Parties with respect to the foregoing.

(b)     A certified copy of this Interim Period Order may, in the discretion of the DIP Agents (with respect to the DIP Term Loan Agent, acting at the direction of Required Lenders (as defined in the DIP Term Loan Credit Agreement)), be filed with or recorded in filing or

recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Period Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

22. *Preservation of Rights Granted Under This Interim Period Order*.

(a) Other than the Carve Out and other claims and liens expressly granted by this Interim Period Order (or permitted under the DIP Credit Agreements), no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Period Order to the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties shall be granted or allowed while any of the applicable DIP Obligations or Adequate Protection Obligations remain outstanding and the DIP Liens, and Adequate Protection Liens shall <u>not</u> be:

(i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code;

(ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise;

(iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; and

(iv)      subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

Unless all DIP Obligations shall have been indefeasibly paid in full in cash and the Commitments have been terminated (including Payment in Full of all Prepetition ABL Debt and DIP ABL Obligations), the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the DIP Loan Parties, without the prior written consent of the DIP Term Loan Agent (acting at the direction of the Required Lenders (as defined in the DIP Term Loan Credit Agreement)) and the DIP ABL Agent, seeks, proposes, supports, or consents to or if there is entered or confirmed (in each case, as applicable):  (i) any modifications, amendments or extensions of this Interim Period Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party; (ii) an order converting or dismissing any of the Chapter 11 Cases; (iii) an order appointing a chapter 11 trustee in the Chapter 11 Cases; (iv) an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (v) except to the extent contemplated under the Restructuring Support Agreement, a plan of reorganization that does not provide for immediate Payment in Full of all DIP ABL Obligations, DIP Term Loan Obligations and Prepetition ABL Debt, as applicable (including a general release in favor of the DIP ABL Secured Parties, DIP Term Loan Secured Parties and Prepetition ABL Secured Parties in form and substance satisfactory to the DIP Agents and Prepetition ABL Agent), on the effective date of such plan; or (vi) the sale of all or substantially all of the assets of the DIP Loan Parties (except to the extent permitted under the DIP Documents), which does not provide for the Payment in Full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made) and the Prepetition ABL Debt upon

68

the consummation thereof.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or that otherwise is at any time entered:  (i) the DIP Superpriority Claims, the DIP Liens, the 507(b) Claims, the Adequate Protection Liens, the Carve Out and, prior to the ABL Satisfaction Date, the Prepetition ABL Liens, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Period Order and the Intercreditor Agreements until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (including Payment in Full of all Prepetition ABL Debt and DIP ABL Obligations), and such DIP Superpriority Claims, DIP Liens, 507(b) Claims and Prepetition Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Period Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Period Order.

(b)     If any or all of the provisions of this Interim Period Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect:  (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by each of the DIP Agents, the Prepetition ABL Agent or the Prepetition Term Loan Agent as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation, stay or any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the DIP Loan Parties to the DIP Agents, the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the

69

DIP Agents, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Period Order, and the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Period Order and the DIP Documents.

(c)      Except as provided in this Interim Period Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Period Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by:  (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Period Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims and the Adequate Protection Obligations and all other rights and

remedies of the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Period Order and the DIP Documents shall continue in full force and effect until the DIP Obligations and the Prepetition Secured Debt are indefeasibly paid in full in cash (other than, with respect to the Prepetition Secured Debt, contingent obligation in respect of unasserted claims), including Payment in Full of all DIP ABL Obligations and Prepetition ABL Debt, as set forth herein and in the DIP Documents and the Prepetition Documents, as applicable, and the Commitments have been terminated.

23.    *Effect of Stipulations on Third Parties.*    The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Period Order shall be binding upon the Debtors in all circumstances and for all purposes.   The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Period Order shall be binding upon all parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless:

(a)     except as otherwise provided under any confirmation order and confirmed plan of reorganization in these Chapter 11 Cases, such committee or any other party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing granted by the Court by no later than a date that is the later of (x) if a Creditors' Committee is not appointed, 75 days after entry of this Interim Period Order, (y) if a Creditors' Committee is appointed, 60 days after entry of the Final Order, unless any such later date as has been agreed to, in writing, by the Prepetition ABL

Agent or the Prepetition Term Loan Agent (with the consent of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement)), as applicable, and (z) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt, the Prepetition ABL Liens or the Prepetition Term Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, a "**Challenge Proceeding**") against the Prepetition Secured Parties or their respective affiliates, subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Credit Agreements, the Prepetition Secured Debt, the Prepetition ABL Liens, the Prepetition Term Liens or the Prepetition Collateral; and

(b)     there is a final non-appealable order in favor of the plaintiff in any such Challenge Proceeding; *provided*, that any pleadings commencing any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred; and *provided further*, nothing contained herein shall preclude or otherwise limit the rights of the Creditors' Committee or any party to seek to intervene, or to appear and be heard under 11 U.S.C. § 1109(b).  For the avoidance of doubt, any informal discovery or examination conducted pursuant to Bankruptcy Rule 2004 relating to the foregoing matters or

claims shall not be deemed or construed to be a Challenge Proceeding.  If no such Challenge

Proceeding is timely and properly filed during the Challenge Period or the Court does not rule in

favor of the plaintiff in any such proceeding then:

    (a)    the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Period Order shall be binding on all parties in interest, including, without limitation, the Creditors' Committee;

    (b)    the obligations of the DIP Loan Parties under Prepetition Credit Agreements, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in these Chapter 11 Cases, and any subsequent chapter 7 case(s);

    (c)    the Prepetition ABL Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens;

    (d)    and the Prepetition Term Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens; and

    (e)    the Prepetition Term Loan Debt, the Prepetition Term Liens, the Prepetition ABL Liens and the Prepetition ABL Debt shall not be subject to any other or further claim or challenge by the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to the Prepetition Credit Agreements shall be deemed forever waived, released and barred.

If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations,

admissions, agreements, and releases contained in this Interim Period Order, shall nonetheless

remain binding and preclusive (as provided in the immediately preceding sentence and including

subparagraphs (a) through (e) above) on the Creditors' Committee and on any other person or

entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. If any party in interest (including the Creditors' Committee) identifies a basis to assert a Challenge Proceeding, it must notify the Debtors during the Challenge Period of its demand that the Debtors initiate an action or adversary proceeding relating thereto.  From the date that the Debtors are so notified, the Debtors shall have five days to notify such party in interest of whether the Debtors intend to initiate or settle such action and ten days to initiate such action, settlement motion or adversary proceeding.  If the Debtors notify such party in interest that the Debtors to not intend to initiate an action, settlement or adversary proceeding, such party in interest shall have ten days from the receipt of such notice to seek standing to initiate an action or adversary proceeding.  Nothing in this Interim Period Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenge Proceedings with respect to the Prepetition Credit Agreements, the Prepetition Secured Debt, the Prepetition ABL Liens and the Prepetition Term Liens.  If the Debtors are timely notified of any potential Challenge Proceeding, the Debtors shall retain authority to prosecute, settle or compromise any such Challenge Proceeding in the exercise of their business judgment and subject to any applicable further order of this Court.

24.     *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding anything herein or in any other order by this Court to the contrary, no DIP Loans, Cash Collateral, DIP Collateral, Prepetition Collateral, proceeds of any of the foregoing or the Carve Out may be used to:

(a)     permit the Debtors, or any other party in interest, or their representatives to challenge or otherwise contest or institute any proceeding to determine (x) the amount, validity, perfection or priority of security interests in favor of any of the DIP Secured Parties or the Prepetition Secured Parties or (y) the amount, validity or enforceability of the obligations of the Debtors under the DIP Credit Agreements or the Prepetition Credit Agreements,

(b)     subject to paragraph 5 hereof, prevent, hinder or otherwise delay any of the DIP Agents or the Prepetition Secured Parties' assertion, enforcement or realization on the Collateral in accordance with the DIP Documents, the Prepetition Credit Agreements or the DIP Orders, other than to seek a determination that an Event of Default has not occurred or is not continuing,

(c)     seek to modify any of the rights granted to the DIP Agents, the DIP Secured Parties or the Prepetition Secured Parties under the DIP Orders, the DIP Documents or the Prepetition Debt Documents, in each of the foregoing cases without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion,

(d)     pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court (including, without limitation, hereunder) and (ii) permitted under the DIP Documents,

(e)     investigate, commence, prosecute or defend any claim, motion, proceeding, or cause of action, or assert any defense or counterclaim, against any of the DIP Secured Parties or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives, including, in each case, without limitation, lender liability claims or claims pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise,

(f)     use or seek to use Cash Collateral or incur indebtedness in violation of the terms hereof or the DIP Documents,

(g)     sell or seek to sell any of the Collateral unless such sales are permitted under this Interim Period Order or the DIP Documents;

*provided* that, notwithstanding anything to the contrary herein, the Creditors' Committee may use

the proceeds of the DIP Loans, Collateral (including Cash Collateral) and/or the Carve Out (subject

to paragraph 5 hereof), in an aggregate amount not to exceed $50,000, to investigate (i) the claims

and liens of the Prepetition Secured Parties and (ii) potential claims, counterclaims, causes of

action or defenses against the Prepetition Secured Parties; *provided further* the Debtors may use

the proceeds of the DIP Loans, Collateral (including Cash Collateral) and/or the Carve Out in connection with its analysis of any demand made on the Debtors pursuant to paragraph 23 (including the analysis and negotiation of any settlement of such a demand) and *provided further* that neither the Debtors nor the Creditors' Committee shall use DIP Loans, Collateral (including Cash Collateral) and/or the Carve Out to prosecute any objections to claims or liens, or to pursue any claims, counterclaims, causes of action, or defenses against any of the DIP ABL Secured Parties, the DIP Term Loan Secured Parties, or the Prepetition ABL Secured Parties.

25.     *Limits to Lender Liability*.  Subject to entry of the Final Order, nothing in this Interim Period Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents or any DIP Secured Party of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as not a result of their gross negligence, bad faith, or willful misconduct (a) the DIP Agents and the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the DIP Loan Parties.

26.     *Interim Period Order Governs*.  In the event of any inconsistency between the provisions of this Interim Period Order, the DIP Documents or any other order entered by this Court (other than the Final Order), the provisions of this Interim Period Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made, or authorization contained in, any other order entered by this Court (other than the Final

Order) shall be consistent with and subject to the requirements set forth in this Interim Period Order and the DIP Documents, including, without limitation, the Budget.

27.     *DIP Termination Date*.  On the applicable DIP Termination Date (as defined in the DIP Documents):  (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facilities will terminate, all letters of credit and Secured Bank Product Obligations under the DIP ABL Credit Agreement and Prepetition ABL Credit Agreement shall be cash collateralized and all other DIP Obligations required to be cash collateralized in order to cause Payment in Full of such DIP Obligations shall be cash collateralized; (b) all authority to use Cash Collateral shall cease, except as expressly provided in Section 9(c) above; and (c) DIP Agents shall have the right to otherwise exercise rights and remedies under and in accordance with the DIP Documents and this Interim Period Order.

28.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Period Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Secured Parties, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Secured Parties, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided*, that the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including

Cash Collateral) or to extend any financing to any chapter 7 trustee (other than the Carve Out), chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

29.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreements, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Period Order or the DIP Documents, none of the DIP Agents, the DIP Secured Parties and the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors, so long as the DIP Agents' and the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of "responsible person" or "managing agent" to exist under applicable law (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Period Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the DIP Loan Parties and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

30.     *Proofs of Claim*.  The DIP Agents, the DIP Secured Parties, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or

Successor Cases for any claim herein and the stipulations and findings set forth in this Interim Period Order shall constitute an informal proof of claim in respect thereof.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, each of (a) the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Secured Parties and (b) the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Secured Parties is hereby authorized and entitled, in its sole discretion, but not required, (x) to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases for any claim herein and (y) to file a single master proof of claim in Case No. 20-30982 and hereunder and such master proof of claim shall be deemed filed as a claim against each of the Debtors.  Any proof of claim filed by the Prepetition ABL Agent or Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Secured Parties or Prepetition Term Loan Secured Parties, respectively.  Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases shall not apply to any claim of the DIP Agents, the DIP Secured Parties, and the Prepetition Secured Parties.

31.    *Insurance*.  To the extent that the Prepetition ABL Agent or the Prepetition Term Loan Agent is listed as loss payee under the Prepetition Borrowers, Holdings, the Prepetition ABL Guarantors or the Prepetition Term Loan Guarantors' insurance policies, the DIP Agents are also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the Payment in Full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), subject to the payment priorities for the DIP Obligations as

between the DIP ABL Obligations and DIP Term Loan Obligations as set forth herein and the Intercreditor Agreements, and second, to the payment of the Prepetition Secured Debt, subject to the payment priorities for the Prepetition Secured Debt as between the Prepetition ABL Debt and Prepetition Term Loan Debt as set forth herein and the Intercreditor Agreements.

32.     *Effectiveness*.   This Interim Period Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules, or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Period Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Period Order.

33.     *Headings*.   Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Period Order.

34.     *Payments Held in Trust*.   Except as expressly permitted in this Interim Period Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible Payment in Full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agents and the DIP Secured Parties (as applicable based on the specific asset at issue) and shall immediately turn over such proceeds to the applicable DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents, the Intercreditor Agreements and this Interim Period Order.

35.   *No Superior Rights of Reclamation*.  Based on the continuation of the Prepetition Liens, the relation back of the DIP Liens, and the integrated nature of the DIP Facilities and the Prepetition Debt Documents, in no event shall any alleged right of reclamation or return (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) be deemed to have priority over the DIP Liens.

36.   *Automatic Stay*.  The giving of notice of termination by any party to the Restructuring Support Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay as it relates to any such notice being provided).

37.   *Credit Bidding*.  In connection with any sale process authorized by the Court, the DIP Agents, the DIP Secured Parties, and the Prepetition Secured Parties may credit bid up to the full amount of the applicable outstanding DIP Obligations or Prepetition Secured Obligations (as applicable), in each case including any accrued interest and expenses (each a "**Credit Bid**") in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through section 363 or section 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, subject in each case to the rights and duties of the parties under the DIP Documents, the Intercreditor Agreements and the Prepetition Documents, and to the provision of cash consideration sufficient to pay in full in cash any claims secured by senior liens on the collateral that is subject to the Credit Bid (including in connection with any bid by any one or more of the Prepetition Term Loan Secured Parties or DIP Term Loan Secured Parties, the Payment in Full of Prepetition ABL Debt and DIP ABL Obligations, as applicable).

38.   *Cash Management; Secured Bank Product Obligations*.

(a)     From and after the date of the entry of the Interim Period Order, and consistent with the DIP ABL Credit Agreement in all respects, any person or entity providing Secured Bank Product Obligations shall be deemed a Secured Creditor (as defined in the DIP ABL Credit Agreement) and an DIP ABL Secured Party with respect to any claims related to such Secured Bank Product Obligations, to the extent provided for under the DIP ABL Credit Agreement, and any such Secured Bank Product Obligation shall constitute an DIP ABL Obligation.

(b)     Debtors shall deposit all Cash Collateral constituting DIP ABL Priority Collateral now or hereafter in their possession or control into a deposit account subject to a Deposit Account Control Agreement (as defined in the DIP ABL Credit Agreement) (or otherwise deliver such Cash Collateral to the DIP ABL Agent in a manner satisfactory to the DIP ABL Agent) promptly upon receipt thereof.  On the third business day of each week, all Cash Collateral (other than proceeds of the DIP Term Facility) received by any of the Debtors after the Petition Date during the prior week that is in excess of the actual disbursements made pursuant to the Budget during such prior week (subject to the Permitted Variance) less such actual disbursements made on account of interest, fees, costs and other charges in respect of the DIP Term Loan Obligations, the Professional Persons and professionals for the DIP Term Loan Secured Parties during such prior week, will be remitted to DIP ABL Agent for application to the DIP ABL Obligations.  Each week, all actual disbursements made pursuant to the Budget (subject to the Permitted Variance) in excess of any available Cash Collateral shall be funded first from the proceeds of the DIP Term Facility (other than payments on account of interest, fees (including professionals for the DIP ABL Secured Parties), costs and other charges in respect of the DIP

ABL Obligations and the ABL Adequate Protection Fees and Expenses) before the Debtors may seek additional loans and letters of credit under the DIP ABL Facility.

(c)    The DIP ABL Agent is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its possession or control which constitute DIP ABL Priority Collateral or proceeds thereof.

(d)    [Reserved]

39.    *Release*.  Upon the date of the Payment in Full of the ABL Prepetition Debt and DIP ABL Obligations and prior to the release of the DIP ABL Liens, Prepetition ABL Liens Prepetition and Prepetition ABL Adequate Protection Liens, Debtors shall execute and deliver to the DIP ABL Secured Parties and the Prepetition ABL Secured Parties Agents a general release (in form and substance satisfactory to DIP ABL Agent and Prepetition ABL Agent) of any and all claims and causes of action that could have been asserted or raised under or in connection with the DIP ABL Documents and the Prepetition ABL Documents.

40.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

41.    *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Period Order.

42.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Interim Period Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

43.     *Final Hearing.*  The Final Hearing is scheduled for _____, 2020 at _____

__.m. before this Court.

44.     *Objections.*   Any party in interest objecting to the relief sought at the Final Hearing

shall file and serve written objections, which objections shall be served upon (i) the U.S. Trustee;

(b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);

(c) counsel to Wells Fargo Capital Finance, LLC, as administrative agent under the Debtors'

prepetition ABL Facility; (d) counsel to Bank of America, N.A., as administrative agent under the

Debtors' prepetition Term Loan Facility; (e) counsel to that certain ad hoc group of lenders under

the Debtors' prepetition Term Loan Facility; (f) counsel to the agents for the Debtors' proposed

postpetition lenders; (g) counsel to the agent for the DIP Term Loan Parties; (h) the United States

Attorney's Office for the Southern District of Texas; (i) the state attorney general's office for all

states in which the Debtors conduct business; (j) the Internal Revenue Service; (k) the Securities

and Exchange Commission; and (l) any party that requests service pursuant to Bankruptcy Rule

2002.

45.     The Debtors shall promptly serve copies of this Interim Period Order (which shall

constitute adequate notice of the Final Hearing, including, without limitation, notice that the

Debtors will seek approval at the Final Hearing of a waiver of rights under sections 552(b) of the

Bankruptcy Code) to the parties having been given notice of the Initial Hearing, to any party that

has filed a request for notices with this Court.

Dated:   February __, 2020
         Houston, TX


                                    _____
                                    THE HONORABLE MARVIN ISGUR
                                    UNITED STATES BANKRUPTCY JUDGE

## <u>Schedule 1</u>

Budget4836-0749-9954v5

**American Commercial Lines Inc.**
*DIP Budget - February 7th Filing*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 2-16 | 2-23 | 3-1 | 3-8 | 3-15 | 3-22 | 3-29 | 4-5 | 4-12 | 4-19 | 4-26 | 5-3 | 5-10 | Post-Petition |
| **Total Cash Receipts** | $ 13,021 | $ 14,269 | $ 14,111 | $ 16,601 | $ 19,526 | $ 20,967 | $ 20,959 | $ 23,432 | $ 19,640 | $ 20,538 | $ 20,425 | $ 23,673 | $ 18,117 | $ 245,277 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | | |
| Capital Expenditures | 863 | 2,818 | 1,057 | 1,057 | 1,057 | 1,057 | 1,057 | 1,376 | 1,376 | 1,376 | 1,376 | 5,467 | 1,467 | 21,406 |
| Charter & Leases | 146 | 241 | 8,295 | 122 | 226 | 250 | 820 | 12,246 | 104 | 284 | 1,153 | 8,396 | 54 | 32,338 |
| Payroll & Benefits | 7,677 | 307 | 7,912 | 4,307 | 7,702 | 307 | 7,005 | 1,214 | 6,180 | 4,804 | 6,155 | 2,064 | 6,180 | 61,814 |
| Fuel | 3,538 | 2,926 | 3,174 | 3,174 | 3,174 | 3,174 | 3,174 | 3,151 | 3,151 | 3,151 | 3,151 | 2,973 | 2,973 | 40,884 |
| Other Operating Expenses | 8,186 | 7,167 | 7,759 | 7,469 | 8,110 | 7,363 | 9,101 | 7,301 | 7,561 | 8,887 | 7,033 | 12,388 | 7,424 | 105,750 |
| **Total Operating Disbursements** | 20,410 | 13,460 | 28,197 | 16,129 | 20,269 | 12,151 | 21,158 | 25,288 | 18,372 | 18,502 | 18,869 | 31,288 | 18,097 | 262,191 |
| **Other Disbursements** | | | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | - | 1,018 | - | 1,815 | - | 320 | 1,183 | 982 | 2,812 | 8,130 |
| Utility Deposit | 62 | - | - | - | - | - | - | - | - | - | - | - | - | 62 |
| **Total Other Disbursements** | 62 | - | - | - | - | 1,018 | - | 1,815 | - | 320 | 1,183 | 982 | 2,812 | 8,192 |
| **Financing & Debt Service** | | | | | | | | | | | | | | |
| DIP / ABL / LCs - Interest & Fees[1] | 539 | 318 | 775 | 1,067 | 421 | 421 | 421 | 870 | 668 | 668 | 668 | 668 | - | 7,506 |
| FILO - Interest & Fees[2] | - | - | 225 | - | - | - | 375 | - | - | - | 363 | - | 963 |
| Term Loan - P&I | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Financing Disbursements** | 539 | 318 | 1,000 | 1,067 | 421 | 421 | 421 | 1,245 | 668 | 668 | 668 | 1,031 | - | 8,468 |
| **Total Disbursements** | 21,011 | 13,778 | 29,197 | 17,196 | 20,691 | 13,590 | 21,579 | 28,348 | 19,041 | 19,491 | 20,720 | 33,301 | 20,910 | 278,852 |
| Beginning Cash Balance | 2,682 | 43,732 | 44,541 | 30,057 | 30,529 | 29,785 | 37,849 | 30,962 | 27,015 | 27,683 | 29,399 | 29,747 | 20,787 | 2,682 |
| Net Cash Flow | (7,989) | 491 | (15,086) | (595) | (1,165) | 7,377 | (620) | (4,916) | 599 | 1,048 | (296) | (9,628) | (2,793) | (33,575) |
| Cash Paydown | - | - | (173) | - | - | - | (6,689) | - | - | - | (380) | - | - | (7,241) |
| Pre Petition Revolver Draw / (Paydown) | (536,262) | - | - | - | - | - | - | - | - | - | - | - | - | (536,262) |
| Post Petition Revolver Draw / (Paydown) | 536,801 | 318 | 775 | 1,067 | 421 | 688 | 421 | 970 | 69 | 668 | 1,023 | 668 | 200 | 544,090 |
| FILO Proceeds[3] | 48,500 | - | - | - | - | - | - | - | - | - | - | - | - | 48,500 |
| **Ending Cash Balance[4]** | 43,732 | 44,541 | 30,057 | 30,529 | 29,785 | 37,849 | 30,962 | 27,015 | 27,683 | 29,399 | 29,747 | 20,787 | 18,194 | 18,194 |
| **Liquidity** | | | | | | | | | | | | | | |
| Net Availability[5] | 9,028 | 7,977 | 6,753 | 5,063 | 16,522 | 15,394 | 20,828 | 20,270 | 19,366 | 22,293 | 20,982 | 20,579 | 21,956 | 21,956 |
| Book Cash | 43,732 | 44,541 | 30,057 | 30,529 | 29,785 | 37,849 | 30,962 | 27,015 | 27,683 | 29,399 | 29,747 | 20,787 | 18,194 | 18,194 |
| **Total Liquidity** | $ 52,760 | $ 52,518 | $ 36,810 | $ 35,592 | $ 46,306 | $ 53,244 | $ 51,789 | $ 47,285 | $ 47,050 | $ 51,693 | $ 50,729 | $ 41,367 | $ 40,151 | $ 40,151 |

*Assumes a bankruptcy filing on February 7, 2020 and first day hearings on February 10, 2020 due to the weekend

** Professional fee estimates and DIP terms assume a pre-packaged bankruptcy filing

(1) Assumes that the interim DIP order is entered February 11, 2020. ABL interest is L+4.5% (0% floor)

(2) Assumes that the interim DIP order is entered February 11, 2020. FILO interest is L+7.0% (2% floor)

(3) $50M FILO facility less a 3.0% FILO upfront fee

(4) Excludes approximately $0.8M of cash held at Finn Holding Corporation

(5) Assumes no additional incremental reserves for (i) 503(b)9 and (ii) maritime / statutory, and (iii) other; also assumes no borrowing base reductions related to the appraisal

## **Exhibit B**

**DIP ABL Credit Agreement**

**SENIOR SECURED DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

**among**

**AMERICAN COMMERCIAL LINES INC.,**

**as Holdings,**

**COMMERCIAL BARGE LINE COMPANY**
**AMERICAN COMMERCIAL BARGE LINE LLC**
**ACBL TRANSPORTATION SERVICES LLC**

**and**

**ACBL RIVER OPERATIONS LLC**
**as Borrowers,**

**VARIOUS LENDERS**

**and**

**WELLS FARGO CAPITAL FINANCE, LLC,**
**as ADMINISTRATIVE AGENT**

**Dated as of February ___, 2020**

**BANK OF AMERICA, N.A.,**
**UBS SECURITIES LLC**

**and**

**WELLS FARGO CAPITAL FINANCE, LLC as**
**JOINT LEAD ARRANGERS AND BOOKRUNNERS**

**BANK OF AMERICA, N.A.**

**and**

**UBS SECURITIES LLC as**
**CO-SYNDICATION AGENTS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE 1    Definitions and Accounting Terms. ........................................................ 1

    Section 1.01    Defined Terms ......................................................................... 1

    Section 1.02    Terms Generally and Certain Interpretive Provisions ...................................... 48

    Section 1.03    Performance; Time........................................................................ 49

    Section 1.04    Divisions ................................................................................. 50

ARTICLE 2    Amount and Terms of Credit. ................................................................... 50

    Section 2.01    The Commitments........................................................................ 50

    Section 2.02    Loans........................................................................................ 50

    Section 2.03    Borrowing Procedure ................................................................. 51

    Section 2.04    Evidence of Debt; Repayment of Loans. ........................................ 52

    Section 2.05    Fees. ....................................................................................... 53

    Section 2.06    Interest on Loans. ...................................................................... 54

    Section 2.07    Termination and Reduction of Commitments........................... 54

    Section 2.08    Interest Elections......................................................................... 55

    Section 2.09    Optional and Mandatory Prepayments of Loans. ..................... 56

    Section 2.10    Payments Generally; Pro Rata Treatment; Sharing of Setoffs......... 59

    Section 2.11    Defaulting Lenders. .................................................................... 61

    Section 2.12    Swingline Loans. ........................................................................ 62

    Section 2.13    Letters of Credit. ........................................................................ 64

    Section 2.14    Settlement Amongst Lenders. ..................................................... 73

    Section 2.15    [Reserved] ................................................................................. 74

    Section 2.16    Lead Borrower .......................................................................... 74

    Section 2.17    Overadvances............................................................................. 75

    Section 2.18    Protective Advances.................................................................... 75

    Section 2.19 Agreements    Existing Bank Product Obligations; Deposit Account Control 76

    Section 2.20    Superpriority ............................................................................. 76

    Section 2.21    Waiver of any Priming Rights .................................................... 76

    Section 2.22    Existing Fleet Mortgages ........................................................... 77

ARTICLE 3    Yield Protection, Illegality and Replacement of Lenders ..................... 77

Section 3.01   Increased Costs, Illegality, etc. ........................................................ 77

Section 3.02   Compensation ................................................................................. 79

Section 3.03   Change of Lending Office ................................................................ 79

Section 3.04   Replacement of Lenders .................................................................. 79

Section 3.05   Inability to Determine Rates ........................................................... 80

Section 3.06   Effect of Benchmark Transition Event. .......................................... 81

ARTICLE 4   [Reserved] ....................................................................................... 81

ARTICLE 5   Taxes. ............................................................................................... 82

Section 5.01   Net Payments. ................................................................................. 82

ARTICLE 6   Conditions Precedent to Credit Events on the Closing Date. ............. 84

Section 6.01   Closing Date; Credit Documents ..................................................... 84

Section 6.02   Five Year Plan................................................................................. 85

Section 6.03   Corporate Documents; Proceedings, etc. ......................................... 85

Section 6.04   Bankruptcy Conditions. .................................................................. 85

Section 6.05   Restructuring Support Agreement .................................................... 86

Section 6.06   Security Agreements ....................................................................... 86

Section 6.07   Subsidiaries Guaranty ..................................................................... 87

Section 6.08   [Reserved] ...................................................................................... 87

Section 6.09   Junior DIP Indebtedness ................................................................. 87

Section 6.10   Fees, etc. ........................................................................................ 87

Section 6.11   [Reserved] ...................................................................................... 87

Section 6.12   Patriot Act ...................................................................................... 87

Section 6.13   Borrowing Notice............................................................................ 88

Section 6.14   Material Adverse Effect................................................................... 88

Section 6.15   Appraisal/Borrowing Base Certificate ............................................. 88

Section 6.16   Flood .............................................................................................. 88

Section 6.17   Officer's Certificate ........................................................................ 88

ARTICLE 7   Conditions Precedent to All Credit Events. ....................................... 88

Section 7.01   Notice of Borrowing ....................................................................... 88

Section 7.02   Availability ..................................................................................... 89

Section 7.03   No Default....................................................................................... 89

Section 7.04   Representations and Warranties....................................................... 89

Section 7.05   No Injunction .................................................................................. 89

Section 7.06    Use of Junior DIP Proceeds .................................................................. 89

Section 7.07    Final Financing Order ........................................................................... 89

ARTICLE 8    Representations, Warranties and Agreements ...................................... 90

Section 8.01    Organizational Status ............................................................................ 90

Section 8.02    Power and Authority .............................................................................. 90

Section 8.03    No Violation ........................................................................................... 90

Section 8.04    Approvals ............................................................................................... 91

Section 8.05    Financial Condition ............................................................................... 91

Section 8.06    Litigation ................................................................................................ 91

Section 8.07    True and Complete Disclosure .............................................................. 91

Section 8.08    Use of Proceeds ..................................................................................... 92

Section 8.09    Tax Returns and Payments .................................................................... 92

Section 8.10    ERISA. .................................................................................................... 92

Section 8.11    The Security Documents........................................................................ 93

Section 8.12    Properties ............................................................................................... 95

Section 8.13    Capitalization ......................................................................................... 95

Section 8.14    Subsidiaries ........................................................................................... 95

Section 8.15    Compliance with Statutes, OFAC Rules and Regulations; Patriot Act; FCPA.    95

Section 8.16    Investment Company Act ...................................................................... 96

Section 8.17    [Reserved] .............................................................................................. 96

Section 8.18    Environmental Matters.......................................................................... 96

Section 8.19    Labor Relations ..................................................................................... 97

Section 8.20    Intellectual Property .............................................................................. 97

Section 8.21    Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; etc .............................................. 97

Section 8.22    Borrowing Base Certificate................................................................... 97

Section 8.23    Eligible Vessels ..................................................................................... 98

Section 8.24    Citizenship ............................................................................................. 98

Section 8.25    [Reserved] .............................................................................................. 98

Section 8.26    Financing Order ..................................................................................... 98

Section 8.27    Exit Financing Commitment Letter ....................................................... 98

Section 8.28    Restructuring Support Agreement ........................................................ 98

Section 8.29   Bankruptcy Cases.................................................................. 98

Section 8.30   Financing Order ................................................................... 98

Section 8.31   Insurance ............................................................................ 99

Section 8.32   Margin Stock....................................................................... 99

ARTICLE 9     Affirmative Covenants........................................................ 99

Section 9.01   Information Covenants......................................................... 99

Section 9.02   Books, Records and Inspections. ....................................... 102

Section 9.03   Maintenance of Property; Insurance. .................................. 103

Section 9.04   Existence; Franchises......................................................... 104

Section 9.05   Compliance with Statutes, etc............................................ 105

Section 9.06   Compliance with Environmental Laws................................ 105

Section 9.07   ERISA ............................................................................... 106

Section 9.08   Performance of Obligations ............................................... 106

Section 9.09   Payment of Taxes............................................................... 107

Section 9.10   [Reserved].......................................................................... 107

Section 9.11   Additional Security; Further Assurances; etc. .................... 107

Section 9.12   Post-Closing Actions ......................................................... 109

Section 9.13   [Reserved].......................................................................... 109

Section 9.14   [Reserved].......................................................................... 109

Section 9.15   Collateral Monitoring and Reporting................................... 110

Section 9.16   Maritime and Other Regulatory Matters.............................. 111

Section 9.17   OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering
Laws          111

Section 9.18   Bankruptcy Transaction Milestones .................................... 111

Section 9.19   Consultant .......................................................................... 111

Section 9.20   [Reserved].......................................................................... 112

Section 9.21   [Reserved].......................................................................... 112

Section 9.22   Bankruptcy Covenants ....................................................... 112

Section 9.23   Bankruptcy Cases............................................................... 112

Section 9.24   Budget Matters................................................................... 113

ARTICLE 10  Negative Covenants............................................................ 113

Section 10.01    Liens.................................................................................. 113

Section 10.02    Consolidation, Merger, or Sale of Assets, etc.................... 118

Section 10.03     Dividends ................................................................................... 121

Section 10.04     Indebtedness.............................................................................. 124

Section 10.05     Advances, Investments and Loans.............................................. 126

Section 10.06     Transactions with Affiliates ....................................................... 130

Section 10.07     Limitations on Payments, Certificate of Incorporation, By-Laws and
Certain Other Agreements, etc.......................................................................... 131

Section 10.08     Limitation on Certain Restrictions on Subsidiaries ................... 132

Section 10.09     Business; Fiscal Year; Activities of Holdings. ........................... 133

Section 10.10     Negative Pledges........................................................................ 134

Section 10.11     Financial Covenant .................................................................... 135

Section 10.12     Use of Proceeds.......................................................................... 136

Section 10.13     Financing Order; Administrative Expense Priority; Payments................... 137

Section 10.14     Restructuring Support Agreement .............................................. 137

Section 10.15     Key Employees .......................................................................... 137

ARTICLE 11   Events of Default ............................................................................ 138

Section 11.01     Payments .................................................................................... 138

Section 11.02     Representations, etc .................................................................... 138

Section 11.03     Covenants ................................................................................... 138

Section 11.04     Default Under Other Agreements ............................................... 138

Section 11.05     Bankruptcy, etc .......................................................................... 138

Section 11.06     ERISA......................................................................................... 139

Section 11.07     Security Documents .................................................................... 139

Section 11.08     Guaranties .................................................................................. 139

Section 11.09     Judgments ................................................................................... 140

Section 11.10     Change of Control....................................................................... 140

Section 11.11     Bankruptcy Matters.................................................................... 140

Section 11.12     Consultant ................................................................................... 143

Section 11.13     Application of Funds.................................................................... 143

ARTICLE 12   The Administrative Agent................................................................ 145

Section 12.01     Appointment and Authorization. ................................................ 145

Section 12.02     Delegation of Duties .................................................................. 146

Section 12.03     Exculpatory Provisions .............................................................. 146

Section 12.04     Reliance by Administrative Agent............................................... 147

Section 12.05   [Reserved] ................................................................................ 148

Section 12.06   Non-reliance on Administrative Agent and Other Lenders ...................... 148

Section 12.07   Indemnification by the Lenders ................................................. 148

Section 12.08   Rights as a Lender.................................................................... 148

Section 12.09   Administrative Agent May File Proofs of Claim; Credit Bidding.............. 148

Section 12.10   Resignation of the Agents. ...................................................... 150

Section 12.11   Collateral Matters and Guaranty Matters.................................... 150

Section 12.12   Secured Bank Product Providers .............................................. 151

Section 12.13   Withholding Taxes ................................................................... 152

Section 12.14   Field Examination Reports; Confidentiality; Disclaimers by Lenders;
Other Reports and Information ............................................................................ 153

ARTICLE 13  Miscellaneous. ............................................................................. 154

Section 13.01   Payment of Expenses, etc. ....................................................... 154

Section 13.02   Right of Setoff.......................................................................... 156

Section 13.03   Notices. .................................................................................... 157

Section 13.04   Benefit of Agreement; Assignments; Participations, etc ................... 158

Section 13.05   No Waiver; Remedies Cumulative .............................................. 160

Section 13.06   [reserved]. ................................................................................ 160

Section 13.07   Calculations; Computations. ..................................................... 160

Section 13.08   GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
WAIVER OF JURY TRIAL.................................................................................... 161

Section 13.09   Counterparts ............................................................................ 162

Section 13.10   Headings Descriptive ............................................................... 162

Section 13.11   Amendment or Waiver; etc. ...................................................... 162

Section 13.12   Survival .................................................................................... 164

Section 13.13   Domicile of Loans..................................................................... 164

Section 13.14   Register .................................................................................... 165

Section 13.15   Confidentiality. ........................................................................ 165

Section 13.16   USA Patriot Act Notice ............................................................ 166

Section 13.17   [reserved]. ................................................................................ 167

Section 13.18   Waiver of Sovereign Immunity ................................................. 167

Section 13.19   [reserved]. ................................................................................ 167

Section 13.20   INTERCREDITOR AGREEMENTS........................................... 167

Section 13.21   Absence of Fiduciary Relationship ........................................................ 168

Section 13.22   Electronic Execution of Assignments and Certain Other Documents ........ 168

Section 13.23   Entire Agreement ........................................................................................ 169

ARTICLE 14  Credit Agreement Party Guaranty. ........................................................... 169

Section 14.01   The Guaranty ................................................................................................ 169

Section 14.02   Bankruptcy .................................................................................................. 169

Section 14.03   Nature of Liability ...................................................................................... 170

Section 14.04   Independent Obligation ............................................................................... 170

Section 14.05   Authorization ............................................................................................... 170

Section 14.06   Reliance ........................................................................................................ 171

Section 14.07   Subordination .............................................................................................. 171

Section 14.08   Waiver. ......................................................................................................... 172

Section 14.09   Maximum Liability ..................................................................................... 172

Section 14.10   Payments ...................................................................................................... 173

Section 14.11   Keepwell ...................................................................................................... 173

Section 14.12   Acknowledgement and Consent to Bail-In of EEA Financial
Institutions     173

Section 14.13   Acknowledgement Regarding Any Supported QFCs ................................. 174

SCHEDULE A-1               Agent's Account
SCHEDULE 1.01(a)           Unrestricted Subsidiaries
SCHEDULE 1.01(b)           Eligible Inventory Locations
SCHEDULE 2.01              Commitments
SCHEDULE 2.19              Existing Secured Bank Product Obligations
SCHEDULE 2.13              Existing Letters of Credit
SCHEDULE 8.09              Taxes
SCHEDULE 8.12(a)           Material Real Property
SCHEDULE 8.12(b)           Title to Property
SCHEDULE 8.14              Subsidiaries
SCHEDULE 8.19              Labor Matters
SCHEDULE 8.21              Legal Names; Types of Organization (and Whether Registered
                           Organization); Jurisdiction of Organization, etc.
SCHEDULE 8.31              Closing Date Insurance
SCHEDULE 9.12              Post-Closing Actions
SCHEDULE 9.15(a)           Collateral Reporting Requirements
SCHEDULE 9.15(d)           Deposit Accounts
SCHEDULE 9.18              Milestones
SCHEDULE 10.01(iii)        Existing Liens
SCHEDULE 10.04             Existing Indebtedness
SCHEDULE 10.05(iii)        Existing Investments
SCHEDULE 10.06(viii)       Affiliate Transactions
SCHEDULE 13.03             Lender Addresses


EXHIBIT A-1                Form of Notice of Borrowing
EXHIBIT A-2                Form of Notice of Conversion/Continuation
EXHIBIT B                  Initial Budget
EXHIBIT C                  Form of U.S. Tax Compliance Certificate
EXHIBIT D                  Form of Notice of Secured Bank Product Provider
EXHIBIT E                  Form of Security Agreement
EXHIBIT F                  Form of Subsidiaries Guaranty
EXHIBIT H                  Form of Compliance Certificate
EXHIBIT I-1                Form of Assignment and Assumption Agreement
EXHIBIT I-2                Initial Financing Order
EXHIBIT L-1                Form of Perfection Certificate
EXHIBIT L-2                Form of Perfection Certificate Supplement
EXHIBIT M                  DIP Motion

## SENIOR SECURED DEBTOR-IN-POSSESSION
## CREDIT AGREEMENT

THIS SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of February ___, 2020, among AMERICAN COMMERCIAL LINES INC., a Delaware corporation ("Holdings"), COMMERCIAL BARGE LINE COMPANY, a Delaware corporation ("CBLC" or the "Lead Borrower"), AMERICAN COMMERCIAL BARGE LINE LLC, a Delaware limited liability company ("ACBL"), ACBL TRANSPORTATION SERVICES LLC, a Delaware limited liability company ("ACBLTS") and ACBL RIVER OPERATIONS LLC, a Delaware limited liability company ("River Ops"), the Lenders party hereto from time to time and WELLS FARGO CAPITAL FINANCE, LLC ("Wells Fargo"), as the Administrative Agent and the Collateral Agent. All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

WHEREAS, on February 7, 2020 (the "Filing Date"), Holdings, Borrowers, and their respective Domestic Subsidiaries (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers have requested that Lenders provide a secured revolving credit facility to Borrowers in order to (a) fund the continued operation of Borrowers' businesses as debtor and debtor-in-possession under the Bankruptcy Code during the pendency of the Bankruptcy Cases and (b) repay in full the Existing Secured Obligations (as hereinafter defined); and

WHEREAS, the Lenders are willing to make available to Borrowers such postpetition loans, other extensions of credit and financial accommodations upon the terms and subject to the conditions set forth herein.

ARTICLE 1    Definitions and Accounting Terms.

Section 1.01    Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"A&M Engagement Agreement" shall mean that certain engagement letter dated November 25, 2019 between Alvarez & Marsal North America, LLC and Lead Borrower (for itself and its Subsidiaries), as in effect on the Closing Date.

"Account Debtor" shall mean any Person who may become obligated to another Person under, with respect to, or on account of, an Account.

"Account Party" shall have the meaning provided in Section 2.13(h).

"Accounts" shall mean all "accounts," as such term is defined in the UCC as in effect on the date hereof in the State of New York, in which any Person now or hereafter has rights.

"Additional Security Documents" shall have the meaning provided in Section 9.11(a).

"Administrative Agent" shall mean Wells Fargo Capital Finance, LLC, in its capacity as Administrative Agent for the Lenders hereunder, and shall include any successor to the Administrative Agent appointed pursuant to Section 12.10.

"Administrative Agent Fee Letter" shall mean that certain fee letter, dated as of even date with this Agreement, among the Borrowers and Administrative Agent, in form and substance reasonably satisfactory to Administrative Agent.

"Administrative Agent Fees" shall have the meaning provided in Section 2.05(b).

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that neither the Administrative Agent nor any Lender (nor any Affiliate thereof) shall be considered an Affiliate of the Lead Borrower or any Subsidiary thereof as a result of this Agreement, the extensions of credit hereunder or its actions in connection therewith.

"Agent's Account" means the Deposit Account of the Administrative Agent identified on Schedule A-1 to this Agreement (or such other Deposit Account of the Administrative Agent that has been designated as such, in writing, by the Administrative Agent to Borrowers and the Lenders).

"Agent Consultant" means any consultant, financial advisor, appraiser, or other professional engaged by Agent or any legal counsel to Agent.

"Agents" shall mean the Administrative Agent, the Collateral Agent and the Security Trustee.

"Aggregate Commitments" shall mean, at any time, the aggregate amount of the Revolving Commitments of all Lenders.

"Aggregate Exposures" shall mean, at any time, the sum of (a) the aggregate Outstanding Amount of all Loans plus (b) the LC Exposure, each determined at such time.

"Agreement" shall mean this Senior Secured Debtor-in-Possession Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Credit Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Credit Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Margin" shall mean (a) with respect to Base Rate Loan, the per annum rate of 3.50% and (b) with respect to LIBO Rate Loans, the per annum rate of 4.50%.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit I-1 (appropriately completed) or such other form as shall be acceptable to the Administrative Agent.

"Availability" shall mean, as of any applicable date, the amount by which the Line Cap at such time exceeds the sum of Aggregate Exposures *plus* outstanding Existing Secured Obligations *plus* Reinstated Existing Secured Obligations on such date.

"Availability Block" shall mean the greater of (a) five percent (5%) of the Line Cap and (b) $30,000,000.

"Avoidance Action" means any and all claims and causes of action of any Borrower's estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payment" has the meaning set forth in Section 2.09(b)(v) of this Agreement.

"Bank Product" shall mean any of the following products, services or facilities extended to any Borrower or any of its Subsidiaries: (a) Cash Management Services; (b) products under Swap Contracts; (c) credit cards, commercial credit card, purchase card and merchant card services; (d) payment card processing services, (e) debit cards, (f) stored value cards and (e) other banking products or services as may be requested by any Borrower, other than Letters of Credit.

"Bank Product Agreements" means those agreements entered into from time to time by any Credit Party with a Secured Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Debt" shall mean Indebtedness and other obligations of a Borrower or any of its Subsidiaries relating to Bank Products.

"Bank Product Reserve" shall mean the aggregate amount of reserves established by the Administrative Agent from time to time in its discretion in respect of Secured Bank Product Obligations (which shall at all times include a reserve for the maximum amount of all Noticed Hedges outstanding at that time).

"Bankruptcy Cases" means the cases of Debtors jointly administered under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court, bearing case number [_____] and any superseding chapter 7 case or cases.

"Bankruptcy Code" shall have the meaning provided in Section 11.05.

"Bankruptcy Court" has the meaning given to it in the Recitals.

"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis), *plus* one percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (c) shall be deemed to be zero).

"Base Rate Loan" shall mean each Revolving Loan which is designated or deemed designated as a Base Rate Loan by the Lead Borrower at the time of the incurrence thereof or conversion thereto.

"Benchmark Replacement" means the sum of:  (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by Administrative Agent and Lead Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for United States dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement shall be deemed to be zero for the purposes of this Agreement.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the LIBO Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Administrative Agent and Lead Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for United States dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest and other administrative matters) that Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists,

in such other manner of administration as Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the LIBO Rate:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the LIBO Rate permanently or indefinitely ceases to provide the LIBO Rate; or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the LIBO Rate:

(a)     a public statement or publication of information by or on behalf of the administrator of the LIBO Rate announcing that such administrator has ceased or will cease to provide the LIBO Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate;

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate, the Federal Reserve System of the United States (or any successor), an insolvency official with jurisdiction over the administrator for the LIBO Rate, a resolution authority with jurisdiction over the administrator for the LIBO Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBO Rate, which states that the administrator of the LIBO Rate has ceased or will cease to provide the LIBO Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate; or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate announcing that the LIBO Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by Administrative Agent or the Required Lenders, as applicable, by notice to Lead Borrower, Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning

at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with Section 3.06 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 3.06.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulations.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person

"Borrowers" shall mean (a) the Lead Borrower, (b) ACBL, ACBLTS, and River Ops and (c) any other Subsidiary Borrower.

"Borrowing" shall mean the borrowing of the same Type of Revolving Loan by the Borrowers from all the Lenders having Commitments on a given date (or resulting from a conversion or conversions on such date), having in the case of LIBO Rate Loans, the same Interest Period; provided that Base Rate Loans incurred pursuant to Section 3.01 shall be considered part of the related Borrowing of LIBO Rate Loans.

"Borrowing Base" shall mean at any time of calculation, an amount equal to the sum of, without duplication:

      (a)     the book value of Eligible Accounts of the Borrowers multiplied by the advance rate of 85%, less the amount, if any, of the Dilution Reserve, plus

      (b)     [**reserved**]

      (c)     the lesser of

           (i)     $10,000,000, and

           (ii)     50% of the net book value (calculated at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices) of Eligible Inventory consisting of fuel, plus

      (d)     the lesser of

           (i)     100% of the net book value (calculated on a basis consistent with Borrowers' historical accounting practices and, for the avoidance of doubt, after giving effect to adjustments for purchase accounting) of Eligible Vessels consisting of Existing Vessels, and

           (ii)     NFL Vessel Advance Rate times the most recently determined Net Forced Liquidation Value, minus the forced liquidation value, as determined by the

Administrative Agent in its Permitted Discretion, of any Existing Vessels which have ceased to be Eligible Vessels since the date of the most recent Vessel Appraisal, plus

(e)    the lesser of

(i)    85% of the Hard Cost of Eligible Vessels consisting of New Vessels, and

(ii)    85% of the net book value (calculated on a basis consistent with the Borrowers' historical accounting practices) of Eligible Vessels consisting of New Vessels, minus

(f)    the Availability Block, minus

(g)    the aggregate amount of reserves, if any, established by the Administrative Agent in its Permitted Discretion pursuant to the terms of this Agreement.

The Administrative Agent shall (i) promptly notify the Lead Borrower in writing (including via email) whenever it determines that the Borrowing Base set forth on a Borrowing Base Certificate differs from the Borrowing Base and (ii) promptly notify the Lead Borrower of its decision with respect to any changes to the Borrowing Base.

"Borrowing Base Certificate" shall mean a certificate of a Responsible Officer of the Lead Borrower in form and substance satisfactory to the Administrative Agent.

"Budget" means the Initial Budget, as amended, modified, supplemented or replaced from time to time in accordance with Section 9.24.

"Budget Variance Covenant" has the meaning set forth in Section 10.11.

"Business Day" shall mean (a) for all purposes other than as covered by clause (b) below, any day except Saturday, Sunday and any day which shall be in New York City and Los Angeles a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, LIBO Rate Loans, any day which is a Business Day described in clause (a) above and which is also a day for trading by and between banks in the New York or London interbank Eurodollar market.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all rental obligations of such Person which, under U.S. GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with U.S. GAAP.

"Carveout" (or "Carve-Out") has the meaning specified therefor in the Initial Financing Order or the Final Financing Order, as applicable.

"Cash Equivalents" shall mean:

        (i)     U.S. Dollars, Canadian dollars, pounds sterling, euros, the national currency of any participating member state of the European Union or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

        (ii)    readily marketable direct obligations of any member of the European Economic Area, Switzerland, or Japan, or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of such country, and, at the time of acquisition thereof, having a credit rating of at least AA (or the equivalent grade) by Moody's or Aa3 by S&P;

        (iii)   marketable general obligations issued by any state of the United States or any political subdivision thereof or any instrumentality thereof that are guaranteed by the full faith and credit of such state, and, at the time of acquisition thereof, having a credit rating of at least AA (or the equivalent grade) by Moody's or Aa3 by S&P;

        (iv)   securities or any other evidence of Indebtedness or readily marketable direct obligations issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities), in such case having maturities of not more than twelve months from the date of acquisition;

        (v)    certificates of deposit and Eurodollar time deposits with maturities of twenty-four months or less from the date of acquisition, bankers' acceptances with maturities not exceeding twenty-four months and overnight bank deposits, in each case, with any Lender party to this Agreement or any commercial bank or trust company having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's;

        (vi)   repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clauses (iv) and (v) above entered into with any financial institution meeting the qualifications specified in clause (v) above;

        (vii)  commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within twenty-four months after the date of acquisition; and

        (viii) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (vii) of this definition.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing

house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements.

"CFC" shall mean a Subsidiary of a Credit Party that is a "controlled foreign corporation" within the meaning of Section 957 of the Code in which any Credit Party (or direct or indirect owner of a Credit Party) is a "United States shareholder" within the meaning of Section 951(b) of the Code.

"Change of Control" shall be deemed to occur if:

(a)     any combination of Permitted Holders shall fail to own beneficially (within the meaning of Rules 13d3 and 13d5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, in the aggregate Equity Interests representing at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings (or a permitted successor under a Tax Restructuring Transaction);

(b)     a "change of control" (or similar event) shall occur in any (A), the Existing Term Loan Document, (B) any Junior DIP Loan Documents, and (C) Indebtedness permitted under Section 10.04(xxx), in each case of this subclause (C) with an aggregate outstanding principal amount in excess of the Threshold Amount;

(c)     Holdings (or a permitted successor under a Tax Restructuring Transaction) shall cease to own, directly or indirectly, 100% of the Equity Interests of each Credit Party (which shall include any Credit Party that is a successor to a Credit Party pursuant to a transaction permitted by this Agreement).

"Chattel Paper" shall have the meaning provided in Article 9 of the UCC.

"Closing Date" shall mean February __, 2020.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document (including any Additional Security Documents) or will be granted in accordance with requirements in this Agreement or the other Credit Documents or the Financing Order, including, without limitation, all collateral as described in the Security Agreement, all Mortgaged Properties, all Mortgaged Vessels and all cash and Cash Equivalents.  Without limitation of the foregoing, subject to the terms of the Initial Financing Order, Final Financing Order, the Intercreditor Agreements and the Carveout, (a) the Collateral shall not include any Avoidance Actions but shall include all proceeds of any and all Avoidance Actions and (b) the Collateral shall not contain any real property other than the Specified Real Property until the Collateral Agent and each Lender shall have received (i) all flood insurance documentation and completed all diligence and coverage in accordance with Flood Insurance Laws and (ii) in the event that any such real property is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", evidence that Borrowers and Credit Parties have maintained flood insurance with respect to such real property (including any personal property which is located thereon) complying with the Flood Disaster Protection Act of

1973, as amended from time to time, in amounts satisfactory to all Lenders and otherwise satisfactory to all Lenders.

"<u>Collateral Agent</u>" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents (other than the Fleet Mortgages).

"<u>Collections</u>" shall mean all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, rental proceeds, and tax refunds).

"<u>Commitment</u>" shall mean, with respect to any Lender, such Lender's Revolving Commitment, LC Commitment or Swingline Commitment.

"<u>Committees</u>" means, collectively, the official committee of unsecured creditors and any other official committee appointed in any Bankruptcy Case.

"<u>Commodity Exchange Act</u>" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"<u>Compliance Certificate</u>" shall mean a certificate of the Responsible Officer of the Lead Borrower substantially in the form of <u>Exhibit H</u> hereto, and in any case, in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Confirmation Order</u>" shall have the meaning set forth in <u>Schedule 9.18</u>.

"<u>Consultant</u>" means a Person providing interim management services for the Credit Parties and/or acting as financial consultant of Credit Parties; such person to be reasonably acceptable to Administrative Agent and engaged by Borrowers pursuant to the terms of an engagement agreement reasonably acceptable to Administrative Agent. As of the Closing Date, the Consultant is Alvarez & Marsall North America, LLC under and pursuant to the A&M Engagement Agreement and Greenhill & Co., LLC under and pursuant to the Greenhill Engagement Agreement.

"<u>Contingent Obligation</u>" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made nonrecourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any such obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which

-10-

such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Cost" shall mean, as reasonably determined by the Administrative Agent in good faith, with respect to Inventory, the lower of (a) cost computed on a specific identification or first in first out basis or (b) market value, provided that for purposes of the calculation of Borrowing Base, the cost of Inventory shall not include (A) the portion of the cost of Inventory equal to the profit earned by any Affiliate on the sale thereof to any Borrower, or (B) write ups or write downs in cost with respect to currency exchange rates.

"Covered Entity" means any of the following:

(a)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified therefor in Section 14.13 of this Agreement

"Credit Agreement Party" shall mean each of Holdings and the Borrowers.

"Credit Agreement Party Guaranty" shall mean the guaranty of each Credit Agreement Party pursuant to Section 14.01.

"Credit Documents" shall mean this Agreement and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Subsidiaries Guaranty, each Security Document, the Intercreditor Agreements, the Reaffirmation Agreement, the Financing Order and any other document, instrument or agreement entered into, now or in the future, by Holdings or any of its Subsidiaries and Agent or any Lender in connection with the Agreement.

"Credit Event" shall mean the making of any Loan.

"Credit Extension" shall mean, as the context may require, (i) a Credit Event or (ii) the issuance, amendment, extension or renewal of any Letter of Credit by the Issuing Bank; provided that "Credit Extensions" shall not include conversions and continuations of outstanding Loans.

"Credit Party" shall mean Holdings, the Borrowers and each Subsidiary Guarantor.

"Debtor Relief Laws" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors" has the meaning given to it in the Recitals.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" shall mean, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Lead Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, any Issuing Bank, any Swingline Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swingline Loans) within two (2) Business Days of the date when due, (b) has notified the Lead Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Lead Borrower, to confirm in writing to the Administrative Agent and the Lead Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Lead Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Lead Borrower and each other Lender promptly following such determination.

"Defaulting Lender Rate" means (a) for the first three days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Revolving Loans that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" shall have the meaning assigned thereto in Article 9 of the UCC.

"Deposit Account Control Agreement" shall mean a Deposit Account control agreement executed or to be executed by each institution maintaining a Deposit Account (other than an Excluded Deposit Account and the Junior DIP Proceeds Account) for any Borrower or any other Credit Party, in each case as required by and in accordance with the terms of Section 9.15(d).

"Dilution" shall mean for any period with respect to any Borrower, the fraction, expressed as a percentage, the numerator of which is the aggregate amount of reductions in the Accounts of such Borrower for such period other than by reason of dollar for dollar cash payment and the denominator of which is the aggregate dollar amount of the sales of such Borrower for such period.

"Dilution Reserve" shall mean, as of any date of determination, an amount (initially $0) sufficient to reduce the advance rate against Eligible Accounts by 1 percentage point (or fraction thereof, rounding to the nearest one-tenth of 1 percentage point) for each percentage point (or fraction thereof, rounding to the nearest one-tenth of 1 percentage point) by which Dilution is in excess of 5%.

"DIP Motion" means a motion substantially in the form attached hereto as Exhibit M.

"DIP Termination Date" at Administrative Agent's election, the earlier to occur of (a) termination of the Commitments and (b) occurrence of the Maturity Date.

"Disclosure Statement" shall have the meaning set forth for such term in the Restructuring Support Agreement as in effect on the Closing Date.

"Dividend" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common equity of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any partnership or membership interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes.

"Dodd-Frank and Basel III" shall have the meaning set forth in Section 3.01(d).

"Domestic Subsidiary" shall mean, as to any Person, any Subsidiary of such Person incorporated or organized under the laws of the United States, any state thereof or the District of Columbia.

"Dominion Account" shall mean an account at PNC Bank, National Association or its affiliate or at another Lender acceptable to the Administrative Agent over which the Collateral

Agent has exclusive control for withdrawal purposes pursuant to the terms and provisions of this Agreement and the other Credit Documents.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit, including by electronic transmission such as SWIFT, electronic mail, facsimile or computer generated communication.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Accounts" means those Accounts created by any Borrower in the ordinary course of its business, that arise out of such Borrower's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Credit Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by the Administrative Agent in the Administrative Agent's Permitted Discretion upon no less than three (3) Business Days' prior written notice to the Borrowers. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits and unapplied cash. Eligible Accounts shall not include the following:

      (i)      Accounts that the Account Debtor has failed to pay within ninety (90) days of invoice date;

      (ii)      Accounts owed by an Account Debtor (or its Affiliates) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above;

      (iii)      Accounts with respect to which the Account Debtor is an Affiliate of a Borrower or an employee or agent of a Borrower or any Affiliate of a Borrower;

      (iv)      Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional;

      (v)      Accounts that are not payable in U.S. Dollars or Canadian dollars;

(vi)    Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or Canada, or (ii) is not organized under the laws of the United States or Canada or any state or province or territory thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless the Account is supported by an irrevocable letter of credit reasonably satisfactory to the Administrative Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to the Administrative Agent and is directly drawable by the Administrative Agent;

(vii)    Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrowers have complied, to the reasonable satisfaction of the Administrative Agent, with the Assignment of Claims Act, 31 USC §3727), or (ii) any state of the United States;

(viii)    Accounts with respect to which the Account Debtor is a creditor of a Borrower, has or has asserted a right of setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of setoff, or dispute;

(ix)    Accounts with respect to an Account Debtor whose total obligations owing to Borrowers exceed 25% (such percentage, as applied to a particular Account Debtor, being subject to reduction by the Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, however, that, in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentages shall be determined by the Administrative Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limits;

(x)    Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which a Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor;

(xi)    Accounts, the collection of which, the Administrative Agent, in its Permitted Discretion, believes to be doubtful by reason of the Account Debtor's financial condition;

(xii)    Accounts that are not subject to a valid and perfected first priority Lien of the Collateral Agent;

(xiii)    Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor;

(xiv)    Accounts with respect to which the Account Debtor is the target of Sanctions or a Sanctioned Person; or

-15-

(xv)     Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by Borrowers of the subject contract for goods or services.

"Eligible Inventory" means Inventory consisting of fuel which the Administrative Agent, in its reasonable credit judgment, determines to be Eligible Inventory, that complies with each of the representations and warranties respecting Eligible Inventory made in the Credit Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, however, that such criteria may be revised from time to time by the Administrative Agent in the Administrative Agent's Permitted Discretion upon no less than three (3) Business Days' prior written notice to the Borrowers. In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices. An item of Inventory shall not be included in Eligible Inventory if:

(i)     a Borrower does not have good and valid title thereto;

(ii)     a Borrower does not have actual and exclusive possession thereof (either directly or through a bailee or agent of Borrowers);

(iii)     it is not located at one of the locations in the continental United States set forth on Schedule 1.01(b) (or in-transit from one such location to another such location);

(iv)     it is located on real property leased by a Borrower or in a contract warehouse, in each case, unless it is subject to a Landlord Lien Waiver and Access Agreement executed by the lessor or warehouseman, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises;

(v)     it is not subject to a valid and perfected first priority Lien of the Collateral Agent;

(vi)     it consists of goods returned or rejected by a Borrower's customer;

(vii)     it consists of finished goods, chemicals, samples, prototypes, goods that are obsolete or slow moving, restrictive or custom items, work-in-process, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in Borrowers' business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment; or

(viii)     it is subject to third party trademark, licensing or other proprietary rights, unless the Administrative Agent is satisfied that such Inventory can be freely sold by the Administrative Agent on and after the occurrence of an Event of a Default despite such third party rights.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited

investor" (as defined in Regulation D of the Securities Act) (other than a natural person) but in any event excluding, the Sponsor, Holdings, each Borrower and their respective Subsidiaries and Affiliates.

"Eligible Vessels" shall mean towboats, barges and other vessels that (a) are owned by the Borrowers, (b) are subject to the first priority valid and perfected lien in favor of the Security Trustee, subject to Permitted Liens, (c) operate exclusively in domestic waters, and, (d) with respect to recently built towboats, barges and other vessels, have been fully constructed and accepted for delivery, as shown to the Security Trustee's reasonable satisfaction.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is or within the preceding six (6) years has been sponsored, maintained or contributed to by any Credit Party or (b) to which any Credit Party has, or has had at any time within the preceding six (6) years, any liability, contingent or otherwise, other than a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

"Environment" shall mean ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata and natural resources such as wetlands, flora and fauna.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations and/or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law, including, without limitation, (a) by governmental or regulatory authorities for enforcement, investigation, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to an alleged injury or threat of injury to human health, safety or the Environment due to the presence of Hazardous Materials, including any Release or threat of Release of any Hazardous Materials.

"Environmental Law" shall mean any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance or code, now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the Environment, occupational health or Hazardous Materials.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and, unless the context indicates otherwise, the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any successor Section thereof.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with a Credit Party or a Restricted Subsidiary of the Lead Borrower would be deemed to

be a "single employer" within the meaning of Section 414(b) or (c) of the Code and solely with respect to Section 412 of the Code, Sections 414(b), (c), (m) or (o) of the Code.

"ERISA Event" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, but excluding any event for which the 30-day notice period is waived with respect to a ERISA Plan, (b) any failure to make a required contribution to any ERISA Plan that would result in the imposition of a Lien or other encumbrance or the failure to satisfy the minimum funding standards set forth in Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA, or the arising of such a Lien or encumbrance, with respect to a ERISA Plan, (c) the incurrence by a Credit Party, or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan or the withdrawal or partial withdrawal (including under Section 4062(e) of ERISA) of a Credit Party, or an ERISA Affiliate from any ERISA Plan or Multiemployer Plan, (d) the filing of a notice of intent to terminate, the treatment of a ERISA Plan amendment as a termination under Section 4041 of ERISA, or the receipt by a Credit Party, or an ERISA Affiliate from the PBGC or a plan administrator of any notice of intent to terminate any ERISA Plan or Multiemployer Plan or to appoint a trustee to administer any ERISA Plan, (e) the adoption of any amendment to a ERISA Plan that would require the provision of security pursuant to the Code, ERISA or other applicable law, (f) the receipt by a Credit Party, or an ERISA Affiliate of any written notice concerning statutory liability arising from the withdrawal or partial withdrawal of a Credit Party, or an ERISA Affiliate from a Multiemployer Plan or a written determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, (g) the occurrence of any nonexempt "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to which a Credit Party is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which a Credit Party could reasonably be expected to have liability, (h) the occurrence of any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of any ERISA Plan or the appointment of a trustee to administer any ERISA Plan, (i) the filing of any request for or receipt of a minimum funding waiver under Section 412(c) of the Code with respect to any ERISA Plan or Multiemployer Plan, (j) a determination that any ERISA Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (k) the receipt by a Credit Party or any ERISA Affiliate of any notice, that a Multiemployer Plan is, or is expected to be, in endangered or critical status under Section 305 of ERISA or, (l) any other extraordinary event or condition with respect to a ERISA Plan or Multiemployer Plan which could reasonably be expected to result in a Lien or any acceleration of any statutory requirement to fund all or a substantial portion of the unfunded accrued benefit liabilities of such plan.

"ERISA Plan" shall mean any pension plan as defined in Section 3(2) of ERISA subject to Title IV of ERISA or Section 412 of the Code other than a Foreign Pension Plan or a Multiemployer Plan, which is maintained or contributed to by (or to which there is an obligation to contribute of) a Credit Party or with respect to which a Credit Party has, or may have, any liability, including, for greater certainty, liability arising from an ERISA Affiliate.

"Event of Default" shall have the meaning provided in Section 11.

"Excluded Deposit Account" shall mean a Deposit Account (a) which is used for the sole purpose of making payroll and withholding tax payments related thereto and other employee wage

and benefit payments and accrued and unpaid employee compensation (including salaries, wages, benefits and expense reimbursements), (b) which is used for the sole purpose of paying taxes, including sales taxes, (c) which is used solely as an escrow account or as a fiduciary or trust account for the benefit of third parties, (d) which is a zero balance Deposit Account or (e) which, individually or together with any other Deposit Accounts that are Excluded Deposit Accounts pursuant to this clause (e), has an average daily balance for any fiscal month of less than $100,000.

"Excluded Subsidiary" shall mean any Subsidiary of the Lead Borrower (other than a Borrower) that is (a) a CFC (other than a Protected CFC), (b) a Specified Excluded Subsidiary, (c) a FSHCO, (d) [**reserved**], (e) [**reserved**], (f) [**reserved**], (g) prohibited by applicable law, rule, regulation from guaranteeing the credit facilities established hereunder, or which would require governmental (including regulatory) consent, approval, license or authorization to provide a guarantee in each case, unless, such consent, approval, license or authorization has been received (but without obligation to seek the same), in each case so long as the Administrative Agent shall have received a certification from the Lead Borrower's general counsel or a Responsible Officer of the Lead Borrower as to the existence of such prohibition or consent, approval, license or authorization requirement, (h) prohibited from guaranteeing the Obligations by any contractual obligation in existence (x) on the Closing Date or (y) at the time of the acquisition of such Subsidiary after the Closing Date (to the extent such prohibition was not entered into in contemplation of such acquisition), (i) a Subsidiary with respect to which a guarantee by it of the Obligations would result in a material adverse tax consequence to Holdings, the Borrowers or the Restricted Subsidiaries, (j) [**reserved**], (k) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent, the cost or other consequences of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom, and (l) any Domestic Subsidiary that is treated under U.S. federal income tax law as a disregarded entity or partnership entity owned by a CFC, other than a Protected CFC; provided that, notwithstanding the above, (x) if a Subsidiary executes the Subsidiaries Guaranty as a "Subsidiary Guarantor" then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Subsidiaries Guaranty as a "Subsidiary Guarantor" in accordance with the terms hereof and thereof), (y) if a Subsidiary serves as a guarantor under the Existing Term Loan Credit Agreement or the Junior DIP Loan Documents, then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Subsidiaries Guaranty as a "Subsidiary Guarantor" in accordance with the terms hereof and thereof) and (z) if a Subsidiary's assets are included in the most recently delivered Borrowing Base Certificate, then it shall not constitute an "Excluded Subsidiary".

"Excluded Swap Obligation" shall mean, with respect to any Guarantor, (x) as it relates to all or a portion of the Guaranty of such Guarantor, any Swap Obligation if, and to the extent that, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor becomes effective with respect to such Swap Obligation or (y) as it relates to all or a portion of the grant by such Guarantor of a security interest, any Swap Obligation if, and to the extent that, such Swap Obligation (or such security interest in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or

the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the security interest of such Guarantor becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Credit Party under any Credit Document, (a) income Taxes imposed on (or measured by) its net income and franchise (and similar) Taxes imposed on it in lieu of income Taxes, either pursuant to the laws of the jurisdiction in which such recipient is organized or in which the principal office or applicable lending office of such recipient is located (or any political subdivision thereof) or as a result of any other present or former connection between it and the jurisdiction imposing such Tax (other than a connection arising from such Administrative Agent, Lender or other recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document), (b) any branch profits Taxes under Section 884(a) of the Code or any similar Tax imposed by any jurisdiction described in clause (a) above, (c) in the case of a Lender (other than an assignee pursuant to a request by a Borrower under Section 3.04), any U.S. federal withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such recipient (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Credit Parties with respect to such withholding tax pursuant to Section 5.01(a), (d) any Taxes attributable to such recipient's failure to comply with Section 5.01(b) or Section 5.01(c), other than any non-U.S. Taxes that would not have arisen if a Credit Party had not made a payment from outside of the United States, (e) any U.S. federal withholding Taxes imposed under FATCA and (f) U.S. federal backup withholding Taxes pursuant to Code Section 3406.

"Existing ABL Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of November 12, 2015, by and between Existing Agent and Existing Term Loan Agent, as the administrative agent, and acknowledged by Holdings and Borrowers, as amended or modified from time to time.

"Existing Agent" means Wells Fargo Bank, National Association, in its capacity as Agents (as defined in the Existing Credit Agreement) for the Existing Lenders.

"Existing Bank Product Obligations" means "Secured Bank Product Obligations" as defined in the Existing Credit Agreement.

"Existing Credit Agreement" means that certain Amended and Restated Revolving Credit Agreement, dated as of November 12, 2015 by and among Holdings, Borrowers, Old JB LLC, a Delaware limited liability company, the Existing Lenders and Existing Agent as amended from time to time.

"Exit Fee Letter" means that certain fee letter or fee letters delivered in connection with the Exit Financing Commitment Letter, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Exit Financing Commitment Letter" means the commitment letter for an exit financing between the Lead Borrower the commercial banks and financial institutions party thereto, which commitment provides for the payment in full in cash of the Obligations and Existing Secured Obligations, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Existing Lenders" means the lenders and other Secured Parties from time to time party to the Existing Credit Agreement.

"Existing Indebtedness" shall have the meaning provided in Section 10.04(vii).

"Existing Letters of Credit" has the meaning set forth in Section 2.13(t).

"Existing Loan Documents" means "Credit Documents" as defined in the Existing Credit Agreement.

"Existing Secured Obligations" means all outstanding principal, accrued interest, accrued fees and expenses and any other indebtedness and amounts owing to Existing Lenders (or the agents therefor) under the Existing Loan Documents and all Existing Bank Product Obligations (in any event excluding, for the avoidance of doubt, upon the Closing Date, the reimbursement obligations with respect to the Existing Letters of Credit that are deemed to be reissued as Letters of Credit hereunder on the Closing Date).

"Existing Swap Contracts" means any Swap Contracts entered into by any Credit Party or any Subsidiary that is outstanding on the Closing Date.

"Existing Term Loan Agent" means the "Term Loan Agent" as defined in the Existing ABL Intercreditor Agreement.

"Existing Term Loan Credit Agreement" means that certain Term Loan Credit Agreement dated as of November 12, 2015, by and among Holdings, CBLC, the Existing Term Loan Agent and the lenders from time to time party thereto, as amended from time to time to the extent permitted under the Existing ABL Intercreditor Agreement.

"Existing Term Loan Debt" means "Term Loan Obligations" as defined in the Existing ABL Intercreditor Agreement.

"Existing Term Loan Documents" means the "Term Loan Documents" as defined in the Existing ABL Intercreditor Agreement.

"Existing Vessels" shall mean all towboats, barges and other vessels for which the Administrative Agent has received a Vessel Appraisal as of any date of determination.

"<u>Fair Value</u>" shall mean the amount at which the assets (both tangible and intangible), in their entirety, of Holdings and its Subsidiaries taken as a whole would change hands between an independent willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"<u>FATCA</u>" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any such amended or successor version), any intergovernmental agreements between a non-U.S. jurisdiction and the United States with respect to any of the foregoing and any Requirement of Law adopted and any agreements entered into pursuant to any such intergovernmental agreement.

"<u>FCPA</u>" shall mean the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate *per annum* equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"<u>Federal Reserve Bank of New York's Website</u>" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"<u>Fees</u>" shall mean all amounts payable pursuant to or referred to in <u>Section 2.05</u>.

"<u>Filing Date</u>" has the meaning specified therefor in the recitals to this Agreement.

"<u>Final Financing Order</u>" means the "Final Order" as defined in the Initial Financing Order, which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Administrative Agent, in its sole discretion.

"<u>Financing Order</u>" means (a) until the entry of the Final Financing Order, the Initial Financing Order, and (b) from and after entry of the Final Financing Order, the Final Financing Order, together with all amendments, modifications and supplements to such Initial Financing Order or Final Financing Order, as applicable, which are acceptable to the Administrative Agent in its sole discretion.

"<u>First Day Hearing</u>" means the first day of the hearing scheduled on which entry of the Initial Financing Order shall be heard.

"First Day Orders" means the orders entered by the Bankruptcy Court in respect of first day motions and applications.

"Fleet Mortgage" shall mean, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by Holdings or its Subsidiaries in favor of the Security Trustee of the "Security Trustee" (as defined in the Existing Credit Agreement), in form and substance reasonably satisfactory to the Security Trustee, that encumber any Vessels, documented by the United States Coast Guard in the name of the applicable Borrowers or the Guarantors to secure all of the Obligations of the Borrowers under and in connection with this Agreement and of the Subsidiary Guarantors under and in connection with the Subsidiaries Guaranty.

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the BiggertWaters Flood Insurance Reform Act of 2012 as now or hereinafter in effect or any successor statute thereto.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Lead Borrower or any one or more of its Restricted Subsidiaries primarily for the benefit of employees of the Lead Borrower or such Restricted Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Foreign Subsidiaries" shall mean each Subsidiary of the Lead Borrower that is not a Domestic Subsidiary.

"Fronting Exposure" shall mean a Defaulting Lender's Pro Rata Share of LC Exposure or Swingline Loans, as applicable, except to the extent allocated to other Lenders under Section 2.11.

"FSHCO" shall mean any Subsidiary, all of the assets of which, disregarding immaterial assets, consist directly or indirectly through disregarded entities for federal income tax purposes of Equity Interests in one or more CFCs, other than Protected CFCs.

"Governmental Authority" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Greenhill Engagement Agreement" shall mean that certain engagement letter dated as of July 1, 2019, by and between Greenhill & Co., LLC and Holdings (for itself and its respective direct and indirect Subsidiaries), as in effect on the Closing Date.

"Guaranteed Obligations" shall mean (i) in the case of Holdings, (x) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the unpaid principal and interest on each Loan issued by, and all Loans made to, the Borrowers under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) thereon) of the Borrowers to the Lenders, the Administrative Agent, the Collateral Agent and the Security Trustee now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than the Intercreditor Agreements) to which any of the Borrowers is a party and the due performance and compliance by the Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than the Intercreditor Agreements) and (y) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) of the Lead Borrower or any of its Restricted Subsidiaries owing under any Secured Bank Product Obligation and the due performance and compliance with all terms, conditions and agreements contained therein, (ii) in the case of a Borrower, (x) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the unpaid principal and interest on each Loan, and all Loans made to, each other Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) thereon) of each other Borrower to the Lenders, the Administrative Agent, the Collateral Agent and the Security Trustee now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than Intercreditor Agreements) to which each other Borrower is a party and the due performance and compliance by the Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than Intercreditor Agreements) and (y) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) of such Borrower or any of its Restricted Subsidiaries owing under any Secured Bank Product Obligation and the due performance and compliance with all terms, conditions and agreements contained therein and (iii) the Obligations of the Subsidiary Guarantors under the Subsidiary Guaranty.

"<u>Guarantor</u>" shall mean (a) Holdings, each Borrower and each Subsidiary Guarantor and (b) with respect to the payment and performance by each Specified Credit Party of its obligations under Article 14 with respect to all Swap Obligations, the Borrowers.

"<u>Guaranty</u>" shall mean and include each of the Credit Agreement Party Guaranty and the Subsidiaries Guaranty.

"<u>Hard Cost</u>" shall mean, with respect to the purchase by a Borrower of an Eligible Vessel, the net cash amount actually paid or intercompany amounts transferred to acquire such Eligible Vessel, net of all incentives, discounts and rebates, and exclusive of freight, delivery charges, installation costs and charges, charges and fees, warranty costs, taxes, insurance and other incidental costs or expenses and all indirect costs or expenses of any kind.

"<u>Hazardous Materials</u>" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance regulated under any Environmental Law.

"<u>Holdings</u>" shall have the meaning provided in the preamble hereto.

"<u>Indebtedness</u>" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person (A) for borrowed money or (B) for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit, bankers' acceptances and similar obligations issued for the account of such Person and all unpaid drawings in respect of such letters of credit, bankers' acceptances and similar obligations, (iii) all Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such Indebtedness, such Indebtedness shall be deemed to be in an amount equal to the lesser of (x) the aggregate unpaid amount of Indebtedness secured by such Lien and (y) the fair market value of the property to which such Lien relates as determined in good faith by such Person), (iv) the aggregate amount of all Capitalized Lease Obligations of such Person, (v) all Contingent Obligations of such Person, (vi) all obligations under any Swap Contracts and any Bank Product Debt or under any similar type of agreement and (vii) all Off-Balance Sheet Liabilities of such Person. Notwithstanding the foregoing, Indebtedness shall not include (a) trade payables and accrued expenses incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person or (b) earn-outs and other contingent payments in respect of acquisitions except to the extent that the liability on account of any such earn-outs or contingent payment becomes fixed and is required by U.S. GAAP to be reflected as a liability on the consolidated balance sheet of the Lead Borrower and its Restricted Subsidiaries.

"<u>Indemnified Person</u>" shall have the meaning provided in <u>Section 13.01(a)</u>.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Budget" means the initial 13-week consolidated weekly operating budget of the Debtors setting forth the Projected Information for the periods described therein prepared by the Borrowers' management, in consultation with the Consultant, a copy of which is attached as Exhibit B.

"Initial Financing Order" means collectively, the order of the Bankruptcy Court substantially in the form of Exhibit I-2 (except as may otherwise be agreed in writing or on the record by the Administrative Agent at the interim hearing with respect to such order in the Bankruptcy Cases) entered in the Bankruptcy Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Administrative Agent, in its sole discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, Debtors to execute and perform under the terms of this Agreement and the other Credit Documents.

"Insolvency Proceeding" shall mean any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" shall have the meaning provided in Section 8.20.

"Intercreditor Agreements" means the Existing ABL Intercreditor Agreement and the Junior DIP Intercreditor Agreement.

"Interest Determination Date" shall mean, with respect to any LIBO Rate Loan, the second Business Day prior to the commencement of any Interest Period relating to such LIBO Rate Loan.

"Interest Period" shall mean, as to any Borrowing of a LIBO Rate Loan, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one, two or three months, as the Lead Borrower may elect, or the date any Borrowing of a LIBO Rate Loan is converted to a Borrowing of a Base Rate Loan in accordance with Section 2.08 or repaid or prepaid in accordance with Section 2.07 or Section 2.09; provided that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Inventory" shall mean all "inventory," as such term is defined in the UCC as in effect on the date hereof in the State of New York, wherever located, in which any Person now or hereafter has rights.

"Investments" shall have the meaning provided in Section 10.05.

"ISP" means , with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any version or revision thereof accepted by the Issuing Bank for use.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by a Borrower in favor of Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" shall mean, as the context may require, (a) Wells Fargo with respect to Letters of Credit issued by it; (b) any other Lender that may become an Issuing Bank at the request of Lead Borrower and with the consent of Administrative Agent and such Lender, with respect to Letters of Credit issued by such Lender; or (c) collectively, all of the foregoing.

"Joint Venture" shall mean any Person other than an individual or a Subsidiary of the Lead Borrower (a) in which the Lead Borrower or any of its Restricted Subsidiaries holds or acquires an ownership interest (by way of ownership of Equity Interests or other evidence of ownership) and (b) which is engaged in a business permitted by Section 10.09.

"Junior DIP Agent" shall mean Cortland Capital Market Services LLC, in its capacity as administrative agent under the Junior DIP Loan Documents.

"Junior DIP Credit Agreement" shall mean that certain Senior Secured Debtor-in-Possession Term Loan Credit Agreement dated as of the Closing Date, by and among Holdings, CBLC, the Junior DIP Agent and the lenders from time to time party thereto, as amended from time to time to the extent permitted under the Junior DIP Intercreditor Agreement.

"Junior DIP Indebtedness" shall mean the Indebtedness evidenced by the Junior DIP Loan Documents.

"Junior DIP Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Agents and the Junior DIP Agent, as the administrative agent, and acknowledged by Holdings and Borrowers, as amended or modified from time to time.

"Junior DIP Loan Documents" shall mean all documents, instruments and agreements delivered in connection with the Junior DIP Credit Agreement.

"Junior DIP Proceeds Account" shall mean the segregated Deposit Account referenced in clause (d) of the definition of "Satisfactory Junior DIP Conditions".

"Landlord Lien Reserve" shall mean an amount equal to three months' rent (or such greater period or amount in Administrative Agent's Permitted Discretion) for all of the leased locations of

the Borrowers at which Eligible Inventory is stored, other than leased locations with respect to which the Administrative Agent has received a Landlord Lien Waiver and Access Agreement.

"Landlord Lien Waiver and Access Agreement" shall mean a Landlord Lien Waiver and Access Agreement, in a form reasonably approved by the Administrative Agent.

"LC Collateral Account" shall mean a collateral account in the form of a deposit account established and maintained by the Administrative Agent for the benefit of the Secured Creditors, in accordance with the provisions of Section 2.13.

"LC Commitment" shall mean the commitment of the Issuing Bank to issue Letters of Credit pursuant to Section 2.13.

"LC Disbursement" shall mean a payment or disbursement made by the Issuing Bank pursuant to a Letter of Credit.

"LC Documents" shall mean all documents, instruments and agreements delivered by the Lead Borrower or any other Person to the Issuing Bank or the Administrative Agent in connection with any Letter of Credit.

"LC Exposure" shall mean at any time the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate principal amount of all LC Disbursements that have not yet been reimbursed at such time. The LC Exposure of any Revolving Lender at any time shall mean its Pro Rata Percentage of the aggregate LC Exposure at such time.

"LC Obligations" shall mean the sum (without duplication) of (a) all amounts owing by the Borrowers for any drawings under Letters of Credit (including any bankers' acceptances or other payment obligations arising therefrom); and (b) the stated amount of all outstanding Letters of Credit.

"LC Participation Fee" shall have the meaning assigned to such term in Section 2.05(c).

"Lead Arrangers" shall mean Bank of America, N.A., UBS Securities LLC and Wells Fargo Capital Finance, LLC.

"Lead Borrower" shall have the meaning provided in the preamble hereto.

"Lender" shall mean each financial institution listed on Schedule 2.01, as well as any Person that becomes a "Lender" hereunder pursuant to Section 3.04 or 13.04(b), and, as the context requires, includes the Swingline Lender.

"Letter of Credit" shall mean any letters of credit issued or to be issued by an Issuing Bank for the account of the Lead Borrower or any of its Subsidiaries pursuant to Section 2.13.

"Letter of Credit Collateralization" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent (including that Collateral Agent has a first priority perfected Lien in such cash collateral), including provisions that specify that the LC Participation Fees and all commissions, fees, charges and expenses provided for in Section

2.13(k) of this Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Agent for the benefit of the Revolving Lenders in an amount equal to 105% of the then existing LC Exposure, (b) delivering to Administrative Agent documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Administrative Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank acceptable to Agent (in its sole discretion) in an amount equal to 105% of the then existing LC Exposure (it being understood that the LC Participation Fee and all fronting fees set forth in this Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"Letter of Credit Expiration Date" shall mean the date which is five (5) Business Days prior to the Maturity Date.

"Letter of Credit Sublimit" means $35,000,000.

"LIBO Rate" means the rate *per annum* as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Administrative Agent may designate from time to time) as of 11:00 a.m., London time, two Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBO Rate Loan requested (whether as an initial LIBO Rate Loan or as a continuation of a LIBO Rate Loan or as a conversion of a Base Rate Loan to a LIBO Rate Loan) by Borrowers in accordance with this Agreement (and, if any such published rate is below zero, then the LIBO Rate shall be deemed to be zero). Each determination of the LIBO Rate shall be made by the Administrative Agent and shall be conclusive in the absence of manifest error.

"LIBO Rate Loan" shall mean each Revolving Loan designated as such by the Lead Borrower at the time of the incurrence thereof or conversion thereto.

"Lien" shall mean any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, deemed or statutory trust, security conveyance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, and any lease having substantially the same effect as any of the foregoing).

"Line Cap" shall mean equal to an amount that is the lesser of (a) the Aggregate Commitments and (b) the then applicable Borrowing Base.

"Liquidity Event" shall mean the occurrence of a date when (a) Availability is less than the greater of (i) 5.0% of the Line Cap and (ii) $30,000,000 until such date when (b) Availability shall have been at least equal to the greater of (i) 5.0% of the Line Cap and (ii) $30,000,000 for thirty (30) consecutive calendar days.

"Liquidity Notice" shall mean a written notice delivered by the Administrative Agent at any time during a Liquidity Period to any bank or other depository at which any Deposit Account (other than any Excluded Deposit Account and the Junior DIP Proceeds Account) is maintained

directing such bank or other depository (a) to remit all funds in such Deposit Account to the Dominion Account, or in the case of the Dominion Account, to the Administrative Agent on a daily basis, and (b) to cease following directions or instructions given to such bank or other depository by any Credit Party regarding the disbursement of funds from such Deposit Account (other than any Excluded Deposit Account and the Junior DIP Proceeds Account), and (c) to follow all directions and instructions given to such bank or other depository by the Administrative Agent in each case, pursuant to the terms of any Deposit Account Control Agreement in place.

"Liquidity Period" shall mean any period throughout which (a) a Liquidity Event has occurred and is continuing or (b) an Event of Default has occurred and is continuing; provided that the Administrative Agent may in its sole discretion permit Borrowers to cure or seek a waiver of such Event of Default for a period not to exceed five (5) Business Days prior to instituting a Liquidity Period under this Agreement pursuant to clause (d) of this definition.

"Loans" shall mean advances made to or at the instructions of the Lead Borrower pursuant to Article 2 hereof and may constitute Revolving Loans, Swingline Loans or Overadvance Loans.

"Location" of any Person shall mean such Person's "location" as determined pursuant to Section 9307 of the UCC of the State of New York.

"Management Incentive Plan" means a management incentive plan implemented in accordance with the MIP Term Sheet attached to the Restructuring Support Agreement as Exhibit C.

"Margin Stock" shall have the meaning provided in Regulation U.

"Maritime and Cost to Complete Reserves" shall mean the reserves established by the Administrative Agent in its Permitted Discretion for necessaries and other maritime liens (including Permitted Vessel Liens) or other maritime liabilities which may result in claims that have lien priority or payment priority over any portion of the Obligations, and the costs to complete transportation of non-grain cargo, including those based upon the categories set forth in the Borrowing Base Certificate under the heading "Maritime Reserves" from time to time.

"Material Adverse Effect" shall mean (i) a material adverse effect on the business, assets, financial condition or results of operations of Holdings, the Lead Borrower and their Restricted Subsidiaries taken as a whole, (ii) a material and adverse effect on the rights and remedies of the Administrative Agent and Lenders, taken as a whole, under the Credit Documents, (iii) a material and adverse effect on the ability of the Credit Parties, taken as a whole, to perform their obligations under the Credit Documents, or (iv) a material adverse effect on the perfection or priority of the Liens granted pursuant to the Credit Documents or the Financing Order, except, in each case, for the commencement of the Bankruptcy Cases and the events that customarily and reasonably result from the commencement of the Bankruptcy Cases.

"Material Real Property" shall mean (i) each parcel of Real Property identified as Material Real Property on Schedule 8.12(a) and (ii) at the request of Collateral Agent in its Permitted Discretion, each parcel of Real Property that is hereafter owned in fee by any Credit Party that (together with any other parcels constituting a single site or operating property) has a fair market value of at least $1,000,000.

-30-

"Maturity Date" means the earliest of (a) August 7, 2020, (b) the consummation of a sale of all or substantially all of the Debtors' assets and (c) the Plan Effective Date.

"Milestones" shall have the meaning set forth in Schedule 9.18.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean a mortgage, debenture, leasehold mortgage, deed of trust, deed of immovable hypothec, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument in form and substance reasonably satisfactory to the Administrative Agent, in favor of the Collateral Agent for the benefit of the Secured Creditors, as the same may be amended, modified, restated and/or supplemented from time to time.

"Mortgaged Property" shall mean any Material Real Property of the Lead Borrower or any of its Restricted Subsidiaries which is or will be encumbered (or required to be encumbered) by a Mortgage.

"Mortgaged Vessel" shall mean any Vessel of the Lead Borrower or any of its Restricted Subsidiaries which will be encumbered (or required to be encumbered) by a Fleet Mortgage.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA under which any Credit Party has any obligation or liability, including on account of an ERISA Affiliate.

"NAIC" shall mean the National Association of Insurance Commissioners.

"Net Cash Proceeds" shall mean:

(a)    with respect to any sale or disposition by any Credit Party or any of its Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Credit Party or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Priority Lien on any asset (other than (A) Indebtedness owing to any Agent or any Lender under this Agreement or the other Credit Documents and (B) Indebtedness assumed by the purchaser of such asset) which (subject to the Existing ABL Intercreditor Agreement and the Financing Order) is required to be, and is, repaid in connection with such sale or disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by such Credit Party or such Subsidiary in connection with such sale or disposition, (iii) Taxes paid or reasonably estimated to be payable to any taxing authorities or Tax distributions permitted by clause (vi)(B) of Section 10.03 paid or estimated to be payable by such Credit Party or such Subsidiary in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or reasonably estimated to be payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries (other than in the case of Tax distributions), and are properly attributable to such transaction and with respect to estimated Tax distributions are actually made, and (iv) all amounts that are set aside as a reserve for adjustments in respect of the purchase price of such assets, to the extent that in each case the funds described above in this clause (iv) are (x) deposited into escrow with a third party escrow agent or set aside in a separate Deposit Account

that is subject to a Control Agreement in favor of Collateral Agent, and (y) paid to Administrative Agent as a prepayment of the applicable Obligations in accordance with Section 2.09 of this Agreement at such time when such amounts are no longer required to be set aside as such a reserve; and

(b)     with respect to the issuance or incurrence of any Indebtedness for borrowed money (other than Indebtedness under this Agreement or any Junior DIP Indebtedness) by any Credit Party or any of its Subsidiaries, or the issuance by any Credit Party or any of its Subsidiaries of any Equity Interests, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Credit Party or such Subsidiary in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by such Credit Party or such Subsidiary in connection with such issuance or incurrence, and (ii) Taxes paid or reasonably estimated to be payable to any taxing authorities or Tax distributions permitted by clause (vi)(B) of Section 10.03 paid or estimated to be payable by such Credit Party or such Subsidiary in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries (other than in the case of Tax distributions permitted by clause (vi)(B) of Section 10.03), and are properly attributable to such transaction.

"Net Liquidation Percentage" shall mean the percentage of the book value of Borrowers' Inventory (or any category thereof) that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be as determined from time to time by an appraisal company in connection with an appraisal conducted in accordance with the terms hereof.

"Net Forced Liquidation Value" shall mean the value of the Borrowers' owned towboats, barges and other vessels that is estimated to be recoverable in a forced liquidation of such vessels net of all associated costs and expenses of such liquidation, such value to be as determined from time to time by an appraisal company in connection with an appraisal conducted in accordance with the terms hereof.

"New Vessels" shall mean, as of any date of determination, all towboats, barges and other vessels owned by the Borrowers for which: (a) construction thereof has been completed not longer than two (2) years prior to such date; and (b) the Administrative Agent has not received a Vessel Appraisal.

"NFL Vessel Advance Rate" shall mean 72%.

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Notice of Borrowing" shall mean a notice substantially in the form of Exhibit A-1 hereto.

"Notice of Conversion/Continuation" shall mean a notice substantially in the form of Exhibit A-2 hereto.

"Notice Office" shall mean for credit and operational notices, the office of the Administrative Agent located at 2450 Colorado Avenue, Suite 3000 West, Santa Monica, California 90404, Attention: Business Finance Division Manager or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Noticed Hedge" shall mean any Secured Bank Product Obligations arising under a Swap Contract with respect to which the Secured Bank Product Provider thereof (other than Wells Fargo or any of its affiliates) have notified the Administrative Agent of the intent to include such Secured Bank Product Obligations as a Noticed Hedge hereunder and with respect to which a Bank Products Reserve has subsequently been established in the maximum amount thereof.

"Obligations" shall mean (x) all now existing or hereafter arising debts, obligations, covenants, and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable to any Lender, any Agent or any Indemnified Person by any Credit Party arising out of this Agreement or any other Credit Document (other than the Intercreditor Agreements), including, without limitation, the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations to pay principal or interest (including interest, fees and other amounts accruing during any proceeding under any Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) on the Loans, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to any Credit Party or for which any Credit Party is liable as indemnitor under the Credit Documents, whether or not evidenced by any note or other instrument and (y) all Secured Bank Product Obligations, and in each case of clauses (x) and (y), the due performance and compliance with all terms, conditions and agreements contained therein; provided, however, that for purposes of each Guaranty and each other guarantee agreement or other instrument or document executed and delivered pursuant to this Agreement or any Guaranty, the term "Obligations" shall not, as to any Subsidiary Guarantor, include any Excluded Swap Obligations.

"OFAC" shall mean the U.S. Treasury Department Office of Foreign Assets Control.

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any Sale-Leaseback Transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Other Statutory Liabilities" means accrued and unpaid statutory liabilities of the Credit Parties which may result in claims that have lien priority or priority of payment over all or any portion of the Obligations, are a statutory trust and/or which are legally required to be paid prior to the repayment in full of such Obligations.

"Other Taxes" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing, value added or similar Taxes arising from any payment made under, from the execution, delivery, registration, performance or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document except any such Taxes imposed with respect to an assignment by a Lender on or after the date hereof

(other than an assignment made pursuant to <u>Section 3.04</u> or otherwise at the request of any Credit Party during an Event of Default described in Section <u>11.01</u> or <u>11.05</u>) that are imposed as a result of any present or former connection between the relevant Lender and the jurisdiction imposing such Tax (other than a connection arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"<u>Outstanding Amount</u>" shall mean with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"<u>Overadvance</u>" shall have the meaning of such term assigned to such term in <u>Section 2.17</u>.

"<u>Overadvance Loan</u>" shall mean a Base Rate Loan made when an Overadvance exists or is caused by the funding thereof.

"<u>Parent Company</u>" shall mean any direct or indirect parent company of the Lead Borrower (other than the Sponsor).

"<u>Participant Register</u>" shall have the meaning provided in <u>Section 13.04(a)</u>.

"<u>Patriot Act</u>" shall have the meaning provided in <u>Section 13.16</u>.

"<u>Payment Office</u>" shall mean the office of the Administrative Agent located at 2450 Colorado Avenue, Suite 3000 West, Santa Monica, California 90404, Attention: Business Finance Division Manager, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"<u>Perfection Certificate</u>" shall mean a certificate in the form of <u>Exhibit L-1</u> or any other form approved by the Collateral Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"<u>Perfection Certificate Supplement</u>" shall mean a certificate supplement in the form of <u>Exhibit L-2</u> or any other form approved by the Collateral Agent.

"<u>Permitted Discretion</u>" means a determination by the Administrative Agent made in the exercise of its reasonable (from the perspective of a secured asset-based lender) business judgment.

"<u>Permitted Encumbrance</u>" shall mean, with respect to any Mortgaged Property, such exceptions to title as are set forth in the mortgage title insurance policy delivered with respect thereto, all of which exceptions must be acceptable to the Administrative Agent in its reasonable discretion.

"<u>Permitted Holders</u>" shall mean the Sponsor.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Permitted Priority Liens" means all Liens permitted to have priority over the Liens in favor of Collateral Agent, solely to the extent that such Liens are valid, perfected and non-avoidable as of the Filing Date (or as may be permitted to be perfected after the Filing Date pursuant to section 546 of the Bankruptcy Code) and were not subordinated by agreement or applicable law, subject to the terms of the Financing Order and otherwise agreed to by Administrative Agent.

"Permitted Variance" means, with respect to determining compliance with Section 10.11(a) relating to the Borrowers' cash receipts and cash disbursements, in each case compared to the amount forecast for the same period in the Budget:  (a) for the Testing Period ending February 23, 2020, a cumulative variance for all disbursements (other than disbursements excluded under Section 10.11(a)(iii)) in excess of the Budget of 20.0% and a cumulative variance for all receipts less than the Budget of 20.0%, (b) for the Testing Period ending March 1, 2020, a cumulative variance for all disbursements (other than disbursements excluded under Section 10.11(a)(iii)) in excess of the Budget of 15.0% and a cumulative variance for all receipts less than the Budget of 15.0%, and (c) for each Testing Period thereafter, a cumulative variance for all disbursements (other than disbursements excluded under Section 10.11(a)(iii)) in excess of the Budget of 10.0% and a cumulative variance for all receipts less than the Budget of 10.0%.

"Permitted Vessel Liens" shall mean Liens permitted under the Fleet Mortgages.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning set forth in Schedule 9.18.

"Plan" shall have the meaning set forth for such term in the Restructuring Support Agreement as in effect on the Closing Date.

"Plan Effective Date" means the date in which all conditions precedent to the effectiveness of a plan of reorganization under Chapter 11 of the Bankruptcy Code have been satisfied or waived in accordance with such plan of reorganization.

"Present Fair Saleable Value" shall mean the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Lead Borrower and its Subsidiaries taken as a whole are sold as a going concern with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Prime Rate" shall mean the rate which the Administrative Agent announces from time to time as its prime lending rate, the Prime Rate to change when and as such prime lending rate changes. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer by the Administrative Agent, which may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Projected Information" means (a) the projected weekly operating cash receipts for each week, (b) the projected weekly disbursements for each week (c) the projected net weekly cash flow for each week, (d) projected cash on hand for each week, (e) projected lease payments for each week, (f) projected trade payables for each week, (g) projected capital expenditures for each week, (h) the projected Availability for each week, (i) the projected aggregate principal amount of Existing Secured Obligations and Obligations outstanding for each week and (j) such other information that Administrative Agent may reasonably request with reasonable advance notice to the Borrowers.

"Properly Contested" with respect to any obligation of a Credit Party, (a) the obligation is subject to a bona fide dispute regarding amount or the Credit Party's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) nonpayment could not have a Material Adverse Effect, nor result in forfeiture or sale of any assets of the Credit Party; (e) no Lien is imposed on assets of the Credit Party, unless bonded and stayed to the satisfaction of Administrative Agent; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Pro Rata Percentage" of any Revolving Lender at any time shall mean the percentage of the total Revolving Commitment represented by such Lender's Revolving Commitment.

"Pro Rata Share" shall mean, with respect to each Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolving Exposure of such Lender at such time and the denominator of which is the aggregate amount of all Aggregate Exposures at such time. The initial Pro Rata Shares of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Protected CFC" means a CFC all of whose "United States shareholders" within the meaning of Section 951(b) of the Code are United States domestic C-corporations that are eligible for the dividends received deduction under Code Section 245A with respect to dividends and income inclusions under Code Section 951(a)(1)(B) or 956 from such CFC under Treasury Regulation Section 1.956-1.

"Protective Advances" shall have the meaning provided in Section 2.18.

"Public Lender" shall have the meaning provided in Section 13.22.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified therefor in Section 14.13 of this Agreement.

"Qualified ECP Guarantor" shall have the meaning provided in Section 14.11.

"Qualified Preferred Stock" shall mean any preferred capital stock of the Lead Borrower so long as the terms of any such preferred capital stock (x) do not contain any mandatory put,

redemption, repayment, sinking fund or other similar provision, or, if later, the 91st day after the then Maturity Date then in effect other than (i) provisions requiring payment solely in the form of common Equity Interests of the Lead Borrower or Holdings or Qualified Preferred Stock, (ii) provisions requiring payment solely as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale are subject to the payment in full of all Obligations in cash (other than unasserted contingent indemnification obligations) or such payment is otherwise permitted by this Agreement (including as a result of a waiver or amendment hereunder) and (iii) with respect to preferred capital stock issued to any plan for the benefit of employees of the Lead Borrower or its Subsidiaries or by any such plan to such employees, provisions requiring the repurchase thereof in order to satisfy applicable statutory or regulatory obligations and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under this Agreement or would result in a Default or Event of Default hereunder.

"Reaffirmation Agreement" means that certain Reaffirmation of Existing Loan Documents, dated as of the Closing Date, by and among the Credit Parties, the Existing Agent and the Agents.

"Real Property" of any Person shall mean, collectively, the right, title and interest of such Person (including any leasehold, mineral or other estate) in and to any and all land, improvements and fixtures owned, leased or operated by such Person, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Recovery Event" shall mean the receipt by the Lead Borrower or any of its Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Lead Borrower or any of its Restricted Subsidiaries (but not by reason of any loss of revenues or interruption of business or operations caused thereby) and (ii) under any policy of insurance required to be maintained under Section 9.03, in each case to the extent such proceeds or awards do not constitute reimbursement or compensation for amounts previously paid by the Lead Borrower or any of its Restricted Subsidiaries in respect of any such event.

"Register" shall have the meaning provided in Section 13.14.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Reinstated Existing Secured Obligations" means any Existing Secured Obligations constituting Avoided Payments, to the extent such obligations have been reinstated, in each case, pursuant to, and subject to the requirements and terms of the Bankruptcy Court.

"Release" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into, through or upon the Environment or within, from or into any building, structure, facility or fixture.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Relevant Guaranteed Obligations" shall mean (i) in the case of Holdings, (x) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the unpaid principal and interest on all Loans made to, the Borrowers under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) thereon) of the Borrowers to the Lenders, the Administrative Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than the Intercreditor Agreements) to which any of the Borrowers is a party and the due performance and compliance by the Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than the Intercreditor Agreements) and (y) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) of the Lead Borrower or any of its Restricted Subsidiaries owing under any Secured Bank Product Obligation and the due performance and compliance with all terms, conditions and agreements contained therein, (ii) in the case of a Borrower, (x) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the unpaid principal and interest on all Loans made to each other Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) thereon) of each other Borrower to the Lenders, the Administrative Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than the Intercreditor Agreements) to which each other Borrower is a party and the due performance and compliance by the Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than the Intercreditor

Agreements) and (y) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) of such Borrower or any of its Restricted Subsidiaries owing under any Secured Bank Product Obligation and the due performance and compliance with all terms, conditions and agreements contained therein.

"Relevant Guaranteed Party" shall mean (i) with respect to the Lead Borrower, each Subsidiary Borrower and (ii) with respect to any Subsidiary Borrower, the Lead Borrower and any other Subsidiary Borrower.

"Replaced Lender" shall have the meaning provided in Section 3.04. "Replacement Lender" shall have the meaning provided in Section 3.04.

"Report" shall have the meaning provided in Section 12.14.

"Required Consenting Term Lenders" shall have the meaning set forth for such term in the Restructuring Support Agreement as in effect on the Closing Date.

"Required Lenders" shall mean Non-Defaulting Lenders, the sum of whose outstanding principal of Commitments as of any date of determination represent greater than 50% of the sum of all outstanding principal of Commitments of Non-Defaulting Lenders at such time.

"Requirement of Law" or "Requirements of Law" shall mean, with respect to any Person, (i) the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person and (ii) any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" shall mean, without duplication of any items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent, from time to time determines in its Permitted Discretion, including but not limited to Dilution Reserves and Landlord Lien Reserves, plus any Maritime and Cost to Complete Reserves, any Bank Product Reserves, reserves for accrued and accruing carve-outs (including the Carveout for any accrued period and the week thereafter reflecting an estimate of the accrued and accruing portions thereof) and Other Statutory Liabilities; provided that (a) Reserves shall not duplicate the exclusionary criteria set forth in the definitions of Eligible Accounts, Eligible Inventory or Eligible Vessels, as applicable, or vice versa and (b) no new Reserve shall be established without at least three (3) Business Days prior written notice from the Administrative Agent to the Lend Borrower, which notice shall include a reasonably detailed description of such Reserve being established (provided that (i) no Credit Extensions shall be made to the Borrowers if after giving effect to such Credit Extension, aggregate Revolving Exposure exceeds the Line Cap after giving effect to such Reserve, (ii) no such prior notice shall be required for changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserve in accordance with the methodology of

calculation set forth in this Agreement or previously utilized, (iii) no such prior notice shall be required during the continuance of any Event of Default and (iv) no such prior notice shall be required with respect to any Reserve established in respect of any Lien that has priority over Collateral Agent's Liens on the Collateral).

"Responsible Officer" shall mean, with respect to any Person, its chief financial officer, chief executive officer, president, or any vice president, managing director, treasurer, controller or other officer of such Person having substantially the same authority and responsibility and, solely for purposes of notices given to Article 2, any other officer or employee of the applicable Credit Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Credit Party designated in or pursuant to an agreement between the applicable Credit Party and the Administrative Agent; provided that, with respect to compliance with financial covenants, "Responsible Officer" shall mean the chief financial officer, treasurer or controller of the Lead Borrower, or any other officer of the Lead Borrower having substantially the same authority and responsibility.

"Restricted Subsidiary" shall mean each Subsidiary of the Lead Borrower other than any Unrestricted Subsidiary. The Subsidiary Borrowers shall at all times constitute Restricted Subsidiaries.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement entered on or prior to the Closing Date, by and among certain Existing Term Lenders, Sponsor and the Credit Parties party thereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof.

"Returns" shall have the meaning provided in Section 8.09.

"Revolver Priority Collateral" shall have the meaning assigned to the term "Revolving Facility Collateral" in the Existing ABL Intercreditor Agreement.

"Revolving Availability Period" shall mean the period from and including the Closing Date to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commitments.

"Revolving Borrowing" shall mean a Borrowing comprised of Revolving Loans.

"Revolving Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans hereunder up to the amount set forth on Schedule 2.01, or in the Assignment and Assumption Agreement pursuant to which such Lender assumed its Revolving Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 13.04. The aggregate amount of the Lenders' Revolving Commitments on the Closing Date is $640,000,000.

"Revolving Exposure" shall mean, with respect to any Lender at any time, the aggregate principal amount at such time of all outstanding Revolving Loans of such Lender, plus the aggregate amount at such time of such Lender's LC Exposure, plus the aggregate amount at such time of such Lender's Swingline Exposure.

"Revolving Lender" shall mean a Lender with a Revolving Commitment.

"Revolving Loans" shall mean advances made to or at the instructions of the Lead Borrower pursuant to Article 2 hereof and may constitute Revolving Loans, Swingline Loans, Protective Advances, or Overadvance Loans.

"S&P" shall mean Standard & Poor's Ratings Services, a division of the McGraw Hill Company, Inc., and any successor owner of such division.

"Sale-Leaseback Transaction" shall mean any arrangements with any Person providing for the leasing by the Lead Borrower or any of its Restricted Subsidiaries of real or personal property (including Vessels) which has been or is to be sold or transferred by the Lead Borrower or such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person in connection therewith.

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any Secured Creditor or any Credit Party or any of their respective Subsidiaries or Affiliates.

"Satisfactory Junior DIP Conditions" means with respect to the Indebtedness governed by the Junior DIP Loan Documents, (a) such Indebtedness has been approved by the Bankruptcy Court as debtor-in-possession Indebtedness, (b) such Indebtedness is an aggregate principal amount of not less than $50,000,000, (c) such Indebtedness and Liens securing such Indebtedness is subordinated to the Obligations and the Liens securing the Obligations pursuant to the Junior DIP Intercreditor Agreement, (d) on the Closing Date, one hundred percent of the proceeds of such Indebtedness shall be deposited into a segregated Deposit Account in favor of the lenders party to

the Junior DIP Credit Agreement and permitted to used by the Borrowers to fund (i) fees and expenses associated with the Transactions (including the transactions evidenced by the Credit Documents), (ii) to finance the ongoing general corporate needs of Borrowers to the extent set forth in the Budget (subject to the Permitted Variance) and (iii) to pay for administrative expenses incurred during the Bankruptcy Cases and set forth in the Budget (subject to the Permitted Variance) and (e) and any financing order(s) with respect to such Indebtedness shall be in form and substance satisfactory to the Administrative Agent.

"SEC" shall have the meaning provided in Section 9.01(f).

"Secured Bank Product Collateralization" means providing cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent) to be held by Administrative Agent for the benefit of the Secured Bank Product Providers (other than with respect to Swap Contracts held by Secured Bank Product Providers) in an amount determined by Administrative Agent as sufficient to satisfy the reasonably estimated credit exposure, operational risk or processing risk with respect to the then existing Secured Bank Product Obligations (other than with respect to Swap Contracts).

"Secured Bank Product Obligations" shall mean Bank Product Debt owing to a Secured Bank Product Provider or any Person that was a Secured Bank Product Provider on the Closing Date or at the time it entered into a Bank Product (which shall include, any Bank Product Debt owing to Wells Fargo or any of its affiliates) at any time) with a Borrower or its Subsidiary, up to the maximum amount (in the case of any Secured Bank Product Provider other than Wells Fargo and its Affiliates) specified by such provider in writing to the Administrative Agent, which amount may be established or increased (by further written notice by such provider to the Administrative Agent from time to time) as long as no Default or Event of Default then exists and no Overadvance would result from establishment of a Bank Product Reserve for such amount and all other Secured Bank Product Obligations.

"Secured Bank Product Provider" shall mean, at the time of entry into a Bank Product with a Borrower or its Subsidiary (or, if such Bank Product exists on the Closing Date, as of the Closing Date) the Administrative Agent, any Lender or any of their respective Affiliates that is providing a Bank Product; provided such provider (other than Wells Fargo and its affiliates) delivers written notice to the Administrative Agent, substantially in the form of Exhibit D hereto, by the later of ten (10) days (or such later date as agreed by the Administrative Agent in its sole discretion) following (x) the Closing Date and (y) creation of the Bank Product, (i) describing the Bank Product and setting forth the maximum amount to be secured by the Collateral and the methodology to be used in calculating such amount, and (ii) agreeing to be bound by Section 12.12. It is hereby understood that a Person may not be a Secured Bank Product Provider to the extent it is similarly treated as such under the Existing Term Loan Credit Agreement in respect of such Bank Product.

"Secured Creditors" shall mean and include (x) each of the Administrative Agent, the Collateral Agent, the Security Trustee and the Lenders and (y) the Secured Bank Product Providers.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 6.06.

"Security Document" shall mean and include each of the Security Agreement, each Mortgage, the Financing Order and, after the execution and delivery thereof, each Fleet Mortgage and each Additional Security Document.

"Security Trustee" shall mean the Administrative Agent acting as security trustee for the Secured Creditors pursuant to the Fleet Mortgages.

"Settlement Date" shall have the meaning provided in Section 2.14(b).

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"Solicitation Commencement Date" shall have the meaning set forth in Schedule 9.18.

"Solvent" and "Solvency" shall mean, with respect to any Person on any date of determination, that on such date (i) the Fair Value of the assets of such Person and its Subsidiaries on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of such Person and its Subsidiaries, on a consolidated basis (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of call the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability); (ii) the Present Fair Saleable Value of the assets of such Person and its Subsidiaries on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of such Person and its Subsidiaries on a consolidated basis (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of call the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability); (iii) such Person and its Subsidiaries on a consolidated basis are able to pay their debts and liabilities (including, without limitation, contingent and subordinated liabilities) as they become absolute and mature and are otherwise "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances; and (iv) such Person and its Subsidiaries on a consolidated basis will have adequate capital with which to conduct the business they are presently conducting and reasonably anticipate conducting.

"Specified Credit Party" shall have the meaning provided in Section 14.11.

"Specified Excluded Subsidiaries" means MarineNet LLC and Bolivar Terminal Co., Inc.

"Specified Real Property" means the Real Property set forth on Schedule S-1.

"Sponsor" shall mean Platinum Equity Advisors, LLC and its Affiliates (excluding any operating portfolio company thereof).

"Standard Letter of Credit Practice" means, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Subordinated Real Property" shall mean (a) the Real Property of Old JB LLC commonly known as 1030 East Market Street, Jeffersonville, IN, 47130, (b) all equipment (which for clarification shall not include any Vessels) of Old JB LLC located at such Real Property referred to in clause (a) above, (c) the Real Property of River Ops commonly known as the West Memphis Marine Terminal located at State Rt 310, Cooper Sandpit Rd, West Memphis, AR 72301 and (d) all equipment (which for clarification shall not include any Vessels) of River Ops located at such Real Property referred to in clause (c) above.

"Subsidiaries Guaranty" shall have the meaning provided in Section 6.07.

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% Equity Interest at the time.

"Subsidiary Borrower" shall mean any Domestic Subsidiaries of the Lead Borrower that own any assets included in the Borrowing Base and that execute a counterpart hereto and to any other applicable Credit Document as a Borrower; provided that no Subsidiary shall be a Subsidiary Borrower until the Administrative Agent and each Lender have received all documentation and other information (including a Beneficial Ownership Certificate) required by Administrative Agent and each Lender under applicable "know your customer" and anti-money laundering rules and regulations and internal policies, including with respect to the Patriot Act.

"Subsidiary Guarantor" shall mean each Subsidiary of the Lead Borrower (other than the Subsidiary Borrowers) in existence on the Closing Date (after giving effect to the Transaction) other than any Excluded Subsidiary, as well as each Subsidiary of the Lead Borrower other than an Excluded Subsidiary established, created or acquired after the Closing Date which becomes a party to the Subsidiaries Guaranty in accordance with the requirements of this Agreement or the provisions of the Subsidiaries Guaranty.

"Supermajority Lenders" shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if the percentage "50%" contained therein were changed to "66 2/3%."

"Superpriority Claim" has the meaning specified therefore in Section 8.11(d) of the Agreement.

"Supported QFC" has the meaning specified therefor in Section 14.13 of this Agreement.

"Swap Contract" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swingline Commitment" shall mean the commitment of the Swingline Lender to make loans pursuant to Section 2.12(a), as the same may be reduced from time to time pursuant to Section 2.07(a) or Section 2.12(a).

"Swingline Exposure" shall mean at any time the aggregate principal amount at such time of all outstanding Swingline Loans. The Swingline Exposure of any Revolving Lender at any time shall equal its Pro Rata Percentage of the aggregate Swingline Exposure at such time.

"Swingline Lender" shall mean Wells Fargo.

"Swingline Loan" shall mean any Loan made by the Swingline Lender pursuant to Section 2.12(b).

"Syndication Agents" shall mean Bank of America, N.A. and UBS Securities LLC, in their capacities as co-syndication agents under this Agreement.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments, liabilities or withholdings imposed by any Governmental Authority in the nature of a tax, including interest, penalties and additions to tax with respect thereto.

"Tax Group" shall have the meaning provided in Section 10.03(vi)(B).

"Tax Restructuring Transaction" shall mean any merger, consolidation, dissolution, amalgamation or liquidation between any Credit Party and any other Person related to tax planning or tax reorganization entered into in contemplation of a plan of reorganization, which merger, consolidation, dissolution, amalgamation or liquidation is reasonably acceptable to the Administrative Agent and Required Lenders provided that, if the surviving entity is not a Credit Party, immediately upon the consummation of such transaction the surviving entity joins this Agreement and the other Credit Documents as a Credit Party and assumes all of the liabilities and obligations of such Credit Party under this Agreement and each other Credit Document on terms reasonably acceptable to the Administrative Agent.

"Term Loan Priority Collateral" shall have the meaning assigned to the term "Term Loan Priority Collateral" in the Existing ABL Intercreditor Agreement.

"Term Loan Priority Collateral Sale" shall have the meaning assigned to the term in Section 9.22.

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Testing Period" shall mean, as applicable, (a) the period beginning on the first day of the Initial Budget and ending February 23, 2020, (b) the three consecutive calendar week period ending March 1, 2020, (c) the four consecutive calendar week period ending March 8, 2020, and (d) each four consecutive calendar week period ending Sunday of each week thereafter.

"Threshold Amount" shall mean $5,000,000.

"Transaction" shall mean, collectively, (a) commencement of the Bankruptcy Cases, (b) the entering into of the Credit Documents and the incurrence of the Loans on the Closing Date, (c) the entering into of the Junior DIP Loan Documents and the initial borrowings thereunder, (d) the other transactions contemplated by the Restructuring Support Agreement and (e) the payment of all Transaction Costs.

"Transaction Costs" shall mean the fees, premiums and expenses payable by Holdings, the Lead Borrower and its Subsidiaries in connection with the transactions in the definition of "Transaction".

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a LIBO Rate Loan.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any version or revision thereof accepted by Issuing Bank for use.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unfunded Pension Liability" of any ERISA Plan subject to Title IV of ERISA shall mean the amount, if any, by which the value of the accumulated plan benefits under the ERISA Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets of such ERISA Plan.

"United States" and "U.S." shall each mean the United States of America.

"Unrestricted Subsidiary" shall mean each Subsidiary of the Lead Borrower listed on Schedule 1.01(a); provided, however, that no Subsidiary Borrower shall be designated as an Unrestricted Subsidiary.

"Unused Line Fee" shall have the meaning provided in Section 2.05(a).

"Unused Line Fee Rate" shall mean 0.375% per annum on the average daily unused Availability.

"U.S. Dollars" and the sign "$" shall each mean freely transferable lawful money (expressed in dollars) of the United States.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time; provided that determinations made pursuant to this Agreement in accordance with U.S. GAAP are subject (to the extent provided therein) to Section 13.08(a).

"U.S. Special Resolution Regimes" has the meaning specified therefor in Section 14.13 of this Agreement.

"U.S. Tax Compliance Certificate" shall have the meaning provided in Section 5.01(c).

"Variance Report" means a weekly variance report prepared by the chief financial officer of Lead Borrower for (i) each Testing Period and (ii) the period from the commencement of the Bankruptcy Cases to the date of such variance report, that sets forth (A) actual results against anticipated results under the applicable Budget for the Testing Period in regard which such accompanying cash flow forecast is being delivered, reported in the aggregate (highlighting key line items) as of the end of such period, (B) the variance in dollar amounts and percentages, on a line item basis, (C) a written explanation for all line item variances of greater than the Permitted Variance for any given Testing Period and (D) such other information as the Administrative Agent may reasonably request with reasonable advance notice to the Borrower.

"Vessel Appraisal" shall mean a written appraisal of the Eligible Vessels delivered to the Administrative Agent, in form, scope and methodology reasonably acceptable to the Administrative Agent in its Permitted Discretion and by Dufour, Lasky & Strouse, Inc., or an appraiser reasonably acceptable to the Administrative Agent and Holdings, addressed to the Administrative Agent.

"Vessels" shall mean the towboats, barges and other vessels owned or leased by the Credit Parties.

"Weekly Cash Flow Forecast" shall have the meaning provided in Section 9.01(k).

"Wells Fargo" shall have the meaning provided in the preamble hereto.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary of such person.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Foreign Subsidiary of such Person.

"Wholly-Owned Restricted Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Restricted Subsidiary of such Person.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person owns 100% of the Equity Interests at such time (other than, in the case of a Foreign Subsidiary with respect to preceding clauses (i) or (ii), director's qualifying shares and/or other nominal amounts of shares required to be held by Persons other than the Lead Borrower and its Subsidiaries under applicable law).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Terms Generally and Certain Interpretive Provisions.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require. All references herein to Articles, Sections, paragraphs, clauses, subclauses, Exhibits and Schedules shall be deemed references to Articles, Sections, paragraphs, clauses and

-48-

subclauses of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Unless otherwise expressly provided herein, (a) all references to documents, instruments and other agreements (including the Credit Documents and organizational documents) shall be deemed to include all subsequent amendments, restatements, amendments and restatements, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, supplements and other modifications are not prohibited by any Credit Document and (b) unless otherwise specified, references to any law, statute, rule or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable). Any reference herein or in any other Credit Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (ii) all accrued expenses of Secured Creditors that are payable by a Credit Party under any Credit Document and are unpaid regardless of whether demand has been made therefor, and (iii) all fees or charges that have accrued hereunder or under any other Credit Document (including the LC Participation Fee and the Unused Line Fee) and are unpaid, (b) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization, (c) in the case of obligations with respect to Secured Bank Products (other than Hedge Obligations), providing Secured Bank Product Collateralization, (d) the receipt by Administrative Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Administrative Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as Administrative Agent reasonably determines is appropriate to secure such contingent Obligations, (e) the payment or repayment in full in immediately available funds of all other outstanding Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts provided by Secured Bank Product Providers) other than (i) unasserted contingent indemnification Obligations, (ii) any Secured Bank Product Obligations (other than with respect to Swap Contracts) that, at such time, are allowed by the applicable Secured Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (iii) any Secured Bank Product Obligations with respect to Swap Contracts that, at such time, are allowed by the applicable Secured Bank Product Provider to remain outstanding without being required to be repaid, (f) the termination of all of the Commitments of the Lenders and (g) the delivery of a payoff letter with respect to such payment in full which shall include a general release of claims against the Indemnified Persons in their capacities as such.

Section 1.03   Performance; Time.  Whenever any performance obligation hereunder or under any other Credit Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  If any Bankruptcy Milestone deadline or other deadline under this Agreement or any other Credit Document falls on a day that is not a Business Day, then such Bankruptcy Milestone deadline or other deadline shall be extended until the next

succeeding Business Day and if satisfied on such Business Day shall be deemed to have been satisfied in compliance with the terms hereof or thereof.

Section 1.04    Divisions.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE 2    Amount and Terms of Credit.

Section 2.01    The Commitments.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth and subject to the terms and conditions of the Financing Order, each Lender agrees, severally and not jointly, to make Revolving Loans to the Borrowers, at any time and from time to time on and after the Closing Date until the earlier of one Business Day prior to the Maturity Date and the termination of the Commitment of such Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in (v) such Lender's Revolving Exposure *minus* (w) such Lender's Pro Rata Percentage of any Reinstated Existing Secured Obligations, *minus* (y) such Lender's Pro Rata Percentage of the Availability Block, *minus* (z) the aggregate amount of reserves, if any, established by the Administrative Agent pursuant to the terms of this Agreement exceeding the lesser of (A) such Lender's Revolving Commitment, and (B) such Lender's Pro Rata Percentage multiplied by the Borrowing Base then in effect. Within the limits set forth above and subject to the terms, conditions and limitations set forth herein, the Borrowers may borrow, pay or prepay and reborrow Revolving Loans. All Borrowers shall be jointly and severally liable as borrowers for all Loans regardless of which Borrower receives the proceeds thereof.

Section 2.02    Loans.

(a)    Each Loan (other than Swingline Loans) shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; provided that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). Except for Loans deemed made pursuant to Section 2.13(d), Loans (other than Swingline Loans) comprising any Borrowing shall be in an aggregate principal amount that is (i) (A) in the case of Base Rate Loans, not less than $500,000 and (B) in the case of LIBO Rate Loans, an integral multiple of $250,000 and not less than $1,000,000, or (ii) equal to the remaining available balance of the applicable Revolving Commitments.

(b)    Subject to Section 3.01, each Borrowing shall be comprised entirely of Base Rate Loans or LIBO Rate Loans as the Lead Borrower may request pursuant to Section 2.03. Each Lender may at its option make any LIBO Rate Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this

Agreement or cause the Borrowers to pay additional amounts pursuant to <u>Section 3.01</u>. Borrowings of more than one Type may be outstanding at the same time; provided further that the Borrowers shall not be entitled to request any Borrowing that, if made, would result in more than ten (10) Borrowings of LIBO Rate Loans outstanding hereunder at any one time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Except with respect to Loans made pursuant to <u>Section 2.13(d)</u>, each Lender shall make each Loan (other than Swingline Loans) to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account as the Administrative Agent may designate not later than 10:00 a.m., Los Angeles time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by the Lead Borrower in the applicable Notice of Borrowing maintained with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met or waived, return the amounts so received to the respective Lenders.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to 9:30 a.m. Los Angeles time on the Business Day that is the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above, and the Administrative Agent may, in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Lead Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to such Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Lead Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).

(e)     Notwithstanding any other provision of this Agreement, the Lead Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03   <u>Borrowing Procedure</u>.  Each Revolving Borrowing shall be made by a written request by a Responsible Officer delivered to the Administrative Agent (which may be delivered through the Administrative Agent's electronic platform or portal; provided that all such requests which are not made online via the Administrative Agent's electronic platform or portal shall be subject to (and unless the Administrative Agent elects otherwise in the exercise of its sole discretion, such Revolving Borrowings shall not be made until the completion of) the Administration Agent's authentication process (with results satisfactory to the Administrative Agent) prior to the funding of any such requested Revolving Loan): (i) in the case of a Borrowing of LIBO Rate Loans, not later than 11:00 a.m., Los Angeles time, three (3) Business Days before the date of the proposed Borrowing or (ii) in the case of a Borrowing of Base Rate Loans (other than Swingline Loans), not later than 11:00 a.m., Los Angeles time, on the Business Day that is

one (1) Business Day prior to the date of the proposed Borrowing; <u>provided</u>, that Administrative Agent may, in its sole discretion, elect to accept as timely requests that are received later than 11:00 a.m., Los Angeles time on the applicable Business Day. Each such telephonic Notice of Borrowing shall be irrevocable, subject to <u>Sections 2.09</u> and <u>3.01</u>, and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Notice of Borrowing in a form approved by the Administrative Agent and signed by the Lead Borrower. Each such telephonic and written Notice of Borrowing shall specify the following information in compliance with <u>Section 2.02</u>:

        (a)     the aggregate amount of such Borrowing;

        (b)     the date of such Borrowing, which shall be a Business Day;

        (c)     whether such Borrowing is to be a Borrowing of Base Rate Loans or a Borrowing of LIBO Rate Loans;

        (d)     in the case of a Borrowing of LIBO Rate Loans, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "<u>Interest Period</u>"; and

        (e)     the location and number of the account to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.02</u>.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be a Borrowing of Base Rate Loans. If no Interest Period is specified with respect to any requested Borrowing of LIBO Rate Loans, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Notice of Borrowing in accordance with this <u>Section 2.03</u>, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Upon the entry of the Initial Financing Order, Borrower Representative shall be deemed to have made an irrevocable written notice delivered to Administrative Agent for a Borrowing in the amount of the then outstanding Existing Secured Obligations comprised of LIBO Rate Loans and Base Rate Loans corresponding to the LIBO Rate Loans and Base Rate Loans (each as defined in the Existing Credit Agreement) comprising the Existing Secured Obligations, plus a Base Rate Loan equal to the amount of any Existing Secured Obligations in excess of Revolving Loans (as defined in the Existing Credit Agreement) outstanding under the Existing Credit Agreement, (excluding Existing Letters of Credit and Existing Bank Product Obligations that survive pursuant to the terms of this Agreement).

Section 2.04    <u>Evidence of Debt; Repayment of Loans</u>.

        (a)     Each Borrower, jointly and severally, hereby unconditionally promises to pay (i) to the Administrative Agent for the account of each Revolving Lender, the then unpaid principal amount of each Revolving Loan of such Lender on the Maturity Date and (ii) to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement. The Lead Borrower shall be entitled to review records of such accounts with prior reasonable notice during normal business hours.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender. The Lead Borrower shall be entitled to review records of such accounts with prior reasonable notice during normal business hours.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded absent manifest error; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Loans in accordance with their terms.

(e)     The Revolving Loans (including Swingline Loans) made by each Lender are evidenced by this Agreement.

Section 2.05    Fees.

(a)     Unused Line Fee. The Borrowers shall, jointly and severally, pay to the Administrative Agent, for the Pro Rata benefit of the Lenders (other than any Defaulting Lender), a fee equal to the Unused Line Fee Rate multiplied by the amount by which the Revolving Commitments (other than Revolving Commitments of a Defaulting Lender) exceed the average daily balance of outstanding Revolving Loans (other than Swingline Loans) and stated amount of outstanding Letters of Credit during any month (such fee, the "Unused Line Fee"). Such fee shall accrue commencing on the date following the most recent payment of all such fees prior to the Closing Date, and will be payable in arrears, as set forth in Section 2.10(a) commencing on or about March 1, 2020.

(b)     Administrative Agent Fees. The Borrowers, jointly and severally, agree to pay to the Administrative Agent, for its own account, the fees set forth in the Administrative Agent Fee Letter or such other fees payable in the amounts and at the times separately agreed upon between the Lead Borrower and the Administrative Agent (the "Administrative Agent Fees").

(c)     LC. The Borrowers, jointly and severally, agree to pay to the Administrative Agent for the account of each Revolving Lender a participation fee ("LC Participation Fee") with respect to its participations in Letters of Credit, which shall accrue at a rate equal to the Applicable Margin from time to time used to determine the interest rate on LIBO Rate Loans pursuant to Section 2.06, on the average daily amount of such Lender's LC Exposure (excluding any portion

thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Lender ceases to have any LC Exposure.  LC Participation Fees shall be payable monthly as set forth in Section 2.10(a), commencing on the first such date to occur after the Closing Date; provided that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on demand (including documentation reasonably supporting such request). Any other fees payable to the Issuing Bank pursuant to this paragraph shall be payable within ten (10) days after written demand (together with backup documentation supporting such reimbursement request).

(d)     All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders (other than Defaulting Lenders), except that the fronting fees shall be paid directly to the Issuing Bank. Once paid, none of the fees shall be refundable under any circumstances.

Section 2.06    Interest on Loans.

(a)     Subject to the provisions of Section 2.06(c), the Loans comprising each Borrowing of Base Rate Loans, including each Swingline Loan, shall bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin in effect from time to time.

(b)     Subject to the provisions of Section 2.06(c), the Loans comprising each Borrowing of LIBO Rate Loans shall bear interest at a rate per annum equal to the LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Notwithstanding the foregoing, upon the occurrence and during the continuation of an Event of Default and at the election of the Administrative Agent or Required Lenders, all Revolving Loans and all other Obligations shall bear interest at a rate per annum equal to (i) in the case of overdue principal of, or interest on, any Loan, 2% plus the rate otherwise applicable to such Loan, (ii) the LC Participation Fee shall be increased to 2% plus the rate otherwise applicable to the LC Participation Fee or (iii) in the case of any other amount, 2% plus the rate applicable to Base Rate Loans.

(d)     Accrued interest on each Loan shall be payable as set forth in Section 2.10(a) in arrears.

(e)     All interest and fees hereunder shall be computed on the basis of a year of 360 days and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Base Rate or LIBO Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

Section 2.07    Termination and Reduction of Commitments.

(a)     The Revolving Commitments, the Swingline Commitment, and the LC Commitment shall automatically terminate on the Maturity Date.

(b)     The Lead Borrower may at any time terminate, or from time to time reduce, the Revolving Commitments; provided that (i) any such reduction shall be in an amount that is an integral multiple of $1,000,000 and (ii) the Revolving Commitments shall not be terminated or reduced if after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.09, the Aggregate Exposures would exceed the Aggregate Commitments.  In connection with any reduction in the Revolver Commitments prior to the Maturity Date, if any Credit Party or any of its Subsidiaries owns any Margin Stock, Borrowers shall deliver to Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as Agent shall reasonably request, in order to enable Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Federal Reserve Board.

(c)     The Lead Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Commitments under paragraph (b) of this Section 2.07 at least five (5) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Lead Borrower pursuant to this Section 2.07 shall be irrevocable except that, to the extent delivered in connection with a refinancing of the Obligations, such notice shall not be irrevocable until such refinancing is closed and funded. Any effectuated termination or reduction of the Aggregate Commitments shall be permanent. Each reduction of the Aggregate Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments.

Section 2.08   Interest Elections.

(a)     Each Revolving Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing and, in the case of a Borrowing of LIBO Rate Loans, shall have an initial Interest Period as specified in such Notice of Borrowing. Thereafter, the Lead Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Borrowing of LIBO Rate Loans, may elect Interest Periods therefor, all as provided in this Section 2.08. The Lead Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. Notwithstanding anything to the contrary, the Lead Borrower shall not be entitled to request any conversion or continuation that, if made, would result in more than ten (10) Borrowings of LIBO Rate Loans outstanding hereunder at any one time. This Section 2.08 shall not apply to Swingline Loans, which may not be converted or continued.

(b)     To make an election pursuant to this Section 2.08, the Lead Borrower shall notify the Administrative Agent of such election by telephone or electronic transmission (if arrangements for doing so have been approved by the Administrative Agent, which approval shall not be unreasonably withheld, delayed or conditioned) by the time that a Notice of Borrowing would be required under Section 2.03 if the Lead Borrower was requesting a Revolving Borrowing of the Type resulting from such election to be made on the effective date of such election, subject to Section 3.05. Each such telephonic Notice of Conversion/Continuation shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Notice of

Conversion/Continuation substantially in the form of Exhibit A-2, unless otherwise agreed to by the Administrative Agent and the Lead Borrower.

(c)     Each telephonic and written Notice of Conversion/Continuation shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Notice of Conversion/Continuation applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Notice of Conversion/Continuation, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be a Borrowing of Base Rate Loans or a Borrowing of LIBO Rate Loans; and

(iv)     if the resulting Borrowing is a Borrowing of LIBO Rate Loans, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Notice of Conversion/Continuation requests a Borrowing of LIBO Rate Loans but does not specify an Interest Period, then the Lead Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of a Notice of Conversion/Continuation, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If a Notice of Conversion/Continuation with respect to a Borrowing of LIBO Rate Loans is not timely delivered prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to a Borrowing of Base Rate Loans. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Lead Borrower, then, after the occurrence and during the continuance of such Event of Default (i) no outstanding Borrowing may be converted to or continued as a Borrowing of LIBO Rate Loans and (ii) unless repaid, each Borrowing of LIBO Rate Loans shall be converted to a Borrowing of Base Rate Loans at the end of the Interest Period applicable thereto.

Section 2.09     Optional and Mandatory Prepayments of Loans.

(a)     Optional Prepayments.     Subject to the Existing Secured Obligations (including any Reinstated Existing Secured Obligations) being fully and finally paid, the Lead Borrower shall have the right at any time and from time to time to prepay, without premium or penalty, any Borrowing, in whole or in part, subject to the requirements of this Section 2.09;

provided that each partial prepayment shall be in an amount that is an integral multiple of $100,000.

       (b)    <u>Revolving Loan Prepayments</u>.

       (i)    In the event of the termination of all the Revolving Commitments, the Lead Borrower shall, on the date of such termination, repay or prepay all the outstanding Revolving Borrowings and all outstanding Swingline Loans and provide Letter of Credit Collateralization with respect to the then outstanding LC Exposure.

       (ii)    In the event of any partial reduction of the Revolving Commitments, then (A) at or prior to the effective date of such reduction, the Administrative Agent shall notify the Lead Borrower and the Revolving Lenders of the Aggregate Exposures after giving effect thereto and (B) if the Aggregate Exposures would exceed the Line Cap then in effect, after giving effect to such reduction, then the Lead Borrower shall, on the date of such reduction, first, repay or prepay all Swingline Loans, second, repay or prepay Revolving Borrowings and third, provide Letter of Credit Collateralization with respect to the then outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

       (iii)    In the event that the Aggregate Exposures at any time exceeds the Line Cap then in effect, the Lead Borrower shall, immediately after demand (or if such overadvance is due to the imposition of new Reserves or a change in the methodology of calculating existing Reserves, or change in eligibility standards, within two (2) Business Days following demand), apply an amount equal to such excess to prepay the Loans and any interest accrued thereon, in accordance with this <u>Section 2.09(b)(iii)</u>. The Lead Borrower shall, first, repay or prepay all Swingline Loans, second, repay or prepay Revolving Borrowings, and third, provide Letter of Credit Collateralization with respect to the then outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

       (iv)    In the event that the aggregate LC Exposure exceeds the LC Commitment then in effect, the Lead Borrower shall, without notice or demand, immediately replace or provide Letter of Credit Collateralization with respect to the then outstanding Letters of Credit, in an amount sufficient to eliminate such excess.

       (v)    In the event that Existing Agent or any of the Existing Lenders are required to repay or disgorge to Debtors or any representatives of the Debtors' estate (as agents, with derivative standing or otherwise) all or any portion of the Existing Secured Obligations authorized and directed to be repaid pursuant to the Financing Order, or any payment on account of the Existing Secured Obligations made to Existing Agent or any Existing Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or other applicable Insolvency Laws or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "<u>Avoided Payments</u>"), then, in such event, Borrowers shall prepay the Revolving Loans in accordance with <u>Section 2.09(c)(i)</u>, in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments

by Debtors or any representative of the Debtors' estate. For the avoidance of doubt, prepayments under this clause (v) shall be without duplication of any prepayments under clause (ii) of this <u>Section 2.09(b)</u>.

(vi)     Within three (3) Business Days of receipt by any Credit Party or any of its Subsidiaries of the Net Cash Proceeds of any disposition of any Revolver Priority Collateral pursuant to <u>Section 10.02(ii)</u>, <u>(iv)</u>, <u>(viii)</u> (solely clause (C)), <u>(ix)</u>, <u>(xii)</u> and <u>(xxiv)</u> (including Net Cash Proceeds of insurance or arising from casualty losses or condemnations and payments in lieu thereof), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.09(c)(i)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such disposition of such Revolver Priority Collateral.  Notwithstanding the foregoing, (i) no Net Cash Proceeds shall be payable under this clause (vi) with respect to any transaction which generates Net Cash Proceeds of $100,000 or less for such transaction (and not more than $1,000,000 in the aggregate for the term of this Agreement) and (ii) prepayments under this clause (vi) shall be without duplication of any prepayments under clause (ii) of this Section 2.09(b).Nothing contained in this <u>Section 2.09(b)(vi)</u> shall permit any Credit Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with <u>Section 10.02</u>.

(vii)     Within one Business Day of the date of incurrence by any Credit Party or any of its Subsidiaries of any Indebtedness for borrowed money (other than Indebtedness under this Agreement or any Junior DIP Indebtedness) or of the issuance by any Credit Party or any of its Subsidiaries of any Equity Interests, Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 11.13</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such incurrence or issuance.  The provisions of this <u>Section 2.09(vii)</u> shall not be deemed to be implied consent to any such incurrence or issuance otherwise prohibited by the terms of this Agreement.

(viii)     On the third Business Day of each week, all Collections (other than proceeds of Indebtedness governed by the Junior DIP Loan Documents) received by Credit Parties for the immediately prior week in excess of disbursements for such week set forth in the Budget (including any Permitted Variance), shall, to the extent not either (A) applied pursuant to Section 2.09(a) or (B) paid on account of interest, fees, costs and other charges in respect of the Junior DIP Indebtedness, professionals retained by the Borrowers pursuant to section 327, 328 or 363 of the Bankruptcy Code, a Committee (if appointed), and professionals for the lenders under the Junior DIP Loan Documents during such prior week, be remitted to the Administrative Agent by a wire to the Agent's Account to be applied pursuant to <u>Section 11.13</u>.

(c)     <u>Application of Prepayments</u>.

(i)     All optional or mandatory prepayments shall be applied pursuant to <u>Section 11.13</u>.

(ii)     Amounts to be applied pursuant to this <u>Section 2.09</u> to the prepayment of Revolving Loans shall be applied, as applicable, first to reduce outstanding Base Rate Loans. Any amounts remaining after each such application shall be applied to prepay LIBO Rate Loans.

(d)     <u>Notice of Prepayment</u>.  The Lead Borrower shall notify the Administrative Agent (and, in the case of prepayment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Borrowing of LIBO Rate Loans, not later than 1:30 p.m., Los Angeles time, three (3) Business Days before the date of prepayment, (ii) in the case of prepayment of a Borrowing of Base Rate Loans, not later than 1:30 p.m., Los Angeles time, on the date of prepayment or (iii) in the case of prepayment of a Swingline Loan, not later than 1:30 p.m., Los Angeles time, on the date of prepayment. Each such notice shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice (other than a notice relating solely to Swingline Loans), the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in <u>Section 2.02</u>, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.06</u>.

Section 2.10   <u>Payments Generally; Pro Rata Treatment; Sharing of Setoffs</u>.

(a)     Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lenders and shall be made in immediately available funds, no later than 1:30 p.m. Los Angeles time on the date specified herein; <u>provided</u> that, for the avoidance of doubt, any payments deposited into a Dominion Account shall be deemed not to be received by the Administrative Agent on any Business Day unless immediately available funds have been credited to Agent's Account prior to 1:30 p.m. Los Angeles time on such Business Day.  Any payment received by the Administrative Agent in immediately available funds in Agent's Account later than 1:30 p.m. Los Angeles time shall be deemed to have been received (unless the Administrative Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.  Except to the extent provided to the contrary in <u>Section 2.05</u>, <u>Section 2.13(k)</u> or <u>Section 2.06(d)</u>, (i) all interest and all other fees payable hereunder or under any of the other Credit Documents (other than LC Participation Fees) shall be due and payable, in arrears, on the first day of each month, (ii) all LC Participation Fees payable hereunder, and all fronting fees and all commissions, other fees, charges and expenses provided for in <u>Section 2.13(k)</u> shall be due and payable, in arrears, on the first Business Day of each month, and (iii) all costs and expenses payable hereunder or under any of the other Credit Documents, and all other costs and expenses payable pursuant to <u>Section 13.01</u> shall be due and payable on (x) with respect to such expenses outstanding as of the Closing Date, the Closing Date, and (y) otherwise, the earlier of (A) the first day of the month following the date on which the applicable costs and expenses were first incurred, or (B) the date on which demand therefor is made by Agent.  Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge to the Revolving

Loan principal balance (A) on the first day of each month, all interest accrued during the prior month on the Revolving Loans hereunder, (B) on the first Business Day of each month, all LC Participation Fees accrued or chargeable hereunder during the prior month, (C) as and when incurred or accrued, all fees and costs provided for in Section 2.05, (D) on the first day of each month, the Unused Line Fee accrued during the prior month pursuant to Section 2.05(a), (E) as and when due and payable, all other fees payable hereunder or under any of the other Credit Documents, (F) on the Closing Date and thereafter as and when due and payable, all other costs and expenses payable under Section 13.01, and (G) as and when due and payable all other payment obligations payable under any Credit Document or any Bank Product Agreement (including any amounts due and payable to the Secured Bank Product Providers in respect of Bank Products). All amounts (including interest, fees, costs, expenses, or other amounts payable hereunder or under any other Credit Document or under any Bank Product Agreement) payable pursuant to this Section 2.10(a) shall thereupon constitute Revolving Loans hereunder, shall constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to Revolving Loans that are Base Rate Loans (unless and until converted into LIBO Rate Loans in accordance with the terms of this Agreement).

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied in the manner as provided in Section 2.09(c) or 11.13 hereof, as applicable, ratably among the parties entitled thereto.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans or participations in LC Disbursements or Swingline Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans and participations in LC Disbursements and Swingline Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Loans and participations in LC Disbursements and Swingline Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Loans and participations in LC Disbursements and Swingline Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Lead Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Lead Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Credit Parties rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of a Credit Party in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank hereunder that the Lead Borrower will not make such payment, the Administrative Agent may assume that the Lead Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due. In such event, if the Lead Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Defaulting Lender Rate.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02(c), 2.10(d), 2.12(d) or 2.13(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)     The receipt of any payment item by the Administrative Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to Agent's Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by the Administrative Agent only if it is received into Agent's Account on a Business Day on or before 1:30 p.m. Los Angeles time.  If any payment item is received into Agent's Account on a non-Business Day or after 1:30 p.m. Los Angeles time on a Business Day (unless the Administrative Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by the Administrative Agent as of the opening of business on the immediately following Business Day.

(g)     At all times during a Liquidity Period, all amounts in the Dominion Account shall be applied to repay the Obligations as set forth in Section 11.13.

Section 2.11     Defaulting Lenders.

(a)     Reallocation of Pro Rata Share; Amendments.  For purposes of determining the Lenders' obligations to fund or acquire participations in Loans or Letters of Credit, the Administrative Agent may exclude the Commitments and Loans of any Defaulting Lender(s) from the calculation of Pro Rata Shares. A Defaulting Lender shall have no right to vote on any amendment, waiver or other modification of a Credit Document, except as provided in Section 13.11(f).

(b)     Payments; Fees.  The Administrative Agent may, in its discretion, receive and retain any amounts payable to a Defaulting Lender under the Credit Documents, and a Defaulting Lender shall be deemed to have assigned to the Administrative Agent such amounts until all Obligations owing to the Administrative Agent, Non-Defaulting Lenders and other

Secured Creditors have been paid in full.  The Administrative Agent may apply such amounts to the Defaulting Lender's defaulted obligations, use the funds to provide Letter of Credit Collateralization with respect to such Lender's Fronting Exposure, or readvance the amounts to the Borrowers hereunder. A Lender shall not be entitled to receive any fees accruing hereunder during the period in which it is a Defaulting Lender, and the unfunded portion of its Commitment shall be disregarded for purposes of calculating the Unused Line Fee under <u>Section 2.05(a)</u>. To the extent any LC Obligations owing to a Defaulting Lender are reallocated to other Lenders, LC Participation Fees attributable to such LC Obligations under <u>Section 2.05(c)</u> shall be paid to such other Lenders. The Administrative Agent shall be paid all LC Participation Fees attributable to LC Obligations that are not so reallocated.

(c)     <u>Cure</u>.  The Administrative Agent and Issuing Bank may agree in writing that a Lender is no longer a Defaulting Lender. At such time, Pro Rata Shares shall be reallocated without exclusion of such Lender's Commitments and Loans, and all outstanding Loans, LC Obligations and other exposures under the Commitments shall be reallocated among Lenders and settled by the Administrative Agent (with appropriate payments by the reinstated Lender) in accordance with the readjusted Pro Rata Shares. Unless expressly agreed by the Lead Borrower, Administrative Agent and Issuing Bank, no reinstatement of a Defaulting Lender shall constitute a waiver or release of claims against such Lender. The failure of any Lender to fund a Loan, to make a payment in respect of LC Obligations or otherwise to perform its obligations hereunder shall not relieve any other Lender of its obligations, and no Lender shall be responsible for default by another Lender.

Section 2.12     <u>Swingline Loans</u>.

(a)     <u>Swingline Commitment</u>.  Subject to the terms and conditions set forth herein, the Swingline Lender may, but shall not be obligated to, make Swingline Loans to the Borrowers from time to time during the Revolving Availability Period, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding $55,000,000 or (ii) the Aggregate Exposures *plus* such Lender's Pro Rata Percentage of any Reinstated Existing Secured Obligations *plus* such Lender's Pro Rata Percentage of the Availability Block, *plus* the aggregate amount of reserves, if any, established by the Administrative Agent pursuant to the terms of this Agreement exceeding the lesser of (A) the Aggregate Commitments and (B) the Borrowing Base then in effect; provided that the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Loan. Within the foregoing limits and subject to the terms and conditions set forth herein, the Lead Borrower may borrow, repay and reborrow Swingline Loans.

(b)     <u>Swingline Loans</u>.  After receipt of a Borrowing Request pursuant to <u>Section 2.03</u> and subject to the conditions set forth in <u>Section 2.12(a)</u>, Swingline Lender may make a Swingline Loan available to Borrowers on the Borrowing date applicable thereto by transferring immediately available funds in the amount of such Borrowing to the Deposit Account of Lead Borrower designated therefor.  Each Swingline Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including <u>Section 7</u>) applicable to other Revolving Loans, except that all payments (including interest) on any Swingline Loan shall be payable to Swingline Lender solely for its own account.  Subject to the provisions of <u>Section 2.17</u>, Swingline Lender shall not make and shall not be obligated to make any Swingline Loan if

Swingline Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 7 will not be satisfied on the date of the requested Borrowing, or (ii) the requested Borrowing would exceed the Availability on such date. Swingline Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 7 have been satisfied on the date applicable thereto prior to making any Swingline Loan. The Swingline Loans shall be secured by Collateral Agent's Liens, constitute Revolving Loans and Obligations, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.

(c)     Prepayment.  The Lead Borrower shall have the right at any time and from time to time to repay, without premium or penalty, any Swingline Loan, in whole or in part, upon giving written or telecopy notice (or telephone notice promptly confirmed by written, or telecopy notice) to the Swingline Lender and to the Administrative Agent before 1:30 p.m., Los Angeles time on the date of repayment at the Swingline Lender's address for notices specified in the Swingline Lender's administrative questionnaire. All principal payments of Swingline Loans shall be accompanied by accrued interest on the principal amount being repaid to the date of payment.

(d)     Participations.  The Swingline Lender may by written notice given to the Administrative Agent not later than 2:00 p.m., Los Angeles time, on any Business Day require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding. Such notice shall specify the aggregate amount of Swingline Loans in which Revolving Lenders will participate. Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Revolving Lender, specifying in such notice such Lender's Pro Rata Percentage of such Swingline Loan or Loans. Each Revolving Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Pro Rata Percentage of such Swingline Loan or Loans pursuant to Section 2.14. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Aggregate Commitments or whether an Overadvance exists or is created thereby, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever (provided that such payment shall not cause such Lender's Revolving Exposure to exceed such Lender's Revolving Commitment). Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.14 with respect to Loans made by such Lender (and Section 2.02 shall apply, mutatis mutandis, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Revolving Lenders. The Administrative Agent shall notify the Lead Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender. Any amounts received by the Swingline Lender from the Lead Borrower (or other party on behalf of the Lead Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear. The purchase of

participations in a Swingline Loan pursuant to this paragraph shall not relieve any Borrower of any default in the payment thereof.

      Section 2.13   <u>Letters of Credit</u>.

      (a)    Subject to the terms and conditions of this Agreement, upon the request of Lead Borrower made in accordance herewith, and prior to the Maturity Date, Issuing Bank agrees to issue a requested standby Letter of Credit or a sight commercial Letter of Credit for the account of Borrowers. By Lead Borrower submitting a request to Issuing Bank for the issuance of a Letter of Credit, Borrowers shall be deemed to have requested that Issuing Bank issue the requested Letter of Credit. Each request for the issuance of a Letter of Credit, or the amendment or extension of any outstanding Letter of Credit, shall be (i) irrevocable and made in writing by an Responsible Officer, (ii) delivered to Administrative Agent and Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to Administrative Agent and Issuing Bank and reasonably in advance of the requested date of issuance, amendment or extension, and (iii) subject to Issuing Bank's authentication procedures with results satisfactory to Issuing Bank. Each such request shall be in form and substance reasonably satisfactory to Administrative Agent and Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment or extension, identification of the Letter of Credit to be so amended or extended) as shall be necessary to prepare, amend or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Administrative Agent or Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Issuing Bank generally requests for Letters of Credit in similar circumstances. Issuing Bank's records of the content of any such request will be conclusive. Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of a Credit Party or one of its Subsidiaries in respect of (x) a lease of real property, or (y) an employment contract.

      (b)    Issuing Bank shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

          (i)    the LC Exposure would exceed the Letter of Credit Sublimit, or

          (ii)    the LC Exposure would exceed the aggregate Revolving Commitments <u>less</u> the outstanding amount of Revolving Loans (including Swing Loans), <u>less</u> the aggregate amount of Reinstated Existing Secured Obligations, <u>less</u> the Availability Block, <u>less</u> the aggregate amount of reserves, if any, established by the Administrative Agent pursuant to the terms of this Agreement, or

          (iii)    the LC Exposure would exceed the Borrowing Base at such time <u>less</u> the outstanding principal balance of the Revolving Loans (including Swing Loans), <u>less</u> the aggregate amount of Reinstated Existing Secured Obligations, <u>less</u> the Availability Block at such time.

(c)     In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and Borrowers to eliminate Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include Borrowers cash collateralizing such Defaulting Lender's LC Exposure.  Additionally, Issuing Bank shall have no obligation to issue or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Bank from issuing such Letter of Credit, or any law applicable to Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Bank shall prohibit or request that Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will not or may not be in United States Dollars.

(d)     Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify Administrative Agent in writing no later than the Business Day prior to the Business Day on which such Issuing Bank issues any Letter of Credit.  In addition, each Issuing Bank (other than Wells Fargo or any of its Affiliates) shall, on the first Business Day of each week, submit to Administrative Agent a report detailing the daily undrawn amount of each Letter of Credit issued by such Issuing Bank during the prior calendar week.  Each Letter of Credit shall be in form and substance reasonably acceptable to Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars.  If Issuing Bank makes a payment under a Letter of Credit, Borrowers shall pay to Administrative Agent an amount equal to the applicable LC Disbursement on the Business Day such LC Disbursement is made and, in the absence of such payment, the amount of the LC Disbursement immediately and automatically shall be deemed to be a Revolving Loan hereunder (notwithstanding any failure to satisfy any conditions precedent set forth in Section 6 and 7) and, initially, shall bear interest at the rate then applicable to Revolving Loans that are Base Rate Loans. If a LC Disbursement is deemed to be a Revolving Loan hereunder, Borrowers' obligation to pay the amount of such LC Disbursement to Issuing Bank shall be automatically converted into an obligation to pay the resulting Revolving Loan.  Promptly following receipt by Administrative Agent of any payment from Borrowers pursuant to this paragraph, Administrative Agent shall distribute such payment to Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to Section 2.13(e) to reimburse Issuing Bank, then to such Revolving Lenders and Issuing Bank as their interests may appear.

(e)     Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.13(d), each Revolving Lender agrees to fund its Pro Rata Percentage of any Revolving Loan deemed made pursuant to Section 2.13(d) on the same terms and conditions as if Borrowers had requested the amount thereof as a Revolving Loan and Administrative Agent shall promptly pay to Issuing Bank the amounts so received by it from the Revolving Lenders.  By the issuance of a Letter of Credit (or an amendment or extension of a Letter of Credit) and without any further action on the part of Issuing Bank or the Revolving Lenders, Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by Issuing Bank, in an amount equal to its Pro Rata Percentage of such Letter of Credit, and each such Revolving Lender agrees

to pay to Administrative Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Percentage of any Letter of Credit Disbursement made by Issuing Bank under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Administrative Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Percentage of each LC Disbursement made by Issuing Bank and not reimbursed by Borrowers on the date due as provided in Section 2.13(d), or of any reimbursement payment that is required to be refunded (or that Administrative Agent or Issuing Bank elects, based upon the advice of counsel, to refund) to Borrowers for any reason.  Each Revolving Lender acknowledges and agrees that its obligation to deliver to Administrative Agent, for the account of Issuing Bank, an amount equal to its respective Pro Rata Percentage of each LC Disbursement pursuant to this Section 2.13(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 5, 6 or 7.  If any such Revolving Lender fails to make available to Administrative Agent the amount of such Revolving Lender's Pro Rata Percentage of a LC Disbursement as provided in this Section, such Revolving Lender shall be deemed to be a Defaulting Lender and Administrative Agent (for the account of Issuing Bank) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)     Each Borrower agrees to indemnify, defend and hold harmless each member of the Secured Creditors (including Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Issuing Bank, a "Letter of Credit Related Person") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of:

(i)     any Letter of Credit or any pre-advice of its issuance;

(ii)     any transfer, sale, delivery, surrender or endorsement (or lack thereof) of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)     any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)     any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)     any unauthorized instruction or request made to Issuing Bank in connection with any Letter of Credit or requested Letter of Credit, or any error, omission, interruption or delay in such instruction or request, whether transmitted by mail, courier, electronic transmission, SWIFT, or any other telecommunication including communications through a correspondent;

(vi)     an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)     any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii)     the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)     any prohibition on payment or delay in payment of any amount payable by Issuing Bank to a beneficiary or transferee beneficiary of a Letter of Credit arising out of Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions;

(x)     Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation;

(xi)     any foreign language translation provided to Issuing Bank in connection with any Letter of Credit;

(xii)     any foreign law or usage as it relates to Issuing Bank's issuance of a Letter of Credit in support of a foreign guaranty including the expiration of such guaranty after the related Letter of Credit expiration date and any resulting drawing paid by Issuing Bank in connection therewith; or

(xiii)     the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

provided, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (xiii) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.13(f).  If and to the extent that the obligations of Borrowers under this Section 2.13(f) are unenforceable for any reason, Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable law.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)     The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the

form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrowers that are caused directly by Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit, or (iii) retaining Drawing Documents presented under a Letter of Credit.  Borrowers' aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrowers to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.13(d), _plus_ interest at the rate then applicable to Base Rate Loans hereunder.  Borrowers shall take action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.  Any claim by Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrowers as a result of the breach or alleged wrongful conduct complained of, and (y) the amount (if any) of the loss that would have been avoided had Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(h)     Borrowers are responsible for the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text submitted by Borrowers. Borrowers understand that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by Issuing Bank, and Borrowers hereby consent to such revisions and changes not materially different from the application executed in connection therewith. Borrowers are solely responsible for the suitability of the Letter of Credit for Borrowers' purposes.  If Borrowers request Issuing Bank to issue a Letter of Credit for an affiliated or unaffiliated third party (an "Account Party"), (i) such Account Party shall have no rights against Issuing Bank; (ii) Borrowers shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be among Issuing Bank and Borrowers.  Borrowers will examine the copy of the Letter of Credit and any other documents sent by Issuing Bank in connection therewith and shall promptly notify Issuing Bank (not later than three (3) Business Days following Borrowers' receipt of documents from Issuing Bank) of any non-compliance with Borrowers' instructions and of any discrepancy in any document under any presentment or other irregularity.  Borrowers understand and agree that Issuing Bank is not required to extend the expiration date of any Letter of Credit for any reason. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing Bank, in its sole and absolute discretion, may give notice of non-extension of such Letter of Credit and, if Borrowers do not at any time want the then current expiration date of such Letter of Credit to be extended, Borrowers will so notify Administrative Agent and Issuing Bank at least 30 calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such non-extension pursuant to the terms of such Letter of Credit.

(i)      Borrowers' reimbursement and payment obligations under this <u>Section 2.13</u> are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)      any lack of validity, enforceability or legal effect of any Letter of Credit, any Issuer Document, this Agreement, or any Credit Document, or any term or provision therein or herein;

(ii)      payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)      Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)      Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)      the existence of any claim, set-off, defense or other right that any Credit Party or any of its Subsidiaries may have at any time against any beneficiary or transferee beneficiary, any assignee of proceeds, Issuing Bank or any other Person;

(vi)      Issuing Bank or any correspondent honoring a drawing upon receipt of an electronic presentation under a Letter of Credit requiring the same, regardless of whether the original Drawing Documents arrive at Issuing Bank's counters or are different from the electronic presentation;

(vii)      any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this <u>Section 2.13(i)</u>, constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against Issuing Bank, the beneficiary or any other Person; or

(viii)      the fact that any Default or Event of Default shall have occurred and be continuing;

<u>provided</u>, that subject to <u>Section 2.13(g)</u> above, the foregoing shall not release Issuing Bank from such liability to Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrowers to Issuing Bank arising under, or in connection with, this <u>Section 2.13</u> or any Letter of Credit.

(j)      Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrowers for, and Issuing Bank's rights and remedies against Borrowers and the obligation of Borrowers to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)      honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)     honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)     the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)      acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)     any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to any Borrower;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)   assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)     payment to any presenting bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)     acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)     honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)     dishonor any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)     honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)     Borrowers shall pay immediately upon demand to Administrative Agent for the account of Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Revolving Loans pursuant to the provisions of Section 2.10(a) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.13(k)): (i) a fronting fee which shall be imposed by Issuing Bank equal to .250% *per annum* times the average amount of the Letter of Credit Usage during the immediately preceding month, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, extensions or cancellations).

(l)     If by reason of (x) any change in law, or (y) compliance by Issuing Bank or any other member of the Secured Creditors with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or any Loans or obligations to make Loans hereunder or hereby, or

(ii)     there shall be imposed on Issuing Bank or any other member of the Secured Creditors any other condition regarding any Letter of Credit, Loans, or obligations to make Loans hereunder,

and the result of the foregoing is to increase, directly or indirectly, the cost to Issuing Bank or any other member of the Secured Creditors of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Administrative Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers, and Borrowers shall pay within 30

days after demand therefor, such amounts as Administrative Agent may specify to be necessary to compensate Issuing Bank or any other member of the Secured Creditors for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (A) Borrowers shall not be required to provide any compensation pursuant to this Section 2.13(l) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Borrowers, and (B) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The determination by Agent of any amount due pursuant to this Section 2.13(l), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m)     Each standby Letter of Credit shall expire not later than the date that is 12 months after the date of the issuance of such Letter of Credit; provided, that any standby Letter of Credit may provide for the automatic extension thereof for any number of additional periods each of up to one year in duration; provided further, that with respect to any Letter of Credit which extends beyond the Maturity Date (excluding any Maturity Date pursuant to clause (c) of the definition of "Maturity Date"), Letter of Credit Collateralization shall be provided therefor on or before the date that is five Business Days prior to such Maturity Date (which shall exclude any Maturity Date pursuant to clause (c) thereof).  Each commercial Letter of Credit shall expire on the earlier of (i) 120 days after the date of the issuance of such commercial Letter of Credit and (ii) the Maturity Date.

(n)     If (i) any Event of Default shall occur and be continuing, or (ii) Availability shall at any time be less than zero, then on the Business Day following the date when the Lead Borrower receives notice from Administrative Agent or the Required Lenders (or, if the maturity of the Obligations has been accelerated, Revolving Lenders with Letter of Credit Exposure representing greater than 50% of the total Letter Credit Exposure) demanding Letter of Credit Collateralization pursuant to this Section 2.13(n) upon such demand, Borrowers shall provide Letter of Credit Collateralization with respect to the then existing Letter of Credit Usage.  If Borrowers fail to provide Letter of Credit Collateralization as required by this Section 2.13(n), the Revolving Lenders may (and, upon direction of Administrative Agent, shall) advance, as Revolving Loans the amount of the cash collateral required pursuant to the Letter of Credit Collateralization provision so that the then existing Letter of Credit Usage is cash collateralized in accordance with the Letter of Credit Collateralization provision (whether or not the Revolver Commitments have terminated, an Overadvance exists or the conditions in Sections 6 and 7 are satisfied).

(o)     Unless otherwise expressly agreed by Issuing Bank and Borrowers when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(p)     Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.

(q)     In the event of a direct conflict between the provisions of this Section 2.13 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.13 shall control and govern.

(r)     The provisions of this Section 2.13 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any Letters of Credit that remain outstanding.

(s)     At Borrowers' costs and expense, Borrowers shall execute and deliver to Issuing Bank such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by Issuing Bank to enable Issuing Bank to issue any Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce Issuing Banks' rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document.  Each Borrower irrevocably appoints Issuing Bank as its attorney-in-fact and authorizes Issuing Bank, without notice to Borrowers, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents.  The power of attorney granted by the Borrowers is limited solely to such actions related to the issuance, confirmation or amendment of any Letter of Credit and to ancillary documents or letters customary in the letter of credit business.  This appointment is coupled with an interest.

(t)     Existing Letters of Credit.  Schedule 2.13 hereto contains a list of all Letters of Credit outstanding on the Filing Date pursuant to the Existing Credit Agreement.  For the period from and after the effective date of the Initial Financing Order, each such Letter of Credit set forth on Schedule 2.13 including any extension or renewal thereof, that remains outstanding on the effective date of the Initial Financing Order (each, as amended from time to time in accordance with the terms thereof and hereof, an "Existing Letter of Credit") shall be deemed Letters of Credit re-issued hereunder for the account of Borrowers, for all purposes of this Agreement, including, without limitation, calculations of Availability, the Borrowing Base, Letter of Credit Usage and all other fees and expenses relating to the Letters of Credit (including any related indemnification obligations).  Issuing Lender hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the issuers of the Existing Letters of Credit.  Borrowers agree to execute and deliver such documentation, if any, requested by Agent, or a Issuing Lender to evidence, record, or further the foregoing deemed re-issuance.  The expiration date of each Letter of Credit, other than the Existing Letters of Credit, shall be on a date that is not later than five (5) Business Days prior to the Maturity Date unless Borrower provides Letter of Credit Collateralization or the Maturity Date is based upon clause (c) of the definition of "Maturity Date".

Section 2.14     Settlement Amongst Lenders.

(a)     The Swingline Lender may, at any time (but, in any event shall weekly), on behalf of the Lead Borrower (which hereby authorizes the Swingline Lender to act on its behalf in that regard) request the Administrative Agent to cause the Lenders to make a Revolving Loan

(which shall be a Base Rate Loan) in an amount equal to such Lender's Pro Rata Percentage of the Outstanding Amount of Swingline Loans, which request may be made regardless of whether the conditions set forth in Article 7 have been satisfied. Upon such request, each Lender shall make available to the Administrative Agent the proceeds of such Revolving Loan for the account of the Swingline Lender. If the Swingline Lender requires a Revolving Loan to be made by the Lenders and the request therefor is received prior to 2:00 p.m. Los Angeles time on a Business Day, such transfers shall be made in immediately available funds no later than 12:00 Noon Los Angeles time on the next Business Day.  The obligation of each such Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent or the Swingline Lender. If and to the extent any Lender shall not have so made its transfer to the Administrative Agent, such Lender agrees to pay to the Administrative Agent, forthwith on demand, such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent, at the Defaulting Lender Rate.

(b)     The amount of each Lender's Pro Rata Percentage of outstanding Revolving Loans (including outstanding Swingline Loans) shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Revolving Loans (including Swingline Loans) and repayments of Revolving Loans (including Swingline Loans) received by the Administrative Agent as of 2:00 p.m. Los Angeles time on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Administrative Agent.

(c)     The Administrative Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Loans (including Swingline Loans) for the period and the amount of repayments received for the period. As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Lender its applicable Pro Rata Percentage of repayments, and (ii) each Lender shall transfer to the Administrative Agent (as provided below) or the Administrative Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Loans made by each Lender with respect to Revolving Loans to the Borrowers (including Swingline Loans) shall be equal to such Lender's applicable Pro Rata Percentage of Revolving Loans (including Swingline Loans) outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Administrative Agent by the Lenders and is received prior to 2:00 p.m. Los Angeles time on a Business Day, such transfers shall be made in immediately available funds no later than 12:00 Noon Los Angeles on the next Business Day.  The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent. If and to the extent any Lender shall not have so made its transfer to the Administrative Agent, such Lender agrees to pay to the Administrative Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent, at the Defaulting Lender Rate.

Section 2.15    [**Reserved**].

Section 2.16    Lead Borrower.  Each Borrower hereby designates the Lead Borrower as its representative and agent for all purposes under the Credit Documents, including requests for Revolving Loans and Letters of Credit, designation of interest rates, delivery or receipt of

communications, preparation and delivery of Borrowing Base and financial reports, receipt and payment of Obligations, requests for, and execution of waivers, amendments or other accommodations, actions under the Credit Documents (including in respect of compliance with covenants), and all other dealings with the Administrative Agent, the Issuing Bank or any Lender. The Lead Borrower hereby accepts such appointment. The Administrative Agent and the Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any Notice of Borrowing) or agreements or documentation delivered by the Lead Borrower on behalf of any Borrower. The Administrative Agent and the Lenders may give any notice or communication with a Borrower hereunder to the Lead Borrower on behalf of such Borrower. Each of the Administrative Agent, the Issuing Bank and the Lenders shall have the right, in its discretion, to deal exclusively with the Lead Borrower for any or all purposes under the Credit Documents. Each Borrower agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by the Lead Borrower shall be binding upon and enforceable against it.

Section 2.17   <u>Overadvances</u>.  If the aggregate Revolving Loans outstanding exceed the Line Cap (an "<u>Overadvance</u>") at any time, the excess amount shall be payable by the Borrowers on demand by the Administrative Agent, but all such Revolving Loans shall nevertheless constitute Obligations secured by the Collateral and entitled to all benefits of the Credit Documents. The Administrative Agent may require the Lenders to honor requests for Overadvance Loans and to forbear from requiring the Borrowers to cure an Overadvance, (a) when no other Event of Default is known to the Administrative Agent, as long as (i) the Overadvance does not continue for more than thirty (30) consecutive days (and no Overadvance may exist for at least five (5) consecutive days thereafter before further Overadvance Loans are required) and (ii) the aggregate amount of all Overadvances and Protective Advances is not known by the Administrative Agent to exceed 10% of the Borrowing Base, (b) regardless of whether an Event of Default exists, if the Administrative Agent discovers an Overadvance not previously known by it to exist, as long as from the date of such discovery the Overadvance (i) is not increased by more than $500,000, and (ii) does not continue for more than thirty (30) consecutive days. In no event shall Overadvance Loans be required that would cause the aggregate outstanding Revolving Loans and LC Obligations to exceed the aggregate Revolving Commitments. The making of any Overadvance shall not create nor constitute a Default or Event of Default; it being understood that the making or continuance of an Overadvance shall not constitute a waiver by the Administrative Agent or the Lenders of the then existing Event of Default. In no event shall any Borrower or other Credit Party be permitted to require any Overadvance Loan to be made.

Section 2.18   <u>Protective Advances</u>.  The Administrative Agent shall be authorized, in its discretion, following notice to and consultation with the Lead Borrower, at any time, to make Base Rate Loans ("<u>Protective Advances</u>") (a) in an aggregate amount, together with the aggregate amount of all Overadvance Loans, not to exceed 10% of the Borrowing Base, if the Administrative Agent deems such Protective Advances necessary or desirable to preserve and protect the Collateral, or to enhance the collectability or repayment of the Obligations; or (b) to pay any other amounts chargeable to Credit Parties under any Credit Documents, including costs, fees and expenses; provided that, the aggregate amount of outstanding Protective Advances plus the outstanding amount of Revolving Loans and LC Obligations shall not exceed the aggregate Revolving Commitments. Each Lender shall participate in each Protective Advance in accordance with its Pro Rata Percentage. Required Lenders may at any time revoke the Administrative Agent's

authority to make further Protective Advances under clause (a) by written notice to the Administrative Agent. Absent such revocation, the Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive. The Administrative Agent may use the proceeds of such Protective Advances to (a) protect, insure, maintain or realize upon any Collateral; or (b) defend or maintain the validity or priority of the Administrative Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien; provided that the Administrative Agent shall use reasonable efforts to notify the Lead Borrower after paying any such amount or taking any such action.

Section 2.19    Existing Bank Product Obligations; Deposit Account Control Agreements. All Existing Secured Obligations under Existing Swap Contracts and all other "Bank Product Debt" (as defined in the Existing Credit Agreement), a list of which is contained in Schedule 2.19 hereto, shall be deemed to have been incurred pursuant hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof and shall constitute Secured Bank Product Obligations, if applicable (and Noticed Hedges) hereunder.  Each Secured Bank Product Provider hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the "Secured Bank Product Provider" (as defined in the Existing Credit Agreement) in accordance with and pursuant to the Existing Credit Agreement and this Agreement, as applicable.  Borrowers agree to execute and deliver such documentation, if any, requested by Administrative Agent, Secured Bank Product Provider to evidence, record, or further the foregoing deemed re-incurrence.  All Deposit Account Control Agreements entered in connection with the Existing Secured Obligations shall secure the Obligations hereunder as well as the Existing Secured Obligations.

Section 2.20    Superpriority. Except as set forth herein or in the Financing Order, no other claim having a priority superior or pari passu to that granted to the Agent and the Lenders by the Financing Order (other than the security interests in the Subordinated Real Property in favor of the Junior DIP Agent and the Existing Term Loan Agent, subject to the Intercreditor Agreements) shall be granted or approved while any Obligations under this Agreement remain outstanding. Except for the Carveout and subject to entry of the Final Financing Order, no costs, fees or expenses of administration shall be imposed against the Administrative Agent, the Lenders or any of the Collateral or any of the Existing Agent, the Existing Lenders or the Collateral (as defined in the Existing Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each of the Credit Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent, Lenders or any of the Collateral or any of the Existing Agent or the Existing Lenders.

Section 2.21    Waiver of any Priming Rights. On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers and the Guarantors hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, in each case other than the Carveout and as contemplated herein or by the Existing Term Credit Documents.

Section 2.22   Existing Fleet Mortgages.  All Fleet Mortgages entered in connection with the Existing Secured Obligations shall secure the Obligations hereunder as well as the Existing Secured Obligations.

ARTICLE 3   Yield Protection, Illegality and Replacement of Lenders.

Section 3.01   Increased Costs, Illegality, etc.

(a)   In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)   on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBO Rate;

(ii)   at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any LIBO Rate Loan because of any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the official interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, official guideline or request, such as, but not limited to: (A) any additional Tax imposed on any Lender (except Indemnified Taxes or Other Taxes indemnified under Section 5.01 or any Excluded Taxes) or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the LIBO Rate; or

(iii)   at any time, if the making or continuance of any LIBO Rate Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone promptly confirmed in writing) to the Lead Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, LIBO Rate Loans shall no longer be available until such time as the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Lead Borrower with respect to LIBO Rate Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrowers, (y) in the case of clause (ii) above, each Borrower, jointly and severally, agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall

determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice setting forth the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, shall be submitted to the Lead Borrower by such Lender and shall, absent manifest error, be final and conclusive and binding on all the parties hereto), (z) in the case of clause (iii) above, the Borrowers shall take one of the actions specified in Section 3.01(b) as promptly as possible and, in any event, within the time period required by law.

(b)      Subject to Section 3.06, at any time that any LIBO Rate Loan is affected by the circumstances described in Section 3.01(a)(ii), the Lead Borrower may, and in the case of a LIBO Rate Loan affected by the circumstances described in Section 3.01(a)(iii), the Lead Borrower shall, either (x) if the affected LIBO Rate Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Lead Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 3.01(a)(ii) or (iii) or (y) if the affected LIBO Rate Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such LIBO Rate Loan into a Base Rate Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 3.01(b).

(c)      If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital or liquidity requirements, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital or liquidity required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then each Borrower, jointly and severally, agrees to pay to such Lender, upon its written demand therefor, such additional documented amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable; provided that such Lender's determination of compensation owing under this Section 3.01(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 3.01(c), will give prompt written notice thereof to the Lead Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

(d)      Notwithstanding anything in this Agreement to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III ((x) and (y) collectively referred to as "Dodd Frank and Basel III"), shall be deemed to be a change after the Closing Date in a requirement of law or government rule,

regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this <u>Section 3.01</u>).

Notwithstanding the above, a Lender will not be entitled to demand compensation for any increased cost or reduction set forth in this Section 3.01 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances at such time.

      Section 3.02   <u>Compensation</u>. Each Borrower, jointly and severally, agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation and the calculation of the amount of such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its LIBO Rate Loans but excluding loss of anticipated profits and excluding the impact of the second proviso of the definition of LIBO Rate) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, LIBO Rate Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the applicable Borrower or deemed withdrawn pursuant to <u>Section 3.01(a)</u>); (ii) if any prepayment or repayment (including any termination or reduction of Commitments made pursuant to <u>Section 2.07</u> or as a result of an acceleration of the Loans pursuant to <u>Section 11</u>) or conversion of any of its LIBO Rate Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any LIBO Rate Loans is not made on any date specified in a notice of termination or reduction given by the Lead Borrower; or (iv) as a consequence of (x) any other default by any Borrower to repay its LIBO Rate Loans when required by the terms of this Agreement or (y) any election made pursuant to <u>Section 3.01(b)</u>.

      Section 3.03   <u>Change of Lending Office</u>. Each Lender agrees that on the occurrence of any event giving rise to the operation of <u>Section 3.01(a)(ii)</u> or <u>(iii)</u>, <u>Section 3.01(c)</u> or <u>Section 5.01</u> with respect to such Lender, it will, if requested by the Lead Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this <u>Section 3.03</u> shall affect or postpone any of the obligations of the Borrowers or the right of any Lender provided in <u>Sections 3.01</u> and <u>5.01</u>.

      Section 3.04   <u>Replacement of Lenders</u>. (x) If any Lender becomes a Defaulting Lender, (y) upon the occurrence of an event giving rise to the operation of <u>Section 3.01(a)(ii)</u> or <u>(iii)</u>, <u>Section 3.01(c)</u> or <u>Section 5.01</u> with respect to such Lender or (z) in the case of a refusal by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in <u>Section 13.12(b)</u>, the Lead Borrower shall have the right, if no Event of Default then exists (or, in the case of preceding clause (z), will exist immediately after giving effect to such replacement), to replace such Lender (the "<u>Replaced Lender</u>") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "<u>Replacement Lender</u>") and each of whom shall be required to be reasonably acceptable to the

Administrative Agent (to the extent the Administrative Agent's consent would be required for an assignment to such Replacement Lender pursuant to Section 13.04); provided that (i) at the time of any replacement pursuant to this Section 3.04, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(b) (and with all fees payable pursuant to said Section 13.04(b) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Lead Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of the Replaced Lender and, in connection therewith, shall pay to (x) the Replaced Lender in respect thereof an amount equal to the sum of (I) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender and (II) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 2.05 and (ii) all obligations of each Borrower due and owing to the Replaced Lender at such time (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid) shall be paid in full to such Replaced Lender concurrently with such replacement. Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 3.04, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 3.04 and Section 13.04. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above, recordation of the assignment on the Register pursuant to Section 13.14, (x) the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 3.01, 3.02, 5.01, 12.07 and 13.01), which shall survive as to such Replaced Lender. In connection with any replacement of Lenders pursuant to, and as contemplated by, this Section 3.04, each Borrower hereby irrevocably authorizes the Lead Borrower to take all necessary action, in the name of such Borrower, as described above in this Section 3.04 in order to effect the replacement of the respective Lender or Lenders in accordance with the preceding provisions of this Section 3.04.

Section 3.05    Inability to Determine Rates.  If the Required Lenders determine in good faith that for any reason (a) U.S. Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) that the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Lead Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the LIBO Rate component of the Base Rate, the utilization of the LIBO Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Lead Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of LIBO Rate Loans in the amount specified therein.

Section 3.06    Effect of Benchmark Transition Event.

(a)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and Lead Borrower may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and Lead Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the LIBO Rate with a Benchmark Replacement pursuant to this Section 3.06 will occur prior to the applicable Benchmark Transition Start Date.

(b)    Benchmark Replacement Conforming Changes.  In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(c)    Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify Lead Borrower and the Lenders of (1) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (2) the implementation of any Benchmark Replacement, (3) the effectiveness of any Benchmark Replacement Conforming Changes, and (4) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Agent or Lenders pursuant to this Section 3.06 including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 3.06.

(d)    Benchmark Unavailability Period.  Upon Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Lead Borrower may revoke any request for a LIBO Borrowing of, conversion to or continuation of LIBO Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Lead Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon the LIBO Rate will not be used in any determination of the Base Rate.

ARTICLE 4    **[Reserved]**.

ARTICLE 5    Taxes.

Section 5.01    Net Payments.

(a)    All payments made by or on account of any Credit Party under any Credit Document shall be made free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable law. If any Indemnified Taxes are required to be withheld or deducted from such payments, then the Credit Parties jointly and severally agree that (i) to the extent such deduction or withholding is on account of an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions or withholding (including deduction or withholdings applicable to additional sums payable under this Section 5.01), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent will make such deductions or withholdings, and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. In addition, the Credit Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law. The Credit Parties will furnish to the Administrative Agent within forty-five (45) days after the date the payment by any of them of any Indemnified Taxes or Other Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by the applicable Credit Party. The Credit Parties jointly and severally agree to indemnify and hold harmless the Administrative Agent and each Lender, and reimburse the Administrative Agent and each Lender, within ten (10) days of written request therefor, for the amount of any Indemnified Taxes (including any Indemnified Taxes imposed on amounts payable under this Section 5.01) payable or paid by the Administrative Agent or such Lender (or their Affiliates on behalf of the Administrative Agent or such Lender) or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, and any Other Taxes, and any reasonable out-of-pocket expenses arising therefrom or with respect thereto (including reasonable attorneys' and tax advisors' fees and expenses), whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

(b)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or a reduced rate of, withholding Tax; provided however, notwithstanding anything to the contrary in this Section 5.01(b), the completion, execution and submission of such forms or documentation (other than such documentation set forth in Section 5.01(c)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or its Affiliates.  Each Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documents required below in Section 5.01(c)) expired, obsolete or inaccurate in any respect, deliver promptly to the Lead Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Lead Borrower or the Administrative Agent) or

promptly notify the Lead Borrower and the Administrative Agent in writing of its inability to do so.

(c)     Without limiting the generality of the foregoing: (w) each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall deliver to the Lead Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 3.04 or 13.04 (unless the relevant Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (or successor form) or Form W-8BEN-E (or successor form) claiming eligibility for benefits of an income tax treaty to which the United States is a party or Form W-8ECI (or successor form); (ii) in the case of a Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a certificate substantially in the form of Exhibit C (any such certificate, a "U.S. Tax Compliance Certificate") and two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (or successor form) or W-8BEN-E (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from U.S. withholding tax with respect to payments of interest to be made under this Agreement; or (iii) to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two accurate and complete original signed copies of Internal Revenue Service Form W-8IMY (or successor form) of the Lender, accompanied by Form W-8ECI, Form W-8BEN, Form W-8BEN-E, U.S. Tax Compliance Certificate, Form W-8IMY, Form W-9, and/or any other required information (or successor or other applicable form) from each beneficial owner that would be required under this Section 5.01(c) if such beneficial owner were a Lender (provided that, if the Lender is a partnership for U.S. federal income Tax purposes (and not a participating Lender), and one or more beneficial owners are claiming the portfolio interest exemption, the U.S. Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owners); (x) each Lender that is a United States person, as defined in Section 7701(a)(30) of the Code, shall deliver to the Lead Borrower and the Administrative Agent, at the times specified in Section 5.01(b), two accurate and complete original signed copies of Internal Revenue Service Form W-9, or any successor form that such Person is entitled to provide at such time, in order to qualify for an exemption from United States backup withholding requirements; (y) the Administrative Agent shall deliver to the Lead Borrower, on or prior to the date it becomes the Administrative Agent hereunder, one accurate and complete original signed copy of Internal Revenue Service Form W-9 or any applicable successor form; and (z) if any payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Administrative Agent, at the time or times prescribed by applicable law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine, if necessary, the amount to deduct and

withhold from such payment. Solely for purposes of this <u>Section 5.01(c)(z)</u>, "<u>FATCA</u>" shall include any amendment made to FATCA after the Closing Date.

Notwithstanding any other provision of this <u>Section 5.01</u>, a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(d)     If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Credit Parties or with respect to which a Credit Party has paid additional amounts pursuant to <u>Section 5.01(a)</u>, it shall, subject to <u>Section 13.02</u>, pay to the relevant Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Credit Party under <u>Section 5.01(a)</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any Taxes) of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the relevant Credit Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this <u>Section 5.01(d)</u>, in no event will the Administrative Agent or any Lender be required to pay any amount to any Credit Party pursuant to this <u>Section 5.01(d)</u> to the extent that such payment would place the Administrative Agent or such Lender in a less favorable position (on a net after-Tax basis) than such party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. Nothing in this <u>Section 5.01(d)</u> shall be construed to obligate the Administrative Agent or any Lender to disclose its Tax returns or any other information regarding its Tax affairs or computations to any Person or otherwise to arrange its Tax affairs in any manner other than as it determines in its sole discretion.

(e)     For the avoidance of doubt, for purposes of <u>Section 5.01</u>, the term "<u>Lender</u>" shall include any Issuing Bank and Swingline Lender.

ARTICLE 6     <u>Conditions Precedent to Credit Events on the Closing Date</u>.

The Administrative Agent, Swingline Lenders, the Issuing Bank and the Lenders shall not be required to fund any Revolving Loans or Swingline Loans, or arrange for the issuance of any Letters of Credit on the Closing Date, until the following conditions are satisfied or waived.

Section 6.01     <u>Closing Date; Credit Documents</u>.  On or prior to the Closing Date, Holdings and the Borrowers shall have signed a counterpart of this Agreement (whether the same or different counterparts) and each other Credit Document and shall have delivered (by electronic transmission or otherwise) the same to the Administrative Agent or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it, including certified copies of a recent date of requests for information or copies (Form UCC1), or equivalent reports as of a recent date, listing all effective financing statements that name any Credit Party as debtor and that are filed in any applicable jurisdiction, together with copies of such other financing statements that

name any Credit Party as debtor, United States Patent and Trademark Office and United States Copyright Office searches reasonably requested by the Administrative Agent, reports as of a recent date listing all effective tax and judgment liens with respect to any Credit Party in each jurisdiction as the Agents may reasonably require, all in form and substance reasonably satisfactory to Agents.

Section 6.02   Five Year Plan.  On or prior to the Closing Date, Agents and Lenders shall have received a five year business plan, in form and substance reasonably acceptable to the Administrative Agent.

Section 6.03   Corporate Documents; Proceedings, etc.

(a)   On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by a Responsible Officer of such Credit Party, and attested to by the Secretary or any Assistant Secretary of such Credit Party with appropriate insertions, together with copies of the certificate or articles of incorporation and bylaws (or equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably satisfactory to the Administrative Agent.

(b)   On the Closing Date, the Administrative Agent shall have received good standing certificates and bring-down telegrams or facsimiles, if any, for the Credit Parties that the Administrative Agent reasonably may have requested, certified by proper Governmental Authorities in each Credit Party's jurisdiction of incorporation or formation, as applicable.

Section 6.04   Bankruptcy Conditions.

(a)   The Bankruptcy Court shall have entered the Initial Financing Order within three (3) Business Days of the commencement of the Bankruptcy Cases, which Initial Financing Order (i) shall have been entered upon an application or motion of the Credit Parties satisfactory in form and substance to Administrative Agent in its sole discretion and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Administrative Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of Administrative Agent; and, if the Initial Financing Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Initial Financing Order, nor the making of the Loans or the performance by the Credit Parties of any of the Obligations shall be the subject of a presently effective stay; (iii) such order shall (A) authorize and approve the Credit Parties' entry into this Agreement, the Credit Documents and the transactions contemplated thereby and hereby, (B) grant the super-priority status, security interests and priming Liens in favor of the Collateral Agent, and approve the payment of all fees of the Agents and Lenders, (C) provide for the lifting or modifying the automatic stay to permit the Debtors to perform their obligations and Agents and the Lenders to exercise their rights and remedies with respect to this Agreement and the other Credit Documents, (D) except to the extent required to be paid pursuant to the Final Financing Order, authorizing the roll up of the Existing Obligations on the date of the Initial Financing Order, (E) provide for adequate protection in favor of Existing Agent and Existing Lenders, (F) provide for the prohibition on non-consensual use of cash collateral or third party financing secured by Liens senior or pari passu with the Liens securing the Obligations or the

Existing Secured Obligations, (G) include terms and conditions customary for transactions of this type and (H) shall otherwise be in form and substance satisfactory to Administrative Agent; (iv) which Initial Financing Order shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of the Administrative Agent, and, if the Initial Financing Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Initial Financing Order, nor the entrance into this Agreement and the other Credit Documents or the performance by the Credit Parties thereunder shall be the subject of a presently effective stay.

(b)     The Bankruptcy Cases shall have been commenced in the Bankruptcy Court, and all material First Day Orders and all material related orders and motions to be entered and documents to be filed with the Bankruptcy Court at or promptly following the commencement of the Bankruptcy Cases shall have been provided in advance to Administrative Agent and shall be in form and substance reasonably satisfactory to Administrative Agent.

(c)     The Bankruptcy Court shall have entered a cash management order authorizing the Credit Parties to maintain and continue to use their cash management system in the ordinary course of business, which order shall be in form and substance reasonably satisfactory to Administrative Agent (the "Cash Management Order").

(d)     Administrative Agent and Lenders shall have received a copy of the Initial Budget, which shall be in form and substance satisfactory to the Administrative Agent and the Lenders and in the form of Exhibit I-1 attached hereto.

Section 6.05    Restructuring Support Agreement.   On or prior to the Closing Date, the Restructuring Support Agreement shall be entered in form and substance satisfactory to Agents and Lenders.

Section 6.06    Security Agreements.   On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement substantially in the form of Exhibit E (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement") covering all of such Credit Party's present and future Collateral referred to therein, and shall have delivered to the Collateral Agent:

(i)     proper financing statements (Form UCC1 or the equivalent) and other filings (including intellectual property security agreements) authorized for filing under the UCC or other appropriate filing offices of each jurisdiction as may be reasonably necessary or desirable to perfect the security interests purported to be created by the Security Agreement;

(ii)     (x) certified copies of a recent date of requests for information or copies (Form UCC1), or equivalent reports as of a recent date, listing all effective financing statements that name the Lead Borrower or any other Credit Party as debtor and that are filed in the jurisdictions referred to in clause (i) above, together with copies of such other financing statements that name the Lead Borrower or any other Credit Party as debtor (none of which shall cover any of the Collateral except to the extent evidencing Permitted Liens), (y) United States Patent and Trademark Office and United States Copyright Office searches

reasonably requested by the Administrative Agent and (z) reports as of a recent date listing all effective tax and judgment liens with respect to the Lead Borrower or any other Credit Party in each jurisdiction as the Agents may reasonably require; and

(iii)    [**reserved**];

(iv)    all of the certificates, instrument and promissory notes evidencing or constituting Collateral referred to in the Security Agreement (to the extent required to be delivered to the Collateral Agent pursuant to the Security Agreement) together with executed and undated endorsements for transfer, along with evidence that all other actions necessary, to perfect (to the extent required in the Security Agreement) the security interests in Collateral purported to be created by the Security Agreement have been taken.

Section 6.07    <u>Subsidiaries Guaranty</u>.  On the Closing Date, each Subsidiary Guarantor shall have duly authorized, executed and delivered the Subsidiaries Guaranty substantially in the form of <u>Exhibit F</u> (as amended, modified or supplemented from time to time, the "<u>Subsidiaries Guaranty</u>"), guaranteeing all of the obligations of the Lead Borrower as more fully provided therein.

Section 6.08    [**Reserved**].

Section 6.09    <u>Junior DIP Indebtedness</u>. On the Closing Date, the Lead Borrower shall have entered into the Junior DIP Loan Documents and shall draw the proceeds thereof on such date and the Satisfactory Junior DIP Conditions have been satisfied in connection therewith.

Section 6.10    <u>Fees, etc</u>.

(a)    On the Closing Date, the Lead Borrower shall have paid to the Agents and each Lender, all costs, fees and expenses (including, without limitation, legal fees and expenses that were provided to the Lead Borrower on or prior to the Closing Date (including those of Goldberg Kohn Ltd., local counsel engaged by the Administrative Agent in connection with the Debtors' Chapter 11 cases, maritime counsel and any other professional advisors) and other compensation payable to the Agents or such Lender or otherwise payable in respect of the Transaction to the extent then due.

(b)    On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Exit Fee Letters, if finalized.

Section 6.11    [**Reserved**].

Section 6.12    <u>Patriot Act</u>.  The Agents and the Lenders shall have received from the Credit Parties all documentation and other information (including a Beneficial Ownership Certificate) required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and OFAC/PEP, and the Agents and each Lender have completed Patriot Act searches, OFAC/PEP searches and customary individual background checks for each Credit Party, and OFAC/PEP searches and customary individual background searches for each Credit Party's senior management, key principals, and legal and beneficial owners,  the results of which shall be satisfactory to Agents and the Lenders.

Section 6.13   <u>Borrowing Notice</u>.  Prior to the making of a Revolving Loan on the Closing Date, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of <u>Section 2.03(c)</u>.

Section 6.14   <u>Material Adverse Effect</u>.  There shall have been no change, event, effect, occurrence, development, matter, state of facts, series of events or circumstances that either individually or in the aggregate, has had or could reasonably be expected to have (i) a material adverse effect on the business, assets, financial condition or results of operations of the Credit Parties taken as a whole, (ii) a material and adverse effect on the rights and remedies of the Administrative Agent and other Secured Creditors, taken as a whole, under the Credit Documents, (iii) a material and adverse effect on the ability of the Credit Parties, taken as a whole, to perform their obligations under the Credit Documents, (iv) the perfection or priority of the Liens granted pursuant to the Credit Documents or the Financing Order, (v) the perfection or priority of the Liens granted to secure the Existing Obligations, or (vi) the ability of the Existing Agent and the Existing Lenders to enforce the Existing Loan Documents, except, in each case for the commencement of the Bankruptcy Cases and the events that customarily and reasonably result from the commencement of the Bankruptcy Cases.

Section 6.15   <u>Appraisal/Borrowing Base Certificate</u>.   The Lead Borrower shall have delivered to the Administrative Agent a satisfactory Borrowing Base Certificate in form and substance reasonably satisfactory to the Administrative Agent.

Section 6.16   <u>Flood</u>.  The Agents and Lenders shall have received (i) all flood insurance documentation and completed all diligence and coverage in accordance with Flood Insurance Laws with respect to the real property subject to a Mortgage on the Closing Date and (ii) in the event that any real property subject to a Mortgage is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", evidence that Borrowers and Credit Parties have maintained flood insurance with respect to such real property (including any personal property which is located thereon) complying with the Flood Insurance Laws, naming the Administrative Agent as loss payee and/or mortgagee thereunder, in amounts satisfactory to all Lenders and otherwise satisfactory to all Lenders.

Section 6.17   <u>Officer's Certificate</u>.   The Administrative Agent shall have received a certificate of a Responsible Officer of Holdings and the Lead Borrower certifying that as of the Closing Date (i) all the representations and warranties set forth in Article 8 hereof or in any other Credit Document are true and correct in all material respects (or to the extent such representation or warranty is qualified as to "<u>materiality</u>" or similar language, such representation or warranty shall be true and correct in all respects) to the extent set forth therein, (ii) there is no Material Adverse Effect as described in <u>Section 6.14</u> and (iii) no Default or Event of Default exists.

ARTICLE 7   <u>Conditions Precedent to All Credit Events</u>.

The obligation of each Lender and each Issuing Bank to make any Credit Extension shall be subject to the satisfaction (or waiver) of each of the conditions precedent set forth below:

Section 7.01   <u>Notice of Borrowing</u>.  The Administrative Agent shall have received a Notice of Borrowing as required by <u>Section 2.03</u> (or such notice shall have been deemed given in

accordance with Section 2.03) if Loans are being requested or, in the case of the issuance, amendment, extension or renewal of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance, amendment, extension or renewal of such Letter of Credit as required by Section 2.13(a) or, in the case of the Borrowing of a Swingline Loan, the Swingline Lender and the Administrative Agent shall have received a notice requesting such Swingline Loan as required by Section 2.12(b).

Section 7.02   Availability.  Availability on the proposed date of such Borrowing shall be adequate to cover the amount of such Borrowing.

Section 7.03   No Default.  No Default or Event of Default shall exist at the time of, or result from, such funding or issuance.

Section 7.04   Representations and Warranties.  Each of the representations and warranties made by any Credit Party set forth in Article 8 hereof or in any other Credit Document shall be true and correct in all material respects (without duplication of any materiality standard set forth in any such representation or warranty) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such date (without duplication of any materiality standard set forth in any such representation or warranty).

Section 7.05   No Injunction.  No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower, Agents, or any Lender.

Section 7.06   Use of Junior DIP Proceeds.  One hundred percent (100%) of the proceeds of the Junior DIP Indebtedness shall have been used by the Borrowers in a manner consistent with the Financing Order and Section 10.12 of the Junior DIP Credit Agreement, as in effect on the date hereof.

Section 7.07   Final Financing Order.  With respect to any Loan or Letter of Credit to be made or issued thirty (30) days after the Filing Date (or such later date acceptable to the Administrative Agent in its sole discretion), the Bankruptcy Court shall have entered the Final Financing Order, which Final Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of Administrative Agent.

The acceptance of the benefits of each Credit Event shall constitute a representation and warranty by each Borrower to the Administrative Agent and each of the Lenders that all the conditions specified in this Article 7 and applicable to such Credit Event are satisfied as of that time (other than such conditions which are subject to the discretion of the Administrative Agent or the Lenders). All of the certificates, legal opinions and other documents and papers referred to in Article 6 and in this Article 7, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders.

ARTICLE 8    Representations, Warranties and Agreements. In order to induce the Lenders to enter into this Agreement and to make the Loans, each of Holdings and each Borrower, as applicable, makes the following representations, warranties and agreements, in each case after giving effect to the Transaction.

Section 8.01    Organizational Status.  Each of Holdings, the Lead Borrower and each of its Restricted Subsidiaries (i) is a duly organized and validly existing corporation, partnership, limited liability company or unlimited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the corporate, partnership, limited liability company or unlimited holding company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications, except for failures to be so qualified which, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 8.02    Power and Authority.   Each Credit Party thereof has the corporate, partnership, limited liability company or unlimited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and subject to the approval of the Bankruptcy Court and pursuant to the Financing Order has taken all necessary corporate, partnership, limited liability company or unlimited liability company action, as the case may be, to authorize the execution, delivery and performance by it of each of such Credit Documents. Each Credit Party thereof has duly executed and delivered each of the Credit Documents to which it is party, and subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

Section 8.03    No Violation.  Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its respective Restricted Subsidiaries pursuant to the terms of, any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its respective Restricted Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject, other than in the case of any contravention, breach, default and/or conflict, that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability

-90-

company agreement or bylaws (or equivalent organizational documents), as applicable, of any Credit Party or any of its respective Restricted Subsidiaries.

Section 8.04   <u>Approvals</u>.  Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, the execution, delivery and performance of any Credit Document.

Section 8.05   <u>Financial Condition</u>.  Since the Closing Date there has been no change, event or occurrence that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 8.06   <u>Litigation</u>.  There are no actions, suits or proceedings pending or, to the knowledge of any Credit Party, threatened (i) other than the filing, commencement and continuation of the Bankruptcy Cases and any litigation resulting therefrom, with respect to the Transaction or any Credit Document or (ii) that either individually or in the aggregate, have had, or would reasonably be expected to have, a Material Adverse Effect.

Section 8.07   <u>True and Complete Disclosure</u>.

(a)   All written information (taken as a whole) furnished by or on behalf of any Credit Party in writing to the Administrative Agent or any Lender (including, without limitation, all such written information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein does not contain any material misstatement of fact or omit to state any material fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such written information was provided.

(b)   Notwithstanding anything to the contrary in the foregoing clause (a) of this <u>Section 8.07</u>, none of the Credit Parties makes any representation, warranty or covenant with respect to any information consisting of statements, estimates, forecasts and projections regarding the future performance of the Lead Borrower or any of its Subsidiaries, or regarding the future condition of the industries in which they operate other than that such information has been prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof (it being understood and agreed that projections are not to be viewed as facts, projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Credit Parties, no assurances can be given that any particular projection will be realized and that actual results during the period or periods covered by such projections may differ from projected results, and such differences may be material).

(c)   As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 8.08    Use of Proceeds.

(a)    All proceeds of the Loans incurred on the date of the entry into the Initial Financing Order will be used by the Lead Borrower to pay in full the Existing Secured Obligations (other than the Existing Bank Product Obligations).

(b)    All proceeds of the Loans incurred on or after the Closing Date will be used in compliance with Section 10.12.

Section 8.09    Tax Returns and Payments.  Except as would not reasonably be expected to result in aggregate liabilities in excess of $1,000,000, (i) each Credit Party and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all federal, state and other material Tax returns, statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of such Credit Party and/or any of its Subsidiaries, (ii) the Tax returns accurately reflect in all material respects all liability for Taxes of the Credit Party and its Subsidiaries for the periods covered thereby, and (iii) each Credit Party and each of its Subsidiaries have paid all material Taxes payable by them, other than to the extent subject to the automatic stay, those, if any, for which payment is otherwise excused under the Bankruptcy Code or those that are being contested in good faith by appropriate proceedings and fully provided for as a reserve on the financial statements of such Person in accordance with U.S. GAAP (to the extent no Lien with respect thereto has been filed other than a Permitted Lien).  Except as set forth in Schedule 8.09, there is no material action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of a Credit Party or any of its Subsidiaries, threatened in writing by any authority regarding any Taxes relating to any Credit Party or any of its Subsidiaries.

Section 8.10    ERISA.

(a)    No ERISA Event has occurred or is reasonably expected to occur that would reasonably be expected to result in a Material Adverse Effect.  Each ERISA Plan and each Employee Benefit Plan is in compliance in form and operation with its terms and with the applicable provisions of ERISA, the Code and other applicable law, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Employee Benefit Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service or is in the form of a prototype document that is the subject of a favorable opinion letter.  There are no pending or, to the knowledge of the Credit Parties, threatened or contemplated claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Employee Benefit Plan, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Employee Benefit Plan, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect.

(b)    There exists no Unfunded Pension Liability with respect to any ERISA Plan, except as would not reasonably be expected to result in a Material Adverse Effect.

(c)     If any Credit Party or ERISA Affiliate were to withdraw from all Multiemployer Plans in a complete withdrawal as of the date this assurance is given, the aggregate withdrawal liability that would be incurred would not reasonably be expected to have a Material Adverse Effect.

(d)     There are no actions, suits or claims pending against or involving any Employee Benefit Plan (other than routine claims for benefits) or, to the knowledge of the Lead Borrower or any Restricted Subsidiary of the Lead Borrower, threatened, which would reasonably be expected to be asserted successfully against any Employee Benefit Plan and, if so asserted successfully, would reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect.

(e)     Each Credit Party and any ERISA Affiliate have made all contributions to or under each ERISA Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such ERISA Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a ERISA Plan or Multiemployer Plan except where any failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(f)     Except as would not reasonably be expected to have a Material Adverse Effect: (i) each Foreign Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made; and (iii) no Credit Party has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan.

Section 8.11   The Security Documents.

(a)     Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order:

(i)     the provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Collateral (as described in the Security Agreement), and upon (i) the timely and proper filing of financing statements listing each applicable Credit Party, as a debtor, and the Collateral Agent, as secured creditor, in the secretary of state's office (or other similar governmental entity) of the jurisdiction of organization of such Credit Party, (ii) sufficient identification of commercial tort claims (as applicable), (iii) execution of a control agreement establishing the Collateral Agent's "control" (within the meaning of the New York UCC) with respect to any Deposit Account, (iv) the recordation of the Patent Security Agreement, if applicable, and the Trademark Security Agreement, if applicable, in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office and (v) the recordation of the Copyright Security Agreement in U.S. Copyrights, if applicable, in the form attached to the Security Agreement with the United States Copyright Office, the Collateral Agent, for the benefit of the Secured Creditors, has

(to the extent provided in the Security Agreement) a fully perfected security interest in all right, title and interest in all of the Collateral (as described in the Security Agreement), subject to no other Liens other than Permitted Liens, in each case, to the extent perfection can be accomplished under applicable law through these actions.

(ii)    The provisions of each Mortgage are effective to create, as security for the Obligations, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) and, upon recordation in the appropriate recording office, perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except as may exist pursuant to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Liens related thereto).

(iii)    The provisions of each Fleet Mortgage are effective to create, as security for the Obligations, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and, upon recordation in the appropriate recording office, perfected security interest in and mortgage lien on the respective Mortgaged Vessel in favor of the Security Trustee (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, subject to no other Liens (other than Permitted Liens related thereto).

(b)    The entry of the Financing Order is effective to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject to the Intercreditor Agreements solely with respect to the ABL Excluded Collateral (as defined therein), (ii) an allowed administrative expense in each of the Bankruptcy Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carveout (the "Superpriority Claims"), (iii) sufficient replacement Liens to the extent of any post-petition diminution in value of the Collateral (as defined in the Existing Credit Agreement) securing the Existing Secured Obligations, subject, in each case and as applicable, to the Carve-Out.

(c)    Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for either (x) the pledge or grant by Holdings or any of its Subsidiaries of the Liens purported to be created in favor of Collateral Agent pursuant to this Agreement or any of the other Credit Documents or (y) the exercise by Agents of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to this Agreement, any of the other Credit Documents or created or

provided for by applicable law), except as may be required in connection with the disposition of any pledged Collateral by laws generally affecting the offering and sale of securities.

Section 8.12   Properties.  As of the Closing Date, the location of all material owned or leased Real Property of the Credit Parties and all dry-docks of the Credit Parties is identified on Schedule 8.12(a) and indicating which Real Property is or will constitute a Mortgaged Property and Schedule 8.12(a) lists completely and correctly as of the date hereof all Vessels owned or leased by the Credit Parties on the Closing Date and indicating which Vessels are or will constitute a Mortgaged Vessel. The Lead Borrower and each of its Subsidiaries has good and marketable title or, except as set forth in Schedule 8.12(b), a valid leasehold interest in any Real Property material to its business, and good and valid title in all material tangible properties owned by it, in each case, free and clear of all Liens, other than Permitted Liens. Without limiting the generality of the foregoing, except as set forth on Schedule 8.12(b), as of the Closing Date, each of the Vessels owned by any of the Credit Parties is either duly documented under the laws of the United States in the name of the Credit Party or the Subsidiary listed on Schedule 8.12(b) as the owner thereof or is the subject of an application for documentation that is in substantial compliance with Chapter 121 of Title 46 of the United States Code and the regulations prescribed thereunder.

Section 8.13   Capitalization.  All outstanding shares of capital stock of the Lead Borrower have been duly and validly issued and are fully paid and non-assessable (other than any assessment on the shareholders of the Lead Borrower that may be imposed as a matter of law) and are owned by Holdings. The Lead Borrower does not have outstanding any capital stock or other securities convertible into or exchangeable for its capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock.

Section 8.14   Subsidiaries.  On and as of the Closing Date and after giving effect to the consummation of the Transaction, (i) Holdings has no direct Subsidiaries other than the Lead Borrower and (ii) the Lead Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule 8.14. Schedule 8.14 correctly sets forth, as of the Closing Date and after giving effect to the Transaction, the percentage ownership (direct and indirect) of the Lead Borrower in each class of capital stock of each of its Subsidiaries and also identifies the direct owner thereof.

Section 8.15   Compliance with Statutes, OFAC Rules and Regulations; Patriot Act; FCPA.

(a)   Except as otherwise permitted by the Bankruptcy Code or pursuant to any order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Agent, each of the Lead Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including Environmental Laws), except such noncompliance as, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.  The Borrowers will not directly (or knowingly indirectly) use the proceeds of the Revolving Loans to violate or result in a violation of any such applicable statutes, regulations, orders or restrictions referred to in the immediately preceding sentence.

(b)      No Credit Party or any of its Subsidiaries is in violation of any Sanctions. No Credit Party nor any of its Subsidiaries nor any director, officer, employee, agent or Affiliate of such Credit Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Credit Parties and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Credit Parties and its Subsidiaries, each director, officer, employee, agent and Affiliate of each such Credit Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Agent, any Lender, any Secured Bank Product Provider, or other individual or entity participating in any transaction).

Section 8.16    Investment Company Act.  None of Holdings, the Lead Borrower or any of its Restricted Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, required to be registered as such.

Section 8.17    [**Reserved**].

Section 8.18    Environmental Matters.

(a)      The Lead Borrower and each of its Restricted Subsidiaries are in compliance with all Environmental Laws and the requirements of any permits issued under such Environmental Laws. There are no pending or, to the knowledge of any Credit Party, threatened Environmental Claims against the Lead Borrower or any of its Restricted Subsidiaries or any Vessel or Real Property currently or formerly owned, leased or operated by the Lead Borrower or any of its Restricted Subsidiaries.  To the knowledge of any Credit Party, there are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Lead Borrower or any of its Restricted Subsidiaries, or any Real Property currently or formerly owned, leased or operated by the Lead Borrower or any of its Restricted Subsidiaries that would be reasonably expected (i) to form the basis of an Environmental Claim against the Lead Borrower or any of its Restricted Subsidiaries or (ii) to cause any Real Property owned, leased or operated by the Lead Borrower or any of its Restricted Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such Real Property by the Lead Borrower or any of its Restricted Subsidiaries under any Environmental Law.

(b)      Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Vessel or Real Property owned, leased or operated by the Lead Borrower or any of its Restricted Subsidiaries where such generation, use, treatment, storage, transportation or Release has (i) violated or would be reasonably expected to violate any Environmental Law, (ii) give rise to an Environmental Claim or (iii) give rise to liability under any Environmental Law.

(c)     Notwithstanding anything to the contrary in this Section 8.18, the representations and warranties made in this Section 8.18 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliance of the types described above would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 8.19   Labor Relations.  Except as set forth in Schedule 8.19or except to the extent the same has not, either individually or in the aggregate, had and would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other labor disputes pending against the Lead Borrower or any of its Restricted Subsidiaries or, to the knowledge of each Credit Party, threatened against the Lead Borrower or any of its Restricted Subsidiaries, (b) to the knowledge of each Credit Party, there are no questions concerning union representation with respect to the Lead Borrower or any of its Restricted Subsidiaries, (c) the hours worked by and payments made to employees of the Lead Borrower or any of its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local, or foreign law dealing with such matters and (d) to the knowledge of each Credit Party, no wage and hour department investigation has been made of the Lead Borrower or any of its Restricted Subsidiaries.

Section 8.20   Intellectual Property.  Each of the Lead Borrower and each of its Restricted Subsidiaries owns or has the right to use all the patents, trademarks, domain names, service marks, trade names, copyrights, inventions, trade secrets, formulas, proprietary information and knowhow of any type, whether or not written (including, but not limited to, rights in computer software and databases) (collectively, "Intellectual Property"), necessary for the present conduct of its business, without any known conflict with or infringements of the Intellectual Property rights of others.

Section 8.21   Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; etc.  Schedule 8.21 contains for each Credit Party, as of the Closing Date, (i) the exact legal name of such Credit Party, (ii) the type of organization of such Credit Party, (iii) whether or not such Credit Party is a registered organization, (iv) the jurisdiction of organization of such Credit Party, (v) such Credit Party's Location, and (vi) the organizational identification number (if any) of such Credit Party. Each Credit Party agrees that as a result of any change with respect to any information provided in the preceding sentence, to make or cause all filings under the UCC or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

Section 8.22   Borrowing Base Certificate.  At the time of delivery of each Borrowing Base Certificate, assuming that any eligibility criterion that requires the approval or satisfaction of the Administrative Agent has been approved by or is satisfactory to the Administrative Agent, (a) each Account reflected therein as eligible for inclusion in the Borrowing Base is an Eligible Account, (b) the Inventory reflected therein as eligible for inclusion in the Borrowing Base constitutes Eligible Inventory and (c) each of the Vessels reflected therein as eligible for inclusion in the Borrowing Base constitutes an Eligible Vessel.

Section 8.23   Eligible Vessels.  As to each Vessel that is identified by any Borrower as an Eligible Vessel on the most recent Borrowing Base Certificate submitted to the Administrative Agent, such Vessel:

(a)      is in the sole and absolute ownership of a Borrower, unencumbered, save and except for a valid and perfected first priority lien in favor of the Security Trustee pursuant to Fleet Mortgage filed against it and Permitted Vessel Liens;

(b)      to the extent applicable, is classed in the highest classification and rating for vessels (or such other classification or rating as is reasonably acceptable to Agent) of the same age and type with the respective Classification Society, as evidenced by a certificate of such Classification Society as to such classification and rating being in full force and effect, without any material outstanding recommendations or requirements restricting the operation of such Vessel;

(c)      is insured in accordance with the provisions of the Fleet Mortgage against it and the requirements thereof in respect of such insurance have been complied with; and

(d)      is not excluded as ineligible by virtue of one or more of the excluding criteria (other than Agent discretionary criteria) set forth in the definition of Eligible Vessels.

Section 8.24   Citizenship.  Each Borrower is a citizen of the United States within the meaning of 46 U.S.C. § 50501, eligible to operate vessels in the coastwise trade of the United States.

Section 8.25   [**Reserved**].

Section 8.26   Financing Order .  The Financing Order is in full force and effect, is not subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order and has not been reversed, modified, amended, stayed or vacated except with Administrative Agent's written consent.

Section 8.27   Exit Financing Commitment Letter.  If finalized, the Exit Financing Commitment Letter is in full force and effect.

Section 8.28   Restructuring Support Agreement.  The Restructuring Support Agreement remains in full force and effect at all times.

Section 8.29   Bankruptcy Cases.  The Bankruptcy Cases were commenced on the Filing Date in accordance with applicable law, and proper notice has been or will be given of (i) the motion seeking approval of the Credit Documents, the Initial Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Initial Financing Order and (iii) the hearing for the entry of the Final Financing Order.

Section 8.30   Financing Order.  The Credit Parties are in compliance with the terms and conditions of the Financing Order.  Each of the Initial Financing Order (with respect to the period prior to the entry of the Final Financing Order) or the Final Financing Order (from after the date the Final Financing Order is entered), is in full force and effect and has not been vacated, reversed

or rescinded, amended or modified (except as otherwise consented to by Administrative Agent in its sole discretion) and no appeal of such order has been timely filed or, if timely filed, a stay pending such appeal is currently effective.

Section 8.31   Insurance. All properties of each Credit Party and its Subsidiaries are insured to the extent required by Section 9.03.   Schedule 8.31 sets forth a description of such insurance as of the Closing Date.

Section 8.32   Margin Stock.   Neither any Credit Party nor any of its Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.   No part of the proceeds of the Loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.   Neither any Credit Party nor any of its Subsidiaries expects to acquire any Margin Stock.

ARTICLE 9   Affirmative Covenants.   The Lead Borrower and each of its Restricted Subsidiaries hereby covenants and agrees that on and after the Closing Date and so long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than (i) any indemnification obligations arising hereunder which are not then due and payable and (ii) Secured Bank Product Obligations), or any Letter of Credit shall remain outstanding (unless subject to Letter of Credit Collateralization).

Section 9.01   Information Covenants.   The Lead Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)   Quarterly Financial Statements.   Beginning with the quarterly accounting period ending March 31, 2020, within forty-five (45) days after the close of each of the quarterly accounting periods of the Lead Borrower (or with respect to the quarterly accounting period ending March 31, 2020, on or prior to June 30, 2020), (i) the consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of operations and income and stockholders' equity and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall be certified by the chief financial officer of the Lead Borrower that they fairly present in all material respects in accordance with U.S. GAAP the financial condition of the Lead Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal yearend audit adjustments and the absence of footnotes, and (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period. If the Lead Borrower has filed (within the time period required above) a Form 10Q with the SEC for any fiscal quarter described above, then to the extent that such quarterly report on Form 10Q contains any of the foregoing items, the Lenders shall accept such Form 10Q in lieu of such items.

(b)   [**Reserved**].

(c)     [**Reserved**].

(d)     Officer's Certificates.  At the time of the delivery of the financial statements and related deliveries pursuant to Section 9.01(a), a compliance certificate from a Responsible Officer of the Lead Borrower substantially in the form of Exhibit H, certifying on behalf of the Lead Borrower that, to such Responsible Officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall certify that there have been no changes to the Perfection Certificate or the latest Perfection Certificate Supplement, if later, since the date of the most recent certificate delivered pursuant to this Section 9.01(d) or Section 9.12, as applicable, or if there have been any such changes, a concurrent Perfection Certificate Supplement evidencing such changes and whether the Lead Borrower and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

(e)     Notice of Default, Litigation and Material Adverse Effect.  Promptly after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default or any default or event of default under the Junior DIP Loan Documents or any other post-petition debt instrument in excess of the Threshold Amount, (ii) any litigation, or governmental investigation or proceeding pending against Holdings or any of its Subsidiaries (x) which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect (other than the Bankruptcy Cases) or (y) with respect to any Credit Document, or (iii) any other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

(f)     Other Reports and Filings.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials and reports, if any, which Holdings or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "SEC").

(g)     Environmental Matters.  Promptly after any officer of the Lead Borrower or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:

(i)     any pending or threatened Environmental Claim against the Lead Borrower or any of its Subsidiaries or any Vessel or Real Property owned, leased or operated by the Borrowers or any of their respective Subsidiaries;

(ii)     any condition or occurrence on or arising from any Vessel or Real Property owned, leased or operated by the Lead Borrower or any of its Subsidiaries that (a) results in noncompliance by the Lead Borrower or any of its Subsidiaries with any Environmental Law or (b) would reasonably be expected to form the basis of an Environmental Claim against the Lead Borrower or any of its Subsidiaries;

(iii)     any condition or occurrence on any Vessel or Real Property owned, leased or operated by the Lead Borrower or any of its Subsidiaries that could reasonably be expected to cause such Vessel or Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Lead Borrower or any of its Subsidiaries of such Vessel or Real Property under any Environmental Law; and

(iv)     the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by the Lead Borrower or any of its Subsidiaries as required by any Environmental Law or Governmental Authority and all notices received by the Lead Borrower or any of its Subsidiaries under, or pursuant to, Environmental Law which identify the Lead Borrower or any of its Subsidiaries as potentially responsible parties for remediation costs or which otherwise notify the Lead Borrower or any of its Subsidiaries of potential liability under Environmental Law.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Lead Borrower's or such Subsidiary's response thereto.

(h)     <u>Notices to Certain Holders of Indebtedness</u>.  Contemporaneously with the sending or filing thereof (or reasonably promptly following receipt of), the Lead Borrower will provide to the Administrative Agent for distribution to each of the Lenders, any notices provided to, or received from, holders of (I) Indebtedness, in each case of this clause (I), with a principal amount in excess of the Threshold Amount, (II) the Existing Term Loan Credit Agreement, or (III) the Junior DIP Loan Documents.

(i)     **[Reserved]**.

(j)     <u>Other Information</u>.  From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(k)     <u>Budget</u>.  Borrowers shall (x) deliver to Administrative Agent and Lenders, no later than 9:00 a.m. Los Angeles time on February 5, 2020 and on the last Business Day of each fourth week thereafter, a proposed rolling 13-week budget with the information set forth in the Financing Order for the Credit Parties for the 13-week period following the date of delivery, which shall be in substantially the same form and detail of the Initial Budget (the "<u>Weekly Cash Flow Forecast</u>"), and accompanied by a certificate signed by a Responsible Officer of the Lead Borrower to the effect that such budget has been prepared in good faith based upon assumptions which the Credit Parties believe to be reasonable in light of the conditions existing at the time of delivery and (y) deliver to Agent and Lenders, on the third Business Day following each Testing Period, (i) a Variance Report in form and substance acceptable to the Administrative Agent, and (ii) a written narrative report of the key performance metrics monitored by management of the Credit Parties regarding the business of the Borrowers and their Subsidiaries, in each case in a form reasonably acceptable to the Administrative Agent.

(l)    <u>Conference Calls</u>.  In addition to the foregoing, upon the reasonable request of Administrative Agent, Borrowers will participate in conference calls with Administrative Agent and Lenders and their representatives, consultants (including, without limitation, any Agent Consultant), and agents, at such mutually convenient dates and times (with frequency not to be unreasonable and in absence of exigent circumstances, no more frequently than one (1) time per calendar week) to be proposed by Administrative Agent upon reasonable notice, and will cause available senior members of management, Consultant, and any investment bankers and other advisors of Holdings and its Subsidiaries, as applicable or as requested by Administrative Agent or such Lenders, and solely to the extent reasonably requested by Agent, one or more members of the board of directors of Holdings and its Subsidiaries, to participate in such calls for the purpose of discussing the status of the financial, collateral, and operational condition, businesses, liabilities, assets, and prospects of the Borrowers and their Subsidiaries and any sale, refinance or other strategic transaction efforts.  Upon Administrative Agent's reasonable request, and subject to any confidentiality restrictions, Holdings and its Subsidiaries shall promptly provide copies of all non-privileged material written materials and reports (in each case, excluding drafts) produced by Holdings and its Subsidiaries and shared with third parties in connection with any sale, refinance, or other strategic transaction efforts, and any written indications of interest, letters of intent, draft purchase documents, and commitment letters received by Holdings and its Subsidiaries relating to such sale, refinance, or other strategic transaction efforts of Holdings and its Subsidiaries or any other non-privileged written materials as Administrative Agent and the Lenders may request from time to time; <u>provided</u>, that such materials may be redacted to the extent information contained therein would adversely affect any attorney-client privilege; <u>provided</u>, <u>further</u>, that only final versions of such documents, or versions of such documents shared with third parties, shall be provided.  Without limiting the foregoing, Borrowers agree to notify Administrative Agent promptly upon any Borrower becoming aware of any material change or development relating to any sale or refinance efforts or to the financial, collateral, or operational condition, businesses, assets, liabilities, or prospects of such Borrower, any of its Affiliates, or any of their respective Subsidiaries.

Section 9.02    <u>Books, Records and Inspections</u>.

(a)    The Lead Borrower will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity with U.S. GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities.

(b)    The Lead Borrower will permit the Administrative Agent, subject to reasonable advance notice to the Lead Borrower and normal business hours, to visit and inspect the properties of any Borrower, at the Borrowers' expense, inspect, audit and make extracts from any Borrower's corporate, financial or operating records, and discuss with its officers, employees, agents, advisors and independent accountants (subject to such accountants' customary policies and procedures) such Borrower's business, financial condition, assets and results of operations (it being understood that a representative of the Lead Borrower is allowed to be present in any discussions with officers, employees, agent, advisors and independent accountants).    Neither the Administrative Agent nor any Lender shall have any duty to any Borrower to make any inspection, nor to share any results of any inspection, appraisal or report with any Borrower. Each of the Lead Borrowers acknowledges that all inspections, appraisals and reports are prepared by the

Administrative Agent and Lenders for their purposes, and the Borrowers shall not be entitled to rely upon them.

(c)     The Lead Borrower will on ten days' notice, reimburse the Administrative Agent for all reasonable documented out-of-pocket costs and expenses in connection with any such inspection, examination, or appraisal. Subject to and without limiting the foregoing, the Borrowers specifically agree to pay the Administrative Agent's then standard charges for examination activities, including the standard charges of the Administrative Agent's internal appraisal group. This Section shall not be construed to limit the Administrative Agent's right to use third parties for such purposes.

(d)     Borrowers agree to cooperate in connection with any field exams, audits, appraisals, or valuations that Agents may conduct or cause to be conducted at any time, including, without limitation, those performed by any Agent Consultant, and will provide any Agent Consultant with reasonable access at all times to all documentation, places of business, officers, Consultant, any investment banker, consultants, and employees of Borrowers and Borrowers' other advisors.  Borrowers will promptly provide to any Agent Consultant such financial information concerning the Borrowers' financial, collateral, and operational condition, businesses, assets, liabilities, and prospects as Agent Consultant may request from time to time.  Borrowers will reimburse Agents in cash, on ten days' notice, for any and all reasonable fees, costs, expenses, and other charges incurred by such Agent relating to the engagement of any Agent Consultant from time to time (in each case, whether or not included in the Budget).  Notwithstanding anything to the contrary in this Section 9.02(d), none of Holdings or any of its Subsidiaries will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrowers, impair, waive or violate (based on the advice of counsel) the attorney-client privilege or is otherwise prohibited by law or fiduciary duty, (ii) such information constitutes attorney work product, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which any Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Agents or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters with respect thereto.

Section 9.03   Maintenance of Property; Insurance.

(a)     The Lead Borrower will, and will cause each of its Restricted Subsidiaries to, (i) keep all tangible property necessary to the business of the Lead Borrower and its Restricted Subsidiaries in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Lead Borrower and its Restricted Subsidiaries (including, without limitation, navigating risk and marine hull and machinery insurance, full form marine protection and indemnity insurance, and, to the extent required by Environmental Laws, vessel pollution, as more fully provided in the Fleet Mortgages), and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried. All such policies relating to owned Vessels shall include insurance in respect of each Vessel in an aggregate amount equal to the greater of the then fair market value or the book value of such Vessel. The provisions of this

<u>Section 9.03</u> shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)    If at any time the improvements on a Mortgaged Property are located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Lead Borrower shall, or shall cause the applicable Credit Party to maintain, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and, as soon as reasonably practical, deliver to the Administrative Agent evidence of such insurance, naming the Administrative Agent as loss payee and/or mortgagee thereunder, in form and substance reasonably acceptable to the Administrative Agent and all Lenders.  Lead Borrower shall, or shall cause the applicable Credit Party to provide the Administrative Agent with evidence of renewal of any such flood insurance prior to the expiration date thereof.

(c)    The Lead Borrower will, and will cause each of its Restricted Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Lead Borrower and/or such Restricted Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee/mortgagee and/or additional insured), (ii) if agreed by the insurer (which agreement the Lead Borrower shall use commercially reasonable efforts to obtain), shall state that such insurance policies shall not be canceled without at least thirty (30) days' prior written notice thereof (or, with respect to nonpayment of premiums, ten (10) days' prior written notice) by the respective insurer to the Collateral Agent; provided that the requirements of this <u>Section 9.03(c)</u> shall not apply to (x) insurance policies covering (1) directors and officers, fiduciary or other professional liability, (2) employment practices liability, (3) workers compensation liability, (4) automobile and aviation liability, (5) health, medical, dental and life insurance, (6) Vessels, to the extent the Fleet Mortgages covering such Vessels include provisions of a similar nature to the requirements of this <u>Section 9.03(c)</u> and (7) such other insurance policies and programs as the Collateral Agent may approve; and (y) self-insurance programs and (iii) shall be deposited with the Collateral Agent.

(d)    If the Lead Borrower or any of its Restricted Subsidiaries shall fail to maintain insurance in accordance with this <u>Section 9.03</u>, or the Lead Borrower or any of its Restricted Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, after any applicable grace period, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Credit Parties jointly and severally agree to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

Section 9.04    <u>Existence; Franchises</u>.  The Lead Borrower will, and will cause each of its Restricted Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and, in the case of the Lead Borrower and its Restricted Subsidiaries, its and their franchises, licenses and permits in each case to the extent material; provided, however, that nothing in this <u>Section 9.04</u> shall prevent (i) sales of assets and other transactions by the Lead

Borrower or any of its Restricted Subsidiaries in accordance with Section 10.02, (ii) the abandonment by the Lead Borrower or any of its Restricted Subsidiaries of any franchises, licenses or permits that the Lead Borrower reasonably determines are no longer material to the operations of the Lead Borrower and its Restricted Subsidiaries taken as a whole or (iii) the withdrawal by the Lead Borrower or any of its Restricted Subsidiaries of its qualification as a foreign corporation, partnership, limited liability company or unlimited liability company, as the case may be, in any jurisdiction if such withdrawal would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 9.05   Compliance with Statutes, etc.  The Lead Borrower will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations (including, without limitation, FCPA, OFAC and the USA PATRIOT Act) and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including Environmental Laws), except for such noncompliance as would not, either individually or in the aggregate reasonably be expected to result in a Material Adverse Effect.

Section 9.06   Compliance with Environmental Laws.

(a)   The Lead Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of any Vessel or Real Property now or hereafter owned, leased or operated by the Lead Borrower or any of its Restricted Subsidiaries, except such noncompliance as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Vessels or Real Property free and clear of any Liens imposed pursuant to such Environmental Laws (other than Liens imposed on leased Real Property resulting from the acts or omissions of the owner of such leased Real Property or of other tenants of such leased Real Property who are not within the control of the Lead Borrower).  Except as have not had, and would not reasonably be expected to have, a Material Adverse Effect, neither the Lead Borrower nor any of its Restricted Subsidiaries will generate, use, treat, store or Release or permit the generation, use, treatment, storage or Release of Hazardous Materials on any Real Property, or from any Vessel, now or hereafter owned, leased or operated by the Lead Borrower or any of its Restricted Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property or Vessel, except for Hazardous Materials generated, used, treated, stored or Released at any such Real Properties or from such Vessels or transported to or from such Real Properties or Vessels in compliance with all Environmental Laws.

(b)   (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in Section 9.01(g), (ii) at any time that the Lead Borrower or any of its Restricted Subsidiaries are not in compliance with Section 9.06(a) or (iii) the Credit Parties will (in each case) jointly and severally provide, at the written request of the Administrative Agent, an environmental site assessment report concerning any Mortgaged Property (in the event of (i) or (ii) that is the subject of or could reasonably be expected to be the subject of such notice or noncompliance), prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the

reasonable worst case cost of any removal or remedial action in connection with such Hazardous Materials on such Mortgaged Property. If the Credit Parties fail to provide the same within thirty (30) days after such request was made, the Administrative Agent may order the same, the reasonable cost of which shall be borne (jointly and severally) by the Lead Borrower, and the Credit Parties shall grant and hereby grant to the Administrative Agent and the Lenders and their respective agents access to such Mortgaged Property and specifically grant the Administrative Agent and the Lenders an irrevocable nonexclusive license to undertake such an assessment at any reasonable time upon reasonable notice to the Lead Borrower, all at the sole expense of the Credit Parties (who shall be jointly and severally liable therefor).

Section 9.07   ERISA.  As soon as reasonably possible and, in any event, within ten (10) Business Days after the Lead Borrower or any Restricted Subsidiary of the Lead Borrower knows of the occurrence of any of the following, the Lead Borrower will deliver to the Administrative Agent a certificate setting forth the full details as to such occurrence and the action, if any, that the Lead Borrower, such Restricted Subsidiary or an ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by the Lead Borrower, such Restricted Subsidiary, the ERISA Plan administrator or such ERISA Affiliate to or with the PBGC or any other Governmental Authority, or a ERISA Plan participant and any notices received by the Lead Borrower, such Restricted Subsidiary or such ERISA Affiliate from the PBGC or any other Governmental Authority with respect thereto: that (a) an ERISA Event has occurred that is reasonably expected to result in a Material Adverse Effect; (b) there has been an increase in Unfunded Pension Liabilities since the date the representations hereunder are given, or from any prior notice, as applicable, in either case, which is reasonably expected to result in a Material Adverse Effect; (c) there has been an increase in the estimated withdrawal liability under Section 4201 of ERISA, if the Lead Borrower, any Restricted Subsidiary of the Lead Borrower and the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans which is reasonably expected to result in a Material Adverse Effect, (d) the Lead Borrower, any Restricted Subsidiary of the Lead Borrower or any ERISA Affiliate adopts, or commences contributions to, any ERISA Plan subject to Section 412 of the Code, or adopts any amendment to a ERISA Plan subject to Section 412 of the Code which is reasonably expected to result in a Material Adverse Effect, (e) that a contribution required to be made with respect to a Foreign Pension Plan has not been timely made which failure is reasonably likely to result in a Material Adverse Effect; or (f) that a Foreign Pension Plan has been or is reasonably expected to be terminated, reorganized, partitioned or declared insolvent and such event is reasonably expected to result in a Material Adverse Effect. The Lead Borrower will also deliver to the Administrative Agent, upon written request by the Administrative Agent, a complete copy of the most recent annual report (on Internal Revenue Service Form 5500 series, including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) filed with the Internal Revenue Service or other Governmental Authority of each ERISA Plan that is maintained or sponsored by the Lead Borrower or a Restricted Subsidiary.

Section 9.08   Performance of Obligations.  The Lead Borrower will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except (i) to the extent such payment, discharge or performance is restricted by the Bankruptcy Code or (ii) such non-performances as, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 9.09    Payment of Taxes.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Credit Party will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all federal, state and other Taxes imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date (including any extension by virtue of the Bankruptcy Cases) on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Lead Borrower or any of its Subsidiaries not otherwise permitted under Section 10.01(i); provided that neither the Lead Borrower nor any of its Subsidiaries shall be required to pay any such Tax which is being contested in good faith and by appropriate proceedings if it has maintained adequate reserves with respect thereto in accordance with U.S. GAAP and does not give rise to a Lien on the Collateral that primes Administrative Agent's Lien.

Section 9.10    **[Reserved]**.

Section 9.11    Additional Security; Further Assurances; etc.

(a)    The Lead Borrower will, and will cause each of the other Credit Parties that are Restricted Subsidiaries of the Lead Borrower to, grant to the Collateral Agent or the Security Trustee, as applicable, for the benefit of the Secured Creditors security interests, Fleet Mortgages and Mortgages in such assets and properties (other than Excluded Collateral (as such term is defined in the Security Agreement) and, in the case of Real Property, limited to Material Real Property) of the Lead Borrower and such other Credit Parties that are Restricted Subsidiaries of the Lead Borrower as are not covered by the original Security Documents and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders (collectively, as may be amended, modified or supplemented from time to time, the "Additional Security Documents"); provided that (i) the pledge of the outstanding Equity Interests of any FSHCO or CFC (other than a Protected CFC) directly owned by the Lead Borrower or a Domestic Subsidiary that is a Credit Party shall be limited to (x) no more than sixty-five percent (65%), or such higher percentage that could not reasonably be expected to result in material adverse tax consequences to Holdings and its Subsidiaries, of the total combined voting power for all classes of the voting Equity Interests of such FSHCO or CFC and (y) one hundred percent (100%) of the nonvoting Equity Interests of such FSHCO or CFC, other than a Protected CFC, and provided further, notwithstanding the foregoing, each Credit Party that is a United States person within the meaning of Section 7701(a)(30) of the Code shall pledge 100% of the Equity Interests it directly owns in any Protected CFC, and (ii) security interests and Mortgages shall not be required with respect to any Real Property that is not Material Real Property or is located outside of the United States. All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and shall include the real estate deliverables listed on Schedule 9.12 (and (subject to exceptions as are reasonably acceptable to the Administrative Agent) shall constitute, upon taking all necessary perfection action (which the Credit Parties agree to promptly take) valid and enforceable perfected security interests and Mortgages (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)), subject to the Intercreditor Agreements, superior to and prior to the rights of all third Persons and subject to no other Liens except for Permitted Liens. The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in

such places as are required by law to establish, perfect, preserve and protect (subject to exceptions as are reasonably acceptable to the Administrative Agent) the Liens in favor of the Collateral Agent or the Security Trustee, as applicable, required to be granted pursuant to the Additional Security Documents and all Taxes, fees and other charges payable in connection therewith shall be paid in full.  Notwithstanding any other provision in this Agreement or any other Credit Document, no FSHCO, CFC (other than a Protected CFC), subsidiary of a CFC (other than a Protected CFC) or other Excluded Subsidiary shall be required to pledge any of its assets to secure any obligations of the Borrowers under the Credit Documents or guarantee the obligations of the Borrowers under the Credit Documents.  At the Administrative Agent's request, (i) the Borrowers shall as soon as reasonably practicable but in any event no later than thirty (30) days after such request (or such longer period as the Administrative Agent may reasonably agree), Borrowers shall deliver for filing new Fleet Mortgages with respect to Vessels secured by Fleet Mortgages securing the Obligations and the Existing Secured Obligations or supplements to such Fleet Mortgages, (ii) as soon as practicable but in any event no later than thirty (30) days (or such later date agreed to by the Administrative Agent in its sole discretion) after such request, Borrowers shall deliver new Mortgages with respect to Material Real Property acquired after the Closing Date and (iii) as soon as practicable but in any event no later than thirty (30) days (or such later date agreed to by the Administrative Agent in its sole discretion) after such request, Borrowers shall deliver new Mortgages with respect to Material Real Property (including the Subordinated Real Property) owned by the Credit Parties on the Closing Date that is not Mortgaged Property (provided that no Mortgage shall be required pursuant to this clause (iii) unless an Event of Default exists under Section 11.03 due to a breach of Section 9.18.

(b)     Subject to the terms of the Intercreditor Agreements, with respect to any person that is or becomes a Restricted Subsidiary after the Closing Date, promptly (i) deliver to the Collateral Agent the certificates, if any, representing all (or such lesser amount as is required) of the Equity Interests of such Subsidiary (to the extent required pursuant to the Security Documents), together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to any Credit Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Credit Party (to the extent required pursuant to the Security Documents), (ii) cause such new Subsidiary (other than an Excluded Subsidiary) (A) to execute a joinder agreement to the Subsidiaries Guaranty and a joinder agreement to each applicable Security Document, substantially in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent, the Collateral Agent or the Security Trustee to cause the Lien created by the applicable Security Document to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent, the Collateral Agent or the Security Trustee and (iii) at the request of the Administrative Agent, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Lenders, of counsel to the Credit Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 9.11(b) as the Administrative Agent may reasonable request.

(c)     The Lead Borrower will, and will cause each of the other Credit Parties that are Restricted Subsidiaries of the Lead Borrower to, at the expense of the Lead Borrower, make,

execute, endorse, acknowledge, file and/or deliver to the Collateral Agent or the Security Trustee, as applicable, promptly, upon the reasonable request of the Administrative Agent, the Collateral Agent or the Security Trustee, at the Lead Borrower's expense, any document or instrument supplemental to or confirmatory of the Security Documents, including opinions of counsel, or otherwise deemed by the Administrative Agent, the Collateral Agent or the Security Trustee reasonably necessary for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except for Permitted Liens or as otherwise permitted by the applicable Security Document.

(d)     If the Administrative Agent reasonably determines that it or the Lenders are required by law or regulation to have appraisals prepared in respect of any Mortgaged Property, the Lead Borrower will, at its own expense, provide to the Administrative Agent appraisals in form and substance reasonably satisfactory to the Administrative Agent.

(e)     The Lead Borrower agrees that each action required by clauses (a) through (d) of this Section 9.11 shall be completed as soon as reasonably practicable, but in no event later than thirty (30) days after such action is required to be taken pursuant to such clauses or requested to be taken by the Administrative Agent or the Required Lenders (or such longer period as the Administrative Agent shall otherwise agree), as the case may be.

(f)     Notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, (x) Collateral Agent shall not accept delivery of any Mortgage from any Credit Party unless Administrative Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender and (y) Agents shall not accept delivery of any joinder to any Credit Document with respect to any Subsidiary of any Credit Party that is not a Credit Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and each Lender has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to each Lender, in which case the time periods for delivery of the applicable Mortgage and/or joinder, as the case may be, shall be automatically extended until the receipt of such confirmation, certification or search, as applicable.

Section 9.12   Post-Closing Actions.  The Lead Borrower agrees that it will, or will cause its relevant Subsidiaries to, complete each of the actions described on Schedule 9.12 as soon as commercially reasonable and by no later than the date set forth in Schedule 9.12 with respect to such action or such later date as the Administrative Agent may reasonably agree. In addition, Holdings will, and will cause each of its Subsidiaries to use commercially reasonable efforts to obtain entry of an order approving the Exit Fee Letters not later than concurrently with the entry of the Final Order.

Section 9.13   [**Reserved**].

Section 9.14   [**Reserved**].

Section 9.15    Collateral Monitoring and Reporting.

(a)    Borrowing Base Certificates.  Provide the Administrative Agent (and if so requested by the Administrative Agent, with copies for each Lender) with each of the reports set forth on Schedule 9.15(a) at the times specified therein.  Borrowers and Administrative Agent hereby agree that the delivery of the Borrowing Base Certificate through the Administrative Agent's electronic platform or portal, subject to Administrative Agent's authentication process, by such other electronic method as may be approved by Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Base as may be approved by Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of Borrowers to deliver such Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate had been manually executed by Borrowers and delivered to Administrative Agent.

(b)    Maintenance of Dominion Account.  Subject to Section 2.19 on the Closing Date (or, with respect to any Deposit Account other than Excluded Deposit Accounts opened following the Closing Date, within ten (10) days (or such later date as the Administrative Agent may agree in its reasonable discretion) of the opening or establishment of such Deposit Account or the date any Person becomes a Credit Party hereunder), (i) each Credit Party shall cause each bank or other depository institution at which any Deposit Account other than any Excluded Deposit Account is maintained, to enter into a Deposit Account Control Agreement that provides for such bank or other depository institution to transfer to the Dominion Account, on a daily basis, all balances in each Deposit Account (other than any Excluded Deposit Account) maintained by any Credit Party with such depository institution for application to the Obligations then outstanding following the receipt by such bank or other depository institution of a Liquidity Notice (it being understood that the Administrative Agent shall reasonably promptly deliver a copy of such Liquidity Notice to the Lead Borrower), (ii) Borrowers shall establish the Dominion Account and obtain an agreement (in form reasonably satisfactory to the Administrative Agent) from the Dominion Account bank, establishing the Administrative Agent's control over and Lien in the Dominion Account and requiring daily wire of all remittances received to a Dominion Account to the Agent's Account during a Liquidity Period, (iii) each Credit Party irrevocably appoints the Administrative Agent as such Credit Party's attorney-in-fact to collect balances in any Deposit Account (other than an Excluded Account) to the extent any such deposit is not so made and (iv) each Credit Party shall instruct each Account Debtor to make all payments with respect to Revolver Priority Collateral into the Dominion Account.   The Agents and the Lenders assume no responsibility to the Borrowers for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any check, draft or other item of payment payable to a Borrower (including those constituting proceeds of Collateral) accepted by any bank.

(c)    Proceeds of Collateral. If any Borrower receives cash or any check, draft or other item of payment payable to a Borrower with respect to any Collateral, it shall hold the same in trust for the Administrative Agent and promptly deposit the same into any such Deposit Account or the Dominion Account. In addition, upon receipt of any proceeds of the sale of any Collateral included in calculating the Borrowing Base in excess of $1,000,000, the Lead Borrower shall promptly notify the Administrative Agent of such sale.

(d)     Administration of Deposit Accounts.   Schedule 9.15(d) sets forth all Deposit Accounts maintained by the Credit Parties, including the Dominion Account, as of the Closing Date. Subject to Section 9.15(b), each Credit Party shall take all actions necessary to establish the Administrative Agent's control (within the meaning of the UCC) over each such Deposit Account other than Excluded Deposit Accounts and the Junior DIP Proceeds Account at all times. Each Credit Party shall be the sole account holder of each Deposit Account and shall not allow any other Person (other than the Administrative Agent, the Junior DIP Agent, and the applicable depositary bank) to have control over a Deposit Account or any deposits therein. The Lead Borrower shall promptly notify the Administrative Agent of any opening or closing of a Deposit Account (other than any Excluded Deposit Accounts), and shall not open any Deposit Accounts (other than any Excluded Deposit Accounts) at a bank not reasonably acceptable to the Administrative Agent.

Section 9.16   Maritime and Other Regulatory Matters.  The Lead Borrower will (i) ensure that each Borrower remains a citizen of the United States qualified to own and operate vessels in the coastwise trade of the United States and (ii) each applicable Borrower will maintain the documentation of applicable Eligible Vessels to operate in the coastwise trade of the United States and will not do or permit anything to be done which might affect such documentation and ability to operate such vessels.

Section 9.17   OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws. Each Credit Party will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Credit Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Credit Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

Section 9.18   Bankruptcy Transaction Milestones.  Holdings will, and will cause each of its Subsidiaries to, cause the performance and delivery of the items set forth on Schedule 9.18 on or before the dates specified therein with respect to such items (the "Milestones").

Section 9.19   Consultant.  Borrowers will continue to engage Consultants on terms and conditions reasonably acceptable to the Administrative Agent (it being understood that the terms of the A&M Engagement Agreement and Greenhill Engagement Agreement are acceptable to Administrative Agent) and on the terms and conditions set forth in, or consistent with, the retention order authorizing the continued engagement of the Consultants.  Borrowers hereby do, and will continue to, authorize and instruct the Consultants to provide access to and corporation with the Administrative Agent and Agent Consultant. Notwithstanding anything to the contrary in this Section 9.19, none of Holdings or any of its Subsidiaries or Consultants will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrowers (based on the advice of counsel) impair, waive or violate the attorney-client privilege or is otherwise prohibited by law or fiduciary duty, (ii) such information constitutes attorney work product, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which any Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Administrative Agent or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters

with respect thereto. All fees and expenses of the Consultants shall be solely the responsibility of Borrowers and in no event shall Administrative Agent or any Lender have any obligation, liability or responsibility of any kind or nature whatsoever for the payment of any such fees, expenses or other obligations, nor shall Administrative Agent or any Lender have any obligation or liability to Borrowers, their Affiliates, or any other Person by reason of any acts or omissions whatsoever of the Consultants at any time.

Section 9.20   [**Reserved**].

Section 9.21   [**Reserved**].

Section 9.22   <u>Bankruptcy Covenants</u>.  Notwithstanding anything in the Credit Documents to the contrary, the Credit Parties shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Financing Order.

Section 9.23   <u>Bankruptcy Cases</u>.

(a)     Each Credit Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable (but in any event at least two (2) Business Days prior to filing (where reasonably practicable)), all material pleadings, motions and other documents (provided that any of the foregoing relating to the Existing Secured Obligations, the Credit Documents, any other postpetition financing, cash collateral use, dispositions of Revolver Priority Collateral or other asset sales outside the ordinary course and any plan of reorganization shall be deemed material) to be filed on behalf of the Credit Parties with the Bankruptcy Court to the Administrative Agent and its counsel. Each Credit Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable (but in any event at least two (2) Business Days prior to any assumption or rejection of any Credit Party's or any Subsidiary's material contracts (including any leases) pursuant to Section 365 of the Bankruptcy Code.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, Borrowers shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Credit Parties with the Bankruptcy Court with respect to the Bankruptcy Cases or filed with respect to any Credit Document, (y) reporting and financial information distributed by or on behalf of the Credit Parties to the Junior DIP Agent (or its advisors) or any Committee and (z) such other reports and information as the Administrative Agent may, from time to time, reasonably request.   In connection with the Bankruptcy Cases, the Credit Parties shall give the proper notice for (x) the motions seeking approval of the Credit Documents and the Financing Order and (y) the hearings for the approval of the Financing Order.  The Borrower and the other Credit Parties shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in the Financing Order. The Borrowers and the other Credit Parties shall use best efforts to obtain the Final Financing Order.

(b)     Each Credit Party shall promptly deliver or cause to be delivered to the Administrative Agent and the Lenders copies of any term sheets, proposals, or presentations from any party, related to (i) the restructuring of the Credit Parties, or (ii) a material sale of assets of one or all of the Credit Parties.

Section 9.24   Budget Matters.   Each Weekly Cash Flow Forecast or amendment or supplement to the Budget delivered by the Borrower to the Administrative Agent and the Lenders shall replace, amend or supplement, as the case may be, the Budget hereunder and under the Final Order unless the Administrative Agent delivers a notice (a "Budget Objection Notice") to the Borrowers no later than three (3) Business Days after delivery of such Weekly Cash Flow Forecast or Budget amendment or supplement. Each Budget Objection Notice shall be in writing (which may be delivered by electronic mail) and shall state the basis of the Administrative Agent's objection to the applicable Weekly Cash Flow Forecast or Budget amendment or supplement. If the Administrative Agent timely delivers a Budget Objection Notice to the Borrowers, the existing Budget shall continue to constitute the applicable Budget until such time as either (i) the subject Weekly Cash Flow Forecast or Budget amendment or supplement is agreed to among Borrowers and the Administrative Agent acting reasonably (upon which such agreed Weekly Cash Flow Forecast or Budget amendment or supplement shall replace, supplement or amend, as the case may be, the prior Budget) or (ii) the Borrower delivers an alternative Weekly Cash Flow Forecast or Budget supplement or amendment which replaces, amends or supplements, as the case may be, the Budget in accordance with the first sentence of this Section 9.24. Each Weekly Cash Flow Forecast delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent.

ARTICLE 10   Negative Covenants.   The Lead Borrower and each of its Restricted Subsidiaries (and Holdings in the case of Section 10.09(b)) hereby covenant and agree that on and after the Closing Date and so long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than (i) any indemnification obligations arising hereunder which are not then due and payable and (ii) Secured Bank Product Obligations) or any Letter of Credit shall remain outstanding (unless subject to Letter of Credit Collateralization):

Section 10.01   Liens.   The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Lead Borrower or any of its Restricted Subsidiaries, whether now owned or hereafter acquired, or sell accounts receivable with recourse to the Lead Borrower or any of its Restricted Subsidiaries or authorize the filing of any financing statement under the UCC with respect to any Lien or any other similar notice of any Lien under any similar recording or notice statute; provided that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of, or any filing in respect of, the following (Liens described below are herein referred to as "Permitted Liens"):

(i)   Liens for Taxes, assessments or governmental charges or levies not overdue for a period of more than thirty (30) days or Liens for Taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with U.S. GAAP (or, for Foreign Subsidiaries, in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization) and if in the Permitted Discretion of the Administrative Agent the amount of such Lien on the Collateral is subject to a Reserve;

(ii)   Carriers', warehousemen's, contractors', materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which are being contested in good faith by appropriate proceedings, which proceedings

——

have the effect of preventing the forfeiture or sale of the property or assets, subject to any such Lien for which adequate reserves have been established in accordance with U.S. GAAP;

(iii)    Liens in existence on the Closing Date which are listed, and the property subject thereto described, in Schedule 10.01(iii) (or to the extent not listed on such Schedule 10.01(iii), where the fair market value of all property to which such Liens under this clause (iii) attach is less than $500,000 in the aggregate), plus modifications, renewals and extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension, plus accrued and unpaid interest and cash fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and (y) any such renewal or extension does not encumber any additional assets or properties of the Lead Borrower or any of its Restricted Subsidiaries (other than after-acquired property that is affixed or incorporated into the property encumbered by such Lien on the Closing Date and the proceeds and products thereof);

(iv)    Liens securing the Existing Secured Obligations, Reinstated Existing Secured Obligations and Liens securing the Obligations (including Liens on Secured Bank Product Obligations), Liens securing Obligations (as defined in the Existing Term Loan Credit Agreement) under the Existing Term Loan Credit Agreement, Liens securing obligations under the Junior DIP Loan Documents and incurred pursuant to Section 10.04(i);

(v)    Leases, subleases, licenses or sublicenses (including licenses or sublicenses of Intellectual Property) granted to other Persons not materially interfering with the conduct of the business of the Lead Borrower or any of its Restricted Subsidiaries;

(vi)    Liens upon assets of the Lead Borrower or any of its Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 10.04(iii), provided that (x) such Liens serve only to secure the payment of Indebtedness and/or other monetary obligations arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset or assets giving rise to such Capitalized Lease Obligation does not encumber any asset of the Lead Borrower or any of its Restricted Subsidiaries other than the proceeds of the assets giving rise to such Capitalized Lease Obligations;

(vii)    Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of the Lead Borrower or any of its Restricted Subsidiaries and placed at the time of the acquisition or construction thereof by the Lead Borrower or such Restricted Subsidiary or within 60 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase or construction price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 10.04(iii) and (y) in all events, the Lien encumbering the equipment,

machinery or other fixed assets so acquired or constructed does not encumber any other asset of the Lead Borrower or such Restricted Subsidiary; provided that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender on customary terms;

(viii)   easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar Liens, charges or encumbrances and title deficiencies or defects, which in the aggregate do not materially interfere with the conduct of the business of the Lead Borrower or any of its Restricted Subsidiaries;

(ix)   Liens arising from precautionary UCC or other similar financing statement filings;

(x)   attachment and judgment Liens, to the extent and for so long as the underlying judgments and decrees do not constitute an Event of Default pursuant to Section 11.09;

(xi)   statutory and common law landlords' liens under leases or subleases to which the Lead Borrower or any of its Restricted Subsidiaries is a party;

(xii)   Liens (other than Liens imposed under ERISA or the Code or similar state or foreign law) incurred in the ordinary course of business in connection with workers' compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety, stay, customs or appeal bonds, performance bonds and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations and (ii) those required or requested by any Governmental Authority other than letters of credit) incurred in the ordinary course of business;

(xiii)   Permitted Encumbrances;

(xiv)   [**reserved**];

(xv)   deposits or pledges to secure bids, tenders, contracts (other than contracts for the repayment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds and other obligations of like nature (including (i) those to secure health, safety and environmental obligations and (ii) those required or requested by any Governmental Authority other than letters of credit), and as security for the payment of rent, in each case arising in the ordinary course of business;

(xvi)   Liens on assets of Foreign Subsidiaries securing Indebtedness of Foreign Subsidiaries permitted pursuant to Section 10.04(viii);

(xvii)   any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense agreement (including software and other technology licenses) in the ordinary course of business;

(xviii) Liens on property subject to or in connection with Sale-Leaseback Transactions to the extent such Sale-Leaseback Transactions are permitted by Section 10.02(xii);

(xix)    any encumbrances or restrictions (including, without limitation, put and call agreements) with respect to the Equity Interests of any Joint Venture expressly permitted by the terms of this Agreement arising pursuant to the agreement evidencing such Joint Venture;

(xx)    Liens on Collateral in favor of any Credit Party securing intercompany Indebtedness permitted by Section 10.05; provided that any Liens securing Indebtedness that is required to be subordinated pursuant to Section 10.05 shall be subordinated to the Liens created pursuant to the Security Documents;

(xxi)    Liens on specific items of inventory or other goods (and proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods, and pledges or deposits in the ordinary course of business;

(xxii)   Liens on insurance policies and the proceeds thereof (whether accrued or not) and rights or claims against an insurer, in each case securing insurance premium financings permitted under Section 10.04(x);

(xxiii) Liens that may arise on inventory or equipment of the Lead Borrower or any of its Restricted Subsidiaries in the ordinary course of business as a result of such inventory or equipment being located on premises owned by Persons other than the Lead Borrower and its Restricted Subsidiaries;

(xxiv)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(xxv)   Liens (i) of a collection bank arising under Section 4210 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of law or under customary general terms and conditions encumbering deposits (including the right of setoff) and which are within the general parameters customary in the banking industry;

(xxvi)  [**reserved;**]

(xxvii) Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence or issuance of Indebtedness or (ii) relating to purchase orders and other agreements entered into with customers of the Lead Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xxviii)Liens attaching solely to cash earnest money deposits in connection with any letter of intent or purchase agreement in connection with an Investment permitted hereunder;

(xxix)  Liens not otherwise permitted by the foregoing clauses (i) through (xxviii), or by following clauses (xxx) through (xlv), to the extent attaching to properties and assets (other than Accounts, Vessels or Inventory, unless such Liens are expressly made junior to the Liens in favor of the Administrative Agent) with an aggregate fair market value not in excess of, and securing liabilities not in excess of $2,500,000 in the aggregate at any time outstanding;

(xxx)   [**reserved**];

(xxxi)  [**reserved**];

(xxxii) [**reserved**];

(xxxiii)Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Lead Borrower or any Restricted Subsidiary in the ordinary course of business;

(xxxiv)Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xxxv) (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business of the Lead Borrower and the Restricted Subsidiaries complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Lead Borrower or any Restricted Subsidiary;

(xxxvi)deposits made in the ordinary course of business to secure liability to insurance carriers;

(xxxvii)       receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxxviii)       [**reserved**];

(xxxix) Permitted Vessel Liens;

(xl)    [**reserved**];

(xli)   [**reserved**];

(xlii)   [**reserved**];

(xliii)   Liens to secure Indebtedness permitted by <u>Section 10.04(iv)</u> so long as such Liens only attach to the applicable New Vessel whose construction is financed with such Indebtedness;

(xliv)   receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on any towboat, barge or other vessel (and proceeds thereof) in connection with the construction of such towboat, barge or other vessel being purchased by third parties;

(xlv)   Liens granted in connection with the construction of Vessels on construction contracts (and rights thereunder) to lessors leasing such Vessels to any Credit Party in the ordinary course of business; and

(xlvi)   Liens otherwise granted by or expressly permitted by the Financing Order and the First Day Orders.

In connection with the granting of Liens of the type described in this <u>Section 10.01</u> by the Lead Borrower or any of its Restricted Subsidiaries, the Administrative Agent, the Collateral Agent and the Security Trustee shall, and shall be authorized to, take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

Section 10.02   <u>Consolidation, Merger, or Sale of Assets, etc</u>.  The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (including by an allocation of assets among newly divided limited liability companies to a "plan of division"), or enter into any sale-leaseback transactions of any Person, except that:

(i)   any Investment permitted by <u>Section 10.05</u> may be structured as a merger, consolidation or amalgamation;

(ii)   the Lead Borrower and its Restricted Subsidiaries may sell assets comprising Term Priority Collateral (and, so long as a new Borrowing Base Certificate is delivered in connection with such sale, any Revolver Priority Collateral) so long as (x) each such sale is on terms and conditions not less favorable to the Lead Borrower or such Restricted Subsidiary as would reasonably be obtained by the Lead Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate and the Lead Borrower or the respective Restricted Subsidiary receives at least fair market value (as determined in good faith by the Lead Borrower or such Restricted Subsidiary, as the case may be) and (y) in the case of any single transaction that involves assets or Equity Interests having a fair market value of more than $100,000 (not to exceed $1,000,000 in the aggregate for all such transactions), 100% of consideration received by the Lead Borrower or such Restricted Subsidiary shall be in the form of cash or Cash Equivalents;

-118-

(iii)    each of the Lead Borrower and its Restricted Subsidiaries may lease (as lessee) or license (as licensee) real or personal property in the ordinary course of business (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 10.04(iii));

(iv)    each of the Lead Borrower and its Restricted Subsidiaries may sell or discount, in each case in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(v)    each of the Lead Borrower and its Restricted Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the ordinary course of business not materially interfering with the conduct of the business of the Lead Borrower or any of its Restricted Subsidiaries, including of Intellectual Property;

(vi)    (w) any Domestic Subsidiary of the Lead Borrower may be merged, consolidated, dissolved, amalgamated or liquidated with or into the Lead Borrower (so long as the surviving Person of such merger, consolidation, dissolution, amalgamation or liquidation is the Lead Borrower), (x) any Foreign Subsidiary of the Lead Borrower may be merged, consolidated, dissolved, amalgamated or liquidated with or into any Wholly-Owned Foreign Subsidiary of the Lead Borrower or any Wholly-Owned Domestic Subsidiary of the Lead Borrower that is an Excluded Subsidiary, so long as such Wholly-Owned Foreign Subsidiary or such Excluded Subsidiary, as applicable, is the surviving corporation of such merger, consolidation, dissolution, amalgamation or liquidation, (y) any Foreign Subsidiary of the Lead Borrower may be merged, consolidated, dissolved, amalgamated or liquidated with or into any Credit Party (so long as such Credit Party is the surviving corporation of such merger, consolidation, dissolution, amalgamation or liquidation); provided that any such merger, consolidation, dissolution, amalgamation or liquidation shall only be permitted pursuant to this clause (vi), so long as (I) no Default and no Event of Default then exists or would exist immediately after giving effect thereto and (II) any security interests granted to the Collateral Agent or the Security Trustee, as applicable, for the benefit of the Secured Creditors in the assets (and Equity Interests) of any such Person subject to any such transaction shall remain in full force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such merger, consolidation, amalgamation or liquidation);

(vii)    any Tax Restructuring Transaction shall be permitted;

(viii)    each of the Lead Borrower and its Restricted Subsidiaries may make sales or leases of (A) inventory (including Vessels), (B) goods held for sale and (C) immaterial assets with a fair market value, in the case of this clause (C), of less than $2,500,000 in the ordinary course of business;

(ix)    each of the Lead Borrower and its Restricted Subsidiaries may sell or otherwise dispose of (i) outdated, obsolete, surplus or worn out property (including Vessels and real property), in each case, in the ordinary course of business and (ii) property

no longer used or useful in the conduct of the business of the Lead Borrower and its Restricted Subsidiaries (including Vessels and real property);

(x)　　[**reserved**];

(xi)　　in order to effect a sale, transfer or disposition otherwise permitted by this Section 10.02, a Restricted Subsidiary of the Lead Borrower may be merged, amalgamated or consolidated with or into another Person, or may be dissolved or liquidated;

(xii)　　each of each Borrower and their Restricted Subsidiaries may effect Sale-Leaseback Transactions involving other property (including Vessels) so long as (1) no Default and no Event of Default then exists or would exist immediately after giving effect thereto, (2) 100% of the proceeds received with respect to the Sale-Leaseback Transaction is in cash, (3) the proceeds received with respect to the Sale-Leaseback Transaction are at least the greater of (x) the fair market value of such property or (y) the forced liquidation value of such property, (4) 100% of the proceeds received with respect to the Sale-Leaseback Transaction are applied pursuant to Section 2.09(b)(vi) and (5) a new Borrowing Base Certificate is delivered concurrently with such Sale-Leaseback Transaction;

(xiii)　　[**reserved**];

(xiv)　　[**reserved**];

(xv)　　subject to Section 2.09, each of the Lead Borrower and its Restricted Subsidiaries may make transfers of property subject to casualty or condemnation proceedings upon the occurrence of the related Recovery Event;

(xvi)　　each of the Lead Borrower and its Restricted Subsidiaries may abandon Intellectual Property rights in the ordinary course of business, in the exercise of its reasonable good faith judgment;

(xvii)　　each of the Lead Borrower and its Restricted Subsidiaries may make voluntary terminations of or unwind Swap Contracts;

(xviii)　　dispositions (other than of Collateral) made pursuant to the First Day Orders;

(xix)　　each of the Lead Borrower and its Restricted Subsidiaries may terminate leases and subleases in the ordinary course of business;

(xx)　　each of the Lead Borrower and its Restricted Subsidiaries may use cash and Cash Equivalents to make payments that are otherwise permitted under Sections 10.03 and 10.07;

(xxi)　　each of the Lead Borrower or its Restricted Subsidiaries may sell or otherwise dispose of property to the extent that (i) such property is exchanged for credit

-120-

against the purchase price of similar replacement property or (ii) the proceeds of such sale or disposition are promptly applied to the purchase price of such replacement property;

(xxii)   sales, dispositions or contributions of property (A) between Credit Parties (other than Holdings), (B) between Restricted Subsidiaries (other than Credit Parties), (C) by Restricted Subsidiaries that are not Credit Parties to the Credit Parties (other than Holdings) or (D) by Credit Parties to any Restricted Subsidiary that is not a Credit Party, provided with respect to clause (D) that such sales, dispositions or contributions shall constitute an Investment in such Restricted Subsidiary subject to Section 10.05;

(xxiii)  dispositions of Investments (including Equity Interests) in (a) Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements and (b) MarineNet LLC;

(xxiv)  transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(xxv)   any disposition of any asset between or among the Restricted Subsidiaries as a substantially concurrent interim disposition in connection with a disposition otherwise permitted pursuant to this Section 10.02; and

(xxvi)  dispositions permitted by Section 10.03.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 10.02 (other than to the Lead Borrower or a Restricted Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent, the Collateral Agent and the Security Trustee shall, and shall be authorized to, take any actions deemed appropriate in order to effect the foregoing.

Section 10.03  Dividends.  The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, authorize, declare or pay any Dividends with respect to the Lead Borrower or any of its Restricted Subsidiaries, except that:

(i)      any Restricted Subsidiary of the Lead Borrower may pay Dividends or return capital or make distributions and other similar payments with regard to its Equity Interests to the Lead Borrower or to other Restricted Subsidiaries of the Lead Borrower which directly or indirectly own equity therein;

(ii)     any non-Wholly-Owned Subsidiary of the Lead Borrower that is not a Credit Party may declare and pay cash Dividends to its shareholders generally so long as the Lead Borrower or its Restricted Subsidiary which owns the Equity Interests in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based

upon its relative holding of the Equity Interests in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary);

> (iii)    in connection with the Management Incentive Plan;

> (iv)    so long as no Default or Event of Default exists at the time of the applicable Dividend, redemption or repurchase or would exist immediately after giving effect thereto, the Lead Borrower may pay cash Dividends to Holdings to allow Holdings to redeem or repurchase, contemporaneously with such Dividend, Equity Interests of Holdings from management, employees and officers of the Lead Borrower and its Restricted Subsidiaries;

> (v)    the Lead Borrower may pay cash Dividends to Holdings so long as the proceeds thereof are promptly used by Holdings to pay costs (including all professional fees and expenses) incurred by Holdings in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed with respect to the Securities Act, the Securities Exchange Act or the respective rules and regulations promulgated thereunder;

> (vi)    the Lead Borrower may pay cash dividends or other distributions, or make loans or advances to, Holdings or the equity interest holders thereof in amounts required for any Parent Company, Holdings or the equity interest holders thereof to pay, in each case without duplication:

>> (A)    franchise Taxes (and other fees and expenses) required to maintain their existence to the extent such Taxes, fees and expenses are reasonably attributable to the operations or ownership of Holdings, the Lead Borrower and its Restricted Subsidiaries;

>> (B)    with respect to any taxable year (or portion thereof) ending after the Closing Date or with respect to which the income taxes of the Lead Borrower have priority status under Section 507(a)(8) of the Bankruptcy Code, in each case in which the Lead Borrower is a member (or is treated for tax purposes as an entity that is disregarded as separate from a member) of a consolidated, combined or similar income tax group (a "Tax Group") of which any Parent Company is the common parent, Taxes of the Tax Group that are attributable to the taxable income or operations or ownership of the Lead Borrower and its Subsidiaries; provided that for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Lead Borrower and its Subsidiaries would have been required to pay as a standalone Tax Group; provided, further, that the permitted payment pursuant to this clause (B) with respect to the Taxes of any Unrestricted Subsidiary for any taxable period shall be limited to the amount actually paid by such Unrestricted Subsidiary to the Lead Borrower or any of its Restricted Subsidiaries for the purpose of paying such consolidated, combined or similar Taxes;

(C)    customary salary, bonus and other benefits payable to officers and employees of Holdings to the extent such salaries, bonuses and other benefits are reasonably attributable to the ownership or operations of the Lead Borrower and its Restricted Subsidiaries;

(D)    general corporate operating and overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties) of Holdings to the extent such costs and expenses are reasonably attributable to the ownership or operations of the Lead Borrower and its Restricted Subsidiaries (but excluding any direct or indirect payments for the benefit of the Sponsor);

(E)    [**reserved**]**;**

(F)    [**reserved**]; and

(G)    [**reserved**];

(vii)    reasonable and customary indemnities to directors, officers and employees of Holdings in the ordinary course of business, to the extent reasonably attributable to the ownership or operation of the Lead Borrower and its Restricted Subsidiaries;

(viii)    the Lead Borrower may pay cash Dividends to Holdings so long as the proceeds thereof are promptly used by Holdings for payment of obligations under or in respect of director and officer insurance policies to the extent reasonably attributable to the ownership or operation of the Lead Borrower and its Restricted Subsidiaries;

(ix)    [**reserved**];

(x)    [**reserved**];

(xi)    [**reserved**];

(xii)    [**reserved**];

(xiii)    [**reserved**];

(xiv)    [**reserved**];

(xv)    [**reserved**];

(xvi)    the Lead Borrower and each Restricted Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person so long as in the case of dividend or other distribution by a Restricted Subsidiary, the Lead Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution;

(xvii)   [**reserved**]; and

(xviii)  [**reserved**].

In determining compliance with this <u>Section 10.03</u>, amounts loaned or advanced to Holdings pursuant to <u>Section 10.05(vi)</u> shall be deemed to be cash Dividends paid to Holdings to the extent provided in said <u>Section 10.05(vi)</u>.

Section 10.04   <u>Indebtedness</u>.  The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)       (A) Existing Secured Obligations, (B) Reinstated Existing Secured Obligations, (C) Indebtedness incurred pursuant to this Agreement and the other Credit Documents and (D) Indebtedness incurred pursuant to the Existing Term Loan Credit Agreement;

(ii)      Indebtedness under Swap Contracts so long as the entering into of such Swap Contracts are bona fide hedging activities and are not for speculative purposes;

(iii)     Indebtedness of the Lead Borrower and its Restricted Subsidiaries (a) evidenced by Capitalized Lease Obligations and purchase money Indebtedness (including obligations in respect of mortgages, industrial revenue bonds, industrial development bonds and similar financings) described in <u>Section 10.01(vii)</u>; provided that in no event shall the aggregate principal amount of Capitalized Lease Obligations and the principal amount of all such Indebtedness incurred or assumed in each case after the Closing Date permitted by this clause (iii) exceed  $1,000,000 at any one time outstanding;

(iv)     Indebtedness under the Junior DIP Loan Documents and any other Indebtedness incurred pursuant to the Financing Order or the First Day Orders;

(v)      [**reserved**];

(vi)     intercompany Indebtedness among the Lead Borrower and its Restricted Subsidiaries to the extent permitted by <u>Section 10.05(vi)</u>;

(vii)    Indebtedness outstanding on the Closing Date and listed on <u>Schedule 10.04</u> ("<u>Existing Indebtedness</u>") and any subsequent extension or renewal thereof; provided that the aggregate principal amount of the Indebtedness to be extended or renewed does not increase from that amount outstanding at the time of any such extension or renewal, plus accrued and unpaid interest and cash fees and expenses (including premium) incurred in connection with such renewal or extension;

(viii)   Indebtedness of Foreign Subsidiaries; provided that the aggregate principal amount of Indebtedness outstanding pursuant to this clause (viii) shall not at any time exceed $1,000,000;

(ix)     [**reserved**];

(x)     Indebtedness incurred in the ordinary course of business to finance insurance premiums or take-or-pay obligations contained in supply arrangements;

(xi)    Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections, employee credit card programs, automatic clearinghouse arrangements and other similar services in connection with cash management and deposit accounts and Indebtedness in connection with the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, including in each case, Bank Product Debt;

(xii)   **[reserved]**;

(xiii)  **[reserved]**;

(xiv)   **[reserved]**;

(xv)    additional Indebtedness of the Lead Borrower and its Restricted Subsidiaries not to exceed $5,000,000 in aggregate principal amount outstanding at any time;

(xvi)   Contingent Obligations for customs, stay, performance, appeal, judgment, replevin and similar bonds and suretyship arrangements, and completion guarantees and other obligations of a like nature, all in the ordinary course of business;

(xvii)  Contingent Obligations to insurers required in connection with worker's compensation and other insurance coverage incurred in the ordinary course of business;

(xviii) guarantees made by the Lead Borrower or any of its Restricted Subsidiaries of Indebtedness of the Lead Borrower or any of its Restricted Subsidiaries permitted to be outstanding under this Section 10.04; provided that such guarantees are permitted by Section 10.05;

(xix)   guarantees made by any Foreign Subsidiary of Indebtedness of any other Foreign Subsidiary permitted to be outstanding under this Section 10.04(viii);

(xx)    **[reserved]**;

(xxi)   customary Contingent Obligations in connection with sales, other dispositions and leases permitted under Section 10.02 (but not in respect of Indebtedness for borrowed money or Capitalized Lease Obligations) including indemnification obligations with respect to leases, and guarantees of collectability in respect of accounts receivable or notes receivable for up to face value;

(xxii)  guarantees of Indebtedness of directors, officers and employees of the Lead Borrower or any of its Restricted Subsidiaries in respect of expenses of such Persons in connection with relocations and other ordinary course of business purposes;

(xxiii) to the extent incurred prior to the Filing Date, guarantees of Indebtedness of a Person in connection with a Joint Venture, provided that the aggregate principal amount of any Indebtedness so guaranteed, when added to the aggregate amount of unreimbursed payments theretofore made in respect of such guarantees and the amount of Investments then outstanding (and deemed outstanding) under clause (xix) of <u>Section 10.05</u>, shall not exceed $5,000,000;

(xxiv) **[reserved]**;

(xxv) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within two (2) Business Days of its incurrence;

(xxvi) (x) severance, pension and health and welfare retirement benefits or the equivalent there of to current and former employees of the Lead Borrower or its Restricted Subsidiaries incurred in the ordinary course of business, (y) to the extent incurred prior to the Filing Date, Indebtedness representing deferred compensation or stock-based compensation (other than pursuant to the Management Incentive Plan) to employees of the Lead Borrower and the Restricted Subsidiaries and (z) Indebtedness consisting of promissory notes issued by any Credit Party to current or former officers, directors and employees, in connection with the Management Incentive Plan to finance the purchase or redemption of Equity Interests of Holdings permitted by Section 10.03;

(xxvii) **[reserved]**;

(xxviii)(x) guarantees made by the Lead Borrower or any of its Restricted Subsidiaries of obligations (not constituting debt for borrowed money) of the Lead Borrower or any of its Restricted Subsidiaries owing to vendors, suppliers and other third parties incurred in the ordinary course of business and (y) Indebtedness of any Credit Party (other than Holdings) as an account party in respect of trade letters of credit issued in the ordinary course of business;

(xxix) **[reserved]**;

(xxx) Indebtedness arising out of Sale-Leaseback Transactions permitted by <u>Section 10.01(xviii)</u>; and

(xxxi) all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxx) above.

Section 10.05 <u>Advances, Investments and Loans</u>.  The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or hold any cash or Cash Equivalents (each of the

foregoing, an "Investment" and, collectively, "Investments" and with the value of each Investment being measured at the time made and without giving effect to subsequent changes in value or any write-ups, write-downs or write-offs thereof), except that the following shall be permitted:

(i)      the Lead Borrower and its Restricted Subsidiaries may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Lead Borrower or such Restricted Subsidiary;

(ii)      the Lead Borrower and its Restricted Subsidiaries may acquire and hold cash and Cash Equivalents;

(iii)      the Lead Borrower and its Restricted Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 10.05(iii), and any modification, renewal or extension thereof that does not increase the principal amount thereof unless any additional Investments made with respect thereto are permitted under the other provisions of this Section 10.05;

(iv)      the Lead Borrower and its Restricted Subsidiaries may acquire and hold Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, and Investments received in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)      the Lead Borrower and its Restricted Subsidiaries may enter into (a) Swap Contracts to the extent permitted by Section 10.04(ii) and (b) Swap Contracts relating to fuel rate caps and forward fuel purchases collectively covering an aggregate amount of fuel not to exceed the aggregate amount of fuel reasonably expected to be used by the Borrowers and their Subsidiaries or in connection with specific contracts or orders, provided, that no such Swap Contracts entered into between any Credit Party and any Lender or any Affiliate of any Lender shall be in force or effect after the date which is thirty (30) days prior to the Maturity Date;

(vi)      (a) the Lead Borrower and any Restricted Subsidiary may make intercompany loans to and other investments in Credit Parties (other than Holdings, unless otherwise permitted by Section 10.03), (b) any Foreign Subsidiary may make intercompany loans to and other investments in the Lead Borrower or any of its Restricted Subsidiaries so long as in the case of such intercompany loans to Credit Parties (other than Holdings), all payment obligations of the respective Credit Parties are subordinated to their obligations under the Credit Documents on terms reasonably satisfactory to the Administrative Agent, (c) the Credit Parties may make intercompany loans to, guarantees on behalf of, and other investments in, Subsidiaries that are not Credit Parties so long as the aggregate amount of outstanding loans, guarantees and other Indebtedness made pursuant to this sub-clause (c) does not exceed $100,000 and (d) any Restricted Subsidiary that is not a Credit Party may make intercompany loans to, and other investments in, any other Restricted Subsidiary that is also not a Credit Party;

(vii)    Investments made pursuant to the First Day Orders;

(viii)    loans and advances by the Lead Borrower and its Restricted Subsidiaries to officers, directors and employees of the Lead Borrower and its Restricted Subsidiaries in connection with (i) business-related travel, relocations and other ordinary course of business purposes (including travel and entertainment expenses) shall be permitted and (ii) any such Person's purchase of Equity Interests of Holdings; provided that no cash is actually advanced pursuant to this clause (ii) unless immediately repaid;

(ix)    advances of payroll payments to employees of the Lead Borrower and its Restricted Subsidiaries in the ordinary course of business;

(x)    noncash consideration may be received in connection with any sale of assets permitted pursuant to Section 10.02(ii);

(xi)    additional Restricted Subsidiaries of the Lead Borrower may be established or created if the Lead Borrower and such Subsidiary comply with the requirements of Section 9.11, if applicable; provided that to the extent any such new Subsidiary is created solely for the purpose of consummating a transaction pursuant to an acquisition permitted by this Section 10.05, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it contemporaneously with the closing of such transaction, such new Subsidiary shall not be required to take the actions set forth in Section 9.11, as applicable, until the respective acquisition is consummated (at which time the surviving or transferee entity of the respective transaction and its Subsidiaries shall be required to so comply in accordance with the provisions thereof);

(xii)    extensions of trade credit may be made in the ordinary course of business (including advances made to distributors consistent with past practice), Investments received in satisfaction or partial satisfaction of previously extended trade credit from financially troubled account debtors, Investments consisting of prepayments to suppliers made in the ordinary course of business and loans or advances made to distributors in the ordinary course of business;

(xiii)    earnest money deposits may be made to the extent required in connection with other Investments to the extent permitted under Section 10.01(xxviii);

(xiv)    Investments in deposit accounts or securities accounts opened in the ordinary course of business;

(xv)    Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(xvi)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit;

(xvii)    [**reserved**];

(xviii)  [**reserved**];

(xix)   in addition to Investments permitted by clauses (i) through (xviii) and (xx) through (xxix) of this <u>Section 10.05</u>, the Lead Borrower and its Restricted Subsidiaries may make additional loans, advances and other Investments to or in a Person (including a Joint Venture) in an aggregate amount for all loans, advances and other Investments made pursuant to this clause (xix), not to exceed, when added to the aggregate amount then guaranteed under clause (xxiii) of <u>Section 10.04</u> and all unreimbursed payments theretofore made in respect of guarantees pursuant to clause (xxiii) of <u>Section 10.04</u>, $1,000,000;

(xx)    the licensing, sublicensing or contribution of Intellectual Property rights pursuant to arrangements with Persons other than the Lead Borrower and the Restricted Subsidiaries in the ordinary course of business for fair market value, as determined by the Lead Borrower or such Restricted Subsidiary, as the case may be, in good faith;

(xxi)   loans and advances to Holdings in lieu of, and not in excess of the amount of, Dividends permitted to be made to Holdings in accordance with <u>Section 10.03</u>; provided that any such loan or advance shall reduce the amount of such applicable Dividend thereafter permitted under <u>Section 10.03</u> by a corresponding amount (if such applicable subsection of <u>Section 10.03</u> contains a maximum amount);

(xxii)  Investments to the extent that payment for such Investments is made solely by the issuance of Equity Interests constituting common stock or Qualified Preferred Stock of Holdings to the seller of such Investments;

(xxiii) Investments of a Person that is acquired and becomes a Restricted Subsidiary or of a company merged or amalgamated or consolidated into any Restricted Subsidiary, in each case after the Closing Date and in accordance with this <u>Section 10.05</u> and/or <u>Section 10.02</u>, as applicable, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation, do not constitute a material portion of the aggregate assets acquired in such transaction and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(xxiv)  Investments in a Restricted Subsidiary that is not a Credit Party or in a Joint Venture, in each case, to the extent such Investment is contemporaneously repaid in full with a dividend or other distribution from such Restricted Subsidiary, any other Restricted Subsidiary that is not a Credit Party or Joint Venture;

(xxv)   to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property, in each case, in the ordinary course of business;

(xxvi)  Investments by the Lead Borrower and its Restricted Subsidiaries consisting of deposits, prepayment and other credits to suppliers or landlords made in the ordinary course of business;

(xxvii) guaranties made in the ordinary course of business of obligations owed to landlords, suppliers, customers, franchisees and licensees of the Lead Borrower or its Subsidiaries; and

(xxviii)Investments consisting of the licensing, sublicensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other Persons.

Section 10.06  Transactions with Affiliates.  The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Lead Borrower or any of its Subsidiaries, other than on terms and conditions not less favorable to the Lead Borrower or such Restricted Subsidiary as would reasonably be obtained by the Lead Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except:

(i)      Dividends may be paid to the extent provided in Section 10.03;

(ii)      loans and other transactions among Holdings, the Lead Borrower and its Restricted Subsidiaries may be made to the extent otherwise expressly permitted under Section 10;

(iii)      customary fees and indemnification (including the reimbursement of out-of-pocket expenses) may be paid to directors of Holdings, the Lead Borrower and its Restricted Subsidiaries;

(iv)      the Lead Borrower and its Restricted Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions, stay bonuses, severance and other similar compensatory arrangements with officers, employees and directors of Holdings, the Lead Borrower and its Restricted Subsidiaries in the ordinary course of business;

(v)      any Tax Restructuring Transaction;

(vi)      [**reserved**];

(vii)      to the extent not otherwise prohibited by this Agreement, transactions between or among the Lead Borrower and any Credit Party;

(viii)      transactions described on Schedule 10.06(viii);

(ix)      Investments in the Lead Borrower's Subsidiaries and Joint Ventures (to the extent any such Subsidiary that is not a Restricted Subsidiary or any such Joint Venture is only an Affiliate as a result of Investments by Holdings and the Restricted Subsidiaries in such Subsidiary or Joint Venture) to the extent otherwise permitted under Section 10.05;

259 of 463

(x)      [**reserved**];

(xi)     [**reserved**];

(xii)    [**reserved**]; and

(xiii)   the issuance of  Equity Interests in the form of common stock or Qualified Preferred Stock to the Sponsor, or to any director, officer, employee or consultant thereof.

Notwithstanding anything to the contrary contained above in this Section 10.06, in no event shall the Lead Borrower or any of its Restricted Subsidiaries pay any management, consulting or similar fee to the Sponsor or any Affiliate of the Sponsor.

Section 10.07 Limitations on Payments, Certificate of Incorporation, By-Laws and Certain Other Agreements, etc.  The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to:

(a)      make (or give any notice (other than any such notice that is expressly contingent upon the repayment in full in cash of all Obligations other than any indemnification obligations arising hereunder which are not due and payable) in respect of) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, Change of Control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), any unsecured Indebtedness or Indebtedness secured by a Lien on Collateral ranking junior to those securing the obligations (it being understood that the Liens securing obligations under the Existing Term Loan Credit Agreement on the date hereof shall not be deemed "junior" for purposes of this Section 10.07);

(b)      make (or give any notice (other than any such notice that is expressly contingent upon the repayment in full in cash of all Obligations other than any indemnification obligations arising hereunder which are not due and payable) in respect of) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, Change of Control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), any Indebtedness under the Existing Term Loan Documents except in accordance with the Existing ABL Intercreditor Agreement;

(c)      amend or modify, or permit the amendment or modification of any provision of, any Indebtedness (after the entering into thereof) with a principal amount in excess of the Threshold Amount, other than any amendment or modification that is not adverse to the interests of the Lenders in any material respect; or

(d)      amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation) or certificate of formation; limited liability company agreement or bylaws (or the

equivalent organizational documents); accounting policies, reporting policies or fiscal year (except as required by U.S. GAAP), as applicable, or any agreement entered into by it with respect to its Equity Interests, or enter into any new agreement with respect to its Equity Interests, unless such amendment, modification, change or other action contemplated by this clause (d) could not reasonably be expected to be adverse to the interests of the Lenders.

Section 10.08 <u>Limitation on Certain Restrictions on Subsidiaries</u>. The Lead Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Lead Borrower or any of its Restricted Subsidiaries, or pay any Indebtedness owed to the Lead Borrower or any of its Restricted Subsidiaries, (b) make loans or advances to the Lead Borrower or any of its Restricted Subsidiaries or (c) transfer any of its properties or assets to the Lead Borrower or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of:

(i)     applicable law;

(ii)    (A) this Agreement and the other Credit Documents, (B) the Existing Credit Agreement and the Existing Loan Documents, (C) the DIP Term Loan Credit Agreement and the other DIP Term Loan Debt Documents, (D) the Existing Term Loan Credit Agreement and the Existing Term Loan Documents and (E) the Exit Financing Commitment Letter;

(iii)   the Financing Order or the First Day Orders;

(iv)    customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Lead Borrower or any of its Restricted Subsidiaries;

(v)     customary provisions restricting assignment of any licensing agreement (in which the Lead Borrower or any of its Restricted Subsidiaries is the licensee) or other contract entered into by the Lead Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(vi)    restrictions on the transfer of any asset pending the close of the sale of such asset;

(vii)   [**reserved**];

(viii)  encumbrances or restrictions on cash or other deposits imposed by customers under agreements entered into in the ordinary course of business;

(ix)    any agreement or instrument relating to Indebtedness of a Foreign Subsidiary incurred pursuant to <u>Section 10.04</u> to the extent such encumbrance or restriction only applies to such Foreign Subsidiary;

(x)     [**reserved**];

(xi)    restrictions on the transfer of any asset subject to a Lien permitted by Section 10.01;

(xii)   restrictions and conditions imposed by the terms of the documentation governing any Indebtedness of a Restricted Subsidiary of the Lead Borrower that is not a Credit Party, which Indebtedness is permitted by Section 10.04;

(xiii)  customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 10.05 and applicable solely to such joint venture;

(xiv)   [**reserved**]; and

(xv)    negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 10.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent, the Collateral Agent and/or the Security Trustee and the Secured Creditors with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens securing the Obligations under the Credit Documents equally and ratably or on a junior basis.

Section 10.09   Business; Fiscal Year; Activities of Holdings.

(a)      The Lead Borrower will not permit at any time the business activities taken as a whole conducted by the Lead Borrower and its Restricted Subsidiaries to be materially different from the business activities taken as a whole conducted by the Lead Borrower and its Restricted Subsidiaries on the Closing Date.

(b)      Holdings will not engage in any business other than its ownership of the capital stock of, and the management of, the Lead Borrower and, indirectly, its Subsidiaries and activities incidental thereto; provided that Holdings may engage in those activities that are incidental to (i) the maintenance of its existence in compliance with applicable law, (ii) legal, tax and accounting matters in connection with any of the foregoing or following activities, (iii) the entering into, and performing its obligations under, this Agreement, (iv) the issuance, sale or repurchase of its Equity Interests and the receipt of capital contributions, (v) the making of dividends or distributions on its Equity Interests to the extent permitted hereunder, (vi) the filing of registration statements, and compliance with applicable reporting and other obligations, under federal, state or other securities laws, (vii) the listing of its equity securities and compliance with applicable reporting and other obligations in connection therewith, (viii) the retention of (and the entry into, and exercise of rights and performance of obligations in respect of, contracts and agreements with) transfer agents, private placement agents, underwriters, counsel, accountants and other advisors and consultants, (ix) the performance of obligations under and compliance with its certificate of incorporation and bylaws, or any applicable law, ordinance, regulation, rule, order, judgment, decree or permit, including, without limitation, as a result of or in connection with the activities of its Subsidiaries, (x) the incurrence and payment of its operating and business expenses

and any taxes for which it may be liable, (xi) the consummation of the Transaction, and (xii) the making of loans to or other Investments in, or incurrence of Indebtedness from, the Lead Borrower, as and to the extent not prohibited by this Agreement.

        (c)      Make any change in fiscal year.

    Section 10.10  Negative Pledges.

    (a) The Lead Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, agree or covenant with any Person to restrict in any way its ability to grant any Lien on its assets in favor of the Lenders, other than pursuant to the Existing Intercreditor Agreement or any other intercreditor agreement contemplated by this agreement, and except that this Section 10.10 shall not apply to:

        (i)      any covenants contained in this Agreement or any other Credit Documents or that exist on the Closing Date;

        (ii)      covenants existing under the Existing Term Loan Credit Agreement and the Existing Term Loan Documents as in effect on the Closing Date;

        (iii)      covenants existing under the (A) Junior DIP Credit Agreement and the other DIP Junior Loan Documents or (B) the Exit Financing Commitment Letter;

        (iv)      covenants and agreements made in connection with any agreement relating to secured Indebtedness permitted by this Agreement but only if such covenant or agreement applies solely to the specific asset or assets to which such Lien relates;

        (v)      customary provisions in leases, subleases, licenses or sublicenses and other contracts restricting the right of assignment thereof;

        (vi)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures that are applicable solely to such joint venture;

        (vii)      restrictions imposed by law;

        (viii)      customary restrictions and conditions contained in agreements relating to any sale of assets or Equity Interests pending such sale, provided such restrictions and conditions apply only to the Person or property that is to be sold;

        (ix)      [**reserved**];

        (x)      negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money entered into after the Closing Date and otherwise permitted under Section 10.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent, the Collateral Agent and/or the Security Trustee and the Secured Creditors with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a

requirement that such holders of such Indebtedness be secured by such Liens securing the Obligations under the Credit Documents equally and ratably or on a junior basis;

(xi)    restrictions on any Foreign Subsidiary pursuant to the terms of any Indebtedness of such Foreign Subsidiary permitted to be incurred hereunder;

(xii)    restrictions on cash deposits imposed by customers under contracts entered into in the ordinary course of business;

(xiii)    any restrictions on Liens imposed by any amendments, modifications, restatements, renewals, increases or supplements of the contracts, instruments or obligations referred to in clauses (i), (ii), (x) and (xi) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Lead Borrower, no more restrictive with respect to such encumbrance and other restrictions than those prior to such amendment, modification, restatement, renewal, increase or supplement;

(xiv)    restrictions under the Existing Loan Documents; and

(xv)    restrictions pursuant to the Financing Order and any First Day Orders.

(b)    Other than Liens securing the Junior DIP Loan Documents and the Carveout, the Lead Borrower shall not permit, and shall not permit any of its Restricted Subsidiaries to permit any Person other than the Collateral Agent to obtain directly or indirectly any Lien (as adequate protection or otherwise) over the Real Property of any Credit Party other than the Collateral Agent's and the Existing Agent's Liens over the Specified Real Property and such Real Property shall remain property of the estate (and the value of any interest in Real Property securing the Existing Obligation as of the Filing Date) will be preserved for the benefit of the estate in the same manner that avoided transfers are preserved for the benefit of the estate under § 551 of the Bankruptcy Code, and any junior liens in such property shall be and remain junior in all respects to the estate's interest in such real property; provided that with respect to any parcel of such Real Property, after the Administrative Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender, then pursuant to the Financing Order such parcel of Real Property shall be automatically become a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien of Collateral Agent, for the benefit of the Secured Creditors, as security for the Obligations, pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code.

Section 10.11 <u>Financial Covenant</u>.    Each of Holdings and each Borrower covenants and agrees that, after the Closing Date until termination of all of the Commitments and payment in full of the Obligations, Holdings and Borrowers will and will cause each of their Subsidiaries to:

(a)    <u>Budget Compliance</u>.    Except as otherwise provided herein or approved by the Administrative Agent and Required Lenders, the Credit Parties will not, and will not permit

any Subsidiary thereof to, directly or indirectly, (i) use any cash, including the proceeds of any Loans, in a manner or for a purpose other than those permitted under this Agreement or contemplated by the Financing Order or the Budget, (ii) make or commit to make payments to critical vendors (other than those critical vendors set forth in the First Day Orders, the Financing Order or in the Budget, in each case as approved in writing by the Administrative Agent in respect of any pre-petition amount in excess of the amount included in the Budget), (iii) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash disbursements (in any event excluding disbursements for professional fees and expenses and restructuring expenses and interest and fees payable under this Agreement and the Junior DIP Credit Agreement) as reported in the Variance Reports delivered with respect to periods ending after the Filing Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Budget for the same such period and (iv) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder and under the Junior DIP Loan Documents) as reported in the Variance Reports delivered with respect to periods ending after the Closing Date through the end of such Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder) forecast in the Budget for the same such period (such covenant, the "Budget Variance Covenant").

Section 10.12  Use of Proceeds.   Holdings will not, and will not permit any of its Subsidiaries to use the proceeds of any Loan made hereunder for any purpose other than, (a) in accordance with and subject to the Budget (subject to Permitted Variances) and the Financing Order, to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Credit Documents, the commencement of the Bankruptcy Cases and the transactions contemplated hereby, as and when such expenses are due and payable, (b) to the extent not otherwise prohibited by the Credit Documents or the Final Financing Order, to fund working capital needs and general corporate purposes of Borrowers, at such times and in such amounts as are in compliance with Section 10.11, (c) to provide cash "adequate protection" (as set forth in Section 361 of the Bankruptcy Code and the relevant sections of other applicable Insolvency Laws) in favor of the Existing Agent and the Existing Lenders, (d) to provide cash "adequate protection" (as set forth in Section 361 of the Bankruptcy Code and the relevant sections of other applicable Insolvency Laws) in favor of the Existing Agent for payments in cash on a current basis of all reasonable and documented fees, costs and expenses of Existing Agent's legal counsel (including local counsel and maritime counsel) and advisors; provided, however, that none of such fees, costs and expenses provided as adequate protection payments under this clause (d) shall be subject to approval by the Bankruptcy Court or the United States Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court; and (e) to repay, in full, the Existing Secured Obligations, including outstanding principal, accrued interest, and accrued fees and expenses owing under or in connection with the Existing Credit Agreement and other Existing Loan Documents; provided, that no part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, (i) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Existing Agent, Existing Lenders, Agent or Lenders, or in connection with the Obligations or Existing Secured Obligations, except for an amount up to $50,000, for investigation costs of any official statutory committee appointed

pursuant to Bankruptcy Code § 1102, (ii) toward repayment of the Existing Term Loan Debt or the Indebtedness under the Junior DIP Loan Documents (including any "adequate protection" payments with respect thereto), (iii) to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (iv) to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person, and (v) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

Section 10.13   <u>Financing Order; Administrative Expense Priority; Payments</u>.  Holdings will not, and will not permit any of its Subsidiaries to:

(a)      seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by Administrative Agent in its sole discretion,

(b)      seek the use of "Cash Collateral" (as defined in the Financing Order) in a manner inconsistent with the terms of the Financing Order without the prior written consent of Administrative Agent, and

(c)      suffer to exist at any time a priority for any administrative expense or unsecured claim against any Credit Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 365, 503((b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code) or any other superpriority claim which is equal or superior to the priority of the Secured Creditors or "Secured Creditors" (as defined in the Existing Credit Agreement) in respect of the Obligations or Existing Secured Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carveout  and as otherwise set forth in the Credit Documents and reasonably acceptable to Administrative Agent.

Section 10.14   <u>Restructuring Support Agreement</u>.  Holdings will not, and will not permit any of its Subsidiaries to amend, modify or change in any manner that could reasonably be expected to be adverse to the interests of the Administrative Agent or Lenders, any term, condition or provision of the Restructuring Support Agreement, or terminate the Restructuring Support Agreement.

Section 10.15   <u>Key Employees</u>.  Other than the Management Incentive Plan, the Borrowers shall not, and the Borrowers shall not permit any of their Subsidiaries to, enter into any agreements or arrangements relating to any key employee incentive or retention plans or any similar officer or employee bonus plans or programs, in each case without the prior written consent of the Administrative Agent or as provided for in the Budget or the relief requested in the Borrower's "first day" employee wage motion and order.

ARTICLE 11  <u>Events of Default</u>.  Upon the occurrence of any of the following specified events (each, an "<u>Event of Default</u>"):

Section 11.01  <u>Payments</u>.  Any Borrower shall (i) default in the payment when due of any principal of any Loan or (ii) default, and such default shall continue unremedied for two (2) or more Business Days, in the payment when due of any interest on any Loan, or any Fees or any other amounts owing hereunder or under any other Credit Document; or

Section 11.02  <u>Representations, etc</u>.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect (without duplication of any materiality standard set forth in any such representation and warranty) on the date as of which made or deemed made; or

Section 11.03  <u>Covenants</u>.   Holdings, the Lead Borrower or any of its Restricted Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in the Financing Order, <u>Section 9.01</u>, <u>9.02(b)</u>, <u>9.02(c)</u>, <u>9.02(d)</u>, <u>9.03(c)</u>, <u>9.04</u>, <u>9.09</u>, <u>9.11</u>, <u>9.12</u>, <u>9.15</u>, <u>9.16</u>, <u>9.17</u>, <u>9.18</u>, <u>9.22</u>, <u>9.23</u>, <u>9.24</u> and <u>9.25</u>, and (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or in any other Credit Document (other than those set forth in <u>Sections 11.01</u> and <u>11.02</u>), and such default shall continue unremedied for a period of thirty (30) days after written notice thereof to the defaulting party by the Administrative Agent or the Required Lenders; or

Section 11.04  <u>Default Under Other Agreements</u>.  (i) Holdings, the Lead Borrower or any of its Restricted Subsidiaries shall (x) default in any payment of any postpetition Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any postpetition Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such postpetition Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such postpetition Indebtedness to become due prior to its stated maturity, (ii) any postpetition Indebtedness (other than the Obligations) of Holdings, the Lead Borrower or any of its Restricted Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that (A) it shall not be a Default or an Event of Default under this <u>Section 11.04</u> unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least equal to the Threshold Amount and (B) the preceding clause (ii) shall not apply to Indebtedness that becomes due as a result of a voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is otherwise permitted hereunder or (iii) the occurrence of a DIP Termination Date; or

Section 11.05  <u>Bankruptcy, etc</u>.  Other than the Debtors in respect of the Bankruptcy Cases, Holdings, the Lead Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall commence a voluntary case concerning itself under Title 11 of the United States

Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against Holdings, the Lead Borrower or any of its Restricted Subsidiaries, and the petition is not dismissed within sixty (60) days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code), receiver, receiver-manager, trustee, monitor is appointed for, or takes charge of, all or substantially all of the property of Holdings, the Lead Borrower or any of its Restricted Subsidiaries, or Holdings, the Lead Borrower or any of its Restricted Subsidiaries commences any other proceeding under any reorganization, bankruptcy, insolvency, arrangement, winding-up, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Holdings, the Lead Borrower or any of its Restricted Subsidiaries, or there is commenced against Holdings, the Lead Borrower or any of its Restricted Subsidiaries any such proceeding which remains undismissed for a period of sixty (60) days, or Holdings, the Lead Borrower or any of its Restricted Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or Holdings, the Lead Borrower or any of its Restricted Subsidiaries suffers any appointment of any custodian, receiver, receiver-manager, trustee, monitor or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of sixty (60) days; or Holdings, the Lead Borrower or any of its Restricted Subsidiaries makes a general assignment for the benefit of creditors; or any corporate, limited liability company or similar action is taken by Holdings, the Lead Borrower or any of its Restricted Subsidiaries for the purpose of effecting any of the foregoing; or

Section 11.06  ERISA.  (a) An ERISA Event has occurred with respect to an ERISA Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in a Material Adverse Effect, (b) there is or arises Unfunded Pension Liability which has resulted or would reasonably be expected to result in a Material Adverse Effect, (c) there is or arises any withdrawal liability under Section 4201 of ERISA, resulting from any Credit Party or any ERISA Affiliate withdrawal from any or all Multiemployer Plans which has resulted or would reasonably be expected to result in a Material Adverse Effect, (d) a Foreign Pension Plan has failed to comply with, or be funded in accordance with, applicable law which has resulted or would reasonably be expected to result in a Material Adverse Effect, or (e) the Lead Borrower or any of its Restricted Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan that, in each case, has resulted or would reasonably be expected to result in a Material Adverse Effect; or

Section 11.07  Security Documents.  Any of the Security Documents shall cease to be in full force and effect, or shall cease to give the Collateral Agent or the Security Trustee for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby, in favor of the Collateral Agent or the Security Trustee, as applicable, superior to and prior to the rights of all third Persons (except as permitted by Section 10.01, the Financing Order or the Intercreditor Agreements), and subject to no other Liens (except as permitted by Section 10.01, the Financing Order or the Intercreditor Agreements)); or

Section 11.08  Guaranties.  Any material Guaranty or any material provision thereof shall cease to be in full force or effect as to any Guarantor, or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm in writing such Guarantor's obligations under the Guaranty to which it is a party or any Guarantor shall default in the due performance or

observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Guaranty to which it is a party; or

Section 11.09  <u>Judgments</u>.  One or more judgments or decrees shall be entered against Holdings, the Lead Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) of the Lead Borrower involving in the aggregate for Holdings, the Lead Borrower and its Restricted Subsidiaries (other than any Immaterial Subsidiary) a liability or liabilities (not paid or fully covered by a reputable and solvent insurance company with respect to judgments for the payment of money) and such judgments and decrees shall not be vacated, discharged or stayed for any period of sixty (60) consecutive days, and the aggregate amount of all such judgments and decrees (to the extent not paid or fully covered by such insurance company) equals or exceeds $1,000,000; or

Section 11.10  <u>Change of Control</u>.  A Change of Control shall occur; or

Section 11.11  <u>Bankruptcy Matters</u>.

(a)     the Final Financing Order is not entered within thirty (30) days following the Filing Date (or such later date acceptable to the Administrative Agent in its sole discretion, not to exceed forty (40) days following the Filing Date);

(b)     Any of the Initial Financing Order or the Final Financing Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified by the Bankruptcy Court without the express prior written consent of the Administrative Agent (such consent to be given in its sole discretion);

(c)     Any Credit Party shall file a pleading seeking to modify or otherwise alter the Initial Financing Order, the Final Financing Order, any Credit Document, any Existing Loan Document or any of the transactions contemplated in any of the foregoing without the prior consent of Administrative Agent, such consent to be given in its sole discretion;

(d)     Without the written consent of the Administrative Agent, an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business of the Credit Parties under Section 1106(b) of the Bankruptcy Code, or (ii) terminating or shortening any Credit Party's exclusive rights to file and solicit acceptances for a plan of reorganization in the Bankruptcy Cases;

(e)     (i) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Collateral Agent or the Security Trustee and the Lenders, or otherwise in respect of the Obligations or Existing Secured Obligations, claims or rights against Credit Parties or any of their Subsidiaries or to subject any Collateral to assessment pursuant to Section 105, 506(c), 552 or any other section of the Bankruptcy Code or other applicable Insolvency Laws, (ii) any lien, security interest or Superpriority Claim created by the Credit Documents or the Financing Order shall, for any reason, cease to be valid, (iii) any action is commenced by any Credit Party or any of its Subsidiaries which contests the extent, validity, perfection, enforceability or priority of any of the liens and security interests of Agent, Existing Agent, the Lenders or Existing Lenders or in respect of the Existing Secured Obligations or the

Obligations created by the Credit Documents, the Existing Credit Agreement, the Existing Loan Documents or the Financing Order, (iv) any Credit Party or any Subsidiary of any Credit Party challenges the extent, validity or priority of the Obligations or the Existing Secured Obligations or the application of any payments or collections received by Administrative Agent, Lenders, Existing Agent, or Existing Lenders to the Obligations or Existing Secured Obligations as provided for herein or in the Financing Order, or (v)  except as expressly provided in the Financing Order with respect to the Carveout, any Agent, any Lender, Existing Agent, any Existing Lender or any Collateral securing the Obligations or Existing Obligations are surcharged pursuant to Sections 105, 506(c) or 552 or any other section of the Bankruptcy Code;

(f)     Without the written consent of the Administrative Agent (acting at the direction of Required Lenders), (i) the filing by any Credit Party of any motion to dismiss any of the Bankruptcy Cases or to convert any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, or (ii) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases (or any case comprising part of any of the Bankruptcy Cases) to a case under chapter 7 of the Bankruptcy Code;

(g)     Any motion, supplement, amendment or other document relating to the Financing Order, the Credit Agreement, the Existing Credit Agreement or the transactions contemplated in any of the foregoing that is not in form in substance satisfactory to Administrative Agent is filed by any Credit Party or entered by the Bankruptcy Court;

(h)     Any sale of, or motion to sell Collateral pursuant to Section 363 of the Bankruptcy Code (except for sales or other disposition expressly permitted hereunder) is filed, not permitted by this Agreement;

(i)     An order with respect to any of the Bankruptcy Cases shall be entered without the express prior written consent of Administrative Agent, (i) to revoke, vacate, reverse, stay, modify, supplement or amend the Existing Credit Agreement, any Credit Document, any Existing Loan Document, the Financing Order or the transactions contemplated in any of the foregoing, or (ii) to permit any administrative expense, claim or lien (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of the Agents, Existing Agent, Lenders and Existing Lenders in respect of the Obligations and Existing Secured Obligations, except for amounts in respect of the Carve-Out as set forth in the Financing Order;

(j)     An order shall be entered by the Bankruptcy Court granting relief from the automatic stay as to any creditor of any Credit Party with respect to any Collateral (other than ABL Excluded Collateral) having a value in excess of $1,000,000;

(k)     Any plan of reorganization is filed by any Credit Party that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in any of the Bankruptcy Cases which does not (i) contain a provision that all Obligations and all Existing Secured Obligations shall be paid in full in a manner satisfactory to the Administrative Agent (acting at the direction of Required Lenders) and the Existing Agent (acting at the direction of "Required Lenders" (as defined in the Existing Credit Agreement)) on or before the effective date, or

substantial consummation, of such plan and (ii) provide for the continuation of the liens and security interests granted to Collateral Agent or the Security Trustee and priorities (subject to the Intercreditor Agreements) until such plan effective date all Obligations and Existing Secured Obligations are paid in full;

(l)     Unless otherwise agreed to by Administrative Agent, a motion shall be filed by any Credit Party seeking authority, or an order shall be entered in any of the Bankruptcy Cases, that (i) permits any Credit Party or any Subsidiary of any Credit Party to incur indebtedness secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the lien granted under the Credit Documents and the Existing Loan Documents and Bankruptcy Code Sections 364(c)(2) or (d) other than with respect to the Subordinated Real Property securing the Junior DIP Indebtedness and the Existing Term Loan Debt unless (A) all of the Obligations and Existing Secured Obligations have been paid in full at the time of the entry of any such order, or (B) the Obligations and the Existing Secured Obligations are paid in full with such indebtedness, or (ii) permits any Credit Party or any Subsidiary of any Credit Party the right to use "Cash Collateral" (as defined in the Financing Order) other than in accordance with the terms of the Financing Order, unless all of the Obligations and Existing Secured Obligations shall have been paid in full;

(m)     Net Cash Proceeds of any sale of all or substantially all assets of the Credit Parties are not directly remitted to Administrative Agent (and, solely with respect to the ABL Excluded Collateral, to the Junior DIP Agent) at the closing thereof, to be applied in accordance with the Financing Orders, the Credit Documents and the Intercreditor Agreements;

(n)     The Restructuring Support Agreement is terminated or ceases to be in full force and effect;

(o)     Subject to the Intercreditor Agreements, any motions in the Bankruptcy Cases to sell Collateral (other than Term Loan Priority Collateral) or approve procedures regarding the same, or any orders of the Bankruptcy Court approving or amending any of the foregoing, are not in form and substance reasonably acceptable to Administrative Agent;

(p)     Any Credit Party or any Subsidiary of any Credit Party shall fail to maintain sufficient projected borrowing capacity under the Credit Agreement plus cash plus projected cash flow to pay all accrued administrative obligations and other administrative claims when due, and sufficient additional borrowing capacity (including proceeds expected to be received pursuant to equity issuances upon exit from the Bankruptcy Cases and exit financing documents) to enable such other unpaid administrative obligations and administrative claims that are required to be paid in full prior to such time that all Obligations and Existing Secured Obligations are paid in full;

(q)     Except as set forth herein, the failure by the Credit Parties to observe or perform any of the material terms or provisions contained in the Financing Order in any respect adverse to the interests of the Lenders; and

(r)     Payment of or granting adequate protection with respect to any Indebtedness that was existing prior to the Filing Date other than as expressly provided in the Financing Order or as consented to by the Administrative Agent.

Section 11.12 <u>Consultant</u>     If (a) the Consultant is terminated or disqualified for any reason, (b) the Consultant is instructed to cease working, (c) the Consultant's engagement by Borrowers, or any of the responsibilities, authority, powers, or duties of the Consultant, is terminated, suspended, or restricted in any material respect, or (d) the Consultant resigns and, in each case of clauses (a) through (d), Borrowers have not engaged a replacement Consultant pursuant to <u>Section 9.19</u> within ten (10) Business Days (or such longer period as the Administrative Agent reasonably agrees).

<u>THEN</u> in the case of <u>Section 11.1</u> through <u>11.12</u> above, notwithstanding Section 362 of the Bankruptcy Code but subject to the applicable terms of the Financing Order, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender to enforce its claims against any Credit Party (provided that, if an Event of Default specified in <u>Section 11.05</u> shall occur with respect to any Credit Party, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below shall occur automatically): (i) declare the Aggregate Commitments terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of and any accrued interest in respect of all Loans and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) enforce, as Collateral Agent or the Security Trustee, as applicable, all of the Liens and security interests created pursuant to the Security Documents; (iv) enforce each Guaranty, (v) terminate, reduce or condition any Revolving Commitment, or make any adjustment to the Borrowing Base (vi) require the Credit Parties to provide Letter of Credit Collateralization, and, if the Credit Parties fail promptly to provide Letter of Credit Collateralization, the Administrative Agent may (and shall upon the direction of Required Lenders) advance the required cash as Revolving Loans (whether or not an Overadvance exists or is created thereby, or the conditions in <u>Section 7</u> are satisfied) and (vii) terminate the Credit Parties' right to use "Cash Collateral" (as defined in the Financing Order) by written notice thereof to counsel for the Credit Parties, counsel for the Committee (if any), the U.S. Trustee, without further notice, application or order of the Bankruptcy Court.

Section 11.13 <u>Application of Funds</u>.

(a)     Any amounts received in the Dominion Account and all other amounts received on account of the Obligations during a Liquidity Period so long as no Event of Default has occurred and is continuing (including without limitation, proceeds received by the Administrative Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral) shall, subject to the provisions of <u>Sections 2.11</u> and <u>2.13(h)</u>, be applied in the following order:

<u>First</u>, to reduce the balance of any Existing Secured Obligations and any Reinstated Existing Secured Obligations in the manner set forth in the Existing Credit Agreement;

<u>Second</u>, to the payment of all reasonable costs and out-of-pocket expenses, fees, commissions and taxes of such sale, collection or other realization including, without

limitation, compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith;

Third, to the payment of all other reasonable costs and out-of-pocket expenses of such sale, collection or other realization including, without limitation, costs and expenses and all costs, liabilities and advances made or incurred by the other Secured Creditors in connection therewith (other than in respect of Secured Bank Product Obligations);

Fourth, to interest then due and payable on the Swingline Loan;

Fifth, to the principal balance of the Swingline Loan outstanding until the same has been prepaid in full;

Sixth, to interest then due and payable on Revolving Loans and other amounts due pursuant to Sections 3.01, 3.02 and 5.01;

Seventh, to Letter of Credit Collateralization plus any accrued and unpaid interest thereon;

Eighth, to the principal balance of Revolving Borrowings then outstanding, pro rata; and

Ninth, to all other Obligations (other than Secured Bank Product Obligations) pro rata.

Amounts used for Letter of Credit Collateralization pursuant to clause Seventh above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Ninth of this Section 11.13(a), the Credit Parties shall remain liable for any deficiency.

(b)     Any amounts received in the Dominion Account and all other amounts received on account of the Obligations after the occurrence of and during the continuation of an Event of Default (including without limitation, proceeds received by the Administrative Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral) shall, subject to the provisions of Sections 2.11 and 2.13(h), be applied in the following order:

First, to reduce the balance of the Existing Secured Obligations and Reinstated Existing Secured Obligations in the manner set forth in the Existing Credit Agreement;

Second, to the payment of all reasonable costs and out-of-pocket expenses, fees, commissions and taxes of such sale, collection or other realization including, without limitation, compensation to the Administrative Agent and its agents and counsel, and all

expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith;

Third, to the payment of all other reasonable costs and out-of-pocket expenses of such sale, collection or other realization including, without limitation, costs and expenses and all costs, liabilities and advances made or incurred by the other Secured Creditors in connection therewith (other than in respect of Secured Bank Product Obligations);

Fourth, to interest then due and payable on the Swingline Loan;

Fifth, to the principal balance of the Swingline Loan outstanding until the same has been prepaid in full;

Sixth, to interest then due and payable on Revolving Loans and other amounts due pursuant to Sections 3.01, 3.02 and 5.01;

Seventh, to Letter of Credit Collateralization plus any accrued and unpaid interest thereon;

Eighth, to the principal balance of Revolving Borrowings then outstanding and all Obligations on account of Noticed Hedges with Secured Creditors, pro rata; and

Ninth, to all other Obligations pro rata.

Amounts used for Letter of Credit Collateralization pursuant to clause Sixth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above. Amounts distributed with respect to any Secured Bank Product Obligations shall be the lesser of the maximum Secured Bank Product Obligations last reported to the Administrative Agent or the actual Secured Bank Product Obligations as calculated by the methodology reported to the Administrative Agent for determining the amount due. The Administrative Agent shall have no obligation to calculate the amount to be distributed with respect to any Secured Bank Product Obligations, and may request a reasonably detailed calculation of such amount from the applicable Secured Creditor. If a Secured Creditor fails to deliver such calculation within five (5) days following request by the Administrative Agent, the Administrative Agent may assume the amount to be distributed is zero.

In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Ninth of this Section 11.13(b), the Credit Parties shall remain liable for any deficiency.

ARTICLE 12   The Administrative Agent.

Section 12.01   Appointment and Authorization.

(a)      Each of the Lenders hereby irrevocably appoints Wells Fargo to act on its behalf as the Administrative Agent hereunder and under the other Credit Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers

-145-

as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article 12 (other than as explicitly stated in Sections 12.08 and 12.11) are solely for the benefit of the Administrative Agent, the Issuing Bank and the Lenders, and neither the Lead Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.

(b)     The Administrative Agent shall also act as the "Collateral Agent" and "Security Trustee" under the Credit Documents and each reference to Administrative Agent herein shall be deemed to also reference Wells Fargo's role as Collateral Agent and Security Trustee hereunder, and each of the Lenders (including in its capacity as Secured Bank Product Provider) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any Credit Party to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "Collateral Agent" or "Security Trustee" and any co-agents, subagents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 12.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article 12 and Article 13 (including Section 13.01, as though such co-agents, subagents and attorneys-in-fact were the "Collateral Agent" or "Security Trustee" under the Credit Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Creditors with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(c)     The Lenders hereby authorize the Administrative Agent to enter into the Intercreditor Agreements and any other intercreditor agreement or arrangement permitted under this Agreement and any such intercreditor agreement shall be being binding upon the Lenders.

Section 12.02  Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more subagents appointed by the Administrative Agent. The exculpatory provisions of this Article 12 shall apply to any such subagent of the Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 12.03  Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by

the other Credit Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable law;

(c)     shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Lead Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)     shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Article 11 and Section 13.11) or (ii) in the absence of its own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Lead Borrower or a Lender; and

(e)     shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 12.04 <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 12.05  [**Reserved**].

Section 12.06  <u>Non-reliance on Administrative Agent and Other Lenders</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

Section 12.07  <u>Indemnification by the Lenders</u>.  To the extent that the Borrowers for any reason fail to pay any amount required under <u>Section 13.01(a)</u> to be paid by them to the Administrative Agent (or any subagent thereof), each Lender severally agrees to pay to the Administrative Agent (or any such subagent) such Lender's pro rata share (based on the amount of then outstanding Loans) of (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such subagent) in its capacity as such. The obligations of the Lenders under this <u>Section 12.07</u> are subject to the provisions of <u>Section 5.01</u>.

Section 12.08  <u>Rights as a Lender</u>.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "<u>Lender</u>" or "<u>Lenders</u>" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Lead Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 12.09  <u>Administrative Agent May File Proofs of Claim; Credit Bidding</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan or LC Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Bank and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Bank and the Administrative Agent under <u>Section 13.01</u>) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Bank to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Bank, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 13.01.

(c)      Nothing contained in this Section 12.09 shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the Issuing Bank to authorize the Administrative Agent to vote in respect of the claim of any Lender or the Issuing Bank or in any such proceeding.

(d)      The Secured Creditors hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which a Credit Party is subject or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Creditors shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a)(i) through (a)(v) of Section 13.04 of this Agreement), and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Creditor or any acquisition vehicle to take any further action.

Section 12.10  <u>Resignation of the Agents</u>.

(a)     The Administrative Agent may at any time give notice of its resignation to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Lead Borrower's consent (other than during the existence of an Event of Default), to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, with the Lead Borrower's consent (other than during the existence of an Event of Default), on behalf of the Lenders, appoint a successor Administrative Agent; provided that if the Administrative Agent shall notify the Lead Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Credit Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section). After the retiring Administrative Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article 12 and <u>Section 13.01</u> shall continue in effect for the benefit of such retiring Administrative Agent and its subagents in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)     Any resignation by Wells Fargo as administrative agent pursuant to this <u>Section 12.10</u> shall also constitute its resignation as lender of the Swingline Loans to the extent that Wells Fargo is acting in such capacity at such time. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring lender of the Swingline Loans and (ii) the retiring lender of the Swingline Loans shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents.

Section 12.11  <u>Collateral Matters and Guaranty Matters</u>. (a) The Lenders and the Issuing Bank irrevocably authorize the Administrative Agent, the Collateral Agent and the Security Trustee, as applicable (and subject to the provisions of the Intercreditor Agreements),

(i)     to release any Lien on any property granted to or held by the Collateral Agent or the Security Trustee, as applicable, under any Credit Document (A) upon termination of the Aggregate Commitments and payment in full of all Obligations and the expiration or termination of all Letters of Credit (unless subject to Letter of Credit Collateralization), (B) that is sold or to be sold as part of or in connection with any sale

-150-

permitted hereunder or under any other Credit Document to a Person that is not a Credit Party, (C) subject to Section 13.12, if approved, authorized or ratified in writing by the Required Lenders, (D) [**reserved**] or (E) if the property subject to such Lien is owned by a Subsidiary Guarantor, subject to Section 13.12, upon release of such Subsidiary Guarantor from its obligations under the Subsidiaries Guaranty pursuant to clause (ii) below;

       (ii)     so long as no Event of Default exists or would be caused thereby to release any Subsidiary Guarantor from its obligations under the Subsidiaries Guaranty if such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction permitted hereunder; and

       (iii)    at the request of the Lead Borrower, to subordinate any Lien on any property granted to or held by the Administrative Agent, the Collateral Agent or the Security Trustee under any Credit Document to the holder of any Lien on such property that is permitted by Sections 10.01(vi), (vii) and (xlv), but only to the extent such sections permit such Lien to be prior to the Liens held by the Collateral Agent, the Security Trustee and the Administrative Agent under the Credit Documents.

Upon request by the Administrative Agent, the Collateral Agent or the Security Trustee at any time, the Required Lenders will confirm in writing the Administrative Agent's, the Collateral Agent's or the Security Trustee's, as applicable, authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 12.11. In each case as specified in this Section 12.11, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty upon receipt, if requested by the Administrative Agent of an officer's certificate by a Responsible Officer of the Lead Borrower certifying that such release or subordination, as applicable, is permitted by the terms of the Credit Documents and otherwise in form and substance reasonably satisfactory to the Administrative Agent, in each case in accordance with the terms of the Credit Documents and this Section 12.11.

Section 12.12  Secured Bank Product Providers.  Each Secured Bank Product Provider, by delivery of a notice to the Administrative Agent of such agreement, agrees to be bound by this Section 12. Each such Secured Bank Product Provider shall indemnify and hold harmless the Administrative Agent and the Collateral Agent, to the extent not reimbursed by the Credit Parties, against all claims that may be incurred by or asserted against the Administrative Agent and the Collateral Agent in connection with such provider's Secured Bank Product Obligations.  Each Secured Bank Product Provider in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Credit Documents for purposes of any reference in a Loan Document to the parties for whom the Administrative Agent is acting.  The Administrative Agent hereby agrees to act as agent for such Secured Bank Product Providers and, by virtue of entering into Bank Product Debt, the applicable Secured Bank Product Provider shall be automatically deemed to have appointed the Administrative Agent as its agent and to have accepted the benefits of the Credit Documents.  It is understood and agreed that the rights and benefits of each Secured

Bank Product Provider under the Credit Documents consist exclusively of such Secured Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to the Administrative Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Secured Bank Product Provider, by virtue of entering into Bank Product Debt, shall be automatically deemed to have agreed that the Administrative Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Secured Bank Product Obligations and that if reserves are established there is no obligation on the part of the Administrative Agent to determine or insure whether the amount of any such reserve is appropriate or not.  In connection with any such distribution of payments or proceeds of Collateral, the Administrative Agent shall be entitled to assume no amounts are due or owing to any Secured Bank Product Provider unless such Secured Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to the Administrative Agent as to the amounts that are due and owing to it and such written certification is received by the Administrative Agent a reasonable period of time prior to the making of such distribution.  The Administrative Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Product Debt, but may rely upon the written certification of the amount due and payable from the applicable Secured Bank Product Provider. In the absence of an updated certification, the Administrative Agent shall be entitled to assume that the amount due and payable to the applicable Secured Bank Product Provider is the amount last certified to the Administrative Agent by such Secured Bank Product Provider as being due and payable (*less* any distributions made to such Secured Bank Product Provider on account thereof). Borrowers may obtain Bank Products from any Secured Bank Product Provider, although Borrowers are not required to do so.  Each Borrower acknowledges and agrees that no Secured Bank Product Provider has committed to provide any Bank Product Debt and that the providing of Bank Product Debt by any Secured Bank Product Provider is in the sole and absolute discretion of such Secured Bank Product Provider.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product Debt shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Credit Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

Section 12.13 <u>Withholding Taxes</u>.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall, within ten (10) days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrowers pursuant to <u>Section 5.01</u> and without limiting or expanding the obligation of the Borrowers to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant

Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due the Administrative Agent under this <u>Section 12.13</u>. The agreements in this <u>Section 12.13</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

Section 12.14   <u>Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information</u>.  By becoming a party to this Agreement, each Lender:

(a)      is deemed to have requested that the Administrative Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting any Credit Party or its Subsidiaries (each, a "<u>Report</u>") prepared by or at the request of the Administrative Agent, and the Administrative Agent shall so furnish each Lender with such Reports,

(b)      expressly agrees and acknowledges that the Administrative Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or other party performing any field examination will inspect only specific information regarding the Credit Parties and their Subsidiaries and will rely significantly upon Holdings' and its Subsidiaries' books and records, as well as on representations of Borrowers' personnel,

(d)      agrees to keep all Reports and other material, non-public information regarding the Credit Parties and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with <u>Section 13.15</u>, and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold the Administrative Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold the Administrative Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by the Administrative Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

(f)      In addition to the foregoing, (x) any Lender may from time to time request of the Administrative Agent in writing that the Administrative Agent provide to such Lender a

-153-

copy of any report or document provided by any Credit Party or its Subsidiaries to the Administrative Agent that has not been contemporaneously provided by such Credit Party or such Subsidiary to such Lender, and, upon receipt of such request, the Administrative Agent promptly shall provide a copy of same to such Lender and (y) to the extent that the Administrative Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from any Credit Party or its Subsidiaries, any Lender may, from time to time, reasonably request the Administrative Agent to exercise such right as specified in such Lender's notice to the Administrative Agent, whereupon the Administrative Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from such Credit Party or such Subsidiary, the Administrative Agent promptly shall provide a copy of same to such Lender.

ARTICLE 13   Miscellaneous.

Section 13.01   Payment of Expenses, etc.

(a)   The Credit Parties hereby jointly and severally agree to: (i) pay all reasonable invoiced out-of-pocket costs and expenses of the Agents, Lenders and Issuing Banks in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein (including field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows (A) a fee of $1,100 per day, per examiner, plus reasonable out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Credit Party or its Subsidiaries performed by or on behalf of Agents, and (B) the reasonable fees, charges or expenses paid or incurred by Agents if it elects to employ the services of one or more third Persons to appraise the Collateral, or any portion thereof), the administration hereof and thereof (including the Administrative Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Credit Party or its Subsidiaries, the Administrative Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith) and any amendment, modification waiver or consent relating hereto or thereto (whether or not effective), of the Agents in connection with their syndication efforts with respect to this Agreement and of the Agents, each Issuing Bank and each Lender in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "workout" or pursuant to any insolvency or bankruptcy proceedings; (ii) pay and hold each Agent, each Lender and each Issuing Bank harmless from and against any and all Other Taxes with respect to the foregoing matters and save each Agent, each Issuing Bank and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Agent, such Lender or such Issuing Bank) to pay such Other Taxes; and (iii) indemnify each Agent, each Lender, each Issuing Bank, each Secured Bank Product Provider, Existing Agent, Existing Lenders, Secured Bank Product Providers (as defined in the Existing Credit Agreement) and their respective Affiliates, the Existing Agent and the officers, directors, employees, agents (including attorneys and the Agent Consultant), trustees, representatives and investment advisors of each of the foregoing (each, an "Indemnified Person") from and hold each

of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) (but excluding Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, actions, costs, expenses and disbursements arising from a non-Tax claim) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (A) in connection with, or as a result of, or related to the entering into and/or performance of this Agreement, any other Credit Document, the Existing Credit Agreement or the Existing Loan Documents or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein, in any other Credit Document, in the Existing Credit Agreement or in any of the Existing Loan Documents or the exercise of any of their rights or remedies provided herein, in the other Credit Documents, in the Existing Credit Agreement or in the Existing Loan Documents, including any investigation, litigation or other proceeding (whether or not any Agent, any Issuing Bank, any Secured Creditor, Existing Agent, Existing Lender or any Secured Bank Product Provider (as defined in the Existing Credit Agreement is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party), (B) in connection with the Bankruptcy Cases, or (C) the actual or alleged presence of Hazardous Materials in the Environment relating in any way to any Vessel or Real Property owned, leased or operated, at any time, by the Lead Borrower or any of its Subsidiaries; the generation, storage, transportation, handling, Release or threat of Release of Hazardous Materials by the Lead Borrower or any of its Subsidiaries at any location, whether or not owned, leased or operated by the Lead Borrower or any of its Subsidiaries; the noncompliance by the Lead Borrower or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder); or any Environmental Claim asserted against the Lead Borrower, any of its Subsidiaries or relating in any way to any Vessel or Real Property at any time owned, leased or operated by the Lead Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable and documented fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnified Person (but excluding in each case any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the applicable Indemnified Person, any Affiliate of such Indemnified Person or any of their respective directors, officers, employees, representatives, agents, Affiliates, trustees or investment advisors (as determined by a court of competent jurisdiction in a final and non-appealable decision). To the extent that the undertaking to indemnify, pay or hold harmless any Agent, any Issuing Bank or any Lender or other Indemnified Person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Credit Parties shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

(b)     No Agent or any Indemnified Person shall be responsible or liable to any Credit Party or any other Person for (x) any determination made by it pursuant to this Agreement or any other Credit Document in the absence of gross negligence or willful misconduct on the part of such Indemnified Person (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (y) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems or (z) any indirect, special, exemplary, incidental, punitive or consequential

-155-

damages (including, without limitation, any loss of profits, business or anticipated savings) which may be alleged as a result of this Agreement or any other Credit Document or the financing contemplated hereby.

(c)     To the fullest extent permitted by applicable law, the Borrowers shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loans or the use of the proceeds thereof. No Indemnified Person referred to in subsection (a) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Person through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final and non-appealable judgment of a court of competent jurisdiction. For the avoidance of doubt, this paragraph shall not limit the obligation of the Borrowers to indemnify each Indemnified Person for any liabilities or damages incurred by such Indemnified Person that are asserted against such Indemnified Person by a third party that are payable by the Borrowers pursuant to subsection (a) of this Section.

(d)     The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender or Issuing Bank, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 13.02  Right of Setoff.

(a)     In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, each Issuing Bank and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) (other than accounts used exclusively for payroll, payroll taxes, fiduciary and trust purposes, and employee benefits) and any other Indebtedness at any time held or owing by the Administrative Agent, such Issuing Bank or such Lender (including, without limitation, by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of the Lead Borrower or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Secured Creditors under this Agreement or under any of the other Credit Documents, including, without limitation, all claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not a Secured Creditor shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

(b)     NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO ISSUING BANK OR LENDER SHALL

EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS OR APPROVED IN WRITING BY THE ADMINISTRATIVE AGENT, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE COLLATERAL AGENT OR THE SECURITY TRUSTEE PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXERCISE BY ANY ISSUING BANK OR ANY LENDER OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS OR THE ADMINISTRATIVE AGENT SHALL BE NULL AND VOID. THIS SUBSECTION (b) SHALL BE SOLELY FOR THE BENEFIT OF EACH ISSUING BANK, EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.

Section 13.03  Notices.

(a)     Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, teleicopier, cable communication or electronic transmission) and mailed, telegraphed, telexed, telecopied, cabled, delivered or transmitted: if to any Credit Party, AMERICAN COMMERCIAL LINES INC., 1701 East Market Street, Jeffersonville, IN 47130, Attn: Dawn Landry, General Counsel, Fax No. (812) 2880294, with a copy to Platinum Equity, LLC, 360 North Crescent Drive, Beverly Hills, CA 90210, Attention: Legal Department, Telecopier No.: (310) 7121863; if to any Lender, at its address specified on Schedule 13.03 (to the extent provided therein) or in writing to the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Lead Borrower and the Administrative Agent. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent and the Borrowers shall not be effective until received by the Administrative Agent or the Lead Borrower, as the case may be.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent, the Lead Borrower or Holdings may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Section 13.04  Benefit of Agreement; Assignments; Participations, etc.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that no Borrower may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of all of the Lenders and, provided, further, that, although any Lender may grant participations in its rights or obligations hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 2.11 and 13.04) and the participant, as the case may be, shall not constitute a "Lender" hereunder and, provided, further, that no Lender shall grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Revolving Loan in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory repayment of any Revolving Loan shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Revolving Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Borrower of any of its rights and obligations under this Agreement, (iii) modify any of the voting percentages set forth in Section 13.11 or the underlying definitions, (iv) except as otherwise expressly provided in the Security Documents, release all or substantially all of the Collateral under all the Security Documents supporting the Revolving Loans in which such participant is participating or (v) except as otherwise provided in the Credit Documents, release all or substantially all of the value of the Guaranty supporting the Loans in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto). Each Credit Party agrees that each participant shall be entitled to the benefits of Sections 3.01 and 5.01 (subject to the limitations and requirements of such Sections) to the same extent as if it were a Lender and had acquired its interest by assignment; provided, however, that a participant shall not be entitled to receive any greater payment under Section 3.01 or Section 5.01 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant except to the extent such entitlement to a greater payment results from a change in law after the sale of the participation takes place and the Participant shall in lieu of providing the forms or documentation required by Section 5.01(b) or 5.01(c) to the Administrative Agent or Lead Borrower, provide such forms or documentation to the Lender granting the participation who shall collect such forms and documentation on behalf of, and for the limited purpose thereof, as an agent of the Borrowers and Administrative Agent. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Lead Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest amounts) of each participant's interest in the Loans or other obligations under the Credit Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loan, or its other

obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form for the purposes of the Code, including pursuant to Section 5f.103-1(c) of the United States Treasury Regulations or its successor. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(a)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations hereunder to (i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this subclause (x)(i)(B)); provided that no such assignment may be made to any such Person that is, or would at such time constitute, a Defaulting Lender, or (ii) in the case of any Lender that is a fund that invests in loans, any other fund that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $5,000,000 (or such lesser amount as may be agreed to by the Administrative Agent) in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement (which Assignment and Assumption Agreement shall contain an acknowledgement and agreement by the respective assignee that, as a Lender, it shall be subject to, and bound by the terms of the Intercreditor Agreements), provided that (i) at such time, Schedule 2.01 shall be deemed modified to reflect the Commitments of such new Lender and of the existing Lenders, (ii) the consent of the (A) Administrative Agent, and (B) the Issuing Bank and the Swingline Lender shall (in either case) be required in connection with any such assignment pursuant to clause (y) above (which consent, in the case of each of clauses (A) and (B), shall not be unreasonably withheld or delayed), (iii) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a nonrefundable assignment fee of $3,500, which the Administrative Agent may waive in its sole discretion and (iv) no such transfer or assignment shall be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15. To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Revolving Loans. At the time of each assignment pursuant to this Section 13.04(b) to a Person that is not already a Lender hereunder, such assignee shall provide to the Administrative Agent and the Lead Borrower such Tax forms as are required to be provided under clauses (b) and (c) of Section 5.01.

(b)     **[reserved]**.

(c)      Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrowers), any Lender which is a fund may pledge all or any portion of its Loans to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be. No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)      Each Lender acknowledges and agrees to comply with the provisions of Section 13.04 applicable to it as a Lender hereunder.

Section 13.05  No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrowers or any other Credit Party and the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender to any other or further action in any circumstances without notice or demand.

Section 13.06  **[reserved]**.

Section 13.07  Calculations; Computations.

(a)      The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with U.S. GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto); provided that (except as otherwise specifically provided herein), all computations of the Applicable Margin, and all computations and all definitions (including accounting terms) used in this Agreement, shall utilize U.S. GAAP and policies in conformity with those used to prepare the audited financial statements of the Lead Borrower for the fiscal year of the Lead Borrower ended December 31, 2018. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect).

(b)      The calculation of any financial ratios under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-down if there is no nearest number).

All such calculations shall include as Indebtedness the present value of long-term leases of revenue-generating equipment and Vessels.

Section 13.08 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.

(a)     THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN THE RELEVANT SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT (EXCEPT THAT, (X) IN THE CASE OF ANY MORTGAGE OR OTHER SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT OR COLLATERAL AGENT IN THE STATE IN WHICH THE RELEVANT MORTGAGED PROPERTY OR COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION AND (Y) IN THE CASE OF ANY BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS WITH RESPECT TO ANY CREDIT PARTY, ACTIONS OR PROCEEDINGS RELATED TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY BE BROUGHT IN SUCH COURT HOLDING SUCH BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS) MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, OR THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH OF THE PARTIES HERETO OR THERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND HEREBY AGREES TO WAIVE ANY RIGHTS IT MAY HAVE TO OBJECT TO ADJUDICATION BY A JUDGE OF THE BANKRUPTCY COURT ON THE BASIS OF A RIGHT TO HAVE MATTERS ADJUDICATED IN FRONT OF AN ARTICLE III JUDGE. EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER IT, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENTS BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER IT. EACH PARTY HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY, AS THE CASE MAY BE, AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE ON THE EARLIER OF ACTUAL RECEIPT OR 30 DAYS AFTER SUCH MAILING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL

AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER SUCH PARTY IN ANY OTHER JURISDICTION.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 13.09  Counterparts.   This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Lead Borrower and the Administrative Agent.

Section 13.10  Headings Descriptive.  The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 13.11  Amendment or Waiver; etc.

(a)     Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Lead Borrower on behalf of the Credit Parties party hereto or thereto and the Required Lenders and acknowledged by the Administrative Agent (although additional parties may be added to (and annexes may be modified to reflect such additions) the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders); provided that no such change, waiver, discharge or termination shall (i) without the prior written consent of each Lender (and Issuing Bank, if applicable) directly and adversely affected thereby, extend the final scheduled maturity of any Revolving Commitment, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with applicability of any post-default increase in interest rates) or reduce or forgive the principal amount thereof, (ii) except as otherwise expressly provided in the Security Documents, release all or substantially all of the Collateral under all the Security Documents without the prior written consent of each Lender, (iii) except as otherwise provided in the Credit Documents, release all or

substantially all of the value of the Guaranty without the prior written consent of each Lender, (iv) amend, modify or waive any pro rata sharing provision of <u>Section 2.10</u>, the payment waterfall provision of <u>Section 11.13</u>, or any provision of this <u>Section 13.11(a)</u> (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Revolving Commitments on the Closing Date), in each case, without the prior written consent of each Lender directly and adversely affected thereby, (v) reduce the percentage specified in the definition of Required Lenders or Supermajority Lenders without the prior written consent of each Lender or (vi) consent to the assignment or transfer by any Borrower of any of its rights and obligations under this Agreement without the consent of each Lender; provided further that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Aggregate Commitments shall not constitute an increase of the Commitment of any Lender), (2) without the consent of each Agent adversely affected thereby, amend, modify or waive any provision of Article 12 or any other provision as same relates to the rights or obligations of such Agent, (3) without the consent of Collateral Agent or the Security Trustee, as applicable, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent or the Security Trustee, as applicable, (4) without the consent of an Issuing Bank or the Swingline Lender, amend, modify or waive any provision relating to the rights or obligations of the such Issuing Bank or Swingline Lender, (5) without the prior written consent of the Supermajority Lenders, change the definition of the term "<u>Availability</u>" or "<u>Borrowing Base</u>" or any component definition used therein (including, without limitation, the definitions of "<u>Eligible Accounts</u>", "<u>Eligible Inventory</u>" and "<u>Eligible Vessels</u>") if, as a result thereof, the amounts available to be borrowed by the Borrowers would be increased; provided that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves and (6) without the prior written consent of the Supermajority Lenders, increase the percentages set forth in the term "<u>Borrowing Base</u>" or add any new classes of eligible assets thereto.

(b)      If, in connection with any proposed change, waiver, discharge or termination of any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to <u>Section 13.11(a)</u>, the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Administrative Agent or Lead Borrower shall have the right, so long as all nonconsenting Lenders whose individual consent is required are treated as described in either clause (A) or (B) below, to either (A) replace each such nonconsenting Lender or Lenders with one or more Replacement Lenders pursuant to <u>Section 3.04</u> so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination or (B) terminate such nonconsenting Lender's Commitments and/or repay the outstanding Revolving Loans of such Lender in accordance with <u>Section 3.04</u>; provided that, unless the Commitments that are terminated, and Revolving Loans repaid, pursuant to the preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B) the Required Lenders (determined after giving effect to the proposed action) shall specifically consent thereto; provided further that in any event the Administrative Agent and Lead Borrower shall not have the right to replace a Lender, terminate its Commitments or repay its Revolving Loans solely as a result of the exercise of such

Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to <u>Section 13.11(a)</u>.

        (c)      **[Reserved**].

        (d)      **[Reserved.]**

        (e)      Notwithstanding anything to the contrary herein, any fee letter may be amended, or rights and privileges thereunder waived, in a writing executed only by the parties thereto.

        (f)      Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments, waivers and consents hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Required Lenders or all of the Lenders, as required, have approved any such amendment, waiver or consent (and the definitions of "<u>Supermajority</u>" and "<u>Required Lenders</u>" will automatically be deemed modified accordingly for the duration of such period); provided that any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to such Defaulting Lender hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Lender.

        (g)      Further, notwithstanding anything to the contrary contained in this <u>Section 13.12</u>, if following the Closing Date, the Administrative Agent and any Credit Party shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents, then the Administrative Agent and the Lead Borrower, on behalf of Credit Parties, shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

        Section 13.12  <u>Survival</u>.  All indemnities set forth herein including, without limitation, in <u>Sections 3.01</u>, <u>3.02</u>, <u>5.01</u>, <u>12.07</u> and <u>13.01</u> shall survive the execution, delivery and termination of this Agreement and the making and repayment of the Obligations.  To the extent of any conflict between the terms of the Financing Order and the terms of this Agreement, the terms of the Financing Order shall govern and control.

        Section 13.13  <u>Domicile of Loans</u>.  Each Lender may transfer and carry its Revolving Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this <u>Section 13.13</u> would, at the time of such transfer, result in increased costs under <u>Section 3.01</u> or <u>5.01</u> from those being charged by the respective Lender prior to such transfer, then the Borrowers shall not be obligated to pay such increased costs (although the Borrowers shall be

obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

Section 13.14 <u>Register</u>.  The Borrowers hereby designate the Administrative Agent to serve as their agent, solely for purposes of this <u>Section 13.14</u>, to maintain a register (the "<u>Register</u>") on which the Administrative Agent will record the Commitments from time to time of each of the Lenders, the Revolving Commitments and principal amount of Revolving Loans and LC Obligations by each of the Lenders and the stated interest on, and each repayment in respect of the principal amount of, the Loans of each Lender. Holdings, the Lead Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive absent manifest error for such purposes), notwithstanding notice to the contrary. With respect to any Lender, the transfer of the Commitments of, and the principal (and interest) amounts of the Revolving Loans owing to, such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Revolving Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Revolving Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Revolving Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to <u>Section 13.04</u>. Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan.  It is intended that the Register be maintained such that the Loans and Commitments are in registered form for the purposes of the Code.

Section 13.15 <u>Confidentiality</u>.

(a)     Subject to the provisions of clause (b) of this <u>Section 13.15</u>, each Agent and each Lender agrees that it will use its commercially reasonable efforts not to disclose without the prior consent of the Lead Borrower (other than to its affiliates and its and their respective directors, officers, employees, auditors, advisors or counsel) or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information; provided such Persons shall be subject to the provisions of this <u>Section 13.15</u> to the same extent as such Lender (or language substantially similar to this <u>Section 13.15(a)</u>) any material, non-public information with respect to the Lead Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this <u>Section 13.15(a)</u> by such Lender, (ii) as may be required or appropriate by regulatory authorities including in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, the Collateral Agent or the

Security Trustee, (vi) to any prospective or actual direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this <u>Section 13.15</u> (or language substantially similar to this <u>Section 13.15(a)</u>), (vii) to any prospective or actual transferee, pledgee or participant in connection with any contemplated transfer, pledge or participation of any of the Commitments or any interest therein by such Lender, (viii) has become available to any Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than Holdings, the Borrowers or any Subsidiary thereof, and which source is not known by such Person to be subject to a confidentiality restriction in respect thereof in favor of the Borrowers or any Affiliate of the Borrowers, provided that such prospective transferee, pledge or participant agrees to be bound by the confidentiality provisions contained in this <u>Section 13.15</u> (or language substantially similar to this <u>Section 13.15(a)</u>) and (ix) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that (A) prior to any disclosure under this clause (ix), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (B) any disclosure under this clause (ix) shall be limited to the portion of the confidential information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (x) as may be agreed to in advance in writing by Borrowers, (xi) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement; provided, that prior to receipt of confidential information any such assignee, participant, or pledgee shall have agreed in writing to receive such confidential information either subject to the terms of this Section 13.15 or pursuant to confidentiality requirements substantially similar to those contained in this Section 13.5 (and such Person may disclose such confidential information to Persons employed or engaged by them as described above) and (xii) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Credit Document; provided, further, that, to the extent permitted pursuant to any applicable law, order, regulation or ruling, and other than in connection with credit and other bank examinations conducted in the ordinary course with respect to such Lender, in the case of any disclosure pursuant to the foregoing clause (ii), (iii) or (iv), to the extent permitted by law, such Lender will use its commercially reasonable efforts to notify the Lead Borrower in advance of such disclosure so as to afford the Lead Borrower the opportunity to protect the confidentiality of the information proposed to be so disclosed.

(b)     The Borrowers hereby acknowledge and agree that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to Holdings, the Lead Borrower or any of its Subsidiaries (including, without limitation, any nonpublic customer information regarding the creditworthiness of Holdings, the Lead Borrower and its Subsidiaries); provided such Persons shall be subject to the provisions of this <u>Section 13.16</u> to the same extent as such Lender.

Section 13.16  <u>USA Patriot Act Notice</u>. Each Lender hereby notifies each Credit Party that pursuant to the requirements of the USA PATRIOT Act Title III of Pub. 10756 (signed into law October 26, 2001 and amended on March 9, 2009) (the "<u>Patriot Act</u>"), it is required to obtain, verify, and record information that identifies Holdings, the Borrowers and each Subsidiary Guarantor, which information includes the name of each Credit Party and other information

(including a Beneficial Ownership Certificate) that will allow such Lender to identify the Credit Party in accordance with the Patriot Act, and each Credit Party agrees to provide such information from time to time to any Lender.

Section 13.17  **[reserved]**.

Section 13.18  <u>Waiver of Sovereign Immunity</u>.  Each of the Credit Parties, in respect of itself, its Subsidiaries, its process agents, and its properties and revenues, hereby irrevocably agrees that, to the extent that Holdings, the Borrowers, or any of their respective Subsidiaries or any of their respective properties has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States or elsewhere, to enforce or collect upon the Loans or any Credit Document or any other liability or obligation of Holdings, the Borrowers, or any of their respective Subsidiaries related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, Holdings and the Borrowers, for themselves and on behalf of their respective Subsidiaries, hereby expressly waive, to the fullest extent permissible under applicable law, any such immunity, and agree not to assert any such right or claim in any such proceeding, whether in the United States or elsewhere. Without limiting the generality of the foregoing, Holdings and the Borrowers further agree that the waivers set forth in this <u>Section 13.18</u> shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

Section 13.19  **[reserved]**.

Section 13.20  <u>INTERCREDITOR AGREEMENTS</u>.

(a)  EACH LENDER PARTY HERETO UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT IT (AND EACH OF ITS SUCCESSORS AND ASSIGNS) AND EACH OTHER LENDER (AND EACH OF THEIR SUCCESSORS AND ASSIGNS) SHALL BE BOUND BY THE INTERCREDITOR AGREEMENTS (AS AMENDED BY THE FINANCING ORDER), WHICH IN CERTAIN CIRCUMSTANCES MAY REQUIRE (AS MORE FULLY PROVIDED THEREIN) THE TAKING OF CERTAIN ACTIONS BY THE LENDERS, INCLUDING THE PURCHASE AND SALE OF PARTICIPATIONS BY VARIOUS LENDERS TO EACH OTHER IN ACCORDANCE WITH THE TERMS THEREOF.

(b)  THE PROVISIONS OF THIS <u>SECTION 13.20</u> ARE NOT INTENDED TO SUMMARIZE OR FULLY DESCRIBE THE PROVISIONS OF THE INTERCREDITOR AGREEMENTS. REFERENCE MUST BE MADE TO EACH INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENTS AND THE TERMS AND PROVISIONS THEREOF, AND NO AGENT OR ANY OF AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENTS. A COPY OF THE

INTERCREDITOR AGREEMENTS MAY BE OBTAINED FROM THE ADMINISTRATIVE AGENT.

(c)    THE INTERCREDITOR AGREEMENTS ARE AGREEMENTS SOLELY AMONGST THE LENDERS (AND THEIR SUCCESSORS AND ASSIGNS) AND ARE NOT AGREEMENTS TO WHICH HOLDINGS OR ANY OF ITS SUBSIDIARIES IS PARTY. AS MORE FULLY PROVIDED THEREIN, THE INTERCREDITOR AGREEMENTS CAN ONLY BE AMENDED BY THE PARTIES THERETO IN ACCORDANCE WITH THE PROVISIONS THEREOF.

Section 13.21  Absence of Fiduciary Relationship.  Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, (i) none of the Lead Arrangers, the Syndication Agents or any Lender shall, solely by reason of this Agreement or any other Credit Document, have any fiduciary, advisory or agency relationship or duty in respect of any Lender or any other Person and (ii) Holdings and the Borrowers hereby waive, to the fullest extent permitted by law, any claims they may have against the Lead Arrangers, the Syndication Agents or any Lender for breach of fiduciary duty or alleged breach of fiduciary duty.

Section 13.22  Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumption Agreements, amendments or other Notice of Borrowings, waivers and consents) shall be deemed to include the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability, the use of a paper-based recordkeeping system, as the case may be. Notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it. The Administrative Agent's electronic platform or portal is provided "as is" and "as available."  No Agent warrants the adequacy of such electronic platform or portal and expressly disclaims liability for errors or omissions in the communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Administrative Agent's electronic platform or portal.  In no event shall any Agent or any of the Agent-Related Persons have any liability to the Credit Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct. Each Credit Party further agrees that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Credit Parties or their securities) (each, a "Public Lender").  The Credit Parties shall be deemed to have authorized the Administrative Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Credit Parties or their securities for purposes of United States federal and state securities laws.  All Borrower Materials marked "PUBLIC" are permitted to be

made available through a portion of the Administrative Agent's electronic platform or portal designated as "Public Investor" (or another similar term).  The Administrative Agent and its Affiliates and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Administrative Agent's electronic platform or portal not marked as "Public Investor" (or such other similar term).

Section 13.23  Entire Agreement.  This Agreement and the other Credit Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements among the parties.

ARTICLE 14  Credit Agreement Party Guaranty.

Section 14.01  The Guaranty. In order to induce the Agents, the Collateral Agent, the Security Trustee and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Secured Creditors to enter into Secured Bank Product Obligations in recognition of the direct benefits to be received by each Credit Agreement Party from the proceeds of the Revolving Loans and the entering into of such Secured Bank Product Obligations, each Credit Agreement Party hereby agrees with the Secured Creditors as follows: each Credit Agreement Party hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of its Relevant Guaranteed Obligations to the Secured Creditors. If any or all of the Relevant Guaranteed Obligations of any Credit Agreement Party to the Secured Creditors becomes due and payable hereunder, such Credit Agreement Party, unconditionally and irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Secured Creditors, or order, on demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Secured Creditors in collecting any of the Relevant Guaranteed Obligations. This Credit Agreement Party Guaranty is a guaranty of payment and not of collection. This Credit Agreement Party Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Relevant Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including any Relevant Guaranteed Party), then and in such event the respective Credit Agreement Party agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Credit Agreement Party, notwithstanding any revocation of this Credit Agreement Party Guaranty or any other instrument evidencing any liability of any Relevant Guaranteed Party, and each Credit Agreement Party shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

Section 14.02  Bankruptcy.  Additionally, each Credit Agreement Party unconditionally and irrevocably guarantees the payment of any and all of its Relevant Guaranteed Obligations to the Secured Creditors whether or not due or payable by any Relevant Guaranteed Party upon the

occurrence of any of the events specified in <u>Section 11.05</u>, and irrevocably and unconditionally promises to pay such indebtedness to the Secured Creditors, or order, on demand, in lawful money of the United States.

Section 14.03   <u>Nature of Liability</u>.   The liability of each Credit Agreement Party hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Relevant Guaranteed Obligations, whether executed by any other guarantor or by any other party, and each Credit Agreement Party understands and agrees, to the fullest extent permitted under law, that the liability of such Credit Agreement Party hereunder shall not be affected or impaired by (a) any direction as to application of payment by any Relevant Guaranteed Party or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Relevant Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking (other than payment in cash of the Relevant Guaranteed Obligations), or (d) any dissolution, termination or increase, decrease or change in personnel by any Relevant Guaranteed Party, or (e) any payment made to any Secured Creditor on the Relevant Guaranteed Obligations which any such Secured Creditor repays to any Relevant Guaranteed Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Credit Agreement Party waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction by the Secured Creditors as contemplated in <u>Section 14.05</u>, or (g) any invalidity, irregularity or enforceability of all or any part of the Relevant Guaranteed Obligations or of any security therefor.

Section 14.04   <u>Independent Obligation</u>.   The obligations of each Credit Agreement Party hereunder are independent of the obligations of any other guarantor, any other party or any Relevant Guaranteed Party, and a separate action or actions may be brought and prosecuted against any Credit Agreement Party whether or not action is brought against any other guarantor, any other party or any Relevant Guaranteed Party and whether or not any other guarantor, any other party or any Relevant Guaranteed Party be joined in any such action or actions. Each Credit Agreement Party waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by any Relevant Guaranteed Party or other circumstance which operates to toll any statute of limitations as to such Relevant Guaranteed Party shall operate to toll the statute of limitations as to the relevant Credit Agreement Party.

Section 14.05   <u>Authorization</u>.   To the fullest extent permitted under law, each Credit Agreement Party authorizes the Secured Creditors without notice or demand, and without affecting or impairing its liability hereunder, from time to time to:

(a)   change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Relevant Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Credit Agreement Party Guaranty shall apply to the Relevant Guaranteed Obligations as so changed, extended, renewed or altered;

(b)     take and hold security for the payment of the Relevant Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Relevant Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)     exercise or refrain from exercising any rights against any Relevant Guaranteed Party, any other Credit Party or others or otherwise act or refrain from acting;

(d)     release or substitute any one or more endorsers, guarantors, any Relevant Guaranteed Party, other Credit Parties or other obligors;

(e)     settle or compromise any of the Relevant Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Relevant Guaranteed Party to its creditors other than the Secured Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of any Relevant Guaranteed Party to the Secured Creditors regardless of what liability or liabilities of such Relevant Guaranteed Party remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document, any Secured Bank Product Obligation or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document, any Secured Bank Product Obligation or any of such other instruments or agreements; and/or

(h)     take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Credit Agreement Party from its liabilities under this Credit Agreement Party Guaranty.

Section 14.06  <u>Reliance</u>.  It is not necessary for any Secured Creditor to inquire into the capacity or powers of any Relevant Guaranteed Party or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Relevant Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

Section 14.07  <u>Subordination</u>.  Any indebtedness of any Relevant Guaranteed Party now or hereafter owing to any Credit Agreement Party is hereby subordinated to the Relevant Guaranteed Obligations of such Relevant Guaranteed Party owing to the Secured Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of such Relevant Guaranteed Party to such Credit Agreement Party shall be collected, enforced and received by such Credit Agreement Party for the benefit of the Secured Creditors and be paid over to the Administrative Agent on behalf of the Secured Creditors on account of the Relevant Guaranteed Obligations of such Relevant Guaranteed Party to the Secured Creditors, but without affecting or impairing in any manner the liability of any Credit Agreement Party under the other provisions of this Credit Agreement Party Guaranty. Without limiting the generality of the

foregoing, each Credit Agreement Party hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Credit Agreement Party Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Relevant Guaranteed Obligations have been irrevocably paid in full in cash.

Section 14.08  Waiver.

(a)  Each Credit Agreement Party waives any right (except as shall be required by applicable law and cannot be waived) any right to require any Secured Creditor to (i) proceed against any Relevant Guaranteed Party, any other guarantor or any other party, (ii) proceed against or exhaust any security held from any Relevant Guaranteed Party, any other guarantor or any other party or (iii) pursue any other remedy in any Secured Creditor's power whatsoever. Each Credit Agreement Party waives any defense (except as shall be required by applicable statute and cannot be waived) based on or arising out of any defense of any Relevant Guaranteed Party, any other guarantor or any other party, other than payment of the Relevant Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of any Relevant Guaranteed Party, any other guarantor or any other party, or the validity, legality or unenforceability of the Relevant Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Relevant Guaranteed Party other than payment of the Relevant Guaranteed Obligations to the extent of such payment. The Secured Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent, the Security Trustee or any other Secured Creditor by one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against any Relevant Guaranteed Party or any other party, or any security, without affecting or impairing in any way the liability of any Credit Agreement Party hereunder except to the extent the Relevant Guaranteed Obligations have been paid. Each Credit Agreement Party waives, to the fullest extent permitted under law, any defense arising out of any such election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Credit Agreement Party against any Relevant Guaranteed Party or any other party or any security.

(b)  Each Credit Agreement Party waives, to the fullest extent permitted under law, all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Credit Agreement Party Guaranty, and notices of the existence, creation or incurring of new or additional Relevant Guaranteed Obligations. Each Credit Agreement Party assumes all responsibility for being and keeping itself informed of each Relevant Guaranteed Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Relevant Guaranteed Obligations and the nature, scope and extent of the risks which such Credit Agreement Party assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Secured Creditors shall have any duty to advise any Credit Agreement Party of information known to them regarding such circumstances or risks.

Section 14.09  Maximum Liability.  It is the desire and intent of each Credit Agreement Party and the Secured Creditors that this Credit Agreement Party Guaranty shall be enforced against such Credit Agreement Party to the fullest extent permissible under the laws and public

policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of any Credit Agreement Party under this Credit Agreement Party Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of such Credit Agreement Party's obligations under this Credit Agreement Party Guaranty shall be deemed to be reduced and such Credit Agreement Party shall pay the maximum amount of the Relevant Guaranteed Obligations which would be permissible under applicable law.

Section 14.10  <u>Payments</u>.  All payments made by a Credit Agreement Party pursuant to this Article 14 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of <u>Section 2.06</u>.

Section 14.11  <u>Keepwell</u>.  Each Credit Agreement Party that is a Qualified ECP Guarantor (as defined below) at the time the Credit Agreement Party Guaranty or the grant of the security interest under the Credit Documents, in each case, by any Specified Credit Party, becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Credit Party with respect to such Swap Obligation as may be needed by such Specified Credit Party from time to time to honor all of its obligations under this Credit Agreement Party Guaranty and the other Credit Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this <u>Section 14.11</u> voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this <u>Section 14.11</u> shall remain in full force and effect until the Guaranteed Obligations have been indefeasibly paid and performed in full. Each Qualified ECP Guarantor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Credit Party for all purposes of the Commodity Exchange Act. "<u>Qualified ECP Guarantor</u>" shall mean, in respect of any Swap Obligation, each Credit Agreement Party that has total assets exceeding $10,000,000 at the time the Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act. A "<u>Specified Credit Party</u>" shall mean any Credit Agreement Party that is not "an eligible contract participant" under the Commodity Exchange Act (determined after giving effect to this <u>Section 14.11</u>).

Section 14.12  <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 14.13  Acknowledgement Regarding Any Supported QFCs.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).  In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

*      *      *

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

**AMERICAN COMMERCIAL LINES INC.,**
as Holdings


By:_____
Name: _____
Title: _____

**COMMERCIAL BARGE LINE COMPANY**,
as Lead Borrower


By:_____
Name: _____
Title: _____

**AMERICAN COMMERCIAL BARGE LINE LLC,**
as a Borrower


By:_____
Name: _____
Title: _____

**ACBL TRANSPORTATION SERVICES LLC,**
as a Borrower


By:_____
Name: _____
Title: _____

**ACBL RIVER OPERATIONS LLC**, as a Borrower


By:_____
Name: _____
Title: _____

**WELLS FARGO CAPITAL FINANCE, LLC**,
as Administrative Agent, Collateral Agent, Security
Trustee, a Lender and an Issuing Bank


By: _____

Name: _____

Title: _____

**BANK OF AMERICA, N.A.**, as a Lender

By:_____
Name: _____
Title: _____

**UBS AG, STAMFORD BRANCH**, as a Lender

By:_____
Name: _____
Title: _____


By:_____
Name: _____
Title: _____

**PNC BANK, NATIONAL ASSOCIATION**,
as a Lender


By:_____
Name: _____
Title: _____

**MUFG UNION BANK, NA**., as a Lender


By:_____
Name: _____
Title: _____

**CITIZENS BUSINESS CAPITAL, F/K/A RBS CITIZENS BUSINESS CAPITAL, A DIVISION OF CITIZENS ASSET FINANCE, INC., F/K/A RBS ASSET FINANCE, INC., A SUBSIDIARY OF CITIZENS BANK, N.A., F/K/A RBS CITIZENS, N.A.**, as a Lender

By:_____

Name: _____

Title: _____

**THE HUNTINGTON NATIONAL BANK**,
as a Lender


By:_____
Name: _____
Title: _____

**DEUTSCHE BANK AG NEW YORK BRANCH**, as a Lender

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

**<u>Exhibit C</u>**

**DIP Credit Agreement**

DPW DRAFT 02/06/2020

**SENIOR SECURED DEBTOR-IN-POSSESSION**
**TERM LOAN CREDIT AGREEMENT**

**among**

**AMERICAN COMMERCIAL LINES INC.**
**a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**as Holdings,**

**COMMERCIAL BARGE LINE COMPANY**
**a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**as Borrower,**

**THE LENDERS PARTY HERETO**

**and**

**CORTLAND CAPITAL MARKET SERVICES LLC,**
**as Administrative Agent**

**Dated as of February [__], 2020**

#92796342v15

DPW DRAFT 02/06/2020

## TABLE OF CONTENTS

Page

ARTICLE 1    Definitions and Accounting Terms. ........................................................................ 1
    Section 1.01    Defined Terms ........................................................................................ 1
    Section 1.02    Terms Generally and Certain Interpretive Provisions ...................................... 34
    Section 1.03    Performance; Time. ................................................................................ 35
    Section 1.04    Divisions .............................................................................................. 35
ARTICLE 2    Amount and Terms of Credit. .............................................................................. 36
    Section 2.01    The Term Commitments ........................................................................... 36
    Section 2.02    Loans. .................................................................................................. 36
    Section 2.03    Borrowing Procedure .............................................................................. 37
    Section 2.04    Evidence of Debt; Repayment of Loans. ....................................................... 37
    Section 2.05    Fees; Discounts; Premium. ....................................................................... 38
    Section 2.06    Interest on Loans. ................................................................................... 39
    Section 2.07    Termination and Reduction of Commitments. ................................................ 40
    Section 2.08    Interest Elections. ................................................................................... 40
    Section 2.09    Optional and Mandatory Prepayments of Loans. ............................................ 41
    Section 2.10    Payments Generally; Pro Rata Treatment; Sharing of Setoffs. ........................... 42
    Section 2.11    Defaulting Lenders. ................................................................................ 44
    Section 2.12    [Reserved]. ........................................................................................... 45
    Section 2.13    [Reserved]. ........................................................................................... 45
    Section 2.14    [Reserved]. ........................................................................................... 45
    Section 2.15    [Reserved.] ........................................................................................... 45
    Section 2.16    [Reserved.] ........................................................................................... 45
    Section 2.17    [Reserved.] ........................................................................................... 45
    Section 2.18    [Reserved.] ........................................................................................... 45
    Section 2.19    [Reserved.] ........................................................................................... 45
    Section 2.20    Superpriority ......................................................................................... 45
    Section 2.21    Waiver of any Priming Rights ................................................................... 45
    Section 2.22    Existing Fleet Mortgages. ........................................................................ 46
ARTICLE 3    Yield Protection, Illegality and Replacement of Lenders ........................................... 46
    Section 3.01    Increased Costs, Illegality, etc. ................................................................. 46

#92796342v15

Section 3.02   Compensation ................................................................. 48

Section 3.03   Change of Lending Office .................................................. 48

Section 3.04   Replacement of Lenders ..................................................... 48

Section 3.05   Inability to Determine Rates ............................................... 49

Section 3.06   Effect of Benchmark Transition Event. ............................... 50

ARTICLE 4    [Reserved] ...................................................................... 50

ARTICLE 5    Taxes. .............................................................................. 51

Section 5.01   Net Payments. ................................................................... 51

ARTICLE 6    Conditions Precedent to Credit Events on the Closing Date. ............................... 53

Section 6.01   Closing Date; Credit Documents ........................................ 53

Section 6.02   Five Year Plan .................................................................. 54

Section 6.03   Corporate Documents; Proceedings, etc. ............................ 54

Section 6.04   Bankruptcy Conditions. ..................................................... 54

Section 6.05   Restructuring Support Agreement. ..................................... 55

Section 6.06   Security Agreements .......................................................... 55

Section 6.07   Subsidiaries Guaranty ........................................................ 56

Section 6.08   [Reserved]. ........................................................................ 56

Section 6.09   ABL DIP Credit Agreement ............................................... 56

Section 6.10   Fees, etc. ........................................................................... 56

Section 6.11   [Reserved] .......................................................................... 56

Section 6.12   Patriot Act ......................................................................... 56

Section 6.13   Borrowing Notice ............................................................... 57

Section 6.14   Material Adverse Effect ...................................................... 57

Section 6.15   [Reserved]. ......................................................................... 57

Section 6.16   [Reserved] .......................................................................... 57

Section 6.17   Officer's Certificate ........................................................... 57

Section 6.18   KYC Documentation; Anti-Money Laundering. ................. 57

ARTICLE 7    Conditions Precedent to All Credit Events. ......................... 57

Section 7.01   Notice of Borrowing .......................................................... 57

Section 7.02   [Reserved.] ........................................................................ 58

Section 7.03   No Default ......................................................................... 58

Section 7.04   Representations and Warranties .......................................... 58

Section 7.05   No Injunction ..................................................................... 58

Section 7.06   **[Reserved.]** ................................................................................. 58

Section 7.07   **[Reserved.]** ................................................................................. 58

ARTICLE 8    Representations, Warranties and Agreements ...................................... 58

Section 8.01   Organizational Status ....................................................................... 58

Section 8.02   Power and Authority ......................................................................... 59

Section 8.03   No Violation ...................................................................................... 59

Section 8.04   Approvals .......................................................................................... 59

Section 8.05   Financial Condition .......................................................................... 59

Section 8.06   Litigation ........................................................................................... 60

Section 8.07   True and Complete Disclosure ......................................................... 60

Section 8.08   Use of Proceeds ................................................................................ 60

Section 8.09   Tax Returns and Payments ............................................................... 60

Section 8.10   ERISA ................................................................................................ 61

Section 8.11   The Security Documents ................................................................... 62

Section 8.12   Properties .......................................................................................... 63

Section 8.13   Capitalization .................................................................................... 63

Section 8.14   Subsidiaries ...................................................................................... 64

Section 8.15   Compliance with Statutes, OFAC Rules and Regulations; Patriot Act; FCPA ................................................................................................ 64

Section 8.16   Investment Company Act .................................................................. 64

Section 8.17   [Reserved.] ........................................................................................ 65

Section 8.18   Environmental Matters ..................................................................... 65

Section 8.19   Labor Relations ................................................................................. 65

Section 8.20   Intellectual Property ......................................................................... 65

Section 8.21   Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; etc ............................... 66

Section 8.22   [Reserved] .......................................................................................... 66

Section 8.23   [Reserved] .......................................................................................... 66

Section 8.24   Citizenship ........................................................................................ 66

Section 8.25   [Reserved] .......................................................................................... 66

Section 8.26   Financing Order ................................................................................ 66

Section 8.27   Exit Financing Commitment Letter .................................................. 66

Section 8.28   Restructuring Support Agreement .................................................... 66

Section 8.29   Bankruptcy Cases.................................................................. 66

Section 8.30   Financing Order ................................................................... 66

Section 8.31   Insurance ............................................................................ 67

Section 8.32   Margin Stock....................................................................... 67

ARTICLE 9   Affirmative Covenants............................................................ 67

Section 9.01   Information Covenants......................................................... 67

Section 9.02   Books, Records and Inspections. ......................................... 70

Section 9.03   Maintenance of Property; Insurance. ................................... 71

Section 9.04   Existence; Franchises .......................................................... 72

Section 9.05   Compliance with Statutes, etc.............................................. 73

Section 9.06   Compliance with Environmental Laws. ................................ 73

Section 9.07   ERISA ................................................................................ 74

Section 9.08   Performance of Obligations ................................................ 74

Section 9.09   Payment of Taxes................................................................ 74

Section 9.10   [Reserved.] ......................................................................... 75

Section 9.11   Additional Security; Further Assurances; etc. ..................... 75

Section 9.12   Post-Closing Actions .......................................................... 77

Section 9.13   [**Reserved**]. ...................................................................... 77

Section 9.14   [**Reserved**] ........................................................................ 77

Section 9.15   [Reserved.] ......................................................................... 77

Section 9.16   Maritime and Other Regulatory Matters............................... 77

Section 9.17   OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering
Laws ................................................................................... 78

Section 9.18   Bankruptcy Transaction Milestones ..................................... 78

Section 9.19   Consultant .......................................................................... 78

Section 9.20   [Reserved.] ......................................................................... 78

Section 9.21   [Reserved]. ......................................................................... 78

Section 9.22   Bankruptcy Covenants ........................................................ 78

Section 9.23   Bankruptcy Cases................................................................ 79

Section 9.24   Budget Matters.................................................................... 79

ARTICLE 10  Negative Covenants ............................................................... 80

Section 10.01  Liens................................................................................... 80

Section 10.02  Consolidation, Merger, or Sale of Assets, etc....................... 85

Section 10.03  Dividends ................................................................................ 88

Section 10.04  Indebtedness ........................................................................... 91

Section 10.05  Advances, Investments and Loans ......................................... 93

Section 10.06  Transactions with Affiliates ................................................... 97

Section 10.07  Limitations on Payments, Certificate of Incorporation, By-Laws and
                           Certain Other Agreements, etc ........................................... 98

Section 10.08  Limitation on Certain Restrictions on Subsidiaries ............... 99

Section 10.09  Business; Fiscal Year; Activities of Holdings. ...................... 100

Section 10.10  Negative Pledges .................................................................... 101

Section 10.11  Financial Covenant ................................................................ 102

Section 10.12  Use of Proceeds ..................................................................... 103

Section 10.13  Financing Order; Administrative Expense Priority; Payments ...................... 104

Section 10.14  Restructuring Support Agreement .......................................... 104

Section 10.15  Key Employees ....................................................................... 104

ARTICLE 11  Events of Default ............................................................................. 105

Section 11.01  Payments ................................................................................ 105

Section 11.02  Representations, etc ................................................................ 105

Section 11.03  Covenants ............................................................................... 105

Section 11.04  Default Under Other Agreements ........................................... 105

Section 11.05  Bankruptcy, etc ...................................................................... 105

Section 11.06  ERISA ..................................................................................... 106

Section 11.07  Security Documents ................................................................ 106

Section 11.08  Guaranties .............................................................................. 106

Section 11.09  Judgments .............................................................................. 107

Section 11.10  Change of Control .................................................................. 107

Section 11.11  Bankruptcy Matters ................................................................ 107

Section 11.12  Consultant .............................................................................. 109

Section 11.13  Application of Funds ............................................................... 110

ARTICLE 12  The Administrative Agent ................................................................ 111

Section 12.01  Appointment and Authorization. ............................................ 111

Section 12.02  Delegation of Duties .............................................................. 112

Section 12.03  Exculpatory Provisions ........................................................... 112

Section 12.04  Reliance by Administrative Agent .......................................... 113

Section 12.05 [Reserved.] ................................................................................. 114

Section 12.06 Non-reliance on Administrative Agent and Other Lenders ........................... 114

Section 12.07 Indemnification by the Lenders ................................................................. 114

Section 12.08 [Reserved]. ................................................................................. 114

Section 12.09 Administrative Agent May File Proofs of Claim; Credit Bidding ................. 114

Section 12.10 Resignation of the Agents. ................................................................ 116

Section 12.11 Collateral Matters and Guaranty Matters .................................................... 116

Section 12.12 [Reserved.] ................................................................................. 117

Section 12.13 Withholding Taxes ......................................................................... 117

Section 12.14 [Reserved.]. ................................................................................. 117

ARTICLE 13  Miscellaneous. ................................................................................. 118

Section 13.01 Payment of Expenses, etc. ................................................................ 118

Section 13.02 Right of Setoff ............................................................................ 120

Section 13.03 Notices. ................................................................................. 121

Section 13.04 Benefit of Agreement; Assignments; Participations, etc ............................. 121

Section 13.05 No Waiver; Remedies Cumulative ............................................................. 123

Section 13.06 **[reserved]**. ................................................................................. 124

Section 13.07 Calculations; Computations. ................................................................ 124

Section 13.08 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
                WAIVER OF JURY TRIAL. ......................................................... 124

Section 13.09 Counterparts ............................................................................ 125

Section 13.10 Headings Descriptive ......................................................................... 126

Section 13.11 Amendment or Waiver; etc. ................................................................ 126

Section 13.12 Survival ................................................................................. 128

Section 13.13 Domicile of Loans ......................................................................... 128

Section 13.14 Register ................................................................................. 128

Section 13.15 Confidentiality. ......................................................................... 128

Section 13.16 USA Patriot Act Notice ................................................................ 130

Section 13.17 **[Reserved]**. ................................................................................. 130

Section 13.18 Waiver of Sovereign Immunity ................................................................ 130

Section 13.19 **[Reserved]**. ................................................................................. 130

Section 13.20 INTERCREDITOR AGREEMENTS. ................................................................ 131

Section 13.21 Absence of Fiduciary Relationship. ........................................................... 131

Section 13.22  Electronic Execution of Assignments and Certain Other Documents ............ 131

Section 13.23  Entire Agreement ................................................................................................ 132

ARTICLE 14  Credit Agreement Party Guaranty. ........................................................................ 132

Section 14.01  The Guaranty ...................................................................................................... 132

Section 14.02  Bankruptcy .......................................................................................................... 133

Section 14.03  Nature of Liability ............................................................................................... 133

Section 14.04  Independent Obligation ...................................................................................... 133

Section 14.05  Authorization ...................................................................................................... 134

Section 14.06  Reliance ............................................................................................................... 134

Section 14.07  Subordination ..................................................................................................... 135

Section 14.08  Waiver .................................................................................................................. 135

Section 14.09  Maximum Liability .............................................................................................. 136

Section 14.10  Payments ............................................................................................................. 136

Section 14.11  Keepwell .............................................................................................................. 136

Section 14.12  Acknowledgement and Consent to Bail-In of EEA Financial Institutions ..... 136

Section 14.13  Acknowledgement Regarding Any Supported QFCs ....................................... 136

SCHEDULE A-1            Agent's Account
SCHEDULE 1.01(a)        Unrestricted Subsidiaries
SCHEDULE 2.01           Commitments
SCHEDULE 8.09           Taxes
SCHEDULE 8.12(a)        Material Real Property
SCHEDULE 8.12(b)        Title to Property
SCHEDULE 8.14           Subsidiaries
SCHEDULE 8.19           Labor Matters
SCHEDULE 8.21           Legal Names; Types of Organization (and Whether Registered
                        Organization); Jurisdiction of Organization, etc.
SCHEDULE 8.31           Closing Date Insurance
SCHEDULE 9.12           Post-Closing Actions
SCHEDULE 9.18           Milestones
SCHEDULE 10.01(iii)     Existing Liens
SCHEDULE 10.04          Existing Indebtedness
SCHEDULE 10.05(iii)     Existing Investments
SCHEDULE 13.03          Lender Addresses


EXHIBIT A-1             Form of Notice of Borrowing
EXHIBIT A-2             Form of Notice of Conversion/Continuation
EXHIBIT A-3             Form of ABL DIP Intercreditor Agreement
EXHIBIT B               Initial Budget
EXHIBIT C               Form of U.S. Tax Compliance Certificate
EXHIBIT E               Form of Security Agreement
EXHIBIT F               Form of Subsidiaries Guaranty
EXHIBIT H               Form of Compliance Certificate
EXHIBIT I-1             Form of Assignment and Assumption Agreement
EXHIBIT I-2             Initial Financing Order
EXHIBIT L-1             Form of Perfection Certificate
EXHIBIT L-2             Form of Perfection Certificate Supplement
EXHIBIT M               DIP Motion

# SENIOR SECURED DEBTOR-IN-POSSESSION
# TERM LOAN CREDIT AGREEMENT

THIS SENIOR SECURED DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT, dated as of February [___], 2020, among AMERICAN COMMERCIAL LINES INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Holdings"), COMMERCIAL BARGE LINE COMPANY, a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the Lenders party hereto from time to time and CORTLAND CAPITAL MARKET SERVICES LLC ("Cortland"), as the Administrative Agent and the Collateral Agent. All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

WHEREAS, on February 7, 2020 (the "Filing Date"), Holdings, Borrower, and their respective Domestic Subsidiaries (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that Lenders provide a secured term loan credit facility to Borrower (the "DIP Term Facility"), with all of the Borrower's obligations under the DIP Term Facility to be guaranteed by Holdings and each Subsidiary Guarantor, the proceeds of which shall be used for (i) working capital and other general corporate purposes of the Borrower and the other Credit Parties and their subsidiaries in accordance with the Budget, (ii) any adequate protection payments in accordance with the Financing Orders and (iii) the professional fees and expenses of administering the Bankruptcy Cases (including payments benefiting from the Carve-Out); and

WHEREAS, the Lenders are willing to make available to Borrower such postpetition loans, other extensions of credit and financial accommodations upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE 1    Definitions and Accounting Terms.

Section 1.01    Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"A&M Engagement Agreement" shall mean that certain engagement letter dated November 25, 2019 between Alvarez & Marsal North America, LLC and Borrower (for itself and its Subsidiaries), as in effect on the Closing Date.

"ABL DIP Agent" shall have the meaning provided in the definition of the term "ABL DIP Credit Agreement".

"ABL DIP Credit Agreement" shall mean that certain Senior Secured Debtor-In-Possession Credit Agreement, dated as of the date hereof, among Holdings, the Borrower, the other borrowers party thereto, the lenders party thereto from time to time and Wells Fargo Capital Finance, LLC, as the administrative agent and collateral agent (in such capacities, the "ABL DIP Agent").

"ABL DIP Credit Documents" shall mean all "Credit Documents" as defined in the ABL DIP Credit Agreement.

"ABL DIP Intercreditor Agreement" shall mean an Intercreditor Agreement in substantially the form set forth in Exhibit A-3, dated as of the date hereof, among the Administrative Agent, the ABL DIP Agent and the Credit Parties.

"ABL Priority Collateral" shall have the meaning assigned to the term " DIP Revolving Facility Collateral" in the ABL Intercreditor Agreement.

"Account Debtor" shall mean any Person who may become obligated to another Person under, with respect to, or on account of, an Account.

"Account Party" shall have the meaning provided in Section 2.13(h).

"Accounts" shall mean all "accounts," as such term is defined in the UCC as in effect on the date hereof in the State of New York, in which any Person now or hereafter has rights.

"Additional Security Documents" shall have the meaning provided in Section 9.11(a).

"Administrative Agent" shall mean Cortland Capital Market Services LLC, in its capacity as Administrative Agent for the Lenders hereunder, and shall include any successor to the Administrative Agent appointed pursuant to Section 12.10.

"Administrative Agent Fee Letter" shall mean that certain fee letter, dated as of even date with this Agreement, among the Borrower and Administrative Agent, in form and substance reasonably satisfactory to Administrative Agent.

"Administrative Agent Fees" shall have the meaning provided in Section 2.05(b).

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; provided, however, that neither the Administrative Agent nor any Lender (nor any Affiliate thereof) shall be considered an Affiliate of the Borrower or any Subsidiary thereof as a result of this Agreement, the extensions of credit hereunder or its actions in connection therewith.

"Agent's Account" means the Deposit Account of the Administrative Agent or such other Deposit Account of the Administrative Agent that has been designated as such, in writing, by the Administrative Agent to Borrower and the Lenders.

"Agent Consultant" means any consultant, financial advisor, appraiser, or other professional engaged by Agent or any legal counsel to Agent.

"Agents" shall mean the Administrative Agent, the Collateral Agent and the Security Trustee.

"Aggregate Commitments" shall mean, at any time, the aggregate amount of the Commitments of all Lenders.

"Agreement" shall mean this Senior Secured Debtor-in-Possession Term Loan Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Credit Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Credit Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Margin" shall mean (a) with respect to Base Rate Loan, the per annum rate of 6.00% and (b) with respect to LIBO Rate Loans, the per annum rate of 7.00%.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit I-1 (appropriately completed) or such other form as shall be acceptable to the Administrative Agent.

"Avoidance Action" means any and all claims and causes of action of the Borrower's estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payment" has the meaning set forth in Section 2.09(b)(v) of this Agreement.

"Bank Product" shall mean any of the following products, services or facilities extended to the Borrower or any of its Subsidiaries: (a) Cash Management Services; (b) products under Swap Contracts; (c) credit cards, commercial credit card, purchase card and merchant card services; (d) payment card processing services, (e) debit cards, (f) stored value cards and (e) other banking products or services as may be requested by the Borrower, other than letters of credit.

"Bank Product Debt" shall mean Indebtedness and other obligations of the Borrower or any of its Subsidiaries relating to Bank Products.

"Bankruptcy Cases" means the cases of Debtors jointly administered under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court, bearing case number [_____] and any superseding chapter 7 case or cases.

"Bankruptcy Code" shall have the meaning provided in Section 11.05.

"Bankruptcy Court" has the meaning given to it in the Recitals.

"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis), *plus* one percentage point, and (c) the per annum rate of interest publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (as determined by the Administrative Agent) (x) the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by Administrative Agent or (y) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the bank prime loan rate or its equivalent) or any similar release by the Federal Reserve Board (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (c) shall be deemed to be zero); provided, that the Base Rate shall in no event be less than 3.00% per annum.

"Base Rate Loan" shall mean each Term Loan which is designated or deemed designated as a Base Rate Loan by the Borrower at the time of the incurrence thereof or conversion thereto.

"Benchmark Replacement" means the sum of:  (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for United States dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement shall be deemed to be zero for the purposes of this Agreement.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the LIBO Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for United States dollar-denominated syndicated credit facilities at such time.

"<u>Benchmark Replacement Conforming Changes</u>" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest and other administrative matters) that Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"<u>Benchmark Replacement Date</u>" means the earlier to occur of the following events with respect to the LIBO Rate:

        (a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the LIBO Rate permanently or indefinitely ceases to provide the LIBO Rate; or

        (b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"<u>Benchmark Transition Event</u>" means the occurrence of one or more of the following events with respect to the LIBO Rate:

        (a)      a public statement or publication of information by or on behalf of the administrator of the LIBO Rate announcing that such administrator has ceased or will cease to provide the LIBO Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate;

        (b)      a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate, the Federal Reserve System of the United States (or any successor), an insolvency official with jurisdiction over the administrator for the LIBO Rate, a resolution authority with jurisdiction over the administrator for the LIBO Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBO Rate, which states that the administrator of the LIBO Rate has ceased or will cease to provide the LIBO Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate; or

        (c)      a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate announcing that the LIBO Rate is no longer representative.

"<u>Benchmark Transition Start Date</u>" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of

information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by Administrative Agent or the Required Lenders, as applicable, by notice to Borrower, Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with Section 3.06 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 3.06.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulations.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person

"Borrower" shall have the meaning provided in the preamble hereto.

"Borrowing" shall mean the borrowing of the same Type of Term Loan, from all the Lenders having Commitments on a given date (or resulting from a conversion or conversions on such date), having in the case of LIBO Rate Loans, the same Interest Period; *provided* that Base Rate Loans incurred pursuant to Section 3.01 shall be considered part of the related Borrowing of LIBO Rate Loans.

"Budget" means the Initial Budget, as amended, modified, supplemented or replaced from time to time in accordance with Section 9.24.

"Budget Variance Covenant" has the meaning set forth in Section 10.11.

"Business Day" shall mean (a) for all purposes other than as covered by clause (b) below, any day except Saturday, Sunday and any day which shall be in New York City and New York a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, LIBO Rate Loans, any day which is a Business Day described in clause (a) above and which is also a day for trading by and between banks in the New York or London interbank Eurodollar market.

"Capitalized Lease Obligations" shall mean, with respect to any Person, all rental obligations of such Person which, under U.S. GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with U.S. GAAP.

"Carve out" (or "Carve-Out") has the meaning specified therefor in the Initial Financing Order or the Final Financing Order, as applicable.

"Cash Equivalents" shall mean:

(i)     U.S. Dollars, Canadian dollars, pounds sterling, euros, the national currency of any participating member state of the European Union or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(ii)    readily marketable direct obligations of any member of the European Economic Area, Switzerland, or Japan, or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of such country, and, at the time of acquisition thereof, having a credit rating of at least AA (or the equivalent grade) by Moody's or Aa3 by S&P;

(iii)   marketable general obligations issued by any state of the United States or any political subdivision thereof or any instrumentality thereof that are guaranteed by the full faith and credit of such state, and, at the time of acquisition thereof, having a credit rating of at least AA (or the equivalent grade) by Moody's or Aa3 by S&P;

(iv)    securities or any other evidence of Indebtedness or readily marketable direct obligations issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities), in such case having maturities of not more than twelve months from the date of acquisition;

(v)     certificates of deposit and Eurodollar time deposits with maturities of twenty-four months or less from the date of acquisition, bankers' acceptances with maturities not exceeding twenty-four months and overnight bank deposits, in each case, with any Lender party to this Agreement or any commercial bank or trust company having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's;

(vi)    repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clauses (iv) and (v) above entered into with any financial institution meeting the qualifications specified in clause (v) above;

(vii)   commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within twenty-four months after the date of acquisition; and

(viii)  money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (vii) of this definition.

"<u>Cash Management Services</u>" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve FedLine system) and other cash management arrangements.

"<u>CFC</u>" shall mean a Subsidiary of a Credit Party that is a "controlled foreign corporation" within the meaning of Section 957 of the Code in which any Credit Party (or direct or indirect owner of a Credit Party) is a "United States shareholder" within the meaning of Section 951(b) of the Code.

"<u>Change of Control</u>" shall be deemed to occur if:

       (a)    any combination of Permitted Holders shall fail to own beneficially (within the meaning of Rules 13d3 and 13d5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, in the aggregate Equity Interests representing at least a majority of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings (or a permitted successor under a Tax Restructuring Transaction);

       (b)    a "change of control" (or similar event) shall occur in any (A) Existing ABL Facility Document, (B) ABL DIP Credit Document, and (C) Indebtedness permitted under <u>Section 10.04(xxx)</u>, in each case of this subclause (C) with an aggregate outstanding principal amount in excess of the Threshold Amount;

       (c)    Holdings (or a permitted successor under a Tax Restructuring Transaction) shall cease to own, directly or indirectly, 100% of the Equity Interests of each Credit Party (which shall include any Credit Party that is a successor to a Credit Party pursuant to a transaction permitted by this Agreement).

"<u>Chattel Paper</u>" shall have the meaning provided in Article 9 of the UCC.

"<u>Closing Date</u>" shall mean February [____], 2020.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" shall mean all property (whether real, personal or otherwise) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document (including any Additional Security Documents) or will be granted in accordance with requirements in this Agreement or the other Credit Documents or the Financing Order, including, without limitation, all collateral as described in the Security Agreement, all Mortgaged Properties, all Mortgaged Vessels and all cash and Cash Equivalents.  Without limitation of the foregoing, subject to the terms of the Initial Financing Order, Final Financing Order, the Intercreditor Agreements and the Carve out, the Collateral shall not include any Avoidance Actions but shall include all proceeds of any and all Avoidance Actions.

"<u>Collateral Agent</u>" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents (other than the Fleet Mortgages).

"<u>Commitment</u>" shall mean a Term Commitment of any Lender.

"<u>Committees</u>" means, collectively, the official committee of unsecured creditors and any other official committee appointed in any Bankruptcy Case.

"<u>Compliance Certificate</u>" shall mean a certificate of the Responsible Officer of the Borrower substantially in the form of <u>Exhibit H</u> hereto, and in any case, in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Confirmation Order</u>" shall have the meaning set forth in <u>Schedule 9.18</u>.

"<u>Consultant</u>" means a Person providing interim management services for the Credit Parties and/or acting as financial consultant of Credit Parties; such person to be reasonably acceptable to Administrative Agent and engaged by Borrower pursuant to the terms of an engagement agreement reasonably acceptable to Administrative Agent (acting at the direction of the Required Lenders).  As of the Closing Date, the Consultant is Alvarez & Marsal North America, LLC under and pursuant to the A&M Engagement Agreement and Greenhill & Co., LLC under and pursuant to the Greenhill Engagement Agreement.

"<u>Contingent Obligation</u>" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made nonrecourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("<u>primary obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any such obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"<u>Covered Entity</u>" means any of the following:

(a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning specified therefor in <u>Section 14.13</u> of this Agreement

"Credit Agreement Party" shall mean each of Holdings and the Borrower.

"Credit Agreement Party Guaranty" shall mean the guaranty of each Credit Agreement Party pursuant to <u>Section 14.01</u>.

"Credit Documents" shall mean this Agreement and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Subsidiaries Guaranty, each Security Document, the Intercreditor Agreements, the Financing Order and any other document, instrument or agreement entered into, now or in the future, by Holdings or any of its Subsidiaries and Agent or any Lender in connection with the Agreement.

"Credit Event" shall mean the making of any Loan.

"Credit Extension" shall mean a Credit Event; provided that "Credit Extensions" shall not include conversions and continuations of outstanding Loans.

"Credit Party" shall mean Holdings, the Borrower and each Subsidiary Guarantor.

"Debtor Relief Laws" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors" has the meaning given to it in the Recitals.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" shall mean, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent,

together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each other Lender promptly following such determination.

"Defaulting Lender Rate" means (a) for the first three days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Term Loans that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" shall have the meaning assigned thereto in Article 9 of the UCC.

"DIP Backstop Premium" shall have the meaning set forth in Section 2.05(b).

"DIP Conversion Discount" shall have the meaning set forth in Section 2.05(c).

"DIP Motion" means a motion substantially in the form attached hereto as Exhibit M.

"DIP Termination Date" at Administrative Agent's election, the earlier to occur of (a) termination of the Commitments and (b) occurrence of the Maturity Date.

"Disclosure Statement"  shall have the meaning set forth for such term in the Restructuring Support Agreement as in effect on the Closing Date.

"Dividend" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common equity of such Person) or cash to its stockholders, partners or members as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any partnership or membership interests outstanding on or after

the Closing Date (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes.

"Dodd-Frank and Basel III" shall have the meaning set forth in Section 3.01(d).

"Domestic Subsidiary" shall mean, as to any Person, any Subsidiary of such Person incorporated or organized under the laws of the United States, any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person) but in any event excluding, the Sponsor, Holdings, Borrower and their respective Subsidiaries and Affiliates.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is or within the preceding six (6) years has been sponsored, maintained or contributed to by any Credit Party or (b) to which any Credit Party has, or has had at any time within the preceding six (6) years, any liability, contingent or otherwise, other than a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

"Environment" shall mean ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata and natural resources such as wetlands, flora and fauna.

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations and/or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law, including, without limitation, (a) by governmental or regulatory authorities for enforcement, investigation, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief arising out of or relating to an alleged injury or

threat of injury to human health, safety or the Environment due to the presence of Hazardous Materials, including any Release or threat of Release of any Hazardous Materials.

"Environmental Law" shall mean any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance or code, now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the Environment, occupational health or Hazardous Materials.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and, unless the context indicates otherwise, the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any successor Section thereof.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with a Credit Party or a Restricted Subsidiary of the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code and solely with respect to Section 412 of the Code, Sections 414(b), (c), (m) or (o) of the Code.

"ERISA Event" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, but excluding any event for which the 30-day notice period is waived with respect to a ERISA Plan, (b) any failure to make a required contribution to any ERISA Plan that would result in the imposition of a Lien or other encumbrance or the failure to satisfy the minimum funding standards set forth in Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA, or the arising of such a Lien or encumbrance, with respect to a ERISA Plan, (c) the incurrence by a Credit Party, or an ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan or the withdrawal or partial withdrawal (including under Section 4062(e) of ERISA) of a Credit Party, or an ERISA Affiliate from any ERISA Plan or Multiemployer Plan, (d) the filing of a notice of intent to terminate, the treatment of a ERISA Plan amendment as a termination under Section 4041 of ERISA, or the receipt by a Credit Party, or an ERISA Affiliate from the PBGC or a plan administrator of any notice of intent to terminate any ERISA Plan or Multiemployer Plan or to appoint a trustee to administer any ERISA Plan, (e) the adoption of any amendment to a ERISA Plan that would require the provision of security pursuant to the Code, ERISA or other applicable law, (f) the receipt by a Credit Party, or an ERISA Affiliate of any written notice concerning statutory liability arising from the withdrawal or partial withdrawal of a Credit Party, or an ERISA Affiliate from a Multiemployer Plan or a written determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, (g) the occurrence of any nonexempt "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to which a Credit Party is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which a Credit Party could reasonably be expected to have liability, (h) the occurrence of any event or

condition which constitutes grounds under Section 4042 of ERISA for the termination of any ERISA Plan or the appointment of a trustee to administer any ERISA Plan, (i) the filing of any request for or receipt of a minimum funding waiver under Section 412(c) of the Code with respect to any Plan or Multiemployer Plan, (j) a determination that any ERISA Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (k) the receipt by a Credit Party or any ERISA Affiliate of any notice, that a Multiemployer Plan is, or is expected to be, in endangered or critical status under Section 305 of ERISA or, (l) any other extraordinary event or condition with respect to a ERISA Plan or Multiemployer Plan which could reasonably be expected to result in a Lien or any acceleration of any statutory requirement to fund all or a substantial portion of the unfunded accrued benefit liabilities of such plan.

"ERISA Plan" shall mean any pension plan as defined in Section 3(2) of ERISA subject to Title IV of ERISA or Section 412 of the Code other than a Foreign Pension Plan or a Multiemployer Plan, which is maintained or contributed to by (or to which there is an obligation to contribute of) a Credit Party or with respect to which a Credit Party has, or may have, any liability, including, for greater certainty, liability arising from an ERISA Affiliate.

"Event of Default" shall have the meaning provided in Section 11.

"Excluded Subsidiary" shall mean any Subsidiary of the Borrower that is (a) a CFC (other than a Protected CFC), (b) a Specified Excluded Subsidiary, (c) a FSHCO, (d) [reserved], (e) [reserved], (f) [reserved], (g) prohibited by applicable law, rule, regulation from guaranteeing the credit facilities established hereunder, or which would require governmental (including regulatory) consent, approval, license or authorization to provide a guarantee in each case, unless, such consent, approval, license or authorization has been received (but without obligation to seek the same), in each case so long as the Administrative Agent shall have received a certification from the Borrower's general counsel or a Responsible Officer of the Borrower as to the existence of such prohibition or consent, approval, license or authorization requirement, (h) prohibited from guaranteeing the Obligations by any contractual obligation in existence (x) on the Closing Date or (y) at the time of the acquisition of such Subsidiary after the Closing Date (to the extent such prohibition was not entered into in contemplation of such acquisition), (i) a Subsidiary with respect to which a guarantee by it of the Obligations would result in a material adverse tax consequence to Holdings, the Borrower or the Restricted Subsidiaries, (j) [reserved], (k) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (acting at the direction of the Required Lenders), the cost or other consequences of guaranteeing the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom, and (l) any Domestic Subsidiary that is treated under U.S. federal income tax law as a disregarded entity or partnership entity owned by a CFC, other than a Protected CFC; provided that, notwithstanding the above, (x) if a Subsidiary executes the Subsidiaries Guaranty as a "Subsidiary Guarantor" then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Subsidiaries Guaranty as a "Subsidiary Guarantor" in accordance with the terms hereof and thereof) and (y) if a Subsidiary serves as a guarantor under the Existing ABL Credit Agreement or the ABL DIP Credit Documents, then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Subsidiaries Guaranty as a "Subsidiary Guarantor" in accordance with the terms hereof and thereof).

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Credit Party under any Credit Document, (a) income Taxes imposed on (or measured by) its net income and franchise (and similar) Taxes imposed on it in lieu of income Taxes, either pursuant to the laws of the jurisdiction in which such recipient is organized or in which the principal office or applicable lending office of such recipient is located (or any political subdivision thereof) or as a result of any other present or former connection between it and the jurisdiction imposing such Tax (other than a connection arising from such Administrative Agent, Lender or other recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document), (b) any branch profits Taxes under Section 884(a) of the Code or any similar Tax imposed by any jurisdiction described in clause (a) above, (c) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 3.04), any U.S. federal withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such recipient (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Credit Parties with respect to such withholding tax pursuant to Section 5.01(a), (d) any Taxes attributable to such recipient's failure to comply with Section 5.01(b) or Section 5.01(c), other than any non-U.S. Taxes that would not have arisen if a Credit Party had not made a payment from outside of the United States, (e) any U.S. federal withholding Taxes imposed under FATCA and (f) U.S. federal backup withholding Taxes pursuant to Code Section 3406.

"Existing ABL Agent" means Wells Fargo Bank, National Association, in its capacity as Agents (as defined in the Existing ABL Credit Agreement) for the lenders party to the Existing ABL Credit Agreement.

"Existing ABL Credit Agreement" shall mean that certain amended and restated asset-based revolving credit agreement, dated as of November 12, 2015, as the same may have been amended, amended and restated, modified or supplemented from time to time prior to the date hereof, among Holdings, the Borrower, the other borrowers party thereto, certain lenders party thereto and Wells Fargo Capital Finance, LLC, as the Administrative Agent.

"Existing ABL Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of November 12, 2015, by and between Existing ABL Agent and Existing Agent, as the administrative agent, and acknowledged by Holdings, Borrower and the other parties thereto, as amended or modified from time to time.

"Existing ABL Facility Documents" means the "Revolving Facility Documents" as defined in the Existing ABL Intercreditor Agreement.

"Existing Agent" means Bank of America, N.A., in its capacity as administrative agent and collateral agent for the lenders party to the Existing Term Loan Credit Agreement.

"Existing Credit Documents" means "Credit Documents" as defined in the Existing Credit Agreement.

"Existing Indebtedness" shall have the meaning provided in Section 10.04(vii).

"Existing Lenders" means the lenders and other Secured Parties from time to time party to the Existing Credit Agreement.

"Existing Secured Obligations" means all outstanding principal, accrued interest, accrued fees and expenses and any other indebtedness and amounts owing to Existing Lenders (or the agents therefor) under the Existing Credit Documents.

"Existing Term Loan Credit Agreement" means that certain Term Loan Credit Agreement, dated as of November 12, 2015, as the same may have been amended, amended and restated, modified or supplemented from time to time prior to the date hereof, among Holdings, the Borrower, the lenders party thereto from time to time and the Existing Agent.

"Existing Vessels" shall mean all towboats, barges and other vessels.

"Exit Financing Commitment Letter" means the commitment letter for an exit financing between the Borrower and the commercial banks and financial institutions party thereto, which commitment provides for the payment in full in cash of the Obligations under the ABL DIP Credit Documents, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Fair Value" shall mean the amount at which the assets (both tangible and intangible), in their entirety, of Holdings and its Subsidiaries taken as a whole would change hands between an independent willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any such amended or successor version), any intergovernmental agreements between a non-U.S. jurisdiction and the United States with respect to any of the foregoing and any Requirement of Law adopted and any agreements entered into pursuant to any such intergovernmental agreement.

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate *per annum* equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Federally Regulated Lender" shall mean any Lender that is subject to applicable Federally Regulated Lender Flood Laws.

"Federally Regulated Lender Excluded Property" shall mean, solely with respect to any Federally Regulated Lenders, any right, title and interest of any Credit Party in and to any real property improved by a Building (as defined in the Federally Regulated Lender Flood Laws) or Manufactured (Mobile) Home (as defined in the Federally Regulated Lender Flood Laws) unless and until all Federally Regulated Lender Flood Zone Documentation has been delivered to such Federally Regulated Lender to the satisfaction of such Federally Regulated Lender.

"Federally Regulated Lender Flood Laws" shall mean, collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Federally Regulated Lender Flood Zone Documentation" shall mean, with respect to any fee interest in any real property located in the United States of any Credit Party, to the extent required to comply with Federally Regulated Lender Flood Laws: (1) a completed standard flood hazard determination form, (2) if the real property is located in a special flood hazard area, a notification to the applicable Credit Party ("Borrower Notice") and, if applicable, notification to such Credit Party that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community does not participate in the NFIP, (3) documentation evidencing the applicable Credit Party's receipt of the Borrower Notice and (4) if the Borrower Notice is required to be given and flood insurance is available in the community in which the real property is located, evidence of applicable flood insurance in such form, on such terms and in such amounts as required by the Flood Laws and as required by the Administrative Agent and each Lender.

"Fees" shall mean all amounts payable pursuant to or referred to in Section 2.05.

"Filing Date" has the meaning specified therefor in the recitals to this Agreement.

"Final Financing Order" means the "Final Order" as defined in the Initial Financing Order, which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Administrative Agent, in its sole discretion.

"Financing Order" means (a) until the entry of the Final Financing Order, the Initial Financing Order, and (b) from and after entry of the Final Financing Order, the Final Financing Order, together with all amendments, modifications and supplements to such Initial Financing Order or Final Financing Order, as applicable, which are acceptable to the Administrative Agent in its sole discretion.

"First Day Hearing" means the first day of the hearing scheduled on which entry of the Initial Financing Order shall be heard.

"First Day Orders" means the orders entered by the Bankruptcy Court in respect of first day motions and applications.

"Fleet Mortgage" shall mean, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by Holdings or its Subsidiaries in favor of the Security Trustee of the "Security Trustee" (as defined in the Existing Credit Agreement), in form and substance reasonably satisfactory to the Security Trustee, that encumber any Vessels, documented by the United States Coast Guard in the name of the Borrower or the Guarantors to secure all of the Obligations of the Borrower under and in connection with this Agreement and of the Subsidiary Guarantors under and in connection with the Subsidiaries Guaranty.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any one or more of its Restricted Subsidiaries primarily for the benefit of employees of the Borrower or such Restricted Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Foreign Subsidiaries" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"FSHCO" shall mean any Subsidiary, all of the assets of which, disregarding immaterial assets, consist directly or indirectly through disregarded entities for federal income tax purposes of Equity Interests in one or more CFCs, other than Protected CFCs.

"Governmental Authority" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Greenhill Engagement Agreement" shall mean that certain engagement letter dated as of July 1, 2019, by and between Greenhill & Co., LLC and Holdings (for itself and its respective direct and indirect Subsidiaries), as in effect on the Closing Date.

"Guaranteed Obligations" shall mean (i) in the case of Holdings, the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the unpaid principal and interest on each Loan issued by, and all Loans made to, the Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable

claim in any such proceeding) thereon) of the Borrower to the Lenders, the Administrative Agent, the Collateral Agent and the Security Trustee now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than the Intercreditor Agreements) to which the Borrower is a party and the due performance and compliance by the Borrower with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than the Intercreditor Agreements) and (ii) in the case of the Borrower, the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed or allowable claim in any such proceeding) thereon) of each other Credit Party to the Lenders, the Administrative Agent, the Collateral Agent and the Security Trustee now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document (other than Intercreditor Agreements) to which any other Credit Party is a party and the due performance and compliance by such other Credit Party with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document (other than Intercreditor Agreements) and (iii) the Obligations of the Subsidiary Guarantors under the Subsidiary Guaranty.

"Guarantor" shall mean Holdings and each Subsidiary Guarantor.

"Guaranty" shall mean and include each of the Credit Agreement Party Guaranty and the Subsidiaries Guaranty.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance regulated under any Environmental Law.

"Holdings" shall have the meaning provided in the preamble hereto.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person (A) for borrowed money or (B) for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit, bankers' acceptances and similar obligations issued for the account of such Person and all unpaid drawings in respect of such letters of credit, bankers' acceptances and similar obligations, (iii) all Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such Indebtedness, such Indebtedness shall be deemed to be in an amount equal to the lesser of (x) the aggregate unpaid

amount of Indebtedness secured by such Lien and (y) the fair market value of the property to which such Lien relates as determined in good faith by such Person), (iv) the aggregate amount of all Capitalized Lease Obligations of such Person, (v) all Contingent Obligations of such Person, (vi) all obligations under any Swap Contracts and any Bank Product Debt or under any similar type of agreement and (vii) all Off-Balance Sheet Liabilities of such Person. Notwithstanding the foregoing, Indebtedness shall not include (a) trade payables and accrued expenses incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person or (b) earn-outs and other contingent payments in respect of acquisitions except to the extent that the liability on account of any such earn-outs or contingent payment becomes fixed and is required by U.S. GAAP to be reflected as a liability on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries.

"Indemnified Person" shall have the meaning provided in Section 13.01(a).

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Budget" means the initial 13-week consolidated weekly operating budget of the Debtors setting forth the Projected Information for the periods described therein prepared by the Borrower's management, in consultation with the Consultant, a copy of which is attached as Exhibit B.

"Initial DIP Commitment Party" shall have the meaning as defined in the Restructuring Support Agreement.

"Initial Financing Order" means collectively, the order of the Bankruptcy Court substantially in the form of Exhibit I-2 (except as may otherwise be agreed in writing or on the record by the Administrative Agent at the interim hearing with respect to such order in the Bankruptcy Cases) entered in the Bankruptcy Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Administrative Agent, in its sole discretion, which, among other matters but not by way of limitation, authorizes, on an interim basis, Debtors to execute and perform under the terms of this Agreement and the other Credit Documents.

"Insolvency Proceeding" shall mean any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" shall have the meaning provided in Section 8.20.

"Intercreditor Agreements" means the Existing ABL Intercreditor Agreement and the ABL DIP Intercreditor Agreement.

"<u>Interest Determination Date</u>" shall mean, with respect to any LIBO Rate Loan, the second Business Day prior to the commencement of any Interest Period relating to such LIBO Rate Loan.

"<u>Interest Payment Date</u>" means the last Business Day of each month.

"<u>Interest Period</u>" shall mean, as to any Borrowing of a LIBO Rate Loan, the period (i) commencing on the Closing Date to the immediately succeeding Interest Payment Date and (ii) thereafter from Interest Payment Date to Interest Payment Date; provided that no Interest Period with respect to any Loan shall extend beyond the maturity date applicable thereto. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"<u>Inventory</u>" shall mean all "inventory," as such term is defined in the UCC as in effect on the date hereof in the State of New York, wherever located, in which any Person now or hereafter has rights.

"<u>Investments</u>" shall have the meaning provided in <u>Section 10.05</u>.

"<u>Joint Venture</u>" shall mean any Person other than an individual or a Subsidiary of the Borrower (a) in which the Borrower or any of its Restricted Subsidiaries holds or acquires an ownership interest (by way of ownership of Equity Interests or other evidence of ownership) and (b) which is engaged in a business permitted by <u>Section 10.09</u>.

"<u>Lender</u>" shall mean each financial institution listed on <u>Schedule 2.01</u>, as well as any Person that becomes a "<u>Lender</u>" hereunder pursuant to <u>Section 3.04 or 13.04(b)</u>.

"<u>LIBO Rate</u>" means the rate *per annum* as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Administrative Agent may designate from time to time) as of 11:00 a.m., London time, two Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBO Rate Loan requested (whether as an initial LIBO Rate Loan or as a continuation of a LIBO Rate Loan or as a conversion of a Base Rate Loan to a LIBO Rate Loan) by Borrower in accordance with this Agreement; *provided* that in any event the LIBO Rate shall not be less than 2.00% per annum.  Each determination of the LIBO Rate shall be made by the Administrative Agent and shall be conclusive in the absence of manifest error.

"<u>LIBO Rate Loan</u>" shall mean each Term Loan designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"<u>Lien</u>" shall mean any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, deemed or statutory trust, security conveyance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, and any lease having substantially the same effect as any of the foregoing).

"<u>Loans</u>" shall mean a Term Loan.

"Location" of any Person shall mean such Person's "location" as determined pursuant to Section 9307 of the UCC of the State of New York.

"Management Incentive Plan" means a management incentive plan implemented in accordance with the MIP Term Sheet attached to the Restructuring Support Agreement as Exhibit C.

"Margin Stock" shall have the meaning provided in Regulation U.

"Material Adverse Effect" shall mean (i) a material adverse effect on the business, assets, financial condition or results of operations of Holdings, the Borrower and their Restricted Subsidiaries taken as a whole, (ii) a material and adverse effect on the rights and remedies of the Administrative Agent and Lenders, taken as a whole, under the Credit Documents, (iii) a material and adverse effect on the ability of the Credit Parties, taken as a whole, to perform their obligations under the Credit Documents, or (iv) a material adverse effect on the perfection or priority of the Liens granted pursuant to the Credit Documents or the Financing Order, except, in each case, for the commencement of the Bankruptcy Cases and the events that customarily and reasonably result from the commencement of the Bankruptcy Cases.

"Material Real Property" shall mean (i) each parcel of Real Property identified as Material Real Property on Schedule 8.12(a) and (ii) at the request of Collateral Agent in its Permitted Discretion, each parcel of Real Property that is hereafter owned in fee by any Credit Party that (together with any other parcels constituting a single site or operating property) has a fair market value of at least $1,000,000.

"Maturity Date" means the earliest of (a) August [_], 2020, (b) the consummation of a sale of all or substantially all of the Debtors' assets and (c) the Plan Effective Date.

"Milestones" shall have the meaning set forth in Section 9.18.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgage" shall mean a mortgage, debenture, leasehold mortgage, deed of trust, deed of immovable hypothec, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument in form and substance reasonably satisfactory to the Administrative Agent, in favor of the Collateral Agent for the benefit of the Secured Creditors, as the same may be amended, modified, restated and/or supplemented from time to time.

"Mortgaged Property" shall mean any Material Real Property of the Borrower or any of its Restricted Subsidiaries which is or will be encumbered (or required to be encumbered) by a Mortgage.

"Mortgaged Vessel" shall mean any Vessel of the Borrower or any of its Restricted Subsidiaries which will be encumbered (or required to be encumbered) by a Fleet Mortgage.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA under which any Credit Party has any obligation or liability, including on account of an ERISA Affiliate.

"NAIC" shall mean the National Association of Insurance Commissioners.

"Net Cash Proceeds" shall mean:

(a)      with respect to any sale or disposition by any Credit Party or any of its Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Credit Party or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Priority Lien on any asset (other than (A) Indebtedness owing to any Agent or any Lender under this Agreement or the other Credit Documents and (B) Indebtedness assumed by the purchaser of such asset) which (subject to the ABL Intercreditor Agreement and the Financing Order) is required to be, and is, repaid in connection with such sale or disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by such Credit Party or such Subsidiary in connection with such sale or disposition, (iii) Taxes paid or reasonably estimated to be payable to any taxing authorities or Tax distributions permitted by clause (vi)(B) of Section 10.03 paid or estimated to be payable by such Credit Party or such Subsidiary in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or reasonably estimated to be payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries (other than in the case of Tax distributions), and are properly attributable to such transaction and with respect to estimated Tax distributions are actually made, and (iv) all amounts that are set aside as a reserve for adjustments in respect of the purchase price of such assets, to the extent that in each case the funds described above in this clause (iv) are (x) deposited into escrow with a third party escrow agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of Collateral Agent, and (y) paid to Administrative Agent as a prepayment of the applicable Obligations in accordance with Section 2.09 of this Agreement at such time when such amounts are no longer required to be set aside as such a reserve; and

(b)      with respect to the issuance or incurrence of any Indebtedness for borrowed money (other than Indebtedness under this Agreement or the ABL DIP Credit Documents) by any Credit Party or any of its Subsidiaries, or the issuance by any Credit Party or any of its Subsidiaries of any Equity Interests, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Credit Party or such Subsidiary in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by such Credit Party or such Subsidiary in connection with such issuance or incurrence, and (ii) Taxes paid or reasonably estimated to be payable to any taxing authorities or Tax distributions permitted by clause (vi)(B) of Section 10.03 paid or estimated to be payable by such Credit Party or such Subsidiary in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries (other than in the case of Tax distributions permitted by clause (vi)(B) of Section 10.03), and are properly attributable to such transaction.

"New Money Conversion Conditions" shall mean the conditions to the issuance of New Money Preferred Equity described in Exhibit D of the Restructuring Support Agreement.

"New Money Preferred Equity" shall have the meaning as defined in the Restructuring Support Agreement.

"New Vessels" shall mean, as of any date of determination, all towboats, barges and other vessels owned by the Borrower for which construction thereof has been completed not longer than two (2) years prior to such date or which constitute "New Vessels" under the ABL DIP Credit Documents.

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Notice of Borrowing" shall mean a notice substantially in the form of Exhibit A-1 hereto.

"Notice of Conversion/Continuation" shall mean a notice substantially in the form of Exhibit A-2 hereto.

"Notice Office" shall mean for credit and operational notices, the office of the Administrative Agent located at 225 W. Washington Street, 9th Floor, Chicago, IL 60606, Attention: Legal Department or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligations" shall mean all now existing or hereafter arising debts, obligations, covenants, and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable to any Lender, any Agent or any Indemnified Person by any Credit Party arising out of this Agreement or any other Credit Document (other than the Intercreditor Agreements), including, without limitation, the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations to pay principal or interest (including interest, fees and other amounts accruing during any proceeding under any Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) on the Loans, to comply and perform all obligations under Section 2.05, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to any Credit Party or for which any Credit Party is liable as indemnitor under the Credit Documents, whether or not evidenced by any note or other instrument, the due performance and compliance with all terms, conditions and agreements contained therein.

"OFAC" shall mean the Office of Foreign Assets Control of the U.S. Department of Treasury.

"OID" shall have the meaning provided in Section 2.05(a).

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any Sale-Leaseback Transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any

obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Other Statutory Liabilities" means accrued and unpaid statutory liabilities of the Credit Parties which may result in claims that have lien priority or priority of payment over all or any portion of the Obligations, are a statutory trust and/or which are legally required to be paid prior to the repayment in full of such Obligations.

"Other Taxes" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing, value added or similar Taxes arising from any payment made under, from the execution, delivery, registration, performance or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document except any such Taxes imposed with respect to an assignment by a Lender on or after the date hereof (other than an assignment made pursuant to Section 3.04 or otherwise at the request of any Credit Party during an Event of Default described in Section 11.01 or 11.05) that are imposed as a result of any present or former connection between the relevant Lender and the jurisdiction imposing such Tax (other than a connection arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Outstanding Amount" shall mean with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Parent Company" shall mean any direct or indirect parent company of the Borrower (other than the Sponsor).

"Participant Register" shall have the meaning provided in Section 13.04(a).

"Patriot Act" or "USA Patriot Act" shall have the meaning provided in Section 13.16.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Perfection Certificate" shall mean a certificate in the form of Exhibit L-1 or any other form approved by the Collateral Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"Perfection Certificate Supplement" shall mean a certificate supplement in the form of Exhibit L-2 or any other form approved by the Collateral Agent.

"Permitted Encumbrance" shall mean, with respect to any Mortgaged Property, such exceptions to title as are set forth in the mortgage title insurance policy delivered with respect thereto, all of which exceptions must be acceptable to the Required Lenders in their reasonable discretion.

"Permitted Holders" shall mean the Sponsor.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Permitted Priority Liens" means all Liens permitted to have priority over the Liens in favor of Collateral Agent, solely to the extent that such Liens are valid, perfected and non-avoidable as of the Filing Date (or as may be permitted to be perfected after the Filing Date pursuant to section 546 of the Bankruptcy Code) and were not subordinated by agreement or applicable law, subject to the terms of the Financing Order and otherwise agreed to by the Required Lenders.

"Permitted Variance" means, with respect to determining compliance with Section 10.11(a) relating to the Borrower's cash receipts and cash disbursements, in each case compared to the amount forecast for the same period in the Budget:  (a) for the Testing Period ending February 23, 2020, a cumulative variance for all disbursements (other than disbursements excluded under Section 10.11(a)(iii)) in excess of the Budget of 20.0% and a cumulative variance for all receipts less than the Budget of 20.0%, (b) for the Testing Period ending March 1, 2020, a cumulative variance for all disbursements (other than disbursements excluded under Section 10.11(a)(iii)) in excess of the Budget of 15.0% and a cumulative variance for all receipts less than the Budget of 15.0%, and (c) for each Testing Period thereafter, a cumulative variance for all disbursements (other than disbursements excluded under Section 10.11(a)(iii)) in excess of the Budget of 10.0% and a cumulative variance for all receipts less than the Budget of 10.0%.

"Permitted Vessel Liens" shall mean Liens permitted under the Fleet Mortgages.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning set forth in Schedule 9.18.

"Plan" shall have the meaning set forth for such term in the Restructuring Support Agreement as in effect on the Closing Date.

"Plan Effective Date" means the date in which all conditions precedent to the effectiveness of a plan of reorganization under Chapter 11 of the Bankruptcy Code have been satisfied or waived in accordance with such plan of reorganization.

"Present Fair Saleable Value" shall mean the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole are sold as a going concern with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the

"bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Projected Information" means (a) the projected weekly operating cash receipts for each week, (b) the projected weekly disbursements for each week (c) the projected net weekly cash flow for each week, (d) projected cash on hand for each week, (e) projected lease payments for each week, (f) projected trade payables for each week, (g) projected capital expenditures for each week, (h) the projected Availability (as defined in the ABL DIP Credit Documents) for each week, (i) the projected aggregate principal amount of Existing Secured Obligations and Obligations outstanding for each week and (j) such other information that Administrative Agent (acting at the direction of the Required Lenders) may reasonably request with reasonable advance notice to the Borrower.

"Protected CFC" means a CFC all of whose "United States shareholders" within the meaning of Section 951(b) of the Code are United States domestic C-corporations that are eligible for the dividends received deduction under Code Section 245A with respect to dividends and income inclusions under Code Section 951(a)(1)(B) or 956 from such CFC under Treasury Regulation Section 1.956-1.

"Public Lender" shall have the meaning provided in Section 13.22.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified therefor in Section 14.13 of this Agreement.

"Qualified Preferred Stock" shall mean any preferred capital stock of the Borrower so long as the terms of any such preferred capital stock (x) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision, or, if later, the 91st day after the then Maturity Date then in effect other than (i) provisions requiring payment solely in the form of common Equity Interests of the Borrower or Holdings or Qualified Preferred Stock, (ii) provisions requiring payment solely as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale are subject to the payment in full of all Obligations in cash (other than unasserted contingent indemnification obligations) or such payment is otherwise permitted by this Agreement (including as a result of a waiver or amendment hereunder) and (iii) with respect to preferred capital stock issued to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, provisions requiring the repurchase thereof in order to satisfy applicable statutory or regulatory obligations and (y) do not require the cash payment of dividends or distributions at any time that such cash payment is not permitted under this Agreement or would result in a Default or Event of Default hereunder.

"Real Property" of any Person shall mean, collectively, the right, title and interest of such Person (including any leasehold, mineral or other estate) in and to any and all land,

improvements and fixtures owned, leased or operated by such Person, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Recovery Event" shall mean the receipt by the Borrower or any of its Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Restricted Subsidiaries (but not by reason of any loss of revenues or interruption of business or operations caused thereby) and (ii) under any policy of insurance required to be maintained under Section 9.03, in each case to the extent such proceeds or awards do not constitute reimbursement or compensation for amounts previously paid by the Borrower or any of its Restricted Subsidiaries in respect of any such event.

"Register" shall have the meaning provided in Section 13.14.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Release" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into, through or upon the Environment or within, from or into any building, structure, facility or fixture.

"Replaced Lender" shall have the meaning provided in Section 3.04. "Replacement Lender" shall have the meaning provided in Section 3.04.

"Required Lenders" shall mean at least two (2) Non-Defaulting Lenders, that are not Affiliates of each other or related funds or under common management, the sum of whose outstanding principal of Commitments as of any date of determination represent greater than 50% of the sum of all outstanding principal of Commitments of Non-Defaulting Lenders at such time.

"Requirement of Law" or "Requirements of Law" shall mean, with respect to any Person, (i) the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person and (ii) any statute, law, treaty, rule, regulation, order, decree, writ, injunction or determination of any arbitrator or court or other

Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" shall mean, with respect to any Person, its chief financial officer, chief executive officer, president, or any vice president, managing director, treasurer, controller or other officer of such Person having substantially the same authority and responsibility and, solely for purposes of notices given to Article 2, any other officer or employee of the applicable Credit Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Credit Party designated in or pursuant to an agreement between the applicable Credit Party and the Administrative Agent; provided that, with respect to compliance with financial covenants, "Responsible Officer" shall mean the chief financial officer, treasurer or controller of the Borrower, or any other officer of the Borrower having substantially the same authority and responsibility.

"Restricted Subsidiary" shall mean each Subsidiary of the Borrower other than any Unrestricted Subsidiary.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement entered on or prior to the Closing Date, by and among certain Existing Lenders, Sponsor and the Credit Parties party thereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof.

"Returns" shall have the meaning provided in Section 8.09.

"S&P" shall mean Standard & Poor's Ratings Services, a division of the McGraw Hill Company, Inc., and any successor owner of such division.

"Sale-Leaseback Transaction" shall mean any arrangements with any Person providing for the leasing by the Borrower or any of its Restricted Subsidiaries of real or personal property (including Vessels) which has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person in connection therewith.

"Sanctioned Entity" means, at any time, (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time, (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any Secured Creditor or any Credit Party or any of their respective Subsidiaries or Affiliates.

"SEC" shall have the meaning provided in Section 9.01(f).

"Secured Creditors" shall mean and include each of the Administrative Agent, the Collateral Agent, the Security Trustee and the Lenders; provided, however, that solely with respect to each Federally Regulated Lender Excluded Property, the term "Secured Creditors" shall exclude each Federally Regulated Lender with respect to such Federally Regulated Lender Excluded Property, it being understood that each Federally Regulated Lenders waives and releases any and all liens, security interest or the rights it may have in and to any Federally Regulated Lender Excluded Property and reserves all rights as a Secured Creditor with respect to all Collateral, other than Federally Regulated Lender Excluded Property.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Security Agreement" shall have the meaning provided in Section 6.06.

"Security Document" shall mean and include each of the Security Agreement, each Mortgage, the Financing Order and, after the execution and delivery thereof, each Fleet Mortgage and each Additional Security Document.

"Security Trustee" shall mean the Administrative Agent acting as security trustee for the Secured Creditors pursuant to the Fleet Mortgages.

"Solicitation Commencement Date" shall have the meaning set forth in Schedule 9.18

"Solvent" and "Solvency" shall mean, with respect to any Person on any date of determination, that on such date (i) the Fair Value of the assets of such Person and its Subsidiaries on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of such Person and its Subsidiaries, on a consolidated basis (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of call the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability); (ii) the Present Fair Saleable Value of the assets of such Person and its Subsidiaries on a consolidated basis, is greater than the total amount of liabilities, including contingent liabilities, of such Person and its Subsidiaries on a consolidated basis (it being understood that the amount of contingent liabilities

at any time shall be computed as the amount that, in light of call the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability); (iii) such Person and its Subsidiaries on a consolidated basis are able to pay their debts and liabilities (including, without limitation, contingent and subordinated liabilities) as they become absolute and mature and are otherwise "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances; and (iv) such Person and its Subsidiaries on a consolidated basis will have adequate capital with which to conduct the business they are presently conducting and reasonably anticipate conducting.

"Specified Excluded Subsidiaries" means MarineNet LLC and Bolivar Terminal Co., Inc.

"Sponsor" shall mean Platinum Equity Advisors, LLC and its Affiliates (excluding any operating portfolio company thereof).

"Subsidiaries Guaranty" shall have the meaning provided in Section 6.07.

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% Equity Interest at the time.

"Subsidiary Guarantor" shall mean each Subsidiary of the Borrower in existence on the Closing Date (after giving effect to the Transaction) other than any Excluded Subsidiary, as well as each Subsidiary of the Borrower other than an Excluded Subsidiary established, created or acquired after the Closing Date which becomes a party to the Subsidiaries Guaranty in accordance with the requirements of this Agreement or the provisions of the Subsidiaries Guaranty.

"Superpriority Claim" has the meaning specified therefore in Section 8.11(d) of the Agreement.

"Supported QFC" has the meaning specified therefor in Section 14.13 of this Agreement.

"Swap Contract" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the

terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments, liabilities or withholdings imposed by any Governmental Authority in the nature of a tax, including interest, penalties and additions to tax with respect thereto.

"Tax Group" shall have the meaning provided in Section 10.03(vi)(B).

"Tax Restructuring Transaction" shall mean any merger, consolidation, dissolution, amalgamation or liquidation between any Credit Party and any other Person related to tax planning or tax reorganization entered into in contemplation of a plan of reorganization, which merger, consolidation, dissolution, amalgamation or liquidation is reasonably acceptable to the Administrative Agent and Required Lenders provided that, if the surviving entity is not a Credit Party, immediately upon the consummation of such transaction the surviving entity joins this Agreement and the other Credit Documents as a Credit Party and assumes all of the liabilities and obligations of such Credit Party under this Agreement and each other Credit Document on terms reasonably acceptable to the Administrative Agent.

"Term Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Term Loans hereunder up to the amount set forth on Schedule 2.01, or in the Assignment and Assumption Agreement pursuant to which such Lender assumed its Term Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 13.04. The aggregate amount of the Lenders' Term Commitments on the Closing Date is $50,000,000.

"Term Loan Priority Collateral" shall mean all assets of the type set forth in the definition of "DIP Term Loan Priority Collateral" in the ABL DIP Intercreditor Agreement.

"Term Loan Priority Collateral Sale" shall have the meaning assigned to the term in Section 9.22.

"Term Loan Proceeds Account" shall mean the account with Comerica (account ending in -4724), in which the proceeds of the Initial Term Loans shall be deposited.

"Term Loan" shall mean a term loan made by a Lender to the Borrower pursuant to Section 2.01.

"Testing Period" shall mean, as applicable, (a) the period beginning on the first day of the Initial Budget and ending February 23, 2020, (b) the three consecutive calendar week period ending March 1, 2020, (c) the four consecutive calendar week period ending March 8, 2020, and (d) each four consecutive calendar week period ending Sunday of each week thereafter.

"Threshold Amount" shall mean $5,000,000.

"Transaction" shall mean, collectively, (a) commencement of the Bankruptcy Cases, (b) the entering into the Credit Documents and the incurrence of the Loans on the Closing Date, (c) the entering into the ABL DIP Credit Documents and the initial borrowings thereunder, (d) the other transactions contemplated by the Restructuring Support Agreement and (e) the payment of all Transaction Costs.

"Transaction Costs" shall mean the fees, premiums and expenses payable by Holdings, the Borrower and its Subsidiaries in connection with the transactions in the definition of "Transaction".

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a LIBO Rate Loan.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unfunded Pension Liability" of any ERISA Plan subject to Title IV of ERISA shall mean the amount, if any, by which the value of the accumulated plan benefits under the ERISA Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets of such ERISA Plan.

"United States" and "U.S." shall each mean the United States of America.

"Unrestricted Subsidiary" shall mean each Subsidiary of the Borrower listed on Schedule 1.01(a).

"U.S. Dollars" and the sign "$" shall each mean freely transferable lawful money (expressed in dollars) of the United States.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time; provided that determinations made pursuant to this Agreement in accordance with U.S. GAAP are subject (to the extent provided therein) to Section 13.08(a).

"U.S. Special Resolution Regimes" has the meaning specified therefor in Section 14.13 of this Agreement.

"U.S. Tax Compliance Certificate" shall have the meaning provided in Section 5.01(c).

"Variance Report" means a weekly variance report prepared by the chief financial officer of Borrower for (i) each Testing Period and (ii) the period from the commencement of the Bankruptcy Cases to the date of such variance report, that sets forth (A) actual results against anticipated results under the applicable Budget for the Testing Period in regard which such accompanying cash flow forecast is being delivered, reported in the aggregate (highlighting key line items) as of the end of such period, (B) the variance in dollar amounts and percentages, on a line item basis, (C) a written explanation for all line item variances of greater than the Permitted Variance for any given Testing Period and (D) such other information as the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request with reasonable advance notice to the Borrower.

"Vessels" shall mean the towboats, barges and other vessels owned or leased by the Credit Parties.

"Weekly Cash Flow Forecast" shall have the meaning provided in Section 9.01(k).

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary of such person.

"Wholly-Owned Foreign Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Foreign Subsidiary of such Person.

"Wholly-Owned Restricted Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Restricted Subsidiary of such Person.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person owns 100% of the Equity Interests at such time (other than, in the case of a Foreign Subsidiary with respect to preceding clauses (i) or (ii), director's qualifying shares and/or other nominal amounts of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02   Terms Generally and Certain Interpretive Provisions.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and

intangible assets and properties, including cash, securities, accounts and contract rights. The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require. All references herein to Articles, Sections, paragraphs, clauses, subclauses, Exhibits and Schedules shall be deemed references to Articles, Sections, paragraphs, clauses and subclauses of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Unless otherwise expressly provided herein, (a) all references to documents, instruments and other agreements (including the Credit Documents and organizational documents) shall be deemed to include all subsequent amendments, restatements, amendments and restatements, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, supplements and other modifications are not prohibited by any Credit Document and (b) unless otherwise specified, references to any law, statute, rule or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).  Any reference herein or in any other Credit Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (ii) all accrued expenses of Secured Creditors that are payable by a Credit Party under any Credit Document and are unpaid regardless of whether demand has been made therefor, and (iii) all fees or charges that have accrued hereunder or under any other Credit Document and are unpaid, (b) [reserved], (c) [reserved], (d) the receipt by Administrative Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Administrative Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as the Administrative Agent and the Required Lenders reasonably determine is appropriate to secure such contingent Obligations, (e) the payment or repayment in full in immediately available funds of all other outstanding Obligations, (f) the termination of all of the Commitments of the Lenders and (g) the delivery of a payoff letter with respect to such payment in full which shall include a general release of claims against the Indemnified Persons in their capacities as such.

Section 1.03   Performance; Time.  Whenever any performance obligation hereunder or under any other Credit Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  If any Bankruptcy Milestone deadline or other deadline under this Agreement or any other Credit Document falls on a day that is not a Business Day, then such Bankruptcy Milestone deadline or other deadline shall be extended until the next succeeding Business Day and if satisfied on such Business Day shall be deemed to have been satisfied in compliance with the terms hereof or thereof.

Section 1.04   Divisions.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been

transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE 2    Amount and Terms of Credit.

Section 2.01    The Term Commitments.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth and subject to the terms and conditions of the Financing Order, each Lender agrees, severally and not jointly to make a term loan to the Borrower on the Closing Date in a principal amount in Dollars not to exceed such Lender's Term Commitment (the "Term Loans").  Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.

Section 2.02    Loans.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; provided that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)    Subject to Section 3.01, each Borrowing shall be comprised entirely of Base Rate Loans or LIBO Rate Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any LIBO Rate Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement or cause the Borrower to pay additional amounts pursuant to Section 3.01. Borrowings of more than one Type may be outstanding at the same time; provided further that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than three (3) Borrowings of LIBO Rate Loans outstanding hereunder at any one time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account as the Administrative Agent may designate not later than 1:00 p.m., New York time, and the Administrative Agent shall promptly wire all requested amounts so received to an account as directed by the Borrower in the applicable Notice of Borrowing maintained with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met or waived, return the amounts so received to the respective Lenders.

(d)    [reserved.]

(e)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.03    Borrowing Procedure.   Each Term Loan shall be made by irrevocable written request by an Responsible Officer delivered to the Administrative Agent in the form of a Notice of Borrowing, appropriately completed and signed by a Responsible Officer of the Borrower: (i) in the case of a Borrowing of LIBO Rate Loans, not later than 1:00 p.m., New York time, three (3) Business Days before the date of the proposed Borrowing or (ii) in the case of a Borrowing of Base Rate Loans, not later than 1:00 p.m., New York time, one (1) Business Day prior to the date of the proposed Borrowing; provided, that Administrative Agent may, at the direction of the Required Lenders, elect to accept as timely requests that are received later than such time as provided in this Section 2.03. Each such Notice of Borrowing shall be irrevocable, subject to Sections 2.09 and 3.01, and shall be a written Notice of Borrowing in a form approved by the Administrative Agent and signed by the Borrower. Each such written Notice of Borrowing shall specify the following information in compliance with Section 2.02:

(a)     the aggregate amount of such Borrowing;

(b)     the date of such Borrowing, which shall be a Business Day;

(c)     whether such Borrowing is to be a Borrowing of Base Rate Loans or a Borrowing of LIBO Rate Loans;

(d)     in the case of a Borrowing of LIBO Rate Loans, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(e)     the account to which funds are to be disbursed, which shall be the Term Loan Proceeds Account.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be a Borrowing of LIBO Rate Loans with an Interest Period of one month's duration. If no Interest Period is specified with respect to any requested Borrowing of LIBO Rate Loans, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Notice of Borrowing in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    Evidence of Debt; Repayment of Loans.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Term Lender, the then unpaid principal amount of each Term Loan of such Lender on the Maturity Date; provided that if on the Plan Effective Date the New Money Conversion Conditions are satisfied, the Term Loan of each Lender shall be deemed repaid through the issuance to such Lender (or its designated Affiliate or related fund) of New Money Preferred Equity with a liquidation preference equal to the principal amount of such Term Loan outstanding on the Plan Effective Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and

interest payable and paid to such Lender from time to time under this Agreement. The Borrower shall be entitled to review records of such accounts with prior reasonable notice during normal business hours.

(c)     The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender. The Borrower shall be entitled to review records of such accounts with prior reasonable notice during normal business hours.

(d)     The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded absent manifest error; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms. In the event of any conflict between the accounts and records pursuant to paragraphs (b) and (c) above, the account and records pursuant to paragraph (c) above shall control.

(e)     [reserved.]

Section 2.05   Fees; Discounts; Premium.

(a)     On the Closing Date, the Borrower shall pay in cash to each Lender, a fee in the form of original issue discount in an amount equal to 3.00% of the amount of the Commitments of such Lender on the Closing Date (the "OID").  OID shall be fully earned, and shall be due and payable on the Closing Date.

(b)     The Borrower shall pay to each Lender that is an Initial DIP Commitment Party (or Affiliate of an Initial DIP Commitment Party or successor of an Initial DIP Commitment Party in its capacity as such) a non-refundable backstop premium in an amount equal to 6.00% (the "DIP Backstop Premium") of the amount of the initial commitment of such Initial DIP Commitment Party pursuant to Section 3.05 of the Restructuring Support Agreement as of the initial date of the Restructuring Support Agreement (without giving effect to any reductions or adjustments thereto).  The DIP Backstop Premium shall be fully earned on the date on which the Initial Financing Order is entered and shall be due and payable (i) on the Maturity Date in cash or (ii) if the New Money Conversion Conditions are satisfied on the Plan Effective Date, in New Money Preferred Equity.

(c)     The Borrower shall pay to each Lender a non-refundable discount in an amount equal to 7.00% (the "DIP Conversion Discount") of the aggregate principal amount of such Lender's Term Loans.  The DIP Conversion Discount shall be earned by and shall be due and payable, (x) with respect to any Term Loans that are prepaid or repaid (whether on a voluntary or mandatory basis) pursuant to Section 2.09 or which became due and payable on the Maturity Date or pursuant to Article IX prior to the Maturity Date, in cash on the date of such

prepayment or repayment or on which such Term Loans become due and payable, and (y) on the Plan Effective Date, if all New Money Conversion Conditions are satisfied, in New Money Preferred Equity.

(d)     The Borrower agrees to pay to the Administrative Agent, for its own account, the fees set forth in the Administrative Agent Fee Letter or such other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent (the "Administrative Agent Fees").

(e)     All fees, premiums and discounts shall be paid on the dates due, in immediately available funds, except with respect to any payments expressly permitted to be made in New Money Preferred Equity, to the Administrative Agent for distribution, if and as appropriate, among the Lenders (other than Defaulting Lenders). Once paid, none of the fees, premiums or discounts shall be refundable under any circumstances. Any Lender may, by written designation to the Borrower, cause any fees, premiums or discounts under paragraphs (b) or (c) above, as applicable, to be issued or paid to any of its Affiliates or related investment vehicles.

Section 2.06     Interest on Loans.

(a)     Subject to the provisions of Section 2.06(c), the Loans comprising each Borrowing of Base Rate Loans, shall bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin in effect from time to time.

(b)     Subject to the provisions of Section 2.06(c), the Loans comprising each Borrowing of LIBO Rate Loans shall bear interest at a rate per annum equal to the LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)     Notwithstanding the foregoing, upon the occurrence and during the continuation of an Event of Default and at the election of the Required Lenders, all Loans and all other Obligations shall bear interest at a rate per annum equal to (i) in the case of overdue principal of, or interest on, any Loan, 2% plus the rate otherwise applicable to such Loan or (iii) in the case of any other amount, 2% plus the rate applicable to Base Rate Loans.

(d)     Accrued interest on each Loan shall be payable as set forth in Section 2.10(a) in arrears.

(e)     All interest and fees hereunder shall be computed on the basis of a year of 360 days and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Base Rate or LIBO Rate shall be determined by the Administrative Agent (acting at the direction of the Required Lenders) in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

Section 2.07    <u>Termination and Reduction of Commitments</u>.    To the extent not terminated earlier, the Term Commitments shall automatically terminate on the Closing Date immediately after giving effect to the Term Loans to be made on such date.

Section 2.08    <u>Interest Elections</u>.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing and, in the case of a Borrowing of LIBO Rate Loans, shall have an initial Interest Period as specified in such Notice of Borrowing. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Borrowing of LIBO Rate Loans, may elect Interest Periods therefor, all as provided in this <u>Section 2.08</u>. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. Notwithstanding anything to the contrary, the Borrower shall not be entitled to request any conversion or continuation that, if made, would result in more than three (3) Borrowings of LIBO Rate Loans outstanding hereunder at any one time.

(b)    To make an election pursuant to this <u>Section 2.08</u>, the Borrower shall notify the Administrative Agent of such election by electronic transmission (if arrangements for doing so have been approved by the Administrative Agent, which approval shall not be unreasonably withheld, delayed or conditioned) by the time that a Notice of Borrowing would be required under <u>Section 2.03</u> if the Borrower was requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election, subject to <u>Section 3.05</u>. Each such written Notice of Conversion/Continuation shall be substantially in the form of <u>Exhibit A-2</u>, unless otherwise agreed to by the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower.

(c)    Each written Notice of Conversion/Continuation shall specify the following information in compliance with <u>Section 2.02</u>:

(i)    the Borrowing to which such Notice of Conversion/Continuation applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Notice of Conversion/Continuation, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be a Borrowing of Base Rate Loans or a Borrowing of LIBO Rate Loans; and

(iv)    if the resulting Borrowing is a Borrowing of LIBO Rate Loans, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "<u>Interest Period</u>".

If any such Notice of Conversion/Continuation requests a Borrowing of LIBO Rate Loans but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of a Notice of Conversion/Continuation, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If a Notice of Conversion/Continuation with respect to a Borrowing of LIBO Rate Loans is not timely delivered prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a LIBO Rate Loan with a one month's Interest Period. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, after the occurrence and during the continuance of such Event of Default (i) no outstanding Borrowing may be converted to or continued as a Borrowing of LIBO Rate Loans and (ii) unless repaid, each Borrowing of LIBO Rate Loans shall be converted to a Borrowing of Base Rate Loans at the end of the Interest Period applicable thereto.

Section 2.09   Optional and Mandatory Prepayments of Loans.

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay, without premium or penalty, other than as set forth in Section 2.05 any Borrowing, in whole or in part, subject to the requirements of this Section 2.09; provided that each partial prepayment shall be in an amount that is an integral multiple of $100,000.

(b)     Mandatory Prepayments.

(i)     Within three (3) Business Days of receipt by any Credit Party or any of its Subsidiaries of the Net Cash Proceeds of any disposition of any Term Loan Priority Collateral pursuant to Section 10.02(ii), (iv), (viii) (solely clause (C), (ix), (xii) and (xxiv) (including Net Cash Proceeds of insurance or arising from casualty losses or condemnations and payments in lieu thereof),  Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.09(c) in an amount equal to 100% of the Net Cash Proceeds (minus any Net Cash Proceeds that are used by any Credit Party to prepay "Obligations" (as defined in the ABL DIP Credit Agreement) in accordance with the terms ABL DIP Credit Agreement) received by such Person in connection with such disposition of such Term Loan Priority Collateral, plus any applicable amounts payable with respect thereto pursuant to Section 2.05. Notwithstanding the foregoing, (i) no Net Cash Proceeds shall be payable under this clause (i) with respect to any transaction which generates Net Cash Proceeds of $100,000 or less for such transaction (and not more than $1,000,000 in the aggregate for the term of this Agreement) and (ii) prepayments under this clause (i) shall be without duplication of any prepayments under clause (ii) of this Section 2.09(b). Nothing contained in this Section 2.09(b)(i) shall permit any Credit Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 10.02.

(ii)     Within one Business Day of the date of incurrence by any Credit Party or any of its Subsidiaries of any Indebtedness for borrowed money (other than Indebtedness under this Agreement or the ABL DIP Credit Agreement) or of the issuance by any Credit Party or any of its Subsidiaries of any Equity Interests, Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.09(c) in an amount equal to 100% of the Net Cash Proceeds (minus any Net Cash Proceeds that are used by any Credit Party to prepay "Obligations" (as defined in the ABL DIP Credit Agreement) in accordance with the terms ABL DIP Credit Agreement) received by such Person in connection with such incurrence or issuance plus any applicable amounts payable with respect thereto pursuant to Section 2.05. The provisions of this Section 2.09(ii) shall not be deemed to be implied consent to any such incurrence or issuance otherwise prohibited by the terms of this Agreement.

(c)     Application of Prepayments.

(i)     All optional or mandatory prepayments shall be applied pursuant to Section 11.13.

(ii)     Amounts to be applied pursuant to this Section 2.09 to the prepayment of Loans shall be applied, as applicable, first to reduce outstanding Base Rate Loans. Any amounts remaining after each such application shall be applied to prepay LIBO Rate Loans.

(a)     Notice of Prepayment.   The Borrower shall notify the Administrative Agent in writing of any prepayment hereunder (i) in the case of prepayment of a Borrowing of LIBO Rate Loans, not later than 1:00 p.m., New York time, three (3) Business Days before the date of prepayment or (ii) in the case of prepayment of a Borrowing of Base Rate Loans, not later than 1:00 p.m., New York time, one Business Day prior to the date of prepayment. Each such notice shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment and specifying the sub-paragraph of this Section 2.09 pursuant to which payment is made. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

Section 2.10   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     Except as otherwise expressly provided herein, all payments by Borrower shall be made to Agent's Account for the account of the Lenders and shall be made in immediately available funds, no later than 1:00 p.m. New York time on the date specified herein. Any payment received by the Administrative Agent in immediately available funds in Agent's Account later than 1:00 p.m. New York time may, in the Administrative Agent's discretion be deemed to have been received on the following Business Day and any applicable interest or fee

shall continue to accrue until such following Business Day.  Except to the extent provided to the contrary in Section 2.05 or Section 2.06(d), (i) all interest and all other fees payable hereunder or under any of the other Credit Documents shall be due and payable, in arrears, on each Interest Payment Date, and (ii) all costs and expenses payable hereunder or under any of the other Credit Documents, and all other costs and expenses payable pursuant to Section 13.01 shall be due and payable on (x) with respect to such expenses outstanding as of the Closing Date, the Closing Date, and (y) otherwise, the earlier of (A) the last Business Day of the month following the date on which the applicable costs and expenses were first incurred, or (B) the date on which demand therefor is made by Agent.  Borrower hereby authorize Agent, from time to time without prior notice to Borrower, to charge to the Term Loan principal balance (A) on the first day of each month, all interest accrued during the prior month on the Term Loans hereunder, (B) when incurred or accrued, all fees, premiums, discounts and amounts provided for in Section 2.05, (C) as and when due and payable, all other fees payable hereunder or under any of the other Credit Documents, (D) on the Closing Date and thereafter as and when due and payable, all other costs and expenses payable under Section 13.01, and (E) as and when due and payable all other payment obligations payable under any Credit Document or any Bank Product Agreement.  All amounts (including interest, fees, costs, expenses, or other amounts payable hereunder or under any other Credit Document or under any Bank Product Agreement) payable pursuant to this Section 2.10(a) shall thereupon constitute Loans hereunder, shall constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to Loans that are Base Rate Loans (unless and until converted into LIBO Rate Loans in accordance with the terms of this Agreement).

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied in the manner as provided in Section 2.09(c) or 11.13 hereof, as applicable, ratably among the parties entitled thereto.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Credit Parties rights of setoff and

counterclaim with respect to such participation as fully as if such Lender were a direct creditor of a Credit Party in the amount of such participation..

(d)     Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Defaulting Lender Rate.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02(c) or 2.10(d), then the Administrative Agent may, in its discretion or acting at the direction of the Required Lenders (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

(f)     The receipt of any payment item by the Administrative Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to Agent's Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by the Administrative Agent only if it is received into Agent's Account on a Business Day on or before 1:00 p.m. New York time.  If any payment item is received into Agent's Account on a non-Business Day or after 1:00 p.m. New York time on a Business Day, it shall be deemed to have been received by the Administrative Agent as of the opening of business on the immediately following Business Day.

(g)     [reserved].

Section 2.11     Defaulting Lenders.

(a)     Amendments.  A Defaulting Lender shall have no right to vote on any amendment, waiver or other modification of a Credit Document, except as provided in Section 13.11(f).

(b)     Payments; Fees.  The Administrative Agent may, acting at the direction of the Required Lenders, receive and retain any amounts payable to a Defaulting Lender under the Credit Documents, and a Defaulting Lender shall be deemed to have assigned to the Administrative Agent such amounts until all Obligations owing to the Administrative Agent, Non-Defaulting Lenders and other Secured Creditors have been paid in full.  The Administrative Agent may, acting at the direction of the Required Lenders, apply such amounts to the Defaulting Lender's defaulted obligations or readvance the amounts to the Borrower hereunder.

A Lender shall not be entitled to receive any fees accruing hereunder during the period in which it is a Defaulting Lender.

   (c) <u>Cure</u>. The Administrative Agent may, acting at the direction of the Required Lenders, agree in writing that a Lender is no longer a Defaulting Lender.  Unless expressly agreed by the Borrower and Administrative Agent (acting at the direction of the Required Lenders) no reinstatement of a Defaulting Lender shall constitute a waiver or release of claims against such Lender. The failure of any Lender to fund a Loan or otherwise to perform its obligations hereunder shall not relieve any other Lender of its obligations, and no Lender shall be responsible for default by another Lender.

   Section 2.12 <u>[Reserved]</u>.

   Section 2.13 <u>[Reserved]</u>.

   Section 2.14 <u>[Reserved]</u>.

   Section 2.15 <u>[Reserved.]</u>.

   Section 2.16 <u>[Reserved.]</u>

   Section 2.17 <u>[Reserved.]</u>

   Section 2.18 <u>[Reserved.]</u>

   Section 2.19 <u>[Reserved.]</u>

   Section 2.20 <u>Superpriority</u>. Except as set forth herein or in the Financing Order, no other claim having a priority superior or pari passu to that granted to the Agent and the Lenders by the Financing Order (other than the claims in favor of the ABL DIP Agent) shall be granted or approved while any Obligations under this Agreement remain outstanding.  Except for the Carve out, no costs, fees or expenses of administration shall be imposed against the Administrative Agent, the Lenders or any of the Collateral or any of the Existing Agent, the Existing Lenders or the Collateral (as defined in the Existing Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each of the Credit Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent, Lenders or any of the Collateral or any of the Existing Agent or the Existing Lenders.

   Section 2.21 <u>Waiver of any Priming Rights</u>.  On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrower and the Guarantors hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, in each case other than the Carve out, obligations under the ABL DIP Credit Documents or otherwise provided in the Financing Orders.

Section 2.22   Existing Fleet Mortgages.  All Fleet Mortgages entered in connection with the Existing Secured Obligations shall secure the Obligations hereunder as well as the Existing Secured Obligations.

ARTICLE 3   Yield Protection, Illegality and Replacement of Lenders.

Section 3.01   Increased Costs, Illegality, etc.

(a)   In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)   on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBO Rate;

(ii)   at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any LIBO Rate Loan because of any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the official interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, official guideline or request, such as, but not limited to: (A) any additional Tax imposed on any Lender (except Indemnified Taxes or Other Taxes indemnified under Section 5.01 or any Excluded Taxes) or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the LIBO Rate; or

(iii)   at any time, if the making or continuance of any LIBO Rate Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice (by telephone promptly confirmed in writing) to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, LIBO Rate Loans shall no longer be available until such time as the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Conversion/Continuation given by the Borrower with respect to LIBO Rate Loans which have not yet been incurred (including by way of conversion) shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating,

interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice setting forth the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, shall be submitted to the Borrower by such Lender and shall, absent manifest error, be final and conclusive and binding on all the parties hereto), (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 3.01(b) as promptly as possible and, in any event, within the time period required by law.

(b)        Subject to Section 3.06, at any time that any LIBO Rate Loan is affected by the circumstances described in Section 3.01(a)(ii), the Borrower may, and in the case of a LIBO Rate Loan affected by the circumstances described in Section 3.01(a)(iii), the Borrower shall, either (x) if the affected LIBO Rate Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 3.01(a)(ii) or (iii) or (y) if the affected LIBO Rate Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such LIBO Rate Loan into a Base Rate Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 3.01(b).

(c)        If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital or liquidity requirements, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital or liquidity required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then Borrower agrees to pay to such Lender, upon its written demand therefor, such additional documented amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable; provided that such Lender's determination of compensation owing under this Section 3.01(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 3.01(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts.

(d)        Notwithstanding anything in this Agreement to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III ((x) and (y) collectively referred to as "Dodd Frank and Basel III"), shall be deemed to be a change after the Closing Date in a requirement of law or

government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 3.01).

Notwithstanding the above, a Lender will not be entitled to demand compensation for any increased cost or reduction set forth in this Section 3.01 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances at such time.

Section 3.02   Compensation.  The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation and the calculation of the amount of such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its LIBO Rate Loans but excluding loss of anticipated profits and excluding the impact of the second proviso of the definition of LIBO Rate) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, LIBO Rate Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the applicable Borrower or deemed withdrawn pursuant to Section 3.01(a)); (ii) if any prepayment or repayment (including any termination or reduction of Commitments made pursuant to Section 2.07 or as a result of an acceleration of the Loans pursuant to Section 11) or conversion of any of its LIBO Rate Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any LIBO Rate Loans is not made on any date specified in a notice of termination or reduction given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay its LIBO Rate Loans when required by the terms of this Agreement or (y) any election made pursuant to Section 3.01(b).

Section 3.03   Change of Lending Office.  Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 3.01(a)(ii) or (iii), Section 3.01(c) or Section 5.01 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 3.03 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 3 and 5.01.

Section 3.04   Replacement of Lenders.  (x) If any Lender becomes a Defaulting Lender, (y) upon the occurrence of an event giving rise to the operation of Section 3.01(a)(ii) or (iii), Section 3.01(c) or Section 5.01 with respect to such Lender or (z) in the case of a refusal by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders as (and to the extent) provided in Section 13.12(b), the Borrower shall have the right, if no Event of Default then exists (or, in the case of preceding clause (z), will exist immediately after giving effect to such replacement), to replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") and each of whom shall be required to be reasonably

acceptable to the Administrative Agent (to the extent the Administrative Agent's consent would be required for an assignment to such Replacement Lender pursuant to <u>Section 13.04</u>); provided that (i) at the time of any replacement pursuant to this <u>Section 3.04</u>, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to <u>Section 13.04(b)</u> (and with all fees payable pursuant to said <u>Section 13.04(b)</u> to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of the Replaced Lender and, in connection therewith, shall pay to (x) the Replaced Lender in respect thereof an amount equal to the sum of (I) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender and (II) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to <u>Section 2.05</u> and (ii) all obligations of Borrower due and owing to the Replaced Lender at such time (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid) shall be paid in full to such Replaced Lender concurrently with such replacement. Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this <u>Section 3.04</u>, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this <u>Section 3.04</u> and <u>Section 13.04</u>. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above, recordation of the assignment on the Register pursuant to <u>Section 13.14</u>, (x) the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, <u>Sections 3.01</u>, <u>3.02</u>, <u>5.01</u>, <u>12.07</u> and <u>13.01</u>), which shall survive as to such Replaced Lender.

Section 3.05   <u>Inability to Determine Rates</u>.  If the Required Lenders determine in good faith that for any reason (a) U.S. Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) that the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the LIBO Rate component of the Base Rate, the utilization of the LIBO Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of LIBO Rate Loans in the amount specified therein.

Section 3.06    Effect of Benchmark Transition Event.

(a)    Benchmark Replacement.   Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent (acting at the direction of the Required Lenders) and Borrower may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. New York time on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the LIBO Rate with a Benchmark Replacement pursuant to this Section 3.06 will occur prior to the applicable Benchmark Transition Start Date.

(b)    Benchmark Replacement Conforming Changes.   In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(c)    Notices; Standards for Decisions and Determinations.   The Administrative Agent (acting at the direction of the Required Lenders) will promptly notify Borrower and the Lenders of (1) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (2) the implementation of any Benchmark Replacement, (3) the effectiveness of any Benchmark Replacement Conforming Changes, and (4) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Agent or Lenders pursuant to this Section 3.06 including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 3.06.

(d)    Benchmark Unavailability Period.   Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any request for a LIBO Borrowing of, conversion to or continuation of LIBO Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon the LIBO Rate will not be used in any determination of the Base Rate.

ARTICLE 4    **[Reserved]**.

ARTICLE 5    Taxes.

Section 5.01    Net Payments.

(a)    All payments made by or on account of any Credit Party under any Credit Document shall be made free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable law. If any Indemnified Taxes are required to be withheld or deducted from such payments, then the Credit Parties jointly and severally agree that (i) to the extent such deduction or withholding is on account of an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions or withholding (including deduction or withholdings applicable to additional sums payable under this Section 5.01), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent will make such deductions or withholdings, and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. In addition, the Credit Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law. The Credit Parties will furnish to the Administrative Agent within forty-five (45) days after the date the payment by any of them of any Indemnified Taxes or Other Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by the applicable Credit Party. The Credit Parties jointly and severally agree to indemnify and hold harmless the Administrative Agent and each Lender, and reimburse the Administrative Agent and each Lender, within ten (10) days of written request therefor, for the amount of any Indemnified Taxes (including any Indemnified Taxes imposed on amounts payable under this Section 5.01) payable or paid by the Administrative Agent or such Lender (or their Affiliates on behalf of the Administrative Agent or such Lender) or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, and any Other Taxes, and any reasonable out-of-pocket expenses arising therefrom or with respect thereto (including reasonable attorneys' and tax advisors' fees and expenses), whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

(b)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or a reduced rate of, withholding Tax; provided however, notwithstanding anything to the contrary in this Section 5.01(b), the completion, execution and submission of such forms or documentation (other than such documentation set forth in Section 5.01(c)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or its Affiliates. Each Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documents required below in Section 5.01(c)) expired, obsolete or inaccurate in any respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new

documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.

(c)     Without limiting the generality of the foregoing: (w) each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Lender that is an assignee or transferee of an interest under this Agreement pursuant to Section 3.04 or 13.04 (unless the relevant Lender was already a Lender hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Lender, (i) two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (or successor form) or Form W-8BEN-E (or successor form) claiming eligibility for benefits of an income tax treaty to which the United States is a party or Form W-8ECI (or successor form); (ii) in the case of a Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest," a certificate substantially in the form of Exhibit C (any such certificate, a "U.S. Tax Compliance Certificate") and two accurate and complete original signed copies of Internal Revenue Service Form W-8BEN (or successor form) or W-8BEN-E (or successor form) certifying to such Lender's entitlement as of such date to a complete exemption from U.S. withholding tax with respect to payments of interest to be made under this Agreement; or (iii) to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two accurate and complete original signed copies of Internal Revenue Service Form W-8IMY (or successor form) of the Lender, accompanied by Form W-8ECI, Form W-8BEN, Form W-8BEN-E, U.S. Tax Compliance Certificate, Form W-8IMY, Form W-9, and/or any other required information (or successor or other applicable form) from each beneficial owner that would be required under this Section 5.01(c) if such beneficial owner were a Lender (provided that, if the Lender is a partnership for U.S. federal income Tax purposes (and not a participating Lender), and one or more beneficial owners are claiming the portfolio interest exemption, the U.S. Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owners); (x) each Lender that is a United States person, as defined in Section 7701(a)(30) of the Code, shall deliver to the Borrower and the Administrative Agent, at the times specified in Section 5.01(b), two accurate and complete original signed copies of Internal Revenue Service Form W-9, or any successor form that such Person is entitled to provide at such time, in order to qualify for an exemption from United States backup withholding requirements; (y) the Administrative Agent shall deliver to the Borrower, on or prior to the date it becomes the Administrative Agent hereunder, one accurate and complete original signed copy of Internal Revenue Service Form W-9 or any applicable successor form; and (z) if any payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine, if necessary,

the amount to deduct and withhold from such payment. Solely for purposes of this Section 5.01(c)(z), "FATCA" shall include any amendment made to FATCA after the Closing Date.

Notwithstanding any other provision of this Section 5.01, a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(d)     If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Credit Parties or with respect to which a Credit Party has paid additional amounts pursuant to Section 5.01(a), it shall, subject to Section 13.02, pay to the relevant Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Credit Party under Section 5.01(a) with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any Taxes) of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the relevant Credit Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 5.01(d), in no event will the Administrative Agent or any Lender be required to pay any amount to any Credit Party pursuant to this Section 5.01(d) to the extent that such payment would place the Administrative Agent or such Lender in a less favorable position (on a net after-Tax basis) than such party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. Nothing in this Section 5.01(d) shall be construed to obligate the Administrative Agent or any Lender to disclose its Tax returns or any other information regarding its Tax affairs or computations to any Person or otherwise to arrange its Tax affairs in any manner other than as it determines in its sole discretion.

ARTICLE 6     Conditions Precedent to Credit Events on the Closing Date.

The Administrative Agent and the Lenders shall not be required to fund any Loans on the Closing Date, until the following conditions are satisfied or waived.

Section 6.01     Closing Date; Credit Documents.  On or prior to the Closing Date, Holdings and the Borrower shall have signed a counterpart of this Agreement (whether the same or different counterparts), the Administrative Agent Fee Letter and each other Credit Document and shall have delivered (by electronic transmission or otherwise) the same to the Administrative Agent or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it, including certified copies of a recent date of requests for information or copies (Form UCC1), or equivalent reports as of a recent date, listing all effective financing statements that name any Credit Party as debtor and that are filed in any applicable jurisdiction, together with copies of such other financing statements that name any Credit Party as debtor, United States Patent and Trademark Office and United States Copyright Office searches reasonably requested by the Administrative Agent (acting at the direction of the

Required Lenders), reports as of a recent date listing all effective tax and judgment liens with respect to any Credit Party in each jurisdiction as the Agents (acting at the direction of the Required Lenders) may reasonably require, all in form and substance reasonably satisfactory to the Required Lenders.

Section 6.02   Five Year Plan.  On or prior to the Closing Date, Agents and Lenders shall have received a five year business plan, in form and substance reasonably acceptable to the Required Lenders.

Section 6.03   Corporate Documents; Proceedings, etc.

(a)   On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by a Responsible Officer of such Credit Party, and attested to by the Secretary or any Assistant Secretary of such Credit Party with appropriate insertions, together with copies of the certificate or articles of incorporation and bylaws (or equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably satisfactory to the Administrative Agent.

(b)   On the Closing Date, the Administrative Agent shall have received good standing certificates and bring-down telegrams or facsimiles, if any, for the Credit Parties that the Administrative Agent reasonably may have requested, certified by proper Governmental Authorities in each Credit Party's jurisdiction of incorporation or formation, as applicable.

Section 6.04   Bankruptcy Conditions.

(a)   The Bankruptcy Court shall have entered the Initial Financing Order within three (3) Business Days of the commencement of the Bankruptcy Cases, which Initial Financing Order (i) shall have been entered upon an application or motion of the Credit Parties satisfactory in form and substance to the Administrative Agent and the Required Lenders in their sole discretion and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by the Required Lenders; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of the Required Lenders; and, if the Initial Financing Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Initial Financing Order, nor the making of the Loans or the performance by the Credit Parties of any of the Obligations shall be the subject of a presently effective stay; (iii) such order shall (A) authorize and approve the Credit Parties' entry into this Agreement, the Credit Documents and the transactions contemplated thereby and hereby, (B) grant of the super-priority status, security interests and priming Liens in favor of the Collateral Agent, and the payment of all fees of the Agents and Lenders (including, without limitations, fees and expenses of legal counsel and financial advisors to the Agents and Lenders), (C) provide for the lifting or modifying the automatic stay to permit the Debtors to perform their obligations and Agents and the Lenders to exercise their rights and remedies with respect to this Agreement and the other Credit Documents, (D) [reserved.], (E) provide for adequate protection in favor of Existing Agent and Existing Lenders, (F) provide for the prohibition on non-consensual use of cash collateral or third party financing secured by Liens senior or pari passu with the Liens securing

the Obligations or the Existing Secured Obligations, (G) include terms and conditions customary for transactions of this type, (H) shall otherwise be in form and substance satisfactory to Required Lenders and (I) provide for the non-refundable payment of fees and other amounts pursuant to Section 2.05 hereof; (iv) which Initial Financing Order shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of the Administrative Agent (acting at the direction of the Required Lenders), and, if the Initial Financing Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Initial Financing Order, nor the entrance into this Agreement and the other Credit Documents or the performance by the Credit Parties thereunder shall be the subject of a presently effective stay.

(b)     The Bankruptcy Cases shall have been commenced in the Bankruptcy Court, and all material First Day Orders and all material related orders and motions to be entered and documents to be filed with the Bankruptcy Court at or promptly following the commencement of the Bankruptcy Cases shall have been provided in advance to the Required Lenders and shall be in form and substance reasonably satisfactory to the Required Lenders.

(c)     The Bankruptcy Court shall have entered a cash management order authorizing the Credit Parties to maintain and continue to use their cash management system in the ordinary course of business, which order shall be in form and substance reasonably satisfactory to the Required Lenders (the "Cash Management Order").

(d)     Administrative Agent and Lenders shall have received a copy of the Initial Budget, which shall be in form and substance satisfactory to the Lenders and in the form of Exhibit I-1 attached hereto.

Section 6.05     Restructuring Support Agreement.  On or prior to the Closing Date, the Restructuring Support Agreement shall be entered in form and substance satisfactory to Agents and Lenders and shall be in full force and effect.

Section 6.06     Security Agreements.  On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement substantially in the form of Exhibit E (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement") covering all of such Credit Party's present and future Collateral referred to therein, and shall have delivered to the Collateral Agent:

(i)     proper financing statements (Form UCC1 or the equivalent) and other filings (including intellectual property security agreements) authorized for filing under the UCC or other appropriate filing offices of each jurisdiction as may be reasonably necessary or desirable to perfect the security interests purported to be created by the Security Agreement;

(ii)     (x) certified copies of a recent date of requests for information or copies (Form UCC1), or equivalent reports as of a recent date, listing all effective financing statements that name the Borrower or any other Credit Party as debtor and that are filed in the jurisdictions referred to in clause (i) above, together with copies of such other financing statements that name the Borrower or any other Credit Party as debtor

(none of which shall cover any of the Collateral except to the extent evidencing Permitted Liens), (y) United States Patent and Trademark Office and United States Copyright Office searches reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) and (z) reports as of a recent date listing all effective tax and judgment liens with respect to the Borrower or any other Credit Party in each jurisdiction as the Agents (acting at the direction of the Required Lenders) may reasonably require; and

(iii)    [reserved]; and

(iv)    all of the certificates, instrument and promissory notes evidencing or constituting Collateral referred to in the Security Agreement (to the extent required to be delivered to the Collateral Agent pursuant to the Security Agreement) together with executed and undated endorsements for transfer, along with evidence that all other actions necessary, to perfect (to the extent required in the Security Agreement) the security interests in Collateral purported to be created by the Security Agreement have been taken.

Section 6.07    Subsidiaries Guaranty.  On the Closing Date, each Subsidiary Guarantor shall have duly authorized, executed and delivered the Subsidiaries Guaranty substantially in the form of Exhibit F (as amended, modified or supplemented from time to time, the "Subsidiaries Guaranty"), guaranteeing all of the obligations of the Borrower as more fully provided therein.

Section 6.08    **[Reserved]**.ABL DIP Credit Agreement.  On the Closing Date, the Credit Parties shall have entered into the ABL DIP Credit Agreement on terms satisfactory to the Required Lenders and all conditions precedent to the effectiveness thereof shall have been satisfied.

Section 6.10    Fees, etc.  On the Closing Date, the Borrower shall have paid to the Agents and each Lender, all costs, fees and expenses (including, without limitation, legal fees and expenses that were provided to the Borrower on or prior to the Closing Date (including those of Davis Polk & Wardwell LLP, counsel engaged by the Lenders, Stroock & Stroock & Lavan LLP, counsel engaged by the Administrative Agent, Rapp & Krock, P.C., counsel engaged by the Lenders in connection with the Debtors' Chapter 11 cases, Winston & Strawn LLP, as maritime counsel to the Lenders, Evercore Group L.L.C. and any other professional advisors)) and other compensation payable to the Agents or such Lender or otherwise payable in respect of the Transaction to the extent then due.

Section 6.11    **[Reserved]**.

Section 6.12    Patriot Act.  The Agents and the Lenders shall have received from the Credit Parties all documentation and other information (including a Beneficial Ownership Certificate) required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and OFAC/Politically Exposed Person ("PEP"), and the Agents and each Lender have completed Patriot Act searches, OFAC/PEP searches and customary individual background checks for each Credit Party, and OFAC/PEP searches and customary individual background searches for each Credit Party's

senior management, key principals, and legal and beneficial owners, the results of which shall be satisfactory to Agents and the Lenders.

Section 6.13   Borrowing Notice.  Prior to the making of a Loan on the Closing Date, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.03(c).

Section 6.14   Material Adverse Effect. There shall have been no change, event, effect, occurrence, development, matter, state of facts, series of events or circumstances that either individually or in the aggregate, has had or could reasonably be expected to have (i) a material adverse effect on the business, assets, financial condition or results of operations of the Credit Parties taken as a whole, (ii) a material and adverse effect on the rights and remedies of the Administrative Agent and other Secured Creditors, taken as a whole, under the Credit Documents, (iii) a material and adverse effect on the ability of the Credit Parties, taken as a whole, to perform their obligations under the Credit Documents, (iv) the perfection or priority of the Liens granted pursuant to the Credit Documents or the Financing Order, (v) the perfection or priority of the Liens granted to secure the Existing Obligations, or (vi) the ability of the Existing Agent and the Existing Lenders to enforce the Existing Credit Documents, except in each case for the commencement of the Bankruptcy Cases and the events that customarily and reasonably result from the commencement of the Bankruptcy Cases.

Section 6.15   **[Reserved]**.

Section 6.16   **[Reserved]**.

Section 6.17   Officer's Certificate.   The Administrative Agent shall have received a certificate of a Responsible Officer of Holdings and the Borrower certifying that as of the Closing Date (i) all the representations and warranties set forth in Article 8 hereof or in any other Credit Document are true and correct in all material respects (or to the extent such representation or warranty is qualified as to "materiality" or similar language, such representation or warranty shall be true and correct in all respects) to the extent set forth therein, (ii) there is no Material Adverse Effect as described in Section 6.14 and (iii) no Default or Event of Default exists.

Section 6.18   KYC Documentation; Anti-Money Laundering. The Borrower shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA Patriot Act, including a duly completed IRS Form W-9 or other applicable tax form.

ARTICLE 7   Conditions Precedent to All Credit Events.

The obligation of each Lender to make any Credit Extension shall be subject to the satisfaction (or waiver) of each of the conditions precedent set forth below:

Section 7.01   Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) if Loans are being requested.

Section 7.02   **[Reserved.]**

Section 7.03   No Default.  No Default or Event of Default shall exist at the time of, or result from, such funding or issuance.

Section 7.04   Representations and Warranties.   Each of the representations and warranties made by any Credit Party set forth in Article 8 hereof or in any other Credit Document shall be true and correct in all material respects (without duplication of any materiality standard set forth in any such representation or warranty) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such date (without duplication of any materiality standard set forth in any such representation or warranty).

Section 7.05   No Injunction.  No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against the Borrower, Agents, or any Lender.

Section 7.06   **[Reserved.]**

Section 7.07   **[Reserved.]**

The acceptance of the benefits of each Credit Event shall constitute a representation and warranty by Borrower to the Administrative Agent and each of the Lenders that all the conditions specified in this Article 7 and applicable to such Credit Event are satisfied as of that time (other than such conditions which are subject to the discretion of the Administrative Agent or the Lenders). All of the certificates, legal opinions and other documents and papers referred to in Article 6 and in this Article 7, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders.

ARTICLE 8   Representations, Warranties and Agreements. In order to induce the Lenders to enter into this Agreement and to make the Loans, each of Holdings and Borrower, as applicable, makes the following representations, warranties and agreements, in each case after giving effect to the Transaction.

Section 8.01   Organizational Status.  Each of Holdings, the Borrower and each of its Restricted Subsidiaries (i) is a duly organized and validly existing corporation, partnership, limited liability company or unlimited liability company, as the case may be, in good standing under the laws of the jurisdiction of its organization, (ii) has the corporate, partnership, limited liability company or unlimited holding company power and authority, as the case may be, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications, except for failures to be so qualified which, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 8.02   <u>Power and Authority</u>.   Each Credit Party thereof has the corporate, partnership, limited liability company or unlimited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and subject to the approval of the Bankruptcy Court and pursuant to the Financing Order has taken all necessary corporate, partnership, limited liability company or unlimited liability company action, as the case may be, to authorize the execution, delivery and performance by it of each of such Credit Documents. Each Credit Party thereof has duly executed and delivered each of the Credit Documents to which it is party, and subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

Section 8.03   <u>No Violation</u>.   Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its respective Restricted Subsidiaries pursuant to the terms of, any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its respective Restricted Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject, other than in the case of any contravention, breach, default and/or conflict, that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or bylaws (or equivalent organizational documents), as applicable, of any Credit Party or any of its respective Restricted Subsidiaries.

Section 8.04   <u>Approvals</u>.   Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date), exemption by, any governmental or public body or authority, or any subdivision thereof, is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, the execution, delivery and performance of any Credit Document.

Section 8.05   <u>Financial Condition</u>.   Since the Closing Date there has been no change, event or occurrence that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 8.06    Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of any Credit Party, threatened (i) other than the filing, commencement and continuation of the Bankruptcy Cases and any litigation resulting therefrom, with respect to the Transaction or any Credit Document or (ii) that either individually or in the aggregate, have had, or would reasonably be expected to have, a Material Adverse Effect.

Section 8.07    True and Complete Disclosure.

(a)    All written information (taken as a whole) furnished by or on behalf of any Credit Party in writing to the Administrative Agent or any Lender (including, without limitation, all such written information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein does not contain any material misstatement of fact or omit to state any material fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such written information was provided.

(b)    Notwithstanding anything to the contrary in the foregoing clause (a) of this Section 8.07, none of the Credit Parties makes any representation, warranty or covenant with respect to any information consisting of statements, estimates, forecasts and projections regarding the future performance of the Borrower or any of its Subsidiaries, or regarding the future condition of the industries in which they operate other than that such information has been prepared in good faith based upon assumptions believed to be reasonable at the time of preparation thereof (it being understood and agreed that projections are not to be viewed as facts, projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Credit Parties, no assurances can be given that any particular projection will be realized and that actual results during the period or periods covered by such projections may differ from projected results, and such differences may be material).

(c)    As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 8.08    Use of Proceeds.  All proceeds of the Loans shall be deposited in the Term Loan Proceeds Account and will be used in compliance with the last sentence of Section 8.15 and Section 10.12.

Section 8.09    Tax Returns and Payments.  Except as would not reasonably be expected to result in aggregate liabilities in excess of $1,000,000, (i) each Credit Party and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all federal, state and other material Tax returns, statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of such Credit Party and/or any of its Subsidiaries, (ii) the Returns accurately reflect in all material respects all liability for Taxes of the Credit Party and its Subsidiaries for the periods covered thereby, and (iii) each Credit Party and each of its Subsidiaries have paid all material Taxes payable by them, other than to the extent subject to the automatic stay, those, if any, for which payment is otherwise excused under the Bankruptcy Code or those that are being contested in good faith by appropriate proceedings and fully provided for as a reserve on the financial

statements of such Person in accordance with U.S. GAAP (to the extent no Lien with respect thereto has been filed other than a Permitted Lien). Except as set forth in Schedule 8.09, there is no material action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of a Credit Party or any of its Subsidiaries, threatened in writing by any authority regarding any Taxes relating to any Credit Party or any of its Subsidiaries.

Section 8.10   ERISA.

(a)     No ERISA Event has occurred or is reasonably expected to occur that would reasonably be expected to result in a Material Adverse Effect.  Each ERISA Plan and each Employee Benefit Plan is in compliance in form and operation with its terms and with the applicable provisions of ERISA, the Code and other applicable law, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Employee Benefit Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service or is in the form of a prototype document that is the subject of a favorable opinion letter.  There are no pending or, to the knowledge of the Credit Parties, threatened or contemplated claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Employee Benefit Plan, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Employee Benefit Plan, except for such non-compliance that would not reasonably be expected to have a Material Adverse Effect.

(b)     There exists no Unfunded Pension Liability with respect to any ERISA Plan, except as would not reasonably be expected to result in a Material Adverse Effect.

(c)     If any Credit Party or ERISA Affiliate were to withdraw from all Multiemployer Plans in a complete withdrawal as of the date this assurance is given, the aggregate withdrawal liability that would be incurred would not reasonably be expected to have a Material Adverse Effect.

(d)     There are no actions, suits or claims pending against or involving any Employee Benefit Plan (other than routine claims for benefits) or, to the knowledge of the Borrower or any Restricted Subsidiary of the Borrower, threatened, which would reasonably be expected to be asserted successfully against any Employee Benefit Plan and, if so asserted successfully, would reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect.

(e)     Each Credit Party and any ERISA Affiliate have made all contributions to or under each ERISA Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such ERISA Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a ERISA Plan or Multiemployer Plan except where any failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(f)     Except as would not reasonably be expected to have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made; and (iii) no Credit Party has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan.

Section 8.11   The Security Documents.

(a)     Subject to the approval of the Bankruptcy Court and pursuant to the Financing Order, the provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Collateral (as described in the Security Agreement), and upon (i) the timely and proper filing of financing statements listing each applicable Credit Party, as a debtor, and the Collateral Agent, as secured creditor, in the secretary of state's office (or other similar governmental entity) of the jurisdiction of organization of such Credit Party, (ii) sufficient identification of commercial tort claims (as applicable), (iii) execution of a control agreement establishing the Collateral Agent's "control" (within the meaning of the New York UCC) with respect to any Deposit Account, (iv) the recordation of the Patent Security Agreement, if applicable, and the Trademark Security Agreement, if applicable, in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office and (v) the recordation of the Copyright Security Agreement in U.S. Copyrights, if applicable, in the form attached to the Security Agreement with the United States Copyright Office, the Collateral Agent, for the benefit of the Secured Creditors, has (to the extent provided in the Security Agreement) a fully perfected security interest in all right, title and interest in all of the Collateral (as described in the Security Agreement), subject to no other Liens other than Permitted Liens, in each case, to the extent perfection can be accomplished under applicable law through these actions.

(b)     The provisions of each Mortgage are effective to create, as security for the Obligations, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) and, upon recordation in the appropriate recording office, perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except as may exist pursuant to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Liens related thereto).

(c)     The provisions of each Fleet Mortgage are effective to create, as security for the Obligations, a valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and, upon recordation in the appropriate recording office, perfected security interest in and mortgage lien on the respective Mortgaged

Vessel in favor of the Security Trustee (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, subject to no other Liens (other than Permitted Liens related thereto).

(d)     The entry of the Financing Order is effective to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, as security for the Obligations, (i) a valid (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject to the Intercreditor Agreements, with the priority set forth therein, (ii) an allowed administrative expense in each of the Bankruptcy Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carveout (the "Superpriority Claims"), (iii) sufficient replacement Liens to the extent of any post-petition diminution in value of the Collateral (as defined in the Existing Credit Agreement) securing the Existing Secured Obligations, subject, in each case and as applicable, to the Carve-Out.

(e)     Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for either (x) the pledge or grant by Holdings or any of its Subsidiaries of the Liens purported to be created in favor of Collateral Agent pursuant to this Agreement or any of the other Credit Documents or (y) the exercise by Agents (acting at the direction of the Required Lenders) of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to this Agreement, any of the other Credit Documents or created or provided for by applicable law), except as may be required in connection with the disposition of any pledged Collateral by laws generally affecting the offering and sale of securities.

Section 8.12    Properties.  As of the Closing Date, the location of all material owned or leased Real Property of the Credit Parties and all dry-docks of the Credit Parties is identified on Schedule 8.12(a) and indicating which Real Property is or will constitute a Mortgaged Property and Schedule 8.12(a) lists completely and correctly as of the date hereof all Vessels owned or leased by the Credit Parties on the Closing Date and indicating which Vessels are or will constitute a Mortgaged Vessel. The Borrower and each of its Subsidiaries has good and marketable title or, except as set forth in Schedule 8.12(b), a valid leasehold interest in any Real Property material to its business, and good and valid title in all material tangible properties owned by it, in each case, free and clear of all Liens, other than Permitted Liens. Without limiting the generality of the foregoing, except as set forth on Schedule 8.12(b), as of the Closing Date, each of the Vessels owned by any of the Credit Parties is either duly documented under the laws of the United States in the name of the Credit Party or the Subsidiary listed on Schedule 8.12(b) as the owner thereof or is the subject of an application for documentation that is in substantial compliance with Chapter 121 of Title 46 of the United States Code and the regulations prescribed thereunder.

Section 8.13    Capitalization.  All outstanding shares of capital stock of the Borrower have been duly and validly issued and are fully paid and non-assessable (other than any assessment on the shareholders of the Borrower that may be imposed as a matter of law) and are

owned by Holdings. The Borrower does not have outstanding any capital stock or other securities convertible into or exchangeable for its capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock.

Section 8.14   Subsidiaries.  On and as of the Closing Date and after giving effect to the consummation of the Transaction, (i) Holdings has no direct Subsidiaries other than the Borrower and (ii) the Borrower has no Subsidiaries other than those Subsidiaries listed on Schedule 8.14. Schedule 8.14 correctly sets forth, as of the Closing Date and after giving effect to the Transaction, the percentage ownership (direct and indirect) of the Borrower in each class of capital stock of each of its Subsidiaries and also identifies the direct owner thereof.

Section 8.15   Compliance with Statutes, OFAC Rules and Regulations; Patriot Act; FCPA.

(a)     Except as otherwise permitted by the Bankruptcy Code or pursuant to any order of the Bankruptcy Court, which order shall be in form and substance acceptable to the Agent, each of the Borrower and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including Environmental Laws), except such noncompliance as, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.  The Borrower will not directly (or knowingly indirectly) use the proceeds of the Loans to violate or result in a violation of any such applicable statutes, regulations, orders or restrictions referred to in the immediately preceding sentence.

(b)     No Credit Party or any of its Subsidiaries is in violation of any Sanctions. No Credit Party nor any of its Subsidiaries nor any director, officer, employee, agent or Affiliate of such Credit Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Credit Parties and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Credit Parties and its Subsidiaries, each director, officer, employee, agent and Affiliate of each such Credit Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Agent, any Lender, or other individual or entity participating in any transaction).

Section 8.16   Investment Company Act.  None of Holdings, the Borrower or any of its Restricted Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, required to be registered as such.

Section 8.17    [Reserved.].  Environmental Matters.

(a)    The Borrower and each of its Restricted Subsidiaries are in compliance with all Environmental Laws and the requirements of any permits issued under such Environmental Laws. There are no pending or, to the knowledge of any Credit Party, threatened Environmental Claims against the Borrower or any of its Restricted Subsidiaries or any Vessel or Real Property currently or formerly owned, leased or operated by the Borrower or any of its Restricted Subsidiaries.  To the knowledge of any Credit Party, there are no facts, circumstances, conditions or occurrences with respect to the business or operations of the Borrower or any of its Restricted Subsidiaries, or any Real Property currently or formerly owned, leased or operated by the Borrower or any of its Restricted Subsidiaries that would be reasonably expected (i) to form the basis of an Environmental Claim against the Borrower or any of its Restricted Subsidiaries or (ii) to cause any Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy or transferability of such Real Property by the Borrower or any of its Restricted Subsidiaries under any Environmental Law.

(b)    Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Vessel or Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries where such generation, use, treatment, storage, transportation or Release has (i) violated or would be reasonably expected to violate any Environmental Law, (ii) give rise to an Environmental Claim or (iii) give rise to liability under any Environmental Law.

(c)    Notwithstanding anything to the contrary in this Section 8.18, the representations and warranties made in this Section 8.18 shall be untrue only if the effect of any or all conditions, violations, claims, restrictions, failures and noncompliance of the types described above would, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 8.19    Labor Relations.  Except as set forth in Schedule 8.19 or except to the extent the same has not, either individually or in the aggregate, had and would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts, slowdowns or other labor disputes pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of each Credit Party, threatened against the Borrower or any of its Restricted Subsidiaries, (b) to the knowledge of each Credit Party, there are no questions concerning union representation with respect to the Borrower or any of its Restricted Subsidiaries, (c) the hours worked by and payments made to employees of the Borrower or any of its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local, or foreign law dealing with such matters and (d) to the knowledge of each Credit Party, no wage and hour department investigation has been made of the Borrower or any of its Restricted Subsidiaries.

Section 8.20    Intellectual Property.    The Borrower and each of its Restricted Subsidiaries owns or has the right to use all patents, trademarks, domain names, service marks, trade names, copyrights, inventions, trade secrets, formulas, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer

software and databases) (collectively, "Intellectual Property"), necessary for the present conduct of their respective businesses, without any known conflict with or infringements of the Intellectual Property rights of others.

Section 8.21   Legal Names; Type of Organization (and Whether a Registered Organization); Jurisdiction of Organization; etc.  Schedule 8.21 contains for each Credit Party, as of the Closing Date, (i) the exact legal name of such Credit Party, (ii) the type of organization of such Credit Party, (iii) whether or not such Credit Party is a registered organization, (iv) the jurisdiction of organization of such Credit Party, (v) such Credit Party's Location, and (vi) the organizational identification number (if any) of such Credit Party. Each Credit Party agrees that as a result of any change with respect to any information provided in the preceding sentence, to make or cause all filings under the UCC or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

Section 8.22   [Reserved].

Section 8.23   [Reserved].

Section 8.24   Citizenship.  Borrower and each Subsidiary Guarantor is a citizen of the United States within the meaning of 46 U.S.C. § 50501, eligible to operate vessels in the coastwise trade of the United States.

Section 8.25   [Reserved]. Financing Order .  The Financing Order is in full force and effect, is not subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order and has not been reversed, modified, amended, stayed or vacated except with Administrative Agent's written consent (acting at the direction of the Required Lenders).

Section 8.27   Exit Financing Commitment Letter.  If finalized, the Exit Financing Commitment Letter is in full force and effect.Restructuring Support Agreement.   The Restructuring Support Agreement remains in full force and effect at all times.

Section 8.29   Bankruptcy Cases.  The Bankruptcy Cases were commenced on the Filing Date in accordance with applicable law, and proper notice has been or will be given of (i) the motion seeking approval of the Credit Documents, the Initial Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Initial Financing Order and (iii) the hearing for the entry of the Final Financing Order.

Section 8.30   Financing Order.  The Credit Parties are in compliance with the terms and conditions of the Financing Order.  Each of the Initial Financing Order (with respect to the period prior to the entry of the Final Financing Order) or the Final Financing Order (from after the date the Final Financing Order is entered), is in full force and effect and has not been vacated, reversed or rescinded, amended or modified (except as otherwise consented to by Administrative Agent (acting at the direction of the Required Lenders)) and no appeal of such order has been timely filed or, if timely filed, a stay pending such appeal is currently effective.

Section 8.31   Insurance. All properties of each Credit Party and its Subsidiaries are insured to the extent required by Section 9.03.   Schedule 8.31 sets forth a description of such insurance as of the Closing Date.

Section 8.32   Margin Stock.   Neither any Credit Party nor any of its Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.   No part of the proceeds of the Loans made to Borrower will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.   Neither any Credit Party nor any of its Subsidiaries expects to acquire any Margin Stock.

ARTICLE 9   Affirmative Covenants.   The Borrower and each of its Restricted Subsidiaries hereby covenants and agrees that on and after the Closing Date and so long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than any indemnification obligations arising hereunder which are not then due and payable):

Section 9.01   Information Covenants.   The Borrower will furnish to the Administrative Agent for distribution to each Lender:

(a)   Quarterly Financial Statements.   Beginning with the quarterly accounting period ending March 31, 2020, within forty-five (45) days after the close of each of the quarterly accounting periods of the Borrower (or with respect to the quarterly accounting period ending March 31, 2020, on or prior to June 30, 2020), (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of operations and income and stockholders' equity and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year, all of which shall be certified by the chief financial officer of the Borrower that they fairly present in all material respects in accordance with U.S. GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal yearend audit adjustments and the absence of footnotes, and (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period. If the Borrower has filed (within the time period required above) a Form 10Q with the SEC for any fiscal quarter described above, then to the extent that such quarterly report on Form 10Q contains any of the foregoing items, the Lenders shall accept such Form 10Q in lieu of such items.

(b)   [reserved].

(c)   [reserved.]

(d)   Officer's Certificates.   At the time of the delivery of the financial statements and related deliveries pursuant to Section 9.01(a), a Compliance Certificate from a Responsible Officer of the Borrower substantially in the form of Exhibit H, certifying on behalf of the Borrower that, to such Responsible Officer's knowledge after due inquiry, no Default or

Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall certify that there have been no changes to the Perfection Certificate or the latest Perfection Certificate Supplement, if later, since the date of the most recent certificate delivered pursuant to this <u>Section 9.01(d)</u> or <u>Section 9.12</u>, as applicable, or if there have been any such changes, a concurrent Perfection Certificate Supplement evidencing such changes and whether the Borrower and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

(e)    <u>Notice of Default, Litigation and Material Adverse Effect</u>.  Promptly after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default or any default or event of default under the ABL DIP Credit Agreement or any other post-petition debt instrument in excess of the Threshold Amount, (ii) any litigation, or governmental investigation or proceeding pending against Holdings or any of its Subsidiaries (x) which, either individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect (other than the Bankruptcy Cases) or (y) with respect to any Credit Document, or (iii) any other event, change or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

(f)    <u>Other Reports and Filings</u>.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials and reports, if any, which Holdings or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "<u>SEC</u>").

(g)    <u>Environmental Matters</u>.  Promptly after any officer of the Borrower or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:

(i)    any pending or threatened Environmental Claim against the Borrower or any of its Subsidiaries or any Vessel or Real Property owned, leased or operated by the Borrower or any of their respective Subsidiaries;

(ii)    any condition or occurrence on or arising from any Vessel or Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that (a) results in noncompliance by the Borrower or any of its Subsidiaries with any Environmental Law or (b) would reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Subsidiaries;

(iii)    any condition or occurrence on any Vessel or Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that could reasonably be expected to cause such Vessel or Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Vessel or Real Property under any Environmental Law; and

(iv) the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries as required by any Environmental Law or Governmental Authority and all notices received by the Borrower or any of its Subsidiaries under, or pursuant to, Environmental Law which identify the Borrower or any of its Subsidiaries as potentially responsible parties for remediation costs or which otherwise notify the Borrower or any of its Subsidiaries of potential liability under Environmental Law.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Subsidiary's response thereto.

(h)     Notices to Certain Holders of Indebtedness.  Contemporaneously with the sending or filing thereof (or reasonably promptly following receipt of), the Borrower will provide to the Administrative Agent for distribution to each of the Lenders, any notices provided to, or received from, holders of (I) Indebtedness, in each case of this clause (I), with a principal amount in excess of the Threshold Amount, (II) the Existing ABL Credit Agreement, or (III) ABL DIP Credit Documents.

(i)     [Reserved].

(j)     Other Information.   From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(k)     Budget.  Borrower shall (x) deliver to Administrative Agent and Lenders, no later than 9:00 a.m. New York time on February 5, 2020 and on the last Business Day of each fourth week thereafter, a proposed rolling 13-week budget with the information set forth in the Financing Order for the Credit Parties for the 13-week period following the date of delivery, which shall be in substantially the same form and detail of the Initial Budget (the "Weekly Cash Flow Forecast"), and accompanied by a certificate signed by a Responsible Officer of the Borrower to the effect that such budget has been prepared in good faith based upon assumptions which the Credit Parties believe to be reasonable in light of the conditions existing at the time of delivery; and (y) deliver to Agent and Lenders, on the third Business Day following each Testing Period, (i) a Variance Report in form and substance acceptable to the Required Lenders, and (ii) a written narrative report of the key performance metrics monitored by management of the Credit Parties regarding the business of the Borrower and its Subsidiaries, in each case in a form reasonably acceptable to the Required Lenders.

(l)     Conference Calls.   In addition to the foregoing, upon the reasonable request of the Required Lenders, Borrowers will participate in conference calls with Administrative Agent and Lenders and their representatives, consultants (including, without limitation, any Agent Consultant), and agents, at such mutually convenient dates and times (with frequency not to be unreasonable and in absence of exigent circumstances, no more frequently than one (1) time per calendar week) to be proposed by the Required Lenders upon reasonable notice, and will cause available senior members of management, Consultant, and any investment

bankers and other advisors of Holdings and its Subsidiaries, as applicable or as requested by such Lenders, and solely to the extent reasonably requested by the Required Lenders, one or more members of the board of directors of Holdings and its Subsidiaries, to participate in such calls for the purpose of discussing the status of the financial, collateral, and operational condition, businesses, liabilities, assets, and prospects of the Borrowers and their Subsidiaries and any sale, refinance or other strategic transaction efforts.   Upon Administrative Agent's (acting at the direction of the Required Lenders) reasonable request, and subject to any confidentiality restrictions, Holdings and its Subsidiaries shall promptly provide copies of all non-privileged material written materials and reports (in each case, excluding drafts) produced by Holdings and its Subsidiaries and shared with third parties in connection with any sale, refinance, or other strategic transaction efforts, and any written indications of interest, letters of intent, draft purchase documents, and commitment letters received by Holdings and its Subsidiaries relating to such sale, refinance, or other strategic transaction efforts of Holdings and its Subsidiaries or any other non-privileged written materials as the Lenders may request from time to time; provided, that such materials may be redacted to the extent information contained therein would adversely affect any attorney-client privilege; provided, further, that only final versions of such documents, or versions of such documents shared with third parties, shall be provided.  Without limiting the foregoing, Borrowers agree to notify, by telephone and in writing, Administrative Agent promptly upon any Borrower becoming aware of any material change or development relating to any sale or refinance efforts or to the financial, collateral, or operational condition, businesses, assets, liabilities, or prospects of such Borrower, any of its Affiliates, or any of their respective Subsidiaries.

Section 9.02   Books, Records and Inspections.

(a)     The Borrower will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity with U.S. GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities.

(b)     The Borrower will permit the Required Lenders, subject to reasonable advance notice to the Borrower and normal business hours, to visit and inspect the properties of the Borrower, at the Borrower's expense, inspect, audit and make extracts from the Borrower's corporate, financial or operating records, and discuss with its officers, employees, agents, advisors and independent accountants (subject to such accountants' customary policies and procedures) such Borrower's business, financial condition, assets and results of operations (it being understood that a representative of the Borrower is allowed to be present in any discussions with officers, employees, agent, advisors and independent accountants).  Neither the Administrative Agent nor any Lender shall have any duty to the Borrower to make any inspection, nor to share any results of any inspection or report with the Borrower. The Borrower acknowledges that all inspections, appraisals and reports are prepared by the Administrative Agent and Lenders for their purposes, and the Borrower shall not be entitled to rely upon them.

(c)     The Borrower will on ten days' notice, reimburse the Administrative Agent (on behalf of the Required Lenders) for all reasonable documented out-of-pocket costs and expenses in connection with any such inspection or examination.  This Section shall not be

construed to limit the Administrative Agent's or Required Lenders' right to use third parties for such purposes.

(d)        Borrower agrees to cooperate in connection with any audits or valuations that Agents (acting at the direction of the Required Lenders) may conduct or cause to be conducted at any time, including, without limitation, those performed by any Agent Consultant, and will provide any Agent Consultant with reasonable access at all times to all documentation, places of business, officers, Consultant, any investment banker, consultants, and employees of Borrower and Borrower's other advisors.   Borrower will promptly provide to any Agent Consultant such financial information concerning the Borrower's financial, collateral, and operational condition, businesses, assets, liabilities, and prospects as Agent Consultant may request from time to time.  Borrower will reimburse Agents in cash, on ten days' notice, for any and all reasonable fees, costs, expenses, and other charges incurred by such Agent relating to the engagement of any Agent Consultant from time to time (in each case, whether or not included in the Budget).  Notwithstanding anything to the contrary in this Section 9.02(d), none of Holdings or any of its Subsidiaries will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrowers, impair, waive or violate (based on the advice of counsel) the attorney-client privilege or is otherwise prohibited by law or fiduciary duty, (ii) such information constitutes attorney work product, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which the Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Agents or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters with respect thereto.

Section 9.03    Maintenance of Property; Insurance.

(a)        The Borrower will, and will cause each of its Restricted Subsidiaries to, (i) keep all tangible property necessary to the business of the Borrower and its Restricted Subsidiaries in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, (ii) maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and its Restricted Subsidiaries (including, without limitation, navigating risk and marine hull and machinery insurance, full form marine protection and indemnity insurance, and, to the extent required by Environmental Laws, vessel pollution, as more fully provided in the Fleet Mortgages), and (iii) furnish to the Administrative Agent, upon its request therefor (acting at the direction of the Required Lenders), full information as to the insurance carried. All such policies relating to owned Vessels shall include insurance in respect of each Vessel in an aggregate amount equal to the greater of the then fair market value or the book value of such Vessel. The provisions of this Section 9.03 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)        If at any time the improvements on a Mortgaged Property are located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available, then the Borrower shall, or shall cause the applicable Credit Party to maintain, with a financially sound

and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations and deliver to the Administrative Agent evidence of such insurance, naming the Administrative Agent as loss payee and/or mortgagee thereunder, in form and substance reasonably acceptable to the Administrative Agent.  Borrower shall, or shall cause the applicable Credit Party to provide the Administrative Agent with evidence of renewal of any such flood insurance prior to the expiration date thereof.

(c)    The Borrower will, and will cause each of its Restricted Subsidiaries to, at all times keep its property insured in favor of the Collateral Agent, and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Borrower and/or such Restricted Subsidiaries) (i) shall be endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee/mortgagee and/or additional insured), (ii) if agreed by the insurer (which agreement the Borrower shall use commercially reasonable efforts to obtain), shall state that such insurance policies shall not be canceled without at least thirty (30) days' prior written notice thereof (or, with respect to nonpayment of premiums, ten (10) days' prior written notice) by the respective insurer to the Collateral Agent; provided that the requirements of this Section 9.03(c) shall not apply to (x) insurance policies covering (1) directors and officers, fiduciary or other professional liability, (2) employment practices liability, (3) workers compensation liability, (4) automobile and aviation liability, (5) health, medical, dental and life insurance, (6) Vessels, to the extent the Fleet Mortgages covering such Vessels include provisions of a similar nature to the requirements of this Section 9.03(c) and (7) such other insurance policies and programs as the Collateral Agent may approve; and (y) self-insurance programs and (iii) shall be deposited with the Collateral Agent.

(d)    If the Borrower or any of its Restricted Subsidiaries shall fail to maintain insurance in accordance with this Section 9.03, or the Borrower or any of its Restricted Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, after any applicable grace period, the Administrative Agent (at the direction of the Required Lenders) shall have the right (but shall be under no obligation) to procure such insurance and the Credit Parties jointly and severally agree to reimburse the Administrative Agent for all reasonable costs and expenses of procuring such insurance.

Section 9.04    Existence; Franchises.  The Borrower will, and will cause each of its Restricted Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and, in the case of the Borrower and its Restricted Subsidiaries, its and their franchises, licenses and permits in each case to the extent material; provided, however, that nothing in this Section 9.04 shall prevent (i) sales of assets and other transactions by the Borrower or any of its Restricted Subsidiaries in accordance with Section 10.02, (ii) the abandonment by the Borrower or any of its Restricted Subsidiaries of any franchises, licenses or permits that the Borrower reasonably determines are no longer material to the operations of the Borrower and its Restricted Subsidiaries taken as a whole or (iii) the withdrawal by the Borrower or any of its Restricted Subsidiaries of its qualification as a foreign corporation, partnership, limited liability company or unlimited liability company, as the case may be, in any jurisdiction if such withdrawal would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 9.05    Compliance with Statutes, etc.  The Borrower will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations (including, without limitation, FCPA, OFAC and the USA PATRIOT Act) and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property (including Environmental Laws) , except for such noncompliance as would not, either individually or in the aggregate reasonably be expected to result in a Material Adverse Effect.

Section 9.06    Compliance with Environmental Laws.

(a)    The Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of any Vessel or Real Property now or hereafter owned, leased or operated by the Borrower or any of its Restricted Subsidiaries, except such noncompliance as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Vessels or Real Property free and clear of any Liens imposed pursuant to such Environmental Laws (other than Liens imposed on leased Real Property resulting from the acts or omissions of the owner of such leased Real Property or of other tenants of such leased Real Property who are not within the control of the Borrower).  Except as have not had, and would not reasonably be expected to have, a Material Adverse Effect, neither the Borrower nor any of its Restricted Subsidiaries will generate, use, treat, store or Release or permit the generation, use, treatment, storage or Release of Hazardous Materials on any Real Property, or from any Vessel, now or hereafter owned, leased or operated by the Borrower or any of its Restricted Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property or Vessel, except for Hazardous Materials generated, used, treated, stored or Released at any such Real Properties or from such Vessels or transported to or from such Real Properties or Vessels in compliance with all Environmental Laws.

(b)    (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in Section 9.01(g), (ii) at any time that the Borrower or any of its Restricted Subsidiaries are not in compliance with Section 9.06(a) or (iii) the Credit Parties will (in each case) jointly and severally provide an environmental site assessment report concerning any Mortgaged Property (in the event of (i) or (ii) that is the subject of or could reasonably be expected to be the subject of such notice or noncompliance), prepared by an environmental consulting firm reasonably approved by the Required Lenders, indicating the presence or absence of Hazardous Materials and the reasonable worst case cost of any removal or remedial action in connection with such Hazardous Materials on such Mortgaged Property. If the Credit Parties fail to provide the same within thirty (30) days after such request was made, the Administrative Agent (at the direction of the Required Lenders) may order the same, the reasonable cost of which shall be borne (jointly and severally) by the Borrower, and the Credit Parties shall grant and hereby grant to the Administrative Agent and the Lenders and their respective agents access to such Mortgaged Property and specifically grant the Administrative Agent and the Lenders an irrevocable nonexclusive license to undertake such an assessment at any reasonable time upon reasonable notice to the Borrower, all at the sole expense of the Credit Parties (who shall be jointly and severally liable therefor).

Section 9.07   ERISA.  As soon as reasonably possible and, in any event, within ten (10) Business Days after the Borrower or any Restricted Subsidiary of the Borrower knows of the occurrence of any of the following, the Borrower will deliver to the Administrative Agent a certificate setting forth the full details as to such occurrence and the action, if any, that the Borrower, such Restricted Subsidiary or an ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by the Borrower, such Restricted Subsidiary, the ERISA Plan administrator or such ERISA Affiliate to or with the PBGC or any other Governmental Authority, or a ERISA Plan participant and any notices received by the Borrower, such Restricted Subsidiary or such ERISA Affiliate from the PBGC or any other Governmental Authority with respect thereto: that (a) an ERISA Event has occurred that is reasonably expected to result in a Material Adverse Effect; (b) there has been an increase in Unfunded Pension Liabilities since the date the representations hereunder are given, or from any prior notice, as applicable, in either case, which is reasonably expected to result in a Material Adverse Effect; (c) there has been an increase in the estimated withdrawal liability under Section 4201 of ERISA, if the Borrower, any Restricted Subsidiary of the Borrower and the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans which is reasonably expected to result in a Material Adverse Effect, (d) the Borrower, any Restricted Subsidiary of the Borrower or any ERISA Affiliate adopts, or commences contributions to, any ERISA Plan subject to Section 412 of the Code, or adopts any amendment to a ERISA Plan subject to Section 412 of the Code which is reasonably expected to result in a Material Adverse Effect, (e) that a contribution required to be made with respect to a Foreign Pension Plan has not been timely made which failure is reasonably likely to result in a Material Adverse Effect; or (f) that a Foreign Pension Plan has been or is reasonably expected to be terminated, reorganized, partitioned or declared insolvent and such event is reasonably expected to result in a Material Adverse Effect. The Borrower will also deliver to the Administrative Agent, upon written request by the Administrative Agent (acting at the direction of the Required Lenders), a complete copy of the most recent annual report (on Internal Revenue Service Form 5500 series, including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) filed with the Internal Revenue Service or other Governmental Authority of each ERISA Plan that is maintained or sponsored by the Borrower or a Restricted Subsidiary.

Section 9.08   Performance of Obligations.  The Borrower will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except (i) to the extent such payment, discharge or performance is restricted by the Bankruptcy Code or (ii) such non-performances as, individually and in the aggregate, have not had, and would not reasonably be expected to have, a Material Adverse Effect.

Section 9.09   Payment of Taxes.  Except as would not reasonably be expected to result in a Material Adverse Effect, each Credit Party will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all federal, state and other Taxes imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date (including any extension by virtue of the Bankruptcy Cases) on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries not otherwise permitted under Section 10.01(i); provided that neither the

Borrower nor any of its Subsidiaries shall be required to pay any such Tax which is being contested in good faith and by appropriate proceedings if it has maintained adequate reserves with respect thereto in accordance with U.S. GAAP and does not give rise to a Lien on the Collateral that primes Administrative Agent's Lien.

Section 9.10   [Reserved.]

Section 9.11   Additional Security; Further Assurances; etc.

(a)   The Borrower will, and will cause each of the other Credit Parties that are Restricted Subsidiaries of the Borrower to, grant to the Collateral Agent or the Security Trustee, as applicable, for the benefit of the Secured Creditors security interests, Fleet Mortgages and Mortgages in such assets and properties (other than Excluded Collateral (as such term is defined in the Security Agreement) and, in the case of Real Property, limited to Material Real Property) of the Borrower and such other Credit Parties that are Restricted Subsidiaries of the Borrower as are not covered by the original Security Documents and as may be reasonably requested from time to time by the Required Lenders (collectively, as may be amended, modified or supplemented from time to time, the "Additional Security Documents"); provided that (i) the pledge of the outstanding Equity Interests of any FSHCO or CFC (other than a Protected CFC) directly owned by the Borrower or a Domestic Subsidiary that is a Credit Party shall be limited to (x) no more than sixty-five percent (65%), or such higher percentage that could not reasonably be expected to result in material adverse tax consequences to Holdings and its Subsidiaries, of the total combined voting power for all classes of the voting Equity Interests of such FSHCO or CFC and (y) one hundred percent (100%) of the nonvoting Equity Interests of such FSHCO or CFC, other than a Protected CFC, and provided further, notwithstanding the foregoing, each Credit Party that is a United States person within the meaning of Section 7701(a)(30) of the Code shall pledge 100% of the Equity Interests it directly owns in any Protected CFC, and (ii) security interests and Mortgages shall not be required with respect to any Real Property that is not Material Real Property or is located outside of the United States. All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Required Lenders and shall include the real estate deliverables listed on Schedule 9.12 and (subject to exceptions as are reasonably acceptable to the Required Lenders) shall constitute, upon taking all necessary perfection action (which the Credit Parties agree to promptly take) valid and enforceable perfected security interests and Mortgages (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)), subject to the Intercreditor Agreements, superior to and prior to the rights of all third Persons and subject to no other Liens except for Permitted Liens. The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect (subject to exceptions as are reasonably acceptable to the Required Lenders) the Liens in favor of the Collateral Agent or the Security Trustee, as applicable, required to be granted pursuant to the Additional Security Documents and all Taxes, fees and other charges payable in connection therewith shall be paid in full. Notwithstanding any other provision in this Agreement or any other Credit Document, no FSHCO, CFC (other than a Protected CFC), subsidiary of a CFC (other than a Protected CFC) or other Excluded Subsidiary shall be required to pledge any of its assets to secure any obligations

of the Borrower under the Credit Documents or guarantee the obligations of the Borrower under the Credit Documents.  At any time when a Mortgage or a Fleet Mortgage (in each case, as defined in the ABL DIP Credit Agreement), as applicable, is executed and delivered to the ABL DIP Agent, (i) in the case of Fleet Mortgages (as defined in the ABL DIP Credit Agreement), the Borrower shall, substantially simultaneously therewith, execute and deliver for filing new Fleet Mortgages or supplements to Fleet Mortgages securing the Obligations with respect to the Vessels covered thereby, and (ii) in the case of Mortgages (as defined in the ABL DIP Credit Agreement), the Borrower shall, substantially simultaneously therewith, Borrower shall execute and deliver for filing new Mortgages securing the Obligations covering the same Real Property. The Borrower shall use commercially reasonable efforts to deliver to any Federally Regulated Lender, with respect to any Real Property that is subject to a Mortgage or otherwise constitutes Collateral, all Federally Regulated Lender Flood Zone Documentation as may be requested from any Federally Regulated Lender from time to time.

(b)     Subject to the terms of the Intercreditor Agreements, with respect to any person that is or becomes a Restricted Subsidiary after the Closing Date, promptly (i) deliver to the Collateral Agent the certificates, if any, representing all (or such lesser amount as is required) of the Equity Interests of such Subsidiary (to the extent required pursuant to the Security Documents), together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to any Credit Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Credit Party (to the extent required pursuant to the Security Documents), (ii) cause such new Subsidiary (other than an Excluded Subsidiary) (A) to execute a joinder agreement to the Subsidiaries Guaranty and a joinder agreement to each applicable Security Document, substantially in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent, the Collateral Agent or the Security Trustee (in each case, acting at the direction of the Required Lenders) to cause the Lien created by the applicable Security Document to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent, the Collateral Agent or the Security Trustee (in each case, acting at the direction of the Required Lenders) and (iii) at the request of the Administrative Agent, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Lenders, of counsel to the Credit Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 9.11(b) as the Administrative Agent may reasonable request.

(c)     The Borrower will, and will cause each of the other Credit Parties that are Restricted Subsidiaries of the Borrower to, at the expense of the Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent or the Security Trustee, as applicable, promptly, at the Borrower's expense, any document or instrument supplemental to or confirmatory of the Security Documents, including opinions of counsel, or otherwise deemed by Required Lenders reasonably necessary for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except for Permitted Liens or as otherwise permitted by the applicable Security Document.

(d)     If the Administrative Agent (acting at the direction of the Required Lenders) reasonably determines that it or the Lenders are required by law or regulation to have appraisals prepared in respect of any Mortgaged Property, the Borrower will, at its own expense, provide to the Administrative Agent appraisals in form and substance reasonably satisfactory to the Required Lenders.

(e)     The Borrower agrees that each action required by clauses (a) through (d) of this Section 9.11 shall be completed as soon as reasonably practicable, but in no event later than thirty (30) days after such action is required to be taken pursuant to such clauses or requested to be taken by the Required Lenders (or such longer period as the Required Lenders shall otherwise agree), as the case may be.

(f)     Notwithstanding anything to the contrary contained in this Agreement or in any other Credit Document, (x) Collateral Agent shall not accept delivery of any Mortgage from any Credit Party unless Administrative Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender and (y) Agents shall not accept delivery of any joinder to any Credit Document with respect to any Subsidiary of any Credit Party that is not a Credit Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and each Lender has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to each Lender, in which case, the time periods for delivery of the applicable Mortgage and/or joinder, as the case may be, shall be automatically extended until the receipt of such confirmation, certification or search, as applicable.

Section 9.12   Post-Closing Actions.  The Borrower agrees that it will, or will cause its relevant Subsidiaries to, complete each of the actions described on Schedule 9.12 as soon as commercially reasonable and by no later than the date set forth in Schedule 9.12 with respect to such action or such later date as the Administrative Agent shall agree (acting on the instructions of the Required Lenders in their reasonable discretion).[1]

Section 9.13   [**Reserved**].

Section 9.14   [**Reserved**].

Section 9.15   [Reserved.]

Section 9.16   Maritime and Other Regulatory Matters.  The Borrower will (i) ensure that Borrower remains a citizen of the United States qualified to own and operate Vessels in the coastwise trade of the United States and (ii) each applicable Borrower will maintain the documentation of applicable Vessels to operate in the coastwise trade of the United States and

---

[1] NTD: To be consistent with ABL DIP Credit Agreement.

will not do or permit anything to be done which might affect such documentation and ability to operate such Vessels.

Section 9.17   OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws. Each Credit Party will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Credit Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Credit Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

Section 9.18   Bankruptcy Transaction Milestones.  Holdings will, and will cause each of its Subsidiaries to, cause the performance and delivery of the items set forth on Schedule 9.18 on or before the dates specified therein with respect to such items (the "Milestones").[2]

Section 9.19   Consultant.  Borrower will continue to engage Consultants on terms and conditions reasonably acceptable to the Required Lenders (it being understood that the terms of the A&M Engagement Agreement and Greenhill Engagement Agreement are acceptable to the Required Lenders) and on the terms and conditions set forth in, or consistent with, the retention order authorizing the continued engagement of the Consultants.  Borrower hereby do, and will continue to, authorize and instruct the Consultants to provide access to and corporation with the Required Lenders, Administrative Agent and Agent Consultant. Notwithstanding anything to the contrary in this Section 9.19, none of Holdings or any of its Subsidiaries or Consultants will be required to disclose any such information to the extent that (i) such disclosure would in the good faith determination of Borrower (based on the advice of counsel) impair, waive or violate attorney-client privilege or is otherwise prohibited by law or fiduciary duty, (ii) such information constitutes attorney work product, or (iii) such information is subject to confidentiality obligations to a third party (not entered into in contemplation thereof and for which the Borrower is using commercially reasonable efforts to lift such confidentiality restrictions) and Administrative Agent or the Lenders (as applicable) have not executed any necessary confidentiality agreements or non-reliance letters with respect thereto. All fees and expenses of the Consultants shall be solely the responsibility of Borrower and in no event shall Administrative Agent or any Lender have any obligation, liability or responsibility of any kind or nature whatsoever for the payment of any such fees, expenses or other obligations, nor shall Administrative Agent or any Lender have any obligation or liability to Borrower, its Affiliates, or any other Person by reason of any acts or omissions whatsoever of the Consultants at any time.

Section 9.20   [Reserved.]

Section 9.21   [Reserved].Bankruptcy Covenants.   Notwithstanding anything in the Credit Documents to the contrary, the Credit Parties shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the Financing Order.

---

[2] NTD: Milestones to be the same as in the RSA.

Section 9.23    Bankruptcy Cases.

(a)    Each Credit Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable (but in any event at least two (2) calendar days prior to filing (where reasonably practicable)), all material pleadings, motions and other documents (provided that any of the foregoing relating to the Existing Secured Obligations, the Credit Documents, any other postpetition financing, cash collateral use, dispositions of ABL Loan Priority Collateral or other asset sales outside the ordinary course and any plan of reorganization shall be deemed material) to be filed on behalf of the Credit Parties with the Bankruptcy Court to the Administrative Agent and its counsel.  Each Credit Party shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable (but in any event at least two (2) calendar days prior to any assumption or rejection of any Credit Party's or any Subsidiary's material contracts (including any leases) pursuant to Section 365 of the Bankruptcy Code.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, Borrower shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Credit Parties with the Bankruptcy Court with respect to the Bankruptcy Cases or filed with respect to any Credit Document, (y) reporting and financial information distributed by or on behalf of the Credit Parties to the ABL DIP Agent (or its advisors) or any Committee and (z) such other reports and information as the Administrative Agent (acting at the direction of the Required Lenders) may, from time to time, reasonably request.   In connection with the Bankruptcy Cases, the Credit Parties shall give the proper notice for (x) the motions seeking approval of the Credit Documents and the Financing Order and (y) the hearings for the approval of the Financing Order.  The Borrower and the other Credit Parties shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in the Financing Order.  The Borrower and the other Credit Parties shall use best efforts to obtain the Final Financing Order.

(b)    Each Credit Party shall promptly deliver or cause to be delivered to the Administrative Agent and the Lenders copies of any term sheets, proposals, or presentations from any party, related to (i) the restructuring of the Credit Parties, or (ii) a material sale of assets of one or all of the Credit Parties.

Section 9.24    Budget Matters.    Each Weekly Cash Flow Forecast or amendment or supplement to the Budget delivered by the Borrower to the Administrative Agent and the Lenders shall replace, amend or supplement, as the case may be, the Budget hereunder and under the Final Order unless the Administrative Agent (acting on the instructions of the Required Lenders) delivers a notice (a "Budget Objection Notice") to the Borrower no later than three (3) Business Days after delivery of such Weekly Cash Flow Forecast or Budget amendment or supplement. Each Budget Objection Notice shall be in writing (which may be delivered by electronic mail) and shall state the basis of the Required Lenders' objection to the applicable Weekly Cash Flow Forecast or Budget amendment or supplement.  If the Administrative Agent (acting on the instructions of the Required Lenders) timely delivers a Budget Objection Notice to the Borrower, the existing Budget shall continue to constitute the applicable Budget until such time as either (i) the subject Weekly Cash Flow Forecast or Budget amendment or supplement is agreed to among Borrowers and the Required Lenders acting reasonably (upon which such agreed Weekly Cash Flow Forecast or Budget amendment or supplement shall replace,

supplement or amend, as the case may be, the prior Budget) or (ii) the Borrower delivers an alternative Weekly Cash Flow Forecast or Budget supplement or amendment which replaces, amends or supplements, as the case may be, the Budget in accordance with the first sentence of this Section 9.24.  Each Weekly Cash Flow Forecast delivered to the Administrative Agent (acting on the instructions of the Required Lenders) shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent (acting on the instructions of the Required Lenders).

ARTICLE 10  Negative Covenants.  The Borrower and each of its Restricted Subsidiaries (and Holdings in the case of Section 10.09(b)) hereby covenant and agree that on and after the Closing Date and so long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than any indemnification obligations arising hereunder which are not then due and payable):

Section 10.01  Liens.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Borrower or any of its Restricted Subsidiaries, whether now owned or hereafter acquired, or sell accounts receivable with recourse to the Borrower or any of its Restricted Subsidiaries or authorize the filing of any financing statement under the UCC with respect to any Lien or any other similar notice of any Lien under any similar recording or notice statute; provided that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of, or any filing in respect of, the following (Liens described below are herein referred to as "Permitted Liens"):

(i)  Liens for Taxes, assessments or governmental charges or levies not overdue for a period of more than thirty (30) days or Liens for Taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with U.S. GAAP (or, for Foreign Subsidiaries, in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization);

(ii)  Carriers', warehousemen's, contractors', materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets, subject to any such Lien for which adequate reserves have been established in accordance with U.S. GAAP;

(iii)  Liens in existence on the Closing Date which are listed, and the property subject thereto described, in Schedule 10.01(iii) (or to the extent not listed on such Schedule 10.01(iii), where the fair market value of all property to which such Liens under this clause (iii) attach is less than $500,000 in the aggregate), plus modifications, renewals and extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension, plus accrued and unpaid interest and cash fees and expenses (including premium) incurred in connection with such renewal, replacement or extension and (y) any such renewal or extension does

not encumber any additional assets or properties of the Borrower or any of its Restricted Subsidiaries (other than after-acquired property that is affixed or incorporated into the property encumbered by such Lien on the Closing Date and the proceeds and products thereof);

(iv)     Liens securing the Existing Secured Obligations, Liens securing Reinstated Existing Secured Obligations (as defined in the ABL DIP Credit Agreement), Liens securing the Obligations, Liens securing Obligations (as defined in the Existing ABL Credit Agreement) under the Existing ABL Credit Agreement and Liens securing obligations under the ABL DIP Credit Documents and incurred pursuant to Section 10.04(i);

(v)     Leases, subleases, licenses or sublicenses (including licenses or sublicenses of Intellectual Property) granted to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(vi)     Liens upon assets of the Borrower or any of its Restricted Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 10.04(iii), provided that (x) such Liens serve only to secure the payment of Indebtedness and/or other monetary obligations arising under such Capitalized Lease Obligation and (y) the Lien encumbering the asset or assets giving rise to such Capitalized Lease Obligation does not encumber any asset of the Borrower or any of its Restricted Subsidiaries other than the proceeds of the assets giving rise to such Capitalized Lease Obligations;

(vii)     Liens placed upon equipment, machinery or other fixed assets acquired or constructed after the Closing Date and used in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries and placed at the time of the acquisition or construction thereof by the Borrower or such Restricted Subsidiary or within 60 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase or construction price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition or construction of any such equipment, machinery or other fixed assets or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 10.04(iii) and (y) in all events, the Lien encumbering the equipment, machinery or other fixed assets so acquired or constructed does not encumber any other asset of the Borrower or such Restricted Subsidiary; provided that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender on customary terms;

(viii)     easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar Liens, charges or encumbrances and title deficiencies or defects, which in the aggregate do not materially interfere with the conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(ix)     Liens arising from precautionary UCC or other similar financing statement filings;

(x)      attachment and judgment Liens, to the extent and for so long as the underlying judgments and decrees do not constitute an Event of Default pursuant to Section 11.09;

(xi)     statutory and common law landlords' liens under leases or subleases to which the Borrower or any of its Restricted Subsidiaries is a party;

(xii)    Liens (other than Liens imposed under ERISA or the Code or similar state or foreign law) incurred in the ordinary course of business in connection with workers' compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the ordinary course of business, statutory obligations, surety, stay, customs or appeal bonds, performance bonds and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations and (ii) those required or requested by any Governmental Authority other than letters of credit) incurred in the ordinary course of business;

(xiii)   Permitted Encumbrances;

(xiv)    [**reserved**];

(xv)     deposits or pledges to secure bids, tenders, contracts (other than contracts for the repayment of borrowed money), leases, statutory obligations, surety, stay, customs and appeal bonds and other obligations of like nature (including (i) those to secure health, safety and environmental obligations and (ii) those required or requested by any Governmental Authority other than letters of credit), and as security for the payment of rent, in each case arising in the ordinary course of business;

(xvi)    Liens on assets of Foreign Subsidiaries securing Indebtedness of Foreign Subsidiaries permitted pursuant to Section 10.04(viii);

(xvii)   any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense agreement (including software and other technology licenses) in the ordinary course of business;

(xviii)  Liens on property subject to or in connection with Sale-Leaseback Transactions to the extent such Sale-Leaseback Transactions are permitted by Section 10.02(xii);

(xix)    any encumbrances or restrictions (including, without limitation, put and call agreements) with respect to the Equity Interests of any Joint Venture expressly permitted by the terms of this Agreement arising pursuant to the agreement evidencing such Joint Venture;

(xx)    Liens on Collateral in favor of any Credit Party securing intercompany Indebtedness permitted by Section 10.05; provided that any Liens securing Indebtedness that is required to be subordinated pursuant to Section 10.05 shall be subordinated to the Liens created pursuant to the Security Documents;

(xxi)    Liens on specific items of inventory or other goods (and proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods, and pledges or deposits in the ordinary course of business;

(xxii)    Liens on insurance policies and the proceeds thereof (whether accrued or not) and rights or claims against an insurer, in each case securing insurance premium financings permitted under Section 10.04(x);

(xxiii)    Liens that may arise on inventory or equipment of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business as a result of such inventory or equipment being located on premises owned by Persons other than the Borrower and its Restricted Subsidiaries;

(xxiv)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(xxv)    Liens (i) of a collection bank arising under Section 4210 of the UCC on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of law or under customary general terms and conditions encumbering deposits (including the right of setoff) and which are within the general parameters customary in the banking industry;

(xxvi)  [reserved;]

(xxvii)  Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence or issuance of Indebtedness or (ii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(xxviii) Liens attaching solely to cash earnest money deposits in connection with any letter of intent or purchase agreement in connection with an Investment permitted hereunder;

(xxix)  Liens not otherwise permitted by the foregoing clauses (i) through (xxviii), or by following clauses (xxx) through (xlv), to the extent attaching to properties and assets (other than Accounts, Vessels or Inventory, unless such Liens are expressly made junior to the Liens in favor of the Administrative Agent) with an aggregate fair

market value not in excess of, and securing liabilities not in excess of, $2,500,000 in the aggregate at any time outstanding;

(xxx)   [reserved];

(xxxi)  [reserved];

(xxxii) [reserved];

(xxxiii) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xxxiv) Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xxxv) (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business of the Borrower and the Restricted Subsidiaries complies, and (ii) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower or any Restricted Subsidiary;

(xxxvi) deposits made in the ordinary course of business to secure liability to insurance carriers;

(xxxvii)      receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxxviii)      [**reserved**];

(xxxix) Permitted Vessel Liens;

(xl)    [**reserved**];

(xli)   **[reserved]**;

(xlii)  [**reserved**];

(xliii)  Liens to secure Indebtedness permitted by <u>Section 10.04(iv)</u> so long as such Liens only attach to the applicable New Vessel whose construction is financed with such Indebtedness;

(xliv)  receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on any towboat, barge or

other vessel (and proceeds thereof) in connection with the construction of such towboat, barge or other vessel being purchased by third parties;

(xlv)    Liens granted in connection with the construction of Vessels on construction contracts (and rights thereunder) to lessors leasing such Vessels to any Credit Party in the ordinary course of business; and

(xlvi)    Liens otherwise granted by or expressly permitted by the Financing Order and the First Day Orders.

In connection with the granting of Liens of the type described in this Section 10.01 by the Borrower or any of its Restricted Subsidiaries, the Administrative Agent, the Collateral Agent and the Security Trustee shall, and shall be authorized to, take any actions, at the direction of the Required Lenders, in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

Section 10.02    Consolidation, Merger, or Sale of Assets, etc.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or any part of its property or assets (including by an allocation of assets among newly divided limited liability companies to a "plan of division"), or enter into any sale-leaseback transactions of any Person, except that:

(i)    any Investment permitted by Section 10.05 may be structured as a merger, consolidation or amalgamation;

(ii)    the Borrower and its Restricted Subsidiaries may sell assets so long as (x) each such sale is on terms and conditions not less favorable to the Borrower or such Restricted Subsidiary as would reasonably be obtained by the Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate and the Borrower or the respective Restricted Subsidiary receives at least fair market value (as determined in good faith by the Borrower or such Restricted Subsidiary, as the case may be); (y) in the case of any single transaction that involves assets or Equity Interests having a fair market value of more than $100,000 (not to exceed $1,000,000 in the aggregate for all such transactions) 100% of consideration received by the Borrower or such Restricted Subsidiary shall be in the form of cash or Cash Equivalents and (z) all Net Cash Proceeds thereof shall be applied consistent with Section 2.09;

(iii)    each of the Borrower and its Restricted Subsidiaries may lease (as lessee) or license (as licensee) real or personal property in the ordinary course of business (so long as any such lease or license does not create a Capitalized Lease Obligation except to the extent permitted by Section 10.04(iii));

(iv)    each of the Borrower and its Restricted Subsidiaries may sell or discount, in each case in the ordinary course of business, accounts receivable arising in

the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(v)     each of the Borrower and its Restricted Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the ordinary course of business not materially interfering with the conduct of the business of the Borrower or any of its Restricted Subsidiaries, including of Intellectual Property;

(vi)    (w) any Domestic Subsidiary of the Borrower may be merged, consolidated, dissolved, amalgamated or liquidated with or into the Borrower (so long as the surviving Person of such merger, consolidation, dissolution, amalgamation or liquidation is Borrower), (x) any Foreign Subsidiary of the Borrower may be merged, consolidated, dissolved, amalgamated or liquidated with or into any Wholly-Owned Foreign Subsidiary of the Borrower or any Wholly-Owned Domestic Subsidiary of the Borrower that is an Excluded Subsidiary, so long as such Wholly-Owned Foreign Subsidiary or such Excluded Subsidiary, as applicable, is the surviving corporation of such merger, consolidation, dissolution, amalgamation or liquidation and (y) any Foreign Subsidiary of the Borrower may be merged, consolidated, dissolved, amalgamated or liquidated with or into any Credit Party (so long as such Credit Party is the surviving corporation of such merger, consolidation, dissolution, amalgamation or liquidation); provided that any such merger, consolidation, dissolution, amalgamation or liquidation shall only be permitted pursuant to this clause (vi), so long as (I) no Default and no Event of Default then exists or would exist immediately after giving effect thereto and (II) any security interests granted to the Collateral Agent or the Security Trustee, as applicable, for the benefit of the Secured Creditors in the assets (and Equity Interests) of any such Person subject to any such transaction shall remain in full force and effect and perfected and enforceable (to at least the same extent as in effect immediately prior to such merger, consolidation, amalgamation or liquidation);

(vii)   any Tax Restructuring Transaction shall be permitted;

(viii)  each of the Borrower and its Restricted Subsidiaries may make sales or leases of (A) inventory (including Vessels), (B) goods held for sale and (C) immaterial assets with a fair market value, in the case of this clause (C), of less than $2,500,000 in the ordinary course of business;

(ix)    each of the Borrower and its Restricted Subsidiaries may sell or otherwise dispose of (i) outdated, obsolete, surplus or worn out property (including Vessels and real property), in each case, in the ordinary course of business and (ii) property no longer used or useful in the conduct of the business of the Borrower and its Restricted Subsidiaries (including Vessels and real property);

(x)     [**reserved**];

(xi)    in order to effect a sale, transfer or disposition otherwise permitted by this Section 10.02, a Restricted Subsidiary of the Borrower may be merged,

amalgamated or consolidated with or into another Person, or may be dissolved or liquidated;

(xii)    Borrower and its Restricted Subsidiaries may effect Sale-Leaseback Transactions involving other property (including Vessels) so long as (1) no Default and no Event of Default then exists or would exist immediately after giving effect thereto, (2) 100% of the proceeds received with respect to the Sale Leaseback Transaction is in cash, (3) the proceeds received with respect to the Sale Leaseback Transaction are at least the greater of (x) the fair market value of such property or (y) the forced liquidation value of such property and (4) 100% of the proceeds received with respect to the Sale Leaseback Transaction are applied pursuant to Section 2.09(b)(i);

(xiii)   [**reserved**];

(xiv)   [**reserved**];

(xv)    subject to Section 2.09, each of the Borrower and its Restricted Subsidiaries may make transfers of property subject to casualty or condemnation proceedings upon the occurrence of the related Recovery Event;

(xvi)   each of the Borrower and its Restricted Subsidiaries may abandon Intellectual Property rights in the ordinary course of business, in the exercise of its reasonable good faith judgment;

(xvii)   each of the Borrower and its Restricted Subsidiaries may make voluntary terminations of or unwind Swap Contracts;

(xviii) dispositions (other than of Collateral) made pursuant to the First Day Orders;

(xix)   each of the Borrower and its Restricted Subsidiaries may terminate leases and subleases in the ordinary course of business;

(xx)    each of the Borrower and its Restricted Subsidiaries may use cash and Cash Equivalents to make payments that are otherwise permitted under Sections 10.03 and 10.07;

(xxi)   each of the Borrower or its Restricted Subsidiaries may sell or otherwise dispose of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such sale or disposition are promptly applied to the purchase price of such replacement property;

(xxii)  sales, dispositions or contributions of property (A) between Credit Parties (other than Holdings), (B) between Restricted Subsidiaries (other than Credit Parties), (C) by Restricted Subsidiaries that are not Credit Parties to the Credit Parties (other than Holdings) or (D) by Credit Parties to any Restricted Subsidiary that is not a Credit Party, provided with respect to clause (D) that such sales, dispositions or

contributions shall constitute an Investment in such Restricted Subsidiary subject to Section 10.05;

(xxiii) dispositions of Investments (including Equity Interests) in [(a)] Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements and (b) MarineNet LLC;

(xxiv) transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(xxv)  any disposition of any asset between or among the Restricted Subsidiaries as a substantially concurrent interim disposition in connection with a disposition otherwise permitted pursuant to this Section 10.02; and

(xxvi)  dispositions permitted by Section 10.03.

To the extent the Required Lenders waive the provisions of this Section 10.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 10.02 (other than to the Borrower or a Restricted Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent, the Collateral Agent and the Security Trustee shall, and shall be authorized to, take any actions, as directed by the Required Lenders, in order to effect the foregoing.

Section 10.03  Dividends.   The Borrower will not, and will not permit any of its Restricted Subsidiaries to, authorize, declare or pay any Dividends with respect to the Borrower or any of its Restricted Subsidiaries, except that:

(i)  any Restricted Subsidiary of the Borrower may pay Dividends or return capital or make distributions and other similar payments with regard to its Equity Interests to the Borrower or to other Restricted Subsidiaries of the Borrower which directly or indirectly own equity therein;

(ii)  any non-Wholly-Owned Subsidiary of the Borrower that is not a Credit Party may declare and pay cash Dividends to its shareholders generally so long as the Borrower or its Restricted Subsidiary which owns the Equity Interests in the Subsidiary paying such Dividends receives at least its proportionate share thereof (based upon its relative holding of the Equity Interests in the Subsidiary paying such Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary);

(iii)  in connection with the Management Incentive Plan, so long as no Default or Event of Default exists at the time of the applicable Dividend, redemption or repurchase or would exist immediately after giving effect thereto, the Borrower may pay cash Dividends to Holdings to allow Holdings to redeem or repurchase,

contemporaneously with such Dividend, Equity Interests of Holdings from management, employees and officers of the Borrower and its Restricted Subsidiaries;

(iv)    [**reserved**];

(v)    the Borrower may pay cash Dividends to Holdings so long as the proceeds thereof are promptly used by Holdings to pay costs (including all professional fees and expenses) incurred by Holdings in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, applicable rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed with respect to the Securities Act, the Securities Exchange Act or the respective rules and regulations promulgated thereunder;

(vi)    the Borrower may pay cash dividends or other distributions, or make loans or advances to, Holdings or the equity interest holders thereof in amounts required for any Parent Company, Holdings or the equity interest holders thereof to pay, in each case without duplication:

(A)    franchise Taxes (and other fees and expenses) required to maintain their existence to the extent such Taxes, fees and expenses are reasonably attributable to the operations or ownership of Holdings, the Borrower and its Restricted Subsidiaries;

(B)    with respect to any taxable year (or portion thereof) ending after the Closing Date or with respect to which the income taxes of the Borrower have priority status under Section 507(a)(8) of the Bankruptcy Code, in each case in which the Borrower is a member (or is treated for tax purposes as an entity that is disregarded as separate from a member) of a consolidated, combined or similar income tax group (a "Tax Group") of which any Parent Company is the common parent, Taxes of the Tax Group that are attributable to the taxable income or operations or ownership of the Borrower and its Subsidiaries; provided that for each taxable period, the amount of such payments made in respect of such taxable period in the aggregate shall not exceed the amount that the Borrower and its Subsidiaries would have been required to pay as a standalone Tax Group; provided, further, that the permitted payment pursuant to this clause (B) with respect to the Taxes of any Unrestricted Subsidiary for any taxable period shall be limited to the amount actually paid by such Unrestricted Subsidiary to the Borrower or any of its Restricted Subsidiaries for the purpose of paying such consolidated, combined or similar Taxes;

(C)    customary salary, bonus and other benefits payable to officers and employees of Holdings to the extent such salaries, bonuses and other benefits are reasonably attributable to the ownership or operations of the Borrower and its Restricted Subsidiaries;

(D)    general corporate operating and overhead costs and expenses (including administrative, legal, accounting and similar expenses

provided by third parties) of Holdings to the extent such costs and expenses are reasonably attributable to the ownership or operations of the Borrower and its Restricted Subsidiaries (but excluding any direct or indirect payments for the benefit of the Sponsor);

(E)    [**reserved**];

(F)    [**reserved**]; and

(G)    [**reserved**];

(vii)    reasonable and customary indemnities to directors, officers and employees of Holdings in the ordinary course of business, to the extent reasonably attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries;

(viii)    the Borrower may pay cash Dividends to Holdings so long as the proceeds thereof are promptly used by Holdings for payment of obligations under or in respect of director and officer insurance policies to the extent reasonably attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries;

(ix)    [**reserved**];

(x)    [**reserved**];

(xi)    [**reserved**];

(xii)    [**reserved**];

(xiii)    [**reserved**];

(xiv)    [**reserved**];

(xv)    [**reserved**];

(xvi)    the Borrower and each Restricted Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person so long as in the case of dividend or other distribution by a Restricted Subsidiary, the Borrower or a Restricted Subsidiary receives at least its pro rata share of such dividend or distribution;

(xvii)    [**reserved**]; and

(xviii)    [**reserved**].

In determining compliance with this Section 10.03, amounts loaned or advanced to Holdings pursuant to Section 10.05(vi) shall be deemed to be cash Dividends paid to Holdings to the extent provided in said Section 10.05(vi).

Section 10.04 <u>Indebtedness</u>.   The Borrower will not, and will not permit any of its Restricted Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness, except:

(i)      (A) Existing Secured Obligations, (B) Reinstated Existing Secured Obligations (as defined in the ABL DIP Credit Agreement), (C) Indebtedness incurred pursuant to this Agreement and the other Credit Documents and (D) Indebtedness incurred pursuant to the Existing ABL Credit Agreement;

(ii)      Indebtedness under Swap Contracts so long as the entering into of such Swap Contracts are bona fide hedging activities and are not for speculative purposes;

(iii)      Indebtedness of the Borrower and its Restricted Subsidiaries (a) evidenced by Capitalized Lease Obligations and purchase money Indebtedness (including obligations in respect of mortgages, industrial revenue bonds, industrial development bonds and similar financings) described in <u>Section 10.01(vii)</u>; provided that in no event shall the aggregate principal amount of Capitalized Lease Obligations and the principal amount of all such Indebtedness incurred or assumed in each case after the Closing Date permitted by this clause (iii) exceed $1,000,000 at any one time outstanding;

(iv)      Indebtedness under the ABL DIP Credit Agreement and any other Indebtedness incurred pursuant to the Financing Order or the First Day Orders;

(v)      [**reserved**];

(vi)      intercompany Indebtedness among the Borrower and its Restricted Subsidiaries to the extent permitted by <u>Section 10.05(vi)</u>;

(vii)      Indebtedness outstanding on the Closing Date and listed on <u>Schedule 10.04</u> ("<u>Existing Indebtedness</u>") and any subsequent extension or renewal thereof; provided that the aggregate principal amount of the Indebtedness to be extended or renewed does not increase from that amount outstanding at the time of any such extension or renewal, plus accrued and unpaid interest and cash fees and expenses (including premium) incurred in connection with such renewal or extension;

(viii)      Indebtedness of Foreign Subsidiaries; provided that the aggregate principal amount of Indebtedness outstanding pursuant to this clause (viii) shall not at any time exceed $1,000,000;

(ix)      [**reserved**];

(x)      Indebtedness incurred in the ordinary course of business to finance insurance premiums or take-or-pay obligations contained in supply arrangements;

(xi)      Indebtedness incurred in the ordinary course of business in respect of netting services, overdraft protections, employee credit card programs, automatic clearinghouse arrangements and other similar services in connection with cash

management and deposit accounts and Indebtedness in connection with the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, including in each case, Bank Product Debt;

(xii)   **[reserved]**;

(xiii)   [**reserved**];

(xiv)   [**reserved**];

(xv)   additional Indebtedness of the Borrower and its Restricted Subsidiaries not to exceed $5,000,000 in aggregate principal amount outstanding at any time;

(xvi)   Contingent Obligations for customs, stay, performance, appeal, judgment, replevin and similar bonds and suretyship arrangements, and completion guarantees and other obligations of a like nature, all in the ordinary course of business;

(xvii)   Contingent Obligations to insurers required in connection with worker's compensation and other insurance coverage incurred in the ordinary course of business;

(xviii) guarantees made by the Borrower or any of its Restricted Subsidiaries of Indebtedness of the Borrower or any of its Restricted Subsidiaries permitted to be outstanding under this Section 10.04; provided that such guarantees are permitted by Section 10.05;

(xix)   guarantees made by any Foreign Subsidiary of Indebtedness of any other Foreign Subsidiary permitted to be outstanding under this Section 10.04(viii);

(xx)   [**reserved**];

(xxi)   customary Contingent Obligations in connection with sales, other dispositions and leases permitted under Section 10.02 (but not in respect of Indebtedness for borrowed money or Capitalized Lease Obligations) including indemnification obligations with respect to leases, and guarantees of collectability in respect of accounts receivable or notes receivable for up to face value;

(xxii)   guarantees of Indebtedness of directors, officers and employees of the Borrower or any of its Restricted Subsidiaries in respect of expenses of such Persons in connection with relocations and other ordinary course of business purposes;

(xxiii) to the extent incurred prior to the Filing Date, guarantees of Indebtedness of a Person in connection with a Joint Venture, provided that the aggregate principal amount of any Indebtedness so guaranteed, when added to the aggregate amount of unreimbursed payments theretofore made in respect of such guarantees and the

amount of Investments then outstanding (and deemed outstanding) under clause (xix) of Section 10.05, shall not exceed $5,000,000;

(xxiv)  **[reserved]**;

(xxv)   Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within two (2) Business Days of its incurrence;

(xxvi)  (x) severance, pension and health and welfare retirement benefits or the equivalent there of to current and former employees of the Borrower or its Restricted Subsidiaries incurred in the ordinary course of business, (y) to the extent incurred prior to the Filing Date, Indebtedness representing deferred compensation or stock-based compensation (other than pursuant to the Management Incentive Plan) to employees of the Borrower and the Restricted Subsidiaries and (z) Indebtedness consisting of promissory notes issued by any Credit Party to current or former officers, directors and employees, in connection with the Management Incentive Plan to finance the purchase or redemption of Equity Interests of Holdings permitted by Section 10.03;

(xxvii) **[reserved]**;

(xxviii)(x) guarantees made by the Borrower or any of its Restricted Subsidiaries of obligations (not constituting debt for borrowed money) of the Borrower or any of its Restricted Subsidiaries owing to vendors, suppliers and other third parties incurred in the ordinary course of business and (y) Indebtedness of any Credit Party (other than Holdings) as an account party in respect of trade letters of credit issued in the ordinary course of business;

(xxix)  [reserved];

(xxx)   Indebtedness arising out of Sale-Leaseback Transactions permitted by Section 10.01(xviii); and

(xxxi)  all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxx) above.

Section 10.05  Advances, Investments and Loans.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or hold any cash or Cash Equivalents (each of the foregoing, an "Investment" and, collectively, "Investments" and with the value of each Investment being measured at the time made and without giving effect to subsequent changes in value or any write-ups, write-downs or write-offs thereof, except that the following shall be permitted:

(i)      the Borrower and its Restricted Subsidiaries may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Restricted Subsidiary;

(ii)      the Borrower and its Restricted Subsidiaries may acquire and hold cash and Cash Equivalents;

(iii)      the Borrower and its Restricted Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule 10.05(iii), and any modification, renewal or extension thereof that does not increase the principal amount thereof unless any additional Investments made with respect thereto are permitted under the other provisions of this Section 10.05;

(iv)      the Borrower and its Restricted Subsidiaries may acquire and hold Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, and Investments received in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(v)      the Borrower and its Restricted Subsidiaries may enter into (a) Swap Contracts to the extent permitted by Section 10.04(ii) and (b) Swap Contracts relating to fuel rate caps and forward fuel purchases collectively covering an aggregate amount of fuel not to exceed the aggregate amount of fuel reasonably expected to be used by the Borrower and its Subsidiaries or in connection with specific contracts or orders, provided, that no such Swap Contracts entered into between any Credit Party and any Lender or any Affiliate of any Lender shall be in force or effect after the date which is thirty (30) days prior to the Maturity Date;

(vi)      (a) the Borrower and any Restricted Subsidiary may make intercompany loans to and other investments in Credit Parties (other than Holdings, unless otherwise permitted by Section 10.03), (b) any Foreign Subsidiary may make intercompany loans to and other investments in the Borrower or any of its Restricted Subsidiaries so long as in the case of such intercompany loans to Credit Parties (other than Holdings), all payment obligations of the respective Credit Parties are subordinated to their obligations under the Credit Documents on terms reasonably satisfactory to the Required Lenders, (c) the Credit Parties may make intercompany loans to, guarantees on behalf of, and other investments in, Subsidiaries that are not Credit Parties so long as the aggregate amount of outstanding loans, guarantees and other Indebtedness made pursuant to this sub-clause (c) does not exceed $100,000 and (d) any Restricted Subsidiary that is not a Credit Party may make intercompany loans to, and other investments in, any other Restricted Subsidiary that is also not a Credit Party;

(vii)      Investments made pursuant to the First Day Orders;

(viii)      loans and advances by the Borrower and its Restricted Subsidiaries to officers, directors and employees of the Borrower and its Restricted Subsidiaries in

connection with (i) business-related travel, relocations and other ordinary course of business purposes (including travel and entertainment expenses) shall be permitted and (ii) any such Person's purchase of Equity Interests of Holdings; provided that no cash is actually advanced pursuant to this clause (ii) unless immediately repaid;

(ix)     advances of payroll payments to employees of the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(x)     noncash consideration may be received in connection with any sale of assets permitted pursuant to Section 10.02(ii);

(xi)     additional Restricted Subsidiaries of the Borrower may be established or created if the Borrower and such Subsidiary comply with the requirements of Section 9.11, if applicable; provided that to the extent any such new Subsidiary is created solely for the purpose of consummating a transaction pursuant to an acquisition permitted by this Section 10.05, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it contemporaneously with the closing of such transaction, such new Subsidiary shall not be required to take the actions set forth in Section 9.11, as applicable, until the respective acquisition is consummated (at which time the surviving or transferee entity of the respective transaction and its Subsidiaries shall be required to so comply in accordance with the provisions thereof);

(xii)     extensions of trade credit may be made in the ordinary course of business (including advances made to distributors consistent with past practice), Investments received in satisfaction or partial satisfaction of previously extended trade credit from financially troubled account debtors, Investments consisting of prepayments to suppliers made in the ordinary course of business and loans or advances made to distributors in the ordinary course of business;

(xiii)     earnest money deposits may be made to the extent required in connection with other Investments to the extent permitted under Section 10.01(xxviii);

(xiv)     Investments in deposit accounts or securities accounts opened in the ordinary course of business;

(xv)     Investments in the nature of pledges or deposits with respect to leases or utilities provided to third parties in the ordinary course of business;

(xvi)     Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit;

(xvii)  [**reserved**];

(xviii)  [**reserved**];

(xix)     in addition to Investments permitted by clauses (i) through (xviii) and (xx) through (xxix) of this Section 10.05, the Borrower and its Restricted

Subsidiaries may make additional loans, advances and other Investments to or in a Person (including a Joint Venture) in an aggregate amount for all loans, advances and other Investments made pursuant to this clause (xix), not to exceed, when added to the aggregate amount then guaranteed under clause (xxiii) of Section 10.04 and all unreimbursed payments theretofore made in respect of guarantees pursuant to clause (xxiii) of Section 10.04, $1,000,000;

(xx)    the licensing, sublicensing or contribution of Intellectual Property rights pursuant to arrangements with Persons other than the Borrower and the Restricted Subsidiaries in the ordinary course of business for fair market value, as determined by the Borrower or such Restricted Subsidiary, as the case may be, in good faith;

(xxi)    loans and advances to Holdings in lieu of, and not in excess of the amount of, Dividends permitted to be made to Holdings in accordance with Section 10.03; provided that any such loan or advance shall reduce the amount of such applicable Dividend thereafter permitted under Section 10.03 by a corresponding amount (if such applicable subsection of Section 10.03 contains a maximum amount);

(xxii)   Investments to the extent that payment for such Investments is made solely by the issuance of Equity Interests constituting common stock or Qualified Preferred Stock of Holdings to the seller of such Investments;

(xxiii)  Investments of a Person that is acquired and becomes a Restricted Subsidiary or of a company merged or amalgamated or consolidated into any Restricted Subsidiary, in each case after the Closing Date and in accordance with this Section 10.05 and/or Section 10.02, as applicable, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation, do not constitute a material portion of the aggregate assets acquired in such transaction and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(xxiv)  Investments in a Restricted Subsidiary that is not a Credit Party or in a Joint Venture, in each case, to the extent such Investment is contemporaneously repaid in full with a dividend or other distribution from such Restricted Subsidiary, any other Restricted Subsidiary that is not a Credit Party or Joint Venture;

(xxv)   to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property, in each case, in the ordinary course of business;

(xxvi)  Investments by the Borrower and its Restricted Subsidiaries consisting of deposits, prepayment and other credits to suppliers or landlords made in the ordinary course of business;

(xxvii) guaranties made in the ordinary course of business of obligations owed to landlords, suppliers, customers, franchisees and licensees of the Borrower or its Subsidiaries; and

(xxviii)Investments consisting of the licensing, sublicensing or contribution of Intellectual Property pursuant to joint marketing arrangements with other Persons.

Section 10.06 <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of the Borrower or any of its Subsidiaries, other than on terms and conditions not less favorable to the Borrower or such Restricted Subsidiary as would reasonably be obtained by the Borrower or such Restricted Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except:

(i)      Dividends may be paid to the extent provided in <u>Section 10.03</u>;

(ii)     loans and other transactions among Holdings, the Borrower and its Restricted Subsidiaries may be made to the extent otherwise expressly permitted under <u>Section 10</u>;

(iii)    customary fees and indemnification (including the reimbursement of out-of-pocket expenses) may be paid to directors of Holdings, the Borrower and its Restricted Subsidiaries;

(iv)     the Borrower and its Restricted Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions, stay bonuses, severance and other similar compensatory arrangements with officers, employees and directors of Holdings, the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(v)      any Tax Restructuring Transaction;

(vi)     [**reserved**];

(vii)    to the extent not otherwise prohibited by this Agreement, transactions between or among the Borrower and any Credit Party;

(viii)   transactions described on <u>Schedule 10.06(viii)</u>;

(ix)     Investments in the Borrower's Subsidiaries and Joint Ventures (to the extent any such Subsidiary that is not a Restricted Subsidiary or any such Joint Venture is only an Affiliate as a result of Investments by Holdings and the Restricted Subsidiaries in such Subsidiary or Joint Venture) to the extent otherwise permitted under <u>Section 10.05</u>;

(x)      [**reserved**];

(xi)     [**reserved**];

(xii)    [**reserved**]; and

(xiii)   the issuance of  Equity Interests in the form of common stock or Qualified Preferred Stock to the Sponsor, or to any director, officer, employee or consultant thereof.

Notwithstanding anything to the contrary contained above in this Section 10.06, in no event shall the Borrower or any of its Restricted Subsidiaries pay any management, consulting or similar fee to the Sponsor or any Affiliate of the Sponsor.

Section 10.07  Limitations on Payments, Certificate of Incorporation, By-Laws and Certain Other Agreements, etc.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to:

(a)    make (or give any notice (other than any such notice that is expressly contingent upon the repayment in full in cash of all Obligations other than any indemnification obligations arising hereunder which are not due and payable) in respect of) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, Change of Control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), any unsecured Indebtedness or Indebtedness secured by a Lien on Collateral ranking junior to those securing the obligations (it being understood that the Liens securing obligations under the Existing ABL Credit Agreement on the date hereof shall not be deemed "junior" for purposes of this Section 10.07);

(b)    make (or give any notice (other than any such notice that is expressly contingent upon the repayment in full in cash of all Obligations other than any indemnification obligations arising hereunder which are not due and payable) in respect of) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, Change of Control or similar event of (including, in each case without limitation, by way of depositing with the trustee with respect thereto or any other Person money or securities before due for the purpose of paying when due), any Indebtedness under the Existing ABL Facility Documents except in accordance with the Existing ABL Intercreditor Agreement;

(c)    amend or modify, or permit the amendment or modification of any provision of, any Indebtedness (after the entering into thereof) with a principal amount in excess of the Threshold Amount, other than any amendment or modification that is not adverse to the interests of the Lenders in any material respect; or

(d)    amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation) or certificate of formation; limited liability company agreement or bylaws (or the equivalent organizational documents); accounting policies, reporting policies or fiscal year (except as required by U.S. GAAP), as applicable, or any agreement entered into by it with respect to its Equity Interests, or enter into any new agreement with respect to its Equity Interests, unless such amendment, modification, change or other action contemplated by this clause (d) could not reasonably be expected to be adverse to the interests of the Lenders.

Section 10.08 <u>Limitation on Certain Restrictions on Subsidiaries</u>. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any of its Restricted Subsidiaries, or pay any Indebtedness owed to the Borrower or any of its Restricted Subsidiaries, (b) make loans or advances to the Borrower or any of its Restricted Subsidiaries or (c) transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of:

> (i)     applicable law;

> (ii)     (A) this Agreement and the other Credit Documents, (B) the Existing ABL Credit Agreement and the Existing ABL Facility Documents, (C) the ABL DIP Credit Agreement and the ABL DIP Credit Documents, (D) the Existing Credit Agreement and the Existing Credit Documents and (E) the Exit Financing Commitment Letter;

> (iii)     the Financing Order or [the First Day Orders];

> (iv)     customary provisions restricting subletting or assignment of any lease governing any leasehold interest of the Borrower or any of its Restricted Subsidiaries;

> (v)     customary provisions restricting assignment of any licensing agreement (in which the Borrower or any of its Restricted Subsidiaries is the licensee) or other contract entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

> (vi)     restrictions on the transfer of any asset pending the close of the sale of such asset;

> (vii)     [**reserved**];

> (viii)     encumbrances or restrictions on cash or other deposits imposed by customers under agreements entered into in the ordinary course of business;

> (ix)     any agreement or instrument relating to Indebtedness of a Foreign Subsidiary incurred pursuant to <u>Section 10.04</u> to the extent such encumbrance or restriction only applies to such Foreign Subsidiary;

> (x)     [**reserved**];

> (xi)     restrictions on the transfer of any asset subject to a Lien permitted by <u>Section 10.01</u>;

(xii)   restrictions and conditions imposed by the terms of the documentation governing any Indebtedness of a Restricted Subsidiary of the Borrower that is not a Credit Party, which Indebtedness is permitted by Section 10.04;

(xiii)   customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 10.05 and applicable solely to such joint venture;

(xiv)   [**reserved**]; and

(xv)   negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money permitted under Section 10.04 but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent, the Collateral Agent and/or the Security Trustee and the Secured Creditors with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens securing the Obligations under the Credit Documents equally and ratably or on a junior basis.

Section 10.09  Business; Fiscal Year; Activities of Holdings.

(a)   The Borrower will not permit at any time the business activities taken as a whole conducted by the Borrower and its Restricted Subsidiaries to be materially different from the business activities taken as a whole conducted by the Borrower and its Restricted Subsidiaries on the Closing Date.

(b)   Holdings will not engage in any business other than its ownership of the capital stock of, and the management of, the Borrower and, indirectly, its Subsidiaries and activities incidental thereto; provided that Holdings may engage in those activities that are incidental to (i) the maintenance of its existence in compliance with applicable law, (ii) legal, tax and accounting matters in connection with any of the foregoing or following activities, (iii) the entering into, and performing its obligations under, this Agreement, (iv) the issuance, sale or repurchase of its Equity Interests and the receipt of capital contributions, (v) the making of dividends or distributions on its Equity Interests to the extent permitted hereunder, (vi) the filing of registration statements, and compliance with applicable reporting and other obligations, under federal, state or other securities laws, (vii) the listing of its equity securities and compliance with applicable reporting and other obligations in connection therewith, (viii) the retention of (and the entry into, and exercise of rights and performance of obligations in respect of, contracts and agreements with) transfer agents, private placement agents, underwriters, counsel, accountants and other advisors and consultants, (ix) the performance of obligations under and compliance with its certificate of incorporation and bylaws, or any applicable law, ordinance, regulation, rule, order, judgment, decree or permit, including, without limitation, as a result of or in connection with the activities of its Subsidiaries, (x) the incurrence and payment of its operating and business expenses and any taxes for which it may be liable, (xi) the consummation of the Transaction, and (xii) the making of loans to or other Investments in, or incurrence of Indebtedness from, the Borrower, as and to the extent not prohibited by this Agreement.

(c)      Make any change in fiscal year.

Section 10.10  <u>Negative Pledges</u>.

(a) The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, agree or covenant with any Person to restrict in any way its ability to grant any Lien on its assets in favor of the Lenders, other than pursuant to the Existing Intercreditor Agreement or any other intercreditor agreement contemplated by this agreement, and except that this <u>Section 10.10</u> shall not apply to:

(i)      any covenants contained in this Agreement or any other Credit Documents or that exist on the Closing Date;

(ii)      covenants existing under the Existing Credit Agreement, the Existing Credit Documents, the Existing ABL Credit Agreement and the Existing ABL Facility Documents as in effect on the Closing Date;

(iii)      covenants existing under the (A) ABL DIP Credit Agreement and the other ABL DIP Credit Documents or (B) the Exit Financing Commitment Letter;

(iv)      covenants and agreements made in connection with any agreement relating to secured Indebtedness permitted by this Agreement but only if such covenant or agreement applies solely to the specific asset or assets to which such Lien relates;

(v)      customary provisions in leases, subleases, licenses or sublicenses and other contracts restricting the right of assignment thereof;

(vi)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures that are applicable solely to such joint venture;

(vii)      restrictions imposed by law;

(viii)      customary restrictions and conditions contained in agreements relating to any sale of assets or Equity Interests pending such sale, provided such restrictions and conditions apply only to the Person or property that is to be sold;

(ix)      [**reserved**];

(x)      negative pledges and restrictions on Liens in favor of any holder of Indebtedness for borrowed money entered into after the Closing Date and otherwise permitted under <u>Section 10.04</u> but only if such negative pledge or restriction expressly permits Liens for the benefit of the Administrative Agent, the Collateral Agent and/or the Security Trustee and the Secured Creditors with respect to the credit facilities established hereunder and the Obligations under the Credit Documents on a senior basis and without a requirement that such holders of such Indebtedness be secured by such Liens securing the Obligations under the Credit Documents equally and ratably or on a junior basis;

(xi)    restrictions on any Foreign Subsidiary pursuant to the terms of any Indebtedness of such Foreign Subsidiary permitted to be incurred hereunder;

(xii)    restrictions on cash deposits imposed by customers under contracts entered into in the ordinary course of business;

(xiii)    any restrictions on Liens imposed by any amendments, modifications, restatements, renewals, increases or supplements of the contracts, instruments or obligations referred to in clauses (i), (ii), (x) and (xi) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower, no more restrictive with respect to such encumbrance and other restrictions than those prior to such amendment, modification, restatement, renewal, increase or supplement;

(xiv)    restrictions under the Existing Credit Documents; and

(xv)    restrictions pursuant to the Financing Order and any First Day Orders.

(b)    Other than Liens securing the ABL DIP Credit Documents and the Carve out, the Borrower shall not permit, and shall not permit any of its Restricted Subsidiaries to permit any Person other than the Collateral Agent to obtain directly or indirectly any Lien (as adequate protection or otherwise) over the Real Property of any Credit Party, other than the Collateral Agent's and the Existing ABL Agent's Liens over such Real Property, and such Real Property shall remain property of the estate (and the value of any interest in Real Property securing the Existing Obligation as of the Filing Date) will be preserved for the benefit of the estate in the same manner that avoided transfers are preserved for the benefit of the estate under § 551 of the Bankruptcy Code, and any junior liens in such property shall be and remain junior in all respects to the estate's interest in such real property; provided that with respect to any parcel of such Real Property, after the Administrative Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender, then pursuant to the Financing Order such parcel of Real Property shall be automatically become a valid (other than with respect to the Permitted Priority Liens and the Carve out) Lien of Collateral Agent, for the benefit of the Secured Creditors, as security for the Obligations, pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code.

Section 10.11 <u>Financial Covenant</u>.    Each of Holdings and the Borrower covenants and agrees that, after the Closing Date until termination of all of the Commitments and payment in full of the Obligations, Holdings and the Borrower will and will cause each of their Subsidiaries to:

(a)    <u>Budget Compliance</u>.    Except as otherwise provided herein or approved by the Administrative Agent (acting at the direction of the Required Lenders), the Credit Parties will not, and will not permit any Subsidiary thereof to, directly or indirectly, (i) use any cash, including the proceeds of any Loans, in a manner or for a purpose other than those permitted

under this Agreement or contemplated by the Financing Order or the Budget, (ii) make or commit to make payments to critical vendors (other than those critical vendors set forth in the First Day Orders, the Financing Order or in the Budget, in each case as approved in writing by the Administrative Agent (acting at the direction of the Required Lenders) in respect of any pre-petition amount in excess of the amount included in the Budget), (iii) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash disbursements (in any event excluding disbursements for professional fees and expenses and restructuring expenses and interest and fees payable under this Agreement and the ABL DIP Credit Agreement) as reported in the Variance Reports delivered with respect to periods ending after the Filing Date through the end of such Testing Period to exceed, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount forecast in the Budget for the same such period and (iv) measured as of the end of each Testing Period, permit the aggregate cumulative amount of actual cash receipts (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder and under the ABL DIP Credit Documents) as reported in the Variance Reports delivered with respect to periods ending after the Closing Date through the end of such Testing Period to be less than, by more than the applicable Permitted Variance, the aggregate cumulative corresponding amount (which shall exclude, for the avoidance of doubt, proceeds from borrowings hereunder) forecast in the Budget for the same such period (such covenant, the "Budget Variance Covenant").

Section 10.12 Use of Proceeds.  Holdings will not, and will not permit any of its Subsidiaries to use the proceeds of any Loan made hereunder for any purpose other than, (a) in accordance with and subject to the Budget (subject to Permitted Variances) and the Financing Order, to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Credit Documents, the commencement of the Bankruptcy Cases and the transactions contemplated hereby, as and when such expenses are due and payable, (b) to the extent not otherwise prohibited by the Credit Documents or the Final Financing Order, to fund working capital needs and general corporate purposes of Borrower, at such times and in such amounts as are in compliance with Section 10.11, (c) to provide cash "adequate protection" (as set forth in Section 361 of the Bankruptcy Code and the relevant sections of other applicable Insolvency Laws) in favor of the Existing Agent and the Existing Lenders, and (d) to provide cash "adequate protection" (as set forth in Section 361 of the Bankruptcy Code and the relevant sections of other applicable Insolvency Laws) in favor of the Existing Agent for payments in cash on a current basis of all reasonable and documented fees, costs and expenses of Existing Agent's legal counsel (including local counsel and maritime counsel) and advisors; provided, however, that none of such fees, costs and expenses provided as adequate protection payments under this clause (d) shall be subject to approval by the Bankruptcy Court or the United States Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court; provided, that no part of the proceeds of any Loan will be used, directly or indirectly, (i) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Existing Agent, Existing Lenders, Agent or Lenders, or in connection with the Obligations or Existing Secured Obligations, except for an amount up to $50,000, for investigation costs of any official statutory committee appointed pursuant to Bankruptcy Code § 1102, (ii) to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (iii) to make any payments to a

Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person, and (iv) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

Section 10.13   <u>Financing Order; Administrative Expense Priority; Payments</u>.   Holdings will not, and will not permit any of its Subsidiaries to:

(a)      seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by Administrative Agent (acting at the direction of the Required Lenders),

(b)      seek the use of "Cash Collateral" (as defined in the Financing Order) in a manner inconsistent with the terms of the Financing Order without the prior written consent of Administrative Agent (acting at the direction of the Required Lenders), and

(c)      suffer to exist at any time a priority for any administrative expense or unsecured claim against any Credit Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 365, 503((b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code) or any other superpriority claim which is equal or superior to the priority of the Secured Creditors or "Secured Creditors" (as defined in the Existing Credit Agreement) in respect of the Obligations or Existing Secured Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carve out  and as otherwise set forth in the Credit Documents and reasonably acceptable to the Required Lenders,

Section 10.14   <u>Restructuring Support Agreement</u>.   Holdings will not, and will not permit any of its Subsidiaries to amend, modify or change in any manner that could reasonably be expected to be adverse to the interests of the Administrative Agent or Lenders, any term, condition or provision of the Restructuring Support Agreement, or terminate the Restructuring Support Agreement.

Section 10.15   <u>Key Employees</u>.   Other than the Management Incentive Plan, the Borrower shall not, and the Borrower shall not permit any of its Subsidiaries to, enter into any agreements or arrangements relating to any key employee incentive or retention plans or any similar officer or employee bonus plans or programs, in each case without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders) or provided for in the Budget or the relief requested in the Borrower's "first day" employee wage motion and order.

ARTICLE 11  <u>Events of Default</u>.  Upon the occurrence of any of the following specified events (each, an "<u>Event of Default</u>"):

Section 11.01  <u>Payments</u>.  The Borrower shall (i) default in the payment when due of any principal of any Loan or (ii) default, and such default shall continue unremedied for two (2) or more Business Days, in the payment when due of any interest on any Loan, or any Fees or any other amounts owing hereunder or under any other Credit Document; or

Section 11.02  <u>Representations, etc</u>.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect (without duplication of any materiality standard set forth in any such representation and warranty) on the date as of which made or deemed made; or

Section 11.03  <u>Covenants</u>.  Holdings, the Borrower or any of its Restricted Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in the Financing Order, <u>Section 9.01</u>, <u>9.02(b)</u>, <u>9.02(c)</u>, <u>9.02(d)</u>, <u>9.03(c)</u>, <u>9.04</u>, <u>9.09</u>, <u>9.11</u>, <u>9.12</u>, <u>9.16</u>, <u>9.17</u>, <u>9.21</u>, <u>9.22</u>, <u>9.23</u> or <u>9.24</u>, or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or in any other Credit Document (other than those set forth in <u>Sections 11.01</u> and <u>11.02</u>), and such default shall continue unremedied for a period of thirty (30) days after written notice thereof to the defaulting party by the Administrative Agent (acting at the direction of the Required Lenders) or the Required Lenders; or

Section 11.04  <u>Default Under Other Agreements</u>.  (i) Holdings, the Borrower or any of its Restricted Subsidiaries shall (x) default in any payment of any postpetition Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any postpetition Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such postpetition Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such postpetition Indebtedness to become due prior to its stated maturity, (ii) any postpetition Indebtedness (other than the Obligations) of Holdings, the Borrower or any of its Restricted Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that (A) it shall not be a Default or an Event of Default under this <u>Section 11.04</u> unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least equal to the Threshold Amount and (B) the preceding clause (ii) shall not apply to Indebtedness that becomes due as a result of a voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is otherwise permitted hereunder or (iii) the occurrence of a DIP Termination Date; or

Section 11.05  <u>Bankruptcy, etc</u>.  Other than the Debtors in respect of the Bankruptcy Cases, Holdings, the Borrower or any of its Restricted Subsidiaries (other than any Immaterial

Subsidiary) shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against Holdings, the Borrower or any of its Restricted Subsidiaries, and the petition is not dismissed within sixty (60) days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code), receiver, receiver-manager, trustee, monitor is appointed for, or takes charge of, all or substantially all of the property of Holdings, the Borrower or any of its Restricted Subsidiaries, or Holdings, the Borrower or any of its Restricted Subsidiaries commences any other proceeding under any reorganization, bankruptcy, insolvency, arrangement, winding-up, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Holdings, the Borrower or any of its Restricted Subsidiaries, or there is commenced against Holdings, the Borrower or any of its Restricted Subsidiaries any such proceeding which remains undismissed for a period of sixty (60) days, or Holdings, the Borrower or any of its Restricted Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or Holdings, the Borrower or any of its Restricted Subsidiaries suffers any appointment of any custodian, receiver, receiver-manager, trustee, monitor or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of sixty (60) days; or Holdings, the Borrower or any of its Restricted Subsidiaries makes a general assignment for the benefit of creditors; or any corporate, limited liability company or similar action is taken by Holdings, the Borrower or any of its Restricted Subsidiaries for the purpose of effecting any of the foregoing or

Section 11.06  ERISA.  (a) An ERISA Event has occurred with respect to an ERISA Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in a Material Adverse Effect, (b) there is or arises Unfunded Pension Liability which has resulted or would reasonably be expected to result in a Material Adverse Effect, (c) there is or arises any withdrawal liability under Section 4201 of ERISA, resulting from any Credit Party or any ERISA Affiliate withdrawal from any or all Multiemployer Plans which has resulted or would reasonably be expected to result in a Material Adverse Effect, (d) a Foreign Pension Plan has failed to comply with, or be funded in accordance with, applicable law which has resulted or would reasonably be expected to result in a Material Adverse Effect, or (e) the Borrower or any of its Restricted Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan that, in each case, has resulted or would reasonably be expected to result in a Material Adverse Effect; or

Section 11.07  Security Documents.  Any of the Security Documents shall cease to be in full force and effect, or shall cease to give the Collateral Agent or the Security Trustee for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby, in favor of the Collateral Agent or the Security Trustee, as applicable, superior to and prior to the rights of all third Persons (except as permitted by Section 10.01, the Financing Order or the Intercreditor Agreements), and subject to no other Liens (except as permitted by Section 10.01, the Financing Order or the Intercreditor Agreements)); or

Section 11.08  Guaranties.  Any material Guaranty or any material provision thereof shall cease to be in full force or effect as to any Guarantor, or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm in writing such Guarantor's obligations under the Guaranty to which it is a party or any Guarantor shall default in the due performance or

observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Guaranty to which it is a party; or

Section 11.09 <u>Judgments</u>.  One or more judgments or decrees shall be entered against Holdings, the Borrower or any Restricted Subsidiary (other than any Immaterial Subsidiary) of the Borrower involving in the aggregate for Holdings, the Borrower and its Restricted Subsidiaries (other than any Immaterial Subsidiary) a liability or liabilities (not paid or fully covered by a reputable and solvent insurance company with respect to judgments for the payment of money) and such judgments and decrees shall not be vacated, discharged or stayed for any period of sixty (60) consecutive days, and the aggregate amount of all such judgments and decrees (to the extent not paid or fully covered by such insurance company) equals or exceeds $1,000,000; or

Section 11.10 <u>Change of Control</u>.  A Change of Control shall occur; or

Section 11.11 <u>Bankruptcy Matters</u>.

(a)    The Final Financing Order is not entered within forty (40) days following the Filing Date (or such later date acceptable to the Administrative Agent (acting on the instructions of the Required Lenders in their sole discretion);

(b)    Any of the Initial Financing Order or the Final Financing Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified by the Bankruptcy Court without the express prior written consent of the Administrative Agent (such consent to be given at the direction of the Required Lenders);

(c)    Any Credit Party shall file a pleading seeking to modify or otherwise alter the Initial Financing Order, the Final Financing Order, any Credit Document, any Existing Credit Document or any of the transactions contemplated in any of the foregoing without the prior consent of Administrative Agent, such consent to be given at the direction of the Required Lenders;

(d)    Without the written consent of the Administrative Agent (acting at the direction of the Required Lenders), an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business of the Credit Parties under Section 1106(b) of the Bankruptcy Code, or (ii) terminating or shortening any Credit Party's exclusive rights to file and solicit acceptances for a plan of reorganization in the Bankruptcy Cases;

(e)    (i) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Collateral Agent or the Security Trustee and the Lenders, or otherwise in respect of the Obligations or Existing Secured Obligations, claims or rights against Credit Parties or any of their Subsidiaries or to subject any Collateral to assessment pursuant to Section 105, 506(c), 552 or any other section of the Bankruptcy Code or other applicable Insolvency Laws, (ii) any lien, security interest or Superpriority Claim created by the Credit Documents or the Financing Order shall, for any reason, cease to be valid, (iii) any action is commenced by any Credit Party or any of its Subsidiaries which contests the extent, validity,

perfection, enforceability or priority of any of the liens and security interests of Agent, Existing Agent, the Lenders or Existing Lenders or in respect of the Existing Secured Obligations or the Obligations created by the Credit Documents, the Existing Credit Agreement, the Existing Credit Documents or the Financing Order, (iv) any Credit Party or any Subsidiary of any Credit Party challenges the extent, validity or priority of the Obligations or the Existing Secured Obligations or the application of any payments or collections received by Administrative Agent, Lenders, Existing Agent, or Existing Lenders to the Obligations or Existing Secured Obligations as provided for herein or in the Financing Order, or (v) except as expressly provided in the Financing Order with respect to the Carve out, any Agent, any Lender, Existing Agent, any Existing Lender or any Collateral securing the Obligations or Existing Obligations are surcharged pursuant to Sections 105, 506(c) or 552 or any other section of the Bankruptcy Code;

(f)     Without the written consent of the Administrative Agent (acting at the direction of Required Lenders), (i) the filing by any Credit Party of any motion to dismiss any of the Bankruptcy Cases or to convert any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, or (ii) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases (or any case comprising part of any of the Bankruptcy Cases) to a case under chapter 7 of the Bankruptcy Code;

(g)     Any motion, supplement, amendment or other document relating to the Financing Order, the Credit Agreement, the Existing Credit Agreement or the transactions contemplated in any of the foregoing that is not in form in substance satisfactory to Required Lenders is filed by any Credit Party or entered by the Bankruptcy Court;

(h)     Any sale of, or motion to sell Collateral pursuant to Section 363 of the Bankruptcy Code (except for sales or other disposition expressly permitted hereunder) is filed, not permitted by this Agreement;

(i)     An order with respect to any of the Bankruptcy Cases shall be entered without the express prior written consent of Administrative Agent (acting at the direction of the Required Lenders), (i) to revoke, vacate, reverse, stay, modify, supplement or amend the Existing Credit Agreement, any Credit Document, any Existing Credit Document, the Financing Order or the transactions contemplated in any of the foregoing, or (ii) to permit any administrative expense, claim or lien (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of the Agents, Existing Agent, Lenders and Existing Lenders in respect of the Obligations and Existing Secured Obligations, except for amounts in respect of the Carve-Out as set forth in the Financing Order;

(j)     An order shall be entered by the Bankruptcy Court granting relief from the automatic stay as to any creditor of any Credit Party with respect to any Collateral having a value in excess of $1,000,000;

(k)     Any plan of reorganization is filed by any Credit Party that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in any of the Bankruptcy Cases which, does not (i) contain a provision that all Obligations shall be paid in full in a manner satisfactory to the Required Lenders on or before the effective date, or substantial

consummation, of such plan and (ii) provide for the continuation of the liens and security interests granted to Collateral Agent or the Security Trustee and priorities (subject to the Intercreditor Agreement) until on such plan effective date all Obligations are paid in full;

(l)     Unless otherwise agreed to by Administrative Agent (acting at the direction of the Required Lenders), a motion shall be filed by any Credit Party seeking authority, or an order shall be entered in any of the Bankruptcy Cases, that (i) permits any Credit Party or any Subsidiary of any Credit Party to incur indebtedness secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the lien granted under the Credit Documents and the Existing Credit Documents and Bankruptcy Code Sections 364(c)(2) or (d) unless (A) all of the Obligations have been paid in full at the time of the entry of any such order, or (B) the Obligations are paid in full with such indebtedness, or (ii) permits any Credit Party or any Subsidiary of any Credit Party the right to use "Cash Collateral" (as defined in the Financing Order) other than in accordance with the terms of the Financing Order, unless all of the Obligations shall have been paid in full;

(m)     Net Cash Proceeds of any sale of all or substantially all assets of the Credit Parties are not directly remitted to Administrative Agent (or the ABL DIP Agent) at the closing thereof, to be applied in accordance with the Financing Orders, the Credit Documents and the Intercreditor Agreements;

(n)     The Restructuring Support Agreement is terminated or ceases to be in full force and effect;

(o)     Subject to the Intercreditor Agreements, any motions in the Bankruptcy Cases to sell Collateral or approve procedures regarding the same, or any orders of the Bankruptcy Court approving or amending any of the foregoing, are not in form and substance reasonably acceptable to the Required Lenders;

(p)     Any Credit Party or any Subsidiary of any Credit Party shall fail to maintain sufficient projected borrowing capacity under the ABL DIP Credit Agreement plus cash plus projected cash flow and sufficient additional borrowing capacity (including proceeds expected to be received pursuant to equity issuances upon exit from the Bankruptcy Cases and exit financing documents) to pay all accrued administrative obligations and other administrative claims when due;

(q)     Except as set forth herein, the failure by the Credit Parties to observe or perform any of the material terms or provisions contained in the Financing Order in any respect adverse to the interests of the Lenders; and

(r)     Payment of or granting adequate protection with respect to any Indebtedness that was existing prior to the Filing Date other than as expressly provided in the Financing Order or as consented to by the Administrative Agent (acting at the direction of the Required Lenders).

Section 11.12 Consultant.  If (a) the Consultant is terminated or disqualified for any reason (b) the Consultant is instructed to cease working, (c) the Consultant's engagement by Borrower, or any of the responsibilities, authority, powers, or duties of the Consultant, is

terminated, suspended, or restricted in any material respect, or (d) the Consultant resigns, in each case of clauses (a) through (d), and Borrower has not engaged a replacement Consultant pursuant to Section 9.19 within ten (10) Business Days (or such longer period as the Required Lenders reasonably agree).

THEN in the case of Section 11.1 through 11.12 above, notwithstanding Section 362 of the Bankruptcy Code but subject to the applicable terms of the Financing Order, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 11.05 shall occur with respect to any Credit Party, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below shall occur automatically): (i) declare the Aggregate Commitments terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately; (ii) declare the principal of and any accrued interest in respect of all Loans and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) enforce, as Collateral Agent or the Security Trustee, as applicable, all of the Liens and security interests created pursuant to the Security Documents; (iv) enforce each Guaranty, (v) [reserved,] (vi) [reserved] and (vii) terminate the Credit Parties' right to use "Cash Collateral" (as defined in the Financing Order) by written notice thereof to counsel for the Credit Parties, counsel for the Committee (if any), the U.S. Trustee, without further notice, application or order of the Bankruptcy Court.

Section 11.13  Application of Funds.

(a)     Subject to the ABL DIP Intercreditor Agreement, any amounts received by the Administrative Agent on account of the Obligations so long as no Event of Default has occurred and is continuing (including without limitation, proceeds received by the Administrative Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral) shall, subject to the provisions of Sections 2.11, be applied in the following order:

First, to the payment of all reasonable costs and out-of-pocket expenses, fees, commissions and taxes of such sale, collection or other realization including, without limitation, compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection with the DIP Term Facility;

Second, to the payment of all other reasonable costs and out-of-pocket expenses of such sale, collection or other realization including, without limitation, costs and expenses and all costs, liabilities and advances made or incurred by the other Secured Creditors in connection therewith;

Third, to interest then due and payable on the Term Loans;

_Fourth_, to the principal balance of Term Loans then outstanding, pro rata; and

_Fifth_, to all other Obligations pro rata.

In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Fifth of this Section 11.13(a), the Credit Parties shall remain liable for any deficiency.

(b)     Subject to the ABL DIP Intercreditor Agreement, any amounts received by the Administrative Agent on account of the Obligations after the occurrence of and during the continuation of an Event of Default (including without limitation, proceeds received by the Administrative Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral) shall, subject to the provisions of Sections 2.11, be applied in the following order:

_First_, to the payment of all reasonable costs and out-of-pocket expenses, fees, commissions and taxes of such sale, collection or other realization including, without limitation, compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection with the DIP Term Facility;

_Second_, to the payment of all other reasonable costs and out-of-pocket expenses of such sale, collection or other realization including, without limitation, costs and expenses and all costs, liabilities and advances made or incurred by the other Secured Creditors in connection therewith;

_Third_, to interest then due and payable on the Term Loans;

_Fourth_, to the principal balance of the Term Loans outstanding until the same has been prepaid in full; and

_Fifth_, to all other Obligations pro rata.

In the event that any such proceeds are insufficient to pay in full the items described in clauses First through Fifth of this Section 11.13(b), the Credit Parties shall remain liable for any deficiency.

ARTICLE 12   The Administrative Agent.

Section 12.01   Appointment and Authorization.

(a)     Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Credit Documents and expressly authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article 12 (other than as explicitly stated in Sections 12.08 and 12.11) are

solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.

(b)     The Administrative Agent shall also act as the "Collateral Agent" and "Security Trustee" under the Credit Documents and each reference to Administrative Agent herein shall be deemed to also reference Cortland Capital Market Services LLC's role as Collateral Agent and Security Trustee hereunder, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any Credit Party to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "Collateral Agent" or "Security Trustee" and any co-agents, subagents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 12.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article 12 and Article 13 (including Section 13.01, as though such co-agents, subagents and attorneys-in-fact were the "Collateral Agent" or "Security Trustee" under the Credit Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Creditors with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(c)     The Lenders hereby expressly authorize the Administrative Agent to enter into the Intercreditor Agreements and any other intercreditor agreement or arrangement permitted under this Agreement and any such intercreditor agreement shall be being binding upon the Lenders.

Section 12.02  Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more subagents appointed by the Administrative Agent. The exculpatory provisions of this Article 12 shall apply to any such subagent of the Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 12.03  Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents. Without limiting the generality of the foregoing, notwithstanding anything in the Credit Documents to the contrary, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Administrative Agent is required to exercise as directed

in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable law;

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Article 11 and Section 13.11) or (ii) in the absence of its own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender; and

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 12.04  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 12.05  [Reserved.]

Section 12.06  <u>Non-reliance on Administrative Agent and Other Lenders</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

Section 12.07  <u>Indemnification by the Lenders</u>.  To the extent that the Borrower for any reason fails to indemnify the Administrative Agent or fails to pay any amount required under <u>Section 13.01(a)</u> to be paid by it to the Administrative Agent (or any subagent thereof), each Lender severally agrees to (i) pay to the Administrative Agent (or any such subagent) such Lender's pro rata share (based on the amount of then outstanding Loans) of (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (which reimbursed amount shall include the costs and fees of local counsel for the Administrative Agent) and (ii) indemnify the Administrative Agent in proportion to such Lender's pro rata share (based on the amount of then outstanding Loans) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any such subagent); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such subagent) in its capacity as such. The obligations of the Lenders under this <u>Section 12.07</u> are subject to the provisions of <u>Section 5.01</u>.  In taking any action hereunder or under any other Credit Document, the Administrative Agent or Collateral Agent, as the case may be, may request direction and additional indemnification from the Required Lenders in their sole discretion.

Section 12.08  [Reserved].<u>Administrative Agent May File Proofs of Claim; Credit Bidding</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due to the Lenders and the Administrative Agent under <u>Section 13.01</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee,

liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 13.01.

(c)     Nothing contained in this Section 12.09 shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

(d)     The Secured Creditors hereby irrevocably expressly authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar laws in any other jurisdictions to which a Credit Party is subject or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Creditors shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a)(i) through (a)(v) of Section 13.04 of this Agreement), and (iii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Creditor or any acquisition vehicle to take any further action.

Section 12.10  <u>Resignation of the Agents</u>.

(a)     The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (other than during the existence of an Event of Default), to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, with the Borrower's consent (other than during the existence of an Event of Default), on behalf of the Lenders, appoint a successor Administrative Agent; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Credit Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section). After the retiring Administrative Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article  12 and <u>Section 13.01</u> shall continue in effect for the benefit of such retiring Administrative Agent and its subagents in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)     [reserved.]

Section 12.11  <u>Collateral Matters and Guaranty Matters</u>. (a) The Lenders irrevocably and expressly authorize the Administrative Agent, the Collateral Agent and the Security Trustee, as applicable (and subject to the provisions of the Intercreditor Agreements),

(i)     to release any Lien on any property granted to or held by the Collateral Agent or the Security Trustee, as applicable, under any Credit Document (A) upon payment in full of all Obligations, (B) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Credit Document to a Person that is not a Credit Party, (C) subject to <u>Section 13.11</u>, if approved, authorized or ratified in writing by the Required Lenders, (D) [reserved] or (E) if the property subject to such Lien is owned by a Subsidiary Guarantor, subject to <u>Section 13.11</u>, upon release of such Subsidiary Guarantor from its obligations under the Subsidiaries Guaranty pursuant to clause (ii) below;

(ii)     [reserved]; and

(iii)    [reserved].

Upon request by the Administrative Agent, the Collateral Agent or the Security Trustee at any time, the Required Lenders will confirm in writing the Administrative Agent's, the Collateral Agent's or the Security Trustee's, as applicable, authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 12.11</u>. In each case as specified in this <u>Section 12.11</u>, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty upon receipt, if requested by the Administrative Agent of an officer's certificate by a Responsible Officer of the Borrower certifying that such release or subordination, as applicable, is permitted by the terms of the Credit Documents and otherwise in form and substance reasonably satisfactory to the Administrative Agent, in each case in accordance with the terms of the Credit Documents and this <u>Section 12.11</u>.

Section 12.12  [Reserved.]

Section 12.13  <u>Withholding Taxes</u>.   To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective), such Lender shall, within ten (10) days after written demand therefor, indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to <u>Section 5.01</u> and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due the Administrative Agent under this <u>Section 12.13</u>. The agreements in this <u>Section 12.13</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

Section 12.14  [Reserved.].

ARTICLE 13  <u>Miscellaneous</u>.

Section 13.01  <u>Payment of Expenses, etc</u>.

(a)       The Credit Parties hereby jointly and severally agree to: (i) pay all reasonable invoiced out-of-pocket costs and expenses of the Agents and Lenders in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein (including, without limitation, Davis Polk & Wardwell LLP, counsel engaged by the Lenders, Rapp & Krock, P.C., counsel engaged by the Lenders in connection with the Debtors' Chapter 11 cases, Winston & Strawn LLP, as maritime counsel to the Lenders, Evercore Group L.L.C., financial advisor to the lenders), the administration hereof and thereof (including the Administrative Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Credit Party or its Subsidiaries, the Administrative Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of the Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith) and any amendment, modification waiver or consent relating hereto or thereto (whether or not effective), of the Agents in connection with their syndication efforts with respect to this Agreement and of the Agents, each Lender in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "<u>workout</u>" or pursuant to any insolvency or bankruptcy proceedings; (ii) pay and hold each Agent and each Lender harmless from and against any and all Other Taxes with respect to the foregoing matters and save each Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Agent or such Lender) to pay such Other Taxes; and (iii) indemnify each Agent, each Lender, Existing Agent, Existing Lenders and their respective Affiliates, the Existing Agent and the officers, directors, employees, agents (including attorneys and the Agent Consultant), trustees, representatives and investment advisors of each of the foregoing (each, an "<u>Indemnified Person</u>") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) (but excluding Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, actions, costs, expenses and disbursements arising from a non-Tax claim) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (A) in connection with, or as a result of, or related to the entering into and/or performance of this Agreement, any other Credit Document, the Existing Credit Agreement or the Existing Credit Documents or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein, in any other Credit Document, in the Existing Credit Agreement or in any of the Existing Credit Documents or the exercise of any of their rights or remedies provided herein, in the other Credit Documents, in the Existing Credit Agreement or in the Existing Credit Documents, including any investigation, litigation or other proceeding (whether or not any Agent, any Secured Creditor, Existing Agent or Existing Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party), (B) in connection with the Bankruptcy Cases, or (C) the actual or

alleged presence of Hazardous Materials in the Environment relating in any way to any Vessel or Real Property owned, leased or operated, at any time, by the Borrower or any of its Subsidiaries; the generation, storage, transportation, handling, Release or threat of Release of Hazardous Materials by the Borrower or any of its Subsidiaries at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries; the noncompliance by the Borrower or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder); or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or relating in any way to any Vessel or Real Property at any time owned, leased or operated by the Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable and documented fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnified Person (but excluding in each case any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence, or willful misconduct of the applicable Indemnified Person, any Affiliate of such Indemnified Person or any of their respective directors, officers, employees, representatives, agents, Affiliates, trustees or investment advisors (as determined by a court of competent jurisdiction in a final and non-appealable decision). To the extent that the undertaking to indemnify, pay or hold harmless any Agent or any Lender or other Indemnified Person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Credit Parties shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

(b)     No Agent or any Indemnified Person shall be responsible or liable to any Credit Party or any other Person for (x) any determination made by it pursuant to this Agreement or any other Credit Document in the absence of gross negligence, or willful misconduct on the part of such Indemnified Person (in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment), (y) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems or (z) any indirect, special, exemplary, incidental, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) which may be alleged as a result of this Agreement or any other Credit Document or the financing contemplated hereby.

(c)     To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loans or the use of the proceeds thereof. No Indemnified Person referred to in subsection (a) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Person through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final and non-appealable judgment of a court of competent jurisdiction. For the avoidance of doubt, this

paragraph shall not limit the obligation of the Borrower to indemnify each Indemnified Person for any liabilities or damages incurred by such Indemnified Person that are asserted against such Indemnified Person by a third party that are payable by the Borrower pursuant to subsection (a) of this Section.

(d)    The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 13.02  Right of Setoff.

(a)    In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) (other than accounts used exclusively for payroll, payroll taxes, fiduciary and trust purposes, and employee benefits) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender (including, without limitation, by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of the Borrower or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Secured Creditors under this Agreement or under any of the other Credit Documents, including, without limitation, all claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not a Secured Creditor shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

(b)    NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER SHALL EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE COLLATERAL AGENT OR THE SECURITY TRUSTEE PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXERCISE BY ANY LENDER OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS SHALL BE NULL AND VOID. THIS SUBSECTION (b) SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.

Section 13.03  Notices.

(a)     Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telecopier, cable communication or electronic transmission) and mailed, telegraphed, telexed, telecopied, cabled, delivered or transmitted: if to any Credit Party, AMERICAN COMMERCIAL LINES INC., 1701 East Market Street, Jeffersonville, IN 47130, Attn: Dawn Landry, General Counsel, Fax No. (812) 2880294, with a copy to Platinum Equity, LLC, 360 North Crescent Drive, Beverly Hills, CA 90210, Attention: Legal Department, Telecopier No.: (310) 7121863; if to any Lender, at its address specified on Schedule 13.03 (to the extent provided therein) or in writing to the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex or telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent, the Borrower or Holdings may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Section 13.04  Benefit of Agreement; Assignments; Participations, etc.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that the Borrower may not assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of all of the Lenders and, provided, further, that, although any Lender may grant participations in its rights or obligations hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 2.11 and 13.04) and the participant, as the case may be, shall not constitute a "Lender" hereunder and, provided, further, that no Lender shall grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory repayment of any Loan shall not constitute a change in the terms of such

participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement, (iii) modify any of the voting percentages set forth in Section 13.11 or the underlying definitions, (iv) except as otherwise expressly provided in the Security Documents, release all or substantially all of the Collateral under all the Security Documents supporting the Loans in which such participant is participating or (v) except as otherwise provided in the Credit Documents, release all or substantially all of the value of the Guaranty supporting the Loans in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto). Each Credit Party agrees that each participant shall be entitled to the benefits of Sections 3.01 and 5.01 (subject to the limitations and requirements of such Sections) to the same extent as if it were a Lender and had acquired its interest by assignment; provided, however, that a participant shall not be entitled to receive any greater payment under Section 3.01 or Section 5.01 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant except to the extent such entitlement to a greater payment results from a change in law after the sale of the participation takes place and the Participant shall in lieu of providing the forms or documentation required by Section 5.01(b) or 5.01(c) to the Administrative Agent or Borrower, provide such forms or documentation to the Lender granting the participation who shall collect such forms and documentation on behalf of, and for the limited purpose thereof, as an agent of the Borrower and Administrative Agent. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest amounts) of each participant's interest in the Loans or other obligations under the Credit Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loan, or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form for the purposes of the Code, including pursuant to Section 5f.103-1(c) of the United States Treasury Regulations or its successor. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(a)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may assign all, or if less than all, a portion equal to at least $500,000 (or such lesser amount as may be agreed to by the Administrative Agent) in the aggregate for the assigning Lender or assigning Lenders, of outstanding Obligations hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption

Agreement (which Assignment and Assumption Agreement shall contain an acknowledgement and agreement by the respective assignee that, as a Lender, it shall be subject to, and bound by the terms of the Intercreditor Agreements), provided that (i) at such time, Schedule 2.01 shall be deemed modified to reflect the Commitments of such new Lender and of the existing Lenders, (ii) the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed), (iii) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a nonrefundable assignment fee of $3,500, which the Administrative Agent may waive in its sole discretion and (iv) no such transfer or assignment shall be effective until recorded by the Administrative Agent on the Register pursuant to Section 13.15. To the extent of any assignment pursuant to this Section 13.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans. At the time of each assignment pursuant to this Section 13.04(b) to a Person that is not already a Lender hereunder, such assignee shall provide to the Administrative Agent and the Borrower such Tax forms as are required to be provided under clauses (b) and (c) of Section 5.01 together with organizational documents, other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

(b)     **[reserved]**.

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Loans to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be. No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)     Each Lender acknowledges and agrees to comply with the provisions of Section 13.04 applicable to it as a Lender hereunder.

Section 13.05   No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent, the Security Trustee or any Lender to any other or further action in any circumstances without notice or demand.

Section 13.06 **[reserved]**.

Section 13.07 <u>Calculations; Computations</u>.

(a)     The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with U.S. GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto); provided that except as otherwise specifically provided herein, all computations of the Applicable Margin, and all computations and all definitions (including accounting terms) used in this Agreement, shall utilize U.S. GAAP and policies in conformity with those used to prepare the audited financial statements of the Borrower for the fiscal year of the Borrower ended December 31, 2018. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to Statement of Financial Accounting Standards 141R or ASC 805 (or any other financial accounting standard having a similar result or effect).

(b)     The calculation of any financial ratios under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-down if there is no nearest number). All such calculations shall include as Indebtedness the present value of long-term leases of revenue-generating equipment and Vessels.

Section 13.08 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.

(a)     THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN THE RELEVANT SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT (EXCEPT THAT, (X) IN THE CASE OF ANY MORTGAGE OR OTHER SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT OR COLLATERAL AGENT (ACTING AT THE DIRECTION OF THE REQUIRED LENDERS) IN THE STATE IN WHICH THE RELEVANT MORTGAGED PROPERTY OR COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION AND (Y) IN THE CASE OF ANY BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS WITH RESPECT TO ANY CREDIT PARTY, ACTIONS OR PROCEEDINGS RELATED TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY BE BROUGHT IN SUCH COURT HOLDING SUCH BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS) MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, OR THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH OF THE PARTIES HERETO OR THERETO HEREBY

IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND HEREBY AGREES TO WAIVE ANY RIGHTS IT MAY HAVE TO OBJECT TO ADJUDICATION BY A JUDGE OF THE BANKRUPTCY COURT ON THE BASIS OF A RIGHT TO HAVE MATTERS ADJUDICATED IN FRONT OF AN ARTICLE III JUDGE. EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER IT, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENTS BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER IT. EACH PARTY HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY, AS THE CASE MAY BE, AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE ON THE EARLIER OF ACTUAL RECEIPT OR 30 DAYS AFTER SUCH MAILING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER SUCH PARTY IN ANY OTHER JURISDICTION.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 13.09  Counterparts.   This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

Section 13.10 <u>Headings Descriptive</u>.   The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 13.11 <u>Amendment or Waiver; etc.</u>

(a)   Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the Borrower on behalf of the Credit Parties party hereto or thereto and the Required Lenders and acknowledged by the Administrative Agent (although additional parties may be added to (and annexes may be modified to reflect such additions) the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders); provided that no such change, waiver, discharge or termination shall (i) without the prior written consent of each Lender directly and adversely affected thereby, extend the date in clause (a) of the definition of "Maturity Date," or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with applicability of any post-default increase in interest rates) or reduce or forgive the principal amount thereof, (ii) except as otherwise expressly provided in the Security Documents, release all or substantially all of the Collateral under all the Security Documents without the prior written consent of each Lender, (iii) except as otherwise provided in the Credit Documents, release all or substantially all of the value of the Guaranty without the prior written consent of each Lender, (iv) amend, modify or waive any pro rata sharing provision of <u>Section 2.10</u>, the payment waterfall provision of <u>Section 11.13</u>, or any provision of this <u>Section 13.11(a)</u> (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Commitments on the Closing Date), in each case, without the prior written consent of each Lender directly and adversely affected thereby, (v) reduce the percentage specified in the definition of Required Lenders without the prior written consent of each Lender (it being understood that, with the prior written consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders, on substantially the same basis as the extensions of Commitments are included on the Closing Date) or (vi) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement without the consent of each Lender; provided further that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Aggregate Commitments shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the consent of each Agent adversely affected thereby, amend, modify or waive any provision of Article 12 or any other provision as same relates to the rights or obligations of such Agent and (3) without the consent of Collateral Agent or the Security Trustee, as applicable, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent or the Security Trustee, as applicable.

(b)   If, in connection with any proposed change, waiver, discharge or termination of any of the provisions of this Agreement as contemplated by clauses (i) through

(v), inclusive, of the first proviso to <u>Section 13.11(a)</u>, the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Administrative Agent or Borrower shall have the right, so long as all nonconsenting Lenders whose individual consent is required are treated as described in either clause (A) or (B) below, to either (A) replace each such nonconsenting Lender or Lenders with one or more Replacement Lenders pursuant to <u>Section 3.04</u> so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination or (B) terminate such nonconsenting Lender's Commitments and/or repay the outstanding Loans of such Lender in accordance with <u>Section 3.04</u>; provided that, unless the Commitments that are terminated, and Loans repaid, pursuant to the preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B) the Required Lenders (determined after giving effect to the proposed action) shall specifically consent thereto; provided further that in any event the Administrative Agent and Borrower shall not have the right to replace a Lender, terminate its Commitments or repay its Loans solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to <u>Section 13.11(a)</u>.

(c)     [**Reserved**].

(d)     **[Reserved.]**

(e)     Notwithstanding anything to the contrary herein, any fee letter may be amended, or rights and privileges thereunder waived, in a writing executed only by the parties thereto.

(f)     Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments, waivers and consents hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Required Lenders or all of the Lenders, as required, have approved any such amendment, waiver or consent (and the definition of "<u>Required Lenders</u>" will automatically be deemed modified accordingly for the duration of such period); provided that any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to such Defaulting Lender hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Lender.

(g)     Further, notwithstanding anything to the contrary contained in this <u>Section 13.12</u>, if following the Closing Date, the Administrative Agent and any Credit Party shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents, then the Administrative Agent and the Borrower, on behalf of Credit Parties, shall be permitted to amend such provision and such

amendment shall become effective without any further action or consent of any other party to any Credit Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

Section 13.12  Survival.  All indemnities set forth herein including, without limitation, in Sections 3.01, 3.02, 5.01, 12.07 and 13.01 shall survive the execution, delivery and termination of this Agreement and the making and repayment of the Obligations.   To the extent of any conflict between the terms of the Financing Order and the terms of this Agreement, the terms of the Financing Order shall govern and control.

Section 13.13  Domicile of Loans.  Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.13 would, at the time of such transfer, result in increased costs under Section 3.01 or 5.01 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

Section 13.14  Register.   The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.14, to maintain a register (the "Register") on which the Administrative Agent will record the Commitments from time to time of each of the Lenders, the Commitments and principal amount of Loans by each of the Lenders and the stated interest on, and each repayment in respect of the principal amount of, the Loans of each Lender. Holdings, the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive absent manifest error for such purposes), notwithstanding notice to the contrary. With respect to any Lender, the transfer of the Commitments of, and the principal (and interest) amounts of the Loans owing to, such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04. Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan.  It is intended that the Register be maintained such that the Loans and Commitments are in registered form for the purposes of the Code.

Section 13.15  Confidentiality.

(a)     Subject to the provisions of clause (b) of this Section 13.15, each Agent and Lender agrees that it will use its commercially reasonable efforts not to disclose without the prior consent of the Borrower (other than to its affiliates and its and their respective directors,

officers, employees, auditors, advisors or counsel) or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information; provided such Persons shall be subject to the provisions of this Section 13.15 to the same extent as such Lender (or language substantially similar to this Section 13.15(a)) any material, non-public information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.15(a) by such Lender, (ii) as may be required or appropriate by regulatory authorities including in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, the Collateral Agent or the Security Trustee, (vi) to any prospective or actual direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.15 (or language substantially similar to this Section 13.15(a)), (vii) to any prospective or actual transferee, pledgee or participant in connection with any contemplated transfer, pledge or participation of any of the Commitments or any interest therein by such Lender, (viii) has become available to any Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Person to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower, provided that such prospective transferee, pledge or participant agrees to be bound by the confidentiality provisions contained in this Section 13.15 (or language substantially similar to this Section 13.15(a)) and (ix) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that (A) prior to any disclosure under this clause (ix), the disclosing party agrees to provide Borrower with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrower pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (B) any disclosure under this clause (ix) shall be limited to the portion of the confidential information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (x) as may be agreed to in advance in writing by Borrower, (xi) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement; provided, that prior to receipt of confidential information any such assignee, participant, or pledgee shall have agreed in writing to receive such confidential information either subject to the terms of this Section 13.15 or pursuant to confidentiality requirements substantially similar to those contained in this Section 13.5 (and such Person may disclose such confidential information to Persons employed or engaged by them as described above) and (xii) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Credit Document; provided, further, that, to the extent permitted pursuant to any applicable law, order, regulation or ruling, and other than in connection with credit and other bank examinations conducted in the ordinary course with respect to such Lender, in the case of any disclosure

pursuant to the foregoing clause (ii), (iii) or (iv), to the extent permitted by law, such Lender will use its commercially reasonable efforts to notify the Borrower in advance of such disclosure so as to afford the Borrower the opportunity to protect the confidentiality of the information proposed to be so disclosed.

(b)     The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to Holdings, the Borrower or any of its Subsidiaries (including, without limitation, any nonpublic customer information regarding the creditworthiness of Holdings, the Borrower and its Subsidiaries); provided such Persons shall be subject to the provisions of this Section 13.16 to the same extent as such Lender.

Section 13.16  USA Patriot Act Notice.  Each Lender hereby notifies each Credit Party that pursuant to the requirements of the USA PATRIOT Act Title III of Pub. 10756 (signed into law October 26, 2001 and amended on March 9, 2009) (the "Patriot Act"), it is required to obtain, verify, and record information that identifies Holdings, the Borrower and each Subsidiary Guarantor, which information includes the name of each Credit Party and other information (including a Beneficial Ownership Certificate) that will allow such Lender to identify the Credit Party in accordance with the Patriot Act, and each Credit Party agrees to provide such information from time to time to any Lender.

Section 13.17  **[Reserved]**.

Section 13.18  Waiver of Sovereign Immunity.  Each of the Credit Parties, in respect of itself, its Subsidiaries, its process agents, and its properties and revenues, hereby irrevocably agrees that, to the extent that Holdings, the Borrower, or any of their respective Subsidiaries or any of their respective properties has or may hereafter acquire any right of immunity, whether characterized as sovereign immunity or otherwise, from any legal proceedings, whether in the United States or elsewhere, to enforce or collect upon the Loans or any Credit Document or any other liability or obligation of Holdings, the Borrower, or any of their respective Subsidiaries related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, Holdings and the Borrower, for themselves and on behalf of their respective Subsidiaries, hereby expressly waive, to the fullest extent permissible under applicable law, any such immunity, and agree not to assert any such right or claim in any such proceeding, whether in the United States or elsewhere. Without limiting the generality of the foregoing, Holdings and the Borrower further agree that the waivers set forth in this Section 13.18 shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

Section 13.19  **[Reserved]**.

Section 13.20  <u>INTERCREDITOR AGREEMENTS</u>.

(a)    EACH    LENDER    PARTY    HERETO    UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT IT (AND EACH OF ITS SUCCESSORS AND ASSIGNS) AND EACH OTHER LENDER (AND EACH OF THEIR SUCCESSORS AND ASSIGNS) SHALL BE BOUND BY THE INTERCREDITOR AGREEMENTS (AS AMENDED BY THE FINANCING ORDER), WHICH IN CERTAIN CIRCUMSTANCES MAY REQUIRE (AS MORE FULLY PROVIDED THEREIN) THE TAKING OF CERTAIN ACTIONS    BY    THE    LENDERS,    INCLUDING    THE    PURCHASE    AND    SALE    OF PARTICIPATIONS BY VARIOUS LENDERS TO EACH OTHER IN ACCORDANCE WITH THE TERMS THEREOF.

(b)    THE PROVISIONS OF THIS <u>SECTION 13.20</u> ARE NOT INTENDED TO SUMMARIZE OR FULLY DESCRIBE THE PROVISIONS OF THE INTERCREDITOR AGREEMENTS.    REFERENCE    MUST    BE    MADE    TO    EACH    INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF    THE    INTERCREDITOR    AGREEMENTS    AND    THE    TERMS    AND    PROVISIONS THEREOF,    AND    NO    AGENT    OR    ANY    OF    AFFILIATES    MAKES    ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENTS. A COPY OF    THE    INTERCREDITOR    AGREEMENTS    MAY    BE    OBTAINED    FROM    THE ADMINISTRATIVE AGENT.

(c)    THE    INTERCREDITOR    AGREEMENTS    ARE    AGREEMENTS SOLELY AMONGST THE LENDERS (AND THEIR SUCCESSORS AND ASSIGNS) AND ARE NOT AGREEMENTS TO WHICH HOLDINGS OR ANY OF ITS SUBSIDIARIES IS PARTY.    AS    MORE    FULLY    PROVIDED    THEREIN,    THE    INTERCREDITOR AGREEMENTS    CAN    ONLY    BE    AMENDED    BY    THE    PARTIES    THERETO    IN ACCORDANCE WITH THE PROVISIONS THEREOF.

Section 13.21  <u>Absence of Fiduciary Relationship.</u> Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, (i) none of the Lenders shall, solely by reason of this Agreement or any other Credit Document, have any fiduciary, advisory or agency relationship or duty in respect of any Lender or any other Person and (ii) Holdings and the Borrower hereby waive, to the fullest extent permitted by law, any claims they may have against any Lender for breach of fiduciary duty or alleged breach of Fiduciary Duty.

Section 13.22  Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumption Agreements, amendments or other Notice of Borrowings, waivers and consents) shall be deemed to include the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability, the use of a paper-based recordkeeping system, as the case may be. Notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly

agreed to by the Administrative Agent pursuant to procedures approved by it. The Administrative Agent's electronic platform or portal is provided "as is" and "as available." No Agent warrants the adequacy of the such electronic platform or portal and expressly disclaims liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Administrative Agent's electronic platform or portal. In no event shall any Agent or any of the Agent-Related Persons have any liability to the Credit Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Credit Party's or any Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct. Each Credit Party further agrees that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Credit Parties or their securities) (each, a "Public Lender"). The Credit Parties shall be deemed to have authorized the Administrative Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Credit Parties or their securities for purposes of United States federal and state securities laws. All Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Administrative Agent's electronic platform or portal designated as "Public Investor" (or another similar term). The Administrative Agent and its Affiliates and the Lenders shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Administrative Agent's electronic platform or portal not marked as "Public Investor" (or such other similar term).

Section 13.23 Entire Agreement. This Agreement and the other Credit Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements among the parties.

ARTICLE 14 Credit Agreement Party Guaranty.

Section 14.01 The Guaranty. In order to induce the Agents, the Collateral Agent, the Security Trustee and the Lenders to enter into this Agreement and to extend credit hereunder, each Credit Agreement Party hereby agrees with the Secured Creditors as follows: each Credit Agreement Party hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of its Guaranteed Obligations to the Secured Creditors. If any or all of the Guaranteed Obligations of any Credit Agreement Party to the Secured Creditors becomes due and payable hereunder, such Credit Agreement Party, unconditionally and irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Secured Creditors, or order, on demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Secured Creditors in collecting any of the Guaranteed Obligations. This Credit Agreement Party Guaranty is a guaranty of payment and not of collection. This Credit Agreement Party Guaranty is a continuing one and all liabilities to which

it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon. If claim is ever made upon any Secured Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including any the Borrower), then and in such event the respective Credit Agreement Party agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Credit Agreement Party, notwithstanding any revocation of this Credit Agreement Party Guaranty or any other instrument evidencing any liability of the Borrower, Holdings and each Credit Agreement Party shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

Section 14.02  Bankruptcy.  Additionally, each Credit Agreement Party unconditionally and irrevocably guarantees the payment of any and all of its Guaranteed Obligations to the Secured Creditors whether or not due or payable upon the occurrence of any of the events specified in Section 11.05, and irrevocably and unconditionally promises to pay such indebtedness to the Secured Creditors, or order, on demand, in lawful money of the United States.

Section 14.03  Nature of Liability.  The liability of each Credit Agreement Party hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and each Credit Agreement Party understands and agrees, to the fullest extent permitted under law, that the liability of such Credit Agreement Party hereunder shall not be affected or impaired by (a) any direction as to application of payment by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking (other than payment in cash of the Guaranteed Obligations), or (d) any dissolution, termination or increase, decrease or change in personnel by any Party, or (e) any payment made to any Secured Creditor on the Guaranteed Obligations which any such Secured Creditor repays pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Credit Agreement Party waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction by the Secured Creditors as contemplated in Section 14.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

Section 14.04  Independent Obligation.  The obligations of each Credit Agreement Party hereunder are independent of the obligations of any other guarantor or any other party, and a separate action or actions may be brought and prosecuted against any Credit Agreement Party whether or not action is brought against any other guarantor or any other party and whether or not any other guarantor or any other party be joined in any such action or actions. Each Credit Agreement Party waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment or other

circumstance which operates to toll any statute of limitations as to such Party shall operate to toll the statute of limitations as to the relevant Credit Agreement Party.

Section 14.05 <u>Authorization</u>.  To the fullest extent permitted under law, each Credit Agreement Party authorizes the Secured Creditors without notice or demand, and without affecting or impairing its liability hereunder, from time to time to:

(a)     change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Credit Agreement Party Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)     take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)     exercise or refrain from exercising any rights against any Credit Party or others or otherwise act or refrain from acting;

(d)     release or substitute any one or more endorsers, guarantors, other Credit Parties or other obligors;

(e)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) to its creditors other than the Secured Creditors;

(f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities to the Secured Creditors regardless of what liability or liabilities remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document or any of such other instruments or agreements; and/or

(h)     take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of such Credit Agreement Party from its liabilities under this Credit Agreement Party Guaranty.

Section 14.06 <u>Reliance</u>.  It is not necessary for any Secured Creditor to inquire into the capacity or powers of any officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

Section 14.07 <u>Subordination</u>.  Any indebtedness now or hereafter owing to any Credit Agreement Party is hereby subordinated to the Guaranteed Obligations owing to the Secured Creditors; and if the Administrative Agent (acting at the direction of the Required Lenders) so requests at a time when an Event of Default exists, all such indebtedness to such Credit Agreement Party shall be collected, enforced and received by such Credit Agreement Party for the benefit of the Secured Creditors and be paid over to the Administrative Agent on behalf of the Secured Creditors on account of the Guaranteed Obligations to the Secured Creditors, but without affecting or impairing in any manner the liability of any Credit Agreement Party under the other provisions of this Credit Agreement Party Guaranty. Without limiting the generality of the foregoing, each Credit Agreement Party hereby agrees with the Secured Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Credit Agreement Party Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash.

Section 14.08 <u>Waiver</u>.

(a)      Each Credit Agreement Party waives any right (except as shall be required by applicable law and cannot be waived) any right to require any Secured Creditor to (i) proceed against any guarantor or any other party, (ii) proceed against or exhaust any security held from any guarantor or any other party or (iii) pursue any other remedy in any Secured Creditor's power whatsoever. Each Credit Agreement Party waives any defense (except as shall be required by applicable statute and cannot be waived) based on or arising out of any defense of any guarantor or any other party, other than payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of any guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability other than payment of the Guaranteed Obligations to the extent of such payment. The Secured Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent, the Security Trustee or any other Secured Creditor by one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Secured Creditors may have against any party, or any security, without affecting or impairing in any way the liability of any Credit Agreement Party hereunder except to the extent the Guaranteed Obligations have been paid. Each Credit Agreement Party waives, to the fullest extent permitted under law, any defense arising out of any such election by the Secured Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Credit Agreement Party against any other party or any security.

(b)      Each Credit Agreement Party waives, to the fullest extent permitted under law, all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Credit Agreement Party Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations. Each Credit Agreement Party assumes all responsibility for being and keeping itself informed of each other Credit Agreement Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Credit Agreement Party assumes and incurs hereunder, and agrees that neither the

Administrative Agent nor any of the other Secured Creditors shall have any duty to advise any Credit Agreement Party of information known to them regarding such circumstances or risks.

Section 14.09  Maximum Liability.  It is the desire and intent of each Credit Agreement Party and the Secured Creditors that this Credit Agreement Party Guaranty shall be enforced against such Credit Agreement Party to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of any Credit Agreement Party under this Credit Agreement Party Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of such Credit Agreement Party's obligations under this Credit Agreement Party Guaranty shall be deemed to be reduced and such Credit Agreement Party shall pay the maximum amount of the Guaranteed Obligations which would be permissible under applicable law.

Section 14.10  Payments.  All payments made by a Credit Agreement Party pursuant to this Article 14 will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Section 2.06.

Section 14.11  Keepwell.  [Reserved.].

Section 14.12  Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 14.13  Acknowledgement Regarding Any Supported QFCs.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Hedge Agreements

or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).   In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

*     *     *

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

**AMERICAN COMMERCIAL LINES INC.,**
as Holdings


By: _____
Name: _____
Title: _____


**COMMERCIAL BARGE LINE COMPANY**,
as Borrower


By: _____
Name: _____
Title: _____

**CORTLAND CAPITAL MARKET SERVICES LLC,**
as Administrative Agent, Collateral Agent and Security Trustee


By: _____
Name: _____
Title: _____

[____], as a Lender


By: _____
Name: _____
Title: _____

**[Schedule 9.18]**

[To be consistent with RSA]

## Exhibit D

## Case Milestones

(a)    file, on, or within one (1) business day of the Petition Date, the Plan (as defined in the Restructuring Support Agreement), Disclosure Statement (as defined in the Restructuring Support Agreement), DIP Motion (as defined in the Restructuring Support Agreement), a motion to approve the Preferred Backstop Commitment Agreement (as defined in the Restructuring Support Agreement) and a motion scheduling a combined hearing on the Plan and Disclosure Statement;

(b)    obtain entry of an order approving the Preferred Backstop Commitment Agreement not later than thirty (30) days after the Petition Date, subject to court availability;

(c)    obtain entry of (i) the Interim Period Order not later than three (3) Business Days after the hearing on the "first-day" motions, subject to court availability, and (ii) a final DIP Order not later than forty (40) days after the Petition Date, subject to court availability;

(d)    obtain and close the ABL DIP Financing no later than (3) Business Days after the entry of the Interim Period DIP Order, which shall roll up the obligations outstanding under the Prepetition ABL Credit Agreement as of the Petition Date;

(e)    obtain entry of an order approving the Disclosure Statement and confirming the Plan (the "Confirmation Order") not later than forty-five (45) days after the Petition Date, subject to court availability; and

(f)    reach the Plan Effective Date (as defined in the Restructuring Term Sheet attached to the Restructuring Support Agreement) not later than 21 days after entry of the Confirmation Order (the "Outside Consummation Date"); provided that if, prior to the Outside Consummation Date, all conditions precedent to effectiveness of the Plan (as provided therein) have been satisfied or waived, as applicable, or, for conditions that by their nature are to be satisfied on the Effective Date, shall then be capable of being satisfied, except the requisite regulatory approvals have not been obtained (including, without limitation, approval by the Coast Guard), the Outside Consummation Date shall be automatically extended by 14 calendar days, or to such other time as agreed between the Parties.